**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: AME CHURCH EMPLOYEE RETIREMENT FUND LITIGATION, | ) ) ) ) | Lead Case No. 1:22–md–03035–STA–jay<br><br>ALL CASES |

---

**ORDER ON MOTIONS TO DISMISS CONSOLIDATED AMENDED COMPLAINT –
CLASS ACTION**

---

This multidistrict litigation concerns losses to a non-ERISA retirement plan established by the African Methodist Episcopal Church for its clergy and employees. Plaintiffs are current or retired clergy of the church and allege a number of claims under Tennessee law and, in the alternative, a series of claims under the Employee Retirement Income Security Act of 1974 ("ERISA"), against the denomination, church officials, third-party service providers to the plan, and other alleged tortfeasors. Before the Court are a series of Motions to Dismiss challenging the sufficiency of Plaintiffs' Consolidated Amended Complaint – Class Action (ECF No. 74) ("the Amended Complaint"). The African Methodist Episcopal Church, the AMEC Department of Retirement Services, the AMEC General Board, AMEC Council of Bishops, Bishop Samuel Green, and Bishop James Davis have filed a Motion to Dismiss (ECF No. 99) twelve of the Amended Complaint's seventeen counts alleged against them. Defendant Newport Group, Inc. has filed its own Motion to Dismiss (ECF No. 100), and Symetra Life Insurance Company has also filed a Motion to Dismiss (ECF No. 111). The parties have fully briefed the issues, and the Court held a motion hearing with counsel for the parties on February 23, 2023. For the reasons set forth below, each Motion to Dismiss is **GRANTED in part, DENIED in part**.

## BACKGROUND

### I. Factual Background

For purposes of deciding Defendants' Motions to Dismiss, the Court accepts the following Well-pleaded facts of the Amended Complaint as true.

**A.  <u>Plaintiffs and the African Methodist Episcopal Church</u>**

Plaintiffs and the members of the class are ministers, bishops, officers, elders, and other employees (and their respective beneficiaries) of AMEC or AMEC-related educational institutions or programs who have (i) lost money that was (or should have been) invested as part of the Church's retirement plan, (ii) had diminished investment returns because of mismanagement of the retirement plan, or (iii) found that they were never actually made participants in the plan as they were promised and should have been. (Am. Compl. ¶ 4.) The following clergy are the ten Plaintiffs named in the Amended Complaint: Reverend Pearce Ewing; Reverend Charles R. Jackson; Presiding Elder Cedric V. Alexander; Reverend Derrell Wade; Reverend Reuben J. Boyd; Presiding Elder Phillip Russ, IV; Reverend Marcius King; Reverend Matthew Ewing; Reverend A. Offord Carmichael, Jr.; and Reverend Diane Conley.  (*Id.* ¶¶ 9–18.) Plaintiffs seek to represent a class defined as

> All persons residing in the United States who are participants in the African Methodist Episcopal Church Ministerial Retirement Annuity Plan, all persons residing in the United States who are beneficiaries entitled to benefits as of January 1, 2021, under the African Methodist Episcopal Church Ministerial Retirement Annuity Plan, and all persons residing in the United States who are qualified employees of the AMEC who were not, but should have been, made participants or beneficiaries in the African Methodist Episcopal Church Ministerial Retirement Annuity Plan.[1]

(*Id.* ¶ 292.)  According to the Amended Complaint, the class consists of more then 5,000 members, though the precise number is not currently known. (*Id.* ¶ 297.)

The African Methodist Episcopal Church ("AMEC" or "the Church") was the first formally

---

[1] The Amended Complaint excludes from the Class "[a]ny Defendant employees who have responsibility or involvement in the administration of the Plan, or who are subsequently determined to be fiduciaries of the Plan, and their beneficiaries . . . ." (Am. Compl. ¶ 292.)

organized African American Christian denomination in the United States. (*Id.* ¶ 91.) The AMEC's first member church, Mother Bethel A.M.E. Church, was dedicated in Philadelphia, Pennsylvania in 1794. (*Id.* ¶ 92.) Today, the AMEC has more the 2,500,000 members and 7,000 congregations. (*Id.* ¶ 102.) The AMEC Council of Bishops ("Council of Bishops") consists of all bishops of the Church and exercises general oversight authority over church affairs. (*Id.* ¶¶ 46, 47.) This includes enforcement of the AMEC's Doctrine and Discipline.[2] The AMEC General Board ("General Board") is made up of members elected from the church. (*Id.* ¶ 41.) The General Board has authority to approve the amendments to the church retirement plan and appoint, monitor, and remove plan trustees. (*Id.* ¶ 42.)

AMEC is organized into 20 Episcopal Districts, which span 39 countries on 5 continents. (*Id.* ¶ 102.) The active bishops of the church, 21 in all, and nine general officers who manage departments within the church administer the work of the denomination. (*Id.*) The AMEC is a Pennsylvania corporation with its principal place of business in Nashville, Tennessee. (*Id.* ¶ 30.) One of the departments within the ecclesiastical structure is the AMEC Department of Retirement Services, the church department responsible for administering the retirement plan. (*Id.* ¶ 36.)[3] The AMEC Department of Retirement Services is headquartered in Memphis, Tennessee. (*Id.*)

From 2000 until June 2021, Rev. Dr. Jerome V. Harris served as the Executive Director of the AMEC Department of Retirement Services. (*Id.* ¶ 24.) In his capacity as Executive Director, Dr.

---

[2] According to the Amended Complaint, the AMEC publishes the Doctrine and Discipline every four years to provide clergy and church members updated information on church beliefs, teachings, and practices. (*Id.* ¶¶ 124, 132.) The Doctrine and Discipline also provides detail about the retirement plan, including clergy and other employees who must be enrolled by the church and required church contributions to the retirement plan on behalf of plan participants. (*Id.* ¶ 49.)

[3] Plaintiffs have made a written version of the retirement plan (ECF No. 74-1) itself an exhibit to the Amended Complaint. According to the written plan, the AMEC Department of Annuity Investments and Insurance is the Plan's "Administrator." Plan, art. I, § 1.3.

3

Harris acted as Trustee of the retirement plan, making investment decisions about the funds held by the plan. (*Id.* ¶ 140.) Dr. Harris provided annual reports to the AMEC Commission on Retirement Services of the General Board.  (*Id*. ¶ 141.)  Bishop James Davis served as the Chair of the Department of Retirement Services from 2012 until July 2016. (*Id.* ¶ 58.)  Bishop Davis was succeeded by Bishop Samuel L. Green, Sr.  (*Id*. ¶ 53.)  Bishop Green served as the Chair of the Department of Retirement Services from 2016 until July 2021. (*Id.*) During their respective tenures as Chair of the Department of Retirement Services, Bishop Davis and Bishop Green oversaw Dr. Harris's work as Executive Director of the Department. (*Id*. ¶ 142.) Plaintiffs have named the AMEC, the Council of Bishops, the General Board, the Department of Retirement Services, Dr. Harris, Bishop Davis, and Bishop Green as Defendants.

**B.  The Plan**

AMEC's retirement plan for its eligible employees has gone through several iterations since its inception in the 1960s.  (*Id.* ¶ 103.) In the mid-1990s, the original plan was renamed the "African Methodist Episcopal Church Retirement Plan." (*Id*. ¶ 104.). Two methods of contribution funded this iteration of the plan: (1) AMEC employer entities (or AMEC itself) contributed a portion of each eligible employee's compensation to the plan on behalf of the employee; and (2) eligible employees could elect to contribute additional portions of their compensation to the plan for their future retirement benefit. (*Id.* ¶ 105.)[4] After the initial creation of the Plan, AMEC organized a second,

---

[4] At its inception, the Plan provided each employee with an account, and the money in each employee's account was the employee's property. (Am. Compl. ¶ 106.) A trustee, who was tasked with managing the fund's assets, managed the money deposited into the fund. (Id. ¶ 107.)  The Plan documents gave AMEC the ability to "appoint and remove the Trustee from time to time" when "necessary for the proper administration of the Plan to assure that the Plan [was] operated for the exclusive benefit of the [eligible employees] and their Beneficiaries." (*Id*. ¶108.) These historical features of the plan as it was originally established are relevant to the extent that Dr. Harris' alleged scheme to defraud the plan of its assets began while the original plan was still in effect. As the Amended Complaint goes on to allege, the AMEC consolidated this version of the plan with two

separate retirement fund only for ministers and church elders funded entirely by AMEC. (*Id.* ¶¶ 109, 110.)   Then, on or about January 1, 2003, AMEC created a third plan, a 401(k) (defined contribution) plan for eligible employees who wished to contribute a portion of their earned compensation to the 401(k) plan. (*Id.* ¶ 111.)

At some point in or around 2005, AMEC consolidated the three separate plans into the Ministerial Annuity Plan of the African Methodist Episcopal Church (the "Plan"). (*Id.* ¶ 113.) The Plan consists of three "Levels." (*Id.* ¶ 112.) Level I is a 401(k) defined contribution feature of the Plan. (*Id.* ¶ 114.)  Level II holds retirement benefits funded by AMEC with periodic contributions equal to 12% of each plan participant's annual salary. (*Id.*) Level III provides annual contributions from the Church's General Treasury to all active Pastors and Presiding Elders. (*Id.*) A summary plan description ("SPD") currently found on the Church's website for Church employees is upon information and belief the only SPD issued by AMEC. (*Id.* ¶ 115.) The SPD describes the defined contribution plan (Level I), requiring plan participants who choose to participate to contribute a percentage of their compensation to the Plan.  Plaintiffs allege on information and belief that there is no summary plan description describing the Level II and Level III components of the Plan. (*Id.* ¶ 116.)

On or about December 19, 2001, acting on the recommendation of Dr. Harris, the AMEC General Board resolved to permit Dr. Harris to move its annuity funds to Safeco Insurance. (*Id.* ¶ 143.) On or about December 31, 2001, AMEC opened its investment account with Safeco Insurance and invested approximately $49.5 million. (*Id.* ¶ 144.)  Safeco Insurance rebranded as Symetra Life Insurance Company ("Symetra") in approximately 2005. (*Id.* ¶ 145.)  AMEC also engaged American Express Tax & Business Services ("AmEx") to operate as an independent, third-party administrator

---

other employee retirement plans to create a single retirement system for AMEC employees.

of the Plan. (*Id.* ¶ 146.) AmEx's role as third-party administrator required it to manage the Plan on a day-to-day basis, including tracking balances of plan participants and preparing and sending statements to plan participants. (*Id.* ¶ 147.) Following a series of corporate mergers and acquisitions,[5] Newport Group, Inc. ("Newport") succeeded AmEx as the plan's third-party administrator. (*Id.* ¶ 150.) Plaintiffs have named Symetra and Newport as Defendants.

## C. Dr. Harris' Companies Formed to Divert Plan Assets

In 2001, Dr. Harris set out on a long-running conspiracy to embezzle plan funds and defraud Plaintiffs. (*Id.* ¶ 153.) As part of a scheme to misappropriate plan assets, Dr. Harris set about creating a series of business organizations to further his fraudulent activities. In 2002, Dr. Harris organized AMEC Financial Services, LLC ("AMEC Financial Services") to serve as a primary vehicle for his investment schemes and business ventures with third parties. (*Id.* ¶ 154.) Among other things, AMEC Financial Services entered into a marketing alliance with Financial Technologies, LLC ("Financial Technologies"). (*Id.* ¶ 155.) Financial Technologies is an entity owned, operated, and controlled by Robert Eaton. (*Id.* ¶¶ 73, 157.) According to Plaintiffs, Financial Technologies provided unknown and possibly illusory "services" to AMEC Financial Services. (*Id.* ¶ 155.) As part of the agreement, Dr. Harris hired Financial Technologies to serve as the Church's exclusive broker of record for the Plan, for which Eaton and his company received compensation. (*Id.* ¶¶ 158, 159.)

Two years later, in 2004, the AMEC Department of Retirement Services, in conjunction with AMEC Financial Services, loaned Financial Technologies more than $500,000. (*Id.* ¶ 160.) Eaton signed the loan agreement on behalf of Financial Technologies. (*Id.*) According to the Amended

---

[5] According to the Amended Complaint, in mid-2005, H&R Block acquired the tax and business services division of AmEx and rebranded it under the name RSM McGladrey. (*Id.* ¶ 148.) H&R Block then sold RSM McGladrey to an entity called Pension Specialist, Inc., which was later rebranded as Verisite, and then merged with Newport in 2014. (*Id.* ¶ 149.)

Complaint, Eaton pledged as collateral for the loan commission checks he and Financial Technologies received from Symetra related to the plan and its assets. (*Id.*) It is not clear from the pleadings whether the commissions were earned by virtue of Financial Technologies' status as the AMEC's exclusive broker of record or on some other basis. Although the loan agreement called for Financial Technologies to repay the loan in three years, Financial Technologies obtained a favorable settlement agreement with AMEC and AMEC Financial Services roughly a year after the loan was made. (*Id.* ¶ 161.) Under the terms of the settlement agreement, AMEC and AMEC Financial Services discharged the debt owed by Financial Technologies in exchange for certain tangible and non–tangible assets that are believed to be worth far less than $500,000. (*Id*. ¶ 162.) AMEC Financial Services was administratively dissolved in 2010. (*Id*. ¶ 156.) Plaintiffs have named Financial Technologies and Robert Eaton as Defendants.

In 2006, Dr. Harris formed Financial Freedom Funds, LLC ("Freedom Funds"). (*Id.* ¶ 163.) Plaintiffs allege on information and belief that the LLC agreement creating Freedom Funds listed "AMEC Ministerial Retirement Annuity Plan" as its manager and Dr. Harris as the Plan's trustee. (*Id.* ¶¶ 164, 165.) For the next fifteen years, Dr. Harris used Freedom Funds as a vehicle to divert millions of dollars from the Department, the Plan, and the Plan's assets through high–risk, speculative, and/or fraudulent investments. (*Id.* ¶¶ 166–67.)

In 2007, Dr. Harris and Robert Eaton formed Financial Freedom Group, Inc. ("Freedom Group"), each holding a 50% interest in the company. (*Id.* ¶¶ 168–69.) Eaton served as the president of Freedom Group and acted in concert with Dr. Harris to divert money from the Department and the Plan. (*Id.* ¶¶ 170–71.) Dr. Harris and Eaton were listed as signatories for agreements involving Freedom Group. (*Id.* ¶ 172.) Freedom Group's business transactions included, inter alia, a loan of more than $500,000 from AMEC Financial Services. (*Id.* ¶ 173.)

7

In 2008, Dr. Harris formed Trinity Financial Consultants, LLC ("Trinity") and acted as its managing member.  (*Id.* ¶¶ 174–75.) Among its business dealings, Trinity entered into a management and administrative services agreement with Freedom Funds, the corporation formed by Dr. Harris and Eaton.  (*Id.* ¶ 177.)  Like his other businesses, Dr. Harris used Trinity to divert money from the Department and the Plan.  (*Id.* ¶ 176.)  Plaintiffs have named Freedom Funds and Freedom Group as Defendants. Trinity is not a party to this action.

**D. The Motorskills Investments**

Motorskill Venture Group; Motorskill Ventures 1, L.P.; Motorskill Asia Venture Group; and Motorskill Asia Ventures 1, L.P. (collectively, the "Motorskill entities") are private equity funds. (*Id.* ¶ 75.) Dr. Jerome Harris used Freedom Funds and other financial entities under his control to make high-risk investments in various the Motorskill entities. (*Id.* ¶ 178.)  Randall Erwin represented the Motorskill entities in their initial dealings with Dr. Harris and entered into various agreements with Dr. Harris. (*Id.* ¶ 179.) Jarrod Erwin, Randall Erwin's son, later took over for his father as the representative of Motorskill Entities in dealings and agreements with Dr. Harris. (*Id.* ¶¶ 180–81.) Through Motorskill Ventures Group, the Plan made investments in "Motorskill Ventures" and "Motorskill Asia Ventures." (*Id.* ¶ 182.) The Plan also made separate investments in Freedom Funds, which in turn invested in additional Motorskill Ventures Group investments called "Motorskill Ventures 1" and "Motorskill Asia Ventures 1." (*Id.* ¶ 183.)  From roughly 2005 to 2016, the Plan invested a total of between $30 million and $40 million in the Motorskill entities, typically by wiring funds from the Department's bank account to Motorskill. (*Id.* ¶¶ 184.) Dr. Harris also directed Symetra to wire funds electronically to the Motorskill entities, which Symetra did without confirming whether Dr. Harris had such authority. (*Id.* ¶ 185.)

The Motorskill entities stopped providing quarterly financial statements in 2019. (*Id.* ¶ 186.)

As a result, Dr. Harris no longer provided any information regarding these investments to Newport. (*Id.* ¶ 187.) Despite not receiving the Motorskill entities' quarterly financial statements, Newport continued to provide plan participants with quarterly statements reflecting account balances that included investments in the Motorskill entities. (*Id.* ¶ 188; *but see id*. ¶ 426) ("Consistent with AMEC's promises that the Plan's participant's retirement savings were invested in a safe, conservative investment strategy, Symetra was the only investment listed as a Plan investment on plan participants' benefits statements.").

On June 11, 2021, Dr. Harris received written notification that his investments in the Motorskill entities were virtually worthless. (*Id.* ¶ 189.) The Motorskill entities have not provided financial records or other documentation to explain how the millions of dollars invested, directly and indirectly, by the Plan evaporated. (*Id.* ¶ 190.) Plaintiffs allege on information and belief that money invested by the Plan in the Motorskill entities was recklessly invested and converted, in whole or in part, by Randall Erwin and Jarrod Erwin, other individual and corporate John Does, and unknown others. (*Id.* ¶ 191.) Dr. Harris and Eaton also, on information and belief, took a share of the converted funds, directly or indirectly. (*Id.* ¶ 192.) The funds in which the Plan invested were terminated by Motorskill. (*Id.* ¶ 193.)

The only known asset of value remaining in the Motorskill entities is an 11% membership interest in Day and Night Solar, LLC, a company formed by Robert Eaton who also acts as its president. (*Id.* ¶¶ 194, 198–99.) This asset's value is unknown but is almost certainly not anywhere close to the tens of millions of dollars that were originally invested in the Motorskill entities. (*Id.* ¶ 195.) According to the AMEC, Dr. Harris, without authority, used pension funds to issue loans to various entities, some of which have not been repaid. (*Id.* ¶ 196.) Plaintiffs allege that Dr. Harris used funds from the Department and/or the Plan to loan over a half a million dollars to Day and

Night Solar, LLC. (*Id.* ¶ 197.)  The Amended Complaint alleges on information and belief that Dr. Harris once owned a stake in Day and Night Solar. (*Id*. ¶ 200.) At some point, Dr. Harris resigned his membership interest, presumably in Day and Night Solar (the Amended Complaint does not specify) upon advice of counsel due to the conflict of interest that arose from making these loans. (*Id.* ¶ 201.) Plaintiffs believe Dr. Harris received this legal advice while working on behalf of AMEC at the time, thereby putting AMEC on notice of Dr. Harris' improper dealings. (*Id*. ¶¶ 202–203.)

### E. <u>Key Marco Property</u>

Dr. Harris invested $2.5 million of the Plan's assets in undeveloped land in Key Marco, Florida. (*Id.* ¶ 205.) The Amended Complaint alleges on information and belief that the AMEC Council of Bishops and/or the AMEC General Board had contemporaneous knowledge of the Key Marco investment. (*Id*. ¶ 206.)  A business organization known as Key Marco Holdings, LLC was listed on the note, mortgage, and loan documents associated with the undeveloped land. (*Id.* ¶ 207.) The sole member of Key Marco Holdings, LLC, is Freedom Funds. (*Id*. ¶ 208.)  A recent valuation of these properties indicates that they are worth less than half of the $2.5 million original loan amount. (*Id.* ¶ 209.)

Plaintiffs allege on information and belief that Defendant Robert Eaton recommended the investments in one or more Motorskill entities, Day & Night Solar, LLC, and Key Marco Holdings, LLC. (*Id.* ¶ 210.) Eaton made these recommendations to Dr. Harris. (*Id*. ¶ 211.) All the while, Eaton maintained his own investment stake in Day & Night Solar, LLC, and Key Marco Holdings, LLC. (*Id.* ¶ 212.) Dr. Harris compensated Eaton for his investment recommendations with funds that were withdrawn from the Plan's assets and/or returns from investments made by the Plan. (*Id.* ¶ 213.)

### F. <u>Audits by Rodney Brown and Company</u>

During Dr. Harris's tenure as Executive Director, the AMEC Department of Retirement

10

Services hired Rodney Brown and Company ("Rodney Brown") to audit the Department's financial statements. (*Id*. ¶ 215.)[6]  Rodney Brown is a certified public accounting firm located in Calumet City, Illinois. (*Id*. ¶¶ 81–82.) Rodney Brown conducted audits and certified that the total account balances of annuities held and invested on behalf of the Plan were in excess of $128 million in 2020 and 2021. (*Id*. ¶ 216.) Rodney Brown's audit report stated that the firm was required to obtain reasonable assurances that the AMEC Department of Retirement Services' financial statements were free from material misstatements.  (*Id.* ¶ 217.)  Plaintiffs allege on information and belief, however, that the reports presented by Rodney Brown were so ill supported and facially inadequate that no fiduciary of a pension fund with the size, leadership structure, and importance of the Plan could accept the reports at face value without violating the fiduciary's duty of care. (*Id*. ¶ 218.) According to the Amended Complaint, Rodney Brown lacked the size, experience, resources, and industry qualifications to audit an entity with the size and importance of the AMEC Department of Retirement Services. (*Id.* ¶ 256.)

## G. Dr. Harris' False Reports About the Plan

Between 2001 to 2021, Dr. Harris engaged in a series of transactions to divert plan assets and engaged in illegal activities and other self-dealing. (*Id.* ¶ 220.)  Dr. Harris typically reported that the various entities were performing services for the Department of Retirement Services and the Plan. (*Id.* ¶ 221.) For years during the class period, Dr. Harris regularly published written materials about

---

[6] The AMEC General Board issued an orientation handbook for its members each four-year period between the Church's quadrennial sessions. (*Id*. ¶ 223.) According to the Amended Complaint, the orientation handbook required the General Board to retain an auditor who would conduct an annual audit of the Department of Retirement Services and its contributions and investments in the Plan. (*Id.*) The Amended Complaint states that Dr. Harris, and not the General Board, retained Rodney Brown to conduct audits. The Amended Complaint contains no other allegations about whether the General Board selected its own auditor or just relied on the audits ordered by Dr. Harris.

the condition of the Plan's holdings and investments and presented those materials to plan participants at conferences. (*Id.* ¶ 219.)[7] For example, Dr. Harris delivered a report on the state of the Plan in July 2016 at the Church's 50th Quadrennial Session General Conference. (*Id.* ¶ 225.) Dr. Harris reported that at the beginning of fiscal year 2015, the Plan had a total value of $113,388,374.50 and had grown to $117,521,777.23 by the end of the fiscal year. (*Id.* ¶ 228.) Dr. Harris' written report thanked plan participants "for their continued confidence in [the] efforts to provide for their retirement future" and praised the "personal commitment and the sacrificial support of the churches that [the plan participants] serve" as the reason that "the AMEC Retirement Plan has continued to experience unparalleled growth and financial success for more than fifty-two years." (*Id.* ¶ 226–27.)

Dr. Harris delivered a similar report on the financial condition of the Plan in 2017. Dr. Harris's 2017 report stated that at the end of fiscal year 2017, the Plan portfolio had a total value of $119,800,961.03. (*Id.* ¶ 231.) Dr. Harris' report noted the impact of turmoil and uncertainty that year on financial markets at home and abroad. (*Id.* ¶ 230.) Dr. Harris nevertheless assured plan participants that the AMEC Department of Retirement Services had "continued to adhere to a conservative investment strategy which has been in place since 2001" and the Department's strategy had produced "continuous and consistent growth . . . ." (*Id.*)

Dr. Harris retired in 2021. (*Id.* ¶ 262.) At General Conference in July 2021, the Church reported that the value of the Plan's assets was nearly $130 million. (*Id.* ¶ 234.) Plan participants continued to received disbursements up until summer 2021. (*Id.* ¶ 238.)

---

[7] The AMEC General Board's orientation handbook stated that the General Board should require the Plan's executive director to provide each General Board member with a report on the Plan and its assets one month before the annual meeting of the General Board. (*Id.* ¶ 224.)

### H. **Discovery of Dr. Harris' Fraudulent Activities**

According to the Church, AMEC officials only learned of Dr. Harris's scheme in June 2021, after his retirement and as part of the transition to new department leadership. (*Id*. ¶ 236.)  On September 14, 2021, Plaintiffs and other plan participants received a letter from the Plan, notifying them that disbursements would be temporarily paused while the Plan was audited due to the change in leadership. (*Id.* ¶ 239.) The letter explained the audit would take four to six weeks. (*Id.* ¶ 240.) Sometime in the first week of November 2021, the AMEC addressed a second letter to Plaintiffs and other plan participants, stating that the audit was not complete and therefore disbursements could not resume. (*Id.* ¶ 241.)  At the conclusion of its work, a church investigative committee could only account for approximately $38 million of the Plan's assets:  $36.9 million invested with Symetra and real property in Key Marco Island, Florida, with an approximate value of  $1 million. (*Id.* ¶ 253.) In other words, between $80 million and $90 million in assets, which Dr. Harris had previously included in his annual reports, could not be accounted for.  (*Id*. ¶ 242.)

The AMEC General Board held a public meeting to address the Plan's losses on January 31, 2022. (*Id*. ¶ 244.)  The General Board confirmed that the Plan had, in fact, lost more than $90 million, though the exact amount of the losses was still unknown.  (*Id.* ¶ 245.) The General Board revealed not all Plan assets were invested in Symetra annuities, despite repeated assurances to participants over two decades. (*Id.* ¶ 247.) The meeting also disclosed that the Council of Bishops, the General Board, the Department of Retirement Services, and other church officials[8] had allowed a single individual, Dr. Harris, to exercise full decision-making authority over the management of all

---

[8] The Amended Complaint alleges that among the church officials who failed to monitor Dr. Harris were "the Trustees."  Other than this passing reference to "Trustees," the Amended Complaint does not specify whether the "Trustee" was an ecclesiastical office, does not describe the role of the "Trustee," and does not identify any individual holding such a title or office other than Dr. Harris. The Plan named Dr. Harris as its Trustee.

Plan assets. (*Id.* ¶ 248.)

Rev. James F. Miller, Dr. Harris's replacement as Executive Director of the Department of Retirement Services, spoke at the January 31, 2022 meeting. According to Rev. Miller, an internal investigation had revealed that tens of millions of dollars had been diverted into high–risk, speculative, imprudent, and possibly fraudulent investments. (*Id.* ¶ 252.) Dr. Miller commented that the office of the Executive Director had been emptied, with nothing in the office cabinets but "empty files and paperclips," not even the most current version of the Plan document. (*Id.* ¶ 251.) Dr. Miller remarked that "never again will we allow one person to count the money." (*Id.* ¶ 249.)

From these factual premises, the Amended Complaint alleges the following causes of action under Tennessee law:

• breach of fiduciary duty against AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Bishop Green, Bishop Davis, Dr. Harris, Robert Eaton, Newport, Symetra, and Rodney Brown (Count 1);

• violation of the Tennessee Uniform Trust Code for breach of trust and misappropriation of trust funds against AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Bishop Green, Bishop Davis, Dr. Harris, Robert Eaton, Newport, Symetra, and Rodney Brown (Count 2);

• negligence against AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Dr. Harris, Bishop Green, Bishop Davis, Robert Eaton, Newport, Symetra, and Rodney Brown (Count 3);

• conversion against Dr. Harris, Robert Eaton, Randall Erwin, Jarrod Erwin, Financial Freedom Funds, LLC, Financial Freedom Group, Inc., Financial Technologies, LLC, and the Motorskill entities (Count 4);

- fraudulent concealment against AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Bishop Green, Bishop Davis, Dr. Harris, Newport, Robert Eaton, Randall Erwin, Jarrod Erwin, Financial Freedom Funds, LLC, Financial Freedom Group, Inc., Financial Technologies, LLC, the Motorskill entities, and Rodney Brown (Count 5);

- fraudulent misrepresentation against AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Dr. Harris, Newport, Robert Eaton, Randall Erwin, Jarrod Erwin, Financial Freedom Funds, LLC, Financial Freedom Group, Inc., Financial Technologies, LLC, the Motorskill entities, and Rodney Brown (Count 6);

- breach of contract against AMEC (Count 7);

- promissory estoppel against AMEC (Count 8);

- outrage against AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Dr. Harris, and Robert Eaton (Count 9); and

- civil conspiracy against Dr. Harris, Robert Eaton, Randall Erwin, Jarrod Erwin, Financial Freedom Funds, LLC, Financial Freedom Group, Inc., Financial Technologies, LLC, and the Motorskill entities (Count 10).

The Amended Complaint alleges in the alternative the following ERISA claims in the event the Court determines that ERISA applies:

- claim for Plan Benefits under ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) against AMEC and the Plan (Count 11);

- breach of fiduciary duties for failing to prudently and loyally select, retain, and monitor Plan investments in violation of ERISA Section 404, 29 U.S.C. § 1104 against AMEC Department of Retirement Services, Bishop Green, Bishop Davis, and Dr. Harris (Count 12);

15

• engaging in prohibited transactions in violation of ERISA Section 406(b), 29 U.S.C. § 1106(b) against Dr. Harris and Robert Eaton (Count 13);

• breaches of fiduciary duty for failure to monitor appointed fiduciaries against AMEC, AMEC Council of Bishops, AMEC General Board, AMEC Department of Retirement Services, Bishop Green and Bishop Davis (Count 14);

• breach of fiduciary duties by failure to follow the terms of the plan in violation of ERISA Section 404, 29 U.S.C. § 1104 against AMEC, the Plan, AMEC Council of Bishops, AMEC General Board, AMEC Department of Retirement Services, Bishop Green, Bishop Davis, and Dr. Harris (Count 15);

• violation of ERISA reporting and disclosure provisions against AMEC, or in the alternative, the AMEC Department of Retirement Services or Newport (Count 16); and

• claim for co–fiduciary breaches in violation of ERISA Section 405(a), 29 U.S.C. § 1105(a) and for knowing participation in fiduciary breaches against All Defendants (Count 17).

## II. Procedural History

### A. <u>Member Cases</u>

In early 2022, Plaintiffs filed six civil actions against the Church and others across several United States District Courts: *Rev. Pearce Ewing v. African Methodist Episcopal Church et al.*, No. 2:22–cv–02136–JTF–atc (W.D. Tenn. Mar. 4, 2022); *Charles R. Jackson v. Newport Group, Inc. et al.*, No. 2:22–cv–02174–JTF–atc (W.D. Tenn. Mar. 22, 2022); *Rev. Cedric V. Alexander v. Rev. Dr. Jerome Harris et al.*, No. 8:22–cv–00707–PJM (D. Md. Mar. 22, 2022); *Phillip Russ, IV et al. v. Newport Group, Inc.*, No. 3:22–cv– 00375–BJD–LLL (M.D. Fla. Mar. 31, 2022); *Rev. Derrell Wade et al. v. Newport Group et al.*, No. 3:22–cv–00179–DN (E.D. Va. Apr. 1, 2022); *Rev. A. Offord Carmichael, Jr. et al. v. Rev. Dr. Jerome Harris et al.*, No. 3:22–cv–00386–UA–JLW (M.D.N.C.

May 19, 2022).

Plaintiff Rev. Pearce Ewing moved under 28 U.S.C. § 1407 to consolidate all proceedings in the Western District of Tennessee.  On June 2, 2022, the Panel on Multidistrict Litigation transferred the civil actions to this Court, finding that consolidation would "serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation." MDL Transfer Order 1, June 2, 2022 (ECF No. 1).   The Panel further found that consolidation in this District was appropriate since the AMEC Department of Retirement Services has its principal place of business in this District and Dr. Harris resides here. *Id*. at 2.

On June 22, 2022, the Court entered a Practice and Procedure order to govern all further proceedings.  *See* Practice & Proc. Order, June 22, 2022 (ECF No. 8). The Court held its initial case management conference with counsel for the parties on August 4, 2022, and approved the case management deadlines proposed by the parties.[9]  On August 25, 2022, the Court entered a case management order (ECF No. 78), setting forth the deadlines discussed at the initial conference. Among other things, the Court gave Plaintiffs until August 21, 2022, to file an amended pleading, and allowed discovery to commence September 9, 2022. On August 21, 2022, Plaintiffs filed a Consolidated Amended Complaint – Class Action (ECF No. 74). Defendants' Motion to Dismiss followed.  In addition to the initial conference, the Court has since had three more status conferences with the parties, the first on October 27, 2022; the next on December 14, 2022; and the most recent on February 23, 2023.

## JURISDICTION

### I.      Subject Matter Jurisdiction

---

[9] The Court had separately set a hearing for August 4, 2022, on Plaintiffs' motion for preliminary injunction (ECF No. 44). On August 3, 2022, Plaintiffs filed notice with the Court of their intention to withdraw the request. Based on Plaintiffs' decision to withdraw their request for a preliminary injunction, the Court denied the motion as moot on August 3, 2022.

The Amended Complaint alleges a proper basis for the Court to exercise original jurisdiction over this class action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d). "Congress enacted CAFA in order to 'amend the procedures that apply to consideration of interstate class actions' . . . ." *Miss. ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 165, 134 S.Ct. 736, 187 L.Ed.2d 654 (2014) (citation omitted). Specifically, CAFA "loosened the requirements for diversity jurisdiction" in certain types of "class actions"[10] by "replac[ing] the ordinary requirement of complete diversity of citizenship among all plaintiffs and defendants with a requirement of minimal diversity." *Id.* (citing *State Farm Fire & Cas. Co. v. Tashire,* 386 U.S. 523, 530–531, 87 S.Ct. 1199, 18 L.Ed.2d 270 (1967)).

Here, the amount in controversy exceeds $5 million, and the facts alleged show that "any member" of the putative class, including all of the named Plaintiffs, "is a citizen of a State different from any defendant." 28 U.S.C. §1332(d)(2)(A) & (B) ("The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs . . . ."). Plaintiffs seek at least $90 million in damages and possibly more.[11] *See* Am. Compl. ¶¶ 2, 244, 482. The Amended Complaint also alleges that named Plaintiffs are residents of Florida, Maryland, North Carolina, and Virginia, *id.* ¶¶ 9–18, while the AMEC is a Pennsylvania corporation with its principal place of business in Tennessee. *Id.* ¶ 30. These allegations establish the Court's jurisdiction under section 1332(d).

In the alternative, the Court has jurisdiction under 28 U.S.C. § 1331(a). The Amended Complaint alleges claims under ERISA, making this a civil action arising under the laws of the

---

[10] CAFA defines a "class action" to mean "any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure." *AU Optronics*, 571 U.S. at 165 (quoting 28 U.S.C. § 1332(d)(1)(B)).

[11] In a recently filed motion to compel, Plaintiffs mention a "working estimate" of "potential damages" of $400 million.  Pls. Mot. to Compel 3, Jan. 26, 2023 (ECF No. 184).

United States. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

## II.      Article III Standing

Symetra argues that Plaintiffs lack standing to sue for injuries to the Plan under settled principles of trust law. Symetra's Motion to Dismiss frames its argument as a challenge to Plaintiffs' Article III standing and therefore the Court's subject-matter jurisdiction. As a trust established for the benefit of AMEC employees like Plaintiffs, the Plan itself, as Symetra sees it, suffered the injuries alleged in the Amended Complaint. Any recovery Plaintiffs may win would only go to the trust, that is, the Plan itself. Plaintiffs are merely the beneficiaries of the trust and therefore cannot bring suit for the trust's losses.  Symetra argues then that "Plaintiffs do not have Article III standing to sue third parties such as Symetra for injuries to the Fund."  Symetra's Mem. in Support Mot. to Dismiss 8 (ECF No. 111–1).

Article III "[s]tanding is a jurisdictional requirement," and "[i]f no plaintiff has standing, then the court lacks subject-matter jurisdiction." *Tenn. Gen. Assembly v. U.S. Dep't of State*, 931 F.3d 499, 507 (6th Cir. 2019).  Even though Symetra casts the issue as a question of Article III standing, there exists a distinction between the constitutional question of standing and the "merits" question of "third party standing," that is, which party "owns" a claim or possesses the "authority" to sue. *Digital Media Sols., LLC v. S. Univ. of Ohio, LLC*, 59 F. 4th 772, 782–83 (6th Cir. 2023) ("This 'ownership' question has nothing to do with any federal 'standing' doctrine; it concerns a "merits" issue about the parties' respective legal rights under the state law that they seek to enforce.").

In the parlance of the Federal Rules of Civil Procedure, Symetra contests Plaintiffs' capacity to sue.  Capacity to sue, however, is a "distinct legal question" from standing.  *Tri–Med Fin. Co. v. Nat'l Century Fin. Enters., Inc.*, 208 F.3d 215, 2000 WL 282445, at *4 (6th Cir. Mar. 6, 2000)

(unpublished table decision); *see also Cranpark Inc. v. Rogers Grp. Inc.*, 821 F.3d 723, 730 (6th Cir. 2016) (concluding that "one who sells his interest in a cause of action is not deprived of Article III standing" but "is susceptible to a real–party–in–interest challenge"); *Norris v. Causey*, 869 F.3d 360, 367 (5th Cir. 2017) ("Courts have recognized this distinction between Article III standing and real–party–in–interest/capacity issues . . . ."); 59 Am. Jur. 2d Parties § 26 ("Capacity to sue is a threshold matter allied with, but conceptually distinct from, the question of standing.").

Rather than address Symetra's argument in the Rule 12(b)(1) context of subject-matter jurisdiction, the Court will take up the issue as part of its merits analysis of Plaintiffs' claims. Nevertheless, "[c]ourts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." *Akno 1010 Mkt. Street St. Louis Mo. LLC v. Pourtaghi*, 43 F.4th 624, 626 (6th Cir. 2022) (quoting *Hertz Corp. v. Friend*, 559 U.S. 77, 94, 130 S.Ct. 1181, 175 L.Ed.2d 1029 (2010)). Because Symetra has called into doubt Plaintiffs' Article III standing and standing is an essential element of a federal court's jurisdiction, *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 861 (6th Cir. 2020), the Court finds it advisable to address standing "as a threshold matter." *Kanuszewski v. Mich. Dept. of Health & Human Servs.*, 927 F.3d 396, 405 (6th Cir. 2019) (citing *Nikolao v. Lyon*, 875 F.3d 310, 315 (6th Cir. 2017)).

Rule 12(b)(1) of the Federal Rules of Civil Procedure permits a party to move for the dismissal of an action for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A Rule 12(b)(1) motion can raise a facial challenge to the sufficiency of the pleadings and the allegations going to the elements of standing, or a factual attack based on the evidence establishing standing. *Assoc. of Am. Physicians & Surgeons v. United States Food & Drug Admin.*, 13 F.4th 531, 543 (6th Cir. 2021) (citing *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007)). "A party raising a facial challenge argues that a complaint does not adequately

plead standing even accepting its facts as true." *Id.* (citing *Mosley v. Kohl's Dep't Stores, Inc.*, 942 F.3d 752, 756 (6th Cir. 2019)).

The Constitution limits the jurisdiction of the federal courts to a "Case" or "Controversy." U.S. Const., art. III, § 2, cl. 1. "To establish a 'case,' a plaintiff must show that the plaintiff has suffered an injury, that the defendant's conduct likely caused the injury, and that the relief sought will likely redress the injury." *Assoc. of Am. Physicians & Surgeons*, 13 F.4th at 537 (citing *TransUnion, LLC v. Ramirez*, 141 S. Ct. 2190, 2203, 210 L.Ed.2d 568 (2021)). At the pleadings stage, a plaintiff has the burden to make plausible allegations going to each of these elements. *Id.* at 543–44 (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). Furthermore, a plaintiff must "demonstrate standing for each claim [it] seeks to press and for each form of relief that is sought," *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439, 137 S.Ct. 1645, 198 L.Ed.2d 64 (2017), because "standing is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (citation omitted). Viewing the facts alleged in the Amended Complaint in a light most favorable to Plaintiffs, the Amended Complaint plausibly alleges each element of Article III standing.

A. **Plaintiffs' Injury-in-Fact**

First, Plaintiffs allege an injury-in-fact. An injury-in-fact must be both "(a) concrete and particularized, . . . and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation marks and citations omitted). An injury is concrete if it is real and "*de facto*," that is, "it must actually exist." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016) (citations omitted). The "most obvious" types of concrete injury "are traditional tangible harms" like monetary losses, meaning "[i]f a defendant has caused . . . monetary injury to the plaintiff, the plaintiff has

suffered a concrete injury in fact under Article III." *TransUnion*, 141 S.Ct. at 2204. An injury is particularized if it affects "the plaintiff in a personal and individual way." *Spokeo*, 578 U.S. at 339 (collecting cases).

The Amended Complaint alleges that all named Plaintiffs are active or retired clergy of the AMEC who participated in the Plan. Am. Compl. ¶ 4 ("Plaintiffs and the members of the class are ministers, bishops, officers, elders, and other employees (and their respective beneficiaries) of AMEC or AMEC–related educational institutions or programs . . . ."). The Amended Complaint describes what is arguably a defined contribution plan. *Id.* ¶¶ 111, 114 (listing three "levels" of the Plan, consisting of a "401(k) defined contribution" component funded by the Church and the elective contributions of plan participants and a pension benefit funded directly by the Church). Under the terms of the Plan, the AMEC was required to contribute an amount equal to 12% of each employee's annual salary to the Plan. *Id*. ¶¶ 114, 118–19. Employees could also choose to contribute amounts over and above the Church's contribution. *Id.* ¶ 121. Each Plaintiff claims to have "lost money that was (or should have been) invested" through the Plan and to have realized "diminished investment returns because of mismanagement of the [Plan] . . . ." *Id.* ¶ 4.[12] All told, Plaintiffs saw nearly two–thirds and perhaps as much as 80% of the money in their retirement accounts vanish. *Id.* ¶¶ 273, 290. A reasonable inference from these allegations is that Plaintiffs lost money they themselves had contributed to the Plan out of their earnings.  This suffices to show concrete and particularized injuries.

Plaintiffs likewise allege an actual or imminent injury. *TransUnion*, 141 S.Ct. at 2203 (citing

---

[12] The Amended Complaint also alleges certain AMEC plan participants have learned they were never actually enrolled in the Plan, even though they were eligible.  Am. Compl. ¶ 4.  None of the named Plaintiffs allege that they were improperly excluded from participation in the Plan.  For purposes of addressing the standing issue raised by Symetra, the Court finds it unnecessary to decide whether a plaintiff excluded from participation would have standing.

*Lujan*, 504 U.S. at 560–561). The Amended Complaint alleges that six named Plaintiffs are already in retirement and have been denied access to their retirement funds, both the money the Church deposited into the Plan on their behalf as well as their own contributions. These named Plaintiffs are former AMEC clergy who participated in the Plan and have now retired from active service in the Church. *Id.* ¶ 9 (Rev. Ewing); *id*. ¶ 11 (Presiding Elder Alexander); *id*. ¶ 14 (Presiding Elder Russ); *id*. ¶ 15 (Rev. King); *id*. ¶ 16 (Rev. Ewing); *id*. ¶ 282 (Rev. Jackson).[13] The retired Plaintiffs allege a present entitlement to the full amount of their retirement funds. *Id*. ¶ 139 (alleging that plan participants upon retirement are "eligible to receive the total amount of funds vested in their name, plus accrued interest"). They also allege they have been denied access to their money, either their requests for disbursements or requests to rollover their funds into an IRA. *Id.* ¶ 274 ("Each Plaintiff has been denied access to the full amount of their account balances."); ¶¶ 275–77, 283–85. The other four named Plaintiffs are current employees of the Church and continue to work in official ministry capacities for local congregations. *Id.* ¶ 12 (Rev. Wade); *id*. ¶ 13 (Rev. Boyd); *id*. ¶ 17 (Rev. Carmichael); *id*. ¶ 18 (Rev. Conley). Each active clergyperson alleges that he or she is a plan participant with vested retirement benefits in the Plan. Several have requested access to their funds and had their requests denied. *Id*. ¶ 278.

Quite simply, these allegations state an actual injury. Regardless of whether the Plaintiff is active or retired, all named Plaintiffs have received information from the Plan "that their retirement funds may be as much as 80% lower than was represented in June 2021." *Id*. ¶ 290. Because a "pocketbook injury" of the sort Plaintiffs allege is "a prototypical form of injury in fact," the Amended Complaint plausibly alleges injury–in–fact arising out of Plaintiffs' participation in the

---

[13] In one paragraph the Amended Complaint alleges that Rev. Jackson continues to work as an active clergyperson and current employee of the AMEC. Am. Compl. ¶ 10. In another paragraph, the Amended Complaint alleges that Rev. Jackson requested the disbursement of his funds "shortly after his retirement." *Id.* ¶ 282.

Church's defined contribution plan. *Collins v. Yellen*, 141 S.Ct. 1761, 1779, 210 L.Ed.2d 432 (2021); *cf. Thole v. U. S. Bank N.A.*, 140 S.Ct. 1615, 1622, 207 L.Ed.2d 85 (2020) ("Winning or losing this suit would not change the plaintiffs' monthly pension benefits [under the terms of defined benefit plan]. The plaintiffs have no concrete stake in this dispute and therefore lack Article III standing.").

### B.  Fairly Traceable

The Amended Complaint plausibly alleges the second element of Article III standing that Plaintiffs' injuries are fairly traceable to the allegedly tortious and fraudulent acts and omissions of Defendants. "[T]he relevant inquiry is whether the plaintiffs' injury can be traced to allegedly unlawful conduct of the defendant . . . ." *Collins*, 141 S.Ct. at 1779 (quoting *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)).  While there must exist a causal connection between the plaintiff's injury and the defendant's conduct, traceability is not the same thing as proximate causation.  *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014) ("Proximate causation is not a requirement of Article III standing . . . ."). "The standard for establishing traceability for standing purposes is *less demanding* than the standard for proving tort causation."  *Buchholz*, 946 F.3d at 866 (emphasis in original) (citing *Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 72 (3d Cir. 1990)). "At the pleading stage, the plaintiff's burden of alleging that their injury is fairly traceable to the defendant's challenged conduct is relatively modest." *Id*. (quoting *Bennett v. Spear*, 520 U.S. 154, 171, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997)) (cleaned up).

The Amended Complaint names ten Plaintiffs and 18 Defendants (not including ten unidentified Doe Corporations and John Does 1 through 10) and contains ten counts under Tennessee law and seven under ERISA. Each count would hold certain Defendants liable for

personal injuries suffered by Plaintiffs (and members of the putative class they seek to represent), claims sounding in trust, tort, contract, and fraud. All of the claims allege that but for the conduct of the Defendants named in that count, Plaintiffs would not have suffered the financial injuries to their retirement accounts. For instance, Plaintiffs would hold the AMEC, the Department of Retirement Services, the General Board, the Council of Bishops, Dr. Harris, Bishop Green, Bishop Davis, Robert Eaton, Newport, Symetra, and Rodney Brown liable for negligence (Count 3). The Amended Complaint alleges that each owed Plaintiffs a "duty to exercise due care in the management and oversight of their assets invested in the Fund" and that their breach of duty caused Plaintiffs' losses. Am. Compl. ¶¶ 385, 387, 394–95.[14] These allegations satisfy Plaintiffs' "relatively modest" burden to allege a causal connection between their injuries and Defendants' conduct.

## C. Redressability

As for the third and final element of Article III standing, Plaintiffs seek remedies that would redress their injuries. "To determine whether an injury is redressable, a court will consider the relationship between the 'judicial relief requested' and the 'injury' suffered." *Calif. v. Texas*, 141 S.Ct. 2104, 2115, 210 L.Ed.2d 230 (2021) (quoting *Allen*, 468 U.S. at 753, n.19)). A plaintiff must allege that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *R. K. by and through J. K. v. Lee*, 53 F.4th 995, 1001 (6th Cir. 2022) (citing *Lujan*, 504 U.S. at 561). The United States Court of Appeals for the Sixth Circuit has described redressability as "a low bar to clear" in cases "where a plaintiff seeks redress for a completed violation of a legal right." *Id*. (citing *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802, 209 L.Ed.2d

---

[14] Defendants have argued in part that the Amended Complaint fails to state the claim because Plaintiffs have not alleged how any Defendant's breach of duty caused Plaintiffs' injuries. That argument is couched in terms of Tennessee law on proximate causation. The standard under Article III is not that demanding.

94 (2021)).  The Amended Complaint seeks money damages and several types of equitable and injunctive relief to remedy the losses Plaintiffs have suffered and to enjoin any conduct that may have contributed to their losses. A favorable decision on these requests would redress their injuries. Suffice it to say, Plaintiffs have cleared the "low bar" for redressability.

Having concluded that Plaintiffs have met the irreducible minimum of Article III standing, the Court holds that Plaintiffs have constitutional standing to press their claims for relief.  Therefore, the Court is satisfied it has subject-matter jurisdiction over this action.

## STANDARD OF REVIEW

Defendants' Motions to Dismiss argue that several of the Amended Complaint's counts fail to state a plausible claim for relief.  A defendant may move to dismiss a claim "for failure to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6).  Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion, the Court must treat all of the well–pleaded allegations of the pleadings as true and construe all of the allegations in the light most favorable to the non–moving party. *Elec. Merchant Sys. LLC v. Gaal*, 58 F.4th 877, 882 (6th Cir. 2023) (citing *Taylor v. City of Saginaw*, 922 F.3d 328, 331 (6th Cir. 2019)).  However, legal conclusions or unwarranted factual inferences need not be accepted as true. *Fisher v. Perron*, 30 F.4th 289, 294 (6th Cir. 2022) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).

Under Rule 8 of the Federal Rules of Civil Procedure, a complaint need only contain "(1) a short and plain jurisdictional statement, (2) a short and plain statement of the claim, and (3) an explanation of the relief sought." Fed. R. Civ. P. 8(a).  "That's it. By listing these elements, Rule 8 implicitly 'excludes other requirements that must be satisfied for a complaint to state a claim for relief.'" *Gallivan v. United States*, 943 F.3d 291, 293 (6th Cir. 2019) (citing Antonin Scalia & Bryan

26

A. Garner, *Reading Law: The Interpretation of Legal Texts* § 10, at 107 (2012) (other citation omitted). Rule 8's notice pleading standard does not require "detailed factual allegations." *Iqbal*, 556 U.S. at 681.

But Rule 8 does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* "Although the rule encourages brevity," a plaintiff must nevertheless "say enough to give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (citing *Dura Pharm. v. Broudo*, 544 U.S. 336, 346, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)). "Rule 8 does not empower [a plaintiff] to plead the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss." *Iqbal*, 556 U.S. at 687. In order to survive a motion to dismiss, the plaintiff must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level" and to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). This means, a complaint "must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *Smith v. Gen. Motors LLC*, 988 F.3d 873, 877 (6th Cir. 2021) (citing *Boland v. Holder*, 682 F.3d 531, 534 (6th Cir. 2012)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *see also Ryan v. Blackwell*, 979 F.3d 519, 524 (6th Cir. 2020) ("A complaint must contain enough 'factual matter' to raise a 'plausible' inference of wrongdoing.") (quotation omitted).

The AMEC Defendants and Newport also argue that Plaintiffs' claims sounding in fraud fail to satisfy the heightened pleading standards for those claims. A party "alleging fraud" must "state

with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "Rule 9(b) requires that the plaintiff specify the 'who, what, when, where, and how' of the alleged fraud." *New London Tobacco Mkt., Inc. v. Ky. Fuel Corp.*, 44 F.4th 393, 410–11 (6th Cir. 2022) (quoting *Sanderson v. HCA–The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006)). This means the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* at 411 (quoting *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008)). The plaintiff must also provide a description of "the fraudulent scheme" and "the resulting injury." *Id.* (quoting *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466–67 (6th Cir. 2011)). Even though Plaintiffs allege claims sounding in fraud under Tennessee law and the substantive law of Tennessee governs Plaintiffs' burden of proving fraud, "Rule 9(b) governs the procedure for pleading fraud in all diversity suits in federal court." *Id.* at 410 n.10 (citing *Minger v. Green*, 239 F.3d 793, 800 (6th Cir. 2001)).

## <u>CHOICE OF LAW</u>

Plaintiffs allege their ERISA claims in the alternative to a number of other claims under state law. One of the primary issues presented in the Motions to Dismiss is whether ERISA should apply at all in this case. "Congress enacted ERISA to protect the interests of participants in employee benefit plans and their beneficiaries by setting out substantive regulatory requirements for employee benefit plans and to provide for appropriate remedies, sanctions, and ready access to the Federal courts." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004) (citing 29 U.S.C. § 1001(b)) (cleaned up). In order to achieve its purpose of creating "a uniform regulatory regime over employee benefit plans," ERISA includes "expansive pre-emption provisions . . . intended to ensure that employee benefit plan regulation would be exclusively a federal

28

concern." *Id.* (quoting *Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 523, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981)).

However, ERISA does not apply to all retirement plans, including "church plans." ERISA defines a "church plan" as "a plan established and maintained . . . for its employees (or their beneficiaries) by a church or by a convention or association of churches which is exempt from tax under section 501 of Title 26." 29 U.S.C. § 1002(33). ERISA does not apply to a "church plan" unless the plan affirmatively elects to be governed by ERISA. 29 U.S.C. § 1003(b)(2) ("The provisions of this subchapter shall not apply to any employee benefit plan if such plan is a church plan (as defined in section 1002(33) of this title) with respect to which no election has been made under section 410(d) of Title 26."). The Sixth Circuit has held that "the existence of an ERISA plan is a nonjurisdictional element of [an] ERISA claim." *Russell v. Catholic Healthcare Partners Emp. Long Term Disability Plan*, 614 F. App'x 271, 274 (6th Cir. 2015) (citing *Daft v. Advest, Inc.*, 658 F.3d 583, 587 (6th Cir. 2011)).

The Amended Complaint does not allege that the Plan has elected to be an ERISA plan. (*Id.* ¶ 126.) In fact, the pleadings disclaim that "[a]ny references to ERISA in the pleadings are not intended to assert that the Plan is an ERISA Plan." *Id.* Plaintiffs simply allege that Defendants have agreed to govern the Plan as if it is an ERISA plan, making certain remedies available as a result of Defendants' conduct. (*Id.* ¶ 127.)[15] The Amended Complaint alleges that Plaintiffs' claims under ERISA are alleged in the alternative in the event "Defendants provide lawful proof that the Plan is an

---

15  For example, on its first page, the Plan's SPD declares that "[t]he Plan is subject to federal laws, such as ERISA (the Employee Retirement Income Security Act)." Am. Compl. ¶ 117; *see also id.* ¶ 123 (stating that "[w]hile the Plan document in Plaintiffs' possession, effective January 1, 2006, conflicts on whether the Plan is directly governed by ERISA, the Plan's operative Plan Document expressly states that the Plan is to be construed and enforced according to ERISA"). Likewise, each version of the AMEC's Doctrine and Discipline from 2000 to 2016 (the most current edition) states that the Plan "shall be consistent with and comply with all requirements of the Employee Retirement Income Security Act (ERISA)." *Id.* ¶ 133.

ERISA plan or should the Court determine that the Plan is an ERISA plan." (*Id*. ¶ 127.)

In their Motion to Dismiss, the AMEC Defendants argue that the Plan has not elected to be an ERISA plan, and at the motion hearing, the parties agreed that ERISA would not apply in this case. The Court would also point out that the Plan, which Plaintiffs have made an exhibit to the Amended Complaint, states that "[t]he Plan is a non–electing Church Plan." Plan, § 9.13 (ECF No. 74–1); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").  In light of the plain language of the Plan itself, the fact that the Amended Complaint alleges the Church has not formally elected to make its Plan an ERISA plan, and the concessions made by the parties at the motion hearing, the Court holds that ERISA does not govern the Plan. Therefore, the Amended Complaint fails to state a claim under ERISA, and Defendants' Motions to Dismiss are **GRANTED** as to the ERISA claims.

This leaves Plaintiffs' claims under state law. The Court has jurisdiction over the claims by virtue of the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d).  As in any case where the Court exercises jurisdiction under section 1332, the Court applies the law of the forum state, including the forum's choice-of-law rules.  *Loreto v. Procter & Gamble Co.*, 515 F. App'x 576, 578 (6th Cir. 2013) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). The parties have briefed the substantive law of the state of Tennessee in their motion papers.  The Court will assume for purposes of deciding the questions of law presented in the Rule 12(b) Motions that Tennessee law governs the parties' dispute.

As part of its application of Tennessee law, the Court must follow "a ruling from the state supreme court." *Smith*, 988 F.3d at 878 (citing *In re Darvocet, Darvon & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917, 937 (6th Cir. 2014)).  Without a clear ruling from the Tennessee Supreme Court, the *Erie* doctrine requires this Court to "predict[] how the state supreme court would

30

rule by looking to all available data, including decisions of the states' appellate courts." *Smith*, 988 F.3d at 878 (internal citation omitted); *see also Lindenberg v. Jackson Nat'l Life Ins. Co.*, 912 F.3d 348, 358 (6th Cir. 2018) (citing Tenn. Sup. Ct. R. 4(G)(2) for the proposition that a published opinion of the Tennessee Court of Appeals is "controlling authority for all purposes unless and until such opinion is reversed or modified by a court of competent jurisdiction").

## ANALYSIS

The AMEC Defendants, Newport, and Symetra each seek the dismissal of several claims alleged against them in the Amended Complaint. Defendants contest the sufficiency of the pleadings as to several claims under Tennessee law. Before reaching each of the issues presented, the Court first addresses some of the preliminary questions raised in the Motions to Dismiss, including the presentation of matters outside of the pleadings and Plaintiffs' capacity to sue for injuries to the Plan.

### I. Matters Outside the Pleadings

As part of their arguments on Defendants' Motions to Dismiss, the parties have adduced certain information not found in the Amended Complaint. Newport has cited a 2001 services agreement (ECF No. 100-3) between the Church and Newport's predecessor AmEx. During oral arguments on the Motions to Dismiss, Plaintiffs for their part referred to new information they had obtained in discovery concerning Dr. Harris' communications with Symetra in 2008 and argued that the new information added even more support for their existing claims. Plaintiffs did not formally move to introduce any evidence into the record or even make the exhibits part of the record of the hearing. The question though is whether the Court can properly consider any of this information, Newport's services agreement or Plaintiffs' discovery of new facts to support their claims, in assessing the sufficiency of the pleadings.

If a court considers matters outside the pleadings in deciding a motion to dismiss, the Court

must treat the motion to dismiss as a motion for summary judgment and give all parties "a reasonable opportunity to present all material pertinent to the motion." *Gaal*, 58 F.4th at 883 (citing *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680 (6th Cir. 2011)).  However, a court retains the discretion to consider "exhibits attached [to the complaint], public records, [and] items appearing in the record of the case . . . . without converting the motion to one for summary judgment." *Id*. Moreover, a court may also consider "exhibits attached to a defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein." *Id*.

In light of these standards, the Court declines to consider any of the information not found in the Amended Complaint as part of its ruling on Defendants' Motions to Dismiss.  First, the services agreement between AmEx and the Church is not an exhibit to the Amended Complaint, a public record, or an item appearing in the record of the case. And while Newport attached the services agreement to its Motion to Dismiss, the Amended Complaint does not refer to the agreement, and the agreement is not central to Plaintiffs' claims against Newport. The Amended Complaint makes a single allegation about the Church hiring AmEx "as an independent third-party administrator of the Plan" and then describes AmEx's role in that capacity. Am. Compl. ¶¶ 146–47.  Plaintiffs have made no allegations about the agreement itself.  Furthermore, it is not clear to the Court how the agreement is central to Plaintiffs' claims. Plaintiffs have not alleged that Newport breached the agreement its predecessor had with the Church. Plaintiffs would hold Newport liable for its alleged violation of fiduciary and common law duties Newport owed to Plaintiffs and its breach of trust in violation of the Tennessee Uniform Trust Code.  The Court understands that Newport relies on the agreement to support its position that Newport had no duty to corroborate any of the financial information furnished to Newport by Dr. Harris.  But without some showing that the pleadings refer to the services agreement and the agreement is central to Plaintiffs' claims against Newport, the

Court is not convinced that it should consider the agreement in deciding Newport's Motion to Dismiss.

The information described by Plaintiffs at the motion hearing appears to be even less appropriate for the Court's consideration at the pleadings stage. Counsel for Plaintiffs made representations to the Court about the content of certain emails between Dr. Harris and Symetra employees, concerning the possibility that the Plan had engaged in a prohibited transaction in 2008. Counsel for Plaintiffs also indicated to the Court that Plaintiffs would likely seek leave to amend their pleadings to include these and other facts as additional support for their causes of action. But that just underscores the point that the information is a discovery revelation, and not part of the existing pleadings. Therefore, the Court will not consider it in making its determination of Defendants' Motions to Dismiss.

## II. Capacity to Sue or Be Sued

The Motions to Dismiss next raise questions concerning the capacity of Plaintiffs to sue on behalf of the Plan and the capacity of certain AMEC Defendants to be sued. Symetra contends that Plaintiffs, all individuals participating in the Plan, cannot sue as representatives of the Plan, a trust presumably established under Tennessee law. In its Motion to Dismiss, the Church has moved for the dismissal of Plaintiffs' claims against the AMEC Council of Bishops and General Board, arguing that as subdivisions of the Church, both entities are not amenable to suit.

Federal Rule of Civil Procedure 17(b) establishes the process for determining a party's capacity to sue or be sued, depending on the legal nature of the party. Fed. R. Civ. P. 17(b). For individuals like Plaintiffs, Rule 17(b)(1) states that the law of the individual's domicile governs capacity to sue or be sued, unless the person is suing in a representative capacity. Fed. R. Civ. P. 17(b)(1). For corporations like the Church, Rule 17(b)(2) requires the Court to ascertain capacity

"by the law under which [the corporation] is organized." Fed. R. Civ. P. 17(b)(2).  For all other types of parties, Rule 17(b)(3) applies and states "the law of the state where the court is located" determines the party's capacity to sue or be sued.  Fed. R. Civ. P. 17(b)(3).  This final provision includes the capacity of a party suing on behalf of a trust. *Doermer v. Oxford Fin. Grp., Ltd.*, 884 F.3d 643, 648 (7th Cir. 2018) (quoting Rule 17(b)(3)); *see also Coverdell v. Mid–South Farm Equip. Ass'n*, 335 F.2d 9, 12 (6th Cir. 1964) (identifying a Tennessee trust as an "unincorporated association" for purposes of Rule 17(b)(3)).  Tennessee law, the law of the state where this Court sits, supplies the governing law to determine Plaintiffs' capacity to sue as representatives of the Plan.  Pennsylvania law, the law under which the AMEC was incorporated, will determine the Council of Bishops and the General Board's capacity to be sued.

As a procedural matter, the parties contesting capacity to sue or be sued have the burden on their lack of capacity defenses. Capacity is "an affirmative defense, not a jurisdictional issue." *Davis v. Lifetime Cap., Inc.*, 560 F. App'x 477, 478 (6th Cir. 2014) (citing *Brown v. Keller*, 274 F.2d 779, 780 (6th Cir. 1960)); *see also De Saracho v. Custom Food Mach., Inc.*, 206 F.3d 874, 878 (9th Cir. 2000) ("The question of a litigant's capacity or right to sue or to be sued generally does not affect the subject matter jurisdiction of the district court.") (citation omitted)).  Typically, a party must raise an affirmative defense in its responsive pleading (which Symetra has not yet filed), or else waive the defense, and then marshal evidence to make out the defense. *Brent v. Wayne Cnty. Dep't of Human Servs.*, 901 F.3d 656, 680 (6th Cir. 2018) ("Federal Rule of Civil Procedure 8(c) requires defendants to raise affirmative defenses in their first responsive pleadings; the failure to do so may result in waiver of the defense."). Unlike standing, Plaintiffs have no specific duty to plead facts to demonstrate their representative capacity to bring the suit.  Fed. R. Civ. P. 9(a)(1)(A) & (B) (stating that "a pleading need not allege a party's capacity to sue or be sued [or] a party's authority to sue or

34

be sued in a representative capacity"). A court may nevertheless grant a motion to dismiss on the basis of an affirmative defense "if the facts [alleged] conclusively establish the defense as a matter of law." *In re McKenzie*, 716 F.3d 404, 412 (6th Cir. 2013) (citing *Hensley Mfg. v. ProPride, Inc.,* 579 F.3d 603, 613 (6th Cir. 2009)).[16]

## A. <u>Plaintiffs' Capacity to Sue in a Representative Capacity</u>

As the Court has already noted, Symetra contests Plaintiffs' "standing" to sue for injuries to the Plan itself. The Amended Complaint alleges three claims under Tennessee law against Symetra: breach of fiduciary duty (count 1), breach of trust in violation of the Tennessee Uniform Trust Code (count 2), and negligence (count 3). The Court has concluded that the Amended Complaint makes plausible allegations to satisfy Plaintiffs' burden of pleading their Article III standing to bring these claims. As the Court's discussion of Plaintiffs' Article III standing already suggests, Plaintiffs have plausibly alleged not only injuries to the Plan and the dissipation of Plan assets but also injuries to Plaintiffs themselves, stemming from conduct directed to Plaintiffs. For example, Plaintiffs allege Symetra is liable for breaches of fiduciary duties and common law duties Symetra allegedly owed not just to the trust but to Plaintiffs themselves. Am. Compl. ¶ 327 ("Symetra owed Plaintiffs and other Class members fiduciary duties . . . ."); *id.* ¶ 385 (alleging that Symetra's "special relationship with Plaintiffs and other Class members . . . gave rise to a duty to exercise due care in the

---

[16] In framing its capacity argument as a challenge to Plaintiffs' standing, Symetra stated that its Rule 12(b)(1) Motion to Dismiss was a facial challenge to the facts alleged in the Amended Complaint. Symetra's Mem. in Support Mot. to Dismiss 11 (ECF No. 111-1). Symetra argued in a footnote that Plaintiffs' lack of Article III standing was apparent from the face of the Amended Complaint. *Id*. at n.6. Symetra went on to argue in the same footnote that the Court should engage in further factfinding "before allowing the case to progress further" and treat the Rule 12(b)(1) Motion as a factual challenge "if the Court concludes that Plaintiffs' lack of standing is uncertain." *Id*. For the reasons stated above, Symetra's facial attack on Plaintiffs' Article III standing fails, and the burden rests with Symetra to show from the pleadings that Plaintiffs lack the capacity to sue for torts and injuries to the Plan itself. The Court finds no basis then to proceed with any factfinding as part of a Rule 12(b)(1) factual attack on Plaintiffs' standing.

management and oversight of their assets invested in the Fund"). These specific allegations illustrate that Plaintiffs have not pursued their breach of fiduciary duty or negligence claims against Symetra merely for the vindication of the rights of the Plan. Plaintiffs obviously have capacity to sue on their own behalf for injuries of this kind.

Still, the Amended Complaint obviously alleges that Plaintiffs are beneficiaries of the Plan, a trust established by the Church for the benefit for its employees. In their capacity as trust beneficiaries, Plaintiffs arguably assert their breach of trust claim against Symetra for injuries to the Plan and seek the recovery of assets belonging to the trust and held by the trust for Plaintiffs' benefit. *Id.* ¶ 380 (seeking "damages sufficient to restore the value of the Fund and its distributions to what they would have been had the breach of trust not occurred") (citing Tenn. Code Ann. § 35–15–1002). Symetra's argument goes to Plaintiffs' capacity to pursue claims of this sort, something other than Plaintiffs' Article III standing to lodge the claims and not as a constitutional question but a matter of Tennessee law.

Assuming without deciding that Symetra's argument goes to Plaintiffs' capacity to bring all of their Tennessee law claims against Symetra (and not just the breach of trust claim), the issue presented is whether the facts of the Amended Complaint "conclusively establish" as a matter of law Plaintiffs' lack of representative capacity to sue a third party like Symetra for injuries to the trust and its assets. *In re McKenzie*, 716 F.3d at 412. The Court holds that Symetra has not met that burden at the pleadings stage. In fact, the Amended Complaint plausibly alleges that Plaintiffs have the capacity to sue third parties for injuries to the Plan as a matter of Tennessee trust law.

Before the Court applies Tennessee trust law to the facts presented in Symetra's Motion to Dismiss, a brief word is in order about the law of trusts in Tennessee and its sources. "Tennessee generally follows the common law" of trusts. *In re Cannon*, 277 F.3d 838, 854 (6th Cir. 2002)

36

(applying Tenn. law and collecting cases). In addition to the common law of trusts, Tennessee has adopted the Tennessee Uniform Trust Code, its own version of the Uniform Trust Code, which itself is "a codification of the common law of trusts," though with "a number of innovative provisions," none of which appear to be relevant at the pleadings stage in this case. Tenn. Code Ann. § 35–15–101, 2013 Restated Cmts. The TUTC explains that "[t]he common law of trusts and principles of equity supplement [the TUTC], except to the extent modified by this chapter or another statute of this state." § 35–15–106(a). Even though the Tennessee version is based on a model or uniform code, "[t]he Tennessee Uniform Trust Code leaves certain issues concerning beneficiaries to the common law." § 35–15–103, 2013 Restated Cmts; § 35–15–106(a) ("The Uniform Trust Code, although comprehensive, does not legislate on every issue."). The Comments appended to the TUTC also supplement "[t]he statutory text of the [TUTC] . . . , which, like the Comments to any uniform act, may be relied on as a guide for interpretation. § 35–15–106, 2013 Restates Cmt.  Lastly, the Comments to the TUTC are replete with references to the Restatement (Second) and (Third) of Trusts.  As an *Erie* proposition, the Court predicts the Tennessee Supreme Court would look to each of these sources in arriving at any decision of Tennessee trust law, including the capacity of a trust beneficiary to sue a third party for injuries to the trust.  Having identified the relevant sources of Tennessee trust law, the Court now considers the issue of Plaintiffs' capacity to bring claims against Symetra on behalf of the Plan.

"Under the common law, a trustee can maintain an action in law or equity against a third person to remedy an injury with respect to trust property as if [the trustee] held the property free of the trust; generally, beneficiaries of the trust cannot." *In re Cannon*, 277 F.3d at 854 (collecting Tenn. cases and citing Restatement (Second) of Trusts §§ 280–82) (other citations omitted).[17]

---

[17] As noted, the Comments to the Tennessee Uniform Trust Code refer extensively to the

However, a beneficiary may pursue a cause of action against a third party when the trustee has committed a breach of trust and "a third party commits an independent wrong against the trust or participates in the trustee's breach of fiduciary duty." *Id*. at 854–55 (citing *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.,* 530 U.S. 238, 252, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000) and Restatement (Second) of Trusts § 294); *see also Foshee v. Forethought Fed. Sav. Bank*, No. 09–2674–JPM–dkv, 2010 WL 2650733, at *7 (W.D. Tenn. July 1, 2010); Restatement (Third) of Trusts § 107(2)(b), cmt. c(2) (2012) ("Similarly, evidence that the trustee and the third party are committing or have committed a breach of trust may justify action by a beneficiary, as may a showing that the trustee is unsuitable to protect the beneficiaries because of the trustee's conflicting interests (see § 78, Comment *e*).").   In sum, under Tennessee law and the common law of trusts, a beneficiary "has two causes of action, one against the trustee and another against the third party and should proceed by joining both in the same action." *In re Cannon*, 277 F.3d at 855 n.6 (quoting Restatement (Second) of Trusts § 294 cmt. a).

Although trust beneficiaries like Plaintiffs would generally lack the capacity to sue a third party for injury to trust assets, Plaintiffs' claims against Symetra fall squarely within the common law exception, at least as far as the pleadings show. The Amended Complaint alleges that the Plan's

---

Restatement (Second) and (Third) of Trusts.  The Comments to the statute do not, however, specifically embrace Restatement (Second) of Trusts §§ 280 through 82 or § 294.  The Court is nevertheless bound to accept these sections as accurate statements of Tennessee trust law.  The Sixth Circuit in *In re Cannon* cited these sections of the Restatement as the law in Tennessee, even though the issue presented in *In re Cannon* was not the same issue presented in this case.  When a panel of the Court of Appeals "has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of [the Court of Appeals], unless an intervening decision of the state's highest court has resolved the issue." *Rutherford v. Columbia Gas*, 575 F.3d 616, 619 (6th Cir. 2009).  Following *In re Cannon*, the Court finds it very likely the Tennessee Supreme Court would look to these sections of the Restatement to arrive at its determination of the issue of whether trust beneficiaries have capacity to sue third parties for injuries to the trust.

trustee Dr. Jerome Harris breached his fiduciary duties to the trust and to the beneficiaries of the trust, including Plaintiffs and the putative class. Because Dr. Harris allegedly breached a series of fiduciary duties, Tennessee law permits Plaintiffs to bring suit against Dr. Harris as well as any third party "commit[ting] an independent wrong against the trust or participat[ing] in the trustee's breach of fiduciary duty." *Id*. at 854–55. The Amended Complaint alleges that Symetra breached certain fiduciary and common law duties Symetra owed the trust and the beneficiaries of the trust. The Amended Complaint also alleges that Symetra committed breaches of trust in violation of the Tennessee Uniform Trust Code. These allegations constitute "independent wrong[s] against the trust." *Id*. The facts alleged support the legal conclusion that Plaintiffs as beneficiaries of the trust may pursue claims on behalf of the trust against Dr. Harris and Symetra.

Additionally, the Restatement (Second) of Trusts also permits "a trust beneficiary" to bring an equity suit "against a third party for property improperly diverted from the trust if: (i) 'the trustee improperly refuses or neglects to bring an action against the third person;' or (ii) 'there is no trustee.'" *Osborn v. Griffin*, 865 F.3d 417, 447 (6th Cir. 2017) (quoting Restatement (Second) of Trusts § 282(2)–(3) (1959) and predicting that the Kentucky Supreme Court would adopt § 282 as the law of that state). In this case the Amended Complaint plausibly alleges that Symetra committed certain breaches of duty and trust at times while Dr. Harris was still trustee. There is no allegation that Dr. Harris or any of his successor trustees took any action on behalf of the trust to recover from Symetra prior to Plaintiffs' filing their underlying lawsuits. On the contrary, the AMEC brought a Cross–Complaint (ECF No. 116) against Symetra in October 2022, more than a year after Dr. Harris's alleged scheme came to light and months after Plaintiffs took action on their own. Even then, the Church, and not the current trustee of the Plan, Dr. James Miller,

39

is the named Cross–Plaintiff pursuing the claims.  Dr. Miller is not even a party to the litigation.[18] The Court concludes then that the allegations of the Amended Complaint and the record of the proceedings bring Plaintiffs' case within the ambit of Restatement (Second) Trusts § 282(2).

Symetra primarily relies for support on a nonbinding, out-of-circuit decision, *Jones v. KPMG LLP*, No. 1:17CV319–LG–RHW, 2019 WL 6895960 (S.D. Miss. Dec. 18, 2019).  In *Jones*, after it came to light an employer had defaulted on its contributions to its employee retirement plan, a plan participant brought breach of fiduciary duty claims against a third-party company hired to conduct audits of the plan's annual financial statements.  The third-party auditor filed a motion to dismiss, arguing that the plan participant lacked standing and that her claims were moot based on the appointment of a special fiduciary to pursue claims on the plan's behalf.  The Southern District of Mississippi considered the plan participant's "standing" in light of Restatement (Third) of Trusts § 107 (2012) and Mississippi trust law. *Jones*, 2019 WL 6895960, at **1–2 (citing principles of Article III standing but then stating that the parties "appear to agree that the question of standing or mootness in this case is governed by trust law").

Section 107(2) states "[a] beneficiary may maintain a proceeding related to the trust or its property against a third party only if (a) the beneficiary is in possession, or entitled to immediate distribution, of the trust property involved; or (b) the trustee is unable, unavailable, unsuitable, or improperly failing to protect the beneficiary's interest." Restatement (Third) of Trusts § 107(2)

---

[18] On this point Symetra asserts "Plaintiffs affirmatively plead that Dr. Miller is actively protecting the Fund's interests." Def.'s Mem. in Support Mot. to Dismiss 10 (citing Am. Compl. ¶ 249). The fact allegation cited from the Amended Complaint though merely states "Rev. James F. Miller, Dr. Harris's replacement as Executive Director of the Department of Retirement Services, promised that 'never again will we allow one person to count the money.'" Symetra's burden is to show that the facts alleged in the Amended Complaint "conclusively establish" Plaintiffs' lack of capacity to bring claims against Symetra on behalf of the Plan.  A single allegation about Dr. Miller's assurances about the future of the plan has little or no bearing on whether Dr. Miller is taking action against Symetra to protect the Plan's assets.

(2012). Section 107(3) permits the appointment of a "trustee ad litem . . . to maintain a proceeding against a third party on behalf of the trust and its beneficiaries." *Id.* at § 107(3). The Southern District of Mississippi concluded that the plan participant could no longer maintain her claims against a third party because she had settled her breach of fiduciary duty claim against the original plan trustee and an appointed special fiduciary had filed a separate action against the third-party auditor. Therefore, the *Jones* court dismissed without prejudice the claims of the plan participant for lack of jurisdiction.

The Court finds *Jones* illustrative but procedurally and legally distinguishable. Unlike the proceedings in *Jones*, there has been no appointment of a "special fiduciary" or any other "trustee ad litem" to pursue claims on behalf of the AMEC Plan. Restatement (Third) of Trusts § 107(3) (permitting the appointment of a "trust ad litem"). The appointment of the special fiduciary in *Jones* and the special fiduciary's pursuit of plan claims against the auditor clearly rendered any separate action by a plan participant moot and incompatible with the requirements of Restatement (Third) of Trusts § 107(3). Unless and until the Court appoints a trustee ad litem, an extraordinary development none of the parties have requested at this point, section 107(3) has no application in this MDL matter.

What is more, unlike the plan participant in *Jones*, Plaintiffs here allege an "entitle[ment] to immediate distribution, of the trust property involved" under section 107(2)(a). Six of the named Plaintiffs are currently in retirement, have made requests for the immediate distribution of the money held in trust for their benefit, and had their requests denied. The other four named Plaintiffs also allege that they have vested benefits under the terms of the Plan and have had their requests for disbursements denied. This is arguably enough to satisfy the requirements of section 107(2)(a). And as the Court has already explained, the failure of Dr. Harris or Dr. Miller to take prompt action

41

against Symetra allows Plaintiffs to bring claims on behalf of the Plan against Symetra, consistent with section 107(2)(b). Restatement (Third) of Trusts § 107(2)(b) (permitting beneficiary actions against third parties where "(b) the trustee is unable, unavailable, unsuitable, or improperly failing to protect the beneficiary's interest").

More fundamentally, the court in *Jones* recited Article III "standing" principles but then proceeded to analyze the plan participant's "standing," not as a constitutional question but as a question "governed by trust law" in Mississippi. *Jones*, 2019 WL 6895960, at *2. The court also recited the fact that the plan participant had already settled a claim against the original trustee of the plan, suggesting the plan participant had had Article III standing to pursue the claim in the first place. *Jones*'s reliance on the Restatement (Third) of Trusts implies that its holding was really a decision on whether the plan participant could continue to act on behalf of the trust, not whether she satisfied Article III. The issue does not implicate the Court's subject-matter jurisdiction but goes to the merits of a trust beneficiary's capacity to sue. *Digital Media Sols.*, 59 F. 4th at 783. In the final analysis, the Southern District of Mississippi's application of Restatement (Third) Trusts § 107 is not inconsistent with the Court's ruling that Plaintiffs have capacity to sue Symetra for damages to the Plan itself. Therefore, Symetra's Motion to Dismiss due to Plaintiffs' lack of capacity to sue is **DENIED**.

**B.  The Capacity of the AMEC Council of Bishops and General Board To Be Sued**

In their Motion to Dismiss, the AMEC Defendants argue that the Court should dismiss any claim against the Church's Council of Bishops and General Board. The Church argues that any claim Plaintiffs may have is against the Church, not any of its constituent departments, committees, or boards. AMEC analogizes the issue to subdivisions of local government. Just as a plaintiff may only sue a county for the acts of its departments or divisions, Plaintiffs cannot name the Council of

Bishops or General Board and must instead pursue their claims against the Church.  Plaintiffs respond that the Council of Bishops and the General Board have defined roles in church governance and specific duties related to the administration of the Plan.  The Council of Bishops and General Board are therefore indispensable parties, particularly in light of Plaintiffs' requests for prospective equitable and injunctive relief regarding the Plan.

The Court holds that the Church has not carried its burden to show why the Court should dismiss the Council of Bishops and General Board at the pleadings stage.  The facts of the Amended Complaint do not "conclusively establish" the Church's affirmative defense as a matter of Pennsylvania law that the Council and the Board lack the capacity to be sued.  The capacity of any board or subdivision within the Church to be sued raises a question of Pennsylvania law, the state under whose laws the Church was incorporated.  The Church has not cited any authority for its position under Pennsylvania or any other state's law of corporations. Due to the AMEC's failure to address that specific question, the Court must deny the Church's request that the Council and the Board be dismissed as parties at the pleadings stage.

The only legal authority cited by the Church is a somewhat inapt analogy to civil rights actions brought under 42 U.S.C. § 1983.  That area of law is complex, to say the least.  On its own terms, § 1983 creates a cause of action against "[e]very person" who causes "a citizen of the United States or other person within the jurisdiction thereof" to suffer a deprivation of their civil rights. 42 U.S.C § 1983.  The United States Supreme Court has held that a municipality is a "person" under § 1983. *Greene v. Crawford Cnty., Mich.*, 22 F.4th 593, 616 (6th Cir. 2022) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). "A state itself, its departments, and its officials are not." *Sherman v. Mich. Dep't of Nat. Res.*, 799 F. App'x 318, 322 (6th Cir. 2020) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70–71, 109

S.Ct. 2304, 105 L.Ed.2d 45 (1989)). Against this backdrop, district courts in the Sixth Circuit routinely hold that a municipality, that is, a city or county government, is the proper "person" to sue under § 1983, for the acts of law enforcement agencies operating as subdivisions of municipal government. *Grace v. City of Ripley, Tenn.*, No. 2:16–cv–2395–JPM–dkv, 2017 WL 835206, at *5 (W.D. Tenn. Mar. 2, 2017) (collecting cases). The Court finds that § 1983 and the nuanced body of case law applying it has little persuasive value on the question of whether the Council of Bishops and General Board have the capacity to be sued under state law on corporations. Therefore, the AMEC Defendants' Motion to Dismiss is **DENIED** on this issue.

### III. Breach of Fiduciary Duty (Count 1 – Newport and Symetra)

Count 1 of the Amended Complaint would hold Newport and Symetra liable for breach of fiduciary duty, a claim asserted under Tennessee law. In their separate Motions to Dismiss, both Newport and Symetra seek dismissal of the claim. Newport argues it is not a fiduciary, either as fiduciary per se or owing to any confidential relationship with Plaintiffs. There is no allegation that Newport is a fiduciary per se because Plaintiffs do not allege a legal relationship of any kind with Newport. And there is no allegation of a confidential relationship where Newport was in a position to influence or control any Plaintiff. The plan document itself did not name Newport as a fiduciary. Symetra makes similar arguments that the Amended Complaint fails to allege any plausible facts to show that Symetra was a fiduciary for purposes of Tennessee law. Plaintiffs' allegations about Symetra's "control over management and disposition of Fund assets," Am. Compl. ¶ 23, and its "authority or control respecting management or control of [Fund] assets," *id.* ¶ 327, are legal conclusions, not factual allegations. The Plan itself does not name Symetra as a fiduciary, and Plaintiffs have not alleged that the designated plan administrator or trustee delegated fiduciary

responsibilities to Symetra.  Symetra's act of selling an annuity and holding annuity funds did not make Symetra a fiduciary.

Even if Newport or Symetra was a fiduciary, Defendants argue nothing in the Amended Complaint shows how either breached its fiduciary duty. According to both Defendants, third-party administrators have no duty to detect mismanagement and breach no duty to plan participants by failing to detect mismanagement.  Lastly, Newport and Symetra contend the Amended Complaint does not allege how any breach of fiduciary duty caused Plaintiffs' injuries.  The Complaint shows that an intervening criminal act of embezzlement resulted in the Plan's losses.

Plaintiffs disagree.  The determination of whether a party is a fiduciary is fact intensive and depends on a party's function, control, and authority over a plan, regardless of whether a plan names that party as a fiduciary. Furthermore, Tennessee statutes like the Uniform Fiduciaries Act and the Tennessee Uniform Trust Code adopt a functional definition of who qualifies as a fiduciary. The Plan names the AMEC Department of Retirement Services as the plan administrator but also grants the Department authority to appoint other parties to assist it in the execution of the Department's fiduciary duties. To the extent that other courts have held that third-party administrators are not fiduciaries, they have reached that conclusion as a matter of ERISA law and usually at summary judgment, not on a motion to dismiss.

In order to recover for breach of fiduciary duty, a plaintiff must establish: (1) a fiduciary relationship, (2) breach of the resulting fiduciary duty, and (3) injury to the plaintiff or benefit to the defendant as a result of that breach. *Faber v. Ciox Health, LLC*, 331 F.Supp.3d 767, 780 (W.D. Tenn. 2018) (citing *In re Estate of Potter*, 2017 WL 4546788, at *2 (Tenn. Ct. App. Oct. 11, 2017) and *Ann Taylor Realtors, Inc. v. Sporup*, No. W2010–00188COA–R3–CV, 2010 WL 4939967 (Tenn. Ct. App. Dec. 3, 2010) and; *see also* 37 C.J.S. *Fraud* § 15 (2008).  The first issue presented then is whether Symetra or Newport acted as a fiduciary.

45

"A fiduciary is a person holding the character of a trustee who bears the duty to act primarily for the benefit of another." *Sanford v. Waugh & Co., Inc.*, 328 S.W.3d 836, 843 (Tenn. 2010) (citing *McRedmond v. Estate of Marianelli*, 46 S.W.3d 730, 738 (Tenn. Ct. App. 2000)).  A fiduciary duty is the highest standard of duty under the law. *Overstreet v. TRW Com. Steering Div.*, 256 S.W.3d 626, 642 (Tenn. 2008) (citation omitted).  In Tennessee, a party can be either a fiduciary per se or a fiduciary due to a confidential relationship. *Faber*, 331 F.Supp.3d at 780 (citing *Grant v. Tucker*, 57 F.Supp.3d 852, 859 (M.D. Tenn. 2014)).  Tennessee law recognizes several kinds of fiduciaries per se: an agent owes a fiduciary duty to its principal, *Knox–Tenn Rental Co. v. Jenkins Ins., Inc.*, 755 S.W.2d 33, 36 (Tenn. 1988) ("An agent is a fiduciary with respect to the matters within the scope of his agency."); attorneys to their clients, *Crawford v. Logan*, 656 S.W.2d 360, 364 (Tenn.1983); guardians and conservators to their wards, *Freeman v. Martin,* 181 S.W.2d 745, 746 (Tenn. 1944); directors and officers of a corporation to the corporation and its shareholders, *Sanford*, 328 S.W.3d at 843; employees to their employers, *Efird v. Clinic of Plastic & Reconstructive Surgery*, 147 S.W.3d 208, 219 (Tenn. Ct. App. 2003); and realtors to their clients, *Ann Taylor Realtors, Inc. v. Sporup*, No. W2010–00188–COAR3V, 2010 WL 4939967, at *3 (Tenn. Ct. App. Dec. 3, 2010); *see also Comm'rs of Powell–Clinch Util. Dist. v. Util. Mgmt. Review Bd.*, 427 S.W.3d 375, 388–89 (Tenn. Ct. App. 2013) (collecting cases).

The parties have not cited any authority under Tennessee law for the proposition that a third-party plan administrator owes any fiduciary duty to the plan participants.  As a general proposition, "the existence or nonexistence of a duty owed by the defendant to the plaintiff is a question of law for the court to decide." *EPAC Techs., Inc. v. HarperCollins Christian Publishing, Inc.*, 398 F.Supp.3d 258, 270 (M.D. Tenn. 2019) (quoting *Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn.

46

1993)). While there exists no case directly on point, the Court is guided by related rules announced in reported decisions of the Tennessee Court of Appeals.  First, trustees owe a fiduciary duty to the beneficiaries of the trust. *Blackburn v. Blackburn*, 63 S.W.3d 338 (Tenn. Ct. App. 2001) (citing *Gillespie v. Branham*, 337 S.W.2d 689, 691 (Tenn. Ct. App. 1959)). Although neither Newport nor Symetra were trustees, the Plan granted the Administrator of the Plan the authority to select fiduciaries and nonfiduciaries who could provide the Plan with professional services.  Plan, art. I, § 1.6. The Court considers this aspect of the Plan in more depth below.

The Tennessee Court of Appeals has also held that those who broker or render investment advice to clients can take on fiduciary status, depending "on the degree of discretion the client has entrusted to the broker or advisor." *Orlowski v. Bates*, 146 F.Supp.3d 908, 927 (W.D. Tenn. 2015) (quoting *Johnson v. John Hancock Funds*, 217 S.W.3d 414, 428 (Tenn. Ct. App. 2006)).  The execution of a "non–discretionary and at arm's length" transaction, for example, "a simple order to buy or sell a particular stock," does not take on a fiduciary character.  *Id*.  However, a broker or advisor who is asked for and gives professional investment advice or who has discretion to select investments for the client has "broad fiduciary obligations that extend beyond the individual transactions." *Id*.  In other words, "[t]he relationship arises when one person reposes special trust and confidence in another person and that other person—the fiduciary—undertakes to assume responsibility for the affairs of the other party."  *Overstreet*, 256 S.W.3d at 642. The fiduciary "upon whom the trust and confidence" is entrusted has "a duty to act for and to give advice for the benefit of the other person on matters within the scope of the relationship." *Id.* (citing *McRedmond*, 46 S.W.3d at 738; and Restatement (Second) of Torts § 874 cmt. a (1979)).

The Court holds that the Amended Complaint plausibly alleges that both Newport and Symetra were fiduciaries. The Court gives separate consideration to Plaintiffs' fiduciary allegations against each company.

## A. Newport Group's Fiduciary Duty

Concerning Newport, the pleadings allege that the company "was a fiduciary by virtue, among other things, of its status and authority as a third-party administrator to the Fund." Am. Compl. ¶ 21. In its capacity as a third-party administrator, Newport owed Plaintiffs unspecified fiduciary duties "because it had substantial discretion and control over the management and oversight of the Fund's assets and each participant's balance." *Id*. ¶ 325. Newport breached its fiduciary duties by

a) Failing to require all regular financial statements from all Plan investments;

b) Continuing to report Fund investments as maintaining their full value even after Fund investments stopped providing regular financial statements;

c) Failing to ensure that all investments made by the Fund were made by a Plan representative acting within the scope of his authorization; and

d) Permitting Defendant Harris and his co–conspirators (as a result of the failures enumerated above) to engage in a long–term pattern of financial mismanagement, embezzlement, fraud, and misrepresentations concerning the Fund.

*Id.* ¶ 326.

The Court holds that Plaintiffs have plausibly alleged Newport's fiduciary status, both under the terms of the Plan and by Newport's alleged role as a third-party administrator. The Court starts with construing the terms of the Plan itself. "The interpretation of a trust agreement is a question of law for the court." *Glass v. SunTrust Bank*, 523 S.W.3d 61, 66 (Tenn. Ct. App. 2016) (citing *Holder v. First Tenn. Bank N.A. Memphis*, No. W1998–00890–COA–R3–CV, 2000 WL 349727, at *3 (Tenn. Ct. App. Mar. 31, 2000)). The Plan named the AMEC Department of Annuity Investments

48

and Insurance, which is not a party to this action, as the Plan's "Administrator," Plan, art. I, § 1.3;

the Church as the "Employer," *id*. at art I, § 1.17, and Dr. Harris as the "Trustee." The Plan

identified these parties as well as "any Investment Manager" as the "named Fiduciaries" of the Plan.

*Id*. at art. IX, § 9.11.  An "Investment Manager" was defined as "a person, firm, or corporation

registered as an investment adviser under the Investment Advisers Act of 1940, a bank, or an

insurance company" that "(a) has the power to manage, acquire, or dispose of Plan assets and (b)

acknowledges fiduciary responsibility to the Plan in writing." *Id*. at art. I, § 1.30

As "named Fiduciaries," each of these parties, the AMEC Department of Annuity

Investments and Insurance ("the Administrator"), the Church ("the Employer"), Dr. Harris ("the

Trustee"), and any "Investment Manager," had "only those specific powers, duties, responsibilities,

and obligations as are specifically given them under the Plan including, but not limited to, any

agreement allocating or delegating their responsibilities, the terms of which are incorporated herein

by reference." *Id*. at art. IX, § 9.11.  The Plan specified that the Administrator in its capacity as a

"named Fiduciary" had "the sole responsibility for the administration of the Plan, including, but not

limited to, the items specified in Article II of the Plan, as the same may be allocated or delegated

thereunder." *Id.* Article II then listed the duties of the Administrator, including the duty "to compute,

certify, and direct the Trustee with respect to the amount and the kind of benefits to which any

Participant shall be entitled hereunder" and the duty "to assist any Participant regarding the

Participant's rights, benefits, or elections available under the Plan." *Id.* at art. II, § 2.3(b) & (l).  The

Plan also charged the Administrator with "keep[ing] a record of all actions taken and [keeping] all

other books of account, records, policies, and other data that may be necessary for proper

administration of the Plan and [the responsibility] for supplying all information and reports to the

Internal Revenue Service, Department of Labor, Participants, Beneficiaries and others as required by law." *Id*. at art. II, § 2.4.

In recognition perhaps of the scope of the duties assigned to the Administrator, the Plan authorized the Administrator ("or the Trustee with the consent of the Administrator") to appoint "counsel, specialists, advisers, agents (including nonfiduciary agents) and other persons as the Administrator or the Trustee deems necessary or desirable in connection with the administration of this Plan . . . ." *Id.* at art. II, § 2.5. This included "agents and advisers to assist with the administration and management of the Plan, and thereby to provide, among such other duties as the Administrator may appoint, assistance with maintaining Plan records and the providing of investment information to the Plan's investment fiduciaries and to Plan Participants." *Id.*  As Article II of the Plan implies, some of these "agents" or other third-party service providers were "nonfiduciary" and others were "fiduciary."  So in addition to the "named Fiduciaries," the Plan identified as a "fiduciary"

> any person who (a) exercises any discretionary authority or discretionary control respecting management of the Plan or exercises any authority or control respecting management or disposition of its assets, (b) renders investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of the Plan or has any authority or responsibility to do so, or (c) has any discretionary authority or discretionary responsibility in the administration of the Plan.

*Id*. at art. I, § 1.20.

The Court construes the Plan to name the Administrator, the AMEC Department of Annuity Investments and Insurance, as a plan fiduciary and grant it the exclusive authority and duty "to compute" the benefits of Plan participants, "to assist" a Plan participant in understanding the participant's rights and benefits under the Plan, to keep all records necessary for the proper administration of the Plan, and to supply "*all* information" to plan participants.  Plan, art. II, §§ 2.3(b) & (l), 2.4 (emphasis added).  The Plan also gives the Administrator the discretion to appoint

"agents" to assist in these facets of plan administration. *Id.* at art. II, § 2.5.  Separately, the Plan required the Administrator to "direct the Trustee, as of each Valuation Date, to determine the net worth of the assets comprising the Trust Fund as it exists on the Valuation Date." *Id.* at art. V, § 5.1.  Reading each of these provisions together and the Plan as a whole, the Administrator exercised these duties of plan administration in a fiduciary capacity.

A reasonable inference from the Amended Complaint is that the Administrator retained Newport to assist in Plan recordkeeping, in communicating information such as participant balances to Plan participants, and in the calculating the values of the Plan's net assets. Plaintiffs plausibly allege Newport was one of the "agents and advisers" selected by the Administrator "to assist with the administration and management of the Plan," specifically, "assistance with maintaining Plan records and the providing of investment information to the Plan's investment fiduciaries and to Plan Participants." *Id*.

The question becomes then did the Administrator's delegation of its own fiduciary duty for these aspects of plan administration make Newport a "fiduciary" of the unnamed sort defined in the Plan, or merely a "nonfiduciary agent"?  The Court holds that for purposes of the Motion to Dismiss, Newport was a "fiduciary." First, under the terms of the Plan, the Amended Complaint alleges facts to show that Newport meets the plan definition of a "fiduciary."  The Plan states that a "fiduciary" is one who "has any discretionary authority or discretionary responsibility in the administration of the Plan." *Id*. at art. I, § 1.20. The Amended Complaint alleges that Newport had "authority" as a "third party administrator" of the Plan, Am. Compl. ¶ 21, and provided Plan participants with quarterly financial statements. *Id.* ¶ 188.  Plaintiffs contend that Newport "continued" to include Plan investments in the Motorskills entities after 2019, even though Newport was no longer receiving quarterly financial statements to validate the Plan's investments in Motorskills.  *Id*. The

commonsense inference from these allegations is that Newport exercised something more than simply a reporting function of a nonfiduciary character and had some measure of professional, specialized discretion over how to report the Plan's holdings to participants. This is enough to show that Newport exercised "*any* discretionary authority or discretionary responsibility in the administration of the Plan." *Id*. at art. I, § 1.20 (emphasis added).

Additionally, the allegations show that Newport was a fiduciary as a matter of Tennessee common law. Newport had a principal-agent relationship with Plan participants, giving rise to a fiduciary duty to provide accurate Plan information to participants when Newport prepared and furnished statements to participants about the value of the Plan's assets. *Knox–Tenn Rental Co.*, 755 S.W.2d at 36 ("An agent is a fiduciary with respect to the matters within the scope of his agency."). The Amended Complaint alleges Newport acted as an agent to assist the Administrator, a "named Fiduciary" under the terms of the Plan, in carrying out specific duties granted to the Administrator and delegated to Newport by the named Fiduciary. While it is true the Plan recognized the possibility of the Administrator appointing "nonfiduciary agents," the Amended Complaint alleges that Newport had some degree of professional discretion over the methods by which Newport collected information about the Plan's assets, calculated the value of each beneficiary's share of those assets, and then reported the information to each beneficiary. In terms of the Tennessee case law, Newport may not have held "broad fiduciary obligations" but did not merely carry out "non–discretionary and at arm's length" transactions on behalf of the Administrator. *Orlowski*, 146 F.Supp.3d at 927 (quoting *Johnson*, 217 S.W.3d at 428). In the ERISA context, "[f]iduciary status is a fact–intensive inquiry, making the resolution of that issue inappropriate for a motion to dismiss." *Wallace v. Int'l Paper Co.*, 509 F.Supp.3d 1045, 1052 (W.D. Tenn. 2020) (quoting *In re Regions Morgan Keegan ERISA Litig.*, 692 F. Supp. 2d 944 (W.D. Tenn. 2010)); *see also* Plan, art. IX,§ 9.3 (stating that the

Plan must be construed according to ERISA "and the laws of the State of Tennessee, other than its laws respecting choice of law, to the extent not pre–empted by the Act"). At the pleadings stage and without a fully developed evidentiary record, the Amended Complaint plausibly alleges enough facts to show that Newport was a fiduciary.

Newport resists this conclusion relying in part on the services agreement its corporate predecessor had with Dr. Harris. As the Court has already noted, Newport has attached a copy of the services agreement to its Motion to Dismiss and cited the express language of the agreement, stating that Newport was not a fiduciary. The Court has already declined to consider the agreement and its contents at the pleadings stage. Even if the Court were to take the agreement into consideration as part of its ruling on the Motion to Dismiss, the agreement itself would not alter the Court's conclusion that Newport was a fiduciary. The agreement states that Newport's predecessor "is acting as a service provider and not in fiduciary capacity" and was not being "retained as a Trustee or Plan Administrator" nor "for investment advice." Servs. Agr. 3 (ECF No. 100–3). Whether Newport or its predecessor in interest owed a fiduciary duty, however, is a question of law for the Court to decide. *EPAC Techns.*, 398 F.Supp.3d at 270 (quoting *Bradshaw*, 854 S.W.2d 865 at 869). A single disclaimer in an engagement letter is not conclusive or dispositive of the question.

Furthermore, the services agreement states that Newport had the duty to prepare "quarterly valuations" of Plan assets and "quarterly participant statements" and provide an "annual reconciliation of plan assets." The Plan assigned these duties to the Administrator of the Plan, a "named Fiduciary," and gave this named Fiduciary the authority to delegate its duties. The Amended Complaint plausibly alleges that Newport failed to carry out this delegated duty. Even though the agreement permitted Newport to rely on the accuracy of "asset data provided by the company" (presumably the Church, Dr. Harris, or the Department of Annuity and Insurance), the Amended

53

Complaint alleges that Newport improperly included data, i.e. investments in the Motorskills entities, when Dr. Harris did <u>not</u> actually provide it. Therefore, the agreement, at least at the pleadings stage, does not show that Newport was not a fiduciary or that Newport did not undertake any fiduciary duty.

### B. Symetra's Fiduciary Duty

As for Symetra, the pleadings allege that the company "was a fiduciary by virtue, among other things, of its exercise of control over management and disposition of Fund assets." Am. Compl. ¶ 23. In this capacity Symetra owed Plaintiffs fiduciary duties "because it had 'authority or control respecting management or control of [Fund] assets.'" *Id.* ¶ 327. Symetra breached its fiduciary duties by

> a) Failing to establish and/or maintain controls, processes, and procedures in a manner consistent with trust law standards and reasonably calculated to protect the Fund from mismanagement, self–dealing, embezzlement, or other misconduct by Fund fiduciaries;
>
> b) Failing to adequately ensure that all withdrawals and disbursements from the Fund were made by a Plan representative acting within the scope of his authorization; and
>
> c) Permitting Defendant Harris and his co–conspirators (as a result of the failures enumerated above) to engage in a long–term pattern of financial mismanagement, embezzlement, fraud, and misrepresentations concerning the Fund.

*Id.* ¶ 328.

The Court holds that just as with Newport, Plaintiffs have plausibly alleged Symetra's fiduciary status, both under the terms of the Plan and as a consequence of Symetra's alleged role as a third-party manager of the Plan's annuity funds. The Plan granted the Trustee authority to purchase annuities from "responsible insurance companies, to be selected by the Administrator, as an investment of the Trust Fund" like Symetra. Plan., art. VII, § 7.3(k). The Amended Complaint alleges that the Plan "opened its investment account" in December 2001 and "invested

54

approximately" $49.5 million in annuities purchased from Symetra's corporate predecessor. *Id.* ¶ 144. However, Symetra did not just sell the Plan an annuity. The $49.5 million annuity purchased by the Plan from Symetra represented the full corpus of the trust in 2001. The Amended Complaint alleges that the funds representing the Symetra annuity was and continues to be held in an account with Symetra and constitutes the Plan's largest single asset. This is not to say that Symetra was the Plan's "Investment Manager." Plan, art. I, § 1.30 (defining the term to mean "a person, firm, or corporation registered as an investment adviser under the Investment Advisers Act of 1940, a bank, or an insurance company" that "(a) has the power to manage, acquire, or dispose of Plan assets *and (b) acknowledges fiduciary responsibility to the Plan in writing*") (emphasis added). At the same time, Symetra was not merely "a bank or trust company pursuant to the terms of its usual and customary bank agency agreement" retained by Dr. Harris for "custodial, clerical and record–keeping" duties. *Id.* at art. VII, § 7.2(b).[19]

The Amended Complaint goes on to allege that Symetra acted on instructions from Dr. Harris to disburse funds and over a period of years those disbursements had the effect of depleting a significant portion of the Plan's total assets. For example, Dr. Harris used an unspecified amount of Plan funds held with Symetra to make transfers and investments in the Motorskills entities, Am. Compl. ¶¶ 184–85, and other ventures founded by Dr. Harris and Eaton. *Id.* ¶ 171 ("For roughly fourteen years, Defendant Harris, in conjunction with Defendant Robert Eaton, used Freedom Group as a vehicle to divert money from the Department, the Plan, and the Fund."). Overall, the pleadings

---

[19] The facts alleged are also inconsistent with the idea that Symetra was as "a nonfiduciary agent" retained "to assist the Trustee in carrying out any investment instructions of Participants and of any Investment Manager or Fiduciary . . . ." Plan, art. VII, § 7.3(r). While Plaintiffs allege that Symetra executed Dr. Harris' instructions to transfer assets from time to time and Dr. Harris is clearly one of the Plan's "named fiduciaries," the Amended Complaint does not allege how Symetra simply "carried out any investment instructions" given by Dr. Harris. As the Court discusses more fully below, Symetra had at least some discretion over the "disposition" of Plan assets.

do not state how much of the Plan's money held by Symetra was diverted by Dr. Harris and Eaton. The Amended Complaint just alleges that after 20 years of doing business with Symetra, the Plan's balance in its investment account had gone from $49.5 million in December 2001, *id.* ¶ 144, to $36.9 million in 2021. *Id.* ¶ 253. The reasonable inference from the fact that the Plan purchased annuities worth a little less than $50 million in 2001, then for the next 20 years earned a rate of return on the annuities and received additional Plan contributions from the Church and Plan participants as well, but ended up with less than $37 million after two decades is that Dr. Harris moved tens of millions of dollars out of the Plan's account with Symetra.

Symetra also paid commissions to one of Dr. Harris' alleged co-conspirators, Robert Eaton, commissions Eaton used as collateral to obtain improper loans for one of his own companies from the Plan. *Id.* ¶ 160. The particulars of this allegation are somewhat vague. At the motion hearing, the parties differed over the nature of the commissions received by Eaton. Counsel for Symetra represented to the Court that the commissions were paid on behalf of the Church or the Plan at the direction of Dr. Harris; counsel for Plaintiffs stated Eaton acted on behalf of Symetra. Confined as it is to the fact pleadings and viewing the allegation in a light most favorable to Plaintiffs, the Court construes the Amended Complaint to allege that Eaton received a commission from Symetra, that is, a "fee paid to an agent or employee for a particular transaction." Black's Law Dictionary (11th ed. 2019). This reasonably implies that Eaton acted as an agent or employee of Symetra at some point during the course of the transactions between the Plan and Symetra.[20]

---

[20] The allegations could be read to show Symetra met the Plan's definition of a "fiduciary" because it "render[ed] investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of the Plan or has any authority or responsibility to do so." Plan, art. I, § 1.20(b) (defining a "fiduciary" as a person who "(b) renders investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of the Plan or has any authority or responsibility to do so"). The Amended Complaint does not directly allege these facts as a basis for finding that Symetra was a "fiduciary."

The upshot of these allegations is that Symetra was not merely a non-discretionary, third-party service provider with which the Plan conducted its annuity business but rather a "fiduciary" with some modicum, however small, of "discretionary authority or control respecting management or disposition of [the Plan's] assets." Plan, art. I, § 1.20(a) (defining a "fiduciary" as a person who "(a) exercises any discretionary authority or discretionary control respecting management of the Plan or exercises any authority or control respecting management or disposition of its assets"). The Amended Complaint alleges that Dr. Harris essentially used the Symetra investment account to fund all of his other improper investments on behalf of the Plan, perhaps to the tune of as much as $90 million. Plaintiffs' allegations plausibly suggest that Symetra had actual knowledge of when, where, and to whom Dr. Harris was transferring Plan assets, including his transfers to the Motorskills entities. Symetra counters that the company had a contractual duty to execute transfers or disbursements authorized by Dr. Harris, being as he was the authorized "Trustee" of the Plan. As Symetra conceded at oral argument, though, this duty was not unbound. For example, counsel for Symetra acknowledged that Symetra would not carry out a transaction at Dr. Harris's direction when Symetra had actual notice the transaction was illegal. Whatever the precise contours of this limiting principle may be, the fact is Symetra had discretion to evaluate the lawfulness of a directive from Dr. Harris and could theoretically refuse the directive if Symetra had reason to know it was improper. In short, Symetra retained some degree of discretion over the "disposition of assets."

The question presents a somewhat close call. But at the pleadings stage, the Amended Complaint alleges enough factual matter to show that Symetra carried out functions which satisfied the Plan's definition of a "fiduciary" and that Symetra acted as a fiduciary under Tennessee law. The Amended Complaint alleges more than a simple "at arm's length" or "non–discretionary" transaction of business over a period of 20 years. Symetra appears to have been the Plan's primary

57

institutional investment company, holding an initial annuity investment making up the entirety of the Trust's assets and receiving subsequent contributions to the Plan from the Church on behalf of its employees and the plan participants themselves.  Symetra apparently still acts as the custodian of nearly $40 million held by the Plan. In its course of dealings with Dr. Harris, Symetra acted on orders to transfer millions of dollars of Plan's assets out of presumably conservative, Symetra annuities and into other investments or ventures. The allegations may not point to "broad fiduciary obligations." *Orlowski*, 146 F.Supp.3d at 927 (quoting *Johnson*, 217 S.W.3d at 428).  And discovery may eventually bear out Symetra's claim that it had no discretion and simply executed Dr. Harris' orders. The Amended Complaint's allegations are nevertheless enough to show that Symetra exercised some level of discretion over the disposition Plan assets and conferred fiduciary status on Symetra. On a Rule 12(b)(6) motion to dismiss, these allegations are enough to make the claim about Symetra's fiduciary status plausible.

## C. <u>Breach of Fiduciary Duty and Causation</u>

Having determined that the Amended Complaint plausibly alleges the fiduciary status of these Defendants, this leaves the remaining elements of Plaintiffs' breach of fiduciary duty claims: that Defendants breached "the resulting fiduciary duty" and caused "injury to the plaintiff or benefit to the defendant as a result of that breach." *Faber*, 331 F.Supp.3d at 780.  "One standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation." *Morrison v. Allen*, 338 S.W.3d 417, 438 (Tenn. 2011) (quoting Restatement (Second) of Torts § 874).  Proof of a causal link between an alleged breach of fiduciary duty and a plaintiff's damages is "an essential element of a fiduciary duty claim." *Id*. (citing *Union Planters Bank of Middle Tenn. v. Choate*, No. M1999–01268–COA–R3–CV, 2000 WL 1231383, at *3 (Tenn. Ct. App. Aug. 31, 2000); 23 Tennessee Practice *Elements of an Action* § 8:1 (2009)

58

(listing damages and proximate cause as elements of the cause of action for breach of fiduciary duty)).

The Court holds that the Amended Complaint plausibly alleges breach and causation. According to Plaintiffs, Newport and Symetra "breached their fiduciary duties to Plaintiffs and other Class members by failing to adequately manage the Fund," Am. Compl. ¶ 339, and "by failing to protect the assets of the Fund . . . ." *Id.* ¶ 340. Taken as a whole, the Amended Complaint plausibly alleges Newport and Symetra breached their separate fiduciary duties. As for a causal connection between the alleged breaches and the injuries to Plaintiffs, the Amended Complaint plausibly shows that the alleged breaches of fiduciary duty caused losses to the Plan. "Causation, or cause in fact, means that the injury or harm would not have occurred 'but for' the defendant's negligent conduct." *Morrison v. Allen*, 338 S.W.3d 417, 438 (Tenn. 2011) (applying but for causation to a claim for breach of fiduciary duty and quoting *Kilpatrick v. Bryant,* 868 S.W.2d 594, 598 (Tenn. 1993)). Newport's alleged failure to produce and provide accurate statements of the Plan's assets in 2019 caused losses to the Plan, and Symetra's alleged failure to implement proper controls allowed Dr. Harris improperly to divert Plan assets out of the Symetra investment account. These allegations satisfy the "but for" standard under Tennessee law.

Newport and Symetra argue that the allegations fail to show causation. Newport argues that a supposed breach of fiduciary duty in 2019 could not have caused Plan losses that occurred prior to that date. Both Defendants contend that the intervening acts of Dr. Harris and others were superseding causes of the losses to the Plan. But these arguments raise disputed factual contentions and perhaps go to the quantum of damages, and not necessarily the causal connection between the alleged breaches of fiduciary duty and losses to the Plan. "Once duty is established, the question of breach of duty and proximate cause of the plaintiff's injury are usually treated as questions of fact."

59

*Leatherwood v. Wadley*, 121 S.W.3d 682, 694 (Tenn. Ct. App. 2003).  The causal role of a "superseding intervening cause" such as a criminal act is also factual question. *McClenahan v. Cooley*, 806 S.W.2d 767, 776 (Tenn. 1991).  These are issues the Court cannot decide as a matter of law at the pleadings stage.  Therefore, Newport's and Symetra's Motions to Dismiss are **DENIED** as to the breach of fiduciary duty claim.

### IV. Violations of the Tennessee Uniform Trust Code for Breach of Trust and Misappropriation of Trust Funds (Count 2 – AMEC Defendants, Newport, Symetra)

The AMEC Defendants, Newport, and Symetra all seek the dismissal of the Amended Complaint's claims for breach of trust and misappropriation of trust funds.  All of the moving Defendants argue that none of them meet the Tennessee Uniform Trust Code's definition of a "trustee."  The only party designated as the "Trustee" in the Plan itself was Dr. Jerome Harris.   The Court agrees.

The Tennessee Uniform Trust Code ("TUTC"), Tenn. Code Ann. § 35–15–101 *et seq.*, imposes a series of legal duties on trustees such as a duty of loyalty (§ 35–15–802), a duty of prudent administration (§ 35–15–804), and a duty to control and protect trust property (§ 35–15–809).[21] The duties of a "trustee" commence "[u]pon acceptance of a trusteeship" and continue "until such time as the trust terminates or a successor trustee is appointed and all assets are delivered in good faith, in accordance with its terms and purposes and the interests of the beneficiaries, and in accordance with" the TUTC.  § 35–15–801 (defining the duty to administer a trust).   In order to prove a "breach of trust" under the TUTC, Plaintiffs must show that (1) a "trustee" (2) violated "a duty the trustee owes to a beneficiary."  § 35–15–1001(a); *see also* § 35–15–1001, cmt. ("A breach of trust occurs

---

[21]  The TUTC permits a trust to vary the trustee duties defined in the statute. *See* § 35-15-105(a) (permitting the terms of a trust to "expand, restrict, eliminate, or otherwise vary the duties and powers of a trustee, any such other fiduciary, relations among any of them, and the rights and interests of a beneficiary" subject to certain exceptions).

when the trustee breaches one of the duties contained in part 8 [T.C.A. § 35–15–801—35–15–817] or elsewhere in the Tennessee Uniform Trust Code.").

The Amended Complaint alleges Defendants violated certain provisions of the TUTC.  For instance, the AMEC Defendants allegedly breached their duty of loyalty under Tenn. Code Ann. § 35–15–802 by failing to make "investment decisions . . . for the exclusive purpose of providing benefits to participants and their beneficiaries . . . ." Am. Compl. ¶ 354.  The Amended Complaint alleges that "Newport's breach of trust involved the failure to require all regular financial statements from all Fund investments, the issuance of financial reports with investment valuations that lacked adequate documentation, and the failure to ensure that all investments made by the Fund were made by a Plan representative acting within the scope of his authorization," though the pleadings do not identify the source of such a duty in the TUTC. *Id.* ¶ 369.  And the Amended Complaint alleges that "Symetra's breach of trust involved the failure to ensure that all withdrawals and disbursements from the Fund were made by a plan representative acting within the scope of his authorization" and "the failure to establish and/or maintain controls, processes, and procedures in a manner consistent with trust law standards and reasonably calculated to protect the Fund from mismanagement, self–dealing, embezzlement, or other misconduct by Fund fiduciaries," again without citing any specific provision of the TUTC as the source of such a duty. *Id.* ¶¶ 372–73.

The problem lies in the fact that the Amended Complaint alleges no facts to show that any of the AMEC Defendants, Newport, or Symetra was a "trustee," as the TUTC defines the term.  Under the statute, a "trustee" is "an original, additional, and successor trustee, and a cotrustee." § 35–15–103(38); *see also id*., 2013 Restated Cmt. ("Because the definition of trustee includes trustees of all types, any trustee, whether original or succeeding, single or cotrustee, has the powers of a trustee and is subject to the duties imposed on trustees under the Tennessee Uniform Trust Code.").  The Plan

defines the "Trustee" as "the person or entity named as trustee herein or in any separate trust forming a part of this Plan, and any successors." Plan, art. I, § 1.59. It is clear from the Plan itself that Dr. Jerome Harris was the Plan's "Trustee." In the absence of any allegation to show how any AMEC Defendant, Newport, or Symetra also meets the definition of a "trustee" found in the TUTC or the Plan, Plaintiffs have failed to state a TUTC breach of trust claim against these Defendants.

Plaintiffs respond that Defendants meet the TUTC's definition as "fiduciaries" and perhaps qualify as "trust advisors" and "trust protectors" as well. The TUTC defines a "fiduciary" to include "a trustee as defined in § 35–14–102 [the definitions section of the Tennessee Uniform Prudent Investor Act]." The Tennessee Uniform Prudent Investor Act ("TUPIA"), in somewhat circular fashion, defines "trustee" as "any fiduciary as defined in [the TUTC]." According to Plaintiffs, this is enough to meet the TUTC's definition of a "trustee" or its "catch–all" provision, which deems "any other party . . . who is acting in a fiduciary capacity" a fiduciary. Tenn. Code Ann. § 35–15–103(13)(A).

The Court finds Plaintiffs' argument unpersuasive. Count 2 of the Amended Complaint alleges a breach of trust in violation of specific sections of the TUTC. By its clear statutory terms, such a breach of the TUTC can only be committed by a "trustee," a term defined in the TUTC itself and limited to the manner in which the TUTC uses the term "trustee," not the TUPIA. Plaintiffs have just alleged that certain Defendants meet the TUTC's definition of "fiduciary" because these Defendants have met the TUPIA's definition of "trustee." Am. Compl. ¶ 26 (Dr. Harris); id. ¶ 32 (AMEC); id. ¶ 38 (AMEC Department of Retirement Services); id. ¶ 44 (General Board); id. ¶ 51 (Council of Bishops); id. ¶ 55 (Bishop Green); id. ¶ 60 (Bishop Davis); id. ¶ 65 (Eaton); id. ¶ 84 (Rodney Brown). But both statutes, TUTC and TUPIA, are separate chapters of Title 35 of the Tennessee Code, each with its own definitions section, and limiting its definition of the term

"trustee" to the manner in which that chapter employs it. § 35–15–103 (defining "trustee" and a number of other terms of the TUTC "[a]s used in this chapter); § 35–14–102 (providing a different definition of "trustee" and other terms of the TUPIA "[a]s used in this chapter"). Plaintiffs' allegation that these Defendants are "trustees" for purposes of TUPIA does little to show that they also meet the TUTC's arguably narrower definition of "trustee."

The Amended Complaint could be read to allege a breach of TUPIA in addition to breaches of trust in violation of TUTC. *Id*. ¶ 350 ("By investing, or permitting the investment of, more than two-thirds of the Fund's assets into highly risky, speculative, possibly fraudulent, and demonstratively imprudent investments real estate, Defendants violated the Tennessee Uniform Prudent Investor Act."). The AMEC Defendants surmise Plaintiffs are perhaps "conflat[ing] the [T]UTC with [TUPIA] and attempt to shoehorn AMEC Defendants into a trustee role by referencing statutory definitions under the [T]UPIA." AMEC Defs.' Mem. in Support Mot. to Dismiss 4 n.3 (ECF No. 99–1). The AMEC Defendants argue that TUPIA is distinct from the TUTC.

The relationship between TUTC and TUPIC is more complicated than that. TUPIA states "a trustee who invests and manages trust assets owes a duty to the beneficiaries of the trust to comply with the prudent investor rule," Tenn. Code. Ann. § 35–14–103(a), meaning a duty to "invest and manage trust assets as a prudent investor would." *Harvey ex rel. Gladden v. Cumberland Tr. & Inv. Co.*, 532 S.W.3d 243, 262–63 (Tenn. 2017). The Tennessee Court of Appeals in a reported decision has held that TUTC incorporates TUPIA by reference. *Glass*, 523 S.W.3d at 72 (citing Tenn. Code Ann. § 35–15–901)). Despite TUTC incorporating TUPIA by reference, each act is a separate chapter within Title 35 of the Tennessee Code and retains its own separate definitions for the term "trustee" and list of statutory duties. At the end of the day, the Amended Complaint alleges the

violation of specific sections of TUTC and does not allege the violation of any specific section of TUPIA. The Court can easily conclude that the Amended Complaint fails to state a TUPIA violation.

This just leaves Plaintiffs' argument regarding "trust protectors" and "trust advisors." TUTC defines both a "trust advisor" and a "trust protector" as "any person described in § 35–15–1201(a)." Tenn. Code Ann. § 35–14–103(35) & (37). Section 35–15–1201(a) defines both terms as "any person, and may be a committee of more than one person, other than a trustee, who under the terms of the trust, an agreement of the qualified beneficiaries, or a court order has a power or duty with respect to a trust, including but not limited to, one or more of" an enumerated powers listed in the statute. § 35–15–1201(a)(1)–(21). Without deciding whether any Defendant can meet the statutory definition of a "trust advisor" or "trust protector," the Court holds that the Amended Complaint does not specifically allege that any AMEC Defendant, Newport, or Symetra meets the definition of a "trust protector" or "trust advisor." The statutory terms appear nowhere in the Amended Complaint, and Plaintiffs have not pointed to any allegations in the Amended Complaint to imply how Defendants acted as "trust advisors" or "trust protectors." Even if they did, the Amended Complaint fails to allege which part of the TUTC any "trust advisor" or "trust protector" violated. For all of these reasons, Defendants' Motions to Dismiss are **GRANTED** as to Count 2.

## V. Negligence (Count 3 – Newport and Symetra)

Count 3 of the Amended Complaint alleges that Newport and Symetra are each liable for negligence under Tennessee common law. Both of their separate Motions to Dismiss argue the Amended Complaint fails to allege that either Defendant owed Plaintiffs any duty of care. According to Newport, the Complaint never differentiates between the several "Defendants" listed in the negligence count and "engages in inappropriate group pleading, lumping all Defendants together." The pleadings allege no facts to establish the special relationship doctrine, an exception under

Tennessee law which recognizes certain relationships giving rise to a legal duty. There is also no allegation to show how Newport breached a duty owed to Plaintiffs. Newport had no role in managing plan assets.  To the extent the claim may be premised on Newport sending participants statements showing Plan investments in Motorskills entities even after the plan no longer held assets in Motorskills, Newport argues it was permitted to rely on the accuracy of the information provided to it by the Church. And like the breach of fiduciary duty, any breach by Newport was not the proximate cause of any injury to Plaintiffs. The criminal acts of Dr. Harris were a superseding, intervening cause.

Symetra's arguments echo Newport's. The Amended Complaint alleges no facts to support allegations concerning the existence of any duty. Symetra issued an annuity and deposited and disbursed funds at the direction of Dr. Harris. Symetra denies that it had discretion or control over the funds. And Plaintiffs have not alleged how any supposed breach injured the plan. The plan assets held by Symetra are the only assets still available.

Plaintiffs have responded in opposition, arguing the Amended Complaint alleges facts to show Newport owed them a duty of care under a multi-factor test, specifically, the duty to confirm independently the plan's self-reports about its investments.  Newport just accepted the Plan's reports about its investments without requiring the Plan to produce financial statements for each investment. Plaintiffs characterize this as a "garbage in-garbage out" approach to administration. This was specifically a failure to properly oversee or manage the funds invested by Plaintiffs and the proposed class, Am. Compl. ¶ 235, a failure to exercise prudence, caution, and good business practices required of persons who obtain and manage retirements funds, *id*. ¶ 388, a failure to perform due diligence and monitoring, *id.* ¶ 389, and a failure to issue quarterly statements to plan participants without first receiving quarterly financial statements from Motorskill entities. *Id.* ¶ 188.  As for Symetra, Plaintiffs

restate their argument in support of their breach-of-fiduciary duty claim. Symetra owed Plan participants a duty of care to "ensure that any withdrawals of the fund assets—the annuity investment—at least bore some resemblance to the normal activity of a Trustee acting within the scope of his duty and authorization."

Under Tennessee common law, a plaintiff alleging negligence must prove the following elements: "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate or legal cause." *Tumminello v. Father Ryan High Sch., Inc.*, 678 F. App'x 281, 286–87 (6th Cir. 2017) (citing *West v. E. Tenn. Pioneer Oil Co.*, 172 S.W.3d 545, 550 (Tenn. 2005)). Defendants' Motions to Dismiss contest the first element and argue they owe Plaintiffs no duty. The question of duty is "entirely a question of law for the court." *Power & Tel. Supply Co., Inc. v. SunTrust Banks, Inc.*, 447 F.3d 923, 932 (6th Cir. 2006) (citing *Bradshaw*, 854 S.W.2d at 869).

"In general, all persons have a duty 'to use reasonable care to refrain from conduct that will foreseeably cause injury to others.'" *Biscan v. Brown*, 160 S.W.3d 462, 478 (Tenn. 2005) (quoting *Turner v. Jordan*, 957 S.W.3d 815, 818 (Tenn. 1997)). "To determine whether a particular defendant owes a duty of care to a particular plaintiff," Tennessee courts "balance the foreseeability and gravity of the potential harm against the feasibility and availability of alternatives that would have prevented the harm." *Hale v. Ostrow*, 166 S.W.3d 713, 716–17 (Tenn. 2005). There is, however, no "affirmative duty to act for the protection of another . . . *unless* the defendant 'stands in some special relationship to either the person who is the source of the danger, or to the person who is foreseeably at risk from the danger.'" *Biscan*, 160 S.W.3d at 478–79 (citing Restatement (Second) of Torts § 315 (1965)). The doctrine recognizes that as a matter of public policy, "certain socially

66

recognized relations exist which constitute the basis for such legal duty." *Id.* at 479 (citing *Bradshaw*, 854 S.W.2d at 871).

Based on the facts alleged in the Amended Complaint, the Court holds that Newport and Symetra each owed Plaintiffs a duty of care. The Court tends to agree with Defendants that the Amended Complaint's allegations of negligence are part and parcel of Plaintiffs' approach to group pleading, listing out several Defendants and then alleging a single cause of action against all of them without differentiation. While this pleading style may not allege all of Plaintiffs' claim with particularity, particularity is not the pleading standard for a common law negligence claim. Reading the pleadings as whole and keeping in mind the Rule 8 notice pleading standard for a claim of negligence, the Amended Complaint plausibly alleges Newport and Symetra owed Plaintiffs a duty of care.

Take Newport first. Plaintiffs allege Newport had a duty "to perform adequate due diligence and monitoring with respect to the Fund and its investments." Am. Compl. ¶ 389. More specifically, Newport had a duty to authenticate or confirm the value of the Plan's assets before including those assets in its calculations of the sum total of the Plan's net assets. *Id.* ¶ 188. Just as the allegations established Newport's fiduciary duty, the same pleadings allege a common law duty. A third-party trust administrator who undertakes the task of calculating the value of a trust's assets and communicating its calculations to the beneficiaries of the trust owes the beneficiaries a duty to ensure the accuracy of its valuations and of the other material information it directs to the beneficiaries. Otherwise, there is a foreseeable risk of potential harm to the trust and its beneficiaries. *Biscan*, 160 S.W.3d at 480 ("Although all the balancing considerations are important, the foreseeability prong is paramount because '[f]oreseeability is the test of negligence.'") (citation omitted)). Balanced against "the feasibility and availability of alternatives that would have

67

prevented the harm," the risk and gravity of the potential harm creates an unreasonable risk. *Hale*, 166 S.W.3d at 716–17. The Court concludes then that Newport owed Plaintiffs a duty as a matter of Tennessee law.

As for Symetra, Plaintiffs allege that the company owed them a duty of prudence, caution, and good business practice required of persons who obtain and manage retirement funds, Am. Compl. ¶ 389, and in particular a duty to properly oversee and manage Plan assets, *id*. ¶ 235, and perform due diligence and monitoring. *Id.* ¶ 389. Like its allegations of Symetra's fiduciary duty, the Amended Complaint alleges a similar common law duty. An insurance or investment company that holds the corpus of a trust established as an institutional employee retirement plan owes the beneficiaries of the trust a duty of prudence and caution to monitor transfers and withdrawals from the trust. The foreseeable risk of harm to the trust and its beneficiaries far outweighs the feasibility and availability of controls and procedures that would prevent such harm. This establishes Symetra's duty to act as a matter of Tennessee law.

The Amended Complaint goes on to make plausible allegations going to each of the other elements of Plaintiffs' negligence claims. According to the pleadings, Newport and Symetra each committed a breach of their common law duties. In its defense Newport contends that the participant statements showing Plan holdings in the Motorskills entities were based on information Newport received from Dr. Harris. But that fact claim is inconsistent with the facts alleged in the Amended Complaint, at least reading the facts in a light most favorable to Plaintiffs. The pleadings show that the Motorskills entities stopped providing financial statements in 2019 and that "[a]s a result, Defendant Harris no longer provided any information regarding these investments to Newport." Am. Compl. ¶ 187. Instead of showing that Newport was relying on information it received from Dr. Harris, the allegation actually shows that Dr. Harris did not furnish Newport with any information

about the Motorskills entities, at least beyond a certain point in time. In any event, this is a dispute the Court need not address further at the pleadings stage. Suffice it to say, the Amended Complaint plausibly alleges that Newport and Symetra breached their separate duties to Plaintiffs.

The Amended Complaint also plausibly alleges causation and injury. Under Tennessee law, "a negligence claim requires proof of two types of causation: causation in fact and proximate cause." *Hale v. Ostrow*, 166 S.W.3d 713, 718 (Tenn. 2005). A defendant's negligence is the cause in fact of a plaintiff's injury if the injury would not have happened "but for" the defendant's negligence. *Id.* (citing *Wood v. Newman, Hayes & Dixon Ins. Agency,* 905 S.W.2d 559, 562 (Tenn. 1995)). Sole causation is not required, just that the defendant's negligence was a cause of the injury. *Id.* A plaintiff must further prove that the defendant's negligence was a proximate cause of the plaintiff's injury. *Id.* Tennessee applies a three-part test to determine proximate cause: (1) the defendant's conduct must have been a "substantial factor" in bringing about the plaintiff's injury; (2) no rule or policy relieves the defendant from liability "because of the manner in which the negligence has resulted in the harm;" and (3) "the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence." *Id.* A defendant will not be liable for injuries "that were not substantially caused by their conduct or were not reasonably foreseeable results of their conduct." *Id.* (citing *Haynes v. Hamilton Cnty.*, 883 S.W.2d 606, 612 (Tenn. 1994)).

Here Plaintiffs allege that Newport's negligence was the cause in fact and the proximate cause of some injury to Plaintiffs. Plan participants like Plaintiffs would have received accurate information sooner about the Motorskills entities and their true valuation, but for Newport's negligence in supplying inaccurate information about this Plan asset. Viewing the Amended Complaint as a whole, accurate information in 2019 may have alerted the Church or the Plan

participants that the Plan's assets were not what Dr. Harris said they were and therefore brought to light some or all of his scheme. And whether Newport's alleged negligence was the proximate cause of some or all of the losses to the Plan is beside the point. The extent of the damages caused by an alleged act of negligence is not the standard for proximate cause. Cause in fact and proximate cause are "ordinarily jury questions, unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome." *Hale*, 166 S.W.3d at 718. The Amended Complaint makes plausible allegations to show causation as a result of Newport's alleged negligence.

Likewise, Plaintiffs have alleged plausible facts to show causation and injury from Symetra's alleged negligence. According to the Amended Complaint, Symetra executed Dr. Harris' orders to transfer funds to the Motorskills entities and a series of other transactions for nearly two decades. Am. Compl. ¶¶ 184–85, 171. But for Symetra's alleged negligence in failing to put proper controls in place, the Plan funds used to invest in these imprudent assets would have never left the Symetra investment account. Whatever role Dr. Harris's subsequent actions had in causing the Plan's losses, the effect of any superseding cause remains a question of fact the Court cannot decide as a matter of Tennessee law based on the pleadings alone. The allegations about Dr. Harris' fraudulent purposes do not negate the inference of causation and the role played by Symetra's negligence in the transactions. Therefore, Newport's and Symetra's Motions to Dismiss are **DENIED** as to the negligence claim.

## VI. Fraudulent Concealment and Fraudulent Misrepresentation (Counts 5 & 6 – AMEC Defendants and Newport)

Counts 5 and 6 of the Amended Complaint allege that certain Defendants, including the AMEC Defendants and Newport, fraudulently concealed certain information about the true state of the Plan's affairs and fraudulently misrepresented certain facts about the Plan. The AMEC

70

Defendants and Newport seek the dismissal of Plaintiffs' claims for fraudulent concealment and fraudulent misrepresentation and for similar reasons. Defendants argue that the Amended Complaint fails to satisfy Rule 9(b)'s heightened pleading standard for fraud claims. Plaintiffs fail to allege the "who, what, and when" of their claims and improperly refer to "Defendants" without differentiation. Nothing in the pleadings shows that the AMEC Defendants or Newport had any knowledge of Dr. Harris's fraudulent activities. Plaintiffs question whether Rule 9(b) should even apply to these claims and argue that the Amended Complaint states plausible claims for fraud. Because the claims are subject to the same heightened pleading standard and otherwise overlap legally and factually, the Court considers them together.

## A. <u>Fraudulent Concealment (Count 5 – AMEC Defendants and Newport)</u>

Under Tennessee law, the tort of fraudulent concealment, also known as "constructive fraud," occurs when "a party who has a duty to disclose a known fact or condition fails to do so, and another party reasonably relies upon the resulting misrepresentation, thereby suffering injury." *Roopchan v. ADT Sec. Sys., Inc.*, 781 F. Supp. 2d 636, 650 (E.D. Tenn. 2011) (quoting *Odom v. Oliver,* 310 S.W.3d 344, 349–50 (Tenn. Ct. App. 2009)); *see also Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 571 (6th Cir. 2003) (quoting *Chrisman v. Hill Home Dev., Inc.,* 978 S.W.2d 535, 538–39 (Tenn. 1998)). To establish their claim for fraudulent concealment, Plaintiffs must show that "(1) [Defendants] concealed or suppressed a material fact, (2) that [Defendants] had a duty to disclose that fact to [Plaintiffs], (3) that [Defendants] intentionally concealed or suppressed that fact with the intent to deceive [Plaintiffs], (4) that [Plaintiffs] were unaware of the fact and would have acted differently if [they] had known about the concealed fact, and (5) that [Plaintiffs were] damaged as a result of the concealment or suppression of the fact." *Saltire Indus., Inc. v. Waller, Lansden, Dortch*

71

& *Davis, PLLC*, 491 F.3d 522, 527 (6th Cir. 2007) (citing *Justice v. Anderson Cnty.*, 955 S.W.2d 613, 616 (Tenn. Ct. App. 1997)).

The Court holds that Plaintiffs have not met Rule 9(b)'s heightened standard for alleging fraudulent concealment. Fraudulent concealment must be pled with particularity in accordance with Rule 9(b) of the Federal Rules of Civil Procedure. *Estate of Abdullah ex rel. Carswell v. Arena*, 601 F. App'x 389, 394 (6th Cir. 2015) (citing *Carrier Corp. v. Outokumpu Oyj,* 673 F.3d 430, 447 (6th Cir. 2012)). First, Plaintiffs have not alleged with particularity which Defendants are liable for what conduct. The Amended Complaint alleges that "Defendants AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Bishop Green, Bishop Davis, Dr. Harris, and Rodney Brown" concealed or suppressed the facts about "the management of the Fund and lack of oversight of Dr. Harris, his investments, and the balance of the Fund" as well as "the mismanagement and missing funds from the Plan prior to January 2022." Am. Compl. ¶¶ 405–406. This approach to group pleading by listing a series of Defendants and alleging that the group concealed facts without any differentiation does not satisfy Rule 9(b)'s heightened pleading standard for allegations of fraud. The allegation fails to give any Defendant notice of the factual grounds for the claim. The Amended Complaint engages in largely the same approach to its allegations against Newport. *Id.* ¶ 411 (lumping together "Dr. Harris, Newport, Robert Eaton, Randall Erwin, Jarrod Erwin, Financial Freedom Funds, LLC, Financial Freedom Group, Inc., Financial Technologies, LLC, and the Motorskill Entities" in a single act of fraudulent concealment). Defendants' Motions to Dismiss the fraudulent concealment claims must be granted for this defect alone.

More fundamentally, the Amended Complaint fails to allege that the AMEC Defendants concealed or suppressed a material fact with the intent to deceive. The Amended Complaint alleges that the AMEC Defendants (and others) concealed and suppressed the facts concerning "the

mismanagement and missing funds from the Plan prior to January 2022." Am. Compl. ¶ 406.  This single allegation about a failure to disclose does not meet Plaintiffs' heightened burden to plead actual fraudulent intent on the part of any AMEC Defendant.  The Amended Complaint alleges that Dr. Harris's alleged fraudulent scheme may have gone back years or even decades and that the AMEC Defendants failed to disclose Plan "mismanagement," a euphemism presumably referring to Dr. Harris's alleged scheme, until January 2022. There are allegations about the Church notifying plan participants of an ongoing audit and freezing Plan disbursements in September 2021 and again in November 2021.  Am. Compl. ¶¶ 239–41. There are also allegations about audits showing $80 million to $90 million in missing Plan assets "by 2020 or 2021." *Id*. ¶ 242.

What is missing from the pleadings, however, are any particulars of what the AMEC Defendants knew about the "mismanagement" of the Plan and when they knew it. Plaintiffs do not allege which AMEC Defendant, the Church, the Department of Retirement Services, the Council of Bishops, or the General Board, first learned about the "mismanagement." Or when the other AMEC Defendants were first made aware of the problem or what steps they had the authority to take in response to the problem. In short, Plaintiffs never allege which AMEC Defendant discovered the "mismanagement," which AMEC had a duty to disclose the mismanagement to Plaintiffs, and when that Defendant's duty to disclose the mismanagement would have arisen.  Plaintiffs simply allege that the Church undertook its own investigation, froze Plan disbursements during the pendency of an audit of Plan assets, and then disclosed the mismanagement in January 2022. This is not enough to state a fraudulent concealment claim against all of the AMEC Defendants for intentionally "suppressing or concealing" information with the intent to deceive. *Saltire Indus.*, 491 F.3d at 527. The AMEC Defendants' Motion to Dismiss is **GRANTED** on the fraudulent concealment claim.

The Amended Complaint falls even shorter in its allegations of fraudulent concealment against Newport. Newport (and others) allegedly concealed and suppressed the facts "concerning the nature and results of investments made with funds from the Plan." *Id.* ¶ 411. This somewhat vague allegation apparently refers to Plaintiffs' separate allegation about Newport listing the Plan's holdings in the Motorskills entities on participant statements, even after Motorskills stopped providing current financials in 2019. *Id.* ¶ 188. Even viewing these allegations, limited as they are, in a light most favorable to Plaintiffs, they do nothing to imply that Newport intentionally concealed or suppressed the *lack* of reporting from Motorskills, much less that Newport did so with the intent to deceive.

Plaintiffs suggest that their theory against Newport is akin to a fraudulent omission and cite authority for the proposition that Rule 9(b) should not govern claims of fraudulent omission. This argument suffers from two principal problems. First, while some states recognize a tort of fraudulent omission, Plaintiffs have not shown that Tennessee is one of them. *See Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 214 (6th Cir. 2019) (noting distinctions between fraudulent omission and fraudulent misrepresentation under Kentucky law). Moreover, even if Plaintiffs were bringing such a claim under Tennessee law or the law of some other state, the Amended Complaint does not actually allege the claim or all of its elements. Specifically, Plaintiffs fail to allege what Newport gained by omitting information from disclosures it did make to Plaintiff. *See Helm v. Ratterman*, 778 F. App'x 359, 369–70 (6th Cir. 2019) (applying Kentucky law and holding that a pleading must allege with Rule 9(b) particularity what the party omitting information "obtained as a consequence of the alleged fraud"). In the absence of more facts alleged with the requisite particularity, Newport's Motion to Dismiss is **GRANTED** on the fraudulent concealment claim.

## B. Fraudulent Misrepresentation (Count 6 – AMEC Defendants and Newport)

The AMEC Defendants and Newport also seek the dismissal of Plaintiffs' fraudulent misrepresentation claims against them, largely for the same reasons they argued for the dismissal of the fraudulent concealment claims. The Tennessee Supreme Court has held that a fraudulent misrepresentation and common law fraud claim share the same elements of proof. *Hodge v. Craig*, 382 S.W.3d 325, 342 & n.28 (Tenn. 2012). In fact, the Tennessee court has suggested that the term "intentional misrepresentation" replace "fraud" and "fraudulent misrepresentation" as the best label for these causes of action and be used exclusively in Tennessee so as to avoid confusion. *Id.* Under Tennessee law, a plaintiff alleging intentional misrepresentation must prove the following elements:

> (1) the defendant made a representation of an existing or past fact; (2) the representation was false when made; (3) the representation was in regard to a material fact; (4) the false representation was made either knowingly or without belief in its truth or recklessly; (5) plaintiff reasonably relied on the misrepresented material fact; and (6) plaintiff suffered damage as a result of the misrepresentation.

*Id.* (citing *Walker v. Sunrise Pontiac–GMC Truck, Inc.,* 249 S.W.3d 301, 311 (Tenn. 2008)). "The essence of fraud is deception." *Deal v. Tatum*, No. M201501078COAR3CV, 2016 WL 373265, at *7 (Tenn. Ct. App. Jan. 29, 2016) (citing *Lopez v. Taylor,* 195 S.W.3d 627, 634 (Tenn. Ct. App. 2005)). !  "In its most general sense, fraud is a trick or artifice or other use of false information that induces a person to act in a way that he or she would not otherwise have acted." *Id*. "Fraud occurs when a person intentionally misrepresents a material fact or intentionally produces a false impression in order to mislead another or to obtain an unfair advantage." *Id.* (citing *Brown v. Birman Managed Care, Inc*., 42 S.W.3d 62, 66 (Tenn. 2001)). !

!     For many of the same reasons already discussed, the Court holds that the Amended Complaint fails to allege fraudulent or intentional misrepresentation with the requisite particularity. The Amended Complaint's approach to making allegations against "Defendants"

75

collectively is even more problematic in its fraudulent misrepresentation count.  The heading of Count 6 states that Plaintiffs bring the claim against *fourteen parties*: "AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Dr. Harris, Newport, Robert Eaton, Randall Erwin, Jarrod Erwin, Financial Freedom Funds, LLC, Financial Freedom Group, Inc., Financial Technologies, LLC, the Motorskill Entities, and Rodney Brown." Am. Compl., Count VI.[22] The Amended Complaint then alleges in conclusory fashion that "Defendants affirmatively misrepresented the true balance and rate of return of the Fund through the use of inaccurate and misleading reported balances in the annual Fund balance update." *Id*. ¶ 416. The Amended Complaint fails to make any particular allegations to differentiate the conduct of any one Defendant from another.

More to the point, Plaintiffs have not alleged that any of the AMEC Defendants or Newport made a false representation "either knowingly or without belief in its truth or recklessly." *Hodge*, 382 S.W.3d at 342; *see also Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) (requiring a party pleading misrepresentation under Rule 9(b) to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent"). Without more, Plaintiffs have not alleged how any of the moving Defendants had knowledge of the true state of the Plan's affairs and

---

[22] This is not to say that Plaintiffs have to identify the specific AMEC or Newport official who made the allegedly fraudulent statement. Under Rule 9(b), "a complaint that identifies a particular corporate defendant as well as the 'time, place, and content of the alleged misrepresentation' need not also identify the corporation's individual employee who made the alleged fraudulent misrepresentation." *Newberry v. Serv. Experts Heating & Air Conditioning, LLC*, 806 F. App'x 348, 362 (6th Cir. 2020) (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 507 (6th Cir. 2007)). And "[c]ourts are more lenient when the alleged wrong did not occur at a discrete time and place and instead 'the transactions involved are complex or cover a long period of time.'" *Alsbrook v. Concorde Career Colleges, Inc.*, 469 F.Supp.3d 805, 843–44 (W.D. Tenn. 2020) (collecting cases). The Amended Complaint's allegations of fraudulent misrepresentation do not meet even these more modest applications of the Rule 9(b) requirements.

acted with an intent to deceive. If anything, the Amended Complaint makes a perfunctory recitation of some of the elements of the claim. Therefore, the Court will **GRANT** the AMEC Defendants' Motion to Dismiss and Newport's Motion to Dismiss the fraudulent misrepresentation claims.

### VII. Breach of Contract (Count 7 – AMEC only)

The AMEC Defendants next argue that the Amended Complaint fails to state a claim for breach of contract. According to the Church, Plaintiffs fail to allege the existence of a contract with the AMEC Defendants. The Amended Complaint alleges the plan document itself constitutes a contract. However, the plan document attached to the Amended Complaint clearly states that it does not constitute a contract between the Church and any plan participant. Plaintiffs respond that they had an implied contract with the church based on their employment, regardless of the disclaimer in the plan document. The AMEC Defendants through the plan documents agreed for the plan to be governed by ERISA, regardless of whether the election to be governed by ERISA was actually made. By failing to fund the Plan and monitor its administration, the AMEC Defendants breached this contract with church employees.

The Court holds Plaintiffs fail to state their breach of contract claim because Plaintiffs have not alleged the existence of an enforceable contract. In Tennessee, the essential elements of a breach of contract claim are as follows: "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *Life Care Ctrs. of Am., Inc. v. Charles Town Assocs., Ltd.*, 79 F.3d 496, 514 (6th Cir. 1996); *C & W Asset Acquisition, LLC v. Oggs,* 230 S.W.3d 671, 676–77 (Tenn. Ct. App. 2007) (quoting *ARC LifeMed, Inc. v. AMC–Tenn., Inc.,* 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)). Plaintiffs allege the breach of three supposed contractual duties undertaken by the Church: "(a) failing to enroll all eligible participants; (b) failing to fund Plan participants' account pursuant to the Plan's terms; and (c)

allowing a single fiduciary, Dr. Harris, to make all investment decisions for the Plan, with no oversight by any other fiduciary or its advisors or agents." Am. Compl. ¶ 437.[23] Plaintiffs locate each of these duties in "the Plan document, Summary Plan Description, Doctrine and Discipline, plan participants' quarterly benefits' statements and other documents." *Id*. ¶ 427. But what Plaintiffs ultimately seek is the specific performance of the duties spelled out in the Plan itself. *Id*. ¶ 440 ("Plaintiffs and the Class are entitled to specific performance of the obligations contained in the Plan documents . . . .").

The Amended Complaint fails to allege why the Plan constitutes an enforceable contract. The Plan itself directly contradicts the notion.  Article IX, section 9.1 clearly and unambiguously states, "This Plan shall not be deemed to constitute a contract between the Employer and any Participant or to be a consideration or an inducement for the employment of any Participant or Employee." Plan, art. IX, § 9.1. Plaintiffs' arguments about the possible existence of an implied contract notwithstanding, this provision of the Plan precludes a claim to treat the Plan and any of its provisions as a contractual agreement between the Church and the Plan participants.  Therefore, the Church's Motion to Dismiss the breach of contract claim is **GRANTED**.

## VIII. Promissory Estoppel (Count 8 – AMEC only)

Count 8 of the Amended Complaint alleges that the AMEC is liable under the quasi-contractual doctrine of promissory estoppel.  The Church argues that Plaintiffs fail to allege a

---

[23] Plaintiffs also allege a breach of the contract's implied duty of good faith and fair dealing. Am. Compl. ¶ 438. Under Tennessee law, "every contract contains an implied covenant of good faith and fair dealing in its performance and its enforcement."  *Beijing Fito Med. Co., Ltd. v. Wright Med. Tech., Inc*., 763 F. App'x 388, 392–93 (6th Cir. 2019) (citing *Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc*., 395 S.W.3d 653, 661 (Tenn. 2013)). There exists, though, "no standalone claim for breach of the implied covenant—it does not form an independent basis for relief." *Id*. at 393 (citing *Berry v. Mortg. Elec. Registration Sys*., 2013 WL 5634472, at *7 (Tenn. Ct. App. Oct. 15, 2013)).  Without a plausible claim for breach of contract, Plaintiffs have also failed to state a claim for breach of the contract's implied covenant.

promise or their reasonable reliance on it. The Amended Complaint also fails to meet Rule 9(b)'s pleading standard for claims sounding in fraud because Plaintiffs have not alleged who made the promise or when. And just as with the breach of contract claim, the Church contends the Plan states that it "shall" not be deemed "an inducement for the employment" of any plan participant. As such, Plaintiffs have not alleged reasonable reliance on any promise from the Plan itself. Plaintiffs respond that the Plan itself is not the only document containing promises about pension benefits. The language cited from the Plan only addresses a contract for employment, not benefits to which an employee is entitled, even when a participant is only employed at will.

"Promissory estoppel has frequently been defined as follows: 'a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.'" *Chavez . Broadway Elec. Serv. Corp.*, 245 S.W.3d 398, 404 (Tenn. Ct. App. 2007 (quoting *Alden v. Presley*, 637 S.W.2d 862, 864 (Tenn. 1982)). The elements of a promissory estoppel claim are: (1) a promise was made; (2) the promise was unambiguous and not unenforceably vague; and (3) the plaintiff reasonably relied on the promise to his or her detriment. *Id.* "Tennessee does not liberally apply the doctrine of promissory estoppel. To the contrary, it limits application of the doctrine to exceptional cases." *Barnes & Robinson Co. v. OneSource Facility Servs., Inc.*, 195 S.W.3d 637, 645 (Tenn. Ct. App. 2006) (citing *Shedd v. Gaylord Entertainment Co.*, 118 S.W.3d 695, 700 (Tenn. Ct. App. 2003). An "exceptional case" is found only when a defendant's conduct "verges on actual fraud." *Shedd*, 118 S.W.3d at 700 (citing *Baliles v. Cities Serv.*, 578 S.W.2d 621, 624 (Tenn. 1979)).

A promissory estoppel claim in Tennessee sounds in fraud and is governed by the Rule 9(b) pleading standard. *Alsbrook v. Concorde Career Colleges, Inc.*, 469 F.Supp.3d 805, 848–49 (W.D.

Tenn. 2020) (collecting cases). In order to meet Rule 9(b)'s requirement that the "circumstances constituting fraud" be pled with "particularity," a plaintiff asserting a promissory estoppel claim must "assert when the alleged promise was made and who specifically made the alleged promise." *Id.* (citation omitted). The Court holds that the Amended Complaint alleges its promissory estoppel claim with particularity. According to Plaintiffs, the Church made the promise, which suffices to meet the particularity requirement about which party made the promise. *Newberry*, 806 F. App'x at 362 (concluding that simply identifying a corporate defendant, not a specific individual in the corporation, satisfies Rule 9(b)). The Amended Complaint further alleges that the Church made the promise in the Plan and other church publications describing the Plan over a period of years. Again, the Court can assume for purposes of deciding the Church's Motion to Dismiss that such a broad allegation meets Rule 9(b). *Alsbrook*, 469 F.Supp.3d at 843–44 (noting the leniency courts apply under Rule 9(b) to allegations concerning "complex" transactions or events "cover[ing] a long period of time").

But just as with Plaintiffs' breach of contract claim, the promissory estoppel claim essentially seeks the enforcement of certain duties contained in the Plan itself. The Amended Complaint alleges that Plaintiffs relied on the Church's promises "(a) to operate the Plan in accordance with ERISA; (b) to enroll all eligible employees in the Plan; (c) to make contributions pursuant to the Plan's terms, including contributing 12% of each employee's salary; (d) to fund Level III benefits for all Pastors and Presiding Elders from the Church's General Treasury; and (e) and to invest the Plan's assets utilizing a conservative investment strategy." Am. Compl. ¶ 443. The Amended Complaint also alleges the Church communicated these promises through "Plan documents."

The Court holds that the Amended Complaint's promissory estoppel claim fails because it contains only a formulaic allegation that Plaintiffs reasonably relied on any promises made by the

AMEC under the terms of the Plan itself.   In determining whether a Plaintiff's reliance was reasonable, courts consider the following factors:

> "(1) the plaintiff's business expertise and sophistication; (2) the existence of a longstanding business or personal relationship between the parties; (3) the availability of the relevant information; (4) the existence of a fiduciary relationship; (5) the concealment of fraud; (6) the opportunity to discover fraud; (7) which party initiated the transaction; and (8) the specificity of the misrepresentation."

*Riddle v. Lowe's Home Ctrs., Inc.*, 802 F. Supp. 2d 900, 908 (M.D. Tenn. 2011) (quoting *Goodall v. Akers*, No. M2008–01608–COA–R3–CV, 2009 WL 528784, at *6 (Tenn. Ct. App. 2009)). Whether a Plaintiff's reliance on a representation is reasonable is generally a question of fact. *Riddle v. Lowe's Home Ctrs., Inc.*, 802 F. Supp. 2d 900, 908 (M.D. Tenn. 2011) (quoting *Goodall v. Akers*, No. M2008–01608–COA–R3–CV, 2009 WL 528784, at *6 (Tenn. Ct. App. 2009)). However, "[c]onclusory statements of reliance are not sufficient to explain with particularity how [a plaintiff] detrimentally relied on the alleged fraud." *Evans v. Pearson Enters., Inc.*, 434 F.3d 839, 852–53 (6th Cir. 2006) (citing *Smith v. Mitlof,* 198 F. Supp. 2d 492, 504–05 (S.D.N.Y. 2002)). The pleadings must contain "either direct or inferential allegations" for each element of fraud, *id.*, including reasonable reliance.  And the allegations must amount to more than mere "labels and conclusions." *Iqbal*, 556 U.S. at 681.

The Plan itself states that it "shall not be deemed to constitute a contract between the Employer and any Participant or to be a consideration or an inducement for the employment of any Participant or Employee."  Plan, art IX, § 9.1.  Plaintiffs have not alleged how they reasonably relied on promises originating in a Plan that specifically denies that the retirement benefits described in the Plan constitute an express or implied contract or an inducement for Plaintiffs' employment.  Put another way, the Amended Complaint cannot plead reasonable reliance on promises contained in a written document when the writing denies the Church's intention to be bound. *Barnes & Robinson*

*Co.*, 195 S.W.3d at 645 (holding that a plaintiff's reliance on a promise "was not reasonable in light of the parties' agreement in the letters of intent that 'the parties shall have no liability in the event the transaction was not completed for any reason whatsoever'").  The Court concludes that the claim fails to make a plausible allegation of reasonable reliance.  Plaintiffs have not alleged enough facts to show that theirs is the "exceptional case" when a defendant's conduct "verges on actual fraud." *Shedd*, 118 S.W.3d at 700.  Therefore, the Church's Motion to Dismiss the promissory estoppel claim is **GRANTED**.

## IX. Outrage (Count 9 – AMEC Defendants)

Finally, the AMEC Defendants argue for the dismissal of Plaintiffs' claim for outrage, a tort known under Tennessee law as the intentional infliction of emotional distress.  *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 205 (Tenn. 2012).  To make out a claim for IIED in Tennessee, a plaintiff must show that: (1) the conduct complained of was intentional or reckless, (2) the conduct is so outrageous that it is not tolerated by a civilized society, and (3) the conduct resulted in serious mental injury.  *Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d 22, 31 (Tenn. 2005) (citing *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997)).  The Tennessee Supreme Court has remarked that a plaintiff seeking damages for IIED must meet "an exacting standard," one which requires a plaintiff to prove conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community." *Miller v. Willbanks*, 8 S.W.3d 607, 614 (Tenn. 1999) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)).  "Recovery for intentional infliction of emotional distress is limited to mental injury which is so severe that no reasonable person would be expected to endure it." *Arnett v. Domino's Pizza I, L.L.C.*, 124 S.W.3d 529, 540 (Tenn. Ct. App. 2003).

The threshold determination of "whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery" is a question for the court. *Bain*, 936 S.W.2d at 623 (citing *Medlin v. Allied Inv. Co.*, 398 S.W.2d 270, 274 (Tenn. 1966)). Plaintiffs, current and former clergy of their Christian denomination, allege that they are the victims of a long–running, far-reaching scheme to deplete the assets of a retirement plan established by their church and employer for their benefit and the benefit of other clergy and church employees. The Amended Complaint contains an image of the 2017 annual report of the AMEC Department of Retirement Services. Am. Compl. ¶ 31. The report bears a seal of the Department and the following motto: "Creating a Better Retirement Future for Those Who Serve the Lord." *Id.* Plaintiffs allege that rather than creating a better retirement future, the Department's Executive Director, Dr. Jerome Harris, squandered tens of millions of dollars in Plan assets, including contributions plan participants made to the Plan from their own salaries. Plaintiffs allege that Dr. Harris is now the target of a criminal investigation and that the Department of Justice has frozen $8 million to $9 million worth of his assets. Plaintiffs, some of whom have already entered retirement, find themselves with only 30 cents of every dollar they had expected to have for their retirement, forcing some to seek out other employment to make ends meet.

The Amended Complaint alleges that Plaintiffs have suffered severe emotional distress after "discovering that their reasonably–expected rewards for years of service to AMEC are not forthcoming" and "learning that any financial plans that they developed for sustaining themselves and their families in their golden years have been utterly destroyed" and "that they have been victimized by the very religious leaders and organizations to which Plaintiffs and other Class members have served in their devotion to the ministry and God." *Id.* ¶¶ 457–59. Plaintiffs would hold the AMEC Department of Retirement Services, the Council of Bishops, the General Board, and

the Church (along with Dr. Harris and Robert Eaton) liable for the intentional or reckless infliction of this emotional distress.

The Court holds, however, that the Amended Complaint's IIED allegations, at least against the AMEC Defendants, do not meet Tennessee's "exacting standard" for such claims. The Amended Complaint alleges that the AMEC Defendants failed in their duties of oversight and supervision to monitor Dr. Harris' activities. The allegations in support of the IIED claim, by and large, describe the intentional or reckless acts of Dr. Harris and Eaton, such as the misappropriation of plan assets, the selection of high-risk investments, and the misrepresentation of the actual value of the Plan's holdings. These serious and troubling allegations against Dr. Harris and Eaton do not create a reasonable inference of intentional conduct on the part of the AMEC Defendants. According to Plaintiffs, the Church did not fully fund the Plan by contributing an amount equal to 12% of each plan participant's church salary to the Plan. These are the only allegations addressed to intentional acts committed by the Church.

It is undoubtedly true that the Amended Complaint alleges the AMEC Defendants had the duty to supervise and monitor Dr. Harris and failed to do so. The AMEC Defendants do not actually challenge the sufficiency of the Amended Complaint to state its claims for breach of fiduciary duty or negligence against them. But under Tennessee law, a claim for IIED or outrage only lies where a plaintiff can prove intentional or reckless conduct. Even assuming the allegations are consistent with recklessness, the conduct just does not meet the standard required by Tennessee law that "no reasonable person would be expected to endure" the distress brought on the Church's actions. *Arnett*, 124 S.W.3d at 540. The Court concludes then that Plaintiffs have not stated a plausible claim for outrage or IIED against the AMEC Defendants. Therefore, the AMEC Defendants' Motion to Dismiss is **GRANTED** as to this claim.

**X. Leave to Amend the Pleadings**

In its Motion to Dismiss, Symetra asserts that the Court should deny Plaintiffs any opportunity to amend their pleadings.  In Symetra's view, Plaintiffs have already filed more than one iteration of their pleadings, and any subsequent amendment would be futile. At the motion hearing, counsel for Plaintiffs indicated an intent to seek leave to amend the Amended Complaint, in part to add new factual allegations. Some sections of Plaintiffs' briefing on the Motions to Dismiss could also be read as a request to amend their allegations.  The Court finds it unnecessary to address Symetra's opposition to any request to amend Plaintiffs may yet raise or to consider whether leave to amend is warranted at this time. To date, Plaintiffs have not filed a motion to amend or sought any other relief from the Court. *Evans*, 434 F.3d at 853 (holding that Rule 7(b)'s general requirements for motion practice apply to requests to amend and deciding that a request raised in a response brief "without providing grounds or a proposed amended complaint to support her request" fails to state the grounds for the request with particularity).

However, should Plaintiffs request leave to amend, the Court's dismissal of certain claims here is without prejudice to Plaintiffs' right to seek leave to include the claims and a proper factual basis to support them in a subsequent, amended pleading and without prejudice to any Defendant's right to oppose the request to amend the pleadings.

<u>**CONCLUSION**</u>

The Court has proper subject-matter jurisdiction over the case or controversy presented in Plaintiffs' Amended Complaint.  Plaintiffs have alleged facts going to each element of their Article III standing to bring this suit. The Court holds that Symetra has not discharged its burden to show that Plaintiffs lack capacity to sue as representatives of the Plan as a matter of Tennessee law and that the AMEC has not carried its burden to show why the Council of Bishops and the General

Board lack the capacity to be sued as matter of the law of corporations.  On the merits of the claims alleged in the Amended Complaint, Plaintiffs have stated plausible claims for breach of fiduciary duty (count 1) and negligence (count 3) against Newport and Symetra.  Therefore, the Motions to Dismiss are **DENIED** as to each of these issues.

The Court further holds that the Amended Complaint fails to state any plausible ERISA claim (counts 11 through 17); its claim for breach of trust and misappropriation of trust assets in violation of the Tennessee Uniform Trust Code (count 2) against the AMEC Defendants, Newport and Symetra; its fraudulent concealment (count 5) and fraudulent misrepresentation (count 6) claims against the AMEC Defendants and Newport; its breach of contract (count 7) and promissory estoppel (count 8) claims against the AMEC; and its claim for the intentional infliction of emotional distress (count 9) against the AMEC.  Defendants' Motions are **GRANTED** as to each of these claims. The claims are hereby dismissed without prejudice to Plaintiffs' right to raise the same claims in a subsequent motion to amend their pleadings filed in accordance with Rule 7(b) and the case management order previously set by the Court.  *See* Case Mgmt. Order, Aug. 25, 2022 (ECF No. 78) (setting Sept. 15, 2023, as the deadline for any party to request leave to add a new party or amend the pleadings).  Defendants' Motions to Dismiss are **GRANTED in part, DENIED in part**.

**IT IS SO ORDERED**.

s/ S. Thomas Anderson
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: March 17, 2023.

86