## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: AME CHURCH EMPLOYEE RETIREMENT FUND LITIGATION, | ) ) ) ) | Lead Case No. 1:22–md–03035–STA–jay<br><br>ALL CASES |

---

## ORDER GRANTING IN PART, DENYING IN PART NEWPORT GROUP, INC.'S MOTION TO DISMISS AFRICAN METHODIST EPISCOPAL CHURCH'S AMENDED CROSS-COMPLAINT (ECF NO. 280)

---

This multidistrict litigation concerns losses to a non-ERISA retirement Plan established by the African Methodist Episcopal Church ("AMEC") for its clergy and employees. Plaintiffs are current or retired clergy of the church and allege a number of claims under Tennessee law against the denomination, church officials, third-party service providers to the Plan, and other alleged tortfeasors. AMEC and the African Methodist Episcopal Church Ministerial Retirement Annuity Plan ("the Plan") have filed an Amended Cross-Complaint (ECF No. 256) naming Newport Group, Inc. as one of several Cross-Defendants. Before the Court is Newport Group, Inc.'s Motion to Dismiss the Amended Cross-Complaint (ECF No. 280). AMEC and the Plan have responded in opposition, and Newport has filed a reply. For the reasons set forth below, Newport's Motion to Dismiss is **GRANTED in part, DENIED in part**.

## BACKGROUND

### I.     Factual Allegations of the Amended Cross-Complaint

According to the Amended Cross-Complaint, AMEC discovered in September 2021 that the Rev. Dr. Jerome V. Harris, the former Executive Director of the AMEC Department of Retirement Services and the Trustee for the Plan, had embezzled Plan funds and defrauded the Church. Am. Cross-Compl. ¶ 1, July 25, 2023 (ECF No. 256). Concerning Newport, the Amended Cross-Complaint alleges that on December 13, 2001, Dr. Harris on behalf of AMEC entered into an

agreement with American Express Tax and Business Services ("AmEx") to perform services as a third-party administrator for the Plan. Cross-Compl. ¶ 49. AmEx's role as third-party administrator required it to manage the Plan on a day-to-day basis. *Id.* ¶ 50. AmEx's responsibilities included, but were not limited to, tracking balances of Plan participants and preparing and sending statements to Plan participants. *Id.* Cross-Plaintiffs allege that AmEx like any third-party administrator had a duty to take reasonable steps to verify whether the financial positions it reported were accurate and a duty to perform reasonable diligence to confirm the accuracy of its reports. *Id.*

Eventually, through a series of corporate mergers, AmEx merged with Newport. *Id.* ¶ 51. As a result of that merger, Newport assumed AmEx's role as third-party administrator and its duties to take reasonable steps to verify the accuracy of financial information about the Plan's investments and assets and its duty of diligence to confirm the accuracy of the information. *Id.* AMEC and the Plan allege Newport breached its duty to take reasonable steps to verify whether the financial positions contained in reports prepared by Newport were accurate and to perform reasonable diligence to confirm the accuracy of its reporting. *Id.* ¶ 52. According to the Amended Cross-Complaint, Motorskill Venture Group; Motorskill Ventures 1, LP; Motorskill Asia Venture Group; and Motorskill Asia Ventures 1, L.P. ("the Motorskill Entities") are private equity funds with whom Dr. Harris and others invested millions of dollars in Plan assets but without any authority from AMEC. *Id.* ¶ 10. Newport stopped receiving quarterly financial statements in 2019 from the Motorskill Entities. *Id.* ¶ 52. Even though Newport did not receive quarterly financial statements from the Motorskill Entities after 2019, Newport continued to include holdings in the Motorskills Entities in its reporting of Plan assets and therefore reported an erroneous and inflated value of the Plan's investments.[1] *Id.* ¶ 52. AMEC and the Plan allege that had Newport investigated why the

---

[1] Although Newport claims that they entered into an Agreement with the Plan and

2

Motorskill Entities stopped providing financial reports, Newport would have learned that the Motorskill Entities were insolvent. *Id*. ¶ 53.

More generally, the Amended Cross-Complaint alleges Newport was on notice as early as October 26, 2011, that Dr. Harris was investing Plan funds in risky, illiquid, privately-held, venture capital securities. *Id*. ¶ 54. Newport, as a professional third-party administrator of retirement plan accounts, knew that such investments were entirely inappropriate for a retirement plan. *Id*. ¶ 55. But Newport failed to inform AMEC of Dr. Harris's inappropriate investments. *Id*. ¶ 56. Newport not only failed to warn the Church regarding the inappropriate investments, Newport also failed to investigate the true value of the investments and the lack of financial reporting from the Motorskill Entities. *Id*. ¶ 57. Newport then negligently reported grossly erroneous information to the auditor of the Plan, Cross-Defendant Rodney Brown, in a non-qualifying letter that failed to disclaim that Newport did not, in fact, confirm the value of the Plan's accounts, nor that it had failed to obtain any supporting documentation. *Id*. ¶ 58. As a result of Newport's negligence and negligent misrepresentations, AMEC and the Plan were gravely harmed.

The Cross-Plaintiffs allege that Newport's conduct has caused the denomination to suffer significant reputational and financial harm. Church funds were used to finance the Plan, and those funds were lost as a result of Newport's negligence. *Id*. ¶ 59. AMEC continues to suffer significant financial damages in that the Church now must replenish the Plan funds that were lost due to Newport's negligence of Newport, not to mention fund the costs of litigation. *Id*. ¶ 60. Newport's negligence has also caused the Plan to sustain financial damages. *Id*. ¶ 61. From these premises, AMEC and the Plan seek to hold Newport liable for negligent misrepresentation, breach of fiduciary duty, simple negligence, and punitive damages.

---

Newport only reported what was given to them, Newport's reports to the Church did not contain that qualifying language.

## II.    Procedural History

In early 2022, Plaintiffs, clergy and other denominational employees who are participants in the Plan, filed six civil actions against AMEC and others across several United States District Courts: *Rev. Pearce Ewing v. African Methodist Episcopal Church et al.*, No. 2:22–cv–02136–JTF– atc (W.D. Tenn. Mar. 4, 2022); *Charles R. Jackson v. Newport Group, Inc. et al.*, No. 2:22–cv– 02174–JTF–atc (W.D. Tenn. Mar. 22, 2022); *Rev. Cedric V. Alexander v. Rev. Dr. Jerome Harris et al.*, No. 8:22–cv–00707–PJM (D. Md. Mar. 22, 2022); *Phillip Russ, IV et al. v. Newport Group, Inc.*, No. 3:22–cv– 00375–BJD–LLL (M.D. Fla. Mar. 31, 2022); *Rev. Derrell Wade et al. v. Newport Group et al.*, No. 3:22–cv–00179–DN (E.D. Va. Apr. 1, 2022); *Rev. A. Offord Carmichael, Jr. et al. v. Rev. Dr. Jerome Harris et al.*, No. 3:22–cv–00386–UA–JLW (M.D.N.C. May 19, 2022).[2]

Plaintiff Rev. Pearce Ewing moved under 28 U.S.C. § 1407 to consolidate all proceedings in the Western District of Tennessee.  On June 2, 2022, the Panel on Multidistrict Litigation transferred the civil actions to this Court, finding that consolidation would "serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation." MDL Transfer Order 1, June 2, 2022 (ECF No. 1).   The Panel further found that consolidation in this District was appropriate since the AMEC Department of Retirement Services has its principal place of business in this District and the Rev. Dr. Jerome V. Harris, the former trustee of the Plan, resides in this District. *Id*. at 2.  On June 22, 2022, the Court entered a Practice and Procedure order to govern all further proceedings.  *See* Practice & Proc. Order, June 22, 2022 (ECF No. 8).  The Court has

---

[2] The Complaints in *Ewing*, *Jackson*, and *Russ* each named  Symetra Financial Corporation and Symetra Life as Defendants.  *Carmichael* and *Alexander* named only Symetra Life; *Wade* named only Symetra Financial.  Once the cases went to MDL and were assigned to this Court for all further pretrial proceedings, Plaintiffs amended their pleadings to allege all claims in a single pleading against all Defendants, the Consolidated Amended Complaint – Class Action (ECF No. 74).  The Amended Complaint did not name Symetra Financial as a Defendant.  The Church and the Plan have named Symetra Financial as a Third-Party Defendant in their Third-Party Complaint.

continued to hold status conferences with counsel for the parties approximately every 60 days.

The Court has also established a series of case management deadlines. The Court held its initial case management conference with counsel for the parties on August 4, 2022, and approved the case management deadlines proposed by the parties. On August 25, 2022, the Court entered a case management order (ECF No. 78), setting forth the deadlines discussed at the initial conference. Among other things, the Court gave the parties until August 30, 2023, to complete all fact discovery, and February 9, 2024, to complete expert discovery. The Court also set March 26, 2024, as Plaintiffs' deadline to file a motion for class certification and the deadline for all parties to file dispositive motions and *Daubert* motions. On January 25, 2024, the Court extended the deadline to complete written discovery to July 20, 2024, the deadline to complete expert discovery to December 20, 2024, and the deadline for Plaintiffs to file their motion for class certification to January 20, 2025. *See* Order Partially Granting Mot. to Extend, Jan. 25, 2024 (ECF No. 330).

On August 21, 2022, Plaintiffs filed their Consolidated Amended Complaint – Class Action (ECF No. 74) ("Amended Complaint"). The Court has thoroughly discussed the allegations of Plaintiffs' Amended Complaint in its previous orders and need not review them in full here. Briefly, the Amended Complaint alleged a number of claims under Tennessee law against AMEC, Symetra Life Insurance Company, Newport Group, and others. AMEC, Symetra Life, and Newport filed separate motions to dismiss, challenging the sufficiency of Plaintiffs' Amended Complaint and Plaintiffs' standing to sue. In an order dated March 17, 2023, the Court held that the Amended Complaint had plausibly alleged Plaintiffs' standing and stated plausible claims for relief against AMEC, Symetra Life, and Newport. *See* Order on Mots. to Dismiss Consolidated Am. Compl. – Class Action, Mar. 17, 2023 (ECF No. 197).

AMEC has denied the allegations of Plaintiffs' Amended Complaint and filed a Rule 13

cross-claim against other Defendants including Newport.  Fed. R. Civ. P. 13(g) ("A pleading may state as a crossclaim any claim by one party against a coparty if the claim arises out of the transaction or occurrence that is the subject matter of the original action or of a counterclaim, or if the claim relates to any property that is the subject matter of the original action.").  AMEC initially filed a Partial Answer to the Amended Complaint as well as Cross-Complaint (ECF No. 116) on October 18, 2022.  In response to AMEC's Amended Cross-Complaint, Newport filed a motion to dismiss (ECF No. 162).  When the Court subsequently granted the Church leave to amend its pleading, the Court denied Newport's motion to dismiss the Church's initial Cross-Complaint as moot.  Order Granting AMEC's Mot. for Leave to File Update Pleading, June 22, 2023 (ECF No. 242).  AMEC then filed an Amended Answer, Cross-Complaint, and Third-Party Complaint (ECF No. 256) on July 25, 2023. The Amended Cross-Complaint alleging AMEC's and the Plan's claims against Newport was found in that single pleading.

### III.   Newport's Motion to Dismiss for Lack of Subject-Matter Jurisdiction and for Failure to State a Claim

Newport now seeks the dismissal of AMEC's cross-claims against it, either for lack of subject-matter jurisdiction or for failure to state a claim for relief.  First, Newport argues that Church lacks Article III standing to press its claims against Newport.  The Amended Cross-Complaint's allegations of reputational harm are too generalized to show how the Church has suffered an injury-in-fact.  AMEC has not alleged why Newport's alleged negligence resulted in lower giving levels in its member congregations.  The denomination also lacks standing to bring any claim on behalf of the Plan.  Dr. Harris' alleged embezzlement scheme has harmed the Plan by depleting Plan assets, not the Church.  AMEC's allegation about its duty to replenish lost funds is totally unsupported and remains speculative.  And the Amended Cross-Complaint's allegations about litigation costs also fail to show injury.  For all of these reasons, Newport argues AMEC has failed to allege the elements of

standing.

As for the merits of the pleadings, Newport next argues that the Amended Cross-Complaint fails to allege all of the essential elements of a claim for negligent misrepresentation on behalf of AMEC. More specifically, AMEC has not alleged that Newport provided the Church with information, much less that the information was false or that the Church relied on the information to its detriment. The Amended Cross-Complaint alleges only that Newport supplied Rodney Brown or Plan participants, not the Church, with information about the Motorskill Entities. Newport also cites the provisions of the original AmEx service agreement with the Church. By agreement AMEC had the duty to provide Newport with asset data and Newport had no independent duty to verify the accuracy of the information. Newport lastly argues that AMEC was in just as good a position to discover Dr. Harris' embezzlement scheme as Newport.

Newport also seeks the dismissal of AMEC's cross-claim for breach of fiduciary duty. Assuming for the sake of argument Newport owed some fiduciary duty to the Plan or Plan participants, the same cannot be said for the Church. Even if Newport owed the Church some fiduciary duty, the Amended Cross-Complaint alleges no facts to support its allegations that Newport had a duty to verify financial information it received from Dr. Harris or warn AMEC about Dr. Harris' investments. Newport had no duty as a third-party administrator to render investment advice. Newport next argues for the dismissal of AMEC's claim for common law negligence. The Amended Cross-Complaint fails to allege why Newport had a duty to inform AMEC of "high risk, illiquid, inappropriate investments." And the pleadings do not allege why the investments met these criteria. The Church also fails to allege any facts to show why Newport had a duty to verify the accuracy of information it received from Dr. Harris. Finally, Newport argues that AMEC has failed to state a claim for punitive damages under Tennessee law. AMEC has not alleged any facts to show

7

that Newport acted intentionally or even recklessly.  Therefore, the Court should dismiss each of the claims the Church makes against Newport in its Amended Cross-Complaint.

AMEC and the Plan have responded in opposition to Newport's Motion to Dismiss.  As an initial matter, the Church argues that the Court should not consider the 2001 services agreement in deciding the Rule 12(b) Motion.  AMEC questions whether the agreement was the final version or even the only agreement between Newport and the Plan.  AMEC contends that dismissal of its claims at the pleadings stage and on the basis of an untested document would be inappropriate without more discovery.  As for standing, the Church argues that the Plan clearly has suffered an injury-in-fact. The Amended Cross-Complaint alleges the Church has suffered its own independent injuries as well.  Furthermore, Newport's argument over injuries to the Plan is really an argument about who was capacity to sue for injuries to the Plan, not Article III standing.  The Amended Cross-Complaint names the AMEC Ministerial Retirement Annuity Plan as a Cross-Plaintiff.  The Church also argues that it has the capacity to sue on behalf of the Plan participants.  To the extent that the Court concludes AMEC does not have the capacity to sue on behalf of the Plan, AMEC requests leave to amend its Amended Cross-Complaint to add the current Plan trustee as a named party.

Turning to the merits of its claims for relief, the Third-Party Plaintiffs argue that the Amended Cross-Complaint states plausible claims for negligent misrepresentation, breach of fiduciary duty, common law negligence, and punitive damages.  On the negligent misrepresentation claim, AMEC argues that the false information supplied by Newport consisted of inflated asset valuations, including assets invested in the  Motorskill Entities as reported by Newport even after the Motorskills Entities stopped providing financial statements in 2019.  The Amended Cross-Complaint also alleges Newport supplied financial information to Rodney Brown as part of that firm's audit of the Plan.  AMEC argues that under Tennessee law, negligent misrepresentation does not require a

specific showing that the alleged misrepresentation was addressed to the party holding the claim.

As for the breach of fiduciary duty, AMEC argues that the contours of the duty are fact-bound and depend on the actual relationship between two parties.  Here, the Amended Cross-Complaint alleges that Newport had a fiduciary duty as a third-party administrator to verify the accuracy of the financial positions it reported to Plan participants and a duty of diligence to confirm the accuracy of its reporting.  The Court has already concluded that Plaintiffs' Amended Complaint plausibly alleged Newport's fiduciary status.  For similar reasons, the Court should reach the same conclusion as to the Church's breach of fiduciary duty claim.  And the same reasoning should apply to AMEC's claim for negligence.  AMEC finally defends the plausibility of its allegations regarding punitive damages.

Newport has filed a reply reiterating its main arguments for the dismissal of the Amended Cross-Complaint.

## **JURISDICTION**

As a threshold jurisdictional question, Newport argues that AMEC lacks Article III standing to bring suit for injuries to the Plan, according to principles of trust law.  Newport's argument tracks in many respects an argument first made by Symetra Life Insurance in its motion to dismiss Plaintiffs' Amended Complaint.  Just as Symetra Life did before in contesting Plaintiffs' standing to sue on behalf of the Plan for injuries to the Plan, Newport frames its argument as a challenge to AMEC's Article III standing and therefore the Court's subject-matter jurisdiction.  As a trust established for the benefit of AMEC employees, the Plan itself, as Newport sees it, suffered the injuries alleged in the Amended Cross-Complaint.  Any recovery AMEC may win would only go to the trust, that is, the Plan itself.

Article III "[s]tanding is a jurisdictional requirement," and "[i]f no plaintiff has standing, then

9

the court lacks subject-matter jurisdiction." *Tenn. Gen. Assembly v. U.S. Dep't of State*, 931 F.3d 499, 507 (6th Cir. 2019).  Even though Newport casts the issue as a question of Article III standing, there exists a distinction between the constitutional question of standing and the "merits" question of "third party standing," that is, which party "owns" a claim or possesses the "authority" to sue. *Digital Media Sols., LLC v. S. Univ. of Ohio, LLC*, 59 F. 4th 772, 782–83 (6th Cir. 2023) ("This 'ownership' question has nothing to do with any federal 'standing' doctrine; it concerns a "merits" issue about the parties' respective legal rights under the state law that they seek to enforce.").

As the Court concluded in deciding Symetra Life's standing argument, the Court holds that Newport's contention goes to the Church's capacity to sue.  Capacity to sue is a "distinct legal question" from standing.  *Tri–Med Fin. Co. v. Nat'l Century Fin. Enters., Inc.*, 208 F.3d 215, 2000 WL 282445, at *4 (6th Cir. Mar. 6, 2000) (unpublished table decision); *see also Cranpark Inc. v. Rogers Grp. Inc.*, 821 F.3d 723, 730 (6th Cir. 2016) (concluding that "one who sells his interest in a cause of action is not deprived of Article III standing" but "is susceptible to a real–party–in–interest challenge"); *Norris v. Causey*, 869 F.3d 360, 367 (5th Cir. 2017) ("Courts have recognized this distinction between Article III standing and real–party–in–interest/capacity issues . . . ."); 59 Am. Jur. 2d Parties § 26 ("Capacity to sue is a threshold matter allied with, but conceptually distinct from, the question of standing.").

Rather than address Newport's argument in the Rule 12(b)(1) context of subject-matter jurisdiction, the Court will take up the issue as part of its merits analysis of AMEC's cross-claims. Nevertheless, "[c]ourts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." *Akno 1010 Mkt. Street St. Louis Mo. LLC v. Pourtaghi*, 43 F.4th 624, 626 (6th Cir. 2022) (quoting *Hertz Corp. v. Friend*, 559 U.S. 77, 94, 130 S.Ct. 1181, 175 L.Ed.2d 1029 (2010)). Because Newport has called into doubt AMEC's Article

10

III standing and standing is an essential element of a federal court's jurisdiction, *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 861 (6th Cir. 2020), the Court finds it advisable to address standing "as a threshold matter." *Kanuszewski v. Mich. Dept. of Health & Human Servs.*, 927 F.3d 396, 405 (6th Cir. 2019) (citing *Nikolao v. Lyon*, 875 F.3d 310, 315 (6th Cir. 2017)).

Rule 12(b)(1) of the Federal Rules of Civil Procedure permits a party to move for the dismissal of an action for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A Rule 12(b)(1) motion can raise a facial challenge to the sufficiency of the pleadings and the allegations going to the elements of standing, or a factual attack based on the evidence establishing standing. *Assoc. of Am. Physicians & Surgeons v. United States Food & Drug Admin.*, 13 F.4th 531, 543 (6th Cir. 2021) (citing *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007)). "A party raising a facial challenge argues that a complaint does not adequately plead standing even accepting its facts as true." *Id.* (citing *Mosley v. Kohl's Dep't Stores, Inc.*, 942 F.3d 752, 756 (6th Cir. 2019)).

The Constitution limits the jurisdiction of the federal courts to a "Case" or "Controversy." U.S. Const., art. III, § 2, cl. 1. "To establish a 'case,' a plaintiff must show that the plaintiff has suffered an injury, that the defendant's conduct likely caused the injury, and that the relief sought will likely redress the injury." *Assoc. of Am. Physicians & Surgeons*, 13 F.4th at 537 (citing *TransUnion, LLC v. Ramirez*, 141 S. Ct. 2190, 2203, 210 L.Ed.2d 568 (2021)). At the pleadings stage, a plaintiff has the burden to make plausible allegations going to each of these elements. *Id.* at 543–44 (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). Furthermore, a plaintiff must "demonstrate standing for each claim [it] seeks to press and for each form of relief that is sought," *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439, 137 S.Ct. 1645, 198 L.Ed.2d 64 (2017), because "standing is not dispensed in gross." *Lewis v. Casey*,

518 U.S. 343, 358 n.6, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (citation omitted).  Viewing the facts alleged in the Amended Cross-Complaint in a light most favorable to AMEC, the Amended Cross-Complaint plausibly alleges each element of Article III standing.

### A. **AMEC's Injury-in-Fact**

First, AMEC alleges an injury-in-fact.  An injury-in-fact must be both "(a) concrete and particularized, . . . and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation marks and citations omitted). An injury is concrete if it is real and "*de facto*," that is, "it must actually exist." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016) (citations omitted). The "most obvious" types of concrete injury "are traditional tangible harms" like monetary losses, meaning "[i]f a defendant has caused . . . monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III." *TransUnion*, 141 S.Ct. at 2204. An injury is particularized if it affects "the plaintiff in a personal and individual way." *Spokeo*, 578 U.S. at 339 (collecting cases).

Construing the allegations of the Amended Cross-Complaint as a whole, AMEC has alleged an actual injury.  The Amended Cross-Complaint alleges that Dr. Harris carried out a long-running scheme to embezzle assets of AMEC's retirement plan established for the benefit of AMEC clergy and employees.  Am. Cross-Compl. ¶ 1.  AMEC describes the AMEC Ministerial Retirement Annuity Plan as the denomination's retirement plan "designed to provide annuity coverage for the salaried personnel of the Church."  *Id.* ¶ 3.  According to AMEC, under the terms of the Plan, the Church "contributes an amount equal to a percentage of the annual salary of each enrolled participant into the Annuity Plan."  *Id.*, *see also id.* ¶ 19.  The Amended Cross-Complaint alleges that Newport's breaches of duty resulted in damages to the Plan and AMEC.  *Id.* ¶ 58 ("As a result

of Newport's negligence and negligent misrepresentation, AMEC and the Plan were gravely harmed."). A reasonable inference from these allegations is that AMEC lost money the Church had contributed to the Plan on behalf of its clergy and employees enrolled in the Plan. The Amended Cross-Complaint further alleges that the Church has been forced to "replenish the Plan funds that were lost due to the negligence of Newport . . .", though the Amended Cross-Complaint does not elaborate further on the amount of subsidy to the Plan the Church has incurred or the source of its duty to provide it. *Id*. ¶ 60.

These allegations suffice to show concrete and particularized injuries, which are actual or imminent. *TransUnion*, 141 S.Ct. at 2203 (citing *Lujan*, 504 U.S. at 560–561). Because a "pocketbook injury" of the sort AMEC alleges is "a prototypical form of injury in fact," the Amended Cross-Complaint plausibly alleges injury–in–fact arising out of the Church's role in funding the Plan and in covering any amounts lost as a consequence of the claims alleged in the Amended Cross-Complaint. *Collins v. Yellen*, 141 S.Ct. 1761, 1779, 210 L.Ed.2d 432 (2021).

## B. **Fairly Traceable**

The Amended Cross-Complaint plausibly alleges the second element of Article III standing that AMEC's injuries are fairly traceable, at least in part, to the allegedly tortious acts and omissions of Newport. "[T]he relevant inquiry is whether the plaintiffs' injury can be traced to allegedly unlawful conduct of the defendant . . . ." *Collins*, 141 S.Ct. at 1779 (quoting *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). While there must exist a causal connection between the plaintiff's injury and the defendant's conduct, traceability is not the same thing as proximate causation. *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014) ("Proximate causation is not a requirement of Article III standing . . . ."). "The standard for establishing traceability for standing purposes is *less*

*demanding* than the standard for proving tort causation." *Buchholz*, 946 F.3d at 866 (emphasis in original) (citing *Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 72 (3d Cir. 1990)). "At the pleading stage, the plaintiff's burden of alleging that their injury is fairly traceable to the defendant's challenged conduct is relatively modest." *Id*. (quoting *Bennett v. Spear*, 520 U.S. 154, 171, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997)) (cleaned up).

The Amended Cross-Complaint alleges that but for the conduct of Newport (and other Cross-Defendants), AMEC would not have suffered the financial injuries alleged. True, the Amended Cross-Complaint specifically faults Newport for valuing the Plan's investments in the Motorskill Entities as part of the Plan's assets, even after Newport was no longer receiving financial statements from the Motorskill Entities to substantiate the Plan's investment. Newport's conduct occurred sometime after 2019 and therefore quite late in the 20-year embezzlement scheme undertaken by Dr. Harris. Even so, AMEC has carried its "relatively modest" burden to allege a causal connection between its injuries and Newport's conduct.

## C. Redressability

As for the third and final element of Article III standing, AMEC seeks remedies that would redress its financial injuries. "To determine whether an injury is redressable, a court will consider the relationship between the 'judicial relief requested' and the 'injury' suffered." *Calif. v. Texas*, 141 S.Ct. 2104, 2115, 210 L.Ed.2d 230 (2021) (quoting *Allen*, 468 U.S. at 753, n.19)). A plaintiff must allege that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *R. K. by and through J. K. v. Lee*, 53 F.4th 995, 1001 (6th Cir. 2022) (citing *Lujan*, 504 U.S. at 561). The United States Court of Appeals for the Sixth Circuit has described redressability as "a low bar to clear" in cases "where a plaintiff seeks redress for a completed violation of a legal right." *Id*. (citing *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802, 209 L.Ed.2d

94 (2021)).  The Amended Cross-Complaint seeks money damages to remedy the losses the Church

has suffered.  A favorable decision on the Church's demand would redress the injuries alleged.  This

clears the "low bar" for redressability.

Having concluded that AMEC has met the irreducible minimum of Article III standing, the

Court holds that AMEC has constitutional standing to press its claims for relief.  Therefore, the

Court is satisfied it has subject-matter jurisdiction over AMEC's cross-claims against Newport.

## **STANDARD OF REVIEW**

Newport's Motions to Dismiss argues that AMEC has failed to state any plausible claim for

relief.  A defendant may move to dismiss a claim "for failure to state a claim upon which relief can

be granted" under Federal Rule of Civil Procedure 12(b)(6).  Fed. R. Civ. P. 12(b)(6).  When

considering a Rule 12(b)(6) motion, the Court must treat all of the well–pleaded allegations of the

pleadings as true and construe all of the allegations in the light most favorable to the non–moving

party. *Elec. Merchant Sys. LLC v. Gaal*, 58 F.4th 877, 882 (6th Cir. 2023) (citing *Taylor v. City of*

*Saginaw*, 922 F.3d 328, 331 (6th Cir. 2019)).  However, legal conclusions or unwarranted factual

inferences need not be accepted as true. *Fisher v. Perron*, 30 F.4th 289, 294 (6th Cir. 2022) (citing

*Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).

Under Rule 8 of the Federal Rules of Civil Procedure, a complaint need only contain "(1) a

short and plain jurisdictional statement, (2) a short and plain statement of the claim, and (3) an

explanation of the relief sought." Fed. R. Civ. P. 8(a).   "That's it. By listing these elements, Rule 8

implicitly 'excludes other requirements that must be satisfied for a complaint to state a claim for

relief.'" *Gallivan v. United States*, 943 F.3d 291, 293 (6th Cir. 2019) (citing Antonin Scalia & Bryan

A. Garner, *Reading Law: The Interpretation of Legal Texts* § 10, at 107 (2012) (other citation

omitted).  Rule 8's notice pleading standard does not require "detailed factual allegations." *Iqbal*,

556 U.S. at 681.

But Rule 8 does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* "Although the rule encourages brevity," a plaintiff must nevertheless "say enough to give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (citing *Dura Pharm. v. Broudo*, 544 U.S. 336, 346, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)). "Rule 8 does not empower [a plaintiff] to plead the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss." *Iqbal*, 556 U.S. at 687. In order to survive a motion to dismiss, the plaintiff must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level" and to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). This means, a complaint "must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *Smith v. Gen. Motors LLC*, 988 F.3d 873, 877 (6th Cir. 2021) (citing *Boland v. Holder*, 682 F.3d 531, 534 (6th Cir. 2012)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *see also Ryan v. Blackwell*, 979 F.3d 519, 524 (6th Cir. 2020) ("A complaint must contain enough 'factual matter' to raise a 'plausible' inference of wrongdoing.") (quotation omitted).

## CHOICE OF LAW

AMEC has alleged each of its cross-claims under Tennessee law. The Court has jurisdiction over Plaintiffs' claims in the Amended Complaint by virtue of the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d). Therefore, the Court has supplemental jurisdiction over AMEC's and

16

the Plan's cross-claims pursuant to 28 U.S.C. § 1367(a).  The Amended Cross-Complaint further alleges that the Court has jurisdiction over the dispute between the Cross-Plaintiffs and Newport by virtue of the amount in controversy and the parties' diversity of citizenship under 28 U.S.C. §1332(a).   As in any case where the Court exercises jurisdiction under section 1332, the Court applies the law of the forum state, including the forum's choice-of-law rules. *Loreto v. Procter & Gamble Co.*, 515 F. App'x 576, 578 (6th Cir. 2013) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). The parties have briefed the substantive law of the state of Tennessee in their motion papers.  The Court will assume for purposes of deciding the questions of law presented in Newport's Rule 12(b) Motion that Tennessee law governs the parties' dispute.

As part of its application of Tennessee law, the Court must follow "a ruling from the state supreme court." *Smith*, 988 F.3d at 878 (citing *In re Darvocet, Darvon & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917, 937 (6th Cir. 2014)).  Without a clear ruling from the Tennessee Supreme Court, the *Erie* doctrine requires this Court to "predict[] how the state supreme court would rule by looking to all available data, including decisions of the states' appellate courts." *Smith*, 988 F.3d at 878 (internal citation omitted); *see also Lindenberg v. Jackson Nat'l Life Ins. Co.*, 912 F.3d 348, 358 (6th Cir. 2018) (citing Tenn. Sup. Ct. R. 4(G)(2) for the proposition that a published opinion of the Tennessee Court of Appeals is "controlling authority for all purposes unless and until such opinion is reversed or modified by a court of competent jurisdiction").

## ANALYSIS

Before reaching the plausibility of the Amended Cross-Complaint's allegations against Newport, the Court pauses to address two procedural questions raised in the Motion to Dismiss, the presentation of matters outside of the pleadings and AMEC's capacity to sue for injuries to the Plan.

**I. Matters Outside the Pleadings**

In support of its Motion to Dismiss, Newport has cited a 2001 services agreement between the Church and AmEx, Newport's corporate predecessor. Newport cited the same agreement (ECF No. 100-3) in support of its earlier Rule 12(b) motion to dismiss Plaintiffs' Amended Complaint. Just as it did in deciding Newport's previous Rule 12(b) motion, the Court declines to consider Newport's services agreement in assessing the sufficiency of the pleadings.

If a court considers matters outside the pleadings in deciding a motion to dismiss, the Court must treat the motion to dismiss as a motion for summary judgment and give all parties "a reasonable opportunity to present all material pertinent to the motion." *Gaal*, 58 F.4th at 883 (citing *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680 (6th Cir. 2011)). However, a court retains the discretion to consider "exhibits attached [to the complaint], public records, [and] items appearing in the record of the case . . . . without converting the motion to one for summary judgment." *Id*. Moreover, a court may also consider "exhibits attached to a defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein." *Id*. Here, the services agreement between AmEx and the Church is not an exhibit to the Amended Cross-Complaint or a public record. And while Newport has made the agreement part of the record, the Amended Cross-Complaint only mentions the agreement to explain the fact that the Church originally contracted with AmEx to serve as the Plan's third-party administrator. Cross-Compl. ¶ 49. Otherwise, the agreement is not central to the Cross-Plaintiffs' claims against Newport, AmEx's corporate successor as a party to the agreement. The Church has made no allegations about the agreement itself. AMEC has not alleged that Newport breached the agreement its predecessor had with the Church. AMEC would hold Newport liable for its alleged violation of fiduciary and common law duties Newport owed to the Church. The Court understands that Newport relies on the

18

agreement to support its position that Newport had no duty to corroborate any of the financial information furnished to Newport by Dr. Harris. But without some showing that the pleadings refer to the services agreement and the agreement is central to the Cross-Plaintiffs' claims against Newport, the Court is not convinced that it should consider the agreement in deciding Newport's Motion to Dismiss.

## II. Capacity to Sue

The Motion to Dismiss next raises a question concerning the capacity of AMEC to sue on behalf of the Plan. Newport reiterates an argument previously raised by Symetra Life against Plaintiffs that a third-party, in this case the Church, cannot sue as a representative of the Plan, a trust presumably established under Tennessee law. Federal Rule of Civil Procedure 17(b) establishes the process for determining a party's capacity to sue or be sued, depending on the legal nature of the party. Fed. R. Civ. P. 17(b). For corporations like the Church, Rule 17(b)(2) requires the Court to ascertain capacity "by the law under which [the corporation] is organized." Fed. R. Civ. P. 17(b)(2). For all other types of parties, Rule 17(b)(3) applies and states "the law of the state where the court is located" determines the party's capacity to sue or be sued. Fed. R. Civ. P. 17(b)(3). This final provision includes the capacity of a party suing on behalf of a trust. *Doermer v. Oxford Fin. Grp., Ltd.*, 884 F.3d 643, 648 (7th Cir. 2018) (quoting Rule 17(b)(3)); *see also Coverdell v. Mid–South Farm Equip. Ass'n*, 335 F.2d 9, 12 (6th Cir. 1964) (identifying a Tennessee trust as an "unincorporated association" for purposes of Rule 17(b)(3)). For purposes of Rule 17 then, Tennessee law, the law of the state where this Court sits, supplies the governing law to determine the capacity of AMEC to sue as a representative of the Plan.

The Court finds it unnecessary to decide the capacity-to-sue argument raised in Newport's Motion to Dismiss. The Court previously held that as a matter of Tennessee law, Plaintiffs have the

capacity to sue on behalf of the Plan. *See* Order on Mots. to Dismiss Consolidated Am. Compl. – Class Action, 35–42 Mar. 17, 2023 (ECF No. 197). The Court notes two important facts that distinguish the issue raised by Symetra Life to challenge Plaintiffs' capacity to sue as representatives of the Plan and Newport's challenge to the Church's capacity to sue as a representative of the Plan. First, the Amended Cross-Complaint names the AMEC Ministerial Retirement Annuity Plan as a Cross-Plaintiff. In other words, the Plan itself is already a party to the Amended Cross-Complaint and is bringing its own claims against the Cross-Defendants including Newport. The Plan has responded in opposition to Newport's Motion to Dismiss. Cross-Pls.' Resp. in Opp'n to Newport's Mot. to Dismiss, Oct. 16, 2023 (ECF No. 289) ("Defendants/Cross-Plaintiffs African Methodist Episcopal Church ('AMEC' or the 'Church') and AMEC Ministerial Retirement Annuity Plan (collectively, 'AMEC CrossPlaintiffs') respectfully submit this Response in Opposition to Cross-Defendant Newport Group Inc.'s Motion to Dismiss AMEC's Amended Cross-Complaint."). Strictly speaking, AMEC is not acting in a representative capacity because the Plan itself is a party to the Amended Cross-Complaint.

Second, the Church and the Plan have stated in their response brief that in the event the Court concludes the Amended Cross-Complaint has not named the correct party to act on behalf of the Plan, AMEC and the Plan request leave of court to amend the Amended Cross-Complaint and name the current trustee of the Plan as a Cross-Plaintiff. "Tennessee generally follows the common law" of trusts. *In re Cannon*, 277 F.3d 838, 854 (6th Cir. 2002) (applying Tenn. law and collecting cases). "Under the common law, a trustee can maintain an action in law or equity against a third person to remedy an injury with respect to trust property as if [the trustee] held the property free of the trust . . . ." *Id.* (collecting Tenn. cases and citing Restatement (Second) of Trusts §§ 280–82) (other citations omitted). Even though the Plan itself is named as a party in the Amended Cross-Complaint, naming

the trustee of the Plan appears to be the better practice under Tennessee law. Fed. R. Civ. P. 17(b)(3) (requiring the application of "the law of the state where the court is located" to determine a party's capacity to sue). Rather than analyzing whether AMEC can sue in a representative capacity or whether the Plan is the proper party, the Court will grant AMEC and the Plan's request for leave to amend and add the current trustee as a Cross-Plaintiff to their Cross-Complaint.

### III. Negligent Misrepresentation (Count V)

Turning now to the causes of action alleged in the Amended Cross-Complaint, Newport seeks the dismissal of AMEC's negligent misrepresentation claim under Tennessee law.[3] Tennessee law recognizes "the common-law tort of negligent misrepresentation and [has] adopted the Restatement (Second) of Torts § 552 (1977) as the guiding principle with regard to these claims." *Hodge v. Craig*, 382 S.W.3d 325, 344–45 (Tenn. 2012) (citing *Bethlehem Steel Corp. v. Ernst & Whinney*, 822 S.W.2d 592, 595 (Tenn. 1991)). In order to prove negligent misrepresentation, a plaintiff must show the following: (1) the defendant was acting, in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary interest; (2) the defendant supplied faulty information meant to guide others in their business transaction; (3) the defendant failed to exercise reasonable care in obtaining or communicating the information; (4) the defendant justifiably relied on the information. *See* Restatement (Second) of Torts § 552; *see also John Martin Co. v. Morese/Diesel, Inc.* 819 S.W.2d 428, 431 (Tenn. 1991).

AMEC's claim for negligent misrepresentation fails in this case for failure to allege that Newport supplied information to the Church meant to guide the Church in its business transactions. The Amended Cross-Complaint makes allegations about Newport compiling inaccurate statements for Plan participants and making inaccurate certifications about the Plan's assets to Rodney Brown, a

---

[3] The Amended Cross-Complaint's allegations concerning Newport's negligent misrepresentation refer only to AMEC as the Cross-Plaintiff alleging the claim, not the Plan itself.

third-party hired to audit the Plan's assets. However, nothing in the pleading alleges that Newport misrepresented any facts to AMEC. Furthermore, without some allegation to establish that Newport communicated information to the Church, the Amended Cross-Complaint fails to allege how the denomination justifiably relied on the information.

AMEC argues that its negligent misrepresentation claim should survive because it need not show that the "information must be provided to AMEC in order for AMEC to have a claim . . . ." Cross-Pl.s' Resp. in Opp'n to Newport's Mot. to Dismiss 15 (ECF No. 289). AMEC relies for support on the Tennessee Supreme Court's decision in *Bethlehem Steel Corp. v. Ernst & Whinney*, 822 S.W.2d 592 (Tenn. 1991). In *Bethlehem Steel*, the court held that a corporation had a claim for negligent misrepresentation against a national accounting firm where the accounting firm had prepared an audit report about one of the corporation's customers. The corporation was not a client of the accounting firm. Nevertheless, the corporation relied on the accounting firm's report in making its decision to extend credit to its customer. When it came to light the customer was actually insolvent, the corporation sought to hold the accounting firm liable for negligent misrepresentation. The Tennessee Supreme Court held that the accounting firm could be liable to the corporation, despite the absence of a client relationship or any other privity but limited the firm's liability "to those persons or class of persons, as determined by current business practices and the particular factual situation, whom the accountant at the time the report is published should reasonably expect to receive and rely on the information." *Bethlehem Steel*, 822 S.W.2d at 596.

AMEC's arguments to the contrary notwithstanding, *Bethlehem Steel* is not inconsistent with the Court's application of Tennessee's negligent misrepresentation doctrine. The holding in *Bethlehem Steel* brought the corporation within the "class of persons, as determined by current business practices and the particular factual situation" which might be reasonably expected to

22

receive and rely on the information.   By contrast, nothing in the Amended Cross-Complaint shows that Newport should have expected the Church to receive information about the Plan's Motorskill Entities holdings and then rely on Newport's information in making decisions to guide its own affairs.   AMEC only alleges that Newport provided the inaccurate information to Plan participants and an outside auditor.   As the Court describes in more depth below, the Plan retained Newport as a third-party administrator to assist the Plan in record-keeping.   But even viewing the pleadings in a light most favorable to the Cross-Plaintiffs, nothing in the allegations suggests that AMEC was within the class of persons relying on Newport to provide accurate information about the Plan's assets.   Because the same information was within the possession of the Church (through church employee and trustee of the Plan Dr. Harris), AMEC has alleged no facts to show why its reliance on Newport for the information was justifiable.   Therefore, Newport's Motion to Dismiss the Amended Cross-Complaint's negligent misrepresentation claim is **GRANTED**.

## IV. Breach of Fiduciary Duty (Count VII)

Count VII of the Amended Cross-Complaint would hold Newport liable for breach of fiduciary duty, a claim asserted under Tennessee law.   The pleadings specifically allege that Newport owed the Church and the Plan a fiduciary duty and breached its duty.   Am. Cross-Complaint ¶ 134 ("Cross-Defendant Newport owed a fiduciary duty to the Plan and the Church as the third-party administrator of tens of millions of dollars of Plan funds.").   However, Newport's Motion to Dismiss tests the sufficiency only of the Church's claim for breach of fiduciary duty. Newport's Mem. in Support of Mot. to Dismiss 13 (ECF No. 280-1) ("AMEC is not the Plan, and the Amended Complaint makes zero allegations that Newport owed fiduciary duties to AMEC under Tennessee law . . . .").   The Church's response in opposition does not squarely address Newport's argument and instead argues that "[i]t would be premature to dismiss AMEC's allegations that

Newport owed a fiduciary duty to *the Plan*."  AMEC's Resp. in Opp'n to Mot. to Dismiss 16 (ECF No. 289) (emphasis added).

In order to recover for breach of fiduciary duty, a plaintiff must establish: (1) a fiduciary relationship, (2) breach of the resulting fiduciary duty, and (3) injury to the plaintiff or benefit to the defendant as a result of that breach. *Faber v. Ciox Health, LLC*, 331 F.Supp.3d 767, 780 (W.D. Tenn. 2018) (citing *In re Estate of Potter*, 2017 WL 4546788, at *2 (Tenn. Ct. App. Oct. 11, 2017) and *Ann Taylor Realtors, Inc. v. Sporup*, No. W2010–00188COA–R3–CV, 2010 WL 4939967 (Tenn. Ct. App. Dec. 3, 2010) and; *see also* 37 C.J.S. *Fraud* § 15 (2008).  The issue is presented is whether the Amended Cross-Complaint plausibly alleges its breach of fiduciary duty claim on behalf of AMEC (not the Plan itself).

To state such a claim, the Church must first allege enough factual material to show that Newport had a fiduciary relationship with AMEC.  "A fiduciary is a person holding the character of a trustee who bears the duty to act primarily for the benefit of another." *Sanford v. Waugh & Co., Inc.*, 328 S.W.3d 836, 843 (Tenn. 2010) (citing *McRedmond v. Estate of Marianelli*, 46 S.W.3d 730, 738 (Tenn. Ct. App. 2000)).  A fiduciary duty is the highest standard of duty under the law. *Overstreet v. TRW Com. Steering Div.*, 256 S.W.3d 626, 642 (Tenn. 2008) (citation omitted).  In Tennessee, a party can be either a fiduciary per se or a fiduciary due to a confidential relationship. *Faber*, 331 F.Supp.3d at 780 (citing *Grant v. Tucker*, 57 F.Supp.3d 852, 859 (M.D. Tenn. 2014)). Tennessee law recognizes several kinds of fiduciaries per se: an agent owes a fiduciary duty to its principal, *Knox–Tenn Rental Co. v. Jenkins Ins., Inc.*, 755 S.W.2d 33, 36 (Tenn. 1988) ("An agent is a fiduciary with respect to the matters within the scope of his agency."); attorneys to their clients, *Crawford v. Logan*, 656 S.W.2d 360, 364 (Tenn.1983); guardians and conservators to their wards, *Freeman v. Martin,* 181 S.W.2d 745, 746 (Tenn. 1944); directors and officers of a

corporation to the corporation and its shareholders, *Sanford*, 328 S.W.3d at 843; employees to their employers, *Efird v. Clinic of Plastic & Reconstructive Surgery*, 147 S.W.3d 208, 219 (Tenn. Ct. App. 2003); and realtors to their clients, *Sporup*, 2010 WL 4939967, at *3; *see also Comm'rs of Powell–Clinch Util. Dist. v. Util. Mgmt. Review Bd.*, 427 S.W.3d 375, 388–89 (Tenn. Ct. App. 2013) (collecting cases). As a general proposition, "the existence or nonexistence of a duty owed by the defendant to the plaintiff is a question of law for the court to decide." *EPAC Techs., Inc. v. HarperCollins Christian Publishing, Inc.*, 398 F.Supp.3d 258, 270 (M.D. Tenn. 2019) (quoting *Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993)).

The Court holds that Newport was a fiduciary of the Church. The Court previously held in denying Newport's motion to dismiss Plaintiffs' breach of fiduciary duty claim that Newport had fiduciary status. The Court focused its analysis on the terms of the Plan and Newport's alleged role as a third-party administrator retained by the trustee of the Plan. Much of the Court's earlier reasoning applies here.

The Court starts with construing the terms of the Plan itself. "The interpretation of a trust agreement is a question of law for the court." *Glass v. SunTrust Bank*, 523 S.W.3d 61, 66 (Tenn. Ct. App. 2016) (citing *Holder v. First Tenn. Bank N.A. Memphis*, No. W1998–00890–COA–R3–CV, 2000 WL 349727, at *3 (Tenn. Ct. App. Mar. 31, 2000)). The Plan named AMEC as "the Employer," Plan, art I, § 1.17; the AMEC Department of Annuity Investments and Insurance, which is not a party to the Amended Cross-Complaint, as the Plan's "Administrator," *id*., art. I, § 1.3; and Dr. Harris as the "Trustee." Elsewhere, the Plan named "the Employer" as the "Administrator." *Id*. art II, §2.2 ("The Employer shall be the Administrator."). The Plan granted AMEC the authority "to appoint any person, including, but not limited to, the Employees of [AMEC] to perform the duties of the Administrator." *Id*. The Plan identified these parties as well as "any Investment Manager" as the

25

"named Fiduciaries" of the Plan. *Id.* at art. IX, § 9.11. An "Investment Manager" was defined as "a person, firm, or corporation registered as an investment adviser under the Investment Advisers Act of 1940, a bank, or an insurance company" that "(a) has the power to manage, acquire, or dispose of Plan assets and (b) acknowledges fiduciary responsibility to the Plan in writing." *Id.* at art. I, § 1.30

As "named Fiduciaries," each of these parties, the Church ("the Employer"), the AMEC Department of Annuity Investments and Insurance ("the Administrator"), Dr. Harris ("the Trustee"), and any "Investment Manager," had "only those specific powers, duties, responsibilities, and obligations as are specifically given them under the Plan including, but not limited to, any agreement allocating or delegating their responsibilities, the terms of which are incorporated herein by reference." *Id.* at art. IX, § 9.11. The Plan specified that the Administrator in its capacity as a "named Fiduciary" had "the sole responsibility for the administration of the Plan, including, but not limited to, the items specified in Article II of the Plan, as the same may be allocated or delegated thereunder." *Id.* Article II then listed the duties of the Administrator, including the duty "to compute, certify, and direct the Trustee with respect to the amount and the kind of benefits to which any Participant shall be entitled hereunder" and the duty "to assist any Participant regarding the Participant's rights, benefits, or elections available under the Plan." *Id.* at art. II, § 2.3(b) & (l). The Plan also charged the Administrator with "keep[ing] a record of all actions taken and [keeping] all other books of account, records, policies, and other data that may be necessary for proper administration of the Plan and [the responsibility] for supplying all information and reports to the Internal Revenue Service, Department of Labor, Participants, Beneficiaries and others as required by law." *Id.* at art. II, § 2.4.

In recognition perhaps of the scope of the duties assigned to the Administrator, the Plan authorized the Administrator ("or the Trustee with the consent of the Administrator") to appoint

26

"counsel, specialists, advisers, agents (including nonfiduciary agents) and other persons as the Administrator or the Trustee deems necessary or desirable in connection with the administration of this Plan . . . ." *Id.* at art. II, § 2.5. This included "agents and advisers to assist with the administration and management of the Plan, and thereby to provide, among such other duties as the Administrator may appoint, assistance with maintaining Plan records and the providing of investment information to the Plan's investment fiduciaries and to Plan Participants." *Id.* As Article II of the Plan implies, some of these "agents" or other third-party service providers were "nonfiduciary" and others were "fiduciary." So in addition to the "named Fiduciaries," the Plan identified as a "fiduciary"

> any person who (a) exercises any discretionary authority or discretionary control respecting management of the Plan or exercises any authority or control respecting management or disposition of its assets, (b) renders investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of the Plan or has any authority or responsibility to do so, or (c) has any discretionary authority or discretionary responsibility in the administration of the Plan.

*Id.* at art. I, § 1.20.

The Court construes the Plan to name AMEC ("the Employer") and the AMEC Department of Annuity Investments and Insurance ("the Administrator") as plan fiduciaries. The Administrator had the exclusive authority and duty "to compute" the benefits of Plan participants, "to assist" a Plan participant in understanding the participant's rights and benefits under the Plan, to keep all records necessary for the proper administration of the Plan, and to supply "*all* information" to plan participants. Plan, art. II, §§ 2.3(b) & (l), 2.4 (emphasis added). The Plan also gave the Administrator the discretion to appoint "agents" to assist in these facets of plan administration. *Id.* at art. II, § 2.5. Separately, the Plan required the Administrator to "direct the Trustee, as of each Valuation Date, to determine the net worth of the assets comprising the Trust Fund as it exists on the

Valuation Date." *Id.* at art. V, § 5.1. Reading each of these provisions together and the Plan as a whole, the Administrator exercised these duties of plan administration in a fiduciary capacity.

A reasonable inference from the Amended Cross-Complaint is that the Administrator retained Newport to assist in Plan recordkeeping, in communicating information such as participant balances to Plan participants, and in the calculating the values of the Plan's net assets. The Amended Cross-Complaint plausibly alleges that Newport was a fiduciary in its capacity as a third-party administrator over tens of millions of dollars in Plan assets. Am. Cross-Compl. ¶ 134. Newport also provided Plan participants with quarterly financial statements. *Id.* ¶ 50. Cross-Plaintiffs contend that Newport "continued" to include Plan investments in the Motorskill Entities after 2019, even though Newport was no longer receiving quarterly financial statements to validate the Plan's investments in Motorskills. *Id.* ¶¶ 52-53. The commonsense inference from these allegations is that Newport exercised something more than simply a reporting function of a nonfiduciary character and had some measure of professional, specialized discretion over how to report the Plan's holdings to participants. This is enough to show that Newport exercised "*any* discretionary authority or discretionary responsibility in the administration of the Plan." *Id*. at art. I, § 1.20 (emphasis added).

The Court concludes that Newport's alleged role in Plan administration was consistent with fiduciary status under the terms of the Plan itself.

Accepting the Amended Cross-Complaint's allegations that Newport was retained as the third-party administrator to assist the Administrator with specific fiduciary functions, Newport owed the Administrator a fiduciary duty as a matter of Tennessee common law. Newport had a principal-agent relationship with the Administrator named in the Plan, AMEC and its delegee the AMEC Department of Annuity Investments and Insurance. *Knox–Tenn Rental Co.*, 755 S.W.2d at 36 ("An agent is a fiduciary with respect to the matters within the scope of his agency."). Furthermore, the

Amended Cross-Complaint plausibly alleges that Newport was something more than simply executing orders. Newport was retained to carry out specific duties and granted some degree of professional discretion over the methods by which it collected information about the Plan's assets, calculated the value of each beneficiary's share of those assets, and then reported the information to each beneficiary. In terms of the Tennessee case law, Newport may not have held "broad fiduciary obligations" but did not merely carry out "non–discretionary and at arm's length" transactions on behalf of the Administrator. *Orlowski v. Bates*, 146 F.Supp.3d 908, 927 (W.D. Tenn. 2015) (quoting *Johnson v. John Hancock Funds*, 217 S.W.3d 414, 428 (Tenn. Ct. App. 2006)).

In the ERISA context, "[f]iduciary status is a fact–intensive inquiry, making the resolution of that issue inappropriate for a motion to dismiss." *Wallace v. Int'l Paper Co.*, 509 F.Supp.3d 1045, 1052 (W.D. Tenn. 2020) (quoting *In re Regions Morgan Keegan ERISA Litig.*, 692 F. Supp. 2d 944 (W.D. Tenn. 2010)); *see also* Plan, art. IX,§ 9.3 (stating that the Plan must be construed according to ERISA "and the laws of the State of Tennessee, other than its laws respecting choice of law, to the extent not pre–empted by the Act"). At the pleadings stage and without a fully developed evidentiary record, the Amended Cross-Complaint plausibly alleges enough facts to show that Newport had a fiduciary relationship with AMEC, not just the Plan.

Newport resists this conclusion relying in part on the services agreement its corporate predecessor had with the Plan. As the Court has already noted, Newport has attached a copy of the services agreement to its Motion to Dismiss and cited the express language of the agreement, stating that Newport was not a fiduciary. The Court has already declined to consider the agreement and its contents at the pleadings stage. Even if the Court were to take the agreement into consideration as part of its ruling on the Motion to Dismiss, the agreement itself would not alter the Court's conclusion that the Amended Cross-Complaint alleges Newport's status as a fiduciary. The

29

agreement states that Newport's predecessor "is acting as a service provider and not in fiduciary capacity" and was not being "retained as a Trustee or Plan Administrator" nor "for investment advice."  Servs. Agr. 3 (ECF No. 100–3). Whether Newport or its predecessor in interest owed a fiduciary duty, however, is a question of law for the Court to decide.  *EPAC Techns.*, 398 F.Supp.3d at 270 (quoting *Bradshaw*, 854 S.W.2d 865 at 869).  A single disclaimer in an engagement letter is not conclusive or dispositive of the question.

Furthermore, the services agreement states that Newport had the duty to prepare "quarterly valuations" of Plan assets and "quarterly participant statements" and provide an "annual reconciliation of plan assets." The Plan assigned these duties to the Administrator of the Plan, a "named Fiduciary," and gave this named Fiduciary the authority to delegate its duties.  The Amended Cross-Complaint plausibly alleges that Newport failed to carry out this delegated duty. Even though the agreement permitted Newport to rely on the accuracy of "asset data provided by the company" (presumably the Church, Dr. Harris, or the Department of Annuity and Insurance), the Amended Cross-Complaint alleges that Newport improperly included data, i.e. investments in the Motorskill entities, when Newport did not receive any financial statements.  Therefore, the agreement, at least at the pleadings stage, does not show that Newport was not a fiduciary or that Newport did not undertake any fiduciary duty.

Having determined that the Amended Cross-Complaint plausibly alleges Newport's fiduciary relationship with AMEC, this leaves the remaining elements of Cross-Plaintiffs' breach of fiduciary duty claims: that Newport breached "the resulting fiduciary duty" and caused "injury to the plaintiff or benefit to the defendant as a result of that breach." *Faber*, 331 F.Supp.3d at 780.  "One standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation." *Morrison v. Allen*, 338 S.W.3d 417, 438 (Tenn.

2011) (quoting Restatement (Second) of Torts § 874). Proof of a causal link between an alleged breach of fiduciary duty and a plaintiff's damages is "an essential element of a fiduciary duty claim." *Id.* (citing *Union Planters Bank of Middle Tenn. v. Choate*, No. M1999–01268–COA–R3–CV, 2000 WL 1231383, at *3 (Tenn. Ct. App. Aug. 31, 2000); 23 Tennessee Practice *Elements of an Action* § 8:1 (2009) (listing damages and proximate cause as elements of the cause of action for breach of fiduciary duty)).

The Court holds that taken as a whole, the Amended Cross-Complaint plausibly alleges breach and causation. The Amended Cross-Complaint plausibly alleges Newport breached its fiduciary duties to AMEC to perform the administrative functions Newport was retained to provide. Newport was hired to collect information about the Plan's assets, calculate the value of each beneficiary's share of those assets, and then report the information to each beneficiary. In the course of performing these fiduciary duties, Newport mistakenly included the value of the Plan's investment in the Motorskill Entities, even though Newport did not receive financial statements to substantiate the value. This plausibly implies that Newport breached its fiduciary role in the administration of the Plan.

As for a causal connection between the alleged breaches and the injuries to Cross-Plaintiffs, the Amended Cross-Complaint plausibly shows that the alleged breaches of fiduciary duty caused losses to the Plan and the Church. "Causation, or cause in fact, means that the injury or harm would not have occurred 'but for' the defendant's negligent conduct." *Morrison v. Allen*, 338 S.W.3d 417, 438 (Tenn. 2011) (applying but for causation to a claim for breach of fiduciary duty and quoting *Kilpatrick v. Bryant,* 868 S.W.2d 594, 598 (Tenn. 1993)). Newport's alleged failure to produce and provide accurate statements of the Plan's assets in 2019 caused losses to the Plan and the Church. These allegations satisfy the "but for" standard under Tennessee law. "Once duty is established, the

31

question of breach of duty and proximate cause of the plaintiff's injury are usually treated as questions of fact." *Leatherwood v. Wadley*, 121 S.W.3d 682, 694 (Tenn. Ct. App. 2003). The causal role of a "superseding intervening cause" such as a criminal act is also factual question. *McClenahan v. Cooley*, 806 S.W.2d 767, 776 (Tenn. 1991). These are issues the Court cannot decide as a matter of law at the pleadings stage. Therefore, Newport's Motion to Dismiss is **DENIED** as to the breach of fiduciary duty claim.

## V. Negligence (Count VIII)

Count VIII of the Amended Cross-Complaint alleges that Newport is liable for negligence under Tennessee common law. Newport seeks the dismissal only of AMEC's negligence claim against it. Under Tennessee common law, a plaintiff alleging negligence must prove the following elements: "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate or legal cause." *Tumminello v. Father Ryan High Sch., Inc.*, 678 F. App'x 281, 286–87 (6th Cir. 2017) (citing *West v. E. Tenn. Pioneer Oil Co.*, 172 S.W.3d 545, 550 (Tenn. 2005)). Newport's Motion to Dismiss contests the first element and argues the company owes AMEC no duty.

The question of duty is "entirely a question of law for the court." *Power & Tel. Supply Co., Inc. v. SunTrust Banks, Inc.*, 447 F.3d 923, 932 (6th Cir. 2006) (citing *Bradshaw*, 854 S.W.2d at 869). "In general, all persons have a duty 'to use reasonable care to refrain from conduct that will foreseeably cause injury to others.'" *Biscan v. Brown*, 160 S.W.3d 462, 478 (Tenn. 2005) (quoting *Turner v. Jordan*, 957 S.W.3d 815, 818 (Tenn. 1997)). "To determine whether a particular defendant owes a duty of care to a particular plaintiff," Tennessee courts "balance the foreseeability and gravity of the potential harm against the feasibility and availability of alternatives that would

have prevented the harm." *Hale v. Ostrow*, 166 S.W.3d 713, 716–17 (Tenn. 2005). There is, however, no "affirmative duty to act for the protection of another . . . *unless* the defendant 'stands in some special relationship to either the person who is the source of the danger, or to the person who is foreseeably at risk from the danger.'" *Biscan*, 160 S.W.3d at 478–79 (citing Restatement (Second) of Torts § 315 (1965)). The doctrine recognizes that as a matter of public policy, "certain socially recognized relations exist which constitute the basis for such legal duty." *Id.* at 479 (citing *Bradshaw*, 854 S.W.2d at 871).

Based on the facts alleged in the Amended Cross-Complaint, the Court holds that Newport owed AMEC a duty of care but not both of the duties alleged in the pleadings. Cross-Plaintiffs allege Newport had a duty "to notify AMEC that its retirement Plan funds were invested in high risk, illiquid, inappropriate investments" and a separate "duty to take reasonable steps to verify whether the financial positions they reported were accurate, and to perform reasonable diligence to confirm the accuracy." Am. Cross-Compl. ¶¶ 146, 148. The first alleged duty, a duty of notification, fails to state a negligence claim. The Amended Cross-Complaint plausibly alleges Newport acted as the third-party administrator for the Plan. This included the duty to compile financial statements regarding the Plan's assets and then to calculate the value of each participant's account and communicate that value to participants in periodic statements. The pleadings, however, allege no facts to show that Newport had a common law duty to notify AMEC about the characteristics of the Plan's investments. Nothing in the Plan itself or in the allegations of the Amended Cross-Complaint suggests that AMEC relied on Newport for investment advice or monitoring. What is more, Cross-Plaintiffs have cited no authority for the theory that a third-party administrator hired to perform discrete functions on behalf of a retirement plan owes the plan or the settlor of the plan a legal duty outside the scope of the administrator's agency or employment. The Amended Cross-Complaint

33

fails to state a claim for negligence based on the duty to notify AMEC about the quality or characteristics of the Plan's investments.

On the other hand, the Amended Cross-Complaint plausibly alleges Newport had the "duty to take reasonable steps to verify whether the financial positions they reported were accurate, and to perform reasonable diligence to confirm the accuracy." Just as the allegations established Newport's fiduciary duty, the same pleadings allege a common law duty of this sort. A third-party trust administrator who undertakes the task of calculating the value of a trust's assets owes a duty to ensure the accuracy of its valuations. Otherwise, there is a foreseeable risk of potential harm to the trust and its beneficiaries. *Biscan*, 160 S.W.3d at 480 ("Although all the balancing considerations are important, the foreseeability prong is paramount because '[f]oreseeability is the test of negligence.'") (citation omitted)). And where as here the settlor of the trust has its own duty to make up for possible shortfalls, as AMEC has alleged in the Amended Cross-Complaint, the third-party administrator owes the same duty to the settlor. Balanced against "the feasibility and availability of alternatives that would have prevented the harm," the risk and gravity of the potential harm creates an unreasonable risk. *Hale*, 166 S.W.3d at 716–17. The Court concludes then that Newport owed AMEC a duty to verify the accuracy of the financial positions it reported as a matter of Tennessee law.

The Amended Cross-Complaint goes on to make plausible allegations going to each of the other elements of AMEC's negligence claim. According to the pleadings, Newport committed a breach of its common law duties. In its defense Newport contends that the participant statements showing Plan holdings in the Motorskills entities were based on information Newport received from Dr. Harris. But that fact claim is inconsistent with the facts alleged in the Amended Cross-Complaint, at least reading the facts in a light most favorable to Cross-Plaintiffs. The pleadings

show that the Motorskill Entities stopped providing financial statements in 2019 and that Newport continued to report the value of the Plan's investments in the Motorskill Entities for some time thereafter.  Instead of showing that Newport was relying on information it received from Dr. Harris, the allegation actually shows that Newport did not receive financial statements at all beyond 2019. This is a dispute the Court need not address further at the pleadings stage.

The Amended Cross-Complaint also plausibly alleges causation and injury.   Under Tennessee law, "a negligence claim requires proof of two types of causation: causation in fact and proximate cause." *Hale*, 166 S.W.3d at 718. A defendant's negligence is the cause in fact of a plaintiff's injury if the injury would not have happened "but for" the defendant's negligence. *Id.* (citing *Wood v. Newman, Hayes & Dixon Ins. Agency,* 905 S.W.2d 559, 562 (Tenn. 1995)).  Sole causation is not required, just that the defendant's negligence was a cause of the injury.  *Id*.  A plaintiff must further prove that the defendant's negligence was a proximate cause of the plaintiff's injury. *Id*.  Tennessee applies a three-part test to determine proximate cause: (1) the defendant's conduct must have been a "substantial factor" in bringing about the plaintiff's injury; (2) no rule or policy relieves the defendant from liability "because of the manner in which the negligence has resulted in the harm;" and (3) "the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence." *Id*.  A defendant will not be liable for injuries "that were not substantially caused by their conduct or were not reasonably foreseeable results of their conduct." *Id.* (citing *Haynes v. Hamilton Cnty.*, 883 S.W.2d 606, 612 (Tenn. 1994)).

Here, Cross-Plaintiffs allege that Newport's negligence was the cause in fact and the proximate cause of some injury to the Church.  Viewing the Amended Cross-Complaint as a whole, accurate information in 2019 may have alerted church leadership that the Plan's assets were not what

Dr. Harris said they were and therefore brought to light some or all of his scheme.  Newport argues that the Church had a duty to supervise Dr. Harris and was actually in a better position to detect his fraud.  But whether Newport's alleged negligence was the proximate cause of some or all of the losses to the Plan is beside the point.  Cause in fact and proximate cause are "ordinarily jury questions, unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome."  *Hale*, 166 S.W.3d at 718.  The Amended Cross-Complaint makes plausible allegations to show causation as a result of Newport's alleged negligence.  Therefore, Newport's Motions to Dismiss is **GRANTED** as to the alleged duty to notify and **DENIED** as to the alleged duty to verify.

## VI. Punitive Damages (Count IX)

The last issue presented is the Amended Cross-Complaint's prayer for an award of punitive damages against Newport.  Count IX alleges that Newport is liable for punitive damages because its "actions and omissions were intentional and reckless, and resulted in the loss of tens of millions of dollars." Am. Cross-Compl. ¶¶ 164-65.  In Tennessee, in order to recover punitive damages, a plaintiff must prove by clear and convincing evidence that the defendant "acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly." *Sanford v. Waugh & Co., Inc.*, 328 S.W.3d 836, 848 (Tenn. 2010).  Punitive damages are reserved for egregious cases and therefore require the higher burden of proof. *Goff v. Elmo Greer & Sons Const. Co., Inc.* 297 S.W.3d 175, 196-97 (Tenn. 2009).  The Court holds that the Amended Cross-Complaint has failed to state a plausible claim for punitive damages.  Cross-Plaintiffs have alleged no facts to support their characterization of Newport's conduct as "intentional" or "reckless."  At most the allegations against Newport are consistent with something more akin to negligence, which is insufficient to justify an

award of punitive damages. Therefore, Newport's Motion to Dismiss is **GRANTED** as to Cross-Plaintiffs' claim for punitive damages.

## <u>CONCLUSION</u>

The Court has proper subject-matter jurisdiction over the case or controversy presented in the Amended Cross-Complaint. AMEC has alleged facts going to each element of its Article III standing to bring this suit. The Court will nevertheless grant Cross-Plaintiffs' request to amend their pleadings and name the current trustee of the Plan as a party to the Cross-Complaint. On the merits of the pleadings, AMEC has stated a plausible claim for breach of fiduciary duty and stated in part its claim for common law negligence. Cross-Plaintiffs have failed to state a claim for negligent misrepresentation or a common law negligence claim based on a duty of notification. Both AMEC and the Plan have failed to state a claim for punitive damages. Therefore, Newport's Motion to Dismiss the Amended Cross-Complaint is **GRANTED in part, DENIED in part**.

**IT IS SO ORDERED**.

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date:  February 28, 2024.

37