## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: AME CHURCH EMPLOYEE | ) | Lead Case No. |
| RETIREMENT FUND LITIGATION, | ) | 1:22–md–03035–STA–jay |
| | ) | |
| | ) | ALL CASES |

---

## ORDER GRANTING IN PART, DENYING IN PART SYMETRA'S MOTION TO STAY OR DISMISS SECOND CONSOLIDATED AMENDED COMPLAINT – CLASS ACTION

---

This multidistrict litigation concerns losses to a non-ERISA retirement plan established by the African Methodist Episcopal Church for its clergy and employees. Plaintiffs are current or retired clergy of the church and have alleged a number of claims under Tennessee law against the denomination, church officials, third-party service providers to the Plan, and other alleged tortfeasors. Before the Court is a Motion to Stay or Dismiss (ECF No. 525) filed by Defendant Symetra Life Insurance Company. Symetra challenges the sufficiency of the pleadings in Plaintiffs' Second Consolidated Amended Complaint – Class Action (ECF No. 493) ("the Second Amended Complaint"). The parties have now fully briefed the issues. For the reasons set forth below, the Motion is **GRANTED in part, DENIED in part**.

## BACKGROUND

### I. Factual Background

The Court previously set out the factual allegations found in Plaintiffs' original consolidated Amended Complaint as part of an order ruling on motions to dismiss that pleading. *See* Order on Mots. to Dismiss Consolidated Am. Compl.—Class Action, Mar. 17, 2023 (ECF No. 197). Plaintiffs' Second Amended Complaint alleges many of the same facts and overall tracks the allegations of the original pleading, though with a number of new allegations. As such, the Court does not recite all of the allegations of the Second Amended Complaint here. For purposes of

deciding Symetra's Motion to Dismiss, the Court accepts the well pleaded facts of the Second
Amended Complaint as true.

### A.  **Plaintiffs and the African Methodist Episcopal Church**

Plaintiffs and the members of the class are ministers, bishops, officers, elders, and other
employees (and their respective beneficiaries) of the African Methodist Episcopal Church
("AMEC" or "the Church") or AMEC-related educational institutions or programs who have (i) lost
money that was (or should have been) invested in the Church's retirement Plan, or (ii) had
diminished investment returns because of Defendants' mismanagement of the Plan.  Second Am.
Compl. ¶ 7.  Plaintiffs seek to represent a class defined as

> All persons residing in the United States who are participants in the African
> Methodist Episcopal Church Ministerial Retirement Annuity Plan, all persons
> residing in the United States who are beneficiaries entitled to benefits as of January
> 1, 2021, under the African Methodist Episcopal Church Ministerial Retirement
> Annuity Plan.

*Id.* ¶ 511.  According to the Amended Complaint, the class consists of more than 5,000 members,
though the precise number is not currently known. *Id.* ¶ 516.

AMEC was the first formally organized African American Christian denomination in the
United States. *Id.* ¶ 81. The AMEC General Board ("General Board") is made up of members
elected from the church. *Id.* ¶ 44. The General Board has authority to approve amendments to the
church retirement Plan and appoint, monitor, and remove Plan trustees.  *Id*. ¶ 46. One of the
departments within the ecclesiastical structure is the AMEC Department of Retirement Services, the
church department responsible for administering the retirement Plan. *Id.* ¶ 41. The AMEC
Department of Retirement Services is headquartered in Memphis, Tennessee. *Id.* The Second
Amended Complaint names both the General Board and the AMEC Department of Retirement
Services as Defendants.

From 2000 until June 2021, Rev. Dr. Jerome V. Harris served as the Executive Director of the AMEC Department of Retirement Services. *Id*. ¶ 28. In his capacity as Executive Director, Dr. Harris acted as Trustee of the retirement Plan, making investment decisions about the funds held by the Plan. *Id.* ¶ 132. Dr. Harris provided annual reports to the AMEC General Board's Commission on Retirement Services. *Id*. ¶ 133. Upon the passing of Dr. Harris in 2024, the Second Amended Complaint names the Estate of Dr. Harris as a Defendant.

On or about December 19, 2001, acting on the recommendation of Dr. Harris, the AMEC General Board resolved to permit Dr. Harris to move its annuity funds to Symetra Life Insurance, which at that time operated and did business as Safeco Insurance. *Id*. ¶ 137. On or about December 31, 2001, AMEC opened its investment account with Safeco Insurance and invested $48,208,803.49 of Plan assets. *Id.* ¶ 144. Safeco Insurance rebranded as Symetra Life Insurance Company ("Symetra") in approximately 2005. *Id.* ¶ 136 n.4. Plaintiffs have named Symetra as a Defendant in their Second Amended Complaint.

Dr. Harris retained Robert Eaton to assist him in investing the Plan's funds. *Id.* ¶ 135. After engaging Eaton, Dr. Harris sent a letter to Symetra, advising the company that Eaton was the "Broker of record" for the Plan. *Id.* ¶ 136. Unbeknownst to the AMEC General Board or the Plan participants, Eaton received a commission from Symetra as part of the transfer of the Plan's annuity funds to Symetra, a commission that initially totaled hundreds of thousands of dollars. *Id.* ¶ 139. Symetra continues to pay Eaton substantial, recurring monthly tail commissions in an amount equal to 0.5% of the Plan's assets. *Id.*

## B. The Plan

In or around 2005, AMEC consolidated three existing retirement systems for church employees into a single plan known as the Ministerial Annuity Plan of the African Methodist

3

Episcopal Church (the "Plan"). *Id.* ¶ 111. The Plan consists of three "Levels." *Id.* ¶ 112. "Level I"

is a 401(k) defined contribution feature of the Plan. *Id.* ¶ 113. "Level II" holds retirement benefits

funded by AMEC with periodic contributions equal to 12% of each Plan participant's annual salary.

*Id.* "Level III" provides annual contributions from the Church's General Treasury to all active

Pastors and Presiding Elders. *Id.* A summary Plan description ("SPD") currently found on the

Church's website for Church employees is upon information and belief the only SPD issued by

AMEC. *Id.* ¶ 114. The SPD describes the defined contribution Plan ("Level I"), requiring Plan

participants who choose to participate to contribute a percentage of their compensation to the Plan.

*Id*. Plaintiffs allege on information and belief that there is no summary Plan description describing

the "Level II" and "Level III" components of the Plan. *Id.* ¶ 115.

The Fund was supposed to be governed by a Plan document. *Id.* ¶ 119. However, only Dr.

Harris signed the document, both as the "Trustee" and as the "Employer." *Id*. Symetra never took

any action to determine the scope of authority granted to Dr. Harris until two weeks after the first

lawsuit in this action was filed. *Id.* ¶ 121.

### C. **Dr. Harris's Companies Formed to Divert Plan Assets**

In 2001, Dr. Harris, Eaton, Symetra, and others began a long-running conspiracy to

misappropriate funds, defraud Plaintiffs, and manage the Fund for their own benefits and to the

detriment of the Plaintiffs and the Plan. *Id.* ¶ 147. The Second Amended Complaint alleges that the

scheme advanced Defendants' goals by, among other means, routing fund assets through a series of

corporate entities controlled by Dr. Harris and Eaton that skimmed fees for fraudulent and/or illusory

services. *Id.* ¶ 148(c). The allegations show that Dr. Harris and Eaton established limited liability

companies and then used the companies to obtain loans, which were never repaid, or entered into

contracts among themselves for services, which were never provided, all as part of a web of activity

4

to siphon off Plan assets.

Start with AMEC Financial Services, LLC ("AMEC Financial Services"). Dr. Harris organized AMEC Financial Services in 2002 to serve as a primary vehicle for his investment schemes and business ventures with third parties. *Id.* ¶ 149. AMEC Financial Services was converted to a C corporation in 2010 and thereafter was a subsidiary, for-profit entity of AMEC. *Id.* ¶ 151. On paper, the Plan owned 100% of AMEC Financial Services' voting stock. *Id.* In reality, Dr. Harris controlled AMEC Financial Services as if it was his own. *Id.*

Among other things, AMEC Financial Services entered into a marketing alliance with Financial Technologies, LLC ("Financial Technologies"). *Id.* ¶ 150. Financial Technologies is an entity owned, operated, and controlled by Robert Eaton. *Id.* ¶¶ 66, 152. As part of the marketing agreement, AMEC Financial Services (Dr. Harris) hired Financial Technologies (Eaton) to serve as the Church's exclusive broker of record for the Plan. *Id.* ¶¶ 153, 154. Financial Technologies received the previously referenced commissions from Symetra. *Id.* According to Plaintiffs, Financial Technologies provided unknown and possibly illusory "services" to AMEC Financial Services. *Id.* ¶ 152.

In 2004, the AMEC Department of Retirement Services, in conjunction with AMEC Financial Services, loaned Financial Technologies more than $500,000. *Id.* ¶ 155. Eaton signed a note on Financial Technologies' behalf and used the commission checks he and Financial Technologies received from Symetra as collateral to secure the loan. *Id.* ¶ 156. The loan was originally due to be repaid in three years, but roughly a year after the loan was made, Financial Technologies obtained a favorable settlement agreement with AMEC and AMEC Financial Services. *Id.* Under the terms of the settlement agreement, AMEC and AMEC Financial Services discharged the debt owed by Financial Technologies in exchange for certain tangible and non-tangible assets

that are believed to be worth far less than $500,000. *Id.* ¶ 157. Plaintiffs have named Financial Technologies and Robert Eaton as Defendants.

Dr. Harris and Eaton created and used other business organizations to carry out their plan, as well. Between 2006 and 2008, Dr. Harris started the following companies: Financial Freedom Funds, LLC ("Freedom Funds"); Financial Freedom Group, Inc. ("Freedom Group"); and Trinity Financial Consultants, LLC ("Trinity" or "Trinity Financial"). *Id.* ¶¶ 158, 166, 172. Dr. Harris was the manager of both LLCs and Eaton served as president of Freedom Group. *Id.* ¶¶ 159, 169, 173. Dr. Harris and Eaton created Freedom Funds in 2006. *Id.* ¶ 160. On January 11, 2008, Freedom Funds agreed to pay AMEC Financial Services 65 basis points plus direct and indirect expenses for "general management, business advisory, program performance, administrative, fiscal, legal and accounting services" *Id.* ¶ 179. In March 2008, Dr. Harris directed Symetra to wire $10 million of Plan assets from the Plan's fixed annuity account at Symetra to an account held by Freedom Funds. *Id.* ¶ 401. For roughly fifteen years, Dr. Harris used Freedom Funds as a vehicle to divert millions of dollars more from the AMEC Department of Retirement Services and the Plan. *Id.* ¶ 161.

On July 1, 2009, Trinity entered into two separate contracts with Freedom Funds and Freedom Group. ¶ 176. As part of the Trinity-Freedom Funds contract, Freedom Funds agreed to pay Trinity $300,000 a year for "general management, business advisory, program performance, administrative, fiscal, legal and accounting services." *Id.* ¶ 177. As part of the Trinity-Freedom Group contract, Trinity agreed to pay Freedom Group $110,000 a year plus up to $125,000 in expenses for "general management support, business advisory, market reviews, program performance reviews, maintain regular contact and collect updated holding analysis and reviews," and "as needed administrative support." *Id.* ¶ 178.

In sum, even though Freedom Funds received assets from the Plan purporting to be

6

investments, Freedom Funds used the money to pay both AMEC Financial Services LLC and Trinity substantial amounts for identical management and administrative services, and at the same time Trinity was paying Freedom Group for similar services that it was getting paid to perform for Freedom Funds. *Id.* ¶ 180. All of the "services" provided by AMEC Financial Services, Financial Freedom Group, and Trinity were fraudulent and/or illusory. *Id.* ¶ 181. Plaintiffs have named Freedom Funds, Freedom Group, and Trinity as Defendants.

Dr. Harris also invested $2.5 million of the Plan's assets in undeveloped land in Key Marco, Florida. *Id.* ¶ 208. Key Marco Holdings, LLC was purportedly established by Dr. Harris and Eaton to isolate this investment from the other Plan investments to avoid any potential liability issues. *Id.* ¶ 210. The sole member of Key Marco Holdings, LLC, is Freedom Funds. *Id.* ¶ 211. Key Marco Holdings, LLC still holds title to five parcels of undeveloped land (Lots 11, 12, 13, 14 and 16, Block 5, Horrs Island, A/K/A Key Marco, recorded in Plat Book 21, Pages 5-19, of the Public Records of Collier County, Florida). *Id.* ¶ 213. A recent valuation of these properties indicates that they are worth less than half of the $2.5 million original loan amount. *Id.* ¶ 212.

Dr. Harris, his son Christopher Harris, and Gloria Peterson (Dr. Harris's executive administrative assistant in the Department of Retirement Services) were on Trinity's payroll from 2009 until October 2021. *Id.* ¶ 174. Each received a salary from Trinity that essentially doubled what they were already receiving from the AMEC Department of Retirement Services. *Id.* For roughly thirteen years, Dr. Harris used Trinity as a vehicle to divert money from the Department and the Plan. *Id.* ¶ 175. Dr. Harris also involved his spouse in the scheme. According to the Second Amended Complaint, Sandra Harris worked at the AMEC Department of Retirement Services for several years in the 2000s and the 2010s, as late 2012, and served as the Executive Assistant to the Director, focusing on special projects. *Id.* ¶ 182. Sandra Harris was also a signatory for a bank

account in the name of Defendant Trinity Financial Consultants, LLC. *Id*. ¶ 183. Plan assets were directed into this bank account. *Id*. Additionally, any Plan assets embezzled by Dr. Harris almost certainly went into at least one of four joint bank accounts held by Dr. Harris and Sandra Harris. *Id*. ¶ 184. Plaintiffs have named Sandra Harris as a Defendant.

### D.  The Motorskill Investments

Dr. Harris used Freedom Funds and the other companies under his control to make high-risk investments in various Motorskill Entities, venture capital companies run by Randall Erwin and his two sons Jarrod Erwin and Ryan Erwin. *Id*. ¶ 185. The Motorskill entities in turn paid kickbacks to Dr. Harris and Eaton for each investment they made with Plan assets. *Id*.  Randall Erwin initially served as the representative of Motorskill Entities in its dealings with Dr. Harris and entered into various agreements with Dr. Harris. *Id*. ¶ 186.  Randall Erwin's son, Jarrod Erwin, later took over Randall Erwin's role as the representative of the Motorskill Entities in its dealings and agreements with Dr. Harris. *Id*. ¶ 187.

From roughly 2005 to 2016, Dr. Harris invested more than $36 million of Plan assets in Motorskill Entities. *Id*. ¶ 188.  Dr. Harris made these investments by submitting requests for Symetra to electronically wire Plan funds either directly to the Motorskill Entities or to entities owned and controlled by Dr. Harris. *Id*. ¶ 189. Dr. Harris's first transfer of Plan assets for the purpose of investing in the Motorskill Entities was the March 2008 transfer of $10 million of Plan assets to Freedom Funds.  According to Plaintiffs, Symetra knew Freedom Funds was owned and controlled by Dr. Harris and Eaton. *Id*.  More specifically, a Symetra employee, Jon David Parker, noted in an internal discussion with other Symetra employees that the money was going to be transferred to a fund controlled by Eaton. *Id.* ¶ 404. Parker called attention to the fact that Eaton was the broker on the AMEC account. *Id.* ¶ 405.  By internal email, another Symetra employee, Jim Daniel, stated, "It

appears they are moving this portion of the Plan to another investment. I have asked [Bob Follette] to get some info. He and [Mark Yahoudy, a managing director at Newport Group, Inc.] are going to talk. I am suspicious that this could be a prohibative [sic] transaction." *Id.* ¶ 406. Follette also recognized the improper nature of the transaction. *Id.* ¶ 408. When Follette alerted Daniel about the request to wire the $10 million, he added, "This looks like Bob [Eaton]'s own LLC that the AMEC Plan is funding." *Id.*.

Follette subsequently discussed the transaction directly with Dr. Harris. *Id.* ¶ 409. Follette recommended that Dr. Harris have a qualified ERISA attorney review the deal before proceeding to ensure that no prohibited transactions or harm to the Plan resulted from the $10 million transfer. *Id.* ¶ 410. Follette specifically warned about the ownership structure of Freedom Funds and any compensation or benefits accruing to interested parties such as Dr. Harris and Eaton. *Id.* ¶ 411. Nevertheless, Follette simultaneously stated that Symetra would proceed with the transaction and stated Dr. Harris should contact them or Yahoudy of Newport with any questions. *Id.* ¶ 412. When Dr. Harris responded to this email, he did not promise to obtain legal advice or state that a lawyer had reviewed and approved the proposed transaction. Instead, he merely stated that "I really appreciate your input and concern, particularly as it relates to my fiduciary responsibilities." *Id.* ¶ 413. Symetra allowed that transaction to go through and $10 million was transferred to Freedom Funds. *Id.* ¶ 414. Upon information and belief, Plaintiffs allege that most of the $10 million was later invested by Freedom Funds into the Motorskill Entities. *Id.* ¶ 415.

After that transaction, Dr. Harris sometimes requested that Symetra transfer Plan funds directly to the Motorskill Entities. *Id.* In other instances, Dr. Harris requested that Symetra route the funds to Freedom Funds and/or other entities that were controlled by Dr. Harris and/or Eaton. *Id.* After using agreements for fictitious management services to skim off a portion of those funds, Dr.

Harris would re-route those funds from Freedom Funds into the Motorskill Entities. *Id.*

Robert Eaton's relationship with the Motorskill Entities was also lucrative. *Id.* ¶ 284. In 2009, the year that $6 million of Plan assets were invested into Defendant Motorskill Ventures I, L.P., Eaton received $200,000 in consulting or placement fees from Motorskill Ventures I, L.P. *Id.* Furthermore, Eaton was employed as vice-president in a series of Motorskill related companies from the mid-2000s to the 2010s. *Id.* ¶¶ 280-83. And between 2009 and 2014, Dr. Harris's and Eaton's company Freedom Group received $840,000 and Trinity received $270,000 in consulting and placement fees from Motorskill Ventures I, L.P. *Id.* ¶¶ 285, 286.

The Motorskill Entities stopped providing financial statements in 2019. *Id.* ¶ 190. On June 11, 2021, Dr. Harris received written notification that the investments in the Motorskill Entities were virtually worthless. *Id.* ¶ 192. The funds in which the Plan invested were eventually terminated by Motorskill. *Id.* ¶ 194. The only known asset of value remaining in the Motorskill Entities is an 11% membership interest in a company known as Day and Night Solar, LLC ("Day and Night Solar"). *Id.* ¶ 195. Day and Night Solar was created by Eaton in 2009, and Eaton continues to serve as president of the company. *Id.* ¶ 201, 202. Dr. Harris originally owned as much as a 41% stake in Day and Night Solar. *Id.* Dr. Harris improperly used funds from the Department of Retirement Services and/or the Plan to loan over a half a million dollars to Day and Night Solar. *Id.* ¶ 198.[1] Eaton also solicited investments in Day and Night Solar from the Plan as well as from the Motorskill Entities. *Id.* ¶ 199. The Motorskill Entities funded an investment in Day and Night Solar with Plan assets Dr. Harris had invested in the Motorskill Entities. *Id.* Eaton solicited these investments in Day and Night

---

[1] In August 2010, Dr. Harris resigned his membership interest in Day and Night Solar upon advice of counsel due to the conflict of interest that arose from making these loans. *Id.* ¶ 204. Upon information and belief, the "counsel" that advised Dr. Harris was working on behalf of AMEC at the time, meaning AMEC was on notice that Dr. Harris was using Plan assets improperly. *Id.* ¶ 205, 206.

Solar to enrich himself to the detriment of the Plan and in breach of his fiduciary duties owed to the Plan. *Id.* ¶ 200. The value of the Plan's 11% membership interest in Day and Night Solar is unknown but almost certainly not anywhere close to the tens of millions of dollars that were originally invested in the Motorskill Entities. *Id.* ¶ 196.

In the more than 20 years that Dr. Harris was executive director of the Department of Retirement Services, Plaintiffs allege no portion of Plan assets were invested in standard investment vehicles for pension Plans such as publicly traded stocks, mutual funds, government securities, and treasury bonds. *Id.* ¶ 225. Instead, most of the Plan's investments were in extremely low-performing annuities and high-risk, possibly fraudulent, venture capital funds. *Id.* ¶ 226. The rest of the Plan's investments—undeveloped real estate, a private solar company, and unsecured loans to AMEC Financial Services, Freedom Group, Freedom Funds, and Day and Night Solar—were also imprudent. *Id.* ¶ 227.

In December 2001, when the entirety of the Plan's contemporaneous assets was deposited with Symetra, Dr. Harris and the AMEC Defendants agreed to invest more than $48 million in an annuity with only a 1.5% minimum interest rate. *Id.* ¶ 228. Although it often earned slightly more than that 1.5% minimum rate, for long periods of time (such as 2017 through 2021), the Plan's funds with Symetra only earned the minimum rate of 1.5%. *Id.* ¶ 229. By contrast, on December 31, 2001, the 10-year U.S. Treasury Yield opened at 5.11% and the 30-year U.S. Treasury Yield opened at 5.54%. *Id.* ¶ 230. According to the United States Department of Labor, the geometric mean of investment returns for ERISA-governed pension Plans with 100 or more participants for the period between 2002 and 2021 was 7.3%. *Id.* ¶ 231. And over that same time, the S&P 500's annualized returns were 9.4%. *Id.*

If the Plan's 2001 assets had been prudently and reasonably invested based on industry

standards for the investment of a pension fund, by 2021 those assets would have been worth significantly more than even the fraudulent figure of $128 million that Dr. Harris reported in June of 2021. *Id*. ¶ 232. In fact, had Dr. Harris just invested the initial $48,208,803.49 in a diversified portfolio that performed at the above-described average rate of return of 7.3%, the Plan's assets would have been worth $197,297,141.01 in June 2021. *Id*. ¶ 233. If Dr. Harris had instead placed the initial funds into an S&P 500 index fund (which had an annualized return of 9.038% from December 2001 through June 2021), the Plan's assets would have been worth $272,072,026.94. 233. *Id*. The above estimates of growth do not include any net contributions that were made to the Plan between 2001 and 2021. *Id*. ¶ 233. Because those contributions over a two-decade period could have also grown at an average rate of 7.3% or more, the true gap between the potential value of the Fund and the lower figure reported by Dr. Harris is even greater. *Id*.

Dr. Harris and Eaton rejected opportunities to safely invest Plan assets for higher returns than what the Plan received from Symetra annuities. *Id*. ¶ 234. For instance, in October 2001, MetLife Resources offered AMEC the opportunity to invest Plan assets in a Fixed Interest General Account. *Id*. ¶ 235. The initial rate of return on this account would have been 4.24%--almost triple the rate of return offered by the Symetra annuities. *Id*. ¶ 236. The contractual minimum rate of return for the Plan's contract with MetLife would have been 3%--double the rate of return offered by the Symetra annuities. *Id*. ¶ 237. MetLife also offered AMEC the opportunity to invest Plan assets in a variety of mutual funds, some of which had conservative approaches to investment risk. *Id*. ¶ 238. Upon information and belief, Dr. Harris and Eaton did not invest Plan assets in MetLife or other alternative investment vendors because they believed Symetra was more willing to allow Dr. Harris and Eaton to enrich themselves with commissions, kickbacks, and prohibited transactions. *Id*. ¶ 239.

**E. Symetra's Improper Payment of Improper Fees to Dr. Harris**

As part of its effort to keep Dr. Harris's business, Symetra paid Dr. Harris "administrative fees" that were excessive and violated the published AMEC Business Practices for Retirement Annuity Contribution Processing. *Id.* ¶ 244. Those business practices stated that contributions to the Plan were "subject to [a] 2% [fee] of each *contribution* for department operations." *Id.* ¶ 245 (emphasis added). These written instructions from AMEC did not give or delegate any authority to Dr. Harris to charge a fee greater than 2% of contributions. *Id.* ¶ 246. These business practices were published and received by Symetra. *Id.* ¶ 248.

Due to some poor wording in the 2000 and 2004 Book of Discipline, the Book of Discipline contained some language that might (in isolation) authorize a fee based on a percentage of the "fund." *Id.* ¶ 293. However, other language in the Book of Discipline clearly indicated that when the Book used the word "fund," it meant "contribution." *Id.* Plaintiffs allege on information and belief that prior to 2005 the Department of Retirement Services had taken out 1% of contributions to the fund as a fee up to a capped maximum of $20,000. *Id.* ¶ 294.

As early as 2005, Newport agreed to advise Dr. Harris on how he could extract a fee from the Plan. *Id.* ¶ 289. In February 2005, Dr. Harris sent Mark Yahoudy (a managing director and CPA at Newport and one of the primary Newport employees on the AMEC account) a letter asking his "input and interpretation" of the passages in the AMEC Book of Discipline. *Id.* ¶ 290. Robert Follette (a project manager for retirement services at Symetra) and Eaton were copied on this letter. *Id.* Specifically, Dr. Harris asked Yahoudy if he agreed that the AMEC Book of Discipline entitled him to take 2% of the total fund every year in administrative fees. *Id.* ¶ 291. In fact, the AMEC Book of Discipline never authorized such a withdrawal. *Id.* ¶ 292. Upon information and belief, Dr. Harris did not seek to confirm his "interpretation" of the Book of Discipline with AMEC's legal counsel because he did not want others at AMEC to learn that he planned to start withdrawing $580,000

annually from the fund. *Id.* ¶ 295. Yahoudy subsequently spoke with Dr. Harris and blessed his interpretation of the Book of Discipline. *Id.* ¶ 297.

So starting in March 2005, Dr. Harris started to withdraw between $140,000 and $180,000 per quarter from the Fund balance at Symetra, much of which he pocketed for himself after covering some of the Department's expenses. *Id.* ¶ 301. These withdrawals were part of a deliberate agreement between Dr. Harris, Symetra, and Newport to maximize Dr. Harris's ability to make withdrawals from the Fund. *Id.* ¶ 302. Instead of assessing a 2% fee on contributions in a manner consistent with AMEC Business Practices for Retirement Annuity Contribution Processing, Symetra paid Dr. Harris a quarterly fee of 0.25% on the entire Symetra account balance for AMEC. *Id.* ¶ 249. This was essentially a 1% annual fee on all AMEC assets at Symetra. *Id.* This 1% fee on assets was at all relevant times significantly larger than a 2% fee on contributions. *Id.* ¶ 250. This 1% fee was illogical and onerous as applied to a Symetra account that was only earning 1.5% a year. *Id.* ¶ 252. The effect of the fee was to ensure that AMEC's money with Symetra was earning significantly less than inflation and therefore losing real (inflation-adjusted) value. *Id.* Furthermore, there was no plausible, legitimate business reason for Symetra to pay Dr. Harris a 1% fee on all AMEC assets held by Symetra. *Id.* ¶ 253. Instead, Symetra paid this 1% fee as part of an agreement between Dr. Harris, Symetra, and Newport in 2005. *Id.* ¶ 254.

The number of withdrawals gradually declined over time as Dr. Harris drained more money from the Fund into the Motorskill Entities, other imprudent investments, and corporate entities in which he and/or Eaton held an interest. *Id.* ¶ 303.[2] To reverse this decline, Dr. Harris submitted a

---

[2] On or about 2009, a former Symetra employee proposed that the Plan move its assets from Symetra to a fixed income account held by a different financial services provider, OneAmerica. *Id.* ¶ 240. OneAmerica offered better fixed-income returns to the Plan than what the Plan was receiving from Symetra. *Id.* ¶ 241. Dr. Harris and Eaton declined to move the Plan's assets from Symetra to

request in 2015 for Symetra to increase the amount of his withdrawals from 1% of the Fund per year to 2.2% per year. *Id*. ¶ 304. This amount exceeded the maximum percentage of 2% that Yahoudy had previously and erroneously advised Dr. Harris was acceptable to withdraw from the Fund. *Id*. On May 18, 2015, Dr. Harris requested that Symetra increase the quarterly administrative fee from 0.25% to 0.55% "until further notice." *Id*. ¶ 255. Symetra quickly agreed to this request. *Id*. ¶ 256. Symetra's next payment of administrative fees to Dr. Harris occurred on June 24, 2015. *Id*. That Symetra quarterly payment was for $233,332.50--an amount more than twice as much as Symetra's last quarterly payment. *Id*. ¶ 257. This money was taken directly from the Plan's assets and sent to Dr. Harris, who converted it to his own purposes. *Id*. ¶ 258.

These "administrative fees" were not wired by Symetra to the Department's bank account. *Id*. ¶ 259. Instead, Symetra would send Dr. Harris a check, made out to "Dr. Jerome V. Harris, Trustee" which left him free to do as he pleased with the funds. *Id*. Typically, Dr. Harris would cash the check and deposit a round, even amount of the check into a Department bank account to cover the Department's expenses, and he would then apparently pocket the difference between the amount he deposited and the rest of the check. *Id*.

For example, in September 2018, Dr. Harris received a check for these "administrative fees" from Symetra, signed by its CEO Margaret Meister. *Id*. ¶ 260. The check was made out to "Harris, Dr. Jerome V, Trustee AMEC Department of Retirement Services" in the amount of $221,056.78. *Id*. Dr. Harris cashed that check on or about October 4, 2018, and deposited the funds as follows:

    a. $75,000.00 into the Department's general bank account;

    b. $75,000.00 into a bank account for Trinity Financial;

---

OneAmerica. *Id*. ¶ 242. Upon information and belief, Dr. Harris and Eaton did not move Plan assets from Symetra to OneAmerica because they believed Symetra was more willing to allow Dr. Harris and Eaton to enrich themselves with commissions, kickbacks, and prohibited transactions. *Id*. ¶ 243.

c. $10,000.00 was used to pay a credit card bill for AMEC Financial Services;

d. $50,000.78 was deposited into the Department's operating account that was used for its

payroll;

e. $7,056.00 was used to pay Dr. Harris's personal credit card; and

f. Dr. Harris kept $4,000 in cash.

*Id*. ¶ 260.

By paying Dr. Harris kickbacks out of the Plan's own assets, Symetra was able to keep Dr. Harris's

business without sustaining a significant hit to its own bottom line. *Id*. ¶ 261.

The difference between the 2% of contributions that Symetra was permitted to pay Dr. Harris

and the 2.2% of Plan assets held at Symetra was substantial. *Id*. ¶ 262. Just between 2016 and 2019,

Symetra paid Dr. Harris more than $3,530,000 in "administrative fees." *Id*. Over that same time, the

maximum amount of legitimate fees would have been less than $650,000. *Id*. At no point prior to Dr.

Harris's retirement did Symetra exhibit any concern about paying out 2.2% of assets in

"administrative fees" for an account that was only earning 1.5%. *Id*. ¶ 263.  Because of Symetra's

agreement with Dr. Harris to pay such excessive fees, the Plan's assets at Symetra continuously lost

value. *Id*. ¶ 264.

Not only did Symetra pay Dr. Harris these excessive fees, Symetra also compensated Robert

Eaton.  Eaton was the "exclusive broker of record" for the Plan and was represented as such to third

parties, including Symetra and Newport. *Id.* ¶ 265.  As the "exclusive broker" for the Plan, Eaton

had fiduciary duties to the Plan. *Id.* ¶ 266. At the same time, Eaton was a "producer" for Symetra,

responsible for generating sales of Symetra products. *Id.* ¶ 267. Eaton was paid commissions by

Symetra for business that he brought to Symetra. *Id.* Eaton and his firm, Financial Technologies, was

hired in August 2001 by Dr. Harris and AMEC Chairman of Employee Security John Hurst Adams

16

to select a new investment vendor for the Plan. *Id.* ¶ 268. Subsequently, Dr. Harris, Eaton, and Adams selected Symetra's corporate predecessor, Safeco Insurance, from thirty-three different annuity investments and insurance firms. *Id.* ¶ 269. As part of the selection process, Dr. Harris, Eaton, and Adams personally interviewed Safeco Insurance in Nashville, Tennessee. *Id.* ¶ 270. Adams and Dr. Harris subsequently claimed that Safeco Insurance was selected "due to its superior abilities and willing commitment to the non-negotiable criteria established." *Id.* ¶ 271. Unbeknownst to the Plan, Symetra paid Eaton a commission for brokering the initial deal between the Department and Symetra and then received monthly tail commissions from Symetra. *Id.* ¶ 272. The commissions Eaton received from Symetra were the largest Symetra had ever paid to a broker. *Id.* ¶ 273.[3]

Eaton also brokered the initial agreement between the Department and Newport. *Id.* ¶ 276. Eaton had regular direct communication with employees from both Newport and Symetra throughout the twenty years that Plan assets were lost or embezzled. *Id.* ¶ 277. Additionally, starting from at least 2005, if not earlier, Eaton was also a contracted consultant for the Motorskill Entities and received a regular consulting fee as well as commissions on sales revenue to any Motorskill company. *Id.* ¶ 278. Newport and Symetra also knew of Eaton's employment with Motorskill, as he regularly corresponded with Newport and Symetra employees from an @motorskill.com email address. *Id.* ¶ 279.

The Second Amended Complaint alleges that Symetra and Newport acted in concert with

---

[3] The Second Amended Complaint goes on to allege that Symetra was fully aware of, and in fact celebrated, Eaton's status as a recipient of large commissions. *Id.* ¶ 274. Symetra featured Eaton on the cover of a marketing magazine to highlight how much other brokers could earn by steering large investments to the company. *Id.* Because Symetra was interviewed in Nashville by Eaton as part of the initial selection process, Symetra knew that it was paying commissions to an individual who had been retained by the Church to conduct an objective evaluation of business proposals from competing companies. *Id.* ¶ 275.

each other and Dr. Harris, Eaton, and others to engage in fraud and misappropriation of the Plan's

assets through a variety of strategies:

- steering Fund assets into low-performing Symetra annuities that enabled Eaton to receive large commissions and Symetra to obtain a source of cheap capital with minimal obligations to generate returns for the Fund;

- Symetra's payment of inflated "administrative fees" to Dr. Harris as an inducement for Dr. Harris to keep Fund assets in Symetra annuities;

- steering Fund assets into the Motorskill Entities in exchange for "commissions" paid to Eaton and Dr. Harris;

- permitting Dr. Harris and Eaton to engage in obvious prohibited investment and loan transactions;

- covertly assisting Dr. Harris's reelection efforts to secure his position as Trustee and prolong the corrupt bargain between Dr. Harris, Eaton, Newport, and Symetra; and

- the use of Newport and Symetra to "launder" fraudulent and unsupported claims about the value of the Fund and the Fund's investment strategy as coming from financial professionals rather than Dr. Harris and Eaton.

*Id*. ¶ 148.

## H. Discovery of Dr. Harris's Fraudulent Activities

According to the Church, AMEC officials only learned of Dr. Harris's scheme in June 2021,

after his retirement and as part of the transition to new department leadership. *Id*. ¶ 452. On

September 14, 2021, Plaintiffs and other Plan participants received a letter from the Plan, notifying

them that disbursements would be temporarily paused while the Plan was audited due to the change

in leadership. *Id*. ¶ 455. The letter explained the audit would take four to six weeks. *Id*. ¶ 456.

Sometime in the first week of November 2021, the AMEC addressed a second letter to Plaintiffs and

other Plan participants, stating that the audit was not complete and therefore disbursements could not

resume. *Id*. ¶ 457. At the conclusion of its work, a church investigative committee could only

18

account for approximately $38 million of the Plan's assets:  $36.9 million invested with Symetra and real property in Key Marco Island, Florida, with an approximate value of $1 million.  *Id.* ¶ 469.  In other words, between $80 million and $90 million in assets, which Dr. Harris had previously included in his annual reports, could not be accounted for.  *Id*. ¶ 462.

From these factual premises, the Second Amended Complaint alleges the following causes of action under Tennessee law:

• breach of fiduciary duty against AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Bishop Green, Bishop Davis,[4] Estate of Dr. Harris, Robert Eaton, Newport, and Symetra (Count 1);

• violation of the Tennessee Uniform Trust Code for breach of trust and misappropriation of trust funds against Estate of Dr. Harris, Newport, Symetra, and Eaton (Count 2);

• negligence against AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Bishop Green, Bishop Davis, Newport, and Symetra (Count 3);

• conversion against Estate of Dr. Harris, Eaton, Financial Freedom Funds, LLC, Financial Freedom Group, Inc., Financial Technologies, LLC, Trinity Financial Consultants, LLC, Financial Technologies, LLC, and Day and Night Solar (Count 4);

• fraudulent concealment against AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Bishop Green, Bishop Davis, Eaton, Estate of Dr. Harris, Newport, and Symetra (Count 5);

• fraudulent misrepresentation against Estate of Dr. Harris and Newport (Count 6);

• breach of contract against AMEC (Count 7);

---

[4] On March 24, 2025, the Court granted Plaintiffs' unopposed motion to dismiss all claims against Davis and Green without prejudice. Order Granting Mot. to Dismiss Without Prejudice, Mar. 24, 2025 (ECF No. 773).

- civil conspiracy against Estate of Dr. Harris, Sandra Harris, Symetra, Newport, Eaton, Financial Freedom Funds, LLC, Day and Night Solar, Financial Freedom Group, Inc., Financial Technologies, LLC, Trinity Financial Consultants, LLC, Financial Technologies, LLC, and the Motorskill Entities (Count 8);

- aiding and abetting breach of fiduciary duty against Newport, Symetra, Financial Freedom Funds, LLC, Day and Night Solar, Financial Freedom Group, Inc., Financial Technologies, LLC, Trinity Financial Consultants, LLC, Financial Technologies, LLC, Day and Night Solar, the Motorskill Entities, and Sandra Harris (Count 9); and

- professional negligence against Newport and Rodney Brown.

On March 24, 2025, the Court granted Plaintiffs' motion for preliminary approval of its settlement with the AMEC Defendants and Plaintiffs' and AMEC's settlement with Newport. Order Granting Prelim. Approval, Mar. 24, 2025 (ECF No. 774, 775). Symetra now seeks the dismissal of most of the claims alleged against it in the Second Amended Complaint.

## STANDARD OF REVIEW

In its Motion to Dismiss, Symetra argues that several of the Second Amended Complaint's counts fail to state a plausible claim for relief. A defendant may move to dismiss a claim "for failure to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6). Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion, the Court must treat all the well–pleaded allegations of the pleadings as true and construe all of the allegations in the light most favorable to the non-moving party. *Elec. Merchant Sys. LLC v. Gaal*, 58 F.4th 877, 882 (6th Cir. 2023) (citing *Taylor v. City of Saginaw*, 922 F.3d 328, 331 (6th Cir. 2019)). However, legal conclusions or unwarranted factual inferences need not be accepted as true. *Fisher v. Perron*, 30 F.4th 289, 294 (6th Cir. 2022) (citing *Iqbal*, 556 U.S. at 678).

20

Under Rule 8 of the Federal Rules of Civil Procedure, a complaint need only contain "(1) a short and plain jurisdictional statement, (2) a short and plain statement of the claim, and (3) an explanation of the relief sought." Fed. R. Civ. P. 8(a). "That's it. By listing these elements, Rule 8 implicitly 'excludes other requirements that must be satisfied for a complaint to state a claim for relief.'" *Gallivan v. United States*, 943 F.3d 291, 293 (6th Cir. 2019) (citing Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 10, at 107 (2012) (other citation omitted). Rule 8's notice pleading standard does not require "detailed factual allegations." *Iqbal*, 556 U.S. at 681.

But Rule 8 does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* "Although the rule encourages brevity," a plaintiff must nevertheless "say enough to give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (citing *Dura Pharm. v. Broudo*, 544 U.S. 336, 346, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)). "Rule 8 does not empower [a plaintiff] to plead the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss." *Iqbal*, 556 U.S. at 687. In order to survive a motion to dismiss, the plaintiff must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level" and to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). This means, a complaint "must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *Smith v. Gen. Motors LLC*, 988 F.3d 873, 877 (6th Cir. 2021) (citing *Boland v. Holder*, 682 F.3d 531, 534 (6th Cir. 2012)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for

the misconduct alleged." *Iqbal*, 556 U.S. at 678; *see also Ryan v. Blackwell*, 979 F.3d 519, 524 (6th Cir. 2020) ("A complaint must contain enough 'factual matter' to raise a 'plausible' inference of wrongdoing.") (quotation omitted).

A party "alleging fraud" must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "Rule 9(b) requires that the plaintiff specify the 'who, what, when, where, and how' of the alleged fraud." *New London Tobacco Mkt., Inc. v. Ky. Fuel Corp.*, 44 F.4th 393, 410–11 (6th Cir. 2022) (quoting *Sanderson v. HCA–The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006)). This means the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id*. at 411 (quoting *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008)). The plaintiff must also provide a description of "the fraudulent scheme" and "the resulting injury." *Id.* (quoting *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466–67 (6th Cir. 2011)). Even though Plaintiffs allege claims sounding in fraud under Tennessee law and the substantive law of Tennessee governs Plaintiffs' burden of proving fraud, "Rule 9(b) governs the procedure for pleading fraud in all diversity suits in federal court." *Id.* at 410 n.10 (citing *Minger v. Green*, 239 F.3d 793, 800 (6th Cir. 2001)).

As in any case where the Court exercises jurisdiction under 28 U.S.C. § 1332, the Court applies the law of the forum state, including the forum's choice-of-law rules. *Loreto v. Procter & Gamble Co.*, 515 F. App'x 576, 578 (6th Cir. 2013) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). The parties have briefed the substantive law of the state of Tennessee in their motion papers. The Court will assume for purposes of deciding the questions of law presented in Symetra's Rule 12(b) Motion that Tennessee law governs the parties' dispute.

As part of its application of Tennessee law, the Court must follow "a ruling from the state supreme court." *Smith*, 988 F.3d at 878 (citing *In re Darvocet, Darvon & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917, 937 (6th Cir. 2014)). Without a clear ruling from the Tennessee Supreme Court, the *Erie* doctrine requires this Court to "predict[] how the state supreme court would rule by looking to all available data, including decisions of the states' appellate courts." *Smith*, 988 F.3d at 878 (internal citation omitted); *see also Lindenberg v. Jackson Nat'l Life Ins. Co.*, 912 F.3d 348, 358 (6th Cir. 2018) (citing Tenn. Sup. Ct. R. 4(G)(2) for the proposition that a published opinion of the Tennessee Court of Appeals is "controlling authority for all purposes unless and until such opinion is reversed or modified by a court of competent jurisdiction").

## ANALYSIS

Before reaching Symetra's arguments for dismissal, the Court first addresses Symetra's argument that the Court should stay Plaintiffs' claims against it because the claims are subject to a mandatory arbitration clause. Symetra contends that as part of the Second Amended Complaint, Plaintiffs allege their claims individually, derivatively on behalf of the Plan, and as representatives of a putative class of Plan participants. Symetra argues that any claims alleged derivatively on behalf of the Plan are subject to a 2003 contract containing an arbitration clause. The Court must therefore stay the action on the derivative claims and should exercise its discretion to stay the action as to Plaintiffs' individual and class action claims while the derivative claims are in arbitration.

AMEC has now reported that the arbitrator has issued his ruling and concluded that the claims between AMEC and Symetra are not subject to arbitration. *See* Mot. to Lift Stay Feb. 26, 2025 (ECF No. 740). On March 11, 2025, the Court granted the AMEC Defendants' motion to lift the stay. Order Granting Mot. to Lift Stay, Mar. 11, 2025 (ECF No. 754). Symetra subsequently filed a supplemental brief (ECF No. 756) to clarify that it is withdrawing its request for a stay. Based on

the dismissal of the arbitration proceedings and Symetra's decision to withdraw its request for a stay, Symetra's Motion to Stay the action on Plaintiffs' claims alleged derivatively on behalf of the Plan is **DENIED** as moot.

Symetra raises a separate point that also implicates its argument about the distinction between Plaintiffs' individual and class action claims and the claims Plaintiffs have alleged derivatively on behalf of the Plan. In deciding a series of Rule 12(b)(6) motions addressed to Plaintiffs' First Amended Complaint, the Court held that "the Amended Complaint plausibly allege[d] that Plaintiffs have the capacity to sue third parties for injuries to the Plan as a matter of Tennessee trust law." Order on Mots. to Dismiss Consolidated Am. Compl. – Class Action 36, Mar. 17, 2023 (ECF No. 197).[5] Symetra now asks the Court to hold that Symetra did not owe any duty, either under common law or as a fiduciary, to Plaintiffs individually or the class of Plan participants they seek to represent. Symetra therefore asks the Court to dismiss the negligence and breach of fiduciary duty claims the Second Amended Complaint alleges on behalf of Plaintiffs individually and the class action claims alleged on behalf of the Plan participants.[6] Symetra's recent supplement to its Motion to Dismiss (ECF No. 756) goes somewhat further and argues that AMEC's cross-claims on behalf of the Plan and Plaintiffs' derivative claims on behalf of the Plan are duplicative. Now that AMEC's cross-claims against Symetra are no longer stayed, the Court should not allow both the Church to press claims on behalf of the Plan and Plaintiffs to pursue their claims brought

---

[5] The Court specifically held that the question implicated Plaintiffs' capacity to sue and that lack of capacity was an affirmative defense on which Symetra bore the burden of proof. The Court also assumed without deciding that Symetra's argument went to Plaintiffs' capacity to bring all of their Tennessee law claims against Symetra (and not just the breach of trust claim).

[6] As part of its recent, post-arbitration proposal for new deadlines (ECF No. 772), Symetra sought leave to file another supplemental brief addressed to this argument.

derivatively on behalf of the Plan.

The Court agrees that the capacity issue identified by Symetra is critically important to this case and remains unsettled to this point.  Almost from the inception of the MDL, Symetra has contested Plaintiffs' capacity to bring claims on behalf of the Plan, first in an initial motion to dismiss the First Amended Complaint, then in a motion to stay Plaintiffs' claims while AMEC and Symetra went to arbitration, and now again as part of Symetra's motion to dismiss the Second Amended Complaint.  Each time the issue has come up, the parties have never quite pinned it down, sometimes casting the issue as a question of Article III standing, other times treating it as a failure to state a plausible claim for relief. The fact that the parties have landed only glancing blows likely stems from the fact that Plaintiffs' capacity, or any lack thereof, is an affirmative defense, on which Symetra and not Plaintiffs have the burden of proof. *Davis v. Lifetime Cap., Inc.*, 560 F. App'x 477, 478 (6th Cir. 2014) (holding that capacity is "an affirmative defense, not a jurisdictional issue"). The issue is therefore not one well suited for decision at the pleadings stage.

Rather than permit the parties to continue to brief the issue in motions addressed to the sufficiency of the pleadings, the Court finds that the better course is to take the issue up at summary judgment with a fully developed evidentiary record and an opportunity for each side to present all of their arguments on this point in one round of briefing. Fact discovery between Plaintiffs and Symetra closed on January 22, 2025, and the deadline for all parties to file dispositive motions is currently less than three months away (June 27, 2025). To the extent that Symetra asks the Court to dismiss Plaintiffs' derivative claims for negligence and breach of fiduciary duty or reach the question of whether Symetra owes Plan participants like Plaintiffs any direct duty, Symetra's Motion to Dismiss is **DENIED** without prejudice to present the issues in a future motion for summary judgment.

Having addressed the scope of the remaining issues presented, the Court now considers the

25

merits of each of the other arguments presented in Symetra's Motion to Dismiss.

## I. Violations of the Tennessee Uniform Trust Code for Breach of Trust and Misappropriation of Trust Funds (Count 2)

Symetra next seeks the dismissal of the Second Amended Complaint's claim for breach of trust and misappropriation of trust funds, both violations of the Tennessee Uniform Trust Code. As the Court noted in its earlier order on the sufficiency of the First Amended Complaint, the Tennessee Uniform Trust Code ("TUTC"), Tenn. Code Ann. § 35–15–101 *et seq.*, imposes a series of legal duties on trustees such as a duty of loyalty (§ 35–15–802), a duty of prudent administration (§ 35–15–804), and a duty to control and protect trust property (§ 35–15–809).[7] The duties of a "trustee" commence "[u]pon acceptance of a trusteeship" and continue "until such time as the trust terminates or a successor trustee is appointed and all assets are delivered in good faith, in accordance with its terms and purposes and the interests of the beneficiaries, and in accordance with" the TUTC. § 35–15–801 (defining the duty to administer a trust). In order to prove a "breach of trust" under the TUTC, Plaintiffs must show that (1) a "trustee" (2) violated "a duty the trustee owes to a beneficiary." § 35–15–1001(a); *see also* § 35–15–1001, Cmt. ("A breach of trust occurs when the trustee breaches one of the duties contained in part 8 [Tenn. Code Ann. § 35–15–801—35–15–817] or elsewhere in the Tennessee Uniform Trust Code.").

The Court previously held that Plaintiff's Amended Complaint failed to state the claim against Symetra, in part because Symetra did not meet the TUTC's definition of a "trustee." Under the statute, a "trustee" is "an original, additional, and successor trustee, and a cotrustee." § 35–15–103(38); *see also id.*, 2013 Restated Cmt. ("Because the definition of trustee includes trustees of all

---

[7] The TUTC permits a trust to vary the trustee duties defined in the statute. *See* § 35–15–105(a) (permitting the terms of a trust to "expand, restrict, eliminate, or otherwise vary the duties and powers of a trustee, any such other fiduciary, relations among any of them, and the rights and interests of a beneficiary" subject to certain exceptions).

types, any trustee, whether original or succeeding, single or cotrustee, has the powers of a trustee and is subject to the duties imposed on trustees under the Tennessee Uniform Trust Code."). The Plan defines the "Trustee" as "the person or entity named as trustee herein or in any separate trust forming a part of this Plan, and any successors." Plan, art. I, § 1.59. The Second Amended Complaint continues to allege that the only party designated as the "Trustee" in the Plan itself was Dr. Jerome Harris. Second Am. Compl. ¶ 132.

Rather than hold Symetra liable as a "trustee," Plaintiffs allege that Symetra qualifies as a "trust protector" or "trust advisor." The TUTC defines both a "trust advisor" and a "trust protector" as "any person described in § 35–15–1201(a)." Tenn. Code Ann. § 35–14–103(35) & (37). Section 35–15–1201(a) defines both terms as "any person, and may be a committee of more than one person, other than a trustee, who under the terms of the trust, an agreement of the qualified beneficiaries, or a court order has a power or duty with respect to a trust, including but not limited to, one or more of" the enumerated powers listed in the statute. § 35–15–1201(a)(1)–(21). The comments to Tenn. Code Ann. § 35–15–1201 make clear that a "trust protector" and a "trust advisor" are synonymous. 2013 Comments to Tenn. Code Ann. § 35–15–1201; *see also* Bogert's *The Law of Trusts and Trustees* § 137 ("The use of 'trust protectors' developed alongside the use of 'trust advisors,' with a great deal of overlap in their roles."). According to one commentator, "[t]he concept of Trust Protectors and Trust Advisors (two names for the same office) originated in the 1980s when grantors created offshore trusts and needed some independent person to have certain powers superior to the trustee, without actually being a trustee." Holbrook, D., "Where There's a Will," 55 *Tenn. Bar J.* 21, 22 n.10.

The Second Amended Complaint alleges that Symetra had one of the specifically enumerated powers that creates a "trust protector" or "trust advisor" for purposes of the Tennessee

Uniform Trust Code. Plaintiffs allege that Symetra had the power to "consent to a trustee's action or inaction relating to the investment of trust assets." Second Am. Compl. ¶ 608.   According to Plaintiffs, such a power is one of the specifically enumerated powers of a trust advisor or trust protector in the TUTC.[8]   Even accepting that Symetra exercised one of the powers listed in Tenn. Code. Ann. § 35–15–1201(a),[9] the TUTC goes a step further and requires not only that a person (or committee of persons) "perform a specific duty or function that would normally be required of a trustee or cotrustee."   A "trust protector" or "trust advisor" becomes such when the person (or committee) exercises such a duty or function after it is vested with that power "under the terms of the trust, an agreement of the qualified beneficiaries, or a court order."

The Court construes Tenn. Code Ann. § 35–15–1201 to define a "trust protector" or "trust advisor" as a person or entity who is designated in "the terms of the trust" to exercise certain duties or functions.   This is the most natural understanding of the statutory language, giving the terms their common and ordinary meanings.   It is also the reading most consistent with general principles of trust law concerning "trust protectors" and "trust advisors."   The roles of trust protector and trust advisor "are established by the settlor in the trust instrument" and remain distinct "from the situation

---

[8] The Second Amended Complaint locates this authority in Tenn. Code Ann. § 35–15–1201(8).   While it is true that subparagraph (8) concerns a trust advisor or trust protector's power to consent, it is the power to consent to "distributions to beneficiaries."   Apparently, Plaintiffs meant to cite subparagraph (12), which addresses "the power to consent to a trustee's or cotrustee's action or inaction relating to investments of trust assets." Tenn. Code Ann. § 35–15–1201(12). Pls.' Resp. in Opp'n to Newport's Mot. to Dismiss 4 n.3 ("The SAC inadvertently cited to Section 1201(8) instead of 1201(10). SAC ¶ 623.").   In any event, Plaintiffs have cited no provision of the Plan naming Symetra and vesting it with this specific authority to consent.

[9] The Second Amended Complaint does not cite § 35–15–1201(a)(10) and instead cites § 35–15–1201(a)(8). As the Court discusses in more detail below, subparagraph (8) is "[t]he power to consent to a trustee's or cotrustee's action or inaction in making distributions to beneficiaries," not the performance of duties or functions normally assigned to a trustee or cotrustee.   The Court assumes for purposes of deciding the Rule 12(b)(6) Motions that the Second Amended Complaint's reference to § 35–15–1201(a)(8) should have cited subparagraph (10).

where a trustee uses his discretion to employ an advisor for the trust, usually an investment advisor." Bogert's *The Law of Trusts and Trustees* § 137. Plaintiffs point out that Symetra performed functions referenced in the Plan and assigned to the Trustee or his "agent." Be that as it may, TUTC's statutory definition is clear and unambiguous: a person becomes a trust advisor or trust protector when "the terms of the trust" vest that person with specific powers or duties. Nothing in the terms of the Plan, however, vested Symetra with "[t]he power to perform a specific duty or function that would normally be required of a trustee or cotrustee." § 35–15–1201(a)(10). The Court concludes then that the Second Amended Complaint fails to plausibly allege that Symetra violated the TUTC as a trust advisor or trust protector. Therefore, Symetra's Motion to Dismiss is **GRANTED** as to this issue.

## II. Fraudulent Concealment (Count 5)

Count 5 of the Second Amended Complaint alleges that certain Defendants, including Symetra, fraudulently concealed certain information about the true state of the Plan's affairs. Under Tennessee law, the tort of fraudulent concealment, also known as "constructive fraud," occurs when "a party who has a duty to disclose a known fact or condition fails to do so, and another party reasonably relies upon the resulting misrepresentation, thereby suffering injury." *Roopchan v. ADT Sec. Sys., Inc.*, 781 F. Supp. 2d 636, 650 (E.D. Tenn. 2011) (quoting *Odom v. Oliver*, 310 S.W.3d 344, 349–50 (Tenn. Ct. App. 2009)); *see also Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 571 (6th Cir. 2003) (quoting *Chrisman v. Hill Home Dev., Inc.,* 978 S.W.2d 535, 538–39 (Tenn. 1998)).

To establish their claim for fraudulent concealment, Plaintiffs must show that "(1) [Symetra] concealed or suppressed a material fact, (2) that [Symetra] had a duty to disclose that fact to [Plaintiffs], (3) that [Symetra] intentionally concealed or suppressed that fact with the intent to deceive [Plaintiffs], (4) that [Plaintiffs] were unaware of the fact and would have acted differently if

[they] had known about the concealed fact, and (5) that [Plaintiffs were] damaged as a result of the concealment or suppression of the fact." *Saltire Indus., Inc. v. Waller, Lansden, Dortch & Davis, PLLC*, 491 F.3d 522, 527 (6th Cir. 2007) (citing *Justice v. Anderson Cnty.*, 955 S.W.2d 613, 616 (Tenn. Ct. App. 1997)). Moreover, fraudulent concealment must be pled with particularity in accordance with Rule 9(b) of the Federal Rules of Civil Procedure. *Estate of Abdullah ex rel. Carswell v. Arena*, 601 F. App'x 389, 394 (6th Cir. 2015) (citing *Carrier Corp. v. Outokumpu Oyj,* 673 F.3d 430, 447 (6th Cir. 2012)).

Symetra argues that the Second Amended Complaint fails to satisfy the heightened pleading standards required to state a fraudulent concealment claim with particularity. Concerning Plaintiffs' claims alleged derivatively on behalf of the Plan, Symetra argues the Second Amended Complaint fails to allege how Symetra concealed anything from the Plan itself.  As for Plaintiffs' individual or direct claims of fraudulent concealment, Symetra argues that there is no legal authority for the proposition that a third-party service provider to a trust has a duty to disclose information directly to the beneficiaries of the trust. Symetra never communicated any information to Plan participants (or even knew their identities), meaning Plan participants have not alleged how they reasonably relied on any information Symetra failed to communicate. Symetra lastly argues that Plaintiffs could have discovered all of the information through the exercise of reasonable diligence. The result is Plaintiffs have not plausibly alleged a claim of fraudulent concealment.

The Court disagrees. The Second Amended Complaint alleges that Symetra failed to disclose the following facts:

- The fact that investments in Symetra annuities were being liquidated with the funds transferred to entities owned and/or controlled by Eaton and/or Dr. Harris;

- The fact that Eaton was receiving hundreds of thousands of dollars in commissions from Symetra;

- The fact that Symetra was writing checks to Dr. Harris for administrative fees totaling almost $1,000,000 per year and making the checks out to "Dr. Jerome V. Harris, Trustee" instead of to the Department; and

- The fact that Symetra allowed Dr. Harris to withdraw "administrative fees" in excess of what his authority permitted.

Second Am. Compl. ¶ 720. Each of these facts arguably constitutes a material fact. "[A] statement is material or involves a material fact if it will likely affect the conduct of a reasonable person." *Saltire Indus.*, 491 F.3d at 527 (quoting *Patel v. Bayliff,* 121 S.W.3d 347, 353 (Tenn. Ct. App. 2003)). However, nothing in the pleadings shows that Symetra concealed or suppressed any of these facts. Plaintiffs have not alleged that Symetra "with[eld] information asked for, [made] use of some device to mislead Plaintiffs," or employed a "trick or contrivance intended to exclude suspicion and prevent inquiry." *Id.* at 528 (quoting *Patten v. Standard Oil Co. of La.*, 55 S.W.2d 759, 761 (Tenn. 1933)).

Plaintiffs answer that Symetra had a duty to disclose these facts based on its status as a fiduciary under the terms of the Plan itself. "A fiduciary is a person holding the character of a trustee who bears the duty to act primarily for the benefit of another." *Sanford v. Waugh & Co., Inc.*, 328 S.W.3d 836, 843 (Tenn. 2010) (citing *McRedmond v. Estate of Marianelli*, 46 S.W.3d 730, 738 (Tenn. Ct. App. 2000)). A fiduciary duty imposes the highest standard of care under the law. *Overstreet v. TRW Com. Steering Div.*, 256 S.W.3d 626, 642 (Tenn. 2008) (citation omitted). "Under Tennessee law, the duty to disclose arises in only three scenarios" one of which is "[w]here there is a previous definite fiduciary relation between the parties." *Saltire Indus.*, 491 F.3d at 528.

31

The Second Amended Complaint alleges that Symetra owed the Plan and the Plan participants a fiduciary duty because Symetra exercised "authority or control respecting management or control of [Plan] assets." Second Am. Compl. ¶ 553 (quotation marks in original).  The Second Amended Complaint's allegation appears to include language directly quoted from the 2006 version of the Plan document. As Plaintiffs rightly point out, the Court held in deciding an earlier motion to dismiss that Symetra's modicum of discretion over "the disposition of assets" arguably made it a fiduciary, as the written Plan defined the term.  The Court held in deciding the parties' first round of Rule 12(b)(6) motions that Plaintiffs had alleged enough factual matter to show that Symetra was a "fiduciary."

However, the Court's holding was a narrow one.  In explaining its rationale, the Court stated as follows:

> The question presents a somewhat close call.  But at the pleadings stage, the Amended Complaint alleges enough factual matter to show that Symetra carried out functions which satisfied the Plan's definition of a "fiduciary" and that Symetra acted as a fiduciary under Tennessee law.  The Amended Complaint alleges more than a simple "at arm's length" or "non-discretionary" transaction of business over a period of 20 years. Symetra appears to have been the Plan's primary institutional investment company, holding an initial annuity investment making up the entirety of the Trust's assets and receiving subsequent contributions to the Plan from the Church on behalf of its employees and the Plan participants themselves.  Symetra apparently still acts as the custodian of nearly $ 40 million held by the Plan. In its course of dealings with Dr. Harris, Symetra acted on orders to transfer millions of dollars of Plan assets out of presumably conservative, Symetra annuities and into other investments or ventures. The allegations may not point to "broad fiduciary obligations." *Orlowski*, 146 F.Supp.3d at 927 (quoting *Johnson*, 217 S.W.3d at 428). And discovery may eventually bear out Symetra's claim that it had no discretion and simply executed Dr. Harris's orders. The Amended Complaint's allegations are nevertheless enough to show that Symetra exercised some level of discretion over the disposition Plan assets and conferred fiduciary status on Symetra. On a Rule 12(b)(6) motion to dismiss, these allegations are enough to make the claim about Symetra's fiduciary status plausible.

Order on Mots. to Dismiss Consolidated Am. Compl. – Class Action 57-58, Mar. 17, 2023 (ECF No. 197). Plaintiffs rest their fraudulent concealment claim then on the Court's conclusion that the earlier pleading had plausibly alleged a breach of fiduciary duty claim against Symetra.

But as the Court's limiting language suggests, the holding was anything but sweeping. The Court concluded that Plaintiffs had alleged enough facts to show that Symetra plausibly met the Plan's definition of a fiduciary for purposes of pleading a breach of fiduciary duty claim against Symetra. Plaintiffs now posit that the Court's holding on Symetra's fiduciary status is the law of the case. Plaintiffs' point is true, as a general proposition. "The doctrine [of the law of the case] precludes reconsideration of issues decided at an earlier stage of the case." *Yeschick v. Mineta*, 675 F.3d 622, 633 (6th Cir. 2012) (quoting *Caldwell v. City of Louisville*, 200 F. App'x 430, 433 (6th Cir. 2006) (cleaned up). The Court would only add that its holding that the First Amended Complaint plausibly alleged Symetra's fiduciary status related to an alleged breach of fiduciary duty rested on one set of allegations found in that pleading.

The Second Amended Complaint's allegation that Symetra fraudulently concealed the improper activities of Dr. Harris and others in breach of its fiduciary duty rests on another. First, Plaintiffs' Amended Complaint included a copy of the Plan document as an attachment to the pleading, meaning the Court could consider the Plan document in analyzing the question of whether Symetra met the Plan's definition of a "fiduciary." That document was dated March 2006 and became part of the Amended Complaint by incorporation. Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). The Court's conclusion that Symetra was a Plan "fiduciary" was based largely on the terms of the Plan document and its definitions of certain fiduciary roles in the administration of the Plan. By contrast, while it cites provisions of the 2006 Plan document, the Second Amended Complaint did not

33

incorporate the 2006 Plan document itself. In fact, Plaintiffs now allege facts that might call into question whether the 2006 Plan document ever became effective as the governing terms of Plan administration. Second Am. Compl. ¶ 119 ("The Fund was supposed to be governed by a Plan document, which Newport was responsible for drafting. Newport did in fact draft a Plan document, but it was originally only signed by Dr. Harris both as the 'Trustee' and as the 'Employer.' Neither Newport nor Symetra ever took any action to confirm that was proper until Newport did in 2019.").

Furthermore, the Second Amended Complaint has gone further than the Amended Complaint and clarified that Plaintiffs allege their causes of action derivatively on behalf of the Plan, directly for themselves, and in a representative capacity for the class of Plan participants they seek to represent. In the section of the pleadings addressed to the fraudulent concealment claim alleged against Symetra, Plaintiffs state as follows: "Plaintiffs, as beneficiaries of the Plan, are permitted under Tennessee law to bring this [fraudulent concealment] claim *on the Plan's behalf*." Second Am. Compl. ¶ 727 (emphasis added). And in the two paragraphs that follow this allegation, the Second Amended Complaint alleges that Symetra (among others) "harmed *the Plan* and participated in Dr. Harris's and Dr. Miller's breach of fiduciary duty." *Id*. ¶ 728 (emphasis added); *see also id*. ¶ 729 ("Plaintiffs, in their capacity as beneficiaries of the Plan, are also permitted to bring this action *on behalf of the Plan* . . . .") (emphasis added). These allegations suggest that Plaintiffs' claim of fraudulent concealment is a derivative claim brought by Plaintiffs on behalf of the Plan, not a direct claim of each Plaintiff or a class action claim. The fiduciary duty at stake then is an alleged duty Symetra owed to the Plan, not necessarily to Plaintiffs as Plan participants.

In short, the Court restates its previous conclusion: the question presents a close call. For purposes of deciding Symetra's Motion to Dismiss, the Court continues to adhere to its earlier holding as the law of the case that Symetra narrowly meets the 2006 Plan document's definition of a

"fiduciary," even though Plaintiffs no longer incorporate the 2006 Plan document into their pleadings and the Second Amended Complaint clearly alleges that Plaintiffs bring their fraudulent concealment claim against Symetra on behalf of the Plan. In the ERISA context, "[f]iduciary status is a fact–intensive inquiry, making the resolution of that issue inappropriate for a motion to dismiss." *Wallace v. Int'l Paper Co.*, 509 F.Supp.3d 1045, 1052 (W.D. Tenn. 2020) (quoting *In re Regions Morgan Keegan ERISA Litig.*, 692 F. Supp. 2d 944 (W.D. Tenn. 2010)); *see also* Plan, art. IX,§ 9.3 (stating that the Plan must be construed according to ERISA "and the laws of the State of Tennessee, other than its laws respecting choice of law, to the extent not pre–empted by the Act"). The Court's holding is confined to the sufficiency of the pleadings in the Second Amended Complaint. The full scope of Symetra's duty to disclose the material information about the nature of Dr. Harris's improper activities and, relatedly, whether Plaintiffs have a fraudulent concealment claim of their own or only the derivative claim alleged on behalf of the Plan are questions better suited for summary judgment, a stage of the case that is now on the horizon.

For purposes of deciding Symetra's Motion to Dismiss, the Court concludes that the Second Amended Complaint plausibly alleges with particularity that Symetra concealed or suppressed the facts about Dr. Harris's dealings in abrogation of its fiduciary duty to the Plan.[10] Therefore, Symetra's Motion to Dismiss is **DENIED** as to this issue.

---

[10] Plaintiffs argue that the Court's ruling on the previous round of Rule 12(b)(6) motions applied to "Plaintiffs individually." Pls.' Resp. in Opp'n 23 (ECF No. 591). However, Plaintiffs have cited nothing in the Court's holding specifying that Symetra owed a fiduciary duty to each Plan participant. And Plaintiffs have not cited any legal authority to show why Symetra owed Plan participants like Plaintiffs a duty to disclose facts about Dr. Harris's machinations. Because the parties have not fully developed this issue in their briefing, the Court finds no reason to consider it in more depth for the time being.

## III. Civil Conspiracy (Count 8)

Count 8 of the Second Amended Complaint alleges that certain Defendants, including Symetra, are liable for civil conspiracy.  To plead civil conspiracy under Tennessee law, Plaintiffs must establish that (1) two or more persons had a common design; (2) the common design sought to accomplish an unlawful purpose; (3) those individuals engaged in an overt act in furtherance of the conspiracy; and (4) Plaintiffs suffered injury as a result. *See Morrow v. Kroger Ltd. P'ship I*, No. 2:24-cv-02564-SHL-cgc, 2025 WL 367404, at *5 (W.D. Tenn. Jan. 29, 2025) (citing *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006)).  Conspiracy is not an independent tort under Tennessee law. *Campbell v. BNSF Ry. Co.*, 600 F.3d 667, 677 (6th Cir. 2010) (citing *Greene v. Brown & Williamson Tobacco Corp.,* 72 F. Supp. 2d 882, 887 (W.D. Tenn. 1999)).  Rather, civil conspiracy is "a means of extending, to a tortfeasor's co-conspirators, liability for the tortfeasor's underlying tort." *Wachter, Inc. v. Cabling Innovations, LLC*, 387 F. Supp. 3d 830, 849 (M.D. Tenn. 2019).

Symetra seeks the dismissal of the civil conspiracy claim for Plaintiffs' failure to allege the existence of an agreement between Symetra and Dr. Harris. The Tennessee Supreme Court has defined the tort of conspiracy as "an agreement between two or more persons to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means." *First Cmty. Bank, N.A. v. First Tenn. Bank, N.A.*, 489 S.W.3d 369, 395 (Tenn. 2015) (citations omitted). There is no requirement that the conspiracy rest on a formal agreement. *Chenault v. Walker*, 36 S.W.3d 45, 52 (Tenn. 2001) (quoting *Dale v. Thomas H. Temple Co.*, 208 S.W. 2d 344, 353 (Tenn. 1948)).  A conspiracy may proceed from only a tacit understanding, meaning "it is not essential that each conspirator have knowledge of the details of the conspiracy." *Id*. "Each conspirator must have the intent to accomplish this common purpose, and each must know of the

other's intent." *First Cmty. Bank*, 489 S.W.3d at 396 (citation omitted). It is not necessary, however, "that each conspirator have knowledge of the details of the conspiracy." *Id*. (citation omitted).

The Second Amended Complaint is replete with allegations about the conspiracy and Symetra's involvement. In fact, the very first allegation stated in the pleading suggests that the gravamen of Plaintiffs' case is a conspiracy: "This case is about a conspiracy between a group of businesses and individuals who used their control and influence over a retirement fund to enrich themselves at Plaintiffs' and Class Members' expense." Second Am. Compl. ¶ 1. It is true the Second Amended Complaint does not allege any direct evidence of an explicit agreement between Dr. Harris, Eaton, and Symetra. Under Tennessee law, the proof necessary to show a civil conspiracy is "rarely" direct. *First Cmty. Bank*, 489 S.W.3d at 396. Instead, a conspiracy is more often proved through circumstantial evidence "and inferences drawn from the evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances." *Id*. (citation omitted).

The circumstances described in the Second Amended Complaint plausibly imply the existence of an agreement involving Symetra. Plaintiffs have identified the participants in the conspiracy and the aims of their agreement. "In 2001, Defendants Dr. Harris, Eaton, Newport, and Symetra began their long[-]running conspiracy to, inter alia, misappropriate funds, defraud Plaintiffs, and manage the Fund for their own benefits and to the detriment of the Plaintiffs and the Plan." Second Am. Compl. ¶ 147. And Plaintiffs have described the general features of what appears to be a quid pro quo between Dr. Harris, Robert Eaton, and Symetra: Dr. Harris "[s]teer[ed] assets into low-performing Symetra annuities that enabled Eaton to receive large commissions and Symetra to obtain a source of cheap capital with minimal obligations to generate returns for the Fund" and "Symetra[] pa[id] inflated 'administrative fees' to Dr. Harris as an inducement for Dr. Harris to keep Fund assets in Symetra annuities." *Id*. ¶ 148(a) & (b).

37

The Second Amended Complaint further alleges the particulars of the administrative fees paid out of Plan assets held by Symetra to Dr. Harris, showing that Dr. Harris was eventually receiving an annual administrative fee of hundreds of thousands of dollars, representing over two percent of the value of the Plan assets invested with Symetra. *E.g. id.* ¶¶ 253-56.  Between 2016 and 2019, Symetra paid Dr. Harris over $3.5 million in administrative fees, even though Church practice entitled Dr. Harris to no more than $650,000.  *Id.* ¶ 262.  And Plaintiffs allege that Symetra committed the following overt acts in furtherance of the supposed conspiracy: (1) "[p]aying kickbacks to Dr. Harris to induce him to keep Fund assets in Symetra annuities"; (2) "[t]ransferring Plan assets to entities owned and/or controlled by Dr. Harris"; and (3) "[c]overtly assisting Dr. Harris's 2008 re-election campaign for Executive Director of the AMEC Department of Retirement Services so that Symetra's corrupt bargain with Dr. Harris could continue." *Id.* ¶ 803.  In short, Plaintiffs have not simply recited a formula or pleaded the bare elements of a conspiracy claim.  The Second Amended Complaint alleges, and in some detail, "the nature of the acts [of the conspirators], the relationship of the parties, the interests of the conspirators, and other circumstances." *First Cmty. Bank*, 489 S.W.3d at 396.  This is enough to state the claim with the requisite particularity, something "more than a suspicion or conjecture that a conspiracy exists." *Id.*

Symetra also argues that the Second Amended Complaint fails to allege a "common design." According to Symetra, Plaintiffs have alleged that Dr. Harris and Symetra allegedly committed different wrongful acts or torts.  The Court finds this argument unconvincing.  The "common design" is another way of saying the agreement.  As the Court has just concluded, the Second Amended Complaint plausibly alleges the existence of a tacit agreement between Dr. Harris and Symetra.  What Plaintiffs must prove is that the common design or agreement between Symetra and Dr. Harris had an unlawful purpose as its object. *Kincaid*, 221 S.W.3d at 38.  Symetra frames the

unlawful purpose inquiry as a requirement that Plaintiffs must show that both Dr. Harris and Symetra were committing the same unlawful act, for example, a breach of fiduciary duty. But Tennessee law only requires Plaintiffs to prove that Dr. Harris committed a breach of fiduciary duty and that Symetra as Dr. Harris's co-conspirator committed "an overt act in furtherance of the conspiracy," not that Symetra committed the same breach of fiduciary duty. *Wachter, LLC*, 387 F. Supp. 3d at 849 (holding that civil conspiracy is "a means of extending, to a tortfeasor's co-conspirators, liability for the tortfeasor's underlying tort"); *see also S. Concrete Prods., Inc. v. Liberty Holdings, LP*, No. 1:19-cv-1105-STA-jay, 2019 WL 7758860, at *4 (W.D. Tenn. Sept. 12, 2019) ("Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, *although not actually committing a tort themselves*, share with the immediate tortfeasors a common Plan or design in its perpetration.") (emphasis added). The Court holds that Plaintiffs' theory of the case comports with Tennessee law.

Symetra also points out the inconsistent nature of Plaintiff's theories of relief. Symetra questions how Plaintiffs can allege Dr. Harris and Symetra had a tacit agreement to deplete the Plan's assets but at the same time allege that Symetra was negligent in carrying out directives from Dr. Harris about the disposition of Plan assets. As Plaintiffs acknowledge in their brief, the pleading rules permit a plaintiff to allege different claims in the alternative. Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."). Symetra's point is a matter better addressed, perhaps, at the summary judgment phase of the case based on the full evidentiary record, not just the fact allegations of the pleadings. For now, Symetra's Motion to Dismiss is **DENIED** as to the civil conspiracy claim.

39

### IV. Aiding and Abetting Breach of Fiduciary Duty (Count 9)

Symetra finally seeks the dismissal of Plaintiffs' claim for aiding and abetting breach of fiduciary duty. Under Tennessee law, a plaintiff may hold a defendant liable for a third-party's breach of duty if "the defendant knew that his companions' conduct constituted a breach of duty, and that he gave substantial assistance or encouragement to them in their acts." *PNC Multifamily Cap. Inst. Fund XXVI Ltd. P'ship v. Bluff City Cmty. Devel. Corp.*, 387 S.W.3d 525, 552 (Tenn. Ct. App. 2012) (quoting *Carr v. United Parcel Serv.*, 955 S.W.2d 832, 836 (Tenn. 1997)). The Tennessee Court of Appeals has cited the Restatement of Torts § 876 (1934 & 2004 Supp.) with approval. *Id.* Restatement of Torts § 876 provides as follows:

> For harm resulting to a third person from the tortious conduct of another, a person is liable if he:
>
> (a) orders or induces such conduct, knowing of the conditions under which the act is done or intending the consequences which ensue, or
>
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
>
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement of Torts § 876 (1934 & 2004 Supp.) At the pleadings stage, the tort of aiding and abetting requires an allegation of "substantial assistance on the part of the alleged tortfeaser [sic]." *PNC Multifamily*, 387 S.W.3d at 552.

The Court holds that the Second Amended Complaint states a plausible claim against Symetra for aiding and abetting Dr. Harris's and Eaton's breaches of fiduciary duty. First, Plaintiffs have alleged that Symetra had actual knowledge of Dr. Harris's and Eaton's separate breaches of fiduciary duty, including the following specific breaches: "a long-term pattern of financial

mismanagement, embezzlement, fraud, and misrepresentations concerning the Plan"; "a pattern of self-dealing with Plan assets"; "making high-risk and speculative investments with Plan assets"; and "allowing the Plan to earn returns that were far below the average rate of return for pension Plans." Second Am. Compl. ¶ 824(a)-(d). The Court has already cited some of the allegations from the pleadings which would go to show how Symetra had actual knowledge of these breaches, for instance, Symetra's handling of Dr. Harris's withdrawal of $10 million in Plan assets to be deposited with a company owned by Eaton and the large administrative fees paid to Dr. Harris which amounted to millions of dollars in Plan assets over time.

There are also allegations to show that Symetra paid Eaton large commissions as an agent for the Plan at the same time that Eaton had an employment relationship with a Motorskill company and corresponded with Symetra employees from an @motorskill.com email address. *Id.* ¶¶ 279-83. Plaintiffs allege that Symetra knew Dr. Harris and Eaton were investing Plan assets in the Motorskill Entities because in some instances Dr. Harris instructed Symetra to wire funds directly to a Motorskill Entity. *Id.* ¶¶ 185, 189. At the pleadings stage, these facts plausibly show that Symetra had actual knowledge of the facts that constitute breaches of fiduciary duty by Dr. Harris and Eaton.

Symetra nevertheless argues that the Second Amended Complaint fails to show how Symetra assisted Dr. Harris in any illegal activity. However, Plaintiffs' claim is that Symetra provided substantial assistance to Dr. Harris in his breaches of fiduciary duty, not that Dr. Harris committed a criminal act. For purposes of Symetra's Motion to Dismiss, Symetra's decision to acquiesce in Dr. Harris's request for the payment of larger administrative fees and its decision to put aside the in-house concerns some Symetra employees had voiced with disbursing $10 million in Plan assets to a company owned by Eaton and then disbursed the money anyway easily satisfy the "substantial

41

assistance" element.  Therefore, Symetra's Motion to Dismiss is **DENIED** as to the aiding and abetting claim.

## <u>CONCLUSION</u>

The Court holds that the Second Amended Complaint fails to state a plausible violation of the Tennessee Uniform Trust Code.  However, Plaintiffs have alleged plausible claims for fraudulent concealment, civil conspiracy, and aiding and abetting breach of fiduciary duty. Therefore, Symetra's Motion to Dismiss is **GRANTED in part, DENIED in part**.

**IT IS SO ORDERED**.

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: April 14, 2025