## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: AME CHURCH EMPLOYEE | ) | Lead Case No. |
| RETIREMENT FUND LITIGATION, | ) | 1:22–md–03035–STA–jay |
| | ) | |
| | ) | ALL CASES |

---

### ORDER GRANTING IN PART, DENYING IN PART AMEC DEFENDANTS' MOTION TO DISMISS SYMETRA'S AMENDED CROSS-COMPLAINT (ECF NO. 825)

---

Before the Court is a Motion to Dismiss (ECF No. 825) filed by the African Methodist Episcopal Church ("AMEC"), the AMEC Ministerial Retirement Annuity Plan ("the Plan"), the AMEC Department of Retirement Services, the AMEC General Board, and the AMEC Council of Bishops (collectively, the "AMEC Defendants").[1]  The AMEC Defendants move for the dismissal of Symetra Life Insurance Company ("Symetra")'s Amended Cross-Complaint against them.  Symetra has responded in opposition, and the AMEC Defendants have filed a reply.  For the reasons set forth below, the Motion is **GRANTED in part, DENIED in part**.

### BACKGROUND

#### I.   Procedural History

This multidistrict litigation concerns losses to a non-ERISA retirement Plan established by the African Methodist Episcopal Church for its clergy and employees.  Plaintiffs Pearce Ewing *et al.* are current or retired clergy of the church and have alleged a number of claims under state law against the denomination, church officials, third-party service providers to the Plan, and other alleged tortfeasors.  The Court has set out the procedural history of the case in its previous orders

---

[1] AMEC, the Plan, and Plaintiffs have filed a separate Joint Motion for Voluntary Dismissal (ECF No. 839), seeking in part a nonsuit of the Plan's crossclaims against Symetra.  The Plan's nonsuit does not affect Symetra's crossclaims against the Plan.

and need not review the full history here. For purposes of deciding the AMEC Defendants' Motion to Dismiss, the following procedural events are most relevant.

Briefly, pursuant to 28 U.S.C. § 1407, the Panel on Multidistrict Litigation transferred a series of civil actions to this Court on June 2, 2022, for the coordinated management of pretrial proceedings. Shortly thereafter, Plaintiffs filed a Consolidated Amended Complaint – Class Action (ECF No. 74) ("First Amended Complaint"), consolidating the parties and claims of each member case into a single amended pleading. As part of their responsive pleadings to the First Amended Complaint, both the AMEC Defendants and Symetra filed Cross-Complaints against each other. AMEC Defs.' Partial Answer & Cross-Complaint (ECF No. 116); Symetra's Answer & Cross-Complaint (ECF No. 214).[2] The AMEC Defendants filed an Amended Cross-Complaint and Third-Party Complaint (ECF No. 256) on July 25, 2023.

Symetra and AMEC then filed motions on the arbitrability of the crossclaims based on an arbitration agreement found in a 2003 Recordkeeping Services Agreement ("2003 RSA"), one of the contracts between the Church and Symetra. AMEC filed a motion to dismiss Symetra's crossclaims (ECF No. 230) against the Church, arguing that the crossclaims were subject to arbitration. Symetra responded by initiating arbitration in June 2023 and then filing two different motions of its own: a motion to stay all of the proceedings on all claims against it (ECF No. 259) as well as a separate

---

[2] The AMEC Defendants' initial Cross-Complaint named another Symetra entity, Symetra Financial Corporation ("Symetra Financial"), as a Cross-Defendant, but not Symetra. On November 23, 2022, Symetra and Symetra Financial filed a motion to dismiss (ECF No. 154) all claims against Symetra Financial in the Cross-Complaint. In response, the AMEC Defendants moved to amend their Cross-Complaint to name both Symetra and Symetra Financial as parties. After more briefing from the parties and the AMEC Defendants' subsequent request to file a different amended pleading, the Court granted the AMEC Defendants leave to file an Amended Cross-Complaint, naming Symetra as a Cross-Defendant, and a Third-Party Complaint, naming Symetra Financial as a Third-Party Defendant. Symetra Financial has since moved to dismiss the Third-Party Complaint against it. Symetra Fin.'s Mot. to Dismiss, May 9, 2025 (ECF No. 807). The AMEC Defendants have responded that they do not oppose dismissal and intend to file a stipulation of dismissal.

motion to stay just AMEC's crossclaims against it (ECF No. 270). The Court granted Symetra's motion for a mandatory stay of the proceedings pursuant to § 3 of the Federal Arbitration Act, 9 U.S.C. § 3, pending arbitration between AMEC and Symetra Life on certain gateway issues of arbitrability. Order Denying AMEC's Mot. to Dismiss, Granting in Part and Denying in Part Symetra Life's Motion to Stay, and Granting Symetra Life's Motion to Stay AMEC's Crossclaims, Dec. 11, 2023 (ECF No. 316). The Court held, however, that Symetra had not shown cause for a stay of the proceedings, either a mandatory stay under § 3 or a discretionary stay pursuant to the Court's inherent power over its docket, as to Plaintiffs' claims against Symetra.[3] On February 24, 2025, the arbitrator issued his decision on the arbitrability issue, holding that the parties had not bound themselves to arbitration, and dismissed the proceeding. *See* Decision on Jurisdiction and Scope of Arbitration, Fed. 24, 2025 (ECF No. 825-2). On March 11, 2025, the Court granted the AMEC Defendants' unopposed motion to lift the stay of the proceedings between AMEC and Symetra. *See* Order Granting AMEC Defs.' Mot. to Lift Stay, Mar. 11, 2025 (ECF No. 754).

While threshold questions about the arbitrability of the crossclaims between AMEC and Symetra were still in arbitration, Plaintiffs filed their Second Consolidated Amended Complaint–Class Action (ECF No. 493, as corrected ECF No. 494) ("the Second Amended Complaint") in August 2024.[4] After the Court lifted the stay of the proceedings between AMEC and Symetra and

---

[3] The Court did grant Symetra Financial's request for a discretionary stay of the proceedings on AMEC's crossclaims against the company, while AMEC and Symetra proceeded to arbitration. Order Denying Symetra Fin.'s Mot. to Dismiss, Granting Mot. for Stay, Mar. 1, 2024 (ECF No. 346).

[4] Plaintiffs and the AMEC Defendants subsequently reported that they had reached a settlement of their dispute. And a short time later, the parties announced to the Court that Plaintiffs and the AMEC Defendants had reached a separate settlement with Newport. The Court granted preliminary approval to both settlements, *see* Mem. Op. & Order Granting Pls.' Mot. for Prelim. Approval, Mar. 24, 2025 (ECF No. 774), and held a fairness hearing on June 26, 2025. The Court

ruled on Symetra's motion to dismiss the Second Amended Complaint, Symetra filed a responsive

pleading, which included an Amended Cross-Complaint against the AMEC Defendants (ECF No.

794) on April 28, 2025. The AMEC Defendants now move for the dismissal of Symetra's

crossclaims against them.

## II. Factual Background

For purposes of deciding the AMEC Defendants' Motion to Dismiss, the Court accepts the

following well pleaded facts of Symetra's Amended Cross-Complaint as true.

### A. <u>Symetra's Overview of its Cross-Complaint</u>

At all times material to this action, AMEC was the Plan sponsor, named fiduciary, and

employer of participants in the African Methodist Episcopal Church Ministerial Retirement Annuity

Plan (the "Plan"). Symetra's Am. Cross-Compl. ¶ 1. As the Plan sponsor and a fiduciary of the Plan,

AMEC owed a duty of prudence and a duty of loyalty to the Plan and the Plan participants, including

the duty to prudently select, monitor, and manage the Plan's investments, and to avoid and replace

imprudent investments. *Id*. ¶ 2. AMEC also had a fiduciary duty to monitor other fiduciaries of the

Plan as well as the Plan's nonfiduciary service and product providers. *Id*. Rather than create a

retirement plan committee of competent professionals or hire an experienced retirement plan

investment advisor to assist it in managing the Plan, AMEC assigned the Executive Director of

AMEC's Department of Retirement Services ("DRS") the duty to act as the sole trustee of the Plan,

with the sole individual authority to manage and administer the Plan, including the sole authority to

invest the Plan's assets. *Id*. ¶ 3.

---

entered an order granting the parties' motion for final approval on August 18, 2025. Order Granting
Final Approval (ECF No. 910).

Since before 2000, the Executive Director of the DRS has been elected for a term of four years. *Id.* ¶ 4. Any member of the AME Church was eligible to run for the position of Executive Director, and no experience with retirement plans or investments was required. *Id.* In 2000, AMEC elected Dr. Jerome Harris ("Harris") as the Executive Director of DRS, which made him the sole trustee of the Plan with complete authority and control to manage the Plan and invest its assets. *Id.* ¶ 5. Between 2004 and July 2021, Harris ran unopposed and was elected four more times for consecutive four-year terms as Executive Director and sole Plan Trustee. *Id.* ¶¶ 6, 7. As a result, Harris served as the sole Plan Trustee for more than 20 years from 2000 to July of 2021. *Id.* ¶ 6.

While he was Executive Director of DRS, Harris was at all times an employee of AMEC. *Id.* ¶ 8. As Executive Director, Harris was acting within the scope of his employment with respect to all actions he took relating to the Plan, and AMEC is responsible for all of Harris's acts and omissions with respect to the Plan. *Id.* ¶ 9. During the 20 years when Harris served as Executive Director, AMEC breached its fiduciary duties of prudence and loyalty to the Plan and its participants by failing to prudently monitor the Plan's investments and expenses, and by failing to supervise Harris's management of the Plan, including a failure to monitor Harris's investment decisions and his expenditure of Plan funds. *Id.* ¶ 10.

In June of 2021, Harris reported that the value of the Plan's assets was approximately $126.8 million. *Id.* ¶ 11. As a result of AMEC's breach of its fiduciary duties, gross negligence, and failure to monitor or supervise the Plan's investments, AMEC asserts that it was unaware in June 2021 where the Plan's assets were actually invested and had no understanding of the value of the Plan's assets independent of Harris's reports. *Id.* Due to an age limitation, Harris was unable to run for reelection as Executive Director in 2021. *Id.* ¶ 12. Instead, Dr. James Miller was elected in July 2021 as the new Executive Director of DRS and sole trustee of the Plan. *Id.* ¶ 13.

Shortly after assuming the role of Executive Director of DRS, Dr. Miller called Symetra, which reported to him that the value of the Plan's annuity contract with Symetra was approximately $37 million. *Id.* ¶ 14. Dr. Miller was unaware of where any other Plan funds were invested. *Id.* Dr. Miller initiated an investigation into the Department's handling of Plan funds and soon learned that the Plan was invested in other things besides Symetra annuity contracts, including (i) Florida real estate; (ii) venture capital funds (referred to as the "Motorskill Entities"); (iii) a loan to Day and Night Solar, LLC; and (iv) an entity called Financial Freedom Funds, LLC formed by Harris in 2006 and owned by the DRS (in other words, it was owned by AMEC). *Id.* ¶ 15.

The investigation revealed that Harris had overstated the value of the Plan's assets in June 2021 by more than $88.5 million, with approximately $88 million of that overstatement attributable to Harris's investment of Plan funds in the Motorskill Entities, which had become worthless. *Id.* ¶ 16. AMEC leadership, including Bishops and members of the General Board, claimed to have no knowledge that Harris had made investments in the Motorskill Entities. *Id.* ¶ 17. In other words, AMEC leadership admitted that they and AMEC had breached their fiduciary duties to supervise Harris and monitor the Plan's investments. *Id.* ¶ 18. Symetra alleges that AMEC is responsible for its own actions and omissions with respect to the Plan and also responsible for those of its employees and agents, including Harris. *Id.* ¶ 19.

Recognizing its culpability with respect to the Plan's losses, AMEC publicly announced that it was committed to making Plan participants whole. *Id.* ¶ 20. After AMEC was sued in six putative class actions, however, AMEC changed its tactics. *Id.* ¶ 21. In order to deflect blame from itself and to obfuscate its grossly negligent failure to manage and monitor the Plan's investments over a 20-year period, AMEC filed crossclaims against several other defendants, including Symetra. *Id.* AMEC also caused the Plan to file crossclaims against Symetra, using the same counsel as AMEC.

*Id.* ¶ 22.  Symetra alleges that by asserting claims against it, AMEC and the Plan materially breached their contractual obligations to Symetra by falsely asserting that Symetra had a duty to investigate and challenge Harris's directions to Symetra in connection with withdrawing or transferring funds from the Symetra annuity contracts and Guaranteed Interest Contracts ("GICs"), directly contrary to the terms of their contracts with Symetra. *Id.* ¶ 23.  Accordingly, Symetra asserts crossclaims for breach of contract against AMEC and the Plan.  *Id.* ¶ 24.  Symetra also asserts crossclaims for declaratory relief that Symetra is not responsible for any losses to the Plan and has no liability for any losses suffered by the Plan due to AMEC's breach of duty and gross negligence. *Id.* ¶ 25.  Given that AMEC is 100% responsible for any and all of the Plan's losses, including all acts and omissions of AMEC's employee Harris, Symetra further asserts claims against AMEC and the Plan for indemnification and contribution.  *Id.* ¶ 26.[5]

### B.   AMEC's Retirement Plan for Church Employees

AMEC is a business that employs thousands of people to run an international church with millions of members. *Id.* ¶ 47.  On its website (ame-church.com), AMEC represents that it has 2,785,000 members worldwide and 7,130 individual congregations. *Id.*  AMEC maintains a retirement plan for its employees called the African Methodist Episcopal Church Ministerial Retirement Annuity Plan (defined above as the "Plan"). *Id.* ¶ 48.  The terms of the Plan are set out in a March 9, 2006, document (the "Plan Document"), a copy of which is attached to Symetra's Cross-Complaint as Exhibit A.  *Id.*  The Plan is a defined-contribution plan, the investments of which were trustee-directed until at least 2022. *Id.* ¶ 49.  As Plan sponsor, AMEC made the decision

---

[5] Symetra also alleges claims for contribution against the other Cross-Defendants named in its Amended Cross-Complaint.

to maintain the Plan as a trustee-directed Plan instead of allowing Plan participants to direct their own investments in individual accounts. *Id.*

Because the Plan is trustee-directed unlike a typical 401(k) plan, each Plan participant does not manage and invest his or her own money. *Id.* ¶ 50. Instead, all of the money contributed by and for all Plan participants is pooled into a single fund (the "Fund"), which is managed and invested by the Plan's Trustee. *Id.* All contributions to the Plan and the Fund were sent by Plan participants, directly or indirectly through their local churches or districts, to the Plan Trustee at the Department, who was responsible for depositing those contributions into one or more bank accounts at Regions Bank. *Id.* ¶ 51. The Fund and all Plan assets were considered to be held in trust as required for tax qualified plans under Section 401(a) of the Internal Revenue Code (the "IRC"). *Id.* ¶ 52. AMEC has referred to the Plan both as a qualified plan under Section 401(a) of the IRC and as a 401(k) plan. *Id.* Section 401(k) plans are a type of 401(a) plan. *Id.*

AMEC is the Plan sponsor, the Plan Administrator, the Plan Employer, and a named fiduciary of the Plan, according to §§ 1.17, 2.23 2.1(c), 2.3, 9.11 of the Plan Document, respectively. *Id.* ¶ 54. As such, AMEC is responsible for prudently selecting, monitoring, and managing the Plan's investments, as well as appointing, supervising, monitoring, and replacing the Plan Trustee, in connection with the investment and disbursement of Plan assets pursuant to §§ 2.1(a), 2.1(c), 2.3, 9.11 of the Plan Document. *Id.* ¶ 55.

## C. Harris' Election as Executive Director of DRS

AMEC created DRS and the position of Executive Director to manage the Plan. *Id.* ¶ 56. The Executive Director was elected every four years at AMEC's General Conference for a term of four years. *Id.* In 2000, Harris was elected as Executive Director of DRS. *Id.* ¶ 57. Symetra alleges that Harris became the sole Trustee of the Plan by virtue of his election as Executive Director. *Id.*

8

Harris served as the Executive Director of DRS and sole Plan Trustee until his retirement in July 2021. *Id.* ¶ 62.

The Cross-Complaint makes a number of allegations about the Trustee's powers under the terms of the written Plan Document, which Symetra has made an exhibit (ECF No. 794-1) to the Cross-Complaint.[6] Under §§ 7.3 and 9.11 of the Plan Document, Harris as Trustee was a fiduciary with full authority to invest and manage Plan assets as he deemed advisable and to change those investments from time to time, including by private contract. *Id.* ¶ 58. Section 7.3(d) of the Plan Document granted Harris as Trustee the authority to register Plan assets in his own name, so long as he kept records showing that such assets were part of the Plan. *Id.* ¶ 59. Section 7.3(h) gave Harris the authority to execute all documents on behalf of AMEC necessary to carry out the investments, transfers, and disbursements of Plan assets that he deemed advisable. *Id.* Under § 7.3(k), Harris as Trustee was authorized to use Plan assets to purchase annuity contracts and to exercise on behalf of AMEC whatever rights and authority those contracts conveyed, including the right to collect, receive, withdraw, and transfer the proceeds of those contracts. *Id.* ¶ 60. Section 7.3(r) vested Harris as Trustee with the authority to appoint third-party administrators and other agents to help him administer the Plan and make investment decisions. *Id.* And section 7.3(k) gave Harris the authority to compensate these agents and to reimburse himself for his expenses using Plan assets. *Id.*

Between 2000 and July 2021, Harris served in this position with the full knowledge, consent, and authority of the AMEC Defendants. *Id.* At all times during the 20 years when Harris

---

[6] Strictly speaking, the construction of the Plan Document is a question of law, not a factual allegation the Court has to accept as true for purposes of a Rule 12(b)(6) motion. *Harvey ex rel. Gladden v. Cumberland Tr. & Inv. Co.*, 532 S.W.3d 243, 252 (Tenn. 2017) (holding that the interpretation of a trust instrument, like a contract, is a legal question under Tennessee law) (citations omitted); *see also* Tenn. Code Ann. § 35–15–107(a) ("The validity and construction of a trust are determined by the law of the jurisdiction designated in the terms of the trust instrument, which is called a state jurisdiction provision.").

served as Executive Director, the AMEC Defendants had actual and constructive knowledge that Harris was holding himself out to the public and third parties, including Symetra, as Plan Trustee. *Id*. ¶ 63. Between 2000 and July 2021, no one at AMEC ever questioned or disputed Harris's role and authority as Trustee of the Plan or tried to prevent him from acting in that capacity. *Id*. ¶ 64. Between 2000 and July 2021, no one at AMEC ever asserted that anyone other than Harris was a trustee of the Plan. *Id*. ¶ 65. The AMEC Defendants provided Harris with the actual and apparent authority to act on behalf of AMEC and the Plan, including the authority to enter contracts and conduct Plan business, without the need for any further authority or approval from anyone else at AMEC. *Id*. ¶ 66. Harris acted at all times with respect to the Plan as the employee and authorized agent of AMEC and as Plan Trustee. *Id*. No one at AMEC ever advised or notified Symetra that any other person besides Harris was required to approve actions that Harris took on behalf of AMEC or the Plan. *Id*. ¶ 67. To the contrary, the AMEC Defendants openly and deliberately allowed Harris to enter contracts, transact Plan business, and act as the sole person with authority to act on behalf of the Plan and for AMEC in AMEC's capacity as Plan sponsor and Plan administrator. *Id*.

### D. AMEC's Failure to Prudently Monitor and Manage the Plan's Investments

At all times when Harris served as Executive Director, AMEC maintained a Commission on Retirement Services (although this Commission had different names over time), including a Chair of the Commission. *Id*. ¶ 68. AMEC charged the Commission on Retirement Services with responsibility for overseeing DRS and its Executive Director. *Id*. The Commission on Retirement Services wholly failed to oversee DRS and its Executive Director. *Id*. ¶ 69. Neither the Commission on Retirement Services nor anyone else at AMEC supervised Harris's activities with respect to the Plan or monitored the investments he was making with Plan funds. *Id*. ¶ 70. AMEC is fully responsible for the actions and omissions of the Commission on Retirement Services. *Id*.

10

During Harris's tenure as Executive Director, the Council of Bishops and General Board also failed to monitor the Plan's investments, failed to monitor Harris's disbursements and uses of monies that were supposed to be deposited into the Plan's Regions Bank accounts, failed to ensure that Harris was prudently investing the Plan's assets, and failed to require a competent audit of the Plan's assets and expenditures. *Id.* ¶ 71. AMEC is fully responsible for the actions and omissions of the Council of Bishops and the General Board. *Id.*

As Executive Director of the Department, Harris prepared an Annual Report each year on the Plan and the activities of the Department, which was sent to AMEC's Commission on Retirement Services, the Council of Bishops, and the General Board (which included the General Officers of the Church). *Id.* ¶ 72. These Annual Reports contained recommendations from the Executive Director. *Id.* ¶ 73. Every Annual Report provided by Harris during his tenure as Executive Director was approved by the Commission on Retirement Services and the General Board. *Id.* ¶ 74. The 2003 Annual Report contained the following explanation of the Executive Director's position and responsibility:

[A]s Trustee and Fiduciary for the AMEC Ministerial Retirement Annuity Plan, it is the inherent responsibility of the elected Executive Director to explore all investment avenues and vehicles in the pursuit of obtaining the maximum investment return for the participants of the Plan, but in a fiscally sound and prudent manner. Certain optional investments, particularly in the area of real estate, in carefully selected markets, provide excellent opportunities to accomplish a more satisfactory investment return, while utilizing collateralization to protect investment value and integrity. In the present investment environment, such opportunities are worthy of serious consideration and are recommended elsewhere in this Annual Report.

*Id.* ¶ 75. Symetra has attached a copy of the 2003 Annual Report as Exhibit B to it Amended Cross-Complaint.

Among other things, the 2003 Annual Report contained a section entitled "Forging New Frontiers of Financial Freedom" that discussed the Department's "ongoing and ever widening

business relationship with Financial Technologies, Inc." *Id.* ¶ 76.  The 2003 Annual Report also stated that the Plan "experienced significant increases in nearly every aspect of measurable accountability," and that "[d]uring 2002, the total value of the Plan increased by 3.1% to $53.1 million Dollars." *Id.*  The Report stated that "the favorable impact of a fixed rate portfolio in a declining rate environment proved to be a tremendous 'safeguard' for the participants in the Plan." *Id.*  The 2003 Annual Report stated that the Department had created AMEC Financial Services, LLC, which was a legal and separate entity of the Church, and that "[t]he Council of Bishops and the General Officers of the Church have agreed to serve as the founding members and as such, shall be authorized to establish policy, supervise the operating agenda and be accountable for all revenue and income generated through its normal business activities." *Id.* ¶ 77.  The Report further stated that the Executive Director was authorized to serve as manager of the LLC, and that AMEC Financial Services was "empowered to negotiate for, transact and engage in any and all matters of business related to the financial services industry."  *Id.*

The 2003 Annual Report contained recommendations to the General Board, including a recommendation that the Executive Director, "as Trustee and Fiduciary of the Plan," be authorized "to invest not more than 30% of the total assets of the Plan in alternative investment vehicles that will provide a greater rate of return, with the requirement that all such investments provide a fixed rate of return and shall be made only on a collateralized basis."  *Id.* ¶ 78.  The 2003 Annual Report also recommended that the Executive Director's title of Interim Manager of AMEC Financial Services, LLC be changed to Manager "to establish the permanent status of this appointment." *Id.* ¶ 79.  All recommendations in the 2003 Annual Report were adopted and approved by the General Board.  *Id.* ¶ 80.

12

In the Department's 2009 Annual Report, Harris touted the Plan's investment performance notwithstanding the 2008 global financial crisis. *Id*. ¶ 81. Harris reported that notwithstanding the "economic 'meltdown' and the global impact that it was inflicting upon the world's financial markets," the Plan "**experienced no loss of principal or accrued interest, and the earnings for the 2008 4th Quarter were the best in the previous three years!**" (bold font in original). *Id*. Addressing "Why?" and "How?," the Annual Report explained that the Plan had engaged in "asset diversification" and had invested funds outside of Symetra annuities:

> Beginning in the latter months of 2007, the Department adopted a strategy of conservative diversification, whereby it began to reinvest a portion of assets into other guaranteed investments, thereby reducing the potential exposure that existed by having the entire portfolio invested in one fixed investment fund. Although the Symetra Financial Retirement Services Company retained the overall Plan management and accountability, lesser portions of the Plan assets were invested elsewhere in specific guaranteed investments. Thus far, this has proven to be a sound strategy.

*Id*. ¶ 81. Symetra has attached a copy of the 2009 Annual Report as Exhibit C to its Amended Cross-Complaint. The statement that Symetra "retained the overall Plan management and accountability" was false, as Symetra had no role in Plan management. *Id*. ¶ 82.

Despite receiving and approving this Annual Report, no one on the Commission of Retirement Services, the Council of Bishops, the General Board, or anyone else at AMEC ever asked Harris for more information about his "asset diversification" or what other investments Harris had made outside of Symetra. *Id*. ¶ 83. As of the date of the 2009 Annual Report, if not before, AMEC had actual and constructive knowledge that Harris was investing Plan assets in other investments besides Symetra annuities. *Id*. ¶ 84. The AMEC Defendants wholly breached their fiduciary duties of prudence in failing to evaluate and monitor these investments. *Id*.

Along with each of his Annual Reports, Harris forwarded to the AMEC Defendants an Audit Report prepared by Rodney Brown & Company. *Id*. ¶ 85. For example, the 2003 Audit

13

Report explained that the majority of the revenue received by the Department consisted of monies that the Department received from the various districts of the Church, and that the Department used these monies to contribute to annuities, and to pay for life insurance, hospital insurance, and administration of the Department. *Id*. The 2003 Audit Report stated that the balance of the Symetra annuity as of March 31, 2003, was $55.7 million. *Id*.

Symetra alleges that Rodney Brown & Company's Audit Reports were deficient and negligently prepared in failing to provide adequate and accurate information. *Id*. ¶ 86. More specifically, the audits failed to provide adequate and accurate information regarding the amount of Plan contributions deposited by the Department into Regions Bank and the disbursement and use of Plan funds by Harris and the Department. *Id*. The Rodney Brown & Company Audit Reports also failed to itemize and disclose all of the Plan's assets. *Id*. ¶ 87. In many cases, the audits falsely stated the value of Symetra's annuity contracts, despite the fact that Symetra always provided accurate statements of contract value to the Department and to Rodney Brown & Company. *Id*.

For example, the 2020 Rodney Brown & Company Audit Report stated: "As of March 31, 2020 and 2019, the total account balances of annuities held and invested on behalf of the clergy servants and full time employees of the African Methodist Episcopal Church was $128,377,716 and $126,659,186 respectively." *Id*. ¶ 88. These numbers were false and substantially overstated the account balance of the Symetra annuity contract. *Id*.

**E. AMEC's Annuity Contracts with Symetra**

In 2001, Harris undertook to move the Plan's investment with American General Insurance Company to another company. *Id*. ¶ 89. As Executive Director and Plan Trustee, Harris engaged Robert Eaton ("Eaton") and Financial Technologies, LLC to act as broker for AMEC and the Plan. *Id*. After several companies responded to a request by Eaton for proposals, approximately three

companies, including Symetra, had meetings with Harris, Eaton, and Bishop John Adams, who was then Chair of the Commission on Retirement Services and a member of the Council of Bishops. *Id.* During this meeting, Harris represented himself as the Trustee of the Plan with authority to transfer the Plan's funds from American General to a new company. *Id.* ¶ 90.  In December 2001, with the knowledge and consent of the AMEC Defendants, Harris applied for and purchased an annuity contract from Symetra's predecessor, Safeco Life Insurance Company, with an initial deposit of approximately $48 million (the "2001 Annuity Contract"). *Id.* ¶ 91.  Harris signed the contract on behalf of AMEC in his capacity as AMEC's authorized agent and the Plan Trustee. *Id.*  Harris was fully authorized by AMEC to instruct Symetra with respect to the 2001 Annuity Contract, including instructions regarding deposits and withdrawals. *Id.*

AMEC and the Plan kept all of the annuity funds in the "fixed" account of the contract. *Id.* ¶ 92. The contract was allocated to only a single entity, the Plan. *Id.*  The contract was not allocated to any Plan participants. *Id.*  Symetra had no knowledge of the identities of Plan participants. *Id.* Symetra had no role in keeping track of any individual participant's interest in the Plan. *Id.*  The identities of the Plan participants and the value of their respective individual accounts or interests in the Plan were tracked by AMEC and its third-party administrator, Newport Group. *Id.* ¶ 93.

Under the 2001 Annuity Contract, and subsequent annuity contracts and GICs issued by Symetra to AMEC or the Plan, AMEC deposited money into the Symetra contract in exchange for a contractual promise from Symetra to pay back that money with interest in the future. *Id.* ¶ 94. Symetra did not undertake in the 2001 Annuity Contract, or in any other contracts with AMEC or the Plan, to assume fiduciary duties, or to manage Plan assets, or to provide any investment advice to AMEC or the Plan. *Id.* ¶ 95.  Once monies were deposited with Symetra pursuant to the annuity contracts and GICs, those monies became Symetra's property. *Id.* ¶ 96.  The "Plan asset" is the

annuity contract or GIC, which is held by the contract owner (AMEC or the Plan).  *Id*.  The annuity

contracts and GICs that Symetra issued to AMEC or the Plan were all "unallocated," meaning that

the money AMEC deposited with Symetra was an undifferentiated lump sum and was not allocated

to individual Plan participants. *Id*. ¶ 97.  Symetra did not maintain any individual accounts for Plan

participants under any of its contracts with AMEC and the Plan.  *Id*.

The Plan, through Harris as Plan Trustee, could add money to the annuity contracts at any

time (which money would then start accruing interest) and could likewise request money be

distributed or transferred out of the annuity contract at any time to any place for any reason or for no

reason at all.  *Id*. ¶ 98.  Harris, as Plan Trustee and authorized representative of AMEC, routinely

directed Symetra to make distributions from the annuity contracts and GICs.  *Id*.

In 2007, Harris purchased a second Symetra annuity contract ("2007 Annuity Contract")

with an initial deposit of approximately $10 million. *Id*. ¶ 99.  By August 2010, all monies had been

transferred or distributed out of the 2001 Annuity Contract, the remaining balance had been

transferred to the 2007 Annuity Contract, and the 2001 Annuity Contract had been closed.  *Id*.  As

Plan Trustee and Executive Director of the Department, and as authorized agent of AMEC, Harris

purchased several products and signed multiple contracts with Symetra, including the following:

Dec. 2001:   Harris applied for and received from Symetra the 2001 Annuity Contract on behalf of the Plan. In connection with the 2001 Annuity Contract, Harris signed a 2001 Recordkeeping Services Agreement ("2001 RSA").

Feb. 2003:   Harris executed a Retirement Plans Recordkeeping Services Agreement ("2003 RSA").

May 2003:    Harris invested approximately $1.7 million of Plan funds in a Symetra Money Market Fund on a short-term basis.  In June 2003, Harris directed Symetra to transfer this money to a different investment (outside of Symetra) and close the fund.

| | |
|---|---|
| March 2007: | Harris applied for and received from Symetra the 2007 Annuity Contract. Harris and Symetra also executed a Guaranteed Interest Contract ("2007 GIC"). Harris invested $20 million of Plan funds in a one-year GIC at 4.56% pursuant to the 2007 GIC. |
| June 2007: | Harris invested $10 million of Plan funds in a second one-year GIC at 4.75%, pursuant to the 2007 GIC. |
| August 2007: | Harris deposited approximately $10 million of Plan funds in the 2007 Annuity Contract. |
| June 2008: | Harris applied for and received from Symetra another Guaranteed Interest Contract ("2008 GIC"). The two prior GICs matured. Harris moved most of the resulting money to other investments but reinvested $5.5 million of the resulting money in a third GIC for three years at 3.89%, pursuant to the 2008 GIC. |
| July 2008: | Harris executed a new Recordkeeping Services Agreement ("2008 RSA") in anticipation that AMEC would invest in mutual funds through Symetra. Harris ultimately invested approximately $1 million in mutual funds through Symetra. |
| Late 2009: | Harris liquidated the mutual fund investment, and Symetra closed its mutual fund program entirely. |
| July 2010: | Harris transferred the remaining balance of the 2001 Annuity Contract to the 2007 Annuity Contract and closed the 2001 Annuity Contract. |
| June 2011: | The 2008 GIC matured. |

*Id*. ¶ 100.

As Plan Trustee and Executive Director of DRS, Harris had actual authority to order disbursements from the Plan's contracts with Symetra. *Id*. ¶ 101. Symetra alleges that it was contractually obligated to execute Harris' orders. *Id*. With AMEC's knowledge, Harris routinely authorized dozens of withdrawal or disbursement requests each quarter. *Id*. The GICs operated in many respects like a Certified Deposit, or CD,[7] with a bank. *Id*. ¶ 102. Under each GIC, the Plan deposited a set amount of money for a set period of time at a set interest rate. *Id*. At the end of the

---

[7] The Cross-Complaint uses the phrase "Certified Deposit" and its abbreviation "CD." The Court assumes for purposes of deciding the AMEC Defendants' Motion to Dismiss that Symetra is referring to a certificate of deposit.

set period, the GIC matured, and Symetra returned the principal plus interest as directed by Harris as the Plan Trustee. *Id.* By June 2011, all of the GICs had matured, leaving the 2007 Annuity Contract as the only remaining contract still active with Symetra. *Id.* ¶ 103.

Symetra did not hold or manage Plan assets or money that belonged to AMEC or the Plan under any of its contracts with AMEC or the Plan. *Id.* ¶ 104. Instead, Symetra received deposits into its contracts in exchange for a contractual promise to repay principal plus interest in the future. *Id.* Monies deposited with Symetra under its contracts became the property of Symetra, not the Plan. *Id.* ¶ 105. In exchange for deposits made, AMEC or the Plan received the contractual right to repayment of the principal plus interest from Symetra. *Id.* Each annuity contract or GIC issued by Symetra was a "Plan asset" held by the contract owner. *Id.*

The 2001 RSA expressly stated that Symetra's participation in the Plan was limited to providing products purchased by the Plan Trustee. *Id.* ¶ 106. The 2001 RSA further stated that the employer (AMEC) would assume or delegate responsibility for all Plan administration. *Id.* In the 2003 RSA executed by Harris as Plan Trustee and authorized representative of AMEC, AMEC and the Plan represented, among other things (i) that AMEC was authorized to act for the Plan, (ii) that AMEC, the Trustee, and Plan administrator would remain responsible for all actions necessary or desirable for the administration of the Plan that were not expressly undertaken by Symetra, (iii) that AMEC, the Trustee, and Plan administrator would collectively exercise all discretionary authority, control, and responsibility for the administration of the Plan and the management of Plan assets, (iv) that Symetra was not and would not become a Plan fiduciary or a party to the Plan or Trust by virtue of its contract, and (v) that "[a]ll matters relating to the administration of the Plan or the investment of Plan assets are to be determined solely by AMEC or another Plan fiduciary, which shall be a person other than [Symetra]." *Id.* ¶ 107.

AMEC and the Plan agreed and represented in the section 9.8 of the Plan Document that insurance companies such as Symetra that issue contracts to the Plan "shall be protected and held harmless in acting in accordance with any written direction of the Trustee, and shall have no duty to see to the application of any funds paid to the Trustee, nor be required to question any actions directed by the Trustee." *Id*. ¶ 108. At all times between 2001 and 2021, Harris had full authority as Plan Trustee to direct Symetra with respect to disbursements and transfers from the annuity contracts and matured GICs. *Id*. ¶ 109. Symetra alleges it was legally obligated to execute Harris's instructions regarding withdrawals. *Id*. Furthermore, if Symetra refused to execute a withdrawal or transfer directive from Harris, Symetra would have risked being accused of materially interfering with AMEC's investment strategy and exposing itself to a breach of contract lawsuit. *Id*. Symetra denies that it had any contractual right or duty to inquire about where withdrawals were going or what other Plan investments Harris was making.

Both the 2007 Annuity Contract, the 2007 GIC, and the 2008 GIC stated that "Symetra is not a party to, nor bound by, any trust or Plan." *Id*. ¶ 110. The 2007 Annuity Contract expressly provided that "Symetra will accept Transfer requests submitted in writing . . . made by: the Contractholder [AMEC] . . . or other authorized person designated to Symetra in writing by the Contractholder," and that "Symetra will not be liable for any failure to question or challenge such request for Transfer as long as there is a valid signed authorization on record at Symetra." *Id*. ¶ 111.

Harris purchased the GICs as Trustee of the Plan and Executive Director of the DRS. *Id*. ¶ 112. The GICs required that Symetra make a cash distribution upon written direction of the contractholder (the Plan) on the maturity date of the GIC. *Id*. The express terms of the 2007 GIC and 2008 GIC each provided that Symetra was entitled to rely on written directives to make a cash distribution and Symetra "shall not be liable" for following the directive or "any failure to question

19

or challenge" the directive: "Symetra Life may rely on the written directive and shall not be liable because of any failure to question or challenge such directive regarding the issuance of an annuity or payment of a cash distribution." *Id*. Symetra alleges that AMEC and the Plan breached this provision of the GICs by filing cross-claims against Symetra asserting that Symetra was liable for relying on, and had a duty to question and challenge, written directives by Harris to transfer funds from the GICs, including in 2008 a clear written directive from Harris to transfer $10 million from a maturing GIC to a Bear Stearns account at Citibank. *Id*. ¶ 113.

## F. AMEC's and Harris's Investment of Plan Assets Outside of Symetra

In 2021, the new Executive Director of the DRS, Dr. James Miller ("Miller"), engaged the accounting firm Gregory Terrell & Company ("Terrell") to conduct an investigation into the Plan investments during Harris's tenure as Executive Director of the Department. *Id*. ¶ 114. The investigation revealed that, in or about 2005, Harris began investing Plan assets in venture capital funds known as the Motorskill Entities by transferring Plan monies directly from one of the Department's Regions Bank accounts to the Motorskill Entities. *Id*. ¶ 115. From 2005 to 2007, Harris made at least five transfers directly from Regions Bank to Motorskill Entities totaling $2.5 million. *Id*. ¶ 116. Harris continued to make transfers directly from Regions Bank to Motorskill Entities through 2015. *Id*. ¶ 117. Symetra had no knowledge of and nothing to do with these transfers. *Id*. The money used for these transfers had never been invested in any Symetra product. *Id*. Symetra denies that it had or ever had any knowledge about the nature of the Motorskill Entities. *Id*. ¶ 118. Nor did Symetra have any duty or contractual obligation to investigate the Motorskill Entities. *Id*. Terrell's investigation also revealed that Harris had invested the Plan's assets in Florida real estate; an entity called Financial Freedom Funds, LLC that was owned by AMEC; and a loan to Day and Night Solar, LLC made by AMEC Financial Services, LLC. *Id*. ¶ 119.

20

On or about March 5, 2008, pursuant to Harris's written directive, Symetra transferred $10 million from a maturing GIC to a Bear Stearns account at Citibank, for the benefit of Financial Freedom Funds, LLC. *Id*. ¶ 120. Due to the "Financial Freedom" naming convention of the entity, which was similar to Financial Freedom Group, an entity Symetra believed was affiliated with Bob Eaton, there was some concern within Symetra that the transfer might have been a prohibited transaction. *Id*. Symetra alleges that it was not its duty or obligation to determine whether or not Harris's transfer was or was not a prohibited transaction. *Id*. Symetra recommended at the time that Harris consult with an ERISA attorney before proceeding. *Id*. Harris decided to proceed with the transfer and clearly and unequivocally directed Symetra to proceed with the wire transfer to Bear Stearns. *Id*. ¶ 121. Symetra denies that the 2008 transfer to Bear Stearns was a prohibited transaction and was unlawful in any way. *Id*. ¶ 122. Symetra alleges that it had no duty, obligation, or discretion to refuse Harris's clear written directive to transfer the funds to Bear Stearns. *Id*. Symetra received no benefit from Harris's decision in 2008 to diversify the Plan's investments and to transfer $10 million from Symetra to Bear Stearns for the benefit of another company. *Id*. ¶ 123. On the contrary, Harris's decision to transfer funds out of Symetra to another company was detrimental to Symetra's interests. *Id*.

## G. Miller Discovers the Plan's Assets Were Overstated; AMEC Promises to Make the Plan Participants Whole

Terrell's investigation concluded that Harris's representation in June 2021 that the Plan's value was $126.8 million was false. *Id*. ¶ 124. The investigation showed that approximately $88 million of this value was attributable to investments in two venture capital funds called Motorskill Ventures 1, L.P. and Motorskill Asia Ventures 1, L.P., based out of Dallas, Texas. *Id*. After Miller became Executive Director, he found a letter from a lawyer in Texas to Harris dated June 11, 2021,

informing Harris that Motorskill Ventures 1 LP was terminating and there was nothing of value left in the fund. *Id*. ¶ 125. The Plan's investment in Motorskill Ventures 1, L.P. had become worthless. *Id*. ¶ 126. In fact, all of the Plan's investments in the Motorskill Entities had become worthless. *Id*. ¶ 127. Terrell concluded that, in addition to direct investments in the Motorskill Entities, Harris had used Plan funds in Financial Freedom Funds, LLC to make additional investments in the Motorskill Entities. *Id*. ¶ 128. At no time when Symetra transferred monies from a Symetra contract to Financial Freedom Funds, LLC pursuant to Harris's directions did Symetra know or have reason to know that Harris would later transfer those funds from Financial Freedom Funds, LLC to the Motorskill Entities. *Id.* ¶ 129.

In 2011, six years after Harris had first started investing in the Motorskill Entities with funds from Regions Bank, Harris directed Symetra to make a transfer from a maturing GIC to Motorskill Venture Group, at Wells Fargo Bank in San Francisco, for credit to Motorskill Ventures 1, LP. *Id*. ¶ 130. Harris directed Symetra to make three more transfers from the 2007 Annuity Contract to the Motorskill Entities in 2012 and 2013. *Id*. At no time when Harris directed Symetra to transfer funds directly to the Motorskill Entities did Symetra have any knowledge that there was anything unlawful or wrong with the Motorskill Entities or that the Motorskill Entities would result in a loss of the Plan's money. *Id*. ¶ 131. Symetra never had any knowledge at all regarding the nature or risk profile of the Motorskill Entities or their investments, nor did Symetra ever have a duty to investigate the nature of the Motorskill Entities. *Id*.

Symetra maintains that it properly, appropriately, and lawfully handled all monies that AMEC (via Harris) invested in Symetra annuities and GICs. *Id*. ¶ 132. None of the money invested in Symetra annuities was ever lost, squandered, mismanaged, or stolen while in Symetra's

possession. *Id.* At no time while Harris served as Plan Trustee or Executive Director did Symetra have any actual knowledge that Harris was engaged in any unlawful conduct of any kind. *Id.* ¶ 133.

While Terrell found that Harris had misappropriated other monies from the Plan, Terrell testified that he did not discover any evidence that Harris benefited personally from investments that Harris made in the Motorskill Entities or that Harris received a portion of the monies that were invested in Motorskill. *Id.* ¶ 134.

After the massive losses that AMEC caused the Plan by failing to supervise Harris and monitor the Plan investments came to light, AMEC made public statements to assure the Plan participants that it would make the Plan whole and replace the missing funds. *Id.* ¶ 135. As reported in the Wall Street Journal:

A summary of a church governing-body meeting in January shows the group discussed borrowing $45 million or selling church property to replace at least some of the shortfall. "The AME Church takes this crime seriously, the church said in a statement. "We are also committed to making every fund participant whole by restoring their full investment plus interest."

*AME Church Halts Retiree Payouts Amid Probe into Missing Funds*, in Wall St. J. (March 10, 2022). *Id.* ¶ 136.

On or about March 30, 2022, AMEC issued publicly an "Important Update on AMEC Retirement Services," in which it stated it was "committed to making every fund participant whole by restoring their full investment plus interest." *Id.* ¶ 137 (quoting https://www.ame-church.com/news/important-update-on-amec-retirement-services/ (last visited April 28, 2025)). AMEC represented that it had formed a "Special Task Force Committee to develop a plan of reorganization, recovery and restoration for fund participants." *Id.* On or about May 2, 2024, Senior Bishop Adam J. Richardson, Jr. issued a statement on behalf of the Council of Bishops stating,

"Though we are facing legal battles, we have not lost sight of our goal: to fully compensate every participant — the full amount of your contributions plus interest minus any early withdrawals. This is our firm commitment as a church and has been from the beginning." *Id.* ¶ 138.

But instead of accepting responsibility for its misconduct and restoring the monies to Plan participants as it had promised, AMEC began attempting to deflect blame by asserting that third parties such as Symetra had responsibility for policing Harris, vetting his investments, and effectively managing the Plan's assets on behalf of AMEC. *Id.* ¶ 139. AMEC also knowingly made false assertions that Symetra was not entitled to rely on written directives from Harris with respect to withdrawals or transfers from Symetra annuity contracts and GICs, despite that such assertions were directly contrary to AMEC's and the Plan's contracts with Symetra. *Id.* ¶ 140. AMEC also knowingly made false assertions that Symetra was a Plan fiduciary that was managing the Plan with a duty to supervise, investigate, and challenge Harris's investment decisions, despite actual knowledge that Symetra's contracts contained no such management responsibilities and directly disclaimed any fiduciary or discretionary role with respect to management of the Plan. *Id.* ¶ 141. AMEC also cut its employees' pensions by two-thirds to reflect the loss of roughly two-thirds of the Plan's assets. *Id.* ¶ 142.

From these factual premises, the Amended Cross-Complaint alleges the following causes of action under Tennessee law:

- Breach of contract, specifically the 2007 Annuity Contract, the 2007 GIC, and the 2008 GIC against AMEC and the Plan (Count I);

- Common law indemnification against AMEC (Count II);

- Negligent Misrepresentation against AMEC and the Plan (Count III);

- Contribution against all AMEC Defendants, the Plan, and all other Defendants (Count IV);

24

- Contractual indemnification against AMEC (Count V); and

- Declaratory relief that (1) Harris was a trustee of the Plan with fiduciary duties owed to the Plan and its participants; (2) AMEC was the Plan sponsor and a fiduciary of the Plan with duties of prudence and loyalty owed to the Plan and its participants; and (3) Symetra is not liable to AMEC or the Plan for any damages or losses suffered by the Plan or Plan participants based on transfers from Symetra annuity contracts or GIC contracts to third parties pursuant to directives received from Harris (Count VI).

The AMEC Defendants now move for the dismissal of the counts alleged against them, arguing that the Amended Cross-Complaint fails to state a plausible claim for relief against AMEC or the Plan.

## <u>STANDARD OF REVIEW</u>

A defendant may move to dismiss a claim "for failure to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6).  Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion, the Court must treat all the well–pleaded allegations of the pleadings as true and construe all of the allegations in the light most favorable to the non-moving party. *Elec. Merchant Sys. LLC v. Gaal*, 58 F.4th 877, 882 (6th Cir. 2023) (citing *Taylor v. City of Saginaw*, 922 F.3d 328, 331 (6th Cir. 2019)).  However, legal conclusions or unwarranted factual inferences need not be accepted as true. *Fisher v. Perron*, 30 F.4th 289, 294 (6th Cir. 2022) (citing *Iqbal*, 556 U.S. at 678).

Under Rule 8 of the Federal Rules of Civil Procedure, a complaint need only contain "(1) a short and plain jurisdictional statement, (2) a short and plain statement of the claim, and (3) an explanation of the relief sought." Fed. R. Civ. P. 8(a).  "That's it. By listing these elements, Rule 8 implicitly 'excludes other requirements that must be satisfied for a complaint to state a claim for relief.'" *Gallivan v. United States*, 943 F.3d 291, 293 (6th Cir. 2019) (citing Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 10, at 107 (2012) (other citation

omitted).  Rule 8's notice pleading standard does not require "detailed factual allegations." *Iqbal*, 556 U.S. at 681.

But Rule 8 does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* "Although the rule encourages brevity," a plaintiff must nevertheless "say enough to give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (citing *Dura Pharm. v. Broudo*, 544 U.S. 336, 346, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)).  "Rule 8 does not empower [a plaintiff] to plead the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss." *Iqbal*, 556 U.S. at 687.  In order to survive a motion to dismiss, the plaintiff must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level" and to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).  This means, a complaint "must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *Smith v. Gen. Motors LLC*, 988 F.3d 873, 877 (6th Cir. 2021) (citing *Boland v. Holder*, 682 F.3d 531, 534 (6th Cir. 2012)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *see also Ryan v. Blackwell*, 979 F.3d 519, 524 (6th Cir. 2020) ("A complaint must contain enough 'factual matter' to raise a 'plausible' inference of wrongdoing.") (quotation omitted).

The AMEC Defendants also seek the dismissal of Symetra's claim for negligent misrepresentation.  A party "alleging fraud" must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  Rule 9(b)'s heightened pleading standard applies to claims

for negligent misrepresentation. *See* Fed. R. Civ. P. 9(b); *Republic Bank & Trust Co. v. Bear Stearns & Co., Inc.*, 683 F.3d 239, 248 (6th Cir. 2012) (holding that negligent misrepresentation requires Rule 9's heightened pleading standard). "Rule 9(b) requires that the plaintiff specify the 'who, what, when, where, and how' of the alleged fraud." *New London Tobacco Mkt., Inc. v. Ky. Fuel Corp.*, 44 F.4th 393, 410–11 (6th Cir. 2022) (quoting *Sanderson v. HCA–The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006)). This means the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id*. at 411 (quoting *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008)). The plaintiff must also provide a description of "the fraudulent scheme" and "the resulting injury." *Id.* (quoting *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466–67 (6th Cir. 2011)). Even though Symetra alleges negligent misrepresentation under Tennessee law and the substantive law of Tennessee governs Symetra's burden of proving fraud, "Rule 9(b) governs the procedure for pleading fraud in all diversity suits in federal court." *Id.* at 410 n.10 (citing *Minger v. Green*, 239 F.3d 793, 800 (6th Cir. 2001)).

As in any case where the Court exercises jurisdiction under 28 U.S.C. § 1332, the Court applies the law of the forum state, including the forum's choice-of-law rules. *Loreto v. Procter & Gamble Co.*, 515 F. App'x 576, 578 (6th Cir. 2013) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). The parties have briefed the substantive law of the state of Tennessee in their motion papers. The Court will assume for purposes of deciding the questions of law presented in the AMEC Defendants' Rule 12(b)(6) Motion that Tennessee law governs the parties' dispute.

As part of its application of Tennessee law, the Court must follow "a ruling from the state supreme court." *Smith*, 988 F.3d at 878 (citing *In re Darvocet, Darvon & Propoxyphene*

27

*Prods. Liab. Litig.*, 756 F.3d 917, 937 (6th Cir. 2014)).  Without a clear ruling from the Tennessee

Supreme Court, the *Erie* doctrine requires this Court to "predict[] how the state supreme court would

rule by looking to all available data, including decisions of the states' appellate courts." *Smith*, 988

F.3d at 878 (internal citation omitted); *see also Lindenberg v. Jackson Nat'l Life Ins. Co.*, 912 F.3d

348, 358 (6th Cir. 2018) (citing Tenn. Sup. Ct. R. 4(G)(2) for the proposition that a published

opinion of the Tennessee Court of Appeals is "controlling authority for all purposes unless and until

such opinion is reversed or modified by a court of competent jurisdiction").

## ANALYSIS

### I. Breach of Contract

The AMEC Defendants first argue that Symetra has failed to state a crossclaim for breach of

contract.  Here, Symetra's breach of contract crossclaim is based on § 9.8 of the 2006 Plan document

and three different agreements Symetra had with AMEC: (1) a 2007 annuity contract, (2) a 2007

Guaranteed Interest Contract (the "2007 GIC"), and (3) a 2008 Guaranteed Interest Contract (the

"2008 GIC").  According to Symetra, the Plan document and the contracts stipulated that Symetra

could not be liable for its failure to question or challenge an annuity transfer request from the Trustee

of the Annuity Plan or be held liable as fiduciary of the Plan.  Symetra alleges that AMEC's

crossclaims against Symetra constitute a breach of these exculpatory clauses not to hold Symetra

liable for relying on Harris' orders about the disposition of Plan assets.

In Tennessee, the essential elements of a breach of contract claim are as follows: "(1) the

existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and

(3) damages caused by the breach of the contract." *Life Care Ctrs. of Am., Inc. v. Charles Town

Assocs., Ltd.*, 79 F.3d 496, 514 (6th Cir. 1996); *C & W Asset Acquisition, LLC v. Oggs,* 230 S.W.3d

671, 676–77 (Tenn. Ct. App. 2007) (quoting *ARC LifeMed, Inc. v. AMC–Tenn., Inc.,* 183 S.W.3d 1,

26 (Tenn. Ct. App. 2005)).  As an initial matter, AMEC contends the Amended Cross-Complaint fails to allege a breach of the 2007 GIC or 2008 GIC because both contracts have expired.   The Amended Cross-Complaint likens the GICs to certificates of deposit (¶ 102) and admits that the 2007 GIC and 2008 GIC had "matured" by June 2011 (¶ 103), leaving only the 2007 annuity contract as an agreement still in effect. The AMEC Defendants do not deny that the 2007 GIC and 2008 GIC were valid and enforceable agreements; they just assert they have now expired.

The AMEC Defendants have not shown, however, why the maturity of the 2007 GIC or the 2008 GIC means Symetra cannot enforce the exculpatory clauses found in those contracts. Symetra's claim is that the 2007 GIC and 2008 GIC contained exculpatory clauses limiting Symetra's liability to AMEC for its performance under those agreements.  AMEC and the Plan allegedly breached the 2007 GIC's exculpatory clause "by filing cross-claims against Symetra asserting, directly contrary to the provisions of the 2007 GIC, that Symetra was liable for relying on Harris's clear written directive in 2008 to transfer $10 million from a maturing GIC to a Bear Stearns account at Citibank for the benefit of Financial Freedom Funds, LLC."  Am. Cross-Compl. ¶ 151.[8] The AMEC Defendants have not cited any case directly on point to support their argument that the expiration of the contracts meant Symetra could no longer enforce them.  Based on nothing more than the pleadings, if AMEC can hold Symetra liable for actions undertaken pursuant to the 2007 GIC or the 2008 GIC, then Symetra should be able to invoke the exculpatory clauses found in those agreements, even though the contracts matured over a decade ago.

Nothing cited by the AMEC Defendants is to the contrary.  The AMEC Defendants rely exclusively in their opening brief on *Gridsmart Technologies, Inc. v. Marlin Controls, Inc.*, 701 F.

---

[8] What the Amended Cross-Complaint does not allege is how AMEC's crossclaims against Symetra breached the exculpatory clause found in the 2008 GIC.  The AMEC Defendants have not raised this as an issue in their Motion to Dismiss, and so the Court need not consider it further.

App'x 488 (6th Cir. 2017), a Sixth Circuit case applying Tennessee law.  In *Gridsmart*, the issue

presented was "whether the arbitration clause in the distribution agreement survived termination of

the agreement."  *Gridsmart*, 701 F. App'x at 489.  The Court of Appeals held that based on the

contractual language addressed to the effect of the termination of the contract and the Tennessee

Uniform Commercial Code itself, the arbitration agreement did not survive the termination of the

parties' contract.

*Gridsmart* is instructive but ultimately unpersuasive as grounds for the dismissal of

Symetra's crossclaims.  Unlike *Gridsmart*, the parties have not briefed whether the 2007 GIC or the

2008 GIC contained a termination clause or how the termination of either GIC affected the parties'

rights to seek enforcement of the contracts in the future.  *Compare id*. at 491 ("Under the plain

language of the contract, . . . the parties ceased to have any rights or obligations concerning the

[unfilled] orders at issue.").  And unlike *Gridsmart*, the contract between Symetra and AMEC did

not involve the sale of goods and therefore would not implicate the UCC.  *Id*. at 490 ("The

Tennessee Uniform Commercial Code . . . applies because the Distribution Agreement is a contract

for the sale of goods.") (citing Tenn. Code Ann. § 47–2–102); *but see also* Tenn. Code Ann. § 47–2–

106(3) (providing that under the Tennessee UCC, when a contract for the sale of goods terminates,

"all obligations which are still executory on both sides are discharged *but any right based on prior

breach or performance survives*") (emphasis added).[9]  The Court finds that *Gridsmart* simply does

---

[9] The AMEC Defendants cite in their reply brief the Supreme Court's decision in *CNH Indus.
N.V. v. Reese*, 583 U.S. 133 (2018) for the proposition that "contractual obligations will cease, in the
ordinary course, upon termination of the bargaining agreement." *Reese*, 583 U.S. at 135–36 (quoting
*M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 441–42 (2015)).  *Reese* and *Tackett* were
addressed to the correct interpretation of collective bargaining agreements and specifically reversed
the Sixth Circuit's presumptions about the vesting of retirement benefits after a CBA expired.
Respectfully, *Reese* and its analysis of contracts in the specific context of CBAs do not answer the
question presented in the AMEC Defendants' Motion to Dismiss.

not show why the dismissal of Symetra's claims based on the 2007 GIC or the 2008 GIC is warranted.

The AMEC Defendants next argue that Symetra's crossclaim fails to allege how AMEC failed to perform a contractual duty under the 2007 GIC, the 2007 annuity contract, or the 2008 GIC. The AMEC Defendants contend that the exculpatory clauses found in the contracts amount to a waiver or release of a legal right, not a contractual duty. The Tennessee Supreme Court, albeit in an unpublished decision, has described "the existence of [an] exculpatory clause" as an affirmative defense. *Stewart v. Chalet Village Props., Inc.*, No. E2007–01499–SC–R11–CV, 2009 WL 3616611, at *2 (Tenn. Nov. 3, 2009). For its part, Symetra has not cited any case applying Tennessee law and recognizing a breach of contract claim based on the breach of an exculpatory clause. The only legal authority cited by Symetra to support its breach-of-contract theory are cases from other jurisdictions recognizing an implied covenant not to sue.

"Tennessee law allows a party to sue for the breach of a covenant not to sue." *Trinity Faire, LLC v. Am.'s Collectibles Network, Inc.*, No. 3:22-cv-417, 2023 WL 6064297, at *4 (E.D. Tenn. Feb. 15, 2023) (citing *Kreutzmann v. Bauman*, 609 S.W.2d 736, 739 (Tenn. Ct. App. 1980) and *Oliver v. Williams*, 83 S.W.2d 271, 273 (Tenn. Ct. App. 1935)). Even though the parties' contracts did not contain an explicit agreement not to sue, Symetra argues that the contractual exculpatory clauses created an implied covenant not to sue. Tennessee recognizes two different types of implied contracts, contracts implied in fact and contracts implied in law. *Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 153–54 (Tenn. 1966). However, the parties have not cited a Tennessee case recognizing cause of action specifically for the breach of an implied covenant not to sue.

The exculpatory clauses raise an additional complication at the pleadings stage. "As a general rule, Tennessee courts recognize that exculpatory clauses are valid in Tennessee and are not

31

against the public policy of the state." *Roopchan v. ADT Sec. Sys., Inc.*, 781 F.Supp.2d 636, 647 (E.D. Tenn. 2011) (quoting *Burks v. Belz–Wilson Props.,* 958 S.W.2d 773, 776 (Tenn. Ct. App. 1997)).  However, not all exculpatory agreements are enforceable in Tennessee.  The Tennessee Supreme Court has held that the enforceability of an exculpatory agreement "should be determined by considering the totality of the circumstances and weighing these non-exclusive factors: (1) relative bargaining power of the parties; (2) clarity of the exculpatory language, which should be clear, unambiguous, and unmistakable about what the party who signs the agreement is giving up; and (3) public policy and public interest implications." *Copeland v. Healthsouth/Methodist Rehab. Hosp., LP*, 565 S.W.3d 260, 274 (Tenn. 2018).  The Court tends to agree with Symetra that on a motion to dismiss, a determination about the enforceability of the exculpatory clauses raises a number of problems.

For purposes of deciding the AMEC Defendants' Motion to Dismiss, the Court will assume the exculpatory clauses are enforceable and constitute a contractual duty on the part of AMEC not to hold Symetra liable as a Plan fiduciary or charge Symetra with a duty to confirm Harris' authority for the transactions in question.  The parties' presentation on the issue does not clearly show that Symetra has a right to enforce the exculpatory clauses as contractual duties.  At the same time, the AMEC Defendants, as the moving parties, have not carried their burden to show why the Amended Cross-Complaint fails to state a claim upon which the Court can grant relief.  The Court will deny the AMEC Defendants' Motion on this point but without prejudice to return to the issue in a later dispositive motion with a more fully developed evidentiary record.

The AMEC Defendants raise two remaining arguments for the dismissal of Symetra's breach-of-contract crossclaim.  Assuming for the sake of argument that the exculpatory clauses do establish a contractual duty, the AMEC Defendants allege that Symetra is liable for other conduct

32

outside of Harris' activities and argue that in any event Symetra cannot proves damages. The AMEC Defendants' first point highlights their allegations about Symetra aiding and abetting Harris' alleged breaches of fiduciary duty by paying Harris additional fees out of Plan assets, not just the transfers of Plan assets to investments or accounts outside of Symetra. It is true that the AMEC Defendants allege in their crossclaims that Symetra improperly paid Harris excessive administrative fees and paid them out of the Plan's assets held by Symetra. AMEC Defs.' Second Am. Cross-Compl. ¶¶ 172, 173 (alleging that Newport and Symetra began paying Harris excessive fees "as early as 2005" and acquiesced to Harris' request in 2015 to "increase the quarterly administrative fee from 0.25% to 0.55%" which amounted to "a 2.2% annual fee on all AMEC assets at Symetra").

Even so, Symetra's crossclaim alleges that the AMEC Defendants breached the exculpatory clauses of the 2007 GIC, the 2007 annuity contract, and the 2008 GIC by suing Symetra over the 2008 transfer of $10 million in Plan assets from Symetra to another financial institution at Harris' direction. Am. Cross-Compl. ¶ 151 ("AMEC and the Plan breached the 2007 GIC by filing cross-claims against Symetra asserting, directly contrary to the provisions of the 2007 GIC, that Symetra was liable for relying on Harris's clear written directive in 2008 to transfer $10 million from a maturing GIC to a Bear Stearns account at Citibank for the benefit of Financial Freedom Funds, LLC."). Symetra's Amended Cross-Complaint does not specifically allege that the AMEC Defendants' crossclaim over the administrative fees Symetra paid to Harris is a breach of any contract Symetra had with AMEC.

The AMEC Defendants also argue that Symetra's breach-of-contract crossclaim fails for lack of plausible allegations about Symetra's damages. "Generally, the courts may award all damages which are the normal and foreseeable results of a breach of contract." *Morrow v. Jones*, 165 S.W.3d 254, 259 (Tenn. Ct. App. 2004); *see also Wilson v. Dealy*, 434 S.W.2d 835, 838 (Tenn.

1968).  Such damages "include reasonably foreseeable incidental and consequential damages."
*Morrow*, 165 S.W.3d at 259.  Incidental damages are "those damages which the law itself implies or
presumes to be the immediate, direct or proximate result, or such as necessarily results from the
injury, without reference to the special character, condition or circumstances of the plaintiff."
*Harrison v. Am. Airlines, Inc.*, 760 F. Supp. 3d 545, 568 (M.D. Tenn. 2024) (quoting *Wills Elec. Co.,
Inc. v. Mirsaidi*, 2001 WL 1589119, at *4 (Tenn. Ct. App. Dec. 13, 2001) (cleaned up).
Consequential damages do "not flow directly and immediately from the act of the party, but only
from some of the consequences or results of such act." *Id.*  "As a general rule [under Tennessee law],
damages are not permitted which are remote and speculative in nature."  *Grantham & Mann, Inc. v.
Am. Safety Prods., Inc.,* 831 F.2d 596, 602 (6th Cir. 1987) (applying Tenn. law).

    The Court holds that Symetra has alleged enough factual matter to show that AMEC's
breach of contract caused its damages, with one exception.  The Amended Cross-Complaint alleges
that Symetra has incurred damages as a result of AMEC's breach of contract, "including the costs,
liabilities, negative publicity, expenses, and attorneys' fees of defending itself against AMEC and
the Plan's cross-claims." Am. Cross-Compl. ¶ 155.  Symetra's allegation of damages in the form of
negative publicity amounts to reputational harm.  "A plaintiff cannot recover for damage to its
reputation arising out of an alleged breach of contract." *Hampton v. Macon Cnty. Bd. of Educ.*, No.
M2013–00864–COA–R3–CV, 2014 WL 107971, at *10 (Tenn. Ct. App. January 10, 2014) (quoting
22 Am. Jur. 2d Damages § 61); *see also* Williston on Contracts § 66:4 (4th ed. 2013) ("[T]he courts
are in agreement that consequential damages for harm to reputation are not recoverable [in a breach
of contract action], because they are altogether nonquantifiable and speculative.").  Damage to
reputation then is not an element of damages Symetra may recover for AMEC's alleged breach of
contract.

34

Otherwise, the other types of damages ("costs, liabilities, expenses, and attorneys' fees") caused by the alleged breach qualify as foreseeable incidental and consequential damages, that is, they are an "immediate, direct or proximate result" of AMEC accusing Symetra of breaching their contracts by suing Symetra over its performance under the agreements. *Harrison*, 760 F. Supp. 3d at 568. The only specific element of damages contested by AMEC is attorney's fees. "If a contract does not specifically or expressly provide for attorney fees, the recovery of fees is not authorized." *Indiv. Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 705 (Tenn. 2019) (citing *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009)). The AMEC Defendants' point is true, as far it goes. Attorney's fees are not recoverable in a suit where the parties sue each other for breach of contract unless their contract contained a fee-shifting provision. But there is a difference between parties to a contract seeking attorney's fees and expenses in litigation between themselves (as the parties did in *Individual Healthcare Specialists*) and seeking attorney's fees and expenses from each other as incidental and consequential damages incurred in litigation with third parties. In that scenario, "attorneys' fees are a form of consequential damages recoverable for breach of contract" under Tennessee law. *Flatiron Acquisition Vehicle, LLC v. CSE Mortgage LLC*, 502 F. Supp. 3d 760, 802 (S.D.N.Y. 2020) (applying Tenn. law and collecting cases). As such Symetra cannot recover attorney's fees from AMEC arising out of the breach-of-contract litigation between AMEC and Symetra. However, to the extent Symetra can prove its breach of contract crossclaim against AMEC, Symetra may also be able to prove that AMEC's breach caused Symetra to incur attorney's fees defending itself against third parties in the MDL and thereby recover its legal expenses as incidental and consequential damages for AMEC's breach of contract.

35

The Court would just add that there is not a brightline between Symetra's incidental and consequential damages on its breach of contract claim and its separate claims against AMEC for indemnification. To the extent that Symetra is permitted to allege alternative claims, the overlap or even outright duplication of the claims is no reason to dismiss Symetra's breach of contract claim. *See* Fed. R. Civ. P. 8(d)(3) (permitting a party to plead "as many separate claims or defenses as it has, regardless of consistency"). For all of these reasons, the AMEC Defendants' Motion to Dismiss the breach of contract crossclaim is **GRANTED in part**, **DENIED in part**.

## II. Negligent Misrepresentation

AMEC next moves for the dismissal of Symetra's claim for negligent misrepresentation. Symetra alleges that according to a 2003 recordkeeping services agreement ("2003 RSA") AMEC had with Symetra's corporate predecessor Safeco, AMEC agreed that Safeco was not a plan fiduciary. Symetra alleges that when AMEC agreed as part of the 2003 RSA that it did not consider Symetra's corporate predecessor a fiduciary, AMEC made a false statement because AMEC now alleges as part of the MDL that Symetra was always a fiduciary. AMEC argues that if anything, Symetra has alleged that AMEC merely disavowed the provision from the 2003 RSA, which cannot form the basis for negligent misrepresentation.

Tennessee law recognizes "the common-law tort of negligent misrepresentation and [has] adopted the Restatement (Second) of Torts § 552 (1977) as the guiding principle with regard to these claims." *Hodge v. Craig*, 382 S.W.3d 325, 344–45 (Tenn. 2012) (citing *Bethlehem Steel Corp. v. Ernst & Whinney*, 822 S.W.2d 592, 595 (Tenn. 1991)). In order to prove negligent misrepresentation, a plaintiff must show the following: (1) the defendant was acting, in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary interest; (2) the defendant supplied faulty information meant to guide others in their business transaction; (3) the

defendant failed to exercise reasonable care in obtaining or communicating the information; (4) the defendant justifiably relied on the information. *See* Restatement (Second) of Torts § 552; *see also John Martin Co. v. Morese/Diesel, Inc.* 819 S.W.2d 428, 431 (Tenn. 1991).

The Court holds that Symetra's Amended Cross-Complaint states a plausible claim for negligent misrepresentation as an inconsistent or alternative grounds for relief. Federal Rule of Civil Procedure 8(d)(2) permits a party to allege two or more claims "alternatively or hypothetically," and Rule 8(d)(3) allows a party to plead "as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(2) & (3). Here, Symetra denies that it is fiduciary of the Plan or had a duty to verify Harris' authority to transact business on behalf of the Plan. As an alternative grounds for relief in its Amended Cross-Complaint, Symetra alleges that in the event the Court concludes it was a fiduciary and owed AMEC some duty to monitor Harris' investment transactions, Symetra would hold AMEC liable for negligently misrepresenting the fact that AMEC would not consider Symetra to be a fiduciary and would not hold Symetra liable for any mismanagement of Plan assets. These allegations plausibly state an alternative, though inconsistent, claim for relief.

AMEC also argues that the Amended Cross-Complaint fails to allege damages to support Symetra's claim for negligent misrepresentation. More specifically, Symetra fails to allege damages suffered "as a result of any alleged representation or reliance on said representation." AMEC's Reply 8 (ECF No. 890). Pecuniary loss is an element of negligent misrepresentation. *Ritter v. Custom Chemicides, Inc.,* 912 S.W.2d 128, 130 (Tenn. 1995); *Parks v. Fin. Fed. Savings Bank*, 345 F.Supp.2d 889, 894 (W.D. Tenn. 2004). That includes "recovery of attorneys' fees based upon an independent tort" such as deceit. *Pullman Std., Inc. v. Abex Corp.*, 693 S.W.2d 336, 339–40 (Tenn. 1985) (citing 42 A.L.R.2d 1183 (1956) and Restatement (Second) of Torts, § 914(2) (1979)). Symetra's allegations fit within this rule. Therefore, the Court concludes that Symetra's Amended

Cross-Complaint plausibly alleges damages. As such, the AMEC Defendants' Motion to Dismiss is **DENIED** as to this issue.

## III. Contribution

Turning to the Amended Cross-Complaints' claim for contribution, the AMEC Defendants argue that the Court should dismiss Symetra's claim for contribution as "premature" and "overbroad." In AMEC's view, the contribution claim is premature because no judgment has been entered against Symetra and overbroad because Symetra would not be entitled to contribution if Symetra is found liable for intentional torts or fraud or unless Symetra is found jointly and severally liable with AMEC for negligence.

Federal pleading rules permit the assertion of contingent crossclaims. See Fed. R. Civ. P. 13(g) (stating that a crossclaim against a co-party "may include a claim that the party against whom it is asserted is or may be liable to the crossclaimant for all or part of a claim asserted in the action against the crossclaimant"); *see also Providential Dev. Co. v. U.S. Steel Co.*, 236 F.2d 277, 281 (10th Cir. 1956) (Rule 13(g) "is not limited by text or purpose to definite or matured claims or causes of action[;]" rather, the rule "is broad enough to include a claim of a contingent nature, the ultimate outcome of which depends upon the determination of other features or issues in the case"); 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1431, at 240–41 (2d ed. 1990) (Rule 13(g) "does not require that the claim be mature at the time of pleading;" hence, "a cross-claim can be contingent upon the ultimate adjudication of the cross-claimant's liability to plaintiff"). Contingent crossclaims are permissible to preserve a defendant's right to seek contribution from others. *See, e.g., Hobart Corp. v. Dayton Power & Light Co.*, 2017 WL 3773146, at *2 (S.D. Ohio Aug. 29, 2017); s*ee also Garot v. Cnty. of San Diego*, 2021 WL 51415, at *4 (S.D. Cal. Jan. 5, 2021) ("Thus, although the County's cross-claim is contingent upon the ultimate

38

adjudication of the parties' liabilities to Plaintiff in this action, that fact is not a proper basis for dismissal of a cross-claim.").

The Court holds that Symetra has plausibly alleged a basis for its contingent crossclaim for contribution, namely, the possibility of joint and several liability with the other alleged tortfeasors named in the MDL. As the Court explained in a previous order, the remedy of contribution for tort claims in Tennessee was severely limited by the adoption of comparative fault in *McIntyre v. Balentine*, 833 S.W.2d 52 (Tenn. 1992). Pursuant to Tenn. Code Ann. § 29–11–107(b)(1) and as a statutorily created exception to principles of comparative fault, Tennessee continues to recognize joint and several liability "[t]o apportion financial responsibility in a civil conspiracy among two (2) or more at-fault defendants who, each having the intent and knowledge of the other's intent, accomplish by concert an unlawful purpose, or accomplish by concert a lawful purpose by unlawful means, which results in damage to the plaintiff." Tenn. Code Ann. § 29–11–107(b)(1).

And Plaintiffs' Second Amended Complaint alleges as much. Second Am. Compl. ¶ 660 (ECF No. 493) (alleging that AMEC, the AMEC Department of Retirement Services, the AMEC General Board, the AMEC Council of Bishops, and Symetra are jointly and severally liable (along "with any intentional tortfeasors named as Defendants in this action") for negligence); ¶ 814 ("The Defendants are jointly and severally liable to the Plan under Tenn. Code Ann. § 29–11–107(b)(1)")). Symetra acknowledges the contingent nature of its crossclaim for contribution. AMEC's argument that the crossclaim is premature and overbroad (because no Defendant has been found liable for a tort for which joint and several liability attaches) is not convincing. Therefore, the AMEC Defendants' Motion to Dismiss the crossclaim for contribution is **DENIED**.

**IV. Contractual Indemnification**

39

The AMEC Defendants also move for the dismissal of Symetra's crossclaim for contractual indemnification. Symetra alleges the 2003 RSA and the 2008 recordkeeping services agreement ("the 2008 RSA") contain contribution provisions. Symetra's Am. Cross-Compl. ¶ 188 ("Under the 2003 RSA and 2008 RSA, AMEC agreed and promised 'to indemnify, defend, and hold harmless [Symetra] . . . .'"). The AMEC Defendants argue that the contracts never took effect. The arbitration proceedings between AMEC and Symetra resulted in a determination that the agreements were not binding because the contracts were not signed by both parties. The arbitrator therefore determined the contracts were never executed and declined to enforce their arbitration clauses.

"In Tennessee, indemnification requires the complete shifting of liability for loss from one party to another and rests on two principles: persons should be responsible for their own wrongdoing and wrongdoers should be liable to persons required to pay damages that the wrongdoers should have paid." *AutoZone, Inc. v. Glidden Co.*, 737 F.Supp.2d 936, 943 (W.D. Tenn. 2010) (quoting *Winter v. Smith,* 914 S.W.2d 527, 541 (Tenn. Ct. App. 1995) (cleaned up)). Partes may agree to indemnify each other by contract, as long as the contract contains "a clear and unequivocal expression of an intention to indemnify." *Id.* at 944 (citing *First Am. Bank of Nashville, N.A. v. Woods*, 734 S.W.2d 622, 632 (Tenn. Ct. App. 1987)). Moreover, "Rule 14 of the Federal Rules of Civil Procedure contemplates indemnity claims being brought contemporaneously with the underlying litigation." *CBR Funding, LLC v. Jones*, No. 1:13-cv-01280-JDB-egb, 2015 WL 12857355, at *2–3 (W.D. Tenn. Jan. 15, 2015) (citing *Am. Zurich Ins. Co. v. Cooper Tire & Rubber Co.*, 512 F.3d 800, 805 (6th Cir. 2008)); Fed. R. Civ. P. 14(a)(1) (permitting "[a] defending party . . . as a third-party plaintiff, [to] serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it").

40

AMEC does not deny that its agreements with Symetra contained an indemnification provision. AMEC just argues that an arbitrator has held that the contracts in question were never formally executed and therefore did not take effect. As a general rule, "an arbitrator's decision has preclusive effect in federal court." *Schreiber v. Philips Display Components Co.*, 580 F.3d 355, 367 (6th Cir. 2009) (citation omitted). However, the party relying on an arbitrator's earlier determination of an issue must usually prove the elements of collateral estoppel. *Id.*; *Cent. Transp., Inc. v. Four Phase Sys., Inc.*, 936 F.2d 256, 260 (6th Cir. 1991). Symetra points out that the AMEC Defendants did not raise collateral estoppel in their opening brief and even if they had, not all of the elements are satisfied. True enough, the AMEC Defendants have not raised the doctrine of collateral estoppel, much less briefed the elements. Without a more complete presentation on the issue, the Court declines to reach it on a motion to dismiss.

AMEC makes one other argument for the dismissal of Symetra's crossclaim for contractual indemnification. According to AMEC, the parties only agreed to indemnify each other for claims "arising out of" their performance of their contracts. AMEC contends that the claims against Symetra in the MDL, Plaintiffs' tort and breach of fiduciary duty claims and the AMEC Defendants' similar claims, do not "arise out of" the 2003 RSA or the 2008 RSA. Symetra did not specifically address this argument in its response brief. Nevertheless, the question of whether Symetra's actions fell within the scope of the indemnification provisions of the RSAs would seem to be highly fact-bound and therefore inappropriate for consideration on a Rule 12 motion.

More than that, viewing the allegations of the Amended Cross-Complaint in a light most favorable to Symetra, there is enough factual matter there to conclude that the claims against Symetra "arise out" of the agreements. For example, Symetra's Amended Cross-Complaint alleges that AMEC agreed in the 2003 RSA that "[AMEC], the Trustee, and Plan administrator would

41

remain responsible for all actions necessary or desirable for the administration of the Plan that were not expressly undertaken by Symetra" and "exercise all discretionary authority, control, and responsibility for the administration of the Plan and the management of Plan assets."  Am. Cross-Compl. ¶ 107.  AMEC also agreed that Symetra was not and would not become a Plan fiduciary or a party to the Plan or Trust by virtue of its contract.  *Id*.  Plaintiffs have alleged claims that Symetra is liable precisely because it did "exercise" some measure of "discretionary authority, control, and responsibility for the administration of the Plan and the management of Plan assets" and thereby became a fiduciary of the Plan.  At the pleadings stage, Symetra's indemnification allegations suffice to show that Symetra seeks contractual indemnification for claims "arising out of" its performance of the RSAs.  Therefore, the AMEC Defendants' Motion to Dismiss is **DENIED** as to this issue.

## V. Common Law or Implied Indemnification

The AMEC Defendants also move to dismiss Symetra's crossclaim for common law, or implied, indemnification.  In addition to an express contractual provision for indemnification, Symetra alleges that the AMEC Defendants have a common law duty to indemnify Symetra. Tennessee recognizes "an obligation to indemnify" by implication "from the parties' relationship. *AutoZone*, 737 F. Supp. 2d at 944 (citing *Houseboating Corp. of Am. v. Marshall*, 553 S.W.2d 588, 589 (Tenn. 1977)).  "Courts will impose an implied obligation to indemnify when the obligation is a necessary element of the parties' relationship, or when justice and fairness demand that the burden of paying for the loss be shifted to the party whose fault or responsibility is qualitatively different from the other parties."  *Winter v. Smith*, 914 S.W.2d 527, 542 (Tenn. Ct. App. 1995) (citing *Lusk v. Jim Walter Homes, Inc.,* 648 S.W.2d 935, 939 (Tenn. 1983) and *Velsicol Chem. Corp. v. Rowe,* 543 S.W.2d 337, 339 (Tenn. 1976)).  "In the absence of an express contract, an obligation to indemnify

will be implied only if the party from who [sic] indemnification is sought breached a contract or engaged in some other related tortious conduct." *Winter*, 914 S.W.2d at 542 (collecting cases).

The AMEC Defendants make two arguments for the dismissal of Symetra's implied contribution crossclaim. First, if Symetra's Amended Cross-Complaint failed to allege a breach of contract or negligent misrepresentation claim against the AMEC Defendants, then Symetra has failed to present grounds for implied contribution from the AMEC Defendants. This argument rises or falls then on the AMEC Defendants' other arguments for the dismissal of Symetra's breach-of-contract and negligent misrepresentation claims. For the reasons the Court has just explained, Symetra's Amended Cross-Complaint states plausible claims for breach of contract and negligent misrepresentation. This first argument necessarily fails.

The AMEC Defendants' other argument is that Symetra failed to allege the kind of relationship between AMEC and Symetra that might create a common law right to indemnification. The AMEC Defendants contrast the Amended Cross-Complaint's assertions about Symetra being an innocent third party which simply followed Harris' orders with AMEC's allegations about Symetra's willful blindness to Harris' lack of authority and questionable investment directives. The AMEC Defendants' argument obviously raises disputes of fact the Court cannot address, much less resolve, on a Rule 12(b)(6) motion. Viewing the facts alleged in Amended Cross-Complaint in a light most favorable to Symetra, the pleading plausibly alleges AMEC could be liable to Symetra under an implied indemnification theory based on AMEC's alleged breach of contract and negligent misrepresentations. Therefore, the AMEC Defendants' Motion to Dismiss must be **DENIED** as to this issue.

**VI. Claims for Declaratory Judgment**

43

Finally, the AMEC Defendants seek the dismissal of Symetra's crossclaims for declaratory judgment. Symetra prays for the following declarations from the Court: (1) that Harris was Plan Trustee with authority to act on behalf of the Plan; (2) that AMEC is a Plan fiduciary; and (3) that Symetra has no liability to AMEC or the Plan for following the written directives of Harris to transfer Annuity Plan funds to other investments and parties as directed by Harris. Am. Cross-Compl. ¶¶ 198, 199, 206; Prayer for Relief ¶¶ (d)-(f). The AMEC Defendants argue that Symetra has not established the elements of Article III standing to bring the claim or in the alternative that the Court should decline to exercise jurisdiction over Symetra's claims for declaratory judgment.

The Declaratory Judgment Act, 28 U.S.C. § 2201, provides that the federal courts "upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). By its very nature, "a declaratory judgment action is a procedural device used to vindicate substantive rights" but is not itself a substantive claim for relief. *Int'l Ass'n of Machinists & Aerospace Workers v. T.V.A.*, 108 F.3d 658, 668 (6th Cir. 1997); *see also Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 199 (2014) (holding that "the operation of the Declaratory Judgment Act" is "procedural" only and leaves "substantive rights unchanged"). In other words, the Act "does not create an independent cause of action" that can be invoked absent some showing of an articulated legal wrong. *Davis v. United States*, 499 F.3d 590, 594 (6th Cir. 2007). A party's prayer for declaratory judgment "is barred to the same extent that the claim for substantive relief on which it is based would be barred." *Int'l Ass'n of Machinists & Aerospace Workers*, 108 F.3d at 668.

The Constitution limits the jurisdiction of the federal courts to a "Case" or "Controversy." U.S. Const., art. III, § 2, cl. 1. "To establish a 'case,' a plaintiff must show that the plaintiff has suffered an injury, that the defendant's conduct likely caused the injury, and that the relief sought

44

will likely redress the injury." *Assoc. of Am. Physicians & Surgeons v. United States Food & Drug Admin.*, 13 F.4th 531, 537 (6th Cir. 2021) (citing *TransUnion, LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). At the pleadings stage, a plaintiff has the burden to make plausible allegations going to each of these elements. *Id*. at 543–44 (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). Furthermore, a plaintiff must "demonstrate standing for each claim [it] seeks to press and for each form of relief that is sought," *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017), because "standing is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) (citation omitted).

"The existence of an 'actual controversy' in a constitutional sense is necessary to sustain jurisdiction under the Declaratory Judgment Act." *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997); *see also Carman v. Yellen*, 112 F.4th 386, 403–04 (6th Cir. 2024) (recognizing that *Magaw*'s holding rested in part on "the since-rejected idea that a vagueness challenge must be as-applied as opposed to facial"). In assessing whether there is an "actual controversy," courts "must ask whether the parties have 'adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment' even though the injury-in-fact has not yet been completed." *Magaw*, 132 F.3d at 280 (quoting *Golden v. Zwickler*, 394 U.S. 103, 108 (1969)). A plaintiff may satisfy that requirement by demonstrating "actual present harm or a significant possibility of future harm," *Hyman v. City of Louisville*, 53 F. App'x 740, 743 (6th Cir. 2002) (quoting *Peoples Rights Org. v. City of Columbus*, 152 F.3d 522, 527 (6th Cir. 1998)), as long as the other elements of standing are satisfied. *White v. United States*, 601 F.3d 545, 555 (6th Cir. 2010).

Viewing the facts alleged in Symetra's Amended Cross-Complaint in a light most favorable to Symetra, the Amended Cross-Complaint's allegations in support of the Declaratory Judgment claim establish each element of Article III standing. The AMEC Defendants do not contest all of the

elements of Symetra's Article III standing.   They only argue that the controversy presented in

Symetra's crossclaims is not "sufficiently immediate and real to warrant the issuance of a

declaratory judgment."  Mem. in Support Mot. to Dismiss 18.  But Symetra alleges that AMEC has

denied each of the contractual propositions for which Symetra seeks declaratory relief and that

AMEC's actions have exposed Symetra to legal liability and thrown the parties' business

relationship into confusion.  Symetra has alleged a significant possibility of future harm that is

imminent, concrete, and particularized.  *Allstate Ins. Co. v. Green*, 825 F.2d 1061, 1064 (6th Cir.

1987), abrogated on other grounds by *Wilton v. Seven Falls Co.*, 515 U.S. 277, 289–90 (1995).  The

controversy alleged is clearly immediate and real and more than satisfies Symetra's burden to show

that it has suffered a concrete injury-in-fact.

Likewise, the AMEC Defendants have not shown why the Court should decline to exercise

jurisdiction over Symetra's crossclaim for declaratory relief.   "Federal courts have a virtually

unflagging obligation to exercise the jurisdiction that Congress bestows on them."  *Fire-Dex, LLC v.

Admiral Ins. Co.*, 139 F.4th 519, 526 (6th Cir. 2025) (quoting *Colorado River Water Conserv. Dist.

v. United States*, 424 U.S. 800, 817 (1976) (cleaned up).   Judicial discretion to "abstain from

exercising jurisdiction is rare," except in actions for declaratory judgment.  *Id*. at 526–27 (citing 28

U.S.C. § 2201(a)'s permissive language and observing that "Congress expressly vested federal

courts with discretion whether to entertain actions for declaratory relief").

The Sixth Circuit has adopted the following five-factor test for courts to consider whether to

exercise jurisdiction over a Declaratory Judgment claim:

(1) [W]hether the declaratory action would settle the controversy; (2) whether the declaratory action
would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory
remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a
race for res judicata;" (4) whether the use of a declaratory action would increase friction between our

federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

*United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 396 (6th Cir. 2019) (citing *Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984)).  However, in a so-called "mixed action," *Fire-Dex*, 139 F.4th at 527 (dubbing a case "that seeks both coercive relief (damages) and non-coercive (declaratory) relief" a  "mixed action"), where the declaratory claim "presents the same legal issue as the coercive claim over which the district court must exercise jurisdiction," "equitable considerations will counsel heavily in favor of not abstaining."  *Id.* at 529 (citing *Adrian Energy Assocs. v. Mich. Pub. Serv. Comm'n*, 481 F.3d 414, 422 (6th Cir. 2007)).

The Court holds that the balance of the *Grand Trunk* factors weighs in favor of exercising jurisdiction. The first and second factors, whether the declaratory action would settle the controversy and whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue, weighs in favor of jurisdiction.  The declarations sought by Symetra are all propositions that would establish one or more elements of Symetra's crossclaims against AMEC for breach of contract and negligent misrepresentation.  While the declarations may not settle the controversy in total, in Symetra's words, the declarations "would substantially streamline the entire action by clarifying AMEC's and Symetra's roles, responsibilities, and relationship to the Plan."  Symetra's Resp. in Opp'n 19.  The fifth and final factor,[10] whether there is an alternative remedy which is better or more effective, does not weigh strongly for or against jurisdiction. The propositions on

_____

[10] As the AMEC Defendants concede, the third and fourth *Grand Trunk* factors—whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata;" and whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction—are not relevant here.

which Symetra seeks declaratory relief are questions bound up with the merits of many of the causes of action in the MDL, not just the controversy between AMEC and Symetra.

Taken together with the strong presumption against declining jurisdiction in this mixed case, the Court holds that an exercise of its jurisdiction over Symetra's crossclaim for declaratory relief is appropriate.  Therefore, the AMEC Defendants' Motion to Dismiss is **DENIED** as to this issue.

## CONCLUSION

The Court holds that Symetra's Amended Cross-Complaint has alleged plausible claims for breach of contract, negligent misrepresentation, contractual indemnification, common law or implied indemnification, contribution, and declaratory relief.  In as much as Symetra seeks breach-of-contract damages for bad publicity, that element of damages is not available for breach of contract under Tennessee law.  Therefore, the AMEC Defendants' Motion to Dismiss the Amended Cross-Complaint is **GRANTED in part**, **DENIED in part**.

**IT IS SO ORDERED**.

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date:  September 10, 2025.