**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

| | | |
|---|---|---|
| **IN RE: AME CHURCH EMPLOYEE** | ) | **Lead Case No.** |
| **RETIREMENT FUND LITIGATION,** | ) | **1:22–md–03035–STA–jay** |
| | ) | |
| | ) | **ALL CASES** |

---

## ORDER GRANTING IN PART, DENYING IN PART SYMETRA'S MOTION TO DISMISS AMEC DEFENDANTS' SECOND AMENDED CROSS-COMPLAINT (ECF NO. 808)

---

Before the Court is Symetra Life Insurance Company's ("Symetra") Motion to Dismiss a Second Amended Cross-Complaint filed against it by the African Methodist Episcopal Church ("AMEC") and the AMEC Ministerial Retirement Annuity Plan ("the Plan" or "the Annuity Plan")[1] (ECF No. 808). AMEC and the Plan have responded in opposition, and Symetra has filed a reply. For the reasons set forth below, the Motion is **GRANTED in part, DENIED in part**.

## BACKGROUND

### I. Procedural History

This multidistrict litigation concerns losses to a non-ERISA retirement plan established by AMEC for its clergy and employees. Plaintiffs Pearce Ewing *et al.* are current or retired clergy of the Church and have alleged a number of claims under Tennessee law against the denomination, church officials, third-party service providers to the Plan, and other alleged tortfeasors. Among the Defendants named in Plaintiffs' suit are AMEC, the Plan,[2] the AMEC Department of Retirement

---

[1] The Second Amended Cross-Complaint refers to an "Annuity Plan" (defined in more detail below), which the Church established in 1997. The pleading refers to the Plan and the Annuity Plan interchangeably. So for purposes of deciding the Motion to Dismiss, the Court assumes the Plan identified as a Cross-Plaintiff is also the "Annuity Plan" or (at least a successor of the 1997 "Annuity Plan") described in the pleadings.

[2] Plaintiffs have argued elsewhere that their Second Amended Complaint names the Plan only as a nominal Defendant. Plaintiffs do not seek any recovery directly from the Plan itself rather

Services, the AMEC General Board, and the AMEC Council of Bishops (collectively, the "AMEC Defendants") as well as one of the third-party service providers, Symetra. As part of the AMEC Defendants' answer to Plaintiffs' allegations, AMEC and the Plan have filed a Second Amended Cross-Complaint (ECF No. 570) against Symetra.

The Court has set out the procedural history of the case in its previous orders and need not review the full history here. For purposes of deciding Symetra's Motion to Dismiss, the following procedural events are most relevant. Briefly, pursuant to 28 U.S.C. § 1407, the Panel on Multidistrict Litigation transferred a series of civil actions filed by Plaintiffs to this Court on June 2, 2022, for the coordinated management of pretrial proceedings. Shortly thereafter, Plaintiffs filed a Consolidated Amended Complaint – Class Action (ECF No. 74) ("First Amended Complaint"), consolidating the parties and claims of each member case into a single amended pleading. As part of their responsive pleadings to the First Amended Complaint, both AMEC and Symetra filed Cross-Complaints against each other. AMEC Defs.' Partial Answer & Cross-Complaint (ECF No. 116); Symetra's Answer & Cross-Complaint (ECF No. 214).[3] AMEC then filed an Amended Cross-Complaint and Third-Party Complaint (ECF No. 256) on July 25, 2023, this time naming both AMEC and the Plan as Cross-Plaintiffs in the Cross-Complaint against Symetra.

---

Plaintiffs allege derivative claims on behalf of the Plan.

[3] The AMEC Defendants' initial Cross-Complaint named another Symetra entity, Symetra Financial Corporation ("Symetra Financial"), as a Cross-Defendant, but not Symetra. On November 23, 2022, Symetra and Symetra Financial filed a motion to dismiss (ECF No. 154) all claims against Symetra Financial in the Cross-Complaint. In response, the AMEC Defendants moved to amend their Cross-Complaint to name both Symetra and Symetra Financial as parties. After more briefing from the parties and the AMEC Defendants' subsequent request to file a different amended pleading, the Court granted the AMEC Defendants leave to file an Amended Cross-Complaint, naming Symetra as a Cross-Defendant, and a Third-Party Complaint, naming Symetra Financial as a Third-Party Defendant. The Court granted Symetra Financial's unopposed motion to dismiss on September 9, 2025. Order Granting Symetra Fin.'s Mot. to Dismiss Sept. 9, 2025 (ECF No. 928).

Both Symetra and AMEC then filed motions on the arbitrability of their crossclaims based on an arbitration agreement found in a 2003 Recordkeeping Services Agreement ("2003 RSA"), one of the contracts between the Church and Symetra. AMEC filed a motion to dismiss Symetra's crossclaims (ECF No. 230) against the Church, arguing that the crossclaims were subject to arbitration. Symetra responded by initiating arbitration in June 2023 and filing two different motions of its own: a motion to stay the proceedings on all claims against it (ECF No. 259) as well as a separate motion to stay just AMEC's crossclaims against it (ECF No. 270). The Court granted Symetra's motion for a mandatory stay of the proceedings pursuant to § 3 of the Federal Arbitration Act, 9 U.S.C. § 3, pending arbitration between AMEC and Symetra on certain gateway issues of arbitrability. Order Denying AMEC's Mot. to Dismiss, Granting in Part and Denying in Part Symetra Life's Motion to Stay, and Granting Symetra Life's Motion to Stay AMEC's Crossclaims, Dec. 11, 2023 (ECF No. 316). The Court held, however, that Symetra had not shown cause for a stay of the rest of the proceedings, either a mandatory stay under § 3 or a discretionary stay pursuant to the Court's inherent power over its docket, as to Plaintiffs' claims against Symetra.[4]

While threshold questions about the arbitrability of the crossclaims between AMEC and Symetra were in arbitration, the dispute between Symetra and the rest of the AMEC Defendants continued as part of the MDL. After Plaintiffs filed their Second Consolidated Amended Complaint–Class Action (ECF No. 493, as corrected ECF No. 494) ("the Second Amended Complaint"), the AMEC Defendants filed a responsive pleading, which included a Second Amended Cross-Complaint (ECF No. 570), once more naming AMEC and the Plan as Cross-Plaintiffs and

---

[4] The Court did grant Symetra Financial's request for a discretionary stay of the proceedings on AMEC's crossclaims against the company, while AMEC and Symetra proceeded to arbitration. Order Denying Symetra Fin.'s Mot. to Dismiss, Granting Mot. for Stay, Mar. 1, 2024 (ECF No. 346).

Symetra as a Cross-Defendant.[5]

On February 24, 2025, the arbitrator issued his decision on the arbitrability issue, holding that the parties had not bound themselves to arbitration, and dismissed the proceeding. *See* Decision on Jurisdiction and Scope of Arbitration, Fed. 24, 2025 (ECF No. 825-2). On March 11, 2025, the Court granted AMEC and the Plan's unopposed motion to lift the stay of the proceedings between AMEC and Symetra. Order Granting AMEC Defs.' Mot. to Lift Stay, Mar. 11, 2025 (ECF No. 754). Symetra now moves for the dismissal of the crossclaims AMEC and the Plan allege against it.

## II. Factual Background

For purposes of deciding Symetra's Motion to Dismiss, the Court accepts the following well pleaded facts of the AMEC Defendants' Second Amended Cross-Complaint as true.

## A. AMEC and the Plan's Overview of Their Second Amended Cross-Complaint

In September 2021, AMEC discovered that Dr. Jerome V. Harris, a former Executive Director of the AMEC Department of Retirement Services, had engaged in a conspiracy with several individuals and/or entities to embezzle funds from the Plan and defraud AMEC, the sponsor of the Plan. AMEC's Second Am. Cross-Compl. ¶ 1. AMEC and the Plan allege that the conspirators advanced their goals by providing AMEC with deceptive, false, and grossly inflated financial statements reporting the Plan's assets. *Id*. At the same time, the conspirators made unauthorized, illegal, or prohibited transactions with funds held by the Plan in a Symetra group variable annuity

---

[5] The Court granted AMEC and the Plan leave to amend their Amended Cross-Complaint to allege their claims against Symetra, even though the arbitration between AMEC and Symetra was ongoing at that time. The Second Amended Cross-Complaint also named the following parties as Cross-Defendants: Daniel Parish, Administrator Ad Litem of the Estate of Rev. Dr. Jerome Harris; Newport Group, Inc.; Robert Eaton; Financial Freedom Group, Inc.; Day and Night Solar, LLC; Financial Technologies, LLC; Trinity Financial Consultants, LLC; Motorskill Asia Venture Group; Motorskill Asia Ventures 1, LP; Motorskill Venture Group; Motorskill Ventures 1, LP; and Rodney Brown & Company. AMEC subsequently reached an agreement to settle its crossclaims against Newport Group, Inc., and the Court has given its approval to the settlement.

account. *Id*. Harris and others were aided and abetted by service providers like Symetra, whose professional status and reputation helped Harris and other conspirators conceal their wrongful conduct. *Id*.

**B. AMEC Department of Retirement Services and Harris' Tenure as Executive Director**

AMEC established a profit-sharing plan, effective January 1, 1997, ("the Annuity Plan") as a 401(a) plan established under § 401(a) of the Internal Revenue Code. *Id*. ¶ 36. AMEC funds the Annuity Plan by contributing for the benefit of each enrolled participant an amount equal to a percentage of the participant's annual salary. *Id*. AMEC then invests the contributions in annuity contracts. *Id*.

Harris was first elected to the position of Executive Director of the AMEC Department of Retirement Services ("DRS") in July 2000. *Id*. ¶ 20. Harris was re-elected to four-year terms and continued to serve as DRS Executive Director until 2021. *Id*. According to AMEC's Book of Doctrine and Discipline, a foundational guidebook for the conduct of church affairs, the Executive Director of the DRS oversees all church programs operated for the retirement security of church personnel. *Id*. ¶ 21. One of the programs under the administration of the Executive Director is the Annuity Plan. *Id*. ¶ 22. The DRS and the Executive Director operate under the direction of the AMEC General Board. *Id*. ¶ 23. More specifically, the Executive Director reports to the AMEC Commission on Retirement Services ("the Commission"), a division of the AMEC General Board. *Id*. ¶ 24.

When Harris took office in 2000, the Annuity Plan had its assets invested under an annuity contract with American General Insurance Company. *Id*. ¶ 38. As one of his first official acts, Harris recommended that AMEC consider moving the Annuity Plan's annuity business to a new company. *Id*. ¶ 39. The AMEC General Board adopted Harris' recommendation in June 2001 and

5

authorized him to receive proposals and conduct due diligence on a new investment vendor.  *Id*.

Harris hired Financial Technologies, LLC, a company owned and operated by Robert Eaton

("Eaton"), to receive and review proposals.  *Id*. ¶ 40.  Eaton was named as the Plan's exclusive

broker of record, for which the DRS paid Eaton a flat fee of $5,000.00.  *Id*.

Harris, Eaton, and Bishop John Hurst Adams (at that time the chair of the Commission of

Retirement Services) met with the prospective vendors.  *Id*. ¶ 43.  One of the companies to submit a

proposal and meet with Harris, Eaton, and Bishop Adams was Safeco Life and Investments

("Safeco"), the corporate predecessor of Symetra.  *Id*. ¶ 42.  As part of the proposal, Safeco

partnered with American Express Tax and Business Services ("AmEx") (a corporate predecessor of

Newport Group, Inc.) to present a "package" of plan administration services for the Church's

retirement plan. *Id*. ¶ 44.  For the sake of clarity, the Court will refer to Safeco and AmEx by the

corporate names by which they are now known, Symetra and Newport.  Together, Symetra and

Newport pledged to "work with the AMEC to provide a comprehensive retirement program designed

to meet the AMEC's objectives."  *Id*. ¶ 48.

After the due diligence period, Harris recommended that the General Board select Symetra

and Newport to take over the Plan's annuity business.  *Id*. ¶ 49.  In December 2001, the AMEC

General Board passed a resolution, adopted Harris' recommendation, and granted Harris authority to

initiate a transfer of the Annuity Plan's funds from American General Insurance to Symetra.  *Id*. ¶

50.  Later that month AMEC opened an account with Symetra and invested approximately $49

million in a Symetra group variable annuity. *Id*. ¶ 51.

Without the knowledge of the AMEC Defendants, Symetra paid Eaton an initial commission

of hundreds of thousands of dollars when the Church decided to move its annuity business to

Symetra.  *Id*. ¶ 52.  Since 2001 Eaton has received monthly tail commissions equal to 0.5% of the

Plan's assets and continues to receive them to the present day. *Id*. Even though Eaton had been engaged as an agent to assist Harris in reviewing requests for proposals, Eaton was an agent and producer with Symetra. *Id*. ¶ 53. Eaton did not disclose his pre-existing agency relationship with Symetra to any of the AMEC Defendants. *Id*. Symetra paid Eaton the commissions knowing full well AMEC had retained Eaton to conduct an objective evaluation of business proposals on behalf of the Church. *Id*. ¶ 54.

## C. Newport's Attempts to Draft New Plan Documents

Harris also signed a separate engagement letter with Newport in December 2001. *Id*. ¶ 61. The engagement letter outlined the plan administration services Newport agreed to provide, one of which was the preparation of a new plan document. *Id*. ¶ 66. To assist it in preparing a new plan document, Newport received several documents, though the crossclaim does not allege who provided the documents to Newport. First, Newport received a copy of the 401(a) plan document adopted to govern the Annuity Plan in January 1997. *Id*. ¶ 68. That plan document had appointed "Members of the Pension Commission, Pension Department of the A.M.E. Church" as the Annuity Plan's trustees. *Id*. Newport also received excerpts from the Doctrine and Discipline. *Id*. The Doctrine and Discipline stated that the Commission on Retirement Services was to serve as the "trust committee for the annuity coverage." *Id*. It is not clear from the crossclaim whether the Commission on Retirement Services was the same board as the "Pension Commission" named in the 1997 plan document. Together, the documents demonstrated the Church's intent to have more than one individual named as a trustee. *Id*. ¶ 69.

Newport, however, prepared a draft plan document that listed only Harris as the trustee. *Id*. Newport sent Harris a copy of the draft document in 2002 under a cover letter written by Mark Yahoudy ("Yahoudy"), a Director at Newport. *Id*. ¶ 70. Yahoudy explained to Harris that the draft

7

"listed only you as a trustee" and stated that "[o]ne item I will need before finalizing the document is a complete list of the plan trustees." *Id*. Newport accepted Harris' word that the document should list him as the sole trustee. *Id*. ¶ 71. Newport never sought any further confirmation from AMEC about who the plan document should name as trustees. *Id*. As it turned out, Newport did not finalize the draft plan document in 2002 and never sought AMEC's formal approval of the draft. *Id*. ¶ 72.

Harris later requested that Newport assist in creating another plan document to reflect a subsequent merger of the AMEC 401(a) Annuity Plan and a separate AMEC 403(b) plan known as the "Retirement Plan for Pastors and Presiding Elders." *Id*. ¶ 73. According to the AMEC Defendants, tax laws and regulations did not allow for such a merger at the time. *Id*. Newport set out to draft a plan document that would do it anyway. *Id*.

In 2005, Newport drafted the second plan document that once again named Harris as sole trustee of the newly merged plans. *Id*. ¶ 74. Just as before, Newport did not receive confirmation or any additional approval from AMEC. *Id*. Even though the second draft plan document was created with an effective date of January 1, 2006, Newport did nothing to finalize the document or verify that AMEC had approved or adopted the document. *Id*. ¶ 75. And as later tax laws and regulations mandated amendments to existing plan documents, Newport never updated the second draft plan document to comply with changes in the law. *Id*. ¶ 76.

In fact, Newport did not realize that the 2006 second draft plan document was never properly approved or adopted until 2019. *Id*. ¶ 77. That year Newport asked Harris to return the signature pages from the second draft plan document, even though the document's provisions no longer complied with tax laws and regulations. *Id*. Harris returned the signature page, this time with AMEC's CFO signing as the "Employer" and the AMEC General Secretary signing the Certificate of Corporate Resolution. *Id*. Despite the many problems with the document's content and execution,

8

Newport continued to operate until 2021 as though the second draft plan document governed the Plan. *Id*.

The AMEC Defendants allege that Newport never actually produced an operative and effective plan document to govern the Plan, despite the drafts created in 2002 and 2006. *Id*. ¶ 79. Newport did, however, draft "Summary Plan Descriptions" and "Business Practices" for Harris to circulate to AMEC and plan participants, all based on provisions in the unexecuted and ineffective second draft plan document. *Id*. These materials did not accurately reflect the terms of the qualified 401(a) plan or 403(b) plan sponsored by the Church and funded by annuity contracts purchased from Symetra. *Id*.

Newport's draft plan documents are the only documents that purport to appoint Harris as sole trustee of any retirement plan sponsored by the Church. *Id*. ¶ 80. According to the crossclaim, the second draft plan document from 2006 aided and contributed to Harris's success in concealing his misconduct with Plan funds because service providers, like Symetra, accepted the unsigned and unexecuted plan document as though it had received AMEC's formal approval. *Id*. Newport also represented and certified to third parties that Harris was the trustee of the Plan, despite never having produced an executed or effective plan document naming him as such. *Id*.

For its part Symetra treated Harris as the sole decisionmaker with authority over the annuity account almost from the start. *Id*. ¶ 81. Symetra never requested or received any confirmation from the AMEC General Board, the AMEC Commission on Retirement Services, or any other AMEC governing body or officer that AMEC had named or appointed or even intended Harris to be the sole trustee with all investment decision making authority. *Id*. ¶ 82. At times, Symetra realized it did not have a formally executed copy of any plan document naming Harris as a trustee but continued to accept Harris' representations about his own authority anyway. *Id*. ¶¶ 83–94. The AMEC

9

Defendants describe this as a "the false and dangerous environment where Harris was treated as the 'Trustee.'" *Id.* ¶ 97.

## D. Harris' Transfers of Plan Assets to Other Non-Annuity Investments

During his 20-year tenure, Harris made a number of unauthorized investments with Plan funds. In May 2003, Harris moved $1.7 million dollars of Plan funds being held in the group variable annuity account at Symetra into a money market account with Symetra. *Id.* ¶ 98. A short time later, Harris directed Symetra to wire the $1.7 million dollars to "Meridian Development Co." in Florida. *Id.* ¶ 99.

When Harris told Symetra that he and Eaton had decided to invest Plan funds in real estate, Jim Daniel, a Symetra employee in client relationships, cautioned Harris. *Id.* ¶ 100. If Harris made such an investment with plan funds, Harris needed to treat the property purely as an investment. *Id.* According to Daniel, no church leader nor anyone acting on behalf of the Plan, including Harris or Eaton, could benefit personally from the purchase or ever use the property for personal enjoyment. *Id.* Daniel also told Harris that a third party would need to appraise the real estate each year and provide the appraisal information to Newport. *Id.* ¶ 101.

Symetra ultimately wired the $1.7 million according to Harris' instructions. Symetra knew the funds would be used to make an investment in real estate. And Symetra did not verify Harris' authority to make such an investment, even though the Plan was a 401(a) Plan funded through annuity contracts and the real estate was a non-annuity investment. *Id.* ¶¶ 103, 104.[6]

---

[6] The Second Amended Complaint alleges that Harris approved a DRS loan of $2.5 million to an entity named "Meridian/AMEC" for the purchase of five lots in Key Marco, Florida. *Id.* ¶ 247. Meridian/AMEC never made any payments on the loan. *Id.* In 2008, Harris assigned the note, mortgage, and loan documents to an entity named Key Marco Holdings, LLC. *Id.* The property likewise was transferred to Key Marco Holdings, LLC. *Id.* The sole member of Key Marco Holdings, LLC is Freedom Funds. *Id.* A recent valuation of these properties indicates that they are

Five years later in 2008, Eaton directed Bob Follette, Symetra's project manager in Group Retirement Plans, to transfer $10 million from the Plan's annuity account to Financial Freedom Funds, LLC. *Id.* ¶ 106. Harris had created the company and listed Eaton as a consultant. *Id.* Several Symetra employees expressed concern with the transfer of cash to an LLC controlled or owned by Eaton. *Id.* ¶ 108. Follette emailed Harris and recommended that Harris seek the advice of a qualified ERISA attorney before proceeding with the transfer due to the risk of a conflict of interest or the possible harm to the Plan's interests. *Id.* ¶ 107. Despite its internal concerns over the transfer, Symetra allowed the $10 million transfer from the Symetra annuity account to a non-annuity investment, just as it had allowed the 2003 real estate investment. *Id.* ¶ 109.

The Second Amended Cross-Complaint goes on to allege that Harris continued to make other non-annuity investments with Plan funds by directing Symetra to move money from the Plan's annuity account with Symetra to outside investments, generally by first transferring funds to Financial Freedom Funds where Harris would then direct the money to other investments. *Id.* ¶ 232–33. Harris invested most of the transferred funds to a series of private equity funds known as Motorskill Venture Group; Motorskill Ventures 1, LP; Motorskill Asia Venture Group; and Motorskill Asia Ventures 1, L.P. (collectively, the "Motorskill Entities"). *Id.* ¶ 12.

Between 2005 and 2021, Harris invested over $37 million of Plan funds in the Motorskill Entities and consistently reported an inflated valuation for the investments to make it seem as though the investments were growing in value. *Id.* ¶¶ 233–34. Harris did not simply invest Plan funds in the Motorskill Entities. Harris and Eaton together created a series of companies through which they moved Plan funds to invest the money in the Motorskill Entities and in exchange received "consulting and placement fees" from the Motorskill Entities. *Id.* ¶ 236–39. By 2019 Harris'

worth less than half the $2.5 million original loan amount. *Id.*

investments in the Motorskill Entities were worthless. *Id*. ¶ 240.

Symetra was on notice that Eaton was engaged in other suspicious and potentially prohibited activity, as well. *Id*. ¶ 55. For example, in October 2002, Eaton signed an agency agreement with Symetra, not in his own name but as "Agency Principal" of "AMEC Financial Services, LLC." *Id*. ¶ 56. Symetra never requested any documentation or other information about AMEC Financial Services. *Id*. ¶ 57. Had Symetra done so, it would have learned that Eaton was not a principal or member of the LLC and had no authority to conduct business in the name of the LLC. *Id*. Later in 2004, Eaton specifically asked Symetra to assign his commissions to AMEC Financial Services, LLC, a request Symetra granted. *Id*. ¶ 58. This arrangement allowed AMEC Financial Services, LLC, an entity Symetra knew was affiliated with the Plan, to receive commissions owed to Eaton and paid out of the Plan's investments with Symetra. *Id*. 59.

And in 2006, Harris emailed Bob Follette, a manager in the Group Retirement Plans section of Symetra Financial, to address a loan: "[i]f you recall, a loan was made from the Annujiyt [sic] Plan via the LLC to FiTec (Bob Eaton's previous company) and it is being repaid by an assignment of all of Bob's trail [sic] commissions and year end bonus." *Id*. ¶ 59. Just five years into its relationship with Harris and Eaton, Symetra had notice of Harris's and Eaton's suspicious movement of Plan funds and commissions earned by Plan investments between entities affiliated with Eaton. *Id*. ¶ 60.

Newport and Symetra also aided and abetted Harris' plans in other ways, namely, through paying large administrative fees to Harris out of the Plan's annuity account with Symetra. *Id*. ¶ 172. In May 2015, Harris requested that Symetra increase the quarterly administrative fee he received from 0.25% to 0.55% "until further notice," a fee representing 2.2% annually on all Plan assets held with Symetra. *Id*. ¶ 173. Symetra did not remit the "administrative fees" to the DRS bank account

and instead made a check payable to "Dr. Jerome V. Harris, Trustee." *Id.* ¶ 174.  According to the crossclaim, Harris typically would cash the check and deposit a round, even amount of the check into a DRS bank account to cover the department's expenses and keep the difference for himself.  *Id.*

Newport and Symetra also assisted Harris in his campaign for re-election as the Executive Director to the DRS in 2008, just months after Symetra carried out Harris' instructions to transfer $10 million in Plan assets out of the Symetra annuity account into a money market account and then to Financial Freedom Funds.  *Id.* ¶ 186.  Symetra and Newport prepared a report to assist Harris with drafting campaign materials to be disseminated at the General Conference and to members of the AME Church.  *Id.* ¶ 187.  According to the report, the Plan had as its focus "fixed interest rate investments" in "keeping with the plan's conservative investment objectives of preserving capital and eliminating market risk." *Id.* ¶ 188. The AMEC Defendants allege that this was a misrepresentation.  *Id.*  Symetra and Newport knew Harris had just directed a $10 million transfer from the annuity account to an investment that was not a fixed interest rate investment, was not conservative, and was otherwise not in line with the objective of preserving capital and eliminating market risk.  *Id.* ¶ 189.  The report also represented that Newport was providing "independent auditing of the retirement plan" and "critical third party oversight of plan management and administration." *Id.* ¶ 190.  The materials that Symetra prepared for Harris also highlighted the Department's creation of the "AME Church Financial Services, LLC" an entity Symetra knew and believed to be an Agency owned by Eaton. *Id.* ¶ 192.

**E. AMEC's Discovery of the True Value of Plan Assets**

At all times during his tenure, Harris reported to AMEC that the investments of the Plan were "conservative" and "prudent" and consisted of annuities provided through Symetra.  *Id.* ¶¶ 25, 26. Harris never disclosed to the AMEC General Board, the Commission, or any other AMEC body or

13

its officer the Plan's non-annuity investments, nor did he seek approval for the investments and loans he made using DRS and/or Plan funds. *Id*. ¶ 26. On July 6, 2021, in his final report to the General Conference, Harris represented to AMEC that the Annuity Plan had a value of $128 million. *Id*. ¶ 248. Harris did not disclose the true value of the Plan's investments in the Motorskill Entities or any other investments. *Id*. 249.[7] Subsequent to Harris' retirement, AMEC learned that only about $37 million of the reported $128 million in Plan assets was actually in the annuity account at Symetra. *Id*. ¶ 257. The inflated values for the Motorskill investments represented over 60% of the Plan's reported valuation. *Id*.

From these factual premises, the Second Amended Cross-Complaint alleges the following causes of action under Tennessee law:

- Conversion (Count I);
- Fraudulent Misrepresentation (Count II);
- Fraudulent Concealment (Count III);
- Civil Conspiracy to Commit Conversion (Count IV);
- Civil Conspiracy to Commit Intentional Misrepresentation (Count V);
- Conspiracy to Commit Constructive Fraud (Count VI);
- Negligent Misrepresentation (Count VII);
- Professional Negligence (Count VIII);
- Breach of Fiduciary Duty (Count IX);
- Aiding and Abetting Breach of Fiduciary Duty (Count X); and
- Negligence (Count XI).

---

[7] Audits from third-party CPA Rodney Brown and Company certified the values of Plan assets as reported by Harris, confirming the values as "the total account balances of annuities held and invested" on behalf of the Plan participants. *Id*. ¶ 27. In the audit report for 2020 and 2021, Rodney Brown and Company certified that "[a]s of March 31, 2021 and 2020, the total account balances of annuities held and invested on behalf of the clergy servants and full time employees of the African Methodist Episcopal Church was $128,342,168 and $128,377,716 respectively." *Id*. ¶ 249.

AMEC and the Plan allege on information and belief that Rodney Brown & Company relied on written confirmation regarding the Plan's investments from David Fizer, a CPA and manager with Newport. *Id*. ¶ 28. AMEC later learned that these reports were intentionally deceptive, false, and grossly inflated. *Id*. ¶ 29.

The Second Amended Cross-Complaint would hold Symetra liable for breach of fiduciary duty, negligence, fraudulent concealment, and negligent misrepresentation as well as the civil conspiracies alleged in Counts IV, V, and VI and aiding and abetting Harris in a breach of his fiduciary duty claim.  Symetra moves for the dismissal of all counts in the Second Amended Cross-Complaint, arguing broadly that AMEC has failed to distinguish which causes of action belong to the Church and which to the Plan and that AMEC has also failed to allege how any conduct committed by Symetra caused AMEC's damages.  Additionally, or in the alternative, Symetra moves for the dismissal of the crossclaims for breach of fiduciary duty, negligence claims, fraudulent concealment, negligent misrepresentation, the civil conspiracy counts, and aiding and abetting breach of fiduciary duty, arguing that the Second Amended Cross-Complaint fails to state these claims for relief.

## STANDARD OF REVIEW

A defendant may move to dismiss a claim "for failure to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6).  Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion, the Court must treat all the well–pleaded allegations of the pleadings as true and construe all of the allegations in the light most favorable to the non-moving party. *Elec. Merchant Sys. LLC v. Gaal*, 58 F.4th 877, 882 (6th Cir. 2023) (citing *Taylor v. City of Saginaw*, 922 F.3d 328, 331 (6th Cir. 2019)).  However, legal conclusions or unwarranted factual inferences need not be accepted as true. *Fisher v. Perron*, 30 F.4th 289, 294 (6th Cir. 2022) (citing *Iqbal*, 556 U.S. at 678).

Under Rule 8 of the Federal Rules of Civil Procedure, a complaint need only contain "(1) a short and plain jurisdictional statement, (2) a short and plain statement of the claim, and (3) an explanation of the relief sought." Fed. R. Civ. P. 8(a).  "That's it. By listing these elements, Rule 8

15

implicitly 'excludes other requirements that must be satisfied for a complaint to state a claim for relief.'" *Gallivan v. United States*, 943 F.3d 291, 293 (6th Cir. 2019) (citing Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 10, at 107 (2012) (other citation omitted). Rule 8's notice pleading standard does not require "detailed factual allegations." *Iqbal*, 556 U.S. at 681.

But Rule 8 does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* "Although the rule encourages brevity," a plaintiff must nevertheless "say enough to give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (citing *Dura Pharm. v. Broudo*, 544 U.S. 336, 346, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)). "Rule 8 does not empower [a plaintiff] to plead the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss." *Iqbal*, 556 U.S. at 687. In order to survive a motion to dismiss, the plaintiff must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level" and to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). This means, a complaint "must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *Smith v. Gen. Motors LLC*, 988 F.3d 873, 877 (6th Cir. 2021) (citing *Boland v. Holder*, 682 F.3d 531, 534 (6th Cir. 2012)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *see also Ryan v. Blackwell*, 979 F.3d 519, 524 (6th Cir. 2020) ("A complaint must contain enough 'factual matter' to raise a 'plausible' inference of wrongdoing.") (quotation omitted).

16

AMEC and the Plan have alleged each of their crossclaims under Tennessee law.  The Court has jurisdiction over Plaintiffs' claims in their Second Amended Complaint by virtue of the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d).  The Court therefore has supplemental jurisdiction over AMEC's and the Plan's crossclaims pursuant to 28 U.S.C. § 1367(a).  *See also* Second Am. Cross-Compl. ¶ 15.  The Second Amended Cross-Complaint further alleges that the Court has jurisdiction over the dispute between AMEC and Symetra by virtue of the amount in controversy and the parties' diversity of citizenship under 28 U.S.C. §1332(a).  *Id*. ¶ 16.   As in any case where the Court exercises jurisdiction under 28 U.S.C. § 1332, the Court applies the law of the forum state, including the forum's choice-of-law rules.  *Loreto v. Procter & Gamble Co.*, 515 F. App'x 576, 578 (6th Cir. 2013) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). The parties have briefed the substantive law of the state of Tennessee in their motion papers.  The Court will assume for purposes of deciding the questions of law presented in Symetra's Rule 12(b) Motion that Tennessee law governs the parties' dispute.

As part of its application of Tennessee law, the Court must follow "a ruling from the state supreme court." *Smith*, 988 F.3d at 878 (citing *In re Darvocet, Darvon & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917, 937 (6th Cir. 2014)).  Without a clear ruling from the Tennessee Supreme Court, the *Erie* doctrine requires this Court to "predict[] how the state supreme court would rule by looking to all available data, including decisions of the states' appellate courts." *Smith*, 988 F.3d at 878 (internal citation omitted); *see also Lindenberg v. Jackson Nat'l Life Ins. Co.*, 912 F.3d 348, 358 (6th Cir. 2018) (citing Tenn. Sup. Ct. R. 4(G)(2) for the proposition that a published opinion of the Tennessee Court of Appeals is "controlling authority for all purposes unless and until such opinion is reversed or modified by a court of competent jurisdiction").

## **ANALYSIS**

17

Symetra seeks the dismissal of each crossclaim alleged by Church against it. An intervening ruling in the case has rendered Symetra's Motion to Dismiss moot in one respect. The Court has by separate order granted the AMEC Defendants' Joint Motion for Voluntary Dismissal of the Plan's crossclaims alleged in the AMEC Defendants' Amended Cross-Complaint (ECF No. 839), thereby permitting the Plan to nonsuit its crossclaims against Symetra for fraudulent concealment (Count III), civil conspiracy to commit conversion (Count IV), civil conspiracy to commit intentional misrepresentation (Count V), conspiracy to commit constructive fraud (Count VI), negligent misrepresentation (Count VII), breach of fiduciary duty (Count IX), aiding and abetting breach of fiduciary duty (Count X), and negligence (Count XI). Order Granting in Part Jt. Mot. for Vol. Dismissal Pursuant to Rule 41(a)(2), Sept. 2, 2025 (ECF No. 925). Under the circumstances, the Court finds that Symetra's argument for the dismissal of any claim asserted by the Plan is now moot. Therefore, Symetra's Motion to Dismiss is **DENIED** as moot as to each crossclaim alleged by the Plan in the AMEC Defendants' Second Amended Cross-Complaint.

The Court now addresses two preliminary matters.

## I. Symetra's Request for Judicial Notice (ECF No. 808-2)

Before reaching the merits of the Motion to Dismiss, the Court considers Symetra's Request for Judicial Notice (ECF No. 808-2). As a procedural matter, Symetra invokes the judicial notice doctrine and asks the Court to take notice of certain facts established in separate litigation involving AMEC and Symetra. Symetra cites *Glover v. The Estate of James R. Glover, Jr., et. al*, No. 2019-CP3201361, a case heard in the Lexington County, South Carolina Court of Common Pleas, Eleventh Judicial Circuit ("*Glover*"). Symetra argues in its Motion to Dismiss and in a Request for Judicial Notice accompanying the Motion that the Court should take judicial notice of three documents from *Glover*: (1) the ruling announced in *Glover v. The Estate of James R. Glover, Jr., et.*

18

*al*, 2022 WL 2826952 (S.C. Ct. C.P. Feb. 9, 2022), a court decision from February 2022 granting

Symetra summary judgment on all claims; (2) a motion for summary judgment filed in 2022 by

AMEC and AMEC Financial Services, Inc., both of which were named as defendants in *Glover*; and

(3) excerpts from the August 2020 deposition of Dr. Harris taken as part of the proceedings in

*Glover*.

Symetra argues that the Court may properly take judicial notice of each document. In

addition to taking judicial notice, Symetra asks the Court to reject certain factual allegations found in

AMEC's pleadings in the MDL, pleadings which are inconsistent with positions AMEC took in

*Glover*. According to *Symetra*, in *Glover* "AMEC unequivocally took the position that Harris was

the Plan's Trustee and that the Plan was governed by the [2006] Plan Document." Symetra's Req.

for Judicial Notice 2. AMEC now denies the same propositions as part of its crossclaims and alleges

instead that Harris was never the trustee and that the 2006 draft plan document was never formally

adopted. Symetra argues that based on its judicial notice of the documents from *Glover*, the Court

should prohibit AMEC from taking inconsistent positions to support its claims and defenses in the

MDL.

Judicial notice would be improper here for a number of reasons. Federal Rule of Evidence

201 allows a court to take judicial notice of "a fact that is not subject to reasonable dispute because it

can be accurately and readily determined from sources whose accuracy cannot reasonably be

questioned." Fed. R. Evid. 201(b)(2). As Rule 201 makes clear, "judicial notice is available only for

facts that are not subject to reasonable dispute." *Changizi v. Dept. of Health & Human Servs.*, 82

F.4th 492, 498 (6th Cir. 2023). So as general rule, "[c]ourts should not take judicial notice at the

Rule 12 stage of the truth of matters subject to reasonable dispute contained in earlier cases." *Mills v.*

*Barnard*, 869 F.3d 473, 486 (6th Cir. 2017) (citing *Stafford v. Jewelers Mut. Ins.*, 554 F. App'x 360,

369 (6th Cir. 2014)). Symetra does not just request judicial notice of the *Glover* case but judicial notice of facts from *Glover* which are hotly contested in the MDL. The specific propositions concern whether the 2006 plan document actually governed the Plan, whether there was a document to govern the Plan at all, and whether Harris was the Plan's trustee from 2001 to 2021. Symetra's Req. for Judicial Notice 2. At the pleadings stage, a reasonable dispute exists over each fact and therefore prevents the Court from taking judicial notice of what the evidence might have showed in *Glover*.

To compound the error, Symetra asks the Court to take judicial notice of the truth of the facts asserted in the *Glover* documents themselves and then to give the facts from *Glover* preclusive effect in this case to bar AMEC from litigating certain factual issues. Courts may refer to public records, including judicial proceedings, to decide a motion to dismiss. *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 576 (6th Cir. 2008). And judicial notice is proper for "indisputable court actions, such as the entry of a guilty plea or the dismissal of a civil action," but not the facts supporting the court actions. *Tollbrook, LLC v. City of Troy*, 774 F. App'x 929, 936 n.5 (6th Cir. 2019). So while it is true the Court could take judicial notice of another court's decision to grant summary judgment, the Court could only take judicial notice of the existence of the decision, not "the truth of the facts recited therein" or the parties' positions on the issues. *Winget*, 537 F.3d at 576; *see also In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 467 (6th Cir. 2014); *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 442 n.6 (6th Cir. 2012). Symetra is not simply asking the Court to take judicial notice of the fact that the state court in South Carolina issued a ruling or entered a judgment. Symetra wants the Court to take judicial notice of the truth of certain matters asserted in *Glover* and then disregard any counterfactuals alleged in AMEC's pleadings in the MDL. The Court finds Symetra's invitation to take judicial notice of the documents from *Glover* to be ill-advised.

20

Therefore, the Court **DENIES** Symetra's request for judicial notice.

## II. AMEC's Failure to Allege Damages and Causation

The Court now addresses Symetra's larger point that the AMEC Defendants' Second Amended Cross-Complaint fails to distinguish which claims AMEC alleges against Symetra and which the Plan alleges. For example, Symetra argues that AMEC has not alleged how the Church itself (as opposed to the Plan) suffered its own damages or how Symetra's actions caused the damages. The Second Amended Cross-Complaint alleges, as Symetra concedes, that AMEC has suffered reputational harm and that the Church has lost tithes, members, and clergy. But Symetra argues that AMEC fails to allege any facts in support of this allegation. And the Church has not alleged how the damages were caused by the mismanagement of the Plan, the financial losses suffered by the Plan, or any action on Symetra's part.

The dismissal of the Plan's crossclaims against Symetra rendered some of its argument on this point moot. What remains is the two-part argument Symetra makes for the dismissal of AMEC's crossclaims, generally. Symetra contends that because AMEC failed to distinguish its claims from the claims alleged by the Plan, the Amended Cross-Complaint fails to allege (1) what damages AMEC (as opposed to the Plan) has suffered or (2) that AMEC sustained its damages as a result of any acts or omissions for which Symetra should be held liable. Under Tennessee law, a jury's "award of damages, which is intended to make a plaintiff whole, compensates the plaintiff for damage or injury caused by a defendant's wrongful conduct." *Dedmon v. Steelman*, 535 S.W.3d 431, 437 (Tenn. 2017) (quoting *Meals ex rel. Meals v. Ford Motor Co.*, 417 S.W.3d 414, 419 (Tenn. 2013)). "A plaintiff may be compensated for any economic or pecuniary losses that naturally result from the defendant's wrongful conduct." *Meals ex rel. Meals*, 417 S.W.3d at 419 (citing *Inland Container Corp. v. Mar.*, 529 S.W.2d 43, 44 (Tenn. 1975)). "The party seeking damages has the

21

burden of proving them." *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 703 (Tenn. Ct. App. 1999).

The Court holds that the Second Amended Cross-Complaint plausibly alleges the fact that AMEC has suffered damages. AMEC makes general allegations about two types of damages: "financial harm" and "significant reputational and structural harm." Second Am. Cross-Compl. ¶¶ 195, 197. According to the Church, the "financial harm" consists of the loss of money used by the Church to establish the Plan and fund contributions to the Plan for the benefit of church employees. *Id*. ¶ 198.[8] Viewing the allegation in a light most favorable to AMEC, this "financial harm" is something other than merely the loss of the Plan's assets and represents a separate injury to AMEC's finances. The other type of alleged damage, AMEC's "reputational and structural harm," has taken the form of "reduced tithing, shrinking membership, and the resignation of clergy" and, even more generally, "incalculable harm to the unity of the Church." *Id*. ¶ 196. This allegation of harm to AMEC combines what is arguably damage of an economic nature (lost tithes) and a non-economic nature (damage to AMEC's reputation and goodwill). These allegations meet AMEC's pleading burden to allege the existence of compensable damages, at least as a general proposition.

Symetra argues that the Second Amended Cross-Complaint's allegations of harm are speculative and indeterminate, in part because AMEC has not and will not be able to quantify them. But Symetra has not cited any case to support this view. "Once an injured party proves that it has been damaged, the amount of the damages need not be proved with certainty or mathematical precision." *Waggoner Motors, Inc. v. Waverly Church of Christ*, 159 S.W.3d 42, 58 (Tenn. Ct. App. 2004) (citing *McClain v. Kimbrough Constr. Co.,* 806 S.W.2d 194, 200 (Tenn. Ct. App. 1990)). The

---

[8] AMEC's Amended Cross-Complaint (ECF No. 256) alleged that the Church had been forced to "replenish the Plan funds that were lost due to the negligence of Newport . . . ." Am. Cross-Compl. ¶ 60. No such allegation concerning damages caused by Symetra appeared in the pleading, and nothing of that sort appears in the Second Amended Cross-Complaint.

"financial harm" claimed by AMEC, including the Church's economic damages for replacing lost funds for the Plan and a decline in giving, are obviously the type of money damages the Church must quantify and substantiate at trial. It is true and well settled in Tennessee that "[d]amages may never be based on speculation or conjecture." *Overstreet*, 4 S.W.3d at 703. The proposition, however, concerns proof and what the party seeking damages must demonstrate at trial, not necessarily how much factual material the party must allege in its pleadings. *Waggoner Motors*, 159 S.W.3d at 57 ("[D]amages become too speculative only when the existence of damages is uncertain, not when the precise amount is uncertain.").

And to the extent that AMEC's alleged reputational and structural harm constitutes a type of non-economic damage, "a plaintiff is generally not required to prove the monetary value of non-economic damages." *Meals ex rel. Meals*, 417 S.W.3d at 420. AMEC's reputational and structural harm is compensable even if the damages are less susceptible to a particular calculation. Symetra has not shown then why AMEC fails to state its crossclaims for lack of damages.

Symetra makes a related argument that AMEC has not alleged how Symetra's tortious conduct caused these supposed harms to the Church. Here, Symetra cites no cases to support its position, only its own suppositions about how a religious organization might be expected to respond to a financial crisis or what other independent causes might explain AMEC's alleged damages like the pandemic or inflation. Symetra's causation argument is based on disputed facts of the kind the Court cannot weigh in deciding a motion to dismiss. *Wilson v. Americare Systems, Inc.*, 397 S.W.3d 552, 559 (Tenn. 2013) ("Where the evidence supports more than one reasonable conclusion, causation in fact and proximate causation are issues of fact which should be decided by the jury and not the [] court."). For all of these reasons, Symetra's Motion to Dismiss must be **DENIED** on this issue. The Court now turns to the merits of Symetra's remaining arguments for dismissal.

## III. Breach of Fiduciary Duty (Count IX) and Common Law Negligence (Count XI)

Count IX of the Second Amended Cross-Complaint alleges that Symetra is liable to AMEC for breach of fiduciary duty, and Count XI alleges a crossclaim for common law negligence. Symetra argues that AMEC's crossclaims for breach of fiduciary duty and negligence fail because Symetra owed AMEC no duty of care at all, either a fiduciary duty or an ordinary duty of care. According to Symetra, AMEC has failed to allege why Symetra owed the church (as opposed to the Plan) any duty of care, either a fiduciary duty or a common law duty. The Cross-Complaint alleges no facts to support the allegations about the existence of a duty and seems to conflate the duty Symetra owed the Plan with a supposed duty Symetra owed AMEC (which Symetra contests). The Court considers each issue, whether AMEC has alleged facts to demonstrate Symetra owed it a duty, either of a fiduciary character or under common law, separately.

## A. Breach of Fiduciary Duty

The question of Symetra's fiduciary duty is not new to the case. The Court has already had two occasions to consider whether Symetra became a fiduciary of the Plan and therefore owed the Plan a fiduciary duty.[9] In both instances, the Court held that the pleadings alleged enough to suggest a fiduciary relationship between Symetra and the Plan. And in both instances, the Court remarked

---

[9] The Court made an initial ruling that Plaintiffs' First Amended Complaint plausibly alleged Symetra and the Plan had a fiduciary relationship based on features of a 2006 plan document, the same document AMEC now alleges never took effect. Order on Mots. to Dismiss Consolidated Am. Compl. – Class Action 57-58, Mar. 17, 2023 (ECF No. 197). In a more recent order, the Court decided "to adhere to its earlier holding as the law of the case" and ruled that Plaintiffs' Second Amended Complaint alleged enough facts to show that Symetra acted as a fiduciary for the Plan because Symetra performed "certain fiduciary roles in the administration of the Plan." Order Granting in Part, Denying in Part Symetra's Mot. to Dismiss Pl.' Second Am. Compl. 35, 33. Plaintiffs' First Amended Complaint relied heavily on definitions and features of a 2006 version of the plan document. Plaintiffs no longer relied on the document to support their allegations in the Second Amended Complaint. And as part of its crossclaim, AMEC argues the Church never formally adopted the document.

that the "the question [of Symetra's fiduciary duty to the Plan] presents a close call" and that "[t]he full scope of Symetra's duty to disclose the material information about the nature of Dr. Harris's improper activities" was a question better left for summary judgment. Symetra does not ask the Court to revisit these rulings. Symetra just argues that AMEC's crossclaim fails to show that Symetra had a fiduciary relationship with AMEC.

"A fiduciary is a person holding the character of a trustee who bears the duty to act primarily for the benefit of another." *Sanford v. Waugh & Co., Inc.*, 328 S.W.3d 836, 843 (Tenn. 2010) (citing *McRedmond v. Estate of Marianelli*, 46 S.W.3d 730, 738 (Tenn. Ct. App. 2000)). In Tennessee, a party can be either a fiduciary *per se* or a fiduciary due to a confidential relationship. *Faber v. Ciox Health, LLC*, 331 F.Supp.3d 767, 780 (W.D. Tenn. 2018) (citing *Grant v. Tucker*, 57 F.Supp.3d 852, 859 (M.D. Tenn. 2014)). Here, AMEC will have a claim for breach of fiduciary duty against Symetra if it can first show Symetra was its fiduciary *per se* or that AMEC had a confidential relationship with Symetra.

AMEC alleges nothing to suggest that the Church had a confidential relationship with Symetra. "Relationships that are not fiduciary *per se* require proof of the elements of dominion and control in order to establish the existence of a confidential relationship." *Foster Business Park, LLC v. Winfree*, No. M2006-02340-COA-R3-CV, 2009 WL 113242, at *12 (Tenn. Ct. App. Jan. 15, 2009) (collecting cases). And the parties to a confidential relationship "must understand that a special trust or confidence has been reposed." *Id.* The crossclaim alleges nothing of that sort.

Without any allegation to establish a confidential relationship, AMEC's theory appears to be that Symetra acted as a fiduciary *per se*. Tennessee recognizes several kinds of fiduciaries *per se*: an agent owes a fiduciary duty to its principal, *Knox–Tenn Rental Co. v. Jenkins Ins., Inc.*, 755 S.W.2d 33, 36 (Tenn. 1988) ("An agent is a fiduciary with respect to the matters within the scope of his

25

agency."); attorneys to their clients, *Crawford v. Logan*, 656 S.W.2d 360, 364 (Tenn. 1983); guardians and conservators to their wards, *Freeman v. Martin*, 181 S.W.2d 745, 746 (Tenn. 1944); directors and officers of a corporation to the corporation and its shareholders, *Sanford*, 328 S.W.3d at 843; employees to their employers, *Efird v. Clinic of Plastic & Reconstructive Surgery*, 147 S.W.3d 208, 219 (Tenn. Ct. App. 2003); and realtors to their clients, *Ann Taylor Realtors, Inc. v. Sporup*, No. W2010–00188–COAR3V, 2010 WL 4939967, at *3 (Tenn. Ct. App. Dec. 3, 2010); *see also Comm'rs of Powell–Clinch Util. Dist. v. Util. Mgmt. Review Bd.*, 427 S.W.3d 375, 388–89 (Tenn. Ct. App. 2013) (collecting cases).

AMEC's allegations about its relationship with Symetra fits within none of these categories. The crossclaim alleges three facts to show that Symetra had a fiduciary duty to AMEC. First, AMEC alleges that Symetra owed it a fiduciary duty because Symetra was "the carrier of tens of millions of dollars of Plan funds." Second Am. Cross-Compl. ¶ 419. True, Symetra sold the Church an annuity in 2001. To be more precise, the Church transferred $49 million from its previous annuity company to a group variable annuity at Symetra. *Id.* ¶¶ 81, 51. Standing alone, though, the sale of the annuity did not transform Symetra into AMEC's fiduciary. The general rule is that "parties dealing at arm's length lack the sort of relationship of trust and confidence that gives rise to a fiduciary relationship." *Faber*, 331 F. Supp. 3d at 781 (quoting *Dick Broadcasting Co., Inc. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 673 (Tenn. 2013) (Koch, J., concurring)) (other citation omitted). In the ERISA context, courts have held that "the mere payment of claims or sale of annuity contracts does not render an insurer a 'fiduciary' within the meaning of ERISA." *James v. Provident Nat. Assur. Co.*, 865 S.W.2d 23, 25 (Tenn. Ct. App. 1993) (holding that an insurance company's performance of "ministerial functions at [the plan sponsor's] direction" did not meet ERISA's statutory definition of a "fiduciary").

Second, AMEC alleges that Symetra owed it a fiduciary duty because Symetra "had authority and control respecting management or control of Plan assets." Second Am. Cross-Compl. ¶ 419. Again, in the realm of ERISA, an insurance company does not exercise "discretionary control over the management of plan assets or the administration of the plan" simply by selling an annuity contract. *Flacche v. Sun Life Assur. Co. of Canada (U.S.)*, 958 F.2d 730, 734–35 (6th Cir. 1992). Other than entering into an annuity contract purchased with Plan assets, the crossclaim does not allege how Symetra "managed" or "controlled" Plan assets.

And third, AMEC alleges that Symetra owed it a fiduciary duty "by virtue of [Symetra's] custom and practice of providing investment advice and compliance advice." Second Am. Cross-Compl. ¶ 419. But the crossclaim does not allege how Symetra rendered investment or compliance advice. Just as selling annuities does not vest an insurance company with "discretionary control" over plan assets, selling annuity contracts is not the same thing as rendering "investment advice." *Flacche*, 958 F.2d at 735. Symetra allegedly advised Dr. Harris about using Plan funds to invest in real estate in 2003 and advised him again in 2008 to consult an ERISA attorney. Second Am. Cross-Compl. ¶ 107. These allegations, limited as they are to two separate incidents, do not show that Symetra had a custom or practice of giving advice on investments or compliance. In sum, AMEC's allegations do not show why Symetra became AMEC's fiduciary *per se* or how the parties had a confidential relationship.

On the other hand, the crossclaim arguably alleges more than just the sale of an annuity. The Plan purchased a group variable annuity from Symetra as part of an existing Rule 401(a) annuity plan for its retirees. Second Am. Cross-Compl. ¶ 36. Section 401(a) of the Internal Revenue Code defines a § 401(a) retirement plan as "[a] trust created or organized in the United States . . . ." 26 U.S.C. § 401(a). "A pension plan within the meaning of section 401(a) is a plan established and

27

maintained by an employer primarily to provide systematically for the payment of definitely determinable benefits to his employees over a period of years, usually for life, after retirement." 26 C.F.R. § 1.401–1.

Consistent with its objectives for the 401(a) Plan, AMEC had selected annuities as the investment vehicle for its the Annuity Plan and prior to 2001 had invested all the Plan's assets in an annuity with American General Insurance Company. Second Am. Cross-Compl. ¶ 38. AMEC's purchase of the group variable annuity from Symetra was part of its decision to move the entirety of its 401(a) Plan's existing annuity investment to a new company. AMEC made the move to Symetra after it had received proposals from several competitors and met with Symetra representatives about investing the Plan's assets in annuities. More than that, AMEC acted through the General Board to authorize Harris to transfer the annuity business to Symetra. All of this to say, AMEC did not just purchase an annuity from Symetra. AMEC transferred the full balance of its 401(a) Plan, nearly $50 million in all, to Symetra with the specific intent to invest the assets in annuities.

Symetra also knew or should have known that AMEC intended for the Plan's obligations to be funded largely, if not entirely, with annuities. *Id.* ¶ 36 ("The 401(a) Plan was funded by annuity contracts, an acceptable form of funding for such plans."). Yet in the years that followed, Symetra processed orders from Dr. Harris for the transfer of millions of dollars of Plan assets out of Symetra annuities into other investments. *Id.* ¶ 104 (transferring $1.7 million to a "non-annuity investment" in Florida real estate); ¶ 109 (transferring $10 million to Financial Freedom Funds, LLC); ¶ 110 (transferring another $10.7 million to Financial Freedom Funds, the Motorskill Entities, and Deutsche Bank); *see also id.* ¶ 96 ("Despite knowing that the 401(a) Annuity Plan was a retirement vehicle for Plan Participants, and therefore, required to be invested in conservative, safe, low-risk annuities, Symetra repeatedly and intentionally ignored Harris's improper withdrawals and transfers

of Plan funds . . . .").[10]  The transfers did not just move a significant share of the Plan's total holdings.  Symetra facilitated a dramatic shift away from AMEC's stated objective of investing in conservative annuities toward higher risk investments in other asset classes outside of the Plan's Symetra account.

Symetra might still escape liability on AMEC's theory that Symetra and the Church had a fiduciary relationship.  As it has from the beginning of the MDL, Symetra counters that it had no duty to question Dr. Harris.  Under settled principles of trust law, "[a] third party is protected from liability in dealing with or assisting a trustee who is committing a breach of trust if the third party does so without knowledge or reason to know that the trustee is acting improperly." Restatement (Third) of Trusts § 108 (2012). But the crossclaim makes exactly that allegation: Symetra knew or should have known Harris's self-serving representations about his authority to act or his unilateral role in plan administration were utterly false when he made them.

According to AMEC, almost from the start, Symetra knew that Dr. Harris was not the trustee or at least not "the sole decision maker regarding the [Group Variable Annuity] account." Second Am. Cross-Compl. ¶ 81.  AMEC alleges Symetra repeatedly asked for written confirmation of Harris's authority as trustee, either in a plan document or some other writing.  Any time Symetra raised the issue, Harris would fraudulently execute a document, falsely identifying himself as a "Trustee" (*id*. ¶ 83) or the "Employer" (¶ 91) or the "Secretary" of the Church (¶ 92) or the "Plan Administrator" (¶ 93).  In each instance Harris's written statements were false when he made them to Symetra, and Symetra should have known as much.

---

[10]  Symetra also acquiesced to Dr. Harris' directives to increase the amount of administrative fees he received, which were paid out of the Plan's variable annuity account with Symetra.  The crossclaim does not specifically allege that Symetra breached a fiduciary duty by remitting the fees to Dr. Harris, and the parties have not addressed the issue as part of their briefing.

From these allegations, AMEC alleges that Symetra owed AMEC, as the employer-sponsor of the Plan, a duty to "safeguard the group retirement plans" invested with it. *Id.* ¶ 181. This meant Symetra owed AMEC the duty to put "processes in place to notify the Employer (here, AMEC) of potential misconduct of the Plan representative (here, Harris)." *Id.* But Symetra never developed or adopted such processes or had a system to "detect" or "prevent fraud or suspicious account activity." *Id.* ¶¶ 178–79. And Symetra never trained its employees on fraud detection or prevention. *Id.* ¶ 180. In sum, the Second Amended Cross-Complaint arguably alleges enough facts to show that Symetra did more than sell AMEC an annuity and that Symetra became a fiduciary of the Church under all of the circumstances described by AMEC.

The Court need not make a final determination of the existence of or the precise scope of Symetra's fiduciary duty to the Church. Just as it has in its earlier rulings, the Court continues to find that a final decision about whether Symetra was a fiduciary is highly fact-dependent and ultimately a question better suited for summary judgment, not a motion to dismiss for failure to state a claim. Returning once more to the ERISA context, "[f]iduciary status is a fact–intensive inquiry, making the resolution of that issue inappropriate for a motion to dismiss." *Wallace v. Int'l Paper Co.*, 509 F.Supp.3d 1045, 1052 (W.D. Tenn. 2020) (quoting *In re Regions Morgan Keegan ERISA Litig.*, 692 F. Supp. 2d 944 (W.D. Tenn. 2010)). Suffice it so say for purposes of Symetra's Motion to Dismiss, AMEC's Second Amended Cross-Complaint plausibly alleges enough facts to show that Symetra owed AMEC a fiduciary duty, at the very least to confirm Dr. Harris' authority to direct the disposition of Plan assets out of the Symetra group variable annuity account, which made up the entire corpus of the Church's 401(a) annuity plan for its retirees, and into non-annuity investments, when Symetra had reason to doubt Dr. Harris' authority to act. Just as with Plaintiffs' claim for breach of fiduciary duty, the question of whether Symetra had a fiduciary relationship with AMEC is

a close one.  This means Symetra's Motion to Dismiss is **DENIED** as to this issue but without prejudice to return to the question in a subsequent dispositive motion.[11]

## B. Negligence

Symetra also argues that it did not owe AMEC an ordinary duty of care.  One of the elements of AMEC's crossclaim for common law negligence is "a duty of care owed by the defendant to the plaintiff."  *Tumminello v. Father Ryan High Sch., Inc.*, 678 F. App'x 281, 286–87 (6th Cir. 2017) (citing *West v. E. Tenn. Pioneer Oil Co.*, 172 S.W.3d 545, 550 (Tenn. 2005)).  "In general, all persons have a duty 'to use reasonable care to refrain from conduct that will foreseeably cause injury to others.'"  *Biscan v. Brown*, 160 S.W.3d 462, 478 (Tenn. 2005) (quoting *Turner v. Jordan*, 957 S.W.3d 815, 818 (Tenn. 1997)).  "To determine whether a particular defendant owes a duty of care to a particular plaintiff," Tennessee courts "balance the foreseeability and gravity of the potential harm against the feasibility and availability of alternatives that would have prevented the harm." *Hale v. Ostrow*, 166 S.W.3d 713, 716–17 (Tenn. 2005).

There is, however, no "affirmative duty to act for the protection of another . . . *unless* the defendant 'stands in some special relationship to either the person who is the source of the danger, or to the person who is foreseeably at risk from the danger.'" *Biscan*, 160 S.W.3d at 478–79 (citing Restatement (Second) of Torts § 315 (1965)). The doctrine recognizes that as a matter of public policy, "certain socially recognized relations exist which constitute the basis for such legal duty." *Id.* at 479 (citing *Bradshaw*, 854 S.W.2d at 871). The question of duty is "entirely a question of law for

---

[11] The crossclaim separately alleges that Cross-Defendant Robert Eaton acted as an agent for Symetra, had a fiduciary relationship with AMEC, and breached his fiduciary duty to the Church. AMEC alleges that Symetra is vicariously liable for Eaton's breach of fiduciary duty. Am. Cross-Compl. ¶¶ 416–18.  Symetra does not seek the dismissal of this claim as part of its Motion to Dismiss. So the Court need not decide whether the crossclaim states such a claim.

the court." *Power & Tel. Supply Co., Inc. v. SunTrust Banks, Inc.*, 447 F.3d 923, 932 (6th Cir. 2006) (citing *Bradshaw*, 854 S.W.2d at 869).

AMEC's crossclaim plausibly alleges Symetra owed AMEC a duty of care. AMEC alleges "[i]t was foreseeable that an individual purporting to be the sole Trustee could mishandle and mismanage funds invested in a group retirement plan." Second Am. Cross-Compl. ¶ 462; *see also Biscan*, 160 S.W.3d at 480 ("Although all the balancing considerations are important, the foreseeability prong is paramount because foreseeability is the test of negligence.") (cleaned up). According to AMEC, Symetra "failed to establish and maintain controls to protect the Plan from unauthorized transfers and activity." Second Am. Cross-Compl. ¶ 462. Balanced against "the feasibility and availability of alternatives that would have prevented the harm," the risk and gravity of the potential harm creates an unreasonable risk. *Hale*, 166 S.W.3d at 716–17.

The Church actually goes further and alleges that to the extent Symetra did have internal controls, the company chose to ignore them "to ensure that Harris kept the remainder of the Plan's annuities with Symetra Life." Second Am. Cross-Compl. ¶ 463. The Court concludes then that Symetra owed AMEC an ordinary duty as a matter of Tennessee law. The Court therefore must **DENY** Symetra's Motion to Dismiss the crossclaims for breach of fiduciary duty and negligence.

## IV. Fraudulent Concealment (Count III)

Count III of the Second Amended Cross-Complaint alleges that Symetra fraudulently concealed certain information about the true state of the Plan's affairs. Under Tennessee law, the tort of fraudulent concealment, also known as "constructive fraud," occurs when "a party who has a duty to disclose a known fact or condition fails to do so, and another party reasonably relies upon the resulting misrepresentation, thereby suffering injury." *Roopchan v. ADT Sec. Sys., Inc.*, 781 F. Supp. 2d 636, 650 (E.D. Tenn. 2011) (quoting *Odom v. Oliver,* 310 S.W.3d 344, 349–50 (Tenn. Ct. App.

2009)); *see also Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 571 (6th Cir. 2003) (quoting *Chrisman v. Hill Home Dev., Inc.,* 978 S.W.2d 535, 538–39 (Tenn. 1998)).

To establish its crossclaim for fraudulent concealment, AMEC must show that "(1) [Symetra] concealed or suppressed a material fact, (2) that [Symetra] had a duty to disclose that fact to [AMEC], (3) that [Symetra] intentionally concealed or suppressed that fact with the intent to deceive [AMEC], (4) that [AMEC was] unaware of the fact and would have acted differently if [the Church] had known about the concealed fact, and (5) that [AMEC was] damaged as a result of the concealment or suppression of the fact." *Saltire Indus., Inc. v. Waller, Lansden, Dortch & Davis, PLLC*, 491 F.3d 522, 527 (6th Cir. 2007) (citing *Justice v. Anderson Cnty.*, 955 S.W.2d 613, 616 (Tenn. Ct. App. 1997)).

Symetra argues that AMEC's crossclaim fails on the second element, that Symetra had a duty to disclose information to AMEC (as opposed to the Plan). But as the Court has just held, for purposes of Symetra's Motion to Dismiss, the crossclaim plausibly (if not narrowly) alleges a fiduciary relationship between Symetra and AMEC. A fiduciary duty imposes the highest standard of care under the law. *Overstreet v. TRW Com. Steering Div.*, 256 S.W.3d 626, 642 (Tenn. 2008) (citation omitted). "Under Tennessee law, the duty to disclose arises in only three scenarios" one of which is "[w]here there is a previous definite fiduciary relation between the parties." *Saltire Indus.*, 491 F.3d at 528. The full scope of Symetra's duty to disclose the material information about the nature of Dr. Harris's improper activities and, relatedly, whether AMEC has a fraudulent concealment claim of its own are questions better suited for summary judgment. The Court therefore **DENIES** Symetra's Motion to Dismiss AMEC's crossclaim for fraudulent concealment.

**V. Negligent Misrepresentation (Count VII)**

33

Count VII of the Second Amended Cross-Complaint would hold Symetra liable for the tort of negligent misrepresentation. Tennessee law recognizes "the common-law tort of negligent misrepresentation and [has] adopted the Restatement (Second) of Torts § 552 (1977) as the guiding principle with regard to these claims." *Hodge v. Craig*, 382 S.W.3d 325, 344–45 (Tenn. 2012) (citing *Bethlehem Steel Corp. v. Ernst & Whinney*, 822 S.W.2d 592, 595 (Tenn. 1991)). In order to prove negligent misrepresentation, a plaintiff must show the following: (1) the defendant was acting, in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary interest; (2) the defendant supplied faulty information meant to guide others in their business transaction; (3) the defendant failed to exercise reasonable care in obtaining or communicating the information; and (4) the defendant justifiably relied on the information. *See* Restatement (Second) of Torts § 552; *see also John Martin Co. v. Morese/Diesel, Inc.* 819 S.W.2d 428, 431 (Tenn. 1991).

AMEC's crossclaim for negligent misrepresentation fails in this case for failure to allege that Symetra supplied information to the Church meant to guide AMEC in its business transactions. The Second Amended Cross-Complaint makes allegations about Symetra assisting Dr. Harris in his 2008 campaign for re-election as the Executive Director of the AMEC Department of Retirement Services. According to AMEC, Symetra helped Harris draft his campaign materials to describe the Plan's focus "on fixed interest rate investments" in "keeping with the plan's conservative investment objectives of preserving capital and eliminating market risk." Second Am. Cross-Compl. ¶ 188. In fact, Symetra knew Dr. Harris had just moved $10 million in Plan assets out of Symetra annuities.

But as the crossclaim alleges, Symetra communicated no information about Dr. Harris' departure from the Plan's conservative investment philosophy to AMEC itself. The supposed misrepresentations made their way into campaign literature disseminated by Dr. Harris to church

34

members at the 2008 General Conference.  Without fact allegations to establish that Symetra directly communicated information to the Church (or a specific church leader or board), the Second Amended Cross-Complaint also fails to allege how the denomination justifiably relied on the information.   The Court therefore **GRANTS** Symetra's Motion to Dismiss the negligent misrepresentation crossclaim.

## VI. Civil Conspiracy (Counts IV–VI)

Counts IV through VI of the Amended Cross-Complaint allege that certain Defendants, including Symetra, are liable for civil conspiracy to commit the following torts: conversion (Count IV), intentional misrepresentation (Count V), and constructive fraud (Count VI).  To plead civil conspiracy under Tennessee law, Plaintiffs must establish that (1) two or more persons had a common design; (2) the common design sought to accomplish an unlawful purpose; (3) those individuals engaged in an overt act in furtherance of the conspiracy; and (4) Plaintiffs suffered injury as a result. *See Morrow v. Kroger Ltd. P'ship I*, No. 2:24-cv-02564-SHL-cgc, 2025 WL 367404, at *5 (W.D. Tenn. Jan. 29, 2025) (citing *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006)).  Conspiracy is not an independent tort under Tennessee law. *Campbell v. BNSF Ry. Co.*, 600 F.3d 667, 677 (6th Cir. 2010) (citing *Greene v. Brown & Williamson Tobacco Corp.,* 72 F. Supp. 2d 882, 887 (W.D. Tenn. 1999)).  Rather, civil conspiracy is "a means of extending, to a tortfeasor's co-conspirators, liability for the tortfeasor's underlying tort." *Wachter, Inc. v. Cabling Innovations, LLC*, 387 F. Supp. 3d 830, 849 (M.D. Tenn. 2019).

Symetra seeks the dismissal of the civil conspiracy crossclaims for AMEC's failure to allege the existence of an agreement between Symetra and Dr. Harris.  The Tennessee Supreme Court has defined the tort of conspiracy as "an agreement between two or more persons to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means."

35

*First Cmty. Bank, N.A. v. First Tenn. Bank, N.A.*, 489 S.W.3d 369, 395 (Tenn. 2015) (citations omitted). There is no requirement that the conspiracy rest on a formal agreement. *Chenault v. Walker*, 36 S.W.3d 45, 52 (Tenn. 2001) (quoting *Dale v. Thomas H. Temple Co.*, 208 S.W. 2d 344, 353 (Tenn. 1948)). A conspiracy may proceed from only a tacit understanding, meaning "it is not essential that each conspirator have knowledge of the details of the conspiracy." *Id*. "Each conspirator must have the intent to accomplish this common purpose, and each must know of the other's intent." *First Cmty. Bank*, 489 S.W.3d at 396 (citation omitted). It is not necessary, however, "that each conspirator have knowledge of the details of the conspiracy." *Id*. (citation omitted).

The Second Amended Cross-Complaint is replete with allegations about the conspiracy and Symetra's involvement. In fact, the very first allegation in the pleading suggests that the gravamen of AMEC's crossclaim is a conspiracy: "In September 2021, AMEC discovered that Harris, former Executive Director of the AMEC Department of Retirement Services, engaged in a conspiracy with several individuals and/or entities to embezzle funds and defraud AMEC, the sponsor of the African Methodist Episcopal Church Ministerial Retirement Annuity Plan ("the Annuity Plan") . . . ." Second Am. Cross-Compl. ¶ 1.

It is true AMEC does not allege any direct evidence of an explicit agreement between Dr. Harris, Symetra, and the other alleged conspirators. Under Tennessee law, the proof necessary to show a civil conspiracy is "rarely" direct. *First Cmty. Bank*, 489 S.W.3d at 396. Instead, a conspiracy is more often proved through circumstantial evidence "and inferences drawn from the evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances." *Id*. (citation omitted). The circumstances described in the crossclaim plausibly imply the existence of an agreement involving Symetra. AMEC has identified the participants in the conspiracy and the aims of their agreement: Dr. Harris and Eaton agreed to move $49 million in Plan

36

assets to Symetra where they began to transfer money to other self-serving or prohibited investments while Symetra paid Eaton commissions from the Plan's purchase of Symetra annuities and Harris inflated administrative fees "to induce him to keep Plan assets in Symetra annuities." Second Am. Cross Compl. ¶¶ 318–22 (alleging a civil conspiracy for the conversion of Plan funds); 346 (alleging a civil conspiracy to commit intentional misrepresentation); 365 & 370 (alleging a civil conspiracy to commit constructive fraud). AMEC has not simply recited a formula or pleaded the bare elements of a conspiracy claim. The Amended Cross-Complaint alleges, and in some detail, "the nature of the acts [of the conspirators], the relationship of the parties, the interests of the conspirators, and other circumstances." *First Cmty. Bank*, 489 S.W.3d at 396. This is enough to state the claim with the requisite particularity, something "more than a suspicion or conjecture that a conspiracy exists." *Id*.

Symetra argues that the Church's civil conspiracy pleading is incompatible with the Supreme Court's holding in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). In Symetra's view, *Twombly* requires something more than the allegation of a tacit agreement, particularly where there is a legal and legitimate explanation for the actions of the alleged co-conspirators. The issue in *Twombly* was "whether a § 1 [of the Sherman Act, 15 U.S.C. § 1] complaint can survive a motion to dismiss when it alleges that major telecommunications providers engaged in certain parallel conduct unfavorable to competition, absent some factual context suggesting agreement, as distinct from identical, independent action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 548–49 (2007). The *Twombly* plaintiffs alleged that regional telephone companies "(variously called 'Regional Bell Operating Companies,' 'Baby Bells,' or 'Incumbent Local Exchange Carriers' (ILECs))" had engaged in "parallel conduct" in violation of federal antitrust law. *Twombly*, 550 U.S. at 549. The Telecommunications Act of 1996 required each ILECs "to share its network with competitors" or

37

"competitive local exchange carriers (CLECs)." *Id.* at 549 (citing *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 402 (2004)).

The *Twombly* plaintiffs alleged that the phones companies engaged in "parallel conduct" to inhibit this new competition, conduct which took two forms: (1) adopting unfair agreements and pricing with their new competitors (the CLECs) to limit the quality and the amount of their access to the phone companies' networks; and (2) the phone companies' implied agreements not to engage in competition among themselves, which was supported only by the allegation that the phone companies did not pursue expansion outside of its own regional territories. *Id.* at 550–51. The Supreme Court held that "an allegation of parallel conduct and a bare assertion of conspiracy" did not state the claim and that "a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Id.* at 556–57.

The Court respectfully finds that *Twombly* is not inconsistent with its holding here. First and foremost, *Twombly* involved an alleged conspiracy under the Sherman Act. As Symetra sees it, *Twombly*'s "core holding" was "that allegations that are equally consistent with either an agreement or independent conduct is not sufficient to nudge an allegation of an agreement across the line from conceivable to plausible." Symetra's Mem. in Support 24 (cleaned up). Symetra's point about *Twombly*'s core holding is likely true, at least as far antitrust conspiracies go. Even before *Twombly*, proving a §1 antitrust conspiracy required "evidence that tends to exclude the possibility that the [conspirators] were acting independently." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)); *see also Superior Production P'ship v. Gordon Auto Body Parts Co., Ltd.*, 784 F.3d 311, 319 (6th Cir. 2015) ("Where, as here, the plaintiff relies on circumstantial evidence of illicit collusion, that evidence must "tend[ ] to exclude the possibility that the alleged conspirators acted

38

independently"—which assumes that the inferences of conspiracy from that evidence are plausible as a matter of economic theory.").

But there are no antitrust violations alleged here, much less the existence of an antitrust conspiracy. AMEC's civil conspiracy crossclaims all implicate Tennessee common law. Other than *Twombly*, Symetra has cited no authority for its argument that pleading a civil conspiracy under Tennessee common law requires fact allegations to exclude the possibility of independent action. And unlike the *Twombly* plaintiffs, AMEC alleges more than mere "parallel conduct." AMEC cites an ongoing course of dealing and concerted action among the Cross-Defendants by which each member of the alleged conspiracy received mutual benefit at AMEC's expense. This is not a case where the conspiracy allegation rests only on a group of parties engaging in independent action.

Symetra also argues that the appearance of a possible quid pro quo is insufficient to allege a conspiracy. Symetra alludes to the Court's statement in an earlier order denying its motion to dismiss a similar civil conspiracy claim alleged by Plaintiffs. Order Granting in Part, Denying in Part Symetra's Mot. to Dismiss 37, Apr. 14, 2025 (ECF No. 785) ("And Plaintiffs have described the general features of what appears to be a quid pro quo between Dr. Harris, Robert Eaton, and Symetra . . . ."). Symetra contends that a quid pro quo does not necessarily imply a conspiracy. Symetra analogizes to a politician receiving a campaign contribution from a lobbyist and then supporting a legislative initiative favorable to the lobbyist. According to Symetra, the course of dealing between the politician and the lobbyist is "not enough to establish a quid pro quo for purposes of a bribery claim" without something more to suggest an improper purpose.

The Court does not find the analogy persuasive. "The gist of the offense of bribery is the conferring of a benefit upon a public servant as consideration for violation of one of his or her duties." 11 C.J.S. Bribery § 3. As the Court has already observed, a civil conspiracy is not even an

39

independent tort but rather "a means of extending, to a tortfeasor's co-conspirators, liability for the tortfeasor's underlying tort." *Wachter*, 387 F. Supp. 3d at 849. In other words, civil conspiracy is an agreement between two or more parties to commit a tort against a third party, here AMEC. The two concepts, bribery and civil conspiracy, involve totally distinguishable forms of conduct.

Symetra makes one final argument for the dismissal of AMEC's civil conspiracy claims. Symetra argues Dr. Harris was at all times acting within the scope of his employment with AMEC and as an agent of the Church. AMEC's allegation that its own employee conspired against it is tantamount to an allegation that AMEC conspired with itself. But as the Court's discussion has already shown, AMEC alleges that Harris acted outside the scope of his authority (and that Symetra knew or should have known as much) in a way to breach the very duties he owed to the Church. The civil conspiracy allegations, viewed in a light most favorable to AMEC, show that Harris, Eaton, and Symetra had a tacit agreement to further Harris' and Eaton's scheme of diverting the Plan's assets. The tacit agreement and the various torts by which the alleged conspirators accomplished the diversion add up to a civil conspiracy that harmed AMEC. Symetra's argument on this point is not convincing. For all of these reasons, Symetra's Motion to Dismiss the civil conspiracy crossclaims is **DENIED**.

## VII. Aiding and Abetting Breach of Fiduciary Duty (Count X)

Symetra finally seeks the dismissal of AMEC's crossclaim for aiding and abetting breach of fiduciary duty. Under Tennessee law, a plaintiff may hold a defendant liable for a third-party's breach of duty if "the defendant knew that his companions' conduct constituted a breach of duty, and that he gave substantial assistance or encouragement to them in their acts." *PNC Multifamily Cap. Inst. Fund XXVI Ltd. P'ship v. Bluff City Cmty. Devel. Corp.*, 387 S.W.3d 525, 552 (Tenn. Ct. App. 2012) (quoting *Carr v. United Parcel Serv.*, 955 S.W.2d 832, 836 (Tenn. 1997)). The Tennessee

40

Court of Appeals has cited the Restatement of Torts § 876 (1934 & 2004 Supp.) with approval. *Id*.

Restatement of Torts § 876 provides as follows:

> For harm resulting to a third person from the tortious conduct of another, a person is liable if he:
>
> (a) orders or induces such conduct, knowing of the conditions under which the act is done or intending the consequences which ensue, or
>
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
>
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement of Torts § 876 (1934 & 2004 Supp.)  At the pleadings stage, the tort of aiding and abetting requires an allegation of "substantial assistance on the part of the alleged tortfeaser [sic]." *PNC Multifamily*, 387 S.W.3d at 552.

The Court holds that the Amended Cross-Complaint states a plausible claim against Symetra for aiding and abetting Dr. Harris's and Eaton's breaches of fiduciary duty.  AMEC's crossclaim is almost verbatim to the claim for aiding and abetting breach of fiduciary duty alleged by Plaintiffs. Like Plaintiffs, AMEC has alleged that Symetra had actual knowledge of Dr. Harris's and Eaton's separate breaches of fiduciary duty, including the following specific breaches: "a long-term pattern of financial mismanagement, embezzlement, fraud, and misrepresentations concerning the Plan"; "a pattern of self-dealing with Plan assets"; "making high-risk and speculative investments with Plan assets"; and "allowing the Plan to earn returns that were far below the average rate of return for pension Plans." Am. Cross-Compl. ¶ 435(a)-(d).

The Court has already cited some of the allegations from the pleadings which would go to show how Symetra had actual knowledge of these breaches, for instance, Symetra's handling of Dr.

41

Harris's withdrawal of $10 million in Plan assets to be deposited with a company owned by Eaton and the large administrative fees paid to Dr. Harris which amounted to millions of dollars in Plan assets over time. There are also allegations to show that Symetra paid Eaton large commissions at the same time Eaton had acted as an agent for the Plan and at the later time when Eaton had an employment relationship with a Motorskill company. *Id.* ¶ 113. At the pleadings stage, these facts plausibly show that Symetra had actual knowledge of the facts that constituted breaches of fiduciary duty by Dr. Harris and Eaton and provided one or both with substantial assistance in their actions.

Symetra once again argues that AMEC's aiding-and-abetting crossclaim is just as consistent with Symetra properly and lawfully following Dr. Harris' instructions to make certain transfers. But Symetra's argument fails to accept the truth of the crossclaims' allegations and give AMEC the benefit of the reasonable inferences to be drawn from the well-pleaded facts. For purposes of Symetra's Motion to Dismiss, Symetra's decision to acquiesce in Dr. Harris's request for the payment of larger administrative fees and its decision to put aside the in-house concerns some Symetra employees had voiced with disbursing $10 million in Plan assets to a company owned by Eaton and then disbursed the money anyway easily satisfy the "substantial assistance" element. And those are just specific instances described in the Second Amended Cross-Complaint. Therefore, Symetra's Motion to Dismiss is **DENIED** as to AMEC's aiding and abetting crossclaim.

## CONCLUSION

The Court holds that AMEC has plausibly alleged damages and causation to support crossclaims of its own against Symetra. The Court further holds that AMEC's Second Amended Cross-Complaint fails to state a plausible crossclaim for negligent misrepresentation. However, the Church has alleged plausible claims for breach of fiduciary duty, negligence, fraudulent

42

concealment, civil conspiracy, and aiding and abetting breach of fiduciary duty. Therefore,

Symetra's Motion to Dismiss is **GRANTED in part, DENIED in part**.

      **IT IS SO ORDERED**.

                                       **s/ S. Thomas Anderson**
                                       S. THOMAS ANDERSON
                                       UNITED STATES DISTRICT JUDGE

                                       Date:  September 23, 2025.