**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: AME CHURCH EMPLOYEE | ) | **Lead Case No.** |
| RETIREMENT FUND LITIGATION, | ) | **1:22–md–03035–STA–jay** |
| | ) | |
| | ) | **ALL CASES** |

---

**ORDER GRANTING IN PART, DENYING IN PART PLAINTIFFS' RENEWED
MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL**

---

Before the Court is Plaintiffs' Renewed Motion for Class Certification  (ECF No. 981) filed October 3, 2025.  Plaintiffs seek Rule 23 certification for all of their class action claims against Defendants.  Only Defendant Symetra Life Insurance Company ("Symetra") has responded in opposition.  Plaintiffs have filed a reply brief in further support of the Motion.  For the reasons set forth below, the Motion is **GRANTED IN PART, DENIED IN PART**.

## BACKGROUND

This multidistrict litigation concerns losses to a non-ERISA retirement plan established by the African Methodist Episcopal Church for its clergy and employees. Plaintiffs are current or retired clergy and other staff of the church and have alleged a number of claims under Tennessee law against the denomination, church officials, third-party service providers to the plan, and other alleged tortfeasors. In early 2022, Plaintiffs filed six civil actions against the Church and others across several United States District Courts: *Rev. Pearce Ewing v. African Methodist Episcopal Church et al.*, No. 2:22–cv–02136–JTF–atc (W.D. Tenn. Mar. 4, 2022); *Charles R. Jackson v. Newport Group, Inc. et al.*, No. 2:22–cv–02174–JTF–atc (W.D. Tenn. Mar. 22, 2022); *Rev. Cedric V. Alexander  v. Rev. Dr. Jerome Harris et al.*, No. 8:22–cv–00707–PJM (D. Md. Mar. 22, 2022); *Phillip Russ, IV et al. v. Newport Group, Inc.*, No. 3:22–cv–00375–BJD–LLL (M.D. Fla. Mar. 31, 2022); *Rev. Derrell Wade et al. v. Newport Group et al.*, No. 3:22–cv–00179–DN (E.D. Va. Apr.

1, 2022); *Rev. A. Offord Carmichael, Jr. et al. v. Rev. Dr. Jerome Harris et al.*, No. 3:22–cv–

00386–UA–JLW (M.D.N.C. May 19, 2022). Plaintiff Rev. Pearce Ewing subsequently moved

under 28 U.S.C. § 1407 to consolidate all proceedings in the Western District of Tennessee.

On June 2, 2022, the Panel on Multidistrict Litigation transferred the civil actions to this

Court, finding that consolidation would "serve the convenience of the parties and witnesses and

promote the just and efficient conduct of this litigation." MDL Transfer Order 1, June 2, 2022

(ECF No. 1). The Panel further found that consolidation in this District was appropriate since the

AMEC Department of Retirement Services had its principal place of business in this District and

one of the Defendants named in the initial lawsuits, Rev. Dr. Jerome V. Harris ("Dr. Harris"),

resided in the Western District of Tennessee. *Id*. at 2.

On June 22, 2022, the Court entered a Practice and Procedure order to govern all further

proceedings. *See* Practice & Proc. Order, June 22, 2022 (ECF No. 8). The Court held an initial

case management conference with counsel for the parties on August 4, 2022, and approved the

case management deadlines proposed by the parties.  On August 25, 2022, the Court entered a case

management order (ECF No. 78), setting forth the deadlines discussed at the initial conference.

On August 21, 2022, Plaintiffs filed a Consolidated Amended Complaint – Class Action (ECF No.

74), setting forth their allegations and causes of action. Plaintiff then amended their pleadings in a

Second Consolidated Amended Complaint – Class Action (ECF No. 493) ("the Second Amended

Complaint") on August 29, 2024.  The Second Amended Complaint contains the current version

of Plaintiffs' allegations.

Plaintiffs allege that Dr. Harris served as the executive director of the AMEC Department

of Retirement Services.  In his role as the executive director of the Church's retirement plan, Dr.

Harris had access to the assets held by the African Methodist Episcopal Church Ministerial

2

Retirement Annuity Plan ("the Plan"). Together with his business associate Defendant Robert Eaton, Dr. Harris and Eaton engaged in a long-running scheme to misappropriate the assets of the Plan for their own benefit. Plaintiffs' Second Amended Complaint focuses on the role of Newport Group ("Newport") and Symetra in facilitating the scheme, allegedly as Harris and Eaton's co-conspirators. Second Am. Compl. ¶¶ 3–4. Plaintiffs allege that Dr. Harris and Eaton elected to move the plan's investment business to Symetra in 2001 and to keep the plan's account with Symetra for the next 20 years, largely "because they believed Symetra was more willing to allow Dr. Harris and Eaton to enrich themselves with commissions, kickbacks, and prohibited transactions." *Id.* ¶ 239.

The alleged prohibited transactions took the form of loans to or capital investments in companies owned or controlled by Dr. Harris and Eaton as well as significant investments in a series of private equity funds known as the Motorskill entities. Plaintiffs have named these businesses as Defendants in the MDL. Symetra also acquiesced to Dr. Harris' demand for excessive and unauthorized plan administrative fees. Between 2016 and 2019 alone, Symetra paid Dr. Harris $3,500,300 in administrative fees. *Id.* ¶ 262. And Plaintiffs fault the Church itself for a lack of oversight that permitted the conspirators to carry out their plan. *Id.* ¶ 5. According to Plaintiffs, Defendants' conduct siphoned away roughly $90 million in Plan assets. *Id.* ¶ 4, 232. Had the Plan been prudently invested in a diversified mix of assets, the Plan would have been worth as much as $272 million by the end of Dr. Harris' tenure in June 2021, assuming a reasonable rate of return over almost two decades. *Id.*

The Second Amended Complaint alleges three types of claims: the individual claims of ten named Plaintiffs, derivative claims brought on behalf of the Plan, and class action claims representing a class of plan participants. The ten individual Plaintiffs named in the Second

Amended Complaint are Rev. Pearce Ewing; Rev. Charles R. Jackson; Presiding Elder Cedric V. Alexander; Rev. Derrell Wade; Rev. Reuben J. Boyd; Presiding Elder Phillip Russ, IV; Lynette Glenn as court-appointed guardian of her father the Rev. Marcius King; Rev. Matthew Ewing; Rev. A. Offord Carmichael, Jr.[1]; and Rev. Diane Conley.  The named Plaintiffs also assert claims in a derivative capacity to represent the Plan.[2]  And Plaintiffs bring claims on behalf of a class of individuals defined as

> All persons residing in the United States who are participants in the African Methodist Episcopal Church Ministerial Retirement Annuity Plan, all persons residing in the United States who are beneficiaries entitled to benefits as of January 1, 2021, under the African Methodist Episcopal Church Ministerial Retirement Annuity Plan.

*Id.* ¶ 511.[3]

The Second Amended Complaint names 20 parties as Defendants.  Plaintiffs have sued Daniel Parrish of Parrish Law, LLC, in his capacity as Administrator Ad Litem of the Estate of Jerome V. Harris, deceased ("Estate of Dr. Harris")[4] and Dr. Harris' widow, Sandra Harris. Plaintiffs have also sued Robert Eaton, who allegedly acted in concert with Dr. Harris as part of a scheme to misappropriate the Plan's funds, and Eaton's company Day and Night Solar, LLC.  The

---

[1] On October 11, 2024, Plaintiffs filed a suggestion of death (ECF No. 551), stating that Rev. Carmichael had passed away on September 10, 2024.

[2] The Second Amended Complaint named the Plan as a nominal Defendant, that is, without actually stating any cause of action against the Plan.

[3] The Second Amended Complaint excludes from the Class "[a]ny Defendant employees who have responsibility or involvement in the administration of the Plan, or who are subsequently determined to be fiduciaries of the Plan, and their beneficiaries . . . ." (Second Am. Compl. ¶ 511.)

[4] According to the Second Amended Complaint, Dr. Harris passed away on May 8, 2024. At the time of his death, Dr. Harris had already been named as a defendant in multiple complaints consolidated in this MDL, including the First Amended Consolidated Complaint.  The Estate of Dr. Harris has never filed an answer to the Second Amended Complaint.

4

Second Amended Complaint also names as Defendants a group of business organizations owned or controlled by Dr. Harris and/or Eaton to further the alleged scheme: Financial Freedom Funds, LLC; Financial Freedom Group, Inc.; Financial Technologies, LLC; and Trinity Financial Corporation. Plaintiffs allege claims against AMEC and certain AMEC-affiliated organizations and individuals: the AMEC Department of Retirement Services; the AMEC General Board; the AMEC Council of Bishops; Bishop Samuel L. Green, Sr.; and Bishop James Davis (collectively "the AMEC Defendants").[5] Plaintiffs also name as Defendants third-party service providers to the Plan: Newport, Symetra, and the accounting firm of Rodney Brown and Company. Finally, the Second Amended Complaint names as Defendants some of the venture capital funds in which Harris and Eaton allegedly invested Plan assets, though none of the entities have ever filed a responsive pleading to the Second Amended Complaint or taken any action to defend themselves in this matter: Motorskill Ventures, Inc.; Motorskill Ventures I, L.P.; and Motorskill Asia Ventures 1, L.P. (collectively "the Motorskill entities").[6]

Discovery commenced September 9, 2022, and closed on January 22, 2025. Two

---

[5] The Second Amended Complaint separately names the "African Methodist Episcopal Church" as a Defendant out of an "abundance of caution." Second Am. Compl. ¶ 36. "Plaintiffs do not concede that there is a distinction between these two alleged entities" AMEC, Inc. and the "African Methodist Episcopal Church." The Second Amended Complaint refers to both entities collectively as "AMEC."

[6] Plaintiffs name Doe Corporations 1-10 and John Does 1-10 as Defendants. The Second Amended Complaint alleges that the Doe Corporations are affiliates or subsidiaries of Defendants that may be responsible for the conduct alleged and that such parties are named in a "Doe Corporations" capacity pending discovery in the case. Plaintiffs allege that the John Does are affiliates or subsidiaries of Defendants that may be responsible for the conduct alleged herein or who may have exercised fiduciary authority with respect to the plan during the class period, all of whom are currently unknown to Plaintiffs and that such parties are named in a "John Doe" capacity pending discovery in this case. To date, Plaintiffs have not amended their pleadings to identify any Doe Corporation or John Doe further.

developments narrowed the scope of the dispute prior to the close of discovery. First, Plaintiffs reached settlements with the AMEC Defendants and Newport. On November 27, 2024, Plaintiffs and the AMEC Defendants finalized a settlement agreement and release and on December 13, 2024, filed a motion for preliminary approval of the settlement (ECF No. 627). Then, at a status conference on February 4, 2025, Plaintiffs, the AMEC Defendants, and Newport announced they had reached a settlement in principle on the courthouse steps. The Court later gave preliminary approval to the settlements and then final approval after holding a final fairness hearing on June 26, 2025.

The other development in the case involved the Court's ruling on Symetra's motion to dismiss the allegations against it in Plaintiffs' Second Amended Complaint. In an order entered on April 14, 2025, the Court granted in part and denied in part Symetra's Rule 12(b)(6) motion, holding that Plaintiffs had failed to state a plausible claim for violation of the Tennessee Uniform Trust Code against Symetra. The Court did hold that the Second Amended Complaint stated its claims against Symetra for fraudulent concealment, civil conspiracy, and aiding and abetting breach of fiduciary duty. (Symetra did not seek the dismissal of Plaintiffs' claim for breach of fiduciary duty or negligence.)

Following Plaintiffs' settlements with some parties and the dismissal of one of the claims against Symetra, the following causes of action on behalf of Plaintiffs individually, derivatively on behalf of the plan, and on behalf of the class remain against the following Defendants:

> • breach of fiduciary duty against the Estate of Dr. Harris, Robert Eaton, and Symetra (Count 1);

> • violation of the Tennessee Uniform Trust Code for breach of trust and misappropriation of trust funds against the Estate of Dr. Harris and Eaton (Count 2);

> • negligence against the Estate of Dr. Harris and Symetra (Count 3);

• conversion against the Estate of Dr. Harris; Sandra Harris; Eaton; Financial Freedom Funds, LLC; Financial Freedom Group, Inc.; Trinity Financial Consultants, LLC; Financial Technologies, LLC; and Day & Night Solar (Count 4);

• fraudulent concealment against the Estate of Dr. Harris, Eaton, and Symetra (Count 5);

• fraudulent misrepresentation against the Estate of Dr. Harris (Count 6);

• civil conspiracy against the Estate of Dr. Harris; Sandra Harris; Eaton; Symetra; Financial Freedom Funds, LLC; Day & Night Solar; Trinity Financial; Financial Freedom Group, Inc.; Financial Technologies, LLC; and the Motorskill Entities (Count 8);[7]

• aiding and abetting breach of fiduciary duty against Symetra; Financial Freedom Funds, LLC; Financial Freedom Group, Inc.; Financial Technologies, LLC; Day & Night Solar; Trinity Financial Consultants, LLC; the Motorskill Entities; and Sandra Harris (Count 9); and

• professional negligence against Rodney Brown (Count 10).[8]

The parties are now in the process of briefing Rule 56 motions for summary judgment as to several of Plaintiffs' claims against the remaining Defendants.

Plaintiffs initially filed a class certification motion (ECF No. 805) on May 7, 2025. Symetra was the only Defendant to oppose that request. After the parties had fully briefed the initial motion, the United States Court of Appeals for the Sixth Circuit issued its *en banc* decision in *Speerly v. General Motors*, 143 F.4th 306 (6th Cir. 2025), a decision the Court discusses in more detail below. Although Plaintiffs and Symetra submitted supplemental briefing based on *Speerly* and ably argued how *Speerly* had impacted the class certification question, the Court ultimately

---

[7] Count 7 of the Second Amended Complaint was Plaintiffs' breach of contract claim against AMEC.

[8] According to the Motion for Class Certification, Plaintiffs intend to voluntarily dismiss their professional negligence claim against Rodney Brown for lack of proof. Plaintiffs do not seek class certification of this claim.

decided that a completely fresh look at class certification was preferable. The Court therefore denied Plaintiff's initial request for class certification without prejudice. Plaintiffs have now filed a Renewed Motion for Class Certification and Appointment of Class Counsel. Plaintiffs seek class certification of 8 of their remaining claims against the remaining Defendants.

### STANDARD OF REVIEW

Litigation by "class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 850 (6th Cir. 2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 346, 131 S. Ct. 2541, 180 L.Ed.2d 374 (2011)). Federal Rule of Civil Procedure 23 "imposes stringent requirements before permitting the aggregation of so many claims by so many people in one court." *Speerly v. Gen. Motors, LLC*, 143 F.4th 306, 315–16 (6th Cir. 2025) (*en banc*). In that way Rule 23's requirements serve "as a gatekeeper to class certification." *In Re Ford Motor Co.*, 86 F.4th 723, 725 (6th Cir. 2023).

Rule 23 directs courts to determine whether to certify a case as a class action "[a]t an early practicable time after a person sues or is sued as a class representative." Fed. R. Civ. P. 23(c)(1)(A). A class certification order "must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g)." Fed. R. Civ. P. 23(c)(1)(B). Plaintiffs seeking class certification must satisfy the requirements of Rule 23(a) and one of the legal tests listed in Rule 23(b). Rule 23(a) allows one or more members of a class to bring suit as representatives on behalf of all members of the class only when four prerequisites are met.

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *see also In Re Ford Motor*, 86 F.4th at 726 (describing the four requirements under Rule 23(a) as "threshold safeguards"). "These four requirements – numerosity, commonality, typicality, and adequate representation – serve to limit class claims to those that are fairly encompassed within the claims of the named plaintiffs because class representatives must share the same interests and injury as the class members." *In re Whirlpool Corp.*, 722 F.3d at 850 (citing *Dukes*, 564 U.S. at 346, 131 S. Ct. 2541). A plaintiff seeking to represent a class must adduce "significant" evidence to meet all four criteria "where they are contested." *In Re Ford Motor*, 86 F.4th at 726 (citing *Dukes*, 564 U.S. at 353, 131 S. Ct. 2541). The role of the district court is to conduct a "rigorous analysis" to show that "all four Rule 23(a) prerequisites are met." *Davis v. Cintas Corp.*, 717 F.3d 476, 484 (6th Cir. 2013) (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161, 102 S. Ct. 2364, 72 L.Ed.2d 740 (1982)).

Once a plaintiff has offered significant proof to meet the tests under Rule 23(a), the plaintiff must then satisfy one of the tests under Rule 23(b). Plaintiffs seek certification here under Rule 23(b)(3), which states, "[a] class action may be maintained if Rule 23(a) is satisfied and if

> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
>> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).

Even when Rule 23(a) and 23(b)'s tests are met, a court has the discretion to certify the class only as to particular issues and/or divide the class into subclasses "that are each treated as a

class under this rule." Fed. R. Civ. P. 23(c)(4) & (5).

Where as here plaintiffs seek class certification under Rule 23(b)(3), the court certifying the class must direct notice to the members of the class using "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). District courts are authorized to direct notice through a variety of methods, including U.S. mail or "electronic means." *Id*. Whatever method is used, Rule 23(c) requires the notice to "clearly and concisely state in plain, easily understood language":

> (i) the nature of the action;
> (ii) the definition of the class certified;
> (iii) the class claims, issues, or defenses;
> (iv) that a class member may enter an appearance through an attorney if the member so desires;
> (v) that the court will exclude from the class any member who requests exclusion;
> (vi) the time and manner for requesting exclusion; and
> (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

*Id*. "The direction that class-certification notice be couched in plain, easily understood language is a reminder of the need to work unremittingly at the difficult task of communicating with class members." Fed. R. Civ. P. 23(c), Adv. Committee Notes to 2003 Am.

At the class certification stage, a court must also appoint class counsel. Fed. R. Civ. P. 23(g). In making the appointment, the court is required to consider

> (i) the work counsel has done in identifying or investigating potential claims in the action;
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
> (iii) counsel's knowledge of the applicable law; and
> (iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A). Additionally, it is permissible for the court to consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."

Fed. R. Civ. P. 23(g)(1)(B). Rule 23(g)'s "framework" is designed to "afford[] substantial flexibility" to the court in making its decision to appoint counsel.  Fed. R. Civ. P. 23(g), Adv. Committee Notes to 2003 Am.

## CHOICE OF LAW

Each of Plaintiffs' causes of action sound in tort, meaning the Court must decide which state's substantive law applies. *Speerly*, 143 F.4th at 316–17, 320.  Because the Court is bound to follow the forum state's choice of law, the Court would ordinarily begin with Tennessee choice-of-law rules.  *Loreto v. Procter & Gamble Co.*, 515 F. App'x 576, 578 (6th Cir. 2013) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). For tort claims, "Tennessee follows the Restatement (Second) of Conflict of Laws for choice-of-law determinations in tort cases." *Burns v. Taurus Int'l Manuf., Inc.*, 826 F. App'x 496, 499 (6th Cir. 2020) (citing *Hataway v. McKinley*, 830 S.W.2d 53, 59 (Tenn. 1992)).  The approach first asks whether "there is a conflict between the laws of two or more states." *Id*.  Several states other than Tennessee would seem to have an interest or connection to Plaintiffs' claims. For instance, the named Plaintiffs reside in Florida, Maryland, Virginia, and North Carolina; none live in Tennessee.

Even so, just as they have throughout the case, the parties have briefed the substantive law of the state of Tennessee in presenting their positions on class certification (as well as in all of the briefing on the various motions for summary judgments).  But the parties have not actually shown why Tennessee substantive law should apply to Plaintiff's claims, much less the claims of the class members. At the end of the day, "choice of law is generally waivable in litigation."  *Smith v. Gen. Motors LLC*, 988 F.3d 873, 879 n.5 (6th Cir. 2021).  Because the parties continue to assume that Tennessee substantive law governs their dispute, the Court finds that they have waived the issue.

11

The Court will assume for purposes of deciding the class certification issue that Tennessee law governs each of class member's causes of action.

As part of its application of Tennessee law, the Court must follow "a ruling from the state supreme court." *Speerly*, 143 F.4th at 320 (citing *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008)); *Smith*, 988 F.3d at 878 (citing *In re Darvocet, Darvon & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917, 937 (6th Cir. 2014)). Without a clear ruling from the Tennessee Supreme Court, the *Erie* doctrine requires this Court to "predict[] how the state supreme court would rule by looking to all available data, including decisions of the states' appellate courts." *Smith*, 988 F.3d at 878 (internal citation omitted); *see also Lindenberg v. Jackson Nat'l Life Ins. Co.*, 912 F.3d 348, 358 (6th Cir. 2018) (citing Tenn. Sup. Ct. R. 4(G)(2) for the proposition that a published opinion of the Tennessee Court of Appeals is "controlling authority for all purposes unless and until such opinion is reversed or modified by a court of competent jurisdiction").

## ANALYSIS

The issue presented is whether Plaintiffs have carried their burden to meet the strict requirements for class certification under Rule 23. Before the Court gets to the merits of that issue, the Court addresses a series of threshold questions to frame the inquiry further, the first being the precise scope of the claims for which Plaintiffs seek class certification. Plaintiffs' Second Amended Complaint alleges its claims on behalf of the ten individual Plaintiffs named in the pleading, derivatively on behalf of the Plan, and as class action on behalf of a class defined to include over 4,400 plan participants.

The named Plaintiffs seek Rule 23 certification of only the claims brought on behalf of the class, not the derivative claims alleged on behalf of the Plan. *See* Fed. R. Civ. P. 23.2 (allowing

12

"an action [to be] brought by or against the members of an unincorporated association as a class by naming certain members as representative parties"); *Curley v. Brignoli, Curley & Roberts Assocs.*, 915 F.2d 81, 84–85 (2d Cir. 1990) ("The language of rule 23.2 specifies only one prerequisite to class treatment, fair and adequate representation."). For purposes of class certification then, the Court focuses its analysis on the class action claims belonging to each member of the class defined as follows:

> All persons who were participants, or were those participants' respective beneficiaries entitled to benefits, in the African Methodist Episcopal Church Ministerial Retirement Annuity Plan on June 30, 2021.[9]

Plaintiffs' Second Amended Complaint alleges eight different putative class action claims against the 13 Defendants who remain as parties to the case: the Estate of Dr. Harris, Sandra Harris, Robert Eaton, Symetra, the Motorskill entities, and a raft of other companies allegedly owned or organized by Dr. Harris or Eaton to siphon off plan assets as part of their alleged conspiracy.[10] Of the remaining Defendants, only Symetra has responded to oppose Plaintiff's Rule 23 Motion.

The Sixth Circuit has held that a party's failure to raise an argument in response to a motion for class certification results in the forfeiture of the argument. *Am. Copper & Brass, Inc. v. Lake City Indus. Prods., Inc.*, 757 F.3d 540, 545 (6th Cir. 2014). Based on this authority, any Defendant who failed to respond in opposition to class certification has forfeited any grounds for opposition it could have raised.

By the same token, "[p]arties seeking class certification *must* satisfy the pre-requisites under Rule 23(a) and 23(b)." *Pickett v. City of Cleveland, Ohio*, 140 F.4th 300, 314–15 (6th Cir.

---

[9] Plaintiffs' proposed class excludes any current or past Defendants named in the MDL.

[10] As the Court has already noted, the Motorskill Entities have never filed a responsive pleading, and Plaintiffs now intend to voluntarily dismiss their claims for professional negligence against Rodney Brown and Company.

2025) (Gibbons, J., concurring) (emphasis in original) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613–14, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). The party seeking class certification has the burden of proof. *Id.* (citing *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996)); *accord Local No. 499, Bd. of Trs. of Shopmen's Pension Plan v. Art Iron, Inc.*, 117 F.4th 923, 933 (6th Cir. 2024) (holding that a district court "cannot grant summary judgment in favor of a movant simply because the adverse party has not responded" because a party seeking summary judgment "always bears the burden of demonstrating the absence of a genuine issue as to a material fact" and "regardless if an adverse party fails to respond").

Moreover, the Court must satisfy itself that Plaintiffs have met the safeguards imposed by Rule 23 only after "a rigorous analysis" of the requirements for class treatment. *Falcon*, 457 U.S. at 161, 102 S. Ct. 2364; *Pickett*, 140 F.4th at 315 (Gibbons, J., concurring) ("This is another reason why a district court must always rigorously analyze the appropriateness of a class action under Rule 23: if it does not, the ability of a class action to adjudicate a series of mass actions in a single swoop will be significantly undermined."). Some circuits have described a district court at the class certification stage as a "fiduciary of the class" to ensure that the requirements for a class action have been satisfied. *Id.* (collecting cases). All of this to say, regardless of any Defendant's failure to respond in opposition to class certification, the Court must conduct the same "rigorous analysis" of the Rule 23 factors for each claim on which Plaintiffs move for class certification.

One last preliminary point remains to be addressed. Symetra has moved for judgment as a matter of law on all claims Plaintiffs allege against it, both the derivative claims Plaintiffs allege on behalf of the Plan as well as the named Plaintiffs' individual claims. *See* Symetra's Mot. for Summ. J. 1, Oct. 3, 2025 (ECF No. 982) (seeking summary judgment "on all of Plaintiffs' claims against Symetra in this action, whether brought derivatively on behalf of the African Methodist

14

Episcopal Church Ministerial Retirement Annuity Plan or individually by each named Plaintiff"). As part of their response in opposition to Symetra's Rule 56 motion, Plaintiffs made two concessions with bearing on the class certification question.

First, Plaintiffs have withdrawn the claim for breach of fiduciary duty against Symetra belonging to the individually named Plaintiffs but not the derivative claims brought on the Plan's behalf.  Pls.' Resp. in Opp'n Symetra Mot. for Summ. J. 29–30 n.10 (ECF No. 1045) ("Symetra argues that there is no evidence that it owed a fiduciary duty directly to the Plan participants because there is no evidence that it communicated directly with any of them. Plaintiffs agree and therefore withdraw that claim. But Symetra did breach a fiduciary duty owed to the Plan itself, as noted above."). As part of the reply brief they submitted in support of their Renewed Motion for Class Certification, Plaintiffs affirmatively stated they "are not seeking class certification of or otherwise pursuing an individual breach of fiduciary duty claim against Symetra."  Pls.' Reply on Mot. for Class Certif. 11 n.10 (ECF No. 1061).

Second, Plaintiffs made a similar, though less definitive, concession about their claim against Symetra for the tort of fraudulent concealment. Pls.' Resp. in Opp'n to Symetra Mot. for Summ. J. 50 n.16 ("Plaintiffs are not pursuing an individual claim for fraudulent concealment. Symetra correctly points out that this Court, in ruling on its motion to dismiss the SAC, limited Plaintiffs' fraud claim to being a derivative claim, not an individual claim, based on a fiduciary duty owed to the Plan. ECF No. 982-2 at PageID 29811-12. Thus, the fraud claim is now only a derivative claim.").  Plaintiffs' response to Symetra's Rule 56 motion is somewhat at odds with their reply brief.  Plaintiffs argue in their reply brief that they can meet the Rule 23 requirements to proceed on their class action claims for fraudulent concealment against Symetra. Pls.' Reply on Mot. for Class Certif. 16–18.

Counsel for Plaintiffs' statements at a recent status conference did not clear up the issue. At a status conference on December 11, 2025, counsel for Plaintiffs represented to the Court that Plaintiffs were seeking class certification on their claims against Symetra for breach of fiduciary duty and fraudulent concealment, despite the concessions in their written briefing. Counsel explained that Plaintiffs were requesting class certification before they formally withdrew the claims at a later time, once the Court had decided class certification and the class had received notice of the class action. While the Court reserves a final ruling on whether Symetra is entitled to judgment as a matter of law on the individual claims for breach of fiduciary duty and fraudulent concealment, the Court will decide whether Plaintiffs have carried their burden for class certification on the class action claims for breach of fiduciary duty and fraudulent concealment.

Having framed the scope of the inquiry, the Court now proceeds to the merits of Plaintiffs' Rule 23 Motion for Class Certification. Symetra raises two related arguments in opposition to class certification that concern Plaintiffs' capacity or standing to sue as a class of individuals as opposed to suing as representatives in a derivative capacity on behalf of the Plan. Because these arguments raise fundamental concerns about the Court's exercise of jurisdiction over the class claims, the Court begins its analysis there.

## I.  Capacity to Sue

Symetra first argues that Plaintiffs and the class of plan participants they seek to represent do not have the capacity to bring individual claims for damages.[11]  In Symetra's view, Plaintiffs have failed to prove they have suffered their own individual injuries separate and apart from harm

---

[11] Because capacity is an affirmative defense and Symetra is the only Defendant to have raised the issue, the Court confines its analysis to the question of whether Plaintiffs have the capacity to sue Symetra for their own individualized injuries and not just in a derivative capacity on behalf of the Plan.

to the Plan.  Federal Rule of Civil Procedure 17 addresses a party's capacity to sue or be sued.  For individuals who are not suing in a representative capacity, "the law of the individual's domicile" determines the party's capacity to sue. Fed. R. Civ. P. 17(b)(1). Capacity, or a lack thereof, is "an affirmative defense, not a jurisdictional issue." *Davis v. Lifetime Cap., Inc.*, 560 F. App'x 477, 478 (6th Cir. 2014) (citing *Brown v. Keller*, 274 F.2d 779, 780 (6th Cir. 1960)); *see also De Saracho v. Custom Food Mach., Inc.*, 206 F.3d 874, 878 (9th Cir. 2000) ("The question of a litigant's capacity or right to sue or to be sued generally does not affect the subject matter jurisdiction of the district court.") (citation omitted)).

The capacity issue raised in Symetra's opposition is not the same capacity issue the Court has addressed in previous orders.  Symetra has maintained throughout the MDL that the named Plaintiffs lack the capacity to sue on behalf of the Plan. As the Court observed in ruling on Symetra's most recent motion to dismiss Plaintiffs' derivative claims at the pleadings stage,

> Almost from the inception of the MDL, Symetra has contested Plaintiffs' capacity to bring claims on behalf of the Plan, first in an initial motion to dismiss the First Amended Complaint, then in a motion to stay Plaintiffs' claims while AMEC and Symetra went to arbitration, and now again as part of Symetra's motion to dismiss the Second Amended Complaint. Each time the issue has come up, the parties have never quite pinned it down, sometimes casting the issue as a question of Article III standing, other times treating it as a failure to state a plausible claim for relief.

Order GIP, DIP Symetra's Mot. to Dismiss SAC 25, Apr. 14, 2024 (ECF No. 785).  That long-running question is a subject raised in other dispositive motions pending for decision.

Although Symetra has identified an important threshold issue for class certification, the Court is not persuaded that the question here is one of capacity or that a supposed lack of capacity forecloses class certification. Symetra does not argue that Plaintiffs, or any other plan participant, lack the capacity to sue under the law of their individual states of domicile, the quintessential framing of a Rule 17 capacity challenge.  Symetra's argument for purposes of class certification is

that the named Plaintiffs and the other plan participants cannot show that they have suffered individual injuries of their own.  If the individuals who make up the class have not suffered their own individualized injuries, then they have no individual claims to aggregate for class treatment. Symetra's essential point is that Plaintiffs seek class action relief for injuries that are properly understood as those of the Plan, not the participants and beneficiaries of the Plan.

Symetra has not shown why its argument implicates the capacity of the named Plaintiffs or the members of the putative class to sue under Rule 17 or as a matter of state law.  And as an affirmative defense, capacity is waivable.  Because no other Defendant has raised capacity as grounds to deny class certification, the Court would only reach the question as a matter of Plaintiffs' class action claims against Symetra. The Court finds then that capacity is not quite the correct framing for Symetra's challenge.

Throughout the pendency of the case, Symetra has questioned why it should be required to answer claims both by the Plan as well as by a class of plan participants where both are represented by the same named Plaintiffs. Symetra's opposition to class certification returns to this fundamental question about the MDL, Plaintiffs' theories of relief, and the means by which Plaintiffs have chosen to pursue them, a question the Court now has occasion to resolve. Plaintiffs have alleged their claims individually, derivatively on behalf of the Plan, and as representatives of a class of similarly situated plan participants. Plaintiff's derivative claims presuppose a harm to the Plan itself. Plaintiffs contend that the Plan is a Tennessee trust of which they are the beneficiaries.  No trustee of the Plan has acted to protect the interests of the trust in the years since Dr. Harris' alleged malfeasance came to light. As a result, Plaintiffs assert the capacity to step into the shoes of the trust and bring derivative claims for relief on the trust's behalf.

Plaintiffs' class action claims, on the other hand, assume a harm to named Plaintiffs and

18

the class of plan participants individually. Plaintiffs allege that each plan participant suffered his or her own individualized injury flowing from the alleged conduct of Defendants. So Plaintiffs argue they have their own standing to assert individualized claims and aggregate them for class treatment under Rule 23. In objecting to certification of the class action claims, Symetra contests Plaintiffs' capacity to simultaneously pursue both the derivative and class action claims, at least without demonstrating individualized injuries suffered by Plaintiffs and the class of participants in the Plan.

When viewed for what they are, alternative and inconsistent theories of recovery, Plaintiffs' derivative claims and class action claims do not raise the capacity problem identified by Symetra at all. The Federal Rules permit plaintiffs to pursue alternative and even inconsistent forms of relief. Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."). Plaintiffs have presented two such alternative claims or theories of relief, each arguably inconsistent with the other.

On the one hand, Plaintiffs allege that they have capacity to represent the Plan and sue for injuries to the Plan and therefore seek recovery for losses to the Plan. On the other hand, Plaintiffs also allege that they have the capacity to proceed for their own losses and sue for injuries they themselves have suffered as a result of the conduct of Symetra and other Defendants. Symetra contests whether Plaintiffs have shown an entitlement to proceed under either theory, both in opposing Plaintiffs' request for certification of the class action component of their case while also moving for judgment as a matter of law on Plaintiffs' derivative claims. So Plaintiffs must still demonstrate an entitlement to proceed to trial on both theories, which in the case of their class action claims means satisfying the Rule 23 safeguards for class treatment.

One more point about the alternative and somewhat inconsistent nature of Plaintiffs'

theories of relief merits discussion.  Even if the Court grants Plaintiffs' request for certification of

a class action and allows them to present both their derivative claims and class action theories to

the jury, there will be only one recovery for the injuries. Tennessee, which supplies the substantive

law of decision for the parties' dispute, has adopted the election of remedies doctrine "to prevent

double redress for a single wrong." *Miller v. United Automax*, 166 S.W.3d 692, 697 (Tenn. 2005)

(citations omitted); *Am.'s Collectibles Network, Inc. v. Sterling Comm. (America), Inc.*, 767 F.

App'x 584, 587 (6th Cir. 2019) (same, applying Tennessee law). As a matter of Tennessee law, "a

party cannot be compensated for the same injury twice." *Hickson Corp. v. Norfolk S. Ry. Co.*, 260

F.3d 559, 566–67 (6th Cir. 2001) (citing *Shahrdar v. Global Housing, Inc.*, 983 S.W.2d 230, 238

(Tenn. Ct. App. 1998)). The election of remedies doctrine is "the legal version of the idea that a

plaintiff may not have his cake and eat it too." *Id*. (quoting D. Dobbs, *Remedies* § 1.5 at 14 (1973)).

But the election is a plaintiff's to make and only after a "damage award results in a duplicative

recovery," at which point "the court may then direct the plaintiff to elect a remedy." *Hickson*, 260

F.3d at 566 (citing *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901 (Tenn. 1999)); *see also* Steven

W. Feldman, *Election of Remedies in Tennessee: Making the Right Choices*, 37 Tenn. Bar J. 14

(Jan. 2001)).

The point is Plaintiffs may, in fact, pursue what Symetra regards as inconsistent theories

of relief, a set of derivative claims on behalf of the Plan and an identical set of class action claims

on behalf of the plan participants. Symetra is likely correct that both theories seek redress for the

same injuries. Plaintiffs have implicitly acknowledged as much in another recently filed brief,

though without specifically addressing the election of remedies doctrine: "the Court may well

decide that Plaintiffs should be allowed to represent the Plan derivatively or represent the Proposed

Class, but not both. . . . Plaintiffs agree that *both procedures* are attempting to recover for *the same*

*harm* to largely *the same Plan participants*, so that it may make sense for Plaintiffs to proceed only under one procedure or the other." Pls.' Resp. in Opp'n to Symetra's Mot. for Final Summ. J. 53 (ECF No. 1045) (emphases added).

Assuming Plaintiffs prevail on both their derivative claims and their class action claims, the election of remedies doctrine will eventually require them to elect, or chose, only one remedy. However, the time for that election will not come unless and until a jury has awarded Plaintiffs damages in a manner than results in an impermissible double recovery. Perhaps most important, both the derivative theory and the class action theory will only proceed to trial if (1) Plaintiffs can meet their burden under Rule 23 and satisfy its demanding prerequisites for class certification and (2) demonstrate that genuine issues of material fact remain for trial on their derivative claims on behalf of the Plan. For the time being, Plaintiffs' pursuit of both derivative claims (standing in the shoes of the Plan) and class action claims (as plan participants) does not mean that Plaintiffs lack the capacity to seek certification of what are arguably duplicative claims for class certification as part of an alternative theory of relief.

The question then is do the named Plaintiffs and the other plan participants have capacity to bring claims as a class? The Court holds that they assuredly do, even if their class action claims are duplicative in some sense of their derivative claims and seek redress for the same harm. Symetra's point is a variation of an argument the Court considered and rejected in denying Symetra's motion to dismiss Plaintiffs' First Amended Complaint over two years ago. At the pleadings stage, Symetra argued that the named Plaintiffs lacked standing to bring the claims for essentially the same reasons: Plaintiffs asserted claims for injuries to the Plan, not themselves. The Court found Symetra's point unpersuasive then and continues to find it unpersuasive now.

As part of its analysis of Plaintiffs' Article III standing at the pleadings stage, the Court

concluded that Plaintiffs had alleged a concrete and particularized injury, namely, the loss of money Plaintiffs themselves had contributed to the Plan. *TransUnion, LLC v. Ramirez*, 594 U.S. 413, 425, 141 S. Ct. 2190, 210 L.Ed.2d 568 (2021) (noting that the "most obvious" types of concrete injury "are traditional tangible harms" like monetary losses, meaning "[i]f a defendant has caused . . . monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III"); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016) (holding that an injury is particularized if it affects "the plaintiff in a personal and individual way"). Plaintiffs who were in retirement (or no longer employed by AMEC) had an immediate right to their money and therefore could prove an actual or imminent injury. *Collins v. Yellen*, 141 S.Ct. 1761, 1779, 210 L.Ed.2d 432 (2021) (describing a "pocketbook injury" as "a prototypical form of injury in fact"). Other Plaintiffs requested disbursements of their funds and had their requests denied. All of this demonstrated an injury to named Plaintiffs individually, and not just an injury to the Plan.

That same reasoning remains just as true now as it did in March 2023: like the named Plaintiffs, all members of the putative class have suffered concrete injuries. Each member of the class was a participant in the plan as of June 2021. Each member of the class had an account funded with contributions made to the Plan, either contributions they elected to make from their own earnings or employer contributions made on their behalf by the Church. Each member of the class has since experienced a greatly reduced balance in their individual accounts, a classic "pocketbook" injury, for which they would hold Symetra and other Defendants liable. In the ERISA context, participants in a defined-contribution plan who do not receive their vested pension benefits "of course have Article III standing to sue and a cause of action under ERISA § 502(a)(1)(B) to recover the benefits due to them." *Thole v. U. S. Bank N.A*, 590 U.S. 538, 542, 140

S.Ct. 1615, 207 L.Ed.2d 85 (2020) (citing 29 U.S.C. § 1132(a)(1)(B)). That same reasoning suggests that the beneficiaries of a retirement plan established by their employer as a common law trust also have standing because they have suffered an injury-in-fact.

Symetra seeks to avoid this straightforward outcome by arguing that the question is not a matter of suffering an Article III injury but rather a lack of capacity. That Symetra now couches the question as a matter of capacity does not alter the result. At the pleadings stage, the Court held that Plaintiffs had "plausibly alleged not only injuries to the Plan and the dissipation of Plan assets but also injuries to Plaintiffs themselves, stemming from conduct directed to Plaintiffs" and therefore established their capacity to bring their individual claims.

Since the filing of the First Amended Complaint, the named Plaintiffs have gone further in their Second Amended Complaint to allege with more particularity that they assert claims for themselves individually, derivatively on behalf of the Plan, and on behalf of the class for which they now seek certification. Symetra correctly posits that, before proceeding as a class on behalf of other plan participants, Plaintiffs must show that plan participants have suffered their own individualized injuries and not just the injuries sustained by the Plan itself. As the Court has just explained, Plaintiffs' theories are essentially alternative and inconsistent.

But the Court's basic Article III conclusion at the pleadings stage answers the injury question posed by Symetra, both for the named Plaintiffs and now for the members of the putative class. The plan participants have suffered their own injuries, concrete, particularized, and actual (or imminent), and therefore have the capacity to sue for those injuries as a class. Therefore, the Court is not persuaded that the question here is one of capacity or that a supposed lack of capacity forecloses class certification.

Symetra largely bases its capacity argument on an analogy to the law of corporations.

23

According to Symetra, Plaintiffs' attempt to raise both individual and derivative claims on the Plan's behalf is akin to corporate shareholders alleging both their own injuries and bringing a derivative suit on behalf of the corporation. Just as shareholders must prove some injury to their interests apart from the injury to the corporation, Plaintiffs as trust beneficiaries must show their own individualized injuries provable without reference to the injuries suffered by the trust holding their assets, the Plan. Because Symetra's argument by analogy to shareholder derivative actions overlaps with its argument on prudential standing, the Court takes up both points together. For purposes of Symetra's capacity argument, the Court concludes that Plaintiffs and the other members of the putative class can prove their own injuries, not just an injury to the Plan, as part of Plaintiffs' alternative, inconsistent theory of class action relief. Symetra has not shown then why the Court should deny Plaintiffs' request for class certification for the plan participants' lack of capacity.

## II. Prudential Standing

As part of a somewhat related argument, Symetra argues that even if they have Article III standing, the named Plaintiffs and the members of the class the Plaintiffs seek to represent lack prudential standing. "[P]rudential standing encompasses the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 12, 124 S.Ct. 2301, 2309 (2004) (citations omitted). The prudential standing doctrine bears some relationship to Article III but is in actuality more about "judicial self-governance." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). "Even when Article III permits the exercise of federal jurisdiction, prudential

considerations demand that the Court insist upon that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Windsor*, 570 U.S. at 760, 133 S.Ct. 2675 (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)).

Symetra's argument goes to the first type of prudential standing, the prohibition on one litigant pursuing legal rights that properly belong to another party. The Supreme Court has identified this species of prudential standing as a question of "third-party standing." *Kowalski v. Tesmer*, 543 U.S. 125, 128–129, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004) (suggesting third-party standing is an element of "prudential standing"); *but see Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 n.3, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014) (noting in dicta that Article III, and not prudential standing, usually bars third-party action, acknowledging that "limitations on third-party standing are harder to classify" but leaving "consideration of that doctrine's proper place in the standing firmament" for "another day").

In the normal course, a party may only assert his own legal rights and interests and "cannot rest his claim to relief on the legal rights or interests of third parties." *Kowalski*, 543 U.S. at 129, 125 S.Ct. 564 (citing *Warth*, 422 U.S. at 499, 95 S.Ct. 2197). The limiting principle on third-party standing rests on the assumption that a party with the legal right will act to protect its own interests without the need for intervention from a third party. *Id.* The Supreme Court has "not treated this rule as absolute, however, recognizing that there may be circumstances where it is necessary to grant a third party standing to assert the rights of another." *Id.* A party seeking third-party standing may avail itself of the exception if (1) "the party asserting the right has a close relationship with the person who possesses the right," and (2) the person who possesses the right experiences some "hindrance" to its ability to protect its own legal interests. *Id.* (citing *Powers v. Ohio*, 499 U.S.

25

400, 411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991)).

Symetra does not actually argue that the Court should deny class certification because named Plaintiffs and the members of the putative class lack prudential standing or cannot make out the requirements for third-party standing to sue on behalf of the Plan. That argument would go to the derivative claims alleged by named Plaintiffs on the Plan's behalf. Symetra's contention is that, under the doctrine of prudential standing, Plaintiffs and the class of plan participants as "stakeholders may not seek compensation for injuries that depend on injuries to the entities in which they claim a stake." Symetra's Resp. in Opp'n to Pls. Mot. for Class Certif. 9 (ECF No. 1036). As Symetra sees it, "Plaintiffs assert direct individual claims in which they allege that Symetra owed a duty directly to each Plaintiff (the 'individual' or 'direct' claims)" and thereby "conflate their individual claims with their derivative claims." *Id*. at 1. Simply put, "Plaintiffs cannot rely on harm to the Plan to maintain standing for their direct claims." *Id*. at 10.

But Symetra's argument fails to persuade. As the Court has already explained, the named Plaintiffs articulate two different sets of claims, derivative claims and class action claims. To the extent that two theories of the case are inconsistent or duplicative, Rule 8(d) permits Plaintiffs to pursue inconsistent or duplicative theories of relief. Although Plaintiffs may eventually be required to choose just one *remedy*, they may nevertheless pursue *more than one theory* to hold Symetra and other Defendants liable.

Furthermore, the named Plaintiffs can show that they are pressing claims on behalf of the class of plan participants for individual injuries, the same injuries for which Plaintiffs now seek class certification. Just as this suffices to show that Plaintiffs meet the Article III requirements for constitutional standing, this also satisfies any concerns that Plaintiffs are simply using the class action mechanism as a vehicle to vindicate the rights and redress the injuries of the Plan alone.

Class certification of Plaintiff's individual injuries (the injuries alleged on behalf of the putative

class) does not implicate any concerns of prudential standing or third-party standing.

Symetra couches both its capacity and prudential standing arguments, to a greater or lesser

degree, on an analogy to the law of corporations. Specifically, Symetra argues that shareholders

may not bring direct actions for damages when the injury is properly understood as an injury to

the corporation itself, not the shareholder. According to Symetra, Plaintiffs and the class of plan

participants have only shown that the Plan suffered injuries and not that the plan participants have

suffered individual harms distinct from harms to the Plan itself.

Symetra's point about shareholder derivative actions is true, as far it goes. As a general

proposition of the law of corporations, a shareholder "has no individual right of action against third

persons for a wrong or injury to the corporation." *Keller v. Estate of McRedmond*, 495 S.W.3d

852, 867 (Tenn. 2016) (quoting H.A. Wood, Annotation, *Stockholder's Right to Maintain*

*(Personal) Action Against Third Person as Affected by Corporation's Right of Action for the Same*

*Wrong,* 167 A.L.R. 279 (20th ed.) (cleaned up).

In recognition of the fact that "the threshold determination of whether a lawsuit filed by a

shareholder is derivative or direct is sometimes difficult and has many legal consequences," the

Tennessee Supreme Court has adopted a two-part test for "shareholder standing." *Keller*, 495

S.W.3d at 867, 869 (quoting *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031, 1036

(Del. 2004)). To determine whether shareholders have "standing to bring a direct claim for their

injuries as shareholders or whether their claims are derivative in nature and must be brought on

behalf of the corporation," courts ask two questions: "(1) who suffered the alleged harm (the

corporation or the suing stockholders, individually); and (2) who would receive the benefit of any

recovery or other remedy (the corporation or the stockholders, individually)?" *Id.* at 875 (quoting

27

*Tooley*, 845 A.2d at 1039); *see also McCarthy v. Middle Tenn. Elec. Membership Corp.*, 466 F.3d 399, 408 (6th Cir. 2006) (pre-dating *Keller* and making an *Erie* prediction that Tennessee would adopt the Delaware rule in *Tooley* on distinguishing direct and derivative actions by shareholders).

In other words, the shareholder only possesses a direct claim against the third party if he can prove an individual harm (as opposed to a harm exclusive to the corporation), and if the recovery for the injury flows to the shareholder individually, and not to the corporation. Symetra argues that the same reasoning applies to the plan participants' individual claims and precludes class certification because the only injury Plaintiffs have identified is an injury to the Plan itself.

The Court disagrees. The analogy strains under the weight of the fundamental distinctions between corporations and trusts. *Church Joint Venture, L.P. v. Blasingame*, 947 F.3d 925, 935 (6th Cir. 2020) (Sutton, J., concurring) ("A corporation and a trust are not one of a kind."). Unlike corporate shareholders, trust beneficiaries have an "equitable interest" in the assets of the trust. *N.C. Dep't of Revenue v. The Kimberley Rice Kaestner 1992 Family Tr.*, 588 U.S. 262, 265, 139 S. Ct. 2213, 204 L.Ed.2d 621 (2019) (citing *Greenough v. Tax Assessors of Newport*, 331 U.S. 486, 494, 67 S.Ct. 1400, 91 L.Ed. 1621 (1947)); *cf.* A. Hess, G. Bogert, & G. Bogert, Law of Trusts and Trustees § 16 ("No equitable title or interest is vested in the shareholders [of a corporation]."). The interests of corporate shareholders and trust beneficiaries simply are not the same.

Even assuming *arguendo* that Tennessee would apply the *Keller* test for direct action by shareholders in the context of direct action by trust beneficiaries, Plaintiffs and other plan participants arguably meet both parts of the *Keller* test. The Court has already determined that plan participants can show their own individualized injuries because of their monetary stake in the Plan's assets. An injury to a trust directly results in and is in a real sense an injury to the beneficiaries of the trust. "In the private trust context, the value of the trust property and the

28

ultimate amount of money received by the beneficiaries will typically depend on how well the trust is managed, so *every penny of gain or loss is at the beneficiaries' risk*." *Thole*, 590 U.S. at 542, 140 S.Ct. 1615 (holding that participants in a defined-benefit plan lacked Article III standing and rejecting the participants' argument that injuries to an ERISA defined-benefit plan participant "are by definition injuries to the plan participants" who possess "an equitable or property interest in the plan"). That satisfies the first prong.

And the class of plan participants would receive the benefit of any recovery on their class action claims. For reasons explained elsewhere in this opinion, Plaintiffs have shown that a future recovery would go into the Qualified Trust established by AMEC as a pool of funds held for the benefit of plan participants. While it is true that any recovery is aggregated and ultimately held in trust, each member of the class would be allocated a pro rata share of the recovery in an individual account as part of the AMEC Legacy Fund. Thus, each member of the class, not the trust, receives the benefit of the recovery.

The recovery received by Plaintiffs through the settlement of their derivative and class claims against AMEC and Symetra only buttresses the point. The benefits of the settlements were structural changes to the Plan and a financial recovery of $60 million. As one term of the settlement with AMEC, the Church agreed to specific equitable reforms of the Plan itself. The Legacy Fund and a new plan, both with outside, third-party administrators, are the result of those reforms. The Qualified Trust now holds the monetary settlement, and each participant's pro rata share of the proceeds are currently making their way into individual accounts. *See* Jt. Status Rep. 6–7, Dec. 4, 2025 (ECF No. 1074) (reporting that the Qualified Trust had processed 85 requests for disbursements and disbursed $1,834,978.68 as of Dec. 3, 2025). So who received the benefit of the settlements, i.e. the equitable changes to the Plan as well as the monetary relief? Quite clearly,

29

Plaintiffs and the members of the settlement class, not the trust.

In sum, the Court is not persuaded by the analogy to corporate shareholders and the strict limits on direct shareholder action. Unlike a shareholder, Plaintiffs and plan participants as the beneficiaries of a trust have equitable interests in the assets held in trust by the Legacy Fund. As a result, Plaintiffs and the members of the putative class can show individualized harm as part of their alternate theory that Symetra and Defendants' acts and omissions injured them individually, and not just the Plan.

Therefore, the Court is satisfied that Plaintiffs' class action claims do not run afoul of any concerns over prudential standing, including the third-party standing doctrine. Because the Court finds that Symetra's threshold defenses to class certification are not dispositive, the Court now turns to the merits and considers whether Plaintiffs have satisfied the Rule 23(a) prerequisites for class certification.

## III. Rule 23(a) Prerequisites for Class Certification

### A. Administrative Feasibility

Plaintiffs argue that, before the Court considers Rule 23's safeguards, the Court should first decide whether the proposed class is administratively feasible. A "class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Tarrify Props., LLC v. Cuyahoga Cnty., Ohio*, 37 F.4th 1101, 1106 (6th Cir. 2022) (citing *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 471 (6th Cir. 2017)); *see also* 7A Wright & Miller's *Federal Practice & Procedure* § 1760 (3d ed. 2005). Without a sufficiently definite class definition, a class action just becomes a series of "mini-trials" so that the court can decide "who is in and who is out," which means "the class-action vehicle imposes inefficiencies rather than ameliorates

them." *Id.*  The Court of Appeals has dubbed this "Rule 23's implicit ascertainability requirement." *Clippinger v. State Farm Auto. Ins. Co.*, 156 F.4th 724, 745 (6th Cir. 2025) (citing *Sandusky Wellness Ctr.*, 863 F.3d at 471)).

Plaintiffs have shown, and Symetra does not dispute, that the proposed class is sufficiently definite and that each named Plaintiff does in fact meet the class definition and qualifies as a member of the class. Therefore, the Court finds that the proposed class definition is administratively feasible.  Having met this separate criterion for class certification, the Court now considers the Rule 23(a) requirements for class treatment.

**B. Numerosity**

Plaintiffs have the burden to "show that [the putative class] is 'so numerous' that joinder is impracticable." *Speerly*, 143 F.4th at 316 (quoting Fed. R. Civ. P. 23(a)(1)).  The Sixth Circuit has held that there is "no specific number" that will or will not render joinder impracticable.  *Am. Med. Sys.*, 75 F.3d at 1079.  Even so, the "sheer number of potential litigants in a class, especially if it is more than several hundred, can be the only factor needed to satisfy Rule 23(a)(1)." *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 570 (6th Cir. 2004) (finding potential class of 800 members "a number well beyond the point that joinder would be feasible").  Here, Plaintiffs have shown that the numerosity requirement is satisfied because the putative class consists of approximately 4,452 members. Lee Decl. ¶ 25, n.8 (ECF No. 750-4). Symetra and no other Defendant has challenged this evidence or Plaintiffs' argument that the Rule 23(a) numerosity requirement is met. *In Re Ford Motor*, 86 F.4th at 726 (placing the burden on a plaintiff to introduce "significant" evidence to the Rule 23(a) prerequisites "*where they are contested*") (emphasis added). The Court concludes then that Rule 23(a)(1) and its numerosity requirement are met.

**C. Typicality**

Plaintiffs must also show that their claims (or defenses) as the representative parties are typical of the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). A representative party's claim is typical if "it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Am. Med. Sys.*, 75 F.3d at 1082 (quoting 1 H. Newberg & A. Conte, *Newberg on Class Actions*, § 3.13, at 3–76 (3d ed. 1992)). The inquiry for the Court is "whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir.1998) (citing *Am. Med. Sys.*, 75 F.3d at 1082). The Supreme Court has noted that Rule 23(a)'s commonality and typicality requirements "tend to merge." *Falcon,* 457 U.S. at 158 n.13, 102 S. Ct. 2364. A class representative is not typical "when a plaintiff can prove his own claim but not necessarily have proved anybody else's claim." *Beattie v. CenturyTel, Inc.,* 511 F.3d 554, 561 (6th Cir. 2007) (citations omitted). Importantly, the Sixth Circuit has cautioned that "a representative's claim need not always involve the same facts or law, provided there is a common element of fact or law." *Id.* (citing *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 n.31 (6th Cir. 1976)).

Plaintiffs argue that they have satisfied the Rule 23(a)(3) typicality requirement. Named Plaintiffs as the proposed class representatives have suffered the same injuries as the members of the putative class as a result of the same alleged conduct by the same Defendants. Like the members of the class, named Plaintiffs allege the same causes of action against the same Defendants and seek the same damages. Symetra contests the showing, though only in a footnote, by arguing that named Plaintiff's claims and the claims of the members of the class will "require

an individualized showing that a particular Plan participant's relationship with Symetra gave rise to a duty or involved a misrepresentation." Symetra's Resp. in Opp'n 11 n.10. Symetra contends that the unique characteristics of each class member's claims defeats both commonality and typicality.

For purposes of deciding Plaintiffs' request for class certification, the Court will assume without deciding that Plaintiffs could satisfy the typicality requirement to the extent that Plaintiffs can also satisfy the commonality requirement under Rule 23(a)(2).

## D. Adequacy

Under Rule 23(a)(4), Plaintiffs must demonstrate that as class representatives they will fairly and adequately represent and protect the interests of the class. Fed. R. Civ. P. 23(a)(4). The adequacy prerequisite requires analysis of two distinct criteria: "the representative must have common interests with unnamed members of the class" and "it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Senter*, 532 F.2d at 525.[12] The adequacy inquiry under the first criterion "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Gooch v. Life Invs. Ins. Co. of Am.*, 672 F.3d 402, 429 (6th Cir. 2012) (quoting *Windsor*, 521 U.S. at 625, 117 S.Ct. 2231). A representative's interests are antagonistic to the interests of the members of the class when there is evidence that the representative plaintiff appears unable to "vigorously prosecute the interests

---

[12] *See also Falcon*, 457 U.S. at 157 n.13, 102 S. Ct. 2364 (noting that "the adequacy-of-representation requirement . . . also raises concerns about the competency of class counsel and conflicts of interest"); *Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 626–27 (6th Cir. 2007) (analyzing competency of class counsel under Rule 23(a)(4)). *But see* Fed. R. Civ. P. 23(g), 2003 Amendments, Adv. Comm. Notes ("Until now, courts have scrutinized proposed class counsel as well as the class representative under Rule 23(a)(4) . . . . Rule 23(a)(4) will continue to call for scrutiny of the proposed class representative, while this subdivision [Rule 23(g)] will guide the court in assessing proposed class counsel as part of the certification decision.").

of the class." *Id*. The lines to differentiate adequacy of representation from other prerequisites for class certification like commonality and typicality often blur. *Rutherford v. City of Cleveland*, 137 F.3d 905, 909 (6th Cir. 1998); *see also* H. Newberg & A. Conte, *Newburg on Class Actions* § 3.22, at 3–126 (3d ed. 1992) ("[T]he two factors that are now predominately recognized as the basic guidelines for the Rule 23(a)(4) prerequisite are (1) absence of conflict and (2) assurance of vigorous prosecution."); 7A Wright & Miller's *Federal Practice & Procedure* § 1768, at 326 (2d ed. 1986) ("It is axiomatic that a putative representative cannot adequately protect the class if his interests are antagonistic to or in conflict with the objectives of those he purports to represent."). For example, the Sixth Circuit has observed, "The adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members." *Am. Med. Sys.,* 75 F.3d at 1083.

Plaintiffs argue that they have carried their burden on Rule 23(a)(4)'s adequacy requirement for the simple fact that named Plaintiffs are "all current or former AMEC pastors or presiding elders who lost the same percentage of their retirement funds in the Plan as the unnamed Class Members did, giving them the requisite common interests." Mem. in Support Pls.' Mot. for Class Certif. 10.

Symetra counters that named Plaintiffs (and class counsel) have irreconcilable conflicts of interest with the rest of the class members they would represent. For one thing, Plaintiffs cannot simultaneously bring a class action together with derivative claims on the Plan's behalf. The class is defined to include only plan participants like named Plaintiffs who were participants as of January 1, 2021. By contrast, the Plan consists of and represents only the interests of current plan participants. This includes eligible AMEC employees who have only become plan participants

34

after January 1, 2021. So named Plaintiffs and the putative class seek damages for themselves while the Plan (by way of named Plaintiffs' derivative claims on behalf of the Plan) will recover damages for the Plan and distribute plan assets according to determinations made by the trustee of the Plan.

Symetra also argues that any named Plaintiffs who are now former participants in the Plan do not share the same interests as current participants in the Plan. Symetra has crossclaims against the Plan for breach of contract and indemnification. Named Plaintiffs and their attorneys have no interest or incentive to defend or resolve Symetra's crossclaims against Plan, only to maximize their own recovery from whatever the source. Symetra contends then that Plaintiffs' conflicts of interest mean they cannot bring both class action claims and derivative claims.

The Court finds Symetra's points about the actual or potential conflict of interest unconvincing. Take the argument that the interests of the named Plaintiffs and the members of the class diverge from the interests of current plan participants first. Symetra's point ignores the critical fact that, as part of the settlement reached between Plaintiffs, the settlement class represented by Plaintiffs, the AMEC Defendants, and Newport, AMEC agreed to several reforms of the Plan. What Symetra refers to as "the Plan" is no longer the homogenous, undifferentiated pool of assets Symetra presupposes it to be.

AMEC has now renamed the Plan, as it had existed prior to the settlement, as "the Legacy Fund." AMEC Class Action Settlement Agr. & Release ("AMEC Agr.") ¶ 2.15 (ECF No. 750-2); *see also* Newport Class Action Settlement Agr. & Release ("Newport Agr.") ¶ 2.16 (ECF No. 750-3). The current assets of the Legacy Fund include the Symetra annuities, real property located in Key Marco, Florida, and "recovery for losses on assets as asserted in [the MDL]." *Id*. Consistent with that understanding, AMEC established the Qualified Trust, a trust account created to operate

the Legacy Fund, and selected an independent, third-party professional investment advisor, Disciplina Group LLC, to advise and manage the Legacy Fund. *See* AMEC Agr. ¶ 2.2; Newport Agr. ¶ 2.3. The same Qualified Trust holds the settlement proceeds recovered by Plaintiffs and paid into the trust by the AMEC Defendants and Newport for the benefit of named Plaintiffs and the settlement class. Named Plaintiffs have represented to the Court that any additional amounts recovered in this action, either on behalf of the putative class or derivatively on behalf of the Plan, will also go into the Qualified Trust for the benefit of the class.

Based on these features of the Legacy Fund and the Qualified Trust which holds its assets, the conflict identified by Symetra between the members of the proposed class and the current participants in the church retirement plan does not exist. As part of the reforms to its retirement system, AMEC has now established a new retirement plan which will hold all retirement contributions moving forward. AMEC's new plan is managed by Wespath, a general agency of the United Methodist Church and the administrator of "one of the largest faith-based pension funds in the world." *See* Mem. in Support Pls.' Mot. for Final Approval Class Action Settlement 11 n.8 (ECF No. 842). The two-part structure of AMEC's retirement plan for its employees, the Legacy Fund administered by Disciplina through the Qualified Trust and the new plan administered by Wespath, means there is no conflict of interest between the members of the putative class in the MDL and participants in the new plan.

Likewise, the fact that the Plan, or to be more precise the Legacy Fund, has its own separate existence undermines Symetra's argument about a secondary conflict between named Plaintiffs and the Plan. Plaintiffs have shown that any recovery from Symetra would be paid into the Legacy Fund's Qualified Trust for the benefit of the putative class members. Symetra has not shown that any recovery it might obtain on its cross-claims against the Plan would also be paid out of the

Qualified Trust.  It is just as likely that AMEC, and not the Legacy Fund, would be liable to Symetra for any damages for breach of contract the Plan might become liable to pay Symetra.  *See* Symetra Cross-Complaint ¶ 146 (ECF No. 794) ("The 2007 Annuity Contract, 2007 GIC, and 2008 GIC are each valid enforceable contracts *between Symetra and AMEC*.") (emphasis added).[13]

As for Symetra's point about the inherent conflict in Plaintiffs bringing both direct claims and derivative claims, all of the cases Symetra cites for support involved shareholder derivative actions for the benefit of the corporation brought in the same suit with class action claims of shareholders alleging direct claims against the corporation. "The conflict arises because the derivative action seeks to enhance the value of the corporation generally by seeking recovery for the corporation on its own behalf. Conversely, plaintiffs in the class action, some of whom are former shareholders, seek a recovery against the corporation."  2 *McLaughlin on Class Actions* § 9:14 (22nd ed.) (quoting *Keyser v. Commonwealth Nat. Fin. Corp.*, 120 F.R.D. 489 (M.D. Pa. 1988)).

The Southern District of New York's decision in *Petersen v. Federated Development Co.*, 416 F. Supp. 466 (S.D.N.Y. 1976), illustrates the point. The plaintiff in *Petersen* alleged a direct claim against the defendant-corporation as well as a derivative claim on behalf of the same defendant-corporation. The Court recognized the pursuit of both direct and derivative claims posed a "potential conflict of interest," which required the plaintiff to "choose between the pursuit of his personal interest and that of the corporation." *Id*. at 475 n.6.  While Symetra does not cite *Petersen*, each of the cases it does cite all rely on similar conflicts of interest in shareholder derivative actions. *Kamerman v. Steinberg*, 113 F.R.D. 511, 516 (S.D.N.Y. 1986) ("Prosecution of both a

---

[13] Symetra argues that it also has a crossclaim against the Plan for indemnification.  In fact, Symetra's Cross-Complaint only alleges a claim for contractual indemnification against AMEC (Count V), not the Plan. *See* Symetra Cross-Complaint ¶¶ 187–92.

derivative and class action by plaintiffs Kamerman and Stepak presents an impermissible conflict

of interest similar to that which arose in *Petersen v. Federated Development Co.,* 416 F. Supp. 466

(S.D.N.Y. 1976).”); *Ruggiero v. Am. Bioculture, Inc.*, 56 F.R.D. 93, 95 (S.D.N.Y. 1972) (“I fail to

see how, on the one hand, they can vigorously seek recovery on behalf of those who have an equity

interest in the corporation and, on the other hand vigorously seek recovery from the corporation

on behalf of those who have no equity interest in the corporation.”); *St. Clair Shores Gen. Empls.*

*Ret. Sys. v. Eibeler*, No. 06 Civ. 688, 2006 WL 2849783, at *7 (S.D.N.Y. Oct. 4, 2006)

(recharacterizing direct claims of a class of shareholders as derivative claims “to eliminate the

conflict of interest” between derivative claims on behalf of the corporation and direct claims for

shareholders over the same flawed proxy disclosures).[14]

The Court finds these cases distinguishable both on their facts and on the law. Factually,

the named Plaintiffs and the putative class are not alleging derivative claims on the Plan’s behalf

and direct claims *against the Plan*.  Plaintiffs have alleged direct claims against Symetra and other

Defendants. Legally, the type of conflict of interest identified by Symetra is not present in this

case.  By contrast, the shareholder conflicts of interest discussed in the cases cited by Symetra all

involved derivative claims for the benefit of the corporation and direct claims against the

---

[14] Symetra also cites an Eastern District of New York case where the court cited the proposition that “[a]ny individual claims raised by a shareholder in a derivative action present an impermissible conflict of interest.” *Tuscano v. Tuscano*, 403 F. Supp. 2d 214, 223 (E.D.N.Y. 2005) (collecting cases). The court in *Tuscano* did not actually hold that a shareholder’s derivative claims prevented him from also alleging individual claims against a law firm where the firm had allegedly prepared stock certificates as part of the corporation’s scheme to defraud the plaintiff who was one of the corporation’s 50% shareholders. *Id*. Instead, the court construed the claims against the law firm as derivative claims brought on behalf of the corporation.  The only direct claim brought by the plaintiff was an equitable claim against the other 50% shareholder for the appointment of a receiver.  The *Tuscano* court concluded that the plaintiff could not maintain the direct claim against the other 50% shareholder along with his derivative claims against the law firm, though without explaining why there was a conflict under the facts of the case. *Id*.

corporation where an obvious conflict existed. The two scenarios are simply not the same. Because named Plaintiffs and the members of class are not seeking recovery from the Plan, the Court finds no conflict of interest in named Plaintiffs bringing both derivative claims and direct class action claims.

The Court would add that shareholder derivative actions implicate unique policy concerns, concerns reflected in the heightened procedural requirements of Rule 23.1. When it comes to class action by shareholders, the Rules of Procedure "single out the specific type of derivative action described in Rule 23.1 because the law has historically been particularly wary of allowing *shareholders* to sue on their *corporation's* behalf" owing to "the fear that shareholder derivative suits could subvert the basic principle of management control over corporate operations." *Kayes v. Pacific Lumber Co.*, 51 F.3d 1449, 1462–1463 (9th Cir. 1995) (citing *Renfro v. FDIC,* 773 F.2d 657, 658 (5th Cir. 1985)).

Those same policy concerns are not present here in a case where trust beneficiaries allege derivative claims on behalf of the trust. Unlike the guardrails Rule 23.1 places on shareholder derivative actions, many courts, including courts within the Sixth Circuit, have persuasively concluded that Rule 23.1 does not even apply to derivative actions "[w]hen a trust beneficiary brings a derivative suit on behalf of a trust." *Kayes v. Pacific Lumber Co.*, 51 F.3d 1449, 1462–1463 (9th Cir. 1995), quoting Charles A. Wright, *Law of Federal Courts* § 73, at 525 (5th ed.1994); *Moeckel v. Caremark RX Inc.*, 385 F. Supp. 2d 668, 685 (M.D. Tenn. 2005); *In re AEP ERISA Litig.*, 327 F. Supp. 2d 812, 820–21 (S.D. Ohio 2004). For all of these reasons, the Court finds that Symetra's analogy to cases involving direct and derivative action by corporate shareholders is inapt.

Symetra has not shown then why Plaintiffs would not be adequate representatives of the

class. The Court concludes that Plaintiffs have met their burden to show they would fairly and adequately protect the interests of the class.

**E. Commonality**

Plaintiffs must satisfy one last Rule 23 prerequisite. Rule 23(a)(2) requires that there be questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). The Supreme Court has held that "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Dukes*, 564 U.S. at 350, 131 S. Ct. 2541 (quoting *Falcon*, 457 U.S. at 157, 102 S. Ct. 2364) (internal quotation marks omitted). The Sixth Circuit recently explained that in Rule 23(b)(3) class actions, a district court must assess commonality and predominance as part of "a structured two-step approach." *Speerly*, 143 F.4th at 316. "Step one: check to see that the plaintiffs have identified a 'common question of law or fact' and met the commonality test of Rule 23(a)(2)." *Id.* (citing Fed. R. Civ. P. 23(a)(2)).

A common question for purposes of Rule 23(a)(2) "must (1) yield a common answer with common evidence and (2) meaningfully progress the lawsuit." *Id.* In other words, the trier of fact "must be able to resolve the question with a yes-or-no answer for the class in one stroke." *Id.* (quoting *Doster v. Kendall*, 54 F.4th 398, 430–31 (6th Cir. 2022), *vacated as moot*, ⸺ U.S. ⸺, 144 S. Ct. 481 (2023)). If the proof shows that the answer to the question is "yes" for some class members and "no" for others, then the question is not common to the class as a whole. *Id.* (citations omitted).

What is more, the plaintiff seeking to represent the class must also show that the common question "affect[s] at least one" disputed "element" of the class's claims. *Speerly*, 143 F.4th at 316 (citing *Doster*, 54 F.4th at 430). That means the district court must "walk through each cause of action, identify the relevant elements, and evaluate which elements, if any, submit to common

answers." *Id.* at 316–17 (citing *In re Nissan N. Am., Inc. Litig.*, 122 F.4th 239, 246–47 (6th Cir. 2024)). The common issue must be "at the heart of the litigation," *Powers*, 501 F.3d at 619, and the resolution of a common issue must advance the litigation. *Sprague*, 133 F.3d at 397.

A single common issue will satisfy Rule 23(a)(2). *Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 884 (6th Cir. 1997) ("Rule 23(a) simply requires *a* common question of law or fact.") (emphasis in original)). "The interests and claims of the various Plaintiffs need not be identical. Rather, the commonality test is met when there is at least one issue whose resolution will affect all or a significant number of the putative class members." *Powers v. Hamilton Cnty. Pub. Defenders Comm'n,* 501 F.3d 592, 619 (6th Cir. 2007) (citing *Am. Med. Sys.*, 75 F.3d at 1080); *Fallick v. Nationwide Mut. Ins. Co.,* 162 F.3d 410, 424 (6th Cir. 1998)).

The Court's task requires it to examine each element of each cause of action to make the commonality determination. Plaintiffs seek certification on eight separate causes of action alleged on behalf of the class members against 12 different Defendants. Accordingly, the Court will examine the elements of each of the claims on which Plaintiffs seek class certification to determine whether Plaintiffs have met Rule 23(a)(2)'s commonality test and then consider whether Plaintiffs have also satisfied the predominance test under Rule 23(b)(3). Because the commonality test requires the presence of just a single common element and the test also bears a relationship to Rule 23(b)(3)'s predominance test, the Court will identify the common legal or factual issues for each of Plaintiffs' causes of action, and then consider whether the common issues predominate over any individualized questions, all as part of the discussion of each claim for relief that follows.

## IV. *Speerly*'s Step One: Commonality for Each Cause of Action

As a starting point of its "walkthrough" of each cause of action, all eight of which sound in tort, the Court applies the substantive law of the State of Tennessee. *Speerly*, 143 F.4th at 316–

41

17, 320. The Court now turns to analyze the elements of each of the class members' causes of action to ascertain whether the common issues they raise predominate over any individualized issues.

**B. Breach of Fiduciary Duty – Estate of Dr. Harris, Eaton, and Symetra**

The Court begins its analysis of the separate causes of action with Plaintiffs' claims for breach of fiduciary duty against the Estate of Dr. Harris, Robert Eaton, and Symetra (Count 1 of the Second Amended Complaint).[15] In order to recover for breach of fiduciary duty in Tennessee, a plaintiff must establish: (1) a fiduciary relationship, (2) breach of the resulting fiduciary duty, and (3) injury to the plaintiff or benefit to the defendant as a result of that breach. *Faber v. Ciox Health, LLC*, 331 F.Supp.3d 767, 780 (W.D. Tenn. 2018) (citing *In re Estate of Potter*, 2017 WL 4546788, at *2 (Tenn. Ct. App. Oct. 11, 2017) and *Ann Taylor Realtors, Inc. v. Sporup*, No. W2010–00188COA–R3–CV, 2010 WL 4939967 (Tenn. Ct. App. Dec. 3, 2010). The Second Amended Complaint makes numerous allegations about all of the ways in which Dr. Harris breached his fiduciary duties.  The pleading does not add any specific allegations about the alleged breaches in the count alleging the breach-of-fiduciary-duty claim against Dr. Harris.  Count 1 of the Second Amended Complaint alleges that Eaton breached his fiduciary duties to the Plan by "a) [e]ngaging in self-dealing by recommending investments in which he had a personal interest; and b) [r]ecommending investments that were extraordinarily speculative and imprudent for the Fund

---

[15] Symetra raises a number of arguments in opposition to class certification, many of which center on Plaintiffs' claims that Symetra owed the individual members of the class a fiduciary duty. *E.g.* Symetra's Resp. in Opp'n to Pls. Mot. for Class Certif. 6 ("But when Plaintiffs claim "Symetra owed a fiduciary duty," the question remains to whom? To the Plan or to Plaintiffs directly? Plaintiffs do not say."). Because Plaintiffs have stated an intention to withdraw their individual and class claims for breach of fiduciary duty against Symetra, the Court will assume without deciding that the existence of such a duty on Symetra's part will yield a common "yes" or "no" answer for the class as a whole.

and exposed the Participants of the Plan to an intolerable amount of investment risk." Second Am. Compl. ¶ 556 (ECF No. 493).

The Court finds that Plaintiffs' class claims against the Estate of Dr. Harris, Eaton, and Symetra present common issues of fact and law, first among them, whether Dr. Harris, Eaton, or Symetra acted as a fiduciary. "A fiduciary is a person holding the character of a trustee who bears the duty to act primarily for the benefit of another." *Sanford v. Waugh & Co., Inc.*, 328 S.W.3d 836, 843 (Tenn. 2010) (citing *McRedmond v. Estate of Marianelli*, 46 S.W.3d 730, 738 (Tenn. Ct. App. 2000)). One of the threshold issues presented is whether Dr. Harris, Eaton, or Symetra had a fiduciary relationship with plan participants. As a general proposition, "the existence or nonexistence of a duty owed by the defendant to the plaintiff is a question of law for the court to decide." *EPAC Techs., Inc. v. HarperCollins Christian Publishing, Inc.*, 398 F.Supp.3d 258, 270 (M.D. Tenn. 2019) (quoting *Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993)).

In fact, Plaintiffs have filed separate motions for summary judgment on the question of whether Dr. Harris (ECF No. 978) or Eaton (ECF No. 979) owed fiduciary duties to the Plan and plan participants, including the members of the class. Symetra has filed its own motion for summary judgment (ECF No. 982) on the issue of whether Symetra owed the Plan or the individual Plaintiffs any fiduciary duty. Because the existence or non-existence of a fiduciary relationship arises out of each class member's participation in the Plan and the roles of Dr. Harris, Eaton, and Symetra in the administration of the plan, the Court's ruling on the fiduciary relationship will yield a common answer for all members of the class. This single common element is enough to meet the commonality test as to Plaintiffs' breach of fiduciary duty claims.

The class will also need to show that Dr. Harris or Eaton or Symetra breached their fiduciary duties to the members of the class and that any such breach caused injuries to the class

members or somehow enriched Dr. Harris or Eaton or Symetra. A fiduciary duty is the highest

standard of duty under the law. *Overstreet v. TRW Com. Steering Div.*, 256 S.W.3d 626, 642 (Tenn.

2008) (citation omitted). In Tennessee, "the question of whether a fiduciary duty has been breached

is a question of fact." *In re Estate of Smith*, No. M2024-01256-COA-R3-CV, 2025 WL 2913182,

at *6 (Tenn. Ct. App. Oct. 14, 2025) (collecting cases).  Here, assuming without deciding Dr.

Harris and/or Eaton and/or Symetra owed fiduciary duties to the members of the class, the class

will then have the burden of proof to show that Dr. Harris and/or Eaton and/or Symetra committed

acts that constituted a breach of fiduciary duty.  Those questions involve discrete plan management

decisions and will likewise be common to all members of the class.  *Iannone v. AutoZone, Inc.*,

No. 2:19-cv-02779-MSN-tmp, 2022 WL 17485953, at *5 (W.D. Tenn. Dec. 7, 2022) (holding that

"whether the Defendants breached their fiduciary duties" was a question of fact "common to all

putative class members" in an ERISA class action).

As for the third and final element, whether the alleged breaches of fiduciary duty

committed by Dr. Harris or Eaton or Symetra injured each member of the class or allowed Dr.

Harris or Eaton or Symetra to enrich themselves, the proof needed to make out this element will

present more common issues.  Start with the injuries to each member of the class. Plaintiffs argue

the question of "whether Defendants' breaches proximately caused the loss in value to the Plan"

is a common issue. Mem. in Support Pls. Mot. Class Certif. 14. But Plaintiffs' framing is not quite

right. Plaintiffs must actually show that a breach of fiduciary duty injured Plaintiffs and the

members of the class or in the alternative that Dr. Harris and/or Eaton and/or Symetra breached

their fiduciary duties and thereby enriched themselves. For reasons the Court has already

discussed, each plan participant and member of the putative class can show individual injury

separate and apart from injury to the Plan as part of Plaintiffs' alternative theory for class-wide

relief.

Plaintiffs can also show Dr. Harris or Eaton enriched themselves when they breached their fiduciary duties. Each loss of plan assets (including money plan participants paid into the Plan), either from transfers of funds to make imprudent investments, or loans made to companies controlled by Dr. Harris or Eaton, or excessive administrative fees paid to Dr. Harris, had the effect of injuring the members of the class and enriching Dr. Harris or Eaton. Plaintiffs have introduced proof to show that several transfers of plan assets went to companies controlled by Dr. Harris and/or Eaton. The proof to make these showings as to any member of the class will prove the element as to all members of the class.

The Court concludes that Plaintiffs' claims for breach of fiduciary duty against Dr. Harris and Eaton and Symetra present common questions of fact and law. Each of the common questions will yield a binary "yes" or "no" answer for the entire class and the answers to the common questions will meaningfully progress the class action claims. *Speerly*, 143 F.4th at 316. Plaintiffs have satisfied the commonality test for their breach of fiduciary duty claims against the Estate of Dr. Harris and Eaton and Symetra.

**B. Violation of the Tennessee Uniform Trust Code for Breach of Trust and Misappropriation of Trust Funds – Estate of Dr. Harris and Eaton**

Count 2 of the Second Amended Complaint alleges violations of the Tennessee Uniform Trust Code. The Tennessee Uniform Trust Code ("TUTC"), Tenn. Code Ann. § 35–15–101 *et seq.*, imposes a series of legal duties on trustees. The duties of a "trustee" commence "[u]pon acceptance of a trusteeship" and continue "until such time as the trust terminates or a successor trustee is appointed and all assets are delivered in good faith, in accordance with its terms and purposes and the interests of the beneficiaries, and in accordance with" the TUTC. § 35–15–801 (defining the duty to administer a trust). In order to prove a "breach of trust" under the TUTC, a plaintiff must

45

show that (1) a "trustee" (2) violated "a duty the trustee owes to a beneficiary." § 35–15–1001(a); *see also* § 35–15–1001, cmt. ("A breach of trust occurs when the trustee breaches one of the duties contained in part 8 [T.C.A. § 35–15–801—35–15–817] or elsewhere in the [TUTC].").

The Second Amended Complaint alleges that both Dr. Harris and Eaton are liable for violations of the TUTC. Plaintiffs allege that Dr. Harris misappropriated Plan assets and engaged in self-dealing by (1) investing "Plan assets in low-performing annuities, high-risk venture firms and undeveloped real estate" for his own benefit (Second Am. Compl. ¶ 575), (2) using "Plan assets to pay for illusory and/or fraudulent services from entities in which Dr. Harris and/or Eaton held a financial interest" (*id*. ¶ 576), (3) keeping "Plan assets invested with an annuity provider that was willing to pay him kickbacks" (*id*. ¶ 577), and (4) withdrawing "a substantial part of his retirement assets from the Plan before the Plan's losses became public knowledge" (*id*. ¶ 579). For his part, Eaton allegedly misappropriated Plan assets and engaged in self-dealing by keeping "Plan assets invested with an annuity provider that was willing to pay him significant commissions . . . in order to benefit Eaton" (*id*. ¶ 578) and using "Plan assets to fund loans to entities that he owned and/or controlled" (*id*. ¶ 580). Plaintiffs allege both Dr. Harris and Eaton violated their statutory duties as trustees and fiduciaries.

The Court finds that Plaintiffs' class claims for violations of the TUTC against the Estate of Dr. Harris and Eaton present common issues of fact and law. First, Plaintiffs have shown that whether Dr. Harris or Eaton meet the statutory definitions of a "fiduciary" or a "trustee" raises a common question. Under the statute, a "trustee" is "an original, additional, and successor trustee, and a cotrustee." § 35–15–103(38); *see also id*., 2013 Restated Cmt. ("Because the definition of trustee includes trustees of all types, any trustee, whether original or succeeding, single or cotrustee, has the powers of a trustee and is subject to the duties imposed on trustees under the

[TUTC]."). The TUTC defines a "fiduciary" to include "a trustee as defined in § 35–14–102 [the definitions section of the Tennessee Uniform Prudent Investor Act]." The Tennessee Uniform Prudent Investor Act ("TUPIA") defines "trustee" as "any fiduciary as defined in [the TUTC]." The determination of whether Dr. Harris or Eaton qualifies as a "trustee" or a "fiduciary" will boil down to a "yes" or "no" for each member of the class.

The alleged breaches committed by Dr. Harris also involve common questions for the members of the class as a whole. The TUTC imposes on "trustees" a duty of loyalty (§ 35–15–802), a duty of prudent administration (§ 35–15–804), and a duty to control and protect trust property (§ 35–15–809).[16] The Second Amended Complaint alleges that Dr. Harris committed a series of acts, which would arguably constitute a breach of each duty. For example, Dr. Harris' selection of imprudent investments implicates his duty of prudent administration and duty to protect trust property. Whether Dr. Harris engaged in each act and whether the act constituted a breach of his statutory duties will result in common answers which apply equally to all members of the class. The same holds true for the alleged breaches committed by Eaton.

The Court holds then that Plaintiffs' claims for violations of the TUTC against the Estate of Dr. Harris and Eaton present common questions of fact and law. Each of the common questions will yield a "yes" or "no" answer, which will apply for the class as a whole, and the answers to the common questions will meaningfully progress a determination of the class action claims. *Speerly*, 143 F.4th at 316. Plaintiffs have met the commonality test for their TUTC claims against the Estate of Dr. Harris and Eaton.

**C. Negligence – Symetra**

---

[16]  The TUTC permits a trust to vary the duties of trustee as defined in the statute. *See* § 35-15-105(a) (permitting the terms of a trust to "expand, restrict, eliminate, or otherwise vary the duties and powers of a trustee, any such other fiduciary, relations among any of them, and the rights and interests of a beneficiary" subject to certain exceptions).

Count 3 of the Second Amended Complaint alleges that Symetra is liable for common law negligence. Under Tennessee common law, a plaintiff alleging negligence must prove the following elements: "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate or legal cause." *Tumminello v. Father Ryan High Sch., Inc.*, 678 F. App'x 281, 286–87 (6th Cir. 2017) (citing *West v. E. Tenn. Pioneer Oil Co.*, 172 S.W.3d 545, 550 (Tenn. 2005)).

According to Plaintiffs, Symetra "had a special relationship with the Plan that gave rise to a duty to exercise due care in the management and oversight of their assets invested in the Fund." Second Am. Compl. ¶ 648. Symetra "negligently failed to exercise the degree of prudence, caution, and good business practice required of persons who obtain and manage retirement funds (*id*. ¶ 651) and "negligently failed to perform adequate due diligence and monitoring with respect to the Plan and its investments" (*id*. ¶ 652). Plaintiffs allege that, but for Symetra's negligence, Symetra "would have discovered that the Plan had lost a substantial portion of its assets" and that Symetra's negligence caused the Plan to suffer damages. *Id*. ¶¶ 656–57.

Plaintiffs' class action claims for negligence against Symetra arguably meet the Rule 23(a) commonality test. Whether Symetra owed plan participants like the class members a duty and whether Symetra breached that duty and caused losses would all appear to be issues common to the class. The existence of a duty to the plan participants would arise out of their participation in the plan, not a specific transaction with Symetra or some individualized relationship with Symetra. The duty owed by Symetra, if any, is common to the class. Likewise, if Symetra breached the duty by failing to impose reasonable controls to prevent self-dealing or embezzlement, the supposed breach as to one plan participant would constitute a breach to all.

48

The Court holds then that Plaintiffs' class action negligence claim against Symetra presents common questions of fact and law. Each of the common questions will yield a "yes" or "no" answer, which will apply for the class as a whole, and the answers to the common questions will meaningfully advance the class action claims. *Speerly*, 143 F.4th at 316. Plaintiffs have met the commonality test for their negligence claim.

**D. Conversion – Estate of Dr. Harris; Sandra Harris; Eaton; Financial Freedom Funds, LLC; Financial Freedom Group, Inc.; Trinity Financial Consultants, LLC; Financial Technologies, LLC; and Day & Night Solar**

Count 4 of the Second Amended Complaint alleges that the following Defendants are liable for the tort of conversion: the Estate of Dr. Harris; Sandra Harris; Eaton; Financial Freedom Funds, LLC; Financial Freedom Group, Inc.; Trinity Financial Consultants, LLC; Financial Technologies, LLC; and Day & Night Solar. "In Tennessee, the elements of a conversion claim are (1) an appropriation of another's tangible property to one's use and benefit; (2) an intentional exercise of dominion over the chattel alleged to have been converted; and (3) defiance of the true owner's rights to the chattel." *In re Piercy*, 21 F.4th 909, 922 (6th Cir. 2021) (quoting *White v. Empire Express, Inc.*, 395 S.W.3d 696, 720 (Tenn. Ct. App. 2012)). The property here, of course, consists of the assets held by the Plan. "Identifiable funds are deemed a chattel for purposes of conversion, and conversion may be established where a party shows ownership or the right to possess specific, identifiable money." *PNC Multifamily Cap. Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 553 (Tenn. Ct. App. 2012) (quoting 90 C.J.S. *Trover and Conversion* § 16 (2012)).

The Court finds that Plaintiffs have met the commonality test for their class action conversion claims against the Estate of Dr. Harris and the other Defendants included in Plaintiffs' allegations of conversion. The Court would highlight that the Second Amended Complaint actually

49

alleges that Defendants converted *the Plan's* assets for their own benefit, and not, strictly speaking, the property of the plan participants who make up the putative class. Plaintiffs nevertheless allege that Defendants converted contributions made by Plaintiffs and other class members to the Plan. Second Am. Compl. ¶ 672 (alleging that the Plan had "been damaged as a proximate and direct result of Defendants' conversion of Plaintiffs and other Class members' respective contributions to the Fund"). One of the common issues to be decided then is whether the members of the class are the true owners of the funds allegedly converted by each Defendant for its own personal use.

The Second Amended Complaint also alleges that each Defendant took discrete actions to improperly appropriate the Plan's assets. For example, Plaintiffs allege Dr. Harris is liable for conversion based on the following acts:

    a. depositing funds from the Plan into his personal checking account;

    b. demanding excessive administrative fees to be taken from the Plan and retaining those fees for his own use;

    c. using funds from the Plan for investment transactions that involved self-dealing;

    d. using funds from the Plan for fraudulent service contracts that involved self-dealing; and

    e. abusing his knowledge of the Plan's losses to withdraw a disproportionate share of retirement funds from the Plan before the scope of the losses became widely known.

Second Am. Compl. ¶ 667. Proof of each action will involve common questions about whether Dr. Harris acted properly in taking the Plan assets in each instance and whether he did so "in defiance of the true owner's rights." *Piercy*, 21 F.4th at 922.

Plaintiffs would hold Sandra Harris liable for conversion because she "directed" or "accepted" the deposit of Plan assets "into a joint bank account she shared with Dr. Harris." Second Am. Compl. ¶ 668. Plaintiffs further allege that Mrs. Harris "abus[ed] her knowledge of the Plan's losses to withdraw a disproportionate share of retirement funds from the Plan before the scope of

the losses became widely known." *Id*. The question of Mrs. Harris' intent and her knowledge that

the money she received rightfully belonged to other plan participants will be common to the class

as a whole.

The same reasoning applies to Plaintiffs' conversion claims against Eaton, Trinity

Financial Consultants, LLC; Financial Technologies, LLC; and Day & Night Solar. Plaintiffs

allege these Defendants are liable for conversion based on the following conduct:

> a. Entering into a loan from the AMEC Department of Retirement Services and subsequently settling the loan on unreasonably favorable terms;
>
> b. Receiving salary and kickbacks from the Motorskill Entities in exchange for steering Plan assets to the Motorskill Entities;
>
> c. Receiving funds from the Plan for fraudulent service contracts;
>
> d. Entering into a loan from the Plan on unreasonably favorable terms for Day & Night Solar's benefit; and
>
> e. Taking investments in Day & Night Solar of Plan assets directly from the Plan and indirectly through Motorskill without giving fair value in exchange to the Plan.

*Id*. ¶ 669. If plan participants establish that the funds rightfully belonged to them, then questions

of each Defendant's intent to appropriate the funds will be common to the class. The same is

likewise true for Plaintiffs' claims against Financial Freedom Funds, LLC and Financial Freedom

Group, Inc. *Id*. ¶ 670 (alleging that Financial Freedom Funds, LLC converted Plan assets by "a.

using funds from the Plan for investment transactions that enriched Eaton and Dr. Harris at the

expense of the Plan; and b. using funds from the Plan for fraudulent service contracts that enriched

Eaton and Dr. Harris at the expense of the Plan"); *id*. ¶ 671 (alleging that Financial Freedom Group,

Inc. "converted a portion of the Plan's assets by, inter alia, receiving funds from the Plan for

fraudulent service contracts").

All of this is enough to meet the commonality test for Plaintiffs' conversion claims. Each

of the common questions will yield a "yes" or "no" answer, which will apply for the class as a whole, and the answers to the common questions will meaningfully progress the class action claims. *Speerly*, 143 F.4th at 316.

### E. Fraudulent Concealment – Estate of Dr. Harris, Eaton, and Symetra

Count 5 of the Second Amended Complaint alleges that Dr. Harris, Eaton, and Symetra fraudulently concealed certain information about the true state of the Plan's affairs. Under Tennessee law, the tort of fraudulent concealment, also known as "constructive fraud," occurs when "a party who has a duty to disclose a known fact or condition fails to do so, and another party reasonably relies upon the resulting misrepresentation, thereby suffering injury." *Roopchan v. ADT Sec. Sys., Inc.*, 781 F. Supp. 2d 636, 650 (E.D. Tenn. 2011) (quoting *Odom v. Oliver*, 310 S.W.3d 344, 349–50 (Tenn. Ct. App. 2009)); *see also Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 571 (6th Cir. 2003) (quoting *Chrisman v. Hill Home Dev., Inc.*, 978 S.W.2d 535, 538–39 (Tenn. 1998)).

To establish their claims for fraudulent concealment, Plaintiffs must show that "(1) [a defendant] concealed or suppressed a material fact, (2) that [the defendant] had a duty to disclose that fact to [Plaintiffs], (3) that [the defendant] intentionally concealed or suppressed that fact with the intent to deceive [Plaintiffs], (4) that [Plaintiffs] were unaware of the fact and would have acted differently if [they] had known about the concealed fact, and (5) that [Plaintiffs were] damaged as a result of the concealment or suppression of the fact." *Saltire Indus., Inc. v. Waller, Lansden, Dortch & Davis, PLLC*, 491 F.3d 522, 527 (6th Cir. 2007) (citing *Justice v. Anderson Cnty.*, 955 S.W.2d 613, 616 (Tenn. Ct. App. 1997)).

The Court finds that common questions exist over many elements of Plaintiffs' fraudulent concealment claims. For example, one of the common questions will be whether Dr. Harris, Eaton,

and Symetra owed plan participants a duty to disclose certain material facts about the administration of the Plan, an issue that also overlaps with the question of duty implicated by Plaintiffs' claims for breach of fiduciary duty and the violation of the TUTC against Dr. Harris and Eaton.  This single common issue suffices to meet Rule 23(a)'s commonality test.

As for the specific material facts allegedly concealed, Plaintiffs have shown that some will turn on common issues of fact while others might not. For example, to support their fraudulent concealment claim against the Estate of Dr. Harris, Plaintiffs allege that Dr. Harris concealed the following material facts from plan participants despite his duty as a plan fiduciary to disclose them:

a. The high-risk and speculative investments made with Plan assets;

b. The fact that the Plan was earning far below the market rate of return and growth for a pension plan;

c. The fact that Dr. Harris was receiving kickbacks in the form of "administrative fees" from Symetra that exceeded the express limits established by AMEC;

d. The fact that Dr. Harris was using Plan assets to pay a network of corporate entities for fraudulent and/or illusory services;

e. The fact that the corporate entities contracting for these "services" were established, owned, and/or operated by Eaton and Dr. Harris;

f. The fact that Dr. Harris and Eaton were receiving kickbacks from the Motorskill Entities in exchange for investing Plan assets in those entities;

g. The fact that Dr. Harris and Eaton repeatedly rejected opportunities to obtain better returns from fixed-income investments than what Symetra was providing the Plan.

Second Am. Compl. ¶ 708.

Although neither the Estate of Dr. Harris nor Eaton have opposed class certification, Symetra has argued that one of the issues related to class certification generally is the fact that certain plan participants also served in positions of church leadership.  By virtue of their leadership roles, these participants had information about Dr. Harris' investments that other plan participants

53

did not have or at least had the information sooner. For instance, some highly placed plan participants received reports from Dr. Harris about the Plan's investments in Florida real estate. And all plan participants received information that the Plan held investments in Symetra annuities and the Motorskill entities. The upshot is that whether Dr. Harris actually concealed certain information from members of the class may not be capable of common answers for the class as a whole.

The same reasoning arguably applies to Plaintiffs' fraudulent concealment claims against Eaton. Plaintiffs allege on behalf of the class that Eaton concealed the following material facts from plan participants despite his duty as a plan fiduciary to disclose them:

a. The high-risk and speculative investments made with Plan assets;

b. The fact that the Plan was earning far below the market rate of return and growth for a pension plan;

c. The fact that Eaton received commissions from Symetra in exchange for his decision to select Symetra as the Plan's primary investment vendor for fixed income investments.

d. The fact that Dr. Harris was using Plan assets to pay a network of corporate entities for fraudulent and/or illusory services;

e. The fact that the corporate entities contracting for these "services" were established, owned, and/or operated by Eaton and Dr. Harris;

f. The fact that Dr. Harris and Eaton were receiving kickbacks from the Motorskill Entities in exchange for investing Plan assets in those entities;

g. The fact that Eaton was a paid employee of the Motorskill Entities during the period Plan assets were being invested in the Motorskill Entities;

h. The fact that Eaton was diverting Plan assets to Day & Night Solar for his benefit; and

i. The fact that Dr. Harris and Eaton repeatedly rejected opportunities to obtain better returns from fixed-income investments than what Symetra was providing the Plan.

Second Am. Compl. ¶ 702.

There remain serious questions over whether Dr. Harris and/or Eaton actually concealed

each of these facts from all plan participants. The Court ultimately finds it unnecessary to address each of the allegedly concealed facts because the Court finds that Plaintiffs' fraudulent concealment claims against the Estate of Dr. Harris, Eaton, or Symetra do not satisfy the Rule 23(b)(3) predominance test. For the time being, the Court assumes without deciding that Plaintiffs can meet the commonality requirement for their fraudulent concealment claims against the Estate of Dr. Harris, Eaton, and Symetra. Plaintiffs' fraudulent concealment claims raise at least one common issue of fact. Therefore, the commonality test is met for the claims of fraudulent concealment against the Estate of Dr. Harris and Eaton.

## F. Fraudulent Misrepresentation – Estate of Dr. Harris

Count 6 of the Second Amended Complaint alleges that Dr. Harris committed the tort of fraudulent misrepresentation. The Tennessee Supreme Court has held that a fraudulent misrepresentation and common law fraud claim share the same elements of proof. *Hodge v. Craig*, 382 S.W.3d 325, 342 & n.28 (Tenn. 2012). In fact, the Tennessee court has suggested that the term "intentional misrepresentation" replace "fraud" and "fraudulent misrepresentation" as the best label for these causes of action and be used exclusively in Tennessee so as to avoid confusion. *Id.* Under Tennessee law, a plaintiff alleging intentional misrepresentation must prove the following elements:

> (1) the defendant made a representation of an existing or past fact; (2) the representation was false when made; (3) the representation was in regard to a material fact; (4) the false representation was made either knowingly or without belief in its truth or recklessly; (5) plaintiff reasonably relied on the misrepresented material fact; and (6) plaintiff suffered damage as a result of the misrepresentation.

*Id.* (citing *Walker v. Sunrise Pontiac–GMC Truck, Inc.,* 249 S.W.3d 301, 311 (Tenn. 2008)). "The essence of fraud is deception." *Deal v. Tatum*, No. M201501078COAR3CV, 2016 WL 373265, at *7 (Tenn. Ct. App. Jan. 29, 2016) (citing *Lopez v. Taylor,* 195 S.W.3d 627, 634 (Tenn. Ct. App.

55

2005)). "In its most general sense, fraud is a trick or artifice or other use of false information that induces a person to act in a way that he or she would not otherwise have acted." *Id.* "Fraud occurs when a person intentionally misrepresents a material fact or intentionally produces a false impression in order to mislead another or to obtain an unfair advantage." *Id.* (citing *Brown v. Birman Managed Care, Inc.*, 42 S.W.3d 62, 66 (Tenn. 2001)).

Plaintiffs would hold the Estate of Dr. Harris liable for the following alleged misrepresentations "about the value of Plan assets, the overall balance of the Fund, and the Fund's rate of return": representing that the Plan's assets included dividends on the Plan's subscription to the Motorskill Entities even though the "dividends had not actually been earned" (Second Am. Compl. ¶ 732); falsely stating that the "Motorskill subscriptions were valued at $7 per unit" (*id.* ¶ 733); knowingly or recklessly making "false representations that the Motorskill Entities remained operating and solvent after 2019" (*id.* ¶ 734); and knowingly or recklessly making "false representations about the value of the Key Marco real estate investments" (*id.* ¶ 735).

Like Plaintiffs' class action claims for negligence, the class action claims for fraudulent misrepresentation against the Estate of Dr. Harris arguably satisfy the Rule 23(a) commonality test. Whether Dr. Harris' representations were false and concerned material facts and whether Dr. Harris knowingly or recklessly made the false representations are common issues for the class as a whole. For instance, a jury would need to decide whether each representation involved a material fact. "[A] statement is material or involves a material fact if it will likely affect the conduct of a reasonable person." *Saltire Indus.*, 491 F.3d at 527 (quoting *Patel v. Bayliff*, 121 S.W.3d 347, 353 (Tenn. Ct. App. 2003)). These common issues clear the bar for the commonality test.

Symetra, though Plaintiffs have not alleged a claim for fraudulent misrepresentation against it, argues elsewhere that reasonable reliance will not be a common issue across all members

56

of the class.  The Court ultimately finds it unnecessary to address that question because the Court

finds that Plaintiffs' fraudulent misrepresentation claim against the Estate of Dr. Harris does not

satisfy the Rule 23(b)(3) predominance test.  While Plaintiffs have offered a damages model to

cover almost 20 years of losses to the Plan, Plaintiffs' fraudulent misrepresentation claims against

the Estate of Dr. Harris are confined to a series of discrete misrepresentations, all occurring long

after Dr. Harris moved the Plan's annuity business to Symetra. For the time being, the Court

assumes without deciding that Plaintiffs can meet the commonality requirement for their

fraudulent misrepresentation claim against the Estate of Dr. Harris.

**G. Civil Conspiracy – Estate of Dr. Harris; Sanda Harris; Eaton; Symetra; Financial Freedom Funds, LLC; Day & Night Solar; Trinity Financial; Financial Freedom Group, LLC; Financial Technologies, LLC; and the Motorskill Entities**

Count 8 of the Second Amended Complaint alleges that several Defendants engaged in a

conspiracy to harm the Plan and plan participants. In order to prove a civil conspiracy under

Tennessee law, Plaintiffs must establish that (1) two or more persons had a common design; (2)

the common design sought to accomplish an unlawful purpose; (3) those individuals engaged in

an overt act in furtherance of the conspiracy; and (4) Plaintiffs suffered injury as a result. *See*

*Morrow v. Kroger Ltd. P'ship I*, No. 2:24-cv-02564-SHL-cgc, 2025 WL 367404, at *5 (W.D.

Tenn. Jan. 29, 2025) (citing *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 38 (Tenn. Ct. App.

2006)). In that way, civil conspiracy is "a means of extending, to a tortfeasor's co-conspirators,

liability for the tortfeasor's underlying tort." *Wachter, Inc. v. Cabling Innovations, LLC*, 387 F.

Supp. 3d 830, 849 (M.D. Tenn. 2019).  Otherwise, conspiracy is not an independent tort under

Tennessee law. *Campbell v. BNSF Ry. Co.*, 600 F.3d 667, 677 (6th Cir. 2010) (citing *Greene v.*

*Brown & Williamson Tobacco Corp.*, 72 F. Supp. 2d 882, 887 (W.D. Tenn. 1999)).

Here, the existence of the alleged conspiracy and the particular aims of the conspiracy all

raise common questions and meet the Rule 23(a) commonality test. Plaintiffs allege that their case "is about a conspiracy between a group of businesses and individuals who used their control and influence over a retirement fund to enrich themselves at Plaintiffs' and Class Members' expense." Second Am. Compl. ¶ 1. Whether Defendants actually had such "a common design" raises a common yes/no question that will apply across the class.

Also, whether Defendants' "common design" sought to accomplish an unlawful purpose, or a lawful purpose by unlawful means, is susceptible to common proof for the class members as a whole. "An essential element of a conspiracy claim is that the conspiring parties intend to accomplish an unlawful purpose, or a lawful purpose by unlawful means." *Kincaid*, 221 S.W.3d at 39 (citation omitted). That means a conspiracy "requires an underlying predicate tort allegedly committed pursuant to the conspiracy." *PNC Multifamily Cap. Inst. Fund*, 387 S.W.3d at 556 (quoting *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 180 (Tenn. Ct. App. 2007)). The predicate torts are the same torts, Dr. Harris' and Eaton's alleged breaches of fiduciary duty and violations of the TUTC, the Court has already identified as presenting common questions for class treatment. The fact that Plaintiffs intend to abandon their claim that Symetra also breached its fiduciary duty to individual plan participants does not alter that conclusion. Plaintiffs can still hold Symetra liable as a conspirator with proof that Symetra joined the conspiracy and committed an overt act to further the goals of the conspiracy. *Morrow*, 2025 WL 367404, at *5. The proof that Symetra paid Dr. Harris greater administrative fees than he was otherwise authorized to receive satisfies the overt act showing. And the proof will apply across the board to all plan participants.

Furthermore, Plaintiffs have shown that Defendants engaged in overt acts to advance the aims of the conspiracy and that their actions harmed plan participants. Plaintiffs trace the origin

58

of the alleged conspiracy all the way back to 2001 when "Dr. Harris, Eaton, Newport, and Symetra began their long[-]running conspiracy to, inter alia, misappropriate funds, defraud Plaintiffs, and manage the Fund for their own benefits and to the detriment of the Plaintiffs and the Plan." *Id*. ¶ 147. According to Plaintiffs, Dr. Harris "[s]teer[ed] assets into low-performing Symetra annuities that enabled Eaton to receive large commissions and Symetra to obtain a source of cheap capital with minimal obligations to generate returns for the Fund" and "Symetra[] pa[id] inflated 'administrative fees' to Dr. Harris as an inducement for Dr. Harris to keep Fund assets in Symetra annuities." *Id*. ¶ 148(a) & (b). Whether the parties actually committed these underlying overt acts or did so with the intent to harm the plan participants raise commons issues suitable for class treatment.

The same is true for other alleged conspirators. Plaintiffs have shown that the business entities owned or controlled by Dr. Harris and Eaton all received Plan assets, either as investments in the companies, as loans made to the companies, or as remuneration for non-existent services. Each overt act had the effect of furthering the conspirators' aims of using Plan assets for their own enrichment. Proof of one of the overt acts will satisfy Plaintiffs' burden to prove the overt act as to all class members.

The Court concludes then that Plaintiffs' claims for civil conspiracy against the Defendants named in this count present common questions of fact and law. Each of the common questions identified here will yield a common "yes" or "no" answer for the entire class and the answers to the common questions will meaningfully advance the class action claims. *Speerly*, 143 F.4th at 316. Therefore, Plaintiffs' have satisfied the commonality test for their civil conspiracy claims against these Defendants.

**H. Aiding and Abetting Breach of Fiduciary Duty – Symetra; Financial Freedom Funds, LLC; Financial Freedom Group, Inc.; Financial Technologies, LLC; Day & Night Solar;**

59

**Trinity Financial Consultants, LLC; the Motorskill Entities; and Sandra Harris**

Count 9 of the Second Amended Complaint alleges that several Defendants, including Symetra, Mrs. Harris, the Motorskill Entities, and several of the business entities owned or controlled by Dr. Harris and Eaton, are liable for aiding and abetting breaches of fiduciary duty. Under Tennessee law, a plaintiff may hold a defendant liable for a third party's breach of duty if "the defendant knew that his companions' conduct constituted a breach of duty, and that he gave substantial assistance or encouragement to them in their acts." *PNC Multifamily Cap. Inst. Fund*, 387 S.W.3d at 552 (quoting *Carr v. United Parcel Serv.*, 955 S.W.2d 832, 836 (Tenn. 1997)). The Tennessee Court of Appeals has cited the Restatement of Torts § 876 (1934 & 2004 Supp.) with approval. *Id*. The Restatement of Torts § 876 provides as follows:

> For harm resulting to a third person from the tortious conduct of another, a person is liable if he:
>
> (a) orders or induces such conduct, knowing of the conditions under which the act is done or intending the consequences which ensue, or
>
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
>
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement of Torts § 876 (1934 & 2004 Supp.).

Plaintiffs allege that several Defendants aided and abetted Dr. Harris and Eaton in their own breaches of fiduciary duty, largely related to the transfer of Plan assets to companies owned or controlled by Dr. Harris and Eaton and the remuneration of excessive fees or kickbacks to Dr. Harris and Eaton.

The Court finds that Plaintiffs have shown that common questions exist to support class

treatment of their aiding and abetting claims. First, the issue of whether Dr. Harris or Eaton owed plan participants a fiduciary duty at all is itself a question common to the class. If either owed a fiduciary duty to any class member by virtue of their participation in the Plan, then he also owed the same duty to all class members by virtue of their participation in the Plan. Second, the issue of whether Symetra, Mrs. Harris, or any other Defendant named in this count knew that the conduct of Dr. Harris or Eaton constituted a breach of his fiduciary duty to the plan participants also presents a common question for determination across the class. Proof of a Defendant's knowledge about Dr. Harris' breach of fiduciary duty will prove its knowledge to establish this element as to each class member's aiding and abetting claim. Finally, if any Defendant gave substantial assistance to Dr. Harris or Eaton in the breach of their fiduciary duties to the plan participants, that common proof will apply to all class members and support their claims for aiding and abetting.

The Court holds then that Plaintiffs' claims for aiding and abetting breach of fiduciary duty against the Defendants named in this count present common questions of fact and law. Each of the common questions identified here will yield a common "yes" or "no" answer for the entire class, and the answers to the common questions will meaningfully advance the class action claims. *Speerly*, 143 F.4th at 316. Therefore, Plaintiffs' have satisfied the commonality test for their aiding and abetting claims against these Defendants.

The Court has now considered whether Plaintiffs can meet Rule 23(a)'s commonality test for each of their eight class action claims and determined that they can. But do these common questions predominate over questions that may not be common to the class? Plaintiffs say "yes," Symetra says "no." Neither the Estate of Dr. Harris nor Eaton have answered the question and pointed to any issues that would not be common. The Court is left then to consider the matter as part of its duty to conduct a rigorous analysis of the Rule 23 requirements. "Technically, the

plaintiffs need only identify one common question to satisfy Rule 23(a)(2)'s commonality element. If other questions raise individual issues, the court's decision to certify a class must then depend on Rule 23(b)(3)'s predominance element." *In re Nissan N. Am., Inc. Litig.*, 122 F.4th at 251 (internal citations omitted). The Court now proceeds to decide whether the predominance test is met.

## V. *Speerly*'s Step Two: Rule 23(b)(3) Predominance Test

A class that satisfies Rule 23(a)'s requirements must also fall within one of three categories found in Rule 23(b). Plaintiffs seek certification here under Rule 23(b)(3), which sets out a two-part test and requires two showings, predominance and superiority. A plaintiff must show that common questions "predominate" and that class action is "superior to other available methods" of adjudication. Fed. R. Civ. P. 23(b)(3). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Beattie*, 511 F.3d at 564 (quoting *Windsor*, 521 U.S. at 632). It is not enough for a class to present common questions "even in droves." *Dukes*, 564 U.S. at 350, 131 S.Ct. 2541. The class action mechanism must nevertheless yield "common answers" of the kind that will resolve the dispute. *Id*. "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id*. (citation omitted).

To satisfy Rule 23(b)(3)'s predominance test, "a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof." *Id.* (quotation marks and citation omitted). "[C]ommon issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues." *Id.* (quotation marks and citation omitted). The Court of Appeals in *Speerly* referred to this as "the second step of the

62

commonality-predominance analysis," where the Court must satisfy itself that the common questions "predominate over any questions affecting only individual members." *Speerly*, 143 F.4th at 316. The court's task is to "put the common issues on one side, the individual issues on the other, then qualitatively evaluate which side predominates." *Nissan*, 122 F.4th at 252.

## A. Plaintiffs' Damages Model

"Class certification under Rule 23(b)(3) requires that a plaintiff establish 'that damages are capable of measurement on a class-wide basis.'" *In Re FirstEnergy Corp. Secs. Litig.*, 149 F.4th 587, 620 (6th Cir. 2025) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 34, 133 S.Ct. 1426, 1431 (2013)). If a class proposes a damages model that fails the Rule 23(b)(3) predominance test, "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *Id.* Mathematical certainty or exactitude is not the standard. *Comcast*, 569 U.S. at 35 (citing *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931)). Whether at the class certification stage or at trial, "courts must conduct a 'rigorous analysis' to determine whether a plaintiff's damages case is consistent with its liability case." *In Re FirstEnergy Corp. Secs. Litig.*, 149 F.4th at 620 (cleaned up). And in cases involving multiple theories of liability or causes of action, the plaintiff's damages must be "specifically attributable" to each theory. *Id.* at 621. Although *Comcast*, the Supreme Court's seminal opinion on the issue, was an antitrust case and addressed damages models in the context of antitrust, the Sixth Circuit has "applied *Comcast* outside the context of antitrust cases." *Zehentbauer Fam. Land, LP v. Chesapeake Expl., L.L.C.*, 935 F.3d 496, 510 (6th Cir. 2019).

Plaintiffs argue that their damages model satisfies this standard and is consistent with their theory of liability. As Plaintiffs state it, "Plaintiffs' damages theory is that Defendants' respective unlawful and tortious actions 'robbed Plaintiffs of reasonable growth and investment returns for

63

almost two decades[.]'" Pls.' Mem. in Support Mot. for Class Certif. 35 (ECF No. 981-1) (quoting Second Am. Compl. ¶ 4). To support their theory of liability, Plaintiffs have disclosed opinion evidence from two witnesses, Martin Dirks and Harris Devor. Plaintiffs' opinion witnesses have opined that the Plan's total balance would have been $265,806,852 had it obtained the historical results of a benchmark index fund, the Vanguard VBIAX fund. Measured against the actual value of the Plan's assets as of the end of the second quarter of 2021 ($38,066,613), Mr. Devor concluded that the Plan suffered a total loss of $227,740,239, that is, the difference between its value had the Plan's assets been prudently invested and its actual value.

Plaintiffs' opinion witnesses arrived at these conclusions based on a series of assumptions. First, Mr. Dirks opined that Plan's investments did not meet the standard of care for the investment of a retirement plan's assets and that a more appropriate asset allocation would have been 60% equities and 40% fixed income. Next, Mr. Dirks determined that the Vanguard ETF VBIAX was an appropriate fund and comparator as a benchmark for a prudently managed retirement fund with the 60%-40% mix of equities and fixed income.

Using Mr. Dirks' opinion testimony about the VBIAX benchmark, Mr. Devor calculated the expected value of the Plan's assets, had they been invested in a more prudent manner. In doing so, Mr. Devor started with historical valuation data from Newport's quarterly reports, beginning with Q1 2002 and continuing for each financial quarter until Q2 2021 when Dr. Harris retired and the Plan's losses first came to light. Newport's quarterly reports reflected changes in the balance of the Plan's assets as part of the following ongoing activities:

> (a) contributions made to the Plan by AMEC and/or Plan participants, (b) distributions paid from Plan assets to Plan participants, (c) various expenses/fees paid by the Plan, e.g., those fees paid to Newport for record-keeping duties or property taxes paid in connection with the Florida Real Estate, (d) purported investment gains/losses supposedly generated by the Plan's various investments (i.e., Symetra, Motorskill, Financial Freedom, and the Florida Real Estate), and (e)

> miscellaneous adjustments that either increased or decreased the Plan's purported
> balance depending on the nature of the adjustment.

Devor Rep. § 23 (ECF No. 995-2).

Based on this historical data about the Plan's financial performance, Mr. Devor constructed a new model to demonstrate the expected value of the Plan's assets for each financial quarter during the period between Q1 2002 and Q2 2021. Mr. Devor used a three-step process to make his calculations: (1) compute the quarter's ending balance after accounting for contributions, withdrawals, and fees and expenses; (2) calculate the expected investment returns for the quarter by multiplying the amount of Plan assets available for investment by the assumed expected rate of investment returns for the quarter; and (3) add the ending quarterly balance to the expected investment returns to arrive at the expected ending balance for the quarter. *Id*. at § 25.

As part of the expenses deducted at step one of the calculations, Mr. Devor was asked to assume that the Plan had not paid $13,490,978 in fees (representing approximately 2% of the Plan's assets each year) to the AMEC Department of Annuity Investment & Insurance between Q1 2005 and Q2 2021. *Id*. at § 27(a). Mr. Devor was also asked to assume that the Plan had not paid $740,302 between Q1 2008 and Q2 2021 in real property taxes on the Florida real estate purchased by Dr. Harris. *Id*. at § 27(b).

Perhaps most important of all, Mr. Devor assumed an expected rate of return consistent with the rates of return for the VIABX benchmark, not the lower rates paid pursuant to the Plan's guaranteed annuity contracts with Symetra. Mr. Devor repeated this calculation for each financial quarter from Q1 2002 to Q2 2021 and arrived at an expected value of $265,806,852 in Plan assets.

Having determined the total shortfall for the Plan's assets, Mr. Devor then proposed a method for calculating each class member's pro rata share of the recovery. Once more utilizing historical plan information compiled by Newport, Mr. Devor calculated each class member's

percentage share of the actual funds on hand as of June 2021 (at the time of Dr. Harris' retirement). Mr. Devor then multiplied each class member's percentage share by the total recovery of the Plan's expected value ($265,806,852) to arrive at the class member's share of the recovery.

The Court notes that there is some reason to question the assumptions behind Plaintiffs' damages model, assumptions with bearing on the relevance and reliability of the model as well as its fit with Plaintiffs' theories of liability and the evidence in the case. Factually, the evidence shows that the Plan's assets were already invested exclusively in annuity contracts before Dr. Harris' election as executive director in 2001 and before the Church moved its annuity business to Symetra in 2002. After all, the Plan was formally known as the AMEC Ministerial Retirement *Annuity* Plan. Not only had the Church already decided to invest the Plan's funds in annuities, Dr. Harris did not unilaterally select Symetra. The proof shows that the then-chair of the AMEC Commission on Retirement Services, Bishop John Adams, was also involved in the selection process and that the AMEC Commission on Retirement Services voted to approve Dr. Harris' recommendation to move the Plan's annuity business to Symetra. A damages model based on the assumption that Dr. Harris steered the Plan's assets into annuities is not well supported in the record.

The soundness of Mr. Dirks' opinion on that point is not the critical issue for purposes of class certification and is a matter better left perhaps for consideration under the *Daubert* standard. Symetra has moved for the exclusion of the opinion evidence in separately filed *Daubert* motions. *See* Mot. to Exclude Proposed Expert Testimony on Damages by H. Devor & M. Dirks, Sept. 11, 2025 (ECF No. 936); Mot. to Exclude Testimony of Pls.' Expert M. Dirks, Sept. 11, 2025 (ECF No. 942).

Even assuming Dr. Harris and other church leaders should have considered a different

investment approach for the Plan's assets, the problem with Plaintiffs' damages model is that the model does not fit each of the theories of liability for which Plaintiffs seek class certification. "The first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event." *Comcast*, 569 U.S. at 38 (quoting Fed. Jud. Ctr., *Reference Manual on Scientific Evidence* 432 (3d ed. 2011)). "[A]fter *Comcast* [a] class must be able to show that their damages stemmed from the defendant's actions that created the legal liability." *In re VHS of Michigan, Inc.*, 601 F. App'x 342, 344 (6th Cir. 2015). Plaintiffs' model assumes that the plan participants' injuries began in 2002 with the selection of Symetra as the annuity provider for the Plan when, according to Mr. Dirks, an investment of 100% of the Plan's assets in annuities was not a prudent way of investing the assets.

By contrast, most of Plaintiffs' theories for relief on behalf of the class do not trace their injuries back to 2002. Rather, Plaintiffs allege that Defendants are liable for discrete acts or omissions that occurred later, and sometimes many years later, and therefore caused injuries in the form of monetary losses long after 2002. Simply put, a model that purports to measure damages from 2002 to 2021, all the while compounding the economic effect of the injuries through quarterly investment growth, is simply overinclusive for most of Plaintiffs' causes of action.

<u>Negligence</u>. For example, Plaintiffs allege that Symetra is liable for losses to the Plan which occurred when Dr. Harris transferred money out of the Plan's annuity account at Symetra and either loaned the funds to his own companies, used the funds to hire his own companies to perform illusory services, or invested the funds in more risky ventures like the Motorskill Entities. The basis of Plaintiffs' common law negligence claim against Symetra is Symetra's "duty to exercise due care in the management and oversight of their assets invested in the Fund." Second Am. Compl. ¶ 648. Plaintiffs suppose Symetra's negligence allowed Dr. Harris to move the money

out of conservative Symetra annuities and into these inappropriate investments, thereby harming plan participants.

The earliest of those improper or imprudent transfers, though, did not occur in 2002, and most occurred years after the Church had opened its annuity account with Symetra. Assuming Symetra owed plan participants a common law duty to put safeguards in place and that the transfers constituted a breach of that duty, each transfer was a completed act of negligence as of the date of the transfer. The plan participants' injuries began to run from the date of each individual transfer, not the original decision to move the Plan's assets into Symetra annuities. A damages model that measures the extent of the plan participants' losses going back to the opening of the account does not fit Plaintiffs' theory of Symetra's negligence.

Breach of Fiduciary Duty and Violations of TUTC. The same reasoning holds true for other claims on which Plaintiffs seek class certification. Plaintiffs allege class action claims against the Estate of Dr. Harris and Eaton for the breach of their fiduciary duties and substantially similar claims for violations of their duties under the TUTC. Notably, the Second Amended Complaint does not specifically allege that either Defendant breached his fiduciary duties by selecting annuities, much less Symetra annuities, in 2002. Plaintiffs do allege that Dr. Harris violated his duties under the TUTC, in part, by investing "Plan assets in low-performing annuities." Second Am. Compl. ¶ 575. Even if Plaintiffs had pleaded a fiduciary or TUTC theory based on the selection of annuities, the specific breach was a discrete act in 2002. Plaintiffs' damages model includes a number of additional adjustments related to later breaches of fiduciary duty, most completely unrelated to any economic harm caused by the choice to keep the Plan's funds in annuities. In other words, the model does not isolate the economic harm resulting from one specific breach of fiduciary duty and instead combines each into an undifferentiated combination

of damages. *Comcast* requires a closer, more congruent fit between a specific theory of liability and a theory of damages. Plaintiffs' model therefore does not satisfy *Comcast* and fails to demonstrate a fit between the particular allegations about each alleged breach of fiduciary duty or violation of the TUTC committed by Dr. Harris or Eaton and the damages modeled.

Conversion. Plaintiffs' class allegations that certain Defendants are liable for conversion all concern transfers, loans, or other imprudent investments that involved Defendants years after the decision was made to invest the Plan's assets in Symetra annuities. *E.g.* Second Am. Compl. ¶ 667 (alleging that Dr. Harris moved Plan funds into his personal checking account, collected excessive administrative fees, and engaged in self-dealing at the Plan's expense); *id.* ¶ 668 (alleging that Mrs. Harris was the joint account owner of the account where Plan assets were deposited).

Fraudulent Concealment. Plaintiffs' class claims of fraudulent concealment against the Estate of Dr. Harris, Eaton, and Symetra largely suffer from the same incongruence. Plaintiffs allege that both Dr. Harris and Eaton concealed material information about the Plan's "high-risk and speculative investments," relatively low rates of return, Dr. Harris' collection of excessive administrative fees paid out of Plan assets, and the use of Plan assets to lend or contract with companies he and Eaton owned, to name a few. Each of the concealed facts related to events that occurred long after the Plan moved its annuities to Symetra in 2002.

Plaintiffs do allege that Eaton fraudulently concealed the fact that Symetra paid him a large commission when the Church selected Symetra as its new annuity provider in 2001 in violation of Eaton's duties to the Plan. That injury fits with the temporal scope of Plaintiffs' damages model. However, Plaintiffs have not shown how the concealment of the fact resulted in *all* of the damages exhibited in its class-wide model. Specifically, there is no evidence that the original commission

or any of Eaton's subsequently-received tail commissions came out of Plan assets. Plaintiffs have introduced opinion evidence that the commissions had the effect of reducing the returns the Plan could expect as part of its annuity accounts with Symetra. Even so, Plaintiffs' damages model does not isolate the damages traceable to Eaton's concealment of his commissions. On the contrary, Plaintiffs' damages model includes additional damages causally unrelated to Eaton's alleged concealment about his commissions.

Fraudulent Misrepresentation. Plaintiffs' class allegations that Dr. Harris fraudulently misrepresented the value of Plan assets all relate to representations Dr. Harris allegedly made about the value of the Plan's investments in the Motorskill Entities and real estate in Florida. Those investments were not made in 2002 and only happened later, once Dr. Harris and Eaton allegedly began to select other investments for the Plan. Plaintiffs' damages model does not properly isolate the impact of these injuries on the expected value of the Plan's assets.

Aiding and Abetting Breach of Fiduciary Duty. Plaintiffs' damages model fails to align with its class claims for aiding and abetting, mostly for the same reasons the model does not fit with Plaintiffs' breach-of-fiduciary-duty theory. Plaintiffs allege that Dr. Harris and Eaton breached their fiduciary duties to the Plan and that Symetra and other Defendants aided and abetted breaches of fiduciary duty committed by Dr. Harris and Eaton, in most cases going back years before Dr. Harris retired. And yet Plaintiffs tie the discrete acts of aiding and abetting to specific transfers of Plan assets or other investment decisions allegedly made by Dr. Harris and Eaton in years after 2002. The damages model captures more damages than those Plaintiffs can trace to any one Defendant's alleged breach of fiduciary duty or act of aiding and abetting.

For all of these reasons, Plaintiffs' damages model simply does not match their class action theories of each Defendant's liability and the damages caused by their tortious conduct. "In light

of the model's inability to bridge the differences between [each of Plaintiffs' class action tort theories], Rule 23(b)(3) cannot authorize treating [plan participants] as members of a single class." *Comcast*, 569 U.S. at 38, 133 S.Ct. 1426.  The Court concludes then that Plaintiffs have not satisfied Rule 23(b)(3)'s predominance test, with one exception.

The Court holds that Plaintiffs' damages model properly aligns with their class action claim for civil conspiracy and therefore meets the *Comcast* standard.  Plaintiffs allege on behalf of the class that Defendants entered into an agreement or common design to misappropriate the Plan's assets for their own gain, starting with the decision in 2001 to move the Plan's annuity business to Symetra, a transaction that yielded a substantial recurring commission for Robert Eaton.  Dr. Harris and Eaton then set about a long-running scheme to use the Plan's assets to lend money to their own companies, invest in their companies, hire their companies to perform illusory services for the Plan, and ultimately to invest in the Motorskill Entities.  Each transfer of the Plan's assets inevitably involved a prohibited transaction and some gain or kickback for Dr. Harris or Eaton. According to Plaintiffs, Symetra's role in the scheme was to facilitate Dr. Harris' questionable transfers of Plan funds from Symetra annuity accounts, which benefited only Dr. Harris and Eaton, while Symetra paid the Plan below-market interest rates and held millions in Plan assets. The civil conspiracy allegedly came to include a number of other Defendants besides Symetra, all playing their own roles to further the broader scheme. Second Am. Compl. ¶ 4 ("The true value of the Fund is roughly $90,000,000 less than what Plaintiffs were promised by Dr. Harris and Newport as recently as June 30, 2021. But the true extent of Plaintiffs' damages is much greater. The misappropriation and mismanagement of the Fund also robbed Plaintiffs of reasonable growth and investment returns for almost two decades, making the actual loss more like $250,000,000.").

Unlike the other torts claims which all involve a series of discrete acts or omissions,

71

Plaintiffs' class action claims for civil conspiracy work differently. As part of its application of the Rule 23(b)(3) predominance test, the Court's task is to ensure that Plaintiffs' damages model "accounts for how each claim works." *Speerly*, 143 F.4th at 335.  If Plaintiffs can prove on behalf of the class that Defendants conspired to raid the Plan and misappropriate its assets for their own gain, "each conspirator is liable for the damages resulting from the wrongful acts of all co-conspirators in carrying out the common scheme." *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 703 (Tenn. 2002) (citations omitted); *see also Tareco Props., Inc. v. Morriss*, 196 F. App'x 358, 365 (6th Cir. 2006) ("It is well settled in Tennessee that conspirators are jointly and severally liable, and it makes no difference how the 'booty' is distributed.") (citation omitted).

The unique nature of joint-and-several liability for civil conspiracy matches the somewhat capacious scope of Plaintiffs' damages model. Symetra concedes as much in its opposition to class certification. Symetra's Resp. in Opp'n 36 ("It is enough to say that most of Plaintiffs' claims, if proven, will require Plaintiffs to prove damages associated with Symetra specifically and cannot rely on aggregate damages or joint and several liability, while one claim, the conspiracy claim, may afford them a way around that requirement."). The model is also entirely consistent with Plaintiffs' conspiracy theory. For purposes of Rule 23(b)(3), the Court concludes that Plaintiffs' damages model meets the *Comcast* standard and predominance test for the class's civil conspiracy claim.

## B. Affirmative Defenses – Statute of Limitations

Symetra makes an additional predominance argument that its individualized statute of limitations defenses will predominate over any common issues of fact or law the class might litigate. A statute of limitations is an affirmative defense. Fed. R. Civ. P. 8(c); *Surles v. Andison*, 678 F.3d 452, 458 (6th Cir. 2012). "Because Civil Rule 23 asks only whether common 'questions

of law or fact' predominate, it applies to affirmative elements and the 'defenses of the class' alike," including affirmative defenses. *Speerly*, 143 F.4th at 335 (citing Fed. R. Civ. P. 23(a)(3)). Symetra argues the statute of limitations bars the class action claims unless the discovery rule tolled the relevant statute of limitations. The proper application of the discovery rule will require an individualized analysis of when each plan participant discovered their alleged injuries.

It is undeniable that Plaintiffs' class allegations address a course of conduct that began in 2001, more than 20 years before Plaintiffs filed suit in 2022. One of the primary issues raised by Symetra and other Defendants at summary judgment has been the statute of limitations. *See* S. Harris' Mem. in Support Mot. Summ. J. 4–7 (ECF No. 971-2); Symetra's Mem. in Support Mot. Final Summ. J. 15 (ECF No. 982-2) (seeking summary judgment on Plaintiffs' individual claims for acts prior to March 2019). Although neither the Estate of Dr. Harris nor Eaton have moved for summary judgment on the timeliness of Plaintiffs' claims, both have raised the statute of limitations as an affirmative defense in their pleadings. Harris' Answer to First Am. Compl., Third Aff. Def. (ECF No. 120) ("Plaintiffs' claims are barred, in whole or in part, by the applicable statutes of limitations."); Eaton's Answer & Aff. Defs. ¶ 20 (ECF No. 524) ("To the extent applicable now or in the course of this litigation, Eaton and FFG rely on the affirmative defenses of the statute of limitations and the statute of repose.").

Generally speaking, "statute of limitations defenses . . . rarely defeat class certification." 2 *Newberg on Class Actions* § 4.57. On the contrary, "when a limitations defense is common across the class, it will contribute to—not undermine—a finding that common issues predominate." *Id*. In other words, the answer to the statute of limitations question is susceptible to a single answer that applies to all members of the class. Because the Court finds that Plaintiffs have only met the Rule 23 requirements for class certification of the plan participants' civil conspiracy claim, the

73

Court confines its analysis of Symetra's statute of limitations argument to that claim.

The Court finds that the statute of limitations on each class member's claim for civil conspiracy actually meets the commonality test and does not present a predominance concern. "A statute of limitations defense has three components: the length of the limitations period, the accrual of the cause of action, and the applicability of any relevant tolling doctrines." *Smith v. Hilliard*, 578 F. App'x 556, 563 (6th Cir. 2014) (quoting *Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 456 (Tenn. 2012) (cleaned up). The statute of limitations on a claim for civil conspiracy is three years. "[B]ecause civil conspiracy is neither a punishable offense standing alone nor a wrong capable of supporting a cause of action by its own weight, courts have applied the statute of limitations for the underlying substantive alleged tort to such claims." *Cutler v. Scott*, No. 1:09-cv-01238-JDB-egb, 2010 WL 2598248, at *5 (W.D. Tenn. June 24, 2010) (citations omitted). Under Tennessee law, the statute of limitations for property torts is three years. Tenn. Code Ann. § 28–3–105(1)–(2); *Hilliard*, 578 F. App'x at 563; *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006). Plaintiffs filed the earliest of their class action complaints alleging a claim for civil conspiracy on August 19, 2022, as part of their Consolidated Amended Complaint–Class Action (ECF No. 74).

Of course, the date suit was filed does not tell the full story on the statute of limitations. The Court also must examine when the cause of action accrued. "A cause of action accrues when the plaintiff discovers it, that is, when the plaintiff knows or in the exercise of reasonable care and diligence should know that an injury has been sustained as a result of wrongful or tortious conduct by the defendant." *Hilliard*, 578 F. App'x at 563 (quoting *PNC Multifamily Cap. Inst. Fund*, 387 S.W.3d at 544) (other citations omitted). A plaintiff has no judicial remedy until the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, "(1) the occasion, the

74

manner and means by which a breach of duty occurred that produced his injury; and (2) the identity

of the defendant who breached the duty." *Foster v. Harris,* 633 S.W.2d 304, 305 (Tenn. 1982);

*Hill v. A.O. Smith Corp.*, 801 F.2d 217, 225 (6th Cir. 1986) (holding that under Tenn. law, civil

conspiracy claim accrued on the date the plaintiff "discover[ed] the source of the problem that

formed the crux of their civil conspiracy claim").

And yet the statute of limitations "can begin to run before a plaintiff has actual knowledge

of her legal claim, if she has learned of facts sufficient to put a reasonable person on notice that

she has suffered an injury as a result of wrongful conduct." *Hilliard*, 578 F. App'x at 564 (quoting

*Redwing*, 363 S.W.3d at 459) (cleaned up).  The Tennessee Supreme Court has referred to this as

"constructive notice" or "inquiry notice." *Redwing*, 363 S.W.3d at 459.  "[I]nquiry notice charges

a plaintiff with knowledge of those facts that a reasonable investigation would have disclosed,"

meaning "once a plaintiff gains information sufficient to alert a reasonable person of the need to

investigate the injury, the limitation period begins to run." *Id.* (citations omitted).

Plaintiffs raise two arguments to show that the statute of limitations will not predominate

over the common issues for class treatment.  First, Plaintiffs contend that the harms committed by

Defendants continued into the limitations period and therefore the statute of limitations had not

yet run when they brought suit.  Plaintiffs emphasize they only discovered the grounds for their

claim once they received information the Plan had lost over 70% of its value.  Second, Plaintiffs

argue that, even if the statute of limitations had run, the discovery rule would apply.  In either

event, Plaintiffs acknowledge that Defendants' statute of limitations defense "will succeed or fail

for all Class members at the same time." Pls.' Reply in Support of Mot. for Class Certif. 18 (ECF

No. 1061).

For purposes of class certification, the Court holds that the accrual of each class member's

cause of action for civil conspiracy and the operation of the discovery rule and the fraudulent

concealment doctrine will be subject to common proof.  "In the mine run of such cases, what a

plaintiff knew and when she came to know it is a fact question inappropriate for summary

judgment," meaning the accrual date of a plaintiff's cause of action presents a jury question.

*Hilliard*, 578 F. App'x at 564 (citing *City State Bank v. Dean Witter Reynolds, Inc.*, 948 S.W.2d

729, 735 (Tenn. Ct. App. 1996)); *Hill*, 801 F.2d at 225 (same).

　　　The evidence the jury receives to make that determination appears to be common to the

members of the class.  Tennessee's discovery rule avoids the inequitable outcome of compelling a

plaintiff "to file suit prior to his knowledge of an injury" and "to vindicate a non-existent wrong,

at a time when injury is unknown and unknowable." *Gilmore v. Davis*, 185 F. App'x 476, 481 (6th

Cir. 2006) (quoting *Potts v. Celotex Corp.*, 796 S.W.2d 678, 681 (Tenn. 1990)). In Plaintiffs' view,

nothing about the information commonly available to plan participants should have alerted them

to the fact that Dr. Harris and Eaton and other Defendants had conspired to misappropriate the

Plan's assets for their own gain.  It is undisputed all plan participants received plan statements at

the same regular intervals and that Dr. Harris produced an annual report. Otherwise, there is no

evidence plan participants as a group received other disclosures about the Plan's affairs.  Even Dr.

Harris' annual reports on the state of the Plan did not disclose the transactions involving the web

of companies owned by Dr. Harris and Eaton and the fact that Dr. Harris and Eaton were enriching

themselves through the companies and other kickbacks from the Motorskill Entities and bloated

administrative fees from Symetra.

　　　As the parties with the burden of proof on the discovery rule, Plaintiffs have argued that

they will seek tolling for the class as a whole on the basis that no class member could have

reasonably discovered the existence of the injuries to their retirement accounts until after Dr.

76

Harris' retirement in 2021. Rather than presenting unique statute-of-limitations problems for each member of the class, Plaintiffs' accrual theory of concealment itself raises a common question for the jury to decide, that is, whether plan participants were on constructive or inquiry notice of the conspiracy and the harm to the Plan prior to 2021. *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 128 (2d Cir. 2013) (holding that "fraudulent concealment can be demonstrated with class-wide, generalized evidence" where conspirators utilized sham companies and "plaintiffs [lacked] the necessary tools to uncover the fraud prior to public disclosure of the [sham companies]"); *Howard v. Wilkes & McHugh, PA*, No. 2:06-cv-2833-JPM-tmp, 2009 WL 10699545, at *13 (W.D. Tenn. Apr. 15, 2009) ("Whether the doctrine of fraudulent concealment will operate to toll the statute of limitations on Plaintiffs' claims is another issue common to the entire class."). The Court concludes then that individualized statute of limitations defenses to Plaintiffs' class claims will not predominate over the other commons issues for the jury to decide.

Symetra counters by arguing that its statute of limitations defenses will be highly individualized based on when each class member received participant statements from the Plan, Dr. Harris's annual reports to the General Conference, and Dr. Harris's statements at an open meeting at which many participants were in attendance. Symetra's Resp. in Opp'n 25. As part of its briefing of the statute of limitations in its separate Rule 56 motion (ECF No. 982), Symetra cites the deposition testimony of AMEC's Rule 30(b)(6) representative, Rev. Brian Blackwell.

Rev. Blackwell testified that he decided as far back as 2011, something "looked off" with the Plan's investments. Rev. Blackwell's suspicions, however, were not that the Plan was losing money. Rather, Rev. Blackwell surmised the Plan was experiencing what seemed like an unusually high rate of return. Rev. Blackwell testified that "[g]iven the current economic condition of the country, [he] couldn't understand how the value of the investment was going up so much."

Blackwell R. 30(b)(6) Dep. 28:11–29:20 (ECF No. 983-2).  Rev. Blackwell even asked Dr. Harris about the nature of the Plan's investments during an open forum for plan participants in 2011 and asked him to explain "what the [Plan's] investment was, where the money was, and how we were -- how the plan was obtaining those returns." *Id*. at 30:11–31:16.  The evidence is one example of how plan participants like Rev. Blackwell might have been on inquiry notice of issues with the administration of the Plan as early as 2011.

Even so, Symetra's accrual argument is unconvincing because the focus remains on common questions and the jury's answers to those questions will drive the resolution of Symetra's statute of limitations defense to Plaintiffs' class claim for civil conspiracy.  The accrual question for the jury will be whether the individual account statements (or any other disclosure about the Plan) should have put plan participants on inquiry notice of their losses due to an alleged conspiracy. As Rev. Blackwell's testimony shows, the statements themselves did not actually reflect a loss for the Plan. The same is true for Dr. Harris' annual reports. Whether a particular account statement or annual report should have put a reasonable plan participant on notice of a loss to the Plan stemming from a conspiracy to spirit away the Plan's assets is a question that will be common across the class.

And Symetra's framing of the accrual inquiry actually poses the wrong questions.  Symetra asserts that accrual depends on "when each purported class member knew or had constructive notice that Harris had invested the Plan outside of fixed interest annuities," *id*. at 3, or "when each purported class member knew or had constructive knowledge of the Plan's inflated value."  *Id*. at 13. But the critical question is when plan participants "learned of facts sufficient to put a reasonable person on notice that [they had] suffered an injury as a result of wrongful conduct." *Redwing*, 363 S.W.3d at 459.  So the timing of when plan participants should have known the Plan was making

78

other investments outside of Symetra annuities or when they should have realized the Plan's value was overstated will not by themselves answer the accrual question.

Even if Symetra can show that Rev. Blackwell or others had their suspicions before 2021, Symetra's point is just another way of stating that some class members may be susceptible to an individualized statute of limitations defense.  In most cases, "the fact that a defense may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 544 (6th Cir. 2012) (citing *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir. 2007)). In Rev. Blackwell's case, Symetra will have the right to put on proof and argue to the jury that Rev. Blackwell (and perhaps other plan participants) had reason to believe Dr. Harris and other parties responsible for the administration of the Plan had not fully disclosed all the material information with bearing on the prudent governance of the Plan. That is a far cry, though, from showing that plan participants like Rev. Blackwell could have known that Dr. Harris and other Defendants, many of whom engaged in conduct that ordinary plan participants arguably could not have discovered, had embarked on a decades long design to raid the Plan through prohibited transactions and the use of closely held limited liability companies and corporations as conduits for the improper transfer of the Plan's money.

And even if a jury could find that some subset of plan participants was on inquiry notice of the injuries to the Plan and a possible conspiracy much earlier than 2021, that finding would not necessarily mean the class fails the predominance test.  "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson*

79

*Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453–54, 136 S.Ct. 1036, 1045 (2016) (quoting 7AA Wright & Miller's *Federal Practice & Procedure* § 1778, at 123–124 (3d ed. 2005)). The possibility of individualized statute of limitations defenses does not *ipso facto* mean Symetra's affirmatives defenses will predominate over other common issues. *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000) ("[A]s long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statute of limitations will not automatically foreclose class certification under Rule 23(b)(3).").

Rev. Blackwell's testimony illustrates the point. According to Rev. Blackwell, he raised his questions publicly in 2011 at a gathering of about 500 individuals, many of whom were presumably plan participants. Symetra might be able to show that plan participants who attended the meeting may have heard or learned something from the presentation, even from Rev. Blackwell's questions, to put them on inquiry notice. That determination would ultimately be for the jury. Regardless, the determination presents a common question which lends itself to a binary "yes" or "no" answer for everyone who attended. In the same way, Symetra could cite plan communications like participant statements that went out to all plan participants. Or Symetra could single out plan participants who held church leadership positions and were privy to more detailed reports from Dr. Harris, to show they were on inquiry notice of possible harms to the Plan.

Assuming Symetra could make these very specific showings, the fact remains each showing would apply to a discrete and identifiable set of plan participants. Symetra's statute of limitations defenses would apply to groups (either the entire class or a subset of the class) in a common way. In any event, Symetra has not shown that any individualized questions related to the statute of limitations predominate over the many common questions Plaintiffs' civil conspiracy claim does present.

The Court would finally add that Symetra has moved for summary judgment on the statute of limitations issue. In as much as the Court's summary judgment ruling requires the Court to revisit the class defined here, that is an issue the Court can deal with in due course and without denying class certification outright. Fed. R. Civ. P. 23(c)(5) ("When appropriate, a class may be divided into subclasses that are each treated as a class[.]"); *In re HCA Holdings, Inc.*, No. 14-0511, 2015 WL 10575861, at *3 (6th Cir. Feb. 26, 2015) ("District courts have a continuing obligation to ensure that the class certification requirements are met and the ability to alter or amend the certification order as circumstances change.") (quoting *Randleman v. Fidelity Nat. Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011)); *see also Owino v. CoreCivic, Inc.*, 60 F.4th 437, 445 (9th Cir. 2022) (*en banc*) ("[N]arrowing the class based on statute of limitations is not required at the certification stage.").

For all these reasons, the Court finds that Plaintiffs have met Rule 23(b)(3)'s predominance test. The damages model proposed by Plaintiffs' experts fits Plaintiffs' class action theory of Defendants' liability for civil conspiracy. Furthermore, the common issues related to Plaintiffs' class action claim for civil conspiracy predominate over any issues the class may not have in common, including the statute of limitations.

## C. Rule 23(b)(3) Superiority Test

In addition to assessing predominance, Rule 23(b)(3) also requires the Court to decide whether a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23 then lists the following factors as "matters pertinent" to the predominance and superiority findings:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or

81

against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D). "The Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all'" in adopting the concept of Rule 23(b)(3) classes. *Windsor*, 521 U.S. at 617. That principle appears to be the case here.

A class action will be superior to other available methods for adjudicating this controversy over the alleged civil conspiracy. As the course of the MDL has shown, each Plaintiff has theories of relief against a whole series of Defendants, from individuals who were church employees to corporations who provided financial or professional services to the plan to business organizations in which plan assets were invested. Plaintiffs have engaged in significant fact and opinion discovery to develop their case, including the class action claim for civil conspiracy. The remedy achievable by any individual plaintiff would be completely out of proportion to the costs of litigating so many claims against so many Defendants. The efficiency of utilizing the Rule 23 class structure far outweighs the interests of the members of the class in individually controlling the prosecution of their separate claims or any other difficulties in managing a class action. *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 325 (E.D. Mich. 2001) (finding that class action is superior because it ensures fair and efficient adjudication).

## VI. Appointment of Class Counsel and Class Representatives

### A. Class Counsel

Plaintiffs request the appointment of Interim Co-Lead Counsel, Liaison Counsel, and members of the named Plaintiffs' Steering Committee previously appointed by the Court, as

Counsel for the Class. The Court may appoint class counsel if it determines the attorneys are adequate under Rule 23(g)(1) and (4). Fed. R. Civ. P. 23(g)(2). In appointing class counsel, the Court must consider:

> (i) the work counsel has done in identifying or investigating potential claims in the action;
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
> (iii) counsel's knowledge of the applicable law; and
> (iv) the resources that counsel will commit to representing the class[.]

Fed. R. Civ. P. 23(g)(1)(A). The Court may also consider any other matter pertinent to counsel's ability to represent the interests of the class fairly and adequately. Fed. R. Civ. P. 23(g)(1)(B).

For the same reasons already discussed as part of the Court's analysis of other Rule 23 factors, the Court finds that class counsel meets the standard of Rule 23(g). The Court hereby appoints Lee Segui, PLLC; Osborne & Francis Law Firm, PLLC; Stranch Jennings & Garvey, PLLC; Kantor & Kantor, LLC; Lieff Cabraser Heimann & Bernstein, LLP; Blue, LLP; Wright & Schulte, LLC; and the AARP Foundation as class counsel.

## B. Class Representatives

The Court continues to find that named Plaintiffs have fairly and adequately protected the interests of the class as well as fulfilled their duties throughout the litigation, including participating in discovery and sitting for depositions. The Court therefore appoints named Plaintiffs as class representatives for the class.

## C. Notice to the Class

Plaintiffs have not specifically requested that the Court issue notice to the class or proposed what form that notice should take. When a class is certified under Rule 23(b)(3), the district court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. Fed. R. Civ. P.

23(c)(2)(B). In a similar fashion, Rule 23(e)(1) requires a court to "direct notice in a reasonable manner to all class members who would be bound by the proposal." *See Gooch*, 672 F.3d at 423 (stating that "all that the notice must do is fairly apprise . . . prospective members of the class of the terms of the proposed settlement so that class members may come to their own conclusions about whether the settlement serves their interests") (internal quotation marks and citations omitted). The notice may be by one or more of the following methods: United States mail, electronic means, or other appropriate means. Fed. R. Civ. P. 23(c)(2)(B).

The Court directs class counsel to propose a form of notice to be issued to the members of the class. Counsel's proposal will be due within 21 days of the entry of this order.

## CONCLUSION

The named Plaintiffs' Renewed Motion for Class Certification and Appointment of Class Counsel is **GRANTED IN PART, DENIED IN PART**. Pursuant to Rule 23(c)(1)(B), the Court hereby appoints the named Plaintiffs as class representatives for the following class of individuals:

> All persons who were participants, or were those participants' respective beneficiaries entitled to benefits, in the African Methodist Episcopal Church Ministerial Retirement Annuity Plan on June 30, 2021.[17]

The Court also appoints Interim Co-Lead Counsel, Liaison Counsel, and members of the Plaintiffs' Steering Committee as class counsel.

The Court **CERTIFIES** the following class claims, issues, and defenses for class action:

> (1) civil conspiracy against the Estate of Dr. Jerome V. Harris; Sandra Harris; Robert Eaton; Symetra Life Insurance Company; Financial Freedom Funds, LLC; Day & Night Solar; Trinity Financial; Financial Freedom Group, Inc.; Financial Technologies, LLC; and the Motorskill Entities (Second Am. Compl., count 8);

> (2) Symetra's affirmative defenses on the statute of limitations, including (a) the application of the discovery rule and when plan participants learned of facts

---

[17] Plaintiffs' proposed class excludes any current or past Defendants named in the MDL.

sufficient to put a reasonable person on notice that they had suffered an injury as a result of wrongful conduct; and (b) whether Defendants fraudulently concealed their alleged wrongs from plan participants.

(3) any other affirmative defense preserved by Symetra and Defendants named in the civil conspiracy count.

Class counsel is directed to propose a form of notice to the class within 21 days of the entry of this order.

**IT IS SO ORDERED**.

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date:  January 2, 2026.

85