**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: AME CHURCH EMPLOYEE | ) | Lead Case No. |
| RETIREMENT FUND LITIGATION, | ) | 1:22–md–03035–STA–jay |
| | ) | |
| | ) | ALL CASES |

---

**ORDER GRANTING IN PART, DENYING IN PART AMEC DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AS TO SYMETRA'S CROSS-COMPLAINT
(ECF NO. 1070)
ORDER GRANTING IN PART, DENYING IN PART SYMETRA'S MOTION FOR
PARTIAL SUMMARY JUDGMENT WITH RESPECT TO CROSS-CLAIMS BETWEEN
SYMETRA AND AMEC
(ECF NO. 1072)**

---

Before the Court is a Motion for Summary Judgment as to Symetra's Cross-Complaint (ECF No. 1070) filed by the African Methodist Episcopal Church ("AMEC" or "the Church"), the AMEC Department of Retirement Services, the AMEC General Board, the AMEC Council of Bishops, and the AMEC Ministerial Retirement Annuity Plan ("the Plan") (collectively, the "AMEC Defendants").[1] Also before the Court is Symetra Life Insurance Company ("Symetra")'s Motion for Partial Summary Judgment with Respect to Cross-Claims Between Symetra and the African Methodist Episcopal Church (ECF No. 1072). Each side has responded in opposition to the other side's Rule 56 Motion, and the moving parties have filed reply briefs. For the reasons set forth below, both Motions are **GRANTED in part and DENIED in part**.

**BACKGROUND**

**I.   Procedural History**

This multidistrict litigation concerns losses to a non-ERISA retirement Plan established by the African Methodist Episcopal Church for its clergy and employees. Plaintiffs Pearce Ewing *et al.*

---

[1] The Court previously granted a joint motion for voluntary dismissal (ECF No. 839) and permitted the Plan to nonsuit crossclaims against Symetra. The Plan's nonsuit did not affect Symetra's crossclaims against the Plan.

are current or retired clergy of the church and have alleged a number of claims under state law against the denomination, church officials, third-party service providers to the Plan, and other alleged tortfeasors. The Court has set out the procedural history of the case in its previous orders and need not review the full history here. For purposes of deciding the parties' Motions for Summary Judgment, the following procedural events are most relevant.

Briefly, pursuant to 28 U.S.C. § 1407, the Panel on Multidistrict Litigation transferred a series of civil actions to this Court on June 2, 2022, for the coordinated management of pretrial proceedings. Shortly thereafter, Plaintiffs filed a Consolidated Amended Complaint – Class Action (ECF No. 74) ("First Amended Complaint"), consolidating the parties and claims of each member case into a single amended pleading. As part of their responsive pleadings to the First Amended Complaint, both the AMEC Defendants and Symetra filed Cross-Complaints against each other. AMEC Defs.' Partial Answer & Cross-Complaint (ECF No. 116); Symetra's Answer & Cross-Complaint (ECF No. 214).[2] The AMEC Defendants filed an Amended Cross-Complaint and Third-Party Complaint (ECF No. 256) on July 25, 2023.

Symetra and AMEC then filed motions on the arbitrability of the crossclaims based on an arbitration agreement found in a 2003 Recordkeeping Services Agreement ("2003 RSA"), one of the contracts between the Church and Symetra. AMEC filed a motion to dismiss Symetra's crossclaims

---

[2] The AMEC Defendants' initial Cross-Complaint named another Symetra entity, Symetra Financial Corporation ("Symetra Financial"), as a Cross-Defendant, but not Symetra. On November 23, 2022, Symetra and Symetra Financial filed a motion to dismiss (ECF No. 154) all claims against Symetra Financial in the Cross-Complaint. In response, the AMEC Defendants moved to amend their Cross-Complaint to name both Symetra and Symetra Financial as parties. After more briefing from the parties and the AMEC Defendants' subsequent request to file a different amended pleading, the Court granted the AMEC Defendants leave to file an Amended Cross-Complaint, naming Symetra as a Cross-Defendant, and a Third-Party Complaint, naming Symetra Financial as a Third-Party Defendant. On September 9, 2025, the Court granted Symetra Financial's motion to dismiss the Third-Party Complaint against it. Order Granting Symetra Fin.'s Mot. to Dismiss, Sept. 9, 2025 (ECF No. 909).

(ECF No. 230) against the Church, arguing that the crossclaims were subject to arbitration. Symetra responded by initiating arbitration in June 2023 and then filing two different motions of its own: a motion to stay all of the proceedings on all claims against it (ECF No. 259) as well as a separate motion to stay just AMEC's crossclaims against it (ECF No. 270). The Court granted Symetra's motion for a mandatory stay of the proceedings pursuant to § 3 of the Federal Arbitration Act, 9 U.S.C. § 3, pending arbitration between AMEC and Symetra on certain gateway issues of arbitrability. Order Denying AMEC's Mot. to Dismiss, GIP, DIP Symetra Life's Motion to Stay, and Granting Symetra Life's Motion to Stay AMEC's Crossclaims, Dec. 11, 2023 (ECF No. 316). The Court held, however, that Symetra had not shown cause for a stay of the proceedings, either a mandatory stay under § 3 or a discretionary stay pursuant to the Court's inherent power over its docket, as to Plaintiffs' claims against Symetra.[3] On February 24, 2025, the arbitrator issued his decision on the arbitrability issue, holding that the parties had not bound themselves to arbitration, and dismissed the proceeding. *See* Decision on Jurisdiction and Scope of Arbitration, Fed. 24, 2025 (ECF No. 825-2). On March 11, 2025, the Court granted the AMEC Defendants' unopposed motion to lift the stay of the proceedings between AMEC and Symetra. *See* Order Granting AMEC Defs.' Mot. to Lift Stay, Mar. 11, 2025 (ECF No. 754).

While threshold questions about the arbitrability of the crossclaims between AMEC and Symetra were still in arbitration, Plaintiffs filed their Second Consolidated Amended Complaint–Class Action (ECF No. 493, as corrected ECF No. 494) ("the Second Amended Complaint") in

---

[3] The Court did grant Symetra Financial's request for a discretionary stay of the proceedings on AMEC's crossclaims against the company, while AMEC and Symetra proceeded to arbitration. Order Denying Symetra Fin.'s Mot. to Dismiss, Granting Mot. for Stay, Mar. 1, 2024 (ECF No. 346).

August 2024.[4] AMEC filed a Partial Answer and Amended Cross-Complaint (ECF No. 570) in response to Plaintiffs' Second Amended Complaint. The Amended Cross-Complaint named Symetra as one of its Cross-Defendants. The AMEC Defendants alleged the following causes of action against Symetra under Tennessee law: fraudulent concealment (Count III); civil conspiracy to commit conversion (Count IV); civil conspiracy to commit intentional misrepresentation (Count V); conspiracy to commit constructive fraud (Count VI); negligent misrepresentation (Count VII); breach of fiduciary duty (Count IX); aiding and abetting breach of fiduciary duty (Count X); and negligence (XI).

After the Court lifted the stay of the proceedings between AMEC and Symetra and ruled on Symetra's motion to dismiss the Second Amended Complaint, Symetra filed its own responsive pleading, which included an Amended Cross-Complaint against the AMEC Defendants (ECF No. 794). Symetra's Amended Cross-Complaint alleged the following causes of action under Tennessee law: breach of contract, specifically the 2007 Annuity Contract, the 2007 GIC, and the 2008 GIC against AMEC and the Plan (Count I); common law indemnification against AMEC (Count II); negligent misrepresentation against AMEC and the Plan (Count III); contribution against all AMEC Defendants, the Plan, and all other Defendants (Count IV); and contractual indemnification against AMEC (Count V). Symetra also sought declaratory relief on the following propositions:

> (1) Harris was a trustee of the Plan with fiduciary duties owed to the Plan and its participants; (2) AMEC was the Plan sponsor and a fiduciary of the Plan with duties of prudence and loyalty owed to the Plan and its participants; and (3) Symetra is not liable to AMEC or the Plan for any damages or losses suffered by the Plan or Plan participants based

---

[4] Plaintiffs and the AMEC Defendants subsequently reported that they had reached a settlement of their dispute. And a short time later, the parties announced to the Court that Plaintiffs and the AMEC Defendants had reached a separate settlement with Newport. The Court granted preliminary approval to both settlements, *see* Mem. Op. & Order Granting Pls.' Mot. for Prelim. Approval, Mar. 24, 2025 (ECF No. 774), and held a fairness hearing on June 26, 2025. The Court entered an order granting the parties' motion for final approval on August 18, 2025. Order Granting Final Approval (ECF No. 910).

4

on transfers from Symetra annuity contracts or GIC contracts to third parties pursuant to directives received from Harris (Count VI).

On September 10, 2025, the Court granted in part and denied in part the AMEC Defendants' Rule 12(b)(6) motion to dismiss Symetra's crossclaims against them. The Court held that Symetra's Amended Cross-Complaint had alleged plausible claims for breach of contract, negligent misrepresentation, contractual indemnification, common law or implied indemnification, contribution, and declaratory relief. The Court dismissed Symetra's claim for breach-of-contract damages for bad publicity, reasoning that that element of damages was not available for breach of contract under Tennessee law.

On September 23, 2025, the Court granted in part and denied in part Symetra's Rule 12(b)(6) motion to dismiss AMEC's crossclaims against it. The Court held that the AMEC's Second Amended Cross-Complaint had plausibly alleged causation and damages as well as AMEC's crossclaims for breach of fiduciary duty, negligence, fraudulent concealment, civil conspiracy, and aiding and abetting the breach of fiduciary duty. The Court granted the motion to dismiss AMEC's crossclaim for negligent misrepresentation.

## II.  Factual Background

Both the AMEC Defendants and Symetra now seek judgment as a matter of law on the crossclaims they have alleged against each other. To decide the parties' Rule 56 Motions, the Court must first consider whether any genuine issue of material fact exists that might preclude judgment as a matter of law. A fact is material if the fact "might affect the outcome of the lawsuit under the governing substantive law." *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citing *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). A dispute about a material fact is genuine "if the evidence is such that a reasonable

5

jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. For purposes of summary judgment, a party asserting that a material fact is not genuinely in dispute must cite particular parts of the record and show that the evidence fails to establish a genuine dispute or that the adverse party has failed to produce admissible evidence to support a fact. Fed. R. Civ. P. 56(c)(1).

Local Rule 56.1(a) requires a party seeking summary judgment to prepare a statement of facts "to assist the Court in ascertaining whether there are any material facts in dispute." Local R. 56.1(a). In support of their Motions, both sides have filed a statement of undisputed facts, to which the other side has responded. The parties have also cited different provisions of the Plan Documents and their contracts as part of their briefing of the undisputed facts at summary judgment. The parties disagree over the correct reading of these contractual provisions and how best to give them effect under the facts of the case.

Generally speaking, the construction of contractual agreements presents a question of law for the Court to decide. *Toomey v. Atyoe*, 32 S.W. 254, 256 (Tenn. 1895); *Manley v. Plasti-Line, Inc.*, 808 F.2d 468, 471 (6th Cir. 1987); *see also* 10B Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Procedure* § 2730.1 (3d. ed. 2009) ("The legal effect or construction of a contract is a question of law that properly may be determined on a summary-judgment motion when the parties' intentions are not in issue."). As such, the Court will examine the relevant contractual provisions in greater depth as part of its analysis of the legal questions presented for summary judgment. The Court will cite the contractual provisions contained in the parties' briefing on the undisputed facts of the case here to provide context and introduce the provisions most relevant to the dispute between the parties.

Based on the parties' submissions, the Court finds that the following facts are undisputed for purposes of summary judgment, unless otherwise noted.

### III. African Methodist Episcopal Church and the Constitution of its Governing Bodies

AMEC is an unincorporated nonprofit religious association existing under the laws of the state of Pennsylvania. AMEC Defs.' SOF ¶ 1.[5] The AMEC Council of Bishops is "the Executive Branch of the Connection Church" and has general oversight of the Church during the interim of General Conferences. *Id*. ¶ 2. The AMEC General Board is "the administrative body and is comprised of various departmental Commissions made up of the respective Executive-Directors, the General Secretary of the AME Church, the Chief Financial Officer, the members of the various Commissions, and one Bishop as presiding officer with the other Bishops associating." *Id*. ¶ 3.

One of the connectional departments of the Church is the AMEC Department of Retirement Services. The Department of Retirement Services is tasked with directing the retirement programs of the Church in accordance with the directions of the General Board. *Id*. ¶ 4. The Department of Retirement Services was formerly known as the Department of Employee Security. *Id*. ¶ 5. The Department of Retirement Services and the Department of Employee Security will hereinafter be referred to as the "DRS" or "the Department." AMEC is the sponsor of the Plan. *Id*. ¶ 6.

The Department is administered by the Executive Director of the Department. *Id*. ¶ 8. The Executive Director is also an elected General Officer of the Church. *Id*. The Executive Director is responsible for giving oversight to Church programs operated for the retirement security of the

---

[5] Symetra does not dispute the contention. Symetra does object that the only support for the claim cited by the AMEC Defendants is their own responsive pleading. As a pleading the AMEC Defendants' Answer to Symetra's Amended Cross-Complaint is not evidence. While the Court tends to agree with Symetra that the allegation of a pleading is generally untested and unverified, the AMEC Defendants are citing an allegation from Symetra's own pleading and the AMEC Defendants' Answer in which they admit the truth of the allegation. The Court finds that the AMEC Defendants have properly cited the fact as an undisputed contention for purposes of summary judgment.

salaried personnel of the Church, including the AMEC Ministerial Retirement Annuity Plan ("the

Plan"). *Id*. Under the Doctrine and Discipline, the Executive Director of the Department is

empowered to hire a specialist in financial management to see that the employees of the Church

receive maximum benefits to which they are entitled from said investments. *Id*. ¶ 9.

### IV. AMEC Retirement Plan and the 1997 Plan Document

The retirement plan at issue in this litigation is the "African Methodist Episcopal Church

Ministerial Retirement Annuity Plan" ("Plan"), a trust[6] or qualified retirement plan sponsored by

AMEC for the benefit of certain AMEC ministers and employees. Symetra SOF ¶ 1. The Plan dates

back to 1964 and was amended and restated as part of a plan document effective January 1, 1997

("1997 Plan Document"). *Id.* ¶ 2.[7] Because the provisions of the 1997 Plan Document provide

relevant factual context for the parties' dispute, the Court will address the 1997 Plan Document here

as part of its analysis of the evidentiary record. To the extent that Symetra has quoted or reproduced

the language from the 1997 Plan Document without alteration or amendment, the AMEC Defendants

do not dispute Symetra's recitations of the plan language.

---

[6] AMEC objects to Symetra's statement of fact insofar as Symetra refers to the Plan as a "trust." The Court finds that the parties' dispute is not actually material to the issues presented in their separate Rule 56 Motions. The Court has frequently referred to the Plan as a "trust," as that term is used in Tennessee trust law, to describe the Plan and its governance.

[7] Symetra asserts that, by at least 1997, the Plan was a tax qualified plan under Section 401(a) of the Internal Revenue Code. Symetra SOF ¶ 3. Section 401(a) states in pertinent part: "(a) Requirements for Qualification. A *trust* created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section[.]" 26 U.S.C. § 401(a) (emphasis added). AMEC objects that Symetra's contention is actually a legal claim, not a factual one. The Court tends to agree that whether the Plan satisfied the IRC's requirements as a qualified Section 401(a) plan is a legal conclusion.

AMEC further argues that the Plan was intended to be funded through annuity contracts purchased directly from insurers. As a consequence, AMEC asserts that "a formal establishment of a trust is not required." AMEC Resp. to SOF ¶ 3. This claim is also legal in nature, and not, strictly speaking, a statement of fact. The Court notes the parties' contentions on this point for the record.

Under the 1997 Plan Document, AMEC and its "agencies and departments" were defined as the "Employer," were "empowered to appoint and remove the Trustee," and had a duty to "periodically review the performance of any person to whom duties have been delegated or allocated by it under the provisions for this Plan." *Id*. ¶ 4. The 1997 Plan Document named "Members of the Pension Commission, Pension Department of the A.M.E. Church" as the Trustee of the Plan. *Id*. ¶ 5.

The 1997 Plan Document went on to define the duties of the Trustee. The "primary responsibility of the Trustee is to administer the Plan." *Id*. The Trustee "shall have the power to determine all questions arising in connection with the administration, interpretation, and application of the Plan." *Id*. "Any such determination by the Trustee shall be conclusive and binding upon all persons." *Id*. The Trustee also had the responsibility "[c]onsistent with the instructions of the Employer to invest, manage and control the Plan assets," and "[t]o direct the Insurer to pay benefits required under the Plan to Participants." *Id*.

Under the 1997 Plan Document, the Trustee was required to provide the Church with an Annual Report, which AMEC had to approve or disapprove. *Id*. ¶ 5. More specifically, under section 7.6, the Trustee had a duty to produce "a written statement of account with respect to the Plan Year" addressed to the following topics:

> (a) the net income, or loss, of the Trust Fund;
> (b) the gains, or losses, realized by the Trust Fund, if any, upon sales or other disposition of the assets;
> (c) the increase, or decrease, in the value of the Trust Fund;
> (d) all payments and distributions made from the Trust Fund; and
> (e) such further information as the Trustee deems appropriate. The Employer forthwith upon its receipt of each such statement shall acknowledge receipt thereof in writing and advise the Trustee of its approval or disapproval thereof. Failure by the Employer to disapprove any such statement of account within thirty days after its receipt thereof shall be deemed an approval thereof. The approval by the Employer of any statement of account shall be binding as to all matters embraced therein as between the Employer and the Trustee to the same extent as if the account of the Trustee had been settled by judgment or decree in an action for a judicial settlement of its account in a court of competent jurisdiction in which the Trustee, the Employer

9

and all persons having or claiming an interest in the Plan were parties; provided, however, that nothing herein contained shall deprive the Trustee of its right to have its accounts judicially settled if the Trustee so desires.

*Id.* ¶ 6.

Section 9.7 of the 1997 Plan Document provided that "[a]ny Insurer," such as an annuity provider like Symetra, which issues a contract for the Plan,

shall not have any responsibility for the validity of this Plan or for the tax or legal aspects of this Plan. The Insurer shall be protected and held harmless in acting in accordance with any written direction of the Trustee, and shall have no duty to see to the application of any funds paid to the Trustee, nor be required to question any actions directed by the Trustee. Regardless of any provision to the contrary the Insurer shall not be required to take or permit any action or allow any benefit or privilege contrary to the terms of any Contract which it issues hereunder, or the rules of the Insurer.

*Id.* ¶ 7. The AMEC Defendants dispute that Symetra was an "Insurer" as that term is used in the 1997 Plan Document. In support of their claim, the AMEC Defendants cite the fact that Symetra did not know whether the company ever had a copy of the 1997 Plan Document. AMEC Defs.' Resp. to SOF ¶ 7. When AMEC Church Districts sent contributions to the Plan, those contributions did not go directly to Symetra but instead were deposited into the Plan's bank account at Regions Bank. Symetra SOF ¶ 8.

A genuine dispute of material fact exists over which person or entity was designated as trustee of the Plan. The AMEC Defendants claim the Church's Doctrine and Discipline named the Commission of Retirement Services as the trust committee for the Church's annuity coverage. *Id.* ¶ 7. Symetra cites the 1997 Plan Document, which named members of both the Commission and the DRS itself as trustees of the Plan. Symetra's Resp. to AMEC Defs.' SOF ¶ 7. Furthermore, in March 2006, AMEC revised and restated the 1997 Plan Document in a new plan document ("the 2006 Plan Document"). *Id.* Symetra takes the position that the 2006 Plan Document thereafter governed the Plan. *Id.* According to Symetra, the 2006 Plan Document named the Executive Director of the DRS

10

as the sole trustee of the Plan. *Id*. The 2006 Plan Document did not mention the Commission and its members as trustees of the Plan. *Id*. The Court considers the evidence regarding the 2006 Plan Document in more depth below.

V.      **Election of Dr. Harris as Executive Director and the Plan's 2001 Annuity Contract and 2001 Recordkeeping Services Agreement with Symetra**

Rev. Dr. Jerome Harris ("Dr. Harris") was first elected to the position of Executive Director of the Department in July 2000. AMEC Defs.' SOF ¶ 11; Symetra SOF ¶ 11. Based on his election as Executive Director, Harris became a General Officer of the Church. *Id*.  The Executive Director is a fiduciary of the Plan, though as previously noted, the parties dispute the extent to which the Executive Director had responsibility for managing and administering the Plan. *Id*. Beginning with his initial election as Executive Director in 2000, Harris was elected to sequential four-year terms, with his final term ending in 2021. AMEC Defs.' SOF ¶ 12.

When Dr. Harris became Executive Director in 2000, the Plan was 100% invested in an annuity issued by the American General Insurance Company. Symetra SOF ¶ 12. In August 2001, the Plan issued a "Request for Proposal" ("RFP") to insurance companies seeking proposals for a new annuity for the Plan. *Id*. ¶ 13. Dr. Harris retained Robert Eaton ("Eaton") as the Plan's exclusive broker of record to assist with the RFP. *Id*. After multiple life insurance companies responded to the RFP as part of a competitive bidding process, Symetra's corporate predecessor Safeco Life Insurance,[8] MetLife, and Principal were selected as finalists. *Id*. ¶ 14. Each finalist was invited to make in-person presentations to Dr. Harris, Eaton, and Bishop John Adams, the Chairman of the Commission on Retirement Services.[9] Symetra employees Robert Follette and James Daniel

---

[8] Until 2007, Symetra Life Insurance Company was known as Safeco Life Insurance Company. To avoid confusion, Symetra's references to "Symetra" include Safeco Life.

[9] The Commission's named changed at times to match the name changes of the Department.

11

presented Symetra's annuity proposal to Eaton, Harris, and Bishop Adams. *Id.* ¶ 15. The AMEC Defendants cite other evidence that Symetra and Newport made a joint presentation. AMEC Defs.' Resp. to SOF ¶ 15. The parties dispute whether Dr. Harris was introduced at the meeting as the Trustee of the Plan or whether Dr. Harris introduced himself as the Trustee.

The Church in due course selected Symetra as its new annuity provider, and the Plan transferred its annuity contract from American General to Symetra. Symetra SOF ¶ 16. On December 6, 2001, Dr. Harris signed the 2001 Application for a Group Fixed Annuity Contract. *Id.* ¶ 17. The application was a pre-printed form prepared by Symetra. *Id.* Dr. Harris signed on the line with the pre-printed label "Employer Representative of Plan." *Id.* Robert Eaton also signed the contract on the pre-printed line for the "Agent/Producer Signature." *Id.* Eaton received a trailing 50 basis point commission (i.e., 0.50% or "50bps") from Symetra for brokering the sale of the annuity. *Id.* ¶ 18. Symetra paid Eaton's commission out of its own funds, not out of the Plan's funds. *Id.* ¶ 18.[10] Eaton was an "independent broker," meaning that he was not employed by Symetra and brokered annuity contracts for multiple insurance companies. *Id.* ¶ 20. Symetra disclosed the 50bps commission to the Plan as part of its RFP response. *Id.* ¶ 19.

By resolution dated December 19, 2001, the General Board of the Church approved, directed, and ordered that all funds invested in the Annuity Plan and then held by American General Insurance Company "be immediately withdrawn, moved, and reinvested" with Symetra, the annuity investment firm selected by the Commission. AMEC Defs. SOF ¶ 16. The Executive Director was given specific authority by the General Board to collect AMEC's contributions to the Plan and deposit the

---

[10] Symetra claims that a trailing 50bps commission for the sale of a fixed annuity to an institutional customer is reasonable and standard within the insurance industry. The AMEC Defendants respond that the claim is not so much a statement of fact but a conclusion of law. The Court does not find that the claim is a legal conclusion so much as it represents an opinion based on specialized knowledge of the annuity industry.

contributions into a Symetra annuity contract which the resolution had authorized him to purchase. *Id*. ¶ 17. Pursuant to the 2001 General Board resolution, Harris transferred $48,208,803.49 into a Group Variable Annuity issued by Symetra. *Id*. ¶ 18.

On December 21, 2001, Symetra issued an annuity contract to the Plan, No. LP1091935 ("2001 Annuity Contract"), which the Plan funded with $48,208,803.49 via wire transfer from American General. Symetra SOF ¶ 21. All funds were placed in the fixed annuity portion of the contract where Symetra contractually guaranteed a fixed rate of interest. *Id*. These funds were deposited in Symetra's General Account, which meant Symetra bore the risk related to its contractual promise to pay the Plan a fixed rate of interest. *Id*.

Section B102 of the 2001 Annuity Contract states that Symetra "is not a party to, nor bound by, any trust or plan" and that Symetra "may rely on the written direction of the Contractholder and shall not be liable because of any failure to question or challenge such direction and certification regarding the issuance of an Annuity or payment of a cash distribution." *Id*. ¶ 22. The AMEC Defendants add that section B102 of the 2001 Annuity Contract states in part:

> [Symetra] shall not be obligated to issue an Annuity or to make a cash distribution until it receives written direction from the Contractholder containing the terms and conditions, manner and amounts of such Annuity or cash distribution, together with a written certification that such Annuity or cash distribution is in accordance with the provisions of the Plan. [Symetra] may rely on the written direction of the Contractholder and shall not be liable because of any failure to question or challenge such direction and certification regarding the issuance of an Annuity or payment of a cash distribution.

AMEC Defs.' Resp. to SOF ¶ 22. The 2001 Annuity Contract defined the "Contractholder" as the "African Methodist Episcopal Church Retirement Plan." *Id*.

Symetra prepared a "Welcome Letter" dated December 11, 2001, in which it described key provisions of the 2001 Annuity Contract, including, (a) a one-year guaranteed interest rate of 5.75%, (b) no surrender charges or market value adjustments for any withdrawals for plan participants; and

13

(c) an annual 0.25% asset-based fee paid to Symetra for five years. Symetra SOF ¶ 23. The AMEC Defendants point out that the version of the letter produced in discovery was unsigned and that there is no evidence the letter was ever sent or received.

Symetra cites evidence that its typical procedure when onboarding a new retirement plan was to confirm the identity of the trustee(s) by obtaining a board resolution or other documentation. *Id.* ¶ 24. According to Symetra, the company would not have proceeded to open the Plan's account if it had not done so in this case. *Id.* The AMEC Defendants answer, however, that Symetra's corporate representative testified she was not aware of any corporate resolution or documentation naming Dr. Harris as a trustee of the Plan at the time the account was established in 2001. AMEC Defs.' Resp. to SOF ¶ 24. The AMEC Defendants also argue that the only written exhibits identifying Dr. Harris as a trustee were documents he prepared or pre-printed documents prepared by third parties, not AMEC.

The 2001 Annuity Contract was a single aggregate sum and was not allocated to individual Plan participants. Symetra SOF ¶ 25. Symetra was not aware of who the individual Plan participants were, how many there were, or how much any particular participant contributed to the Plan. *Id.* Symetra's quarterly statements to DRS reported only the pooled value of the annuity contract. *Id.* Newport Group and DRS kept all information on individual Plan participants and sent individual quarterly statements to the participants. *Id.* The parties dispute the accuracy of Symetra's quarterly statements to the DRS and the extent of Symetra's involvement in providing information for quarterly statements to plan participants.

Along with the 2001 Annuity Contract, Symetra, AMEC, and the Plan signed a Recordkeeping Services Agreement ("2001 RSA"). *Id.* ¶ 26. Dr. Harris signed the 2001 RSA on a pre-printed line labeled "Trustee" and on another pre-printed line labeled "Plan Administrator." *Id.*

14

The AMEC Defendants add that no representative signed the 2001 RSA on behalf of Symetra. AMEC Defs.' Resp. to SOF ¶ 26. The 2001 RSA stated that Symetra's "participation in the Plan shall be limited to providing such investment products as may be purchased by the Plan Trustee(s) and the services described above" and that the "Employer [AMEC] shall assume or delegate responsibility for all plan administration . . . ." Symetra SOF ¶ 27.

## VI.   Symetra's Payment of Administrative Fees to the Department

Beginning in 2002, Dr. Harris directed Symetra to disburse 0.25% of the 2001 Annuity Contract to DRS each quarter as an "administrative fee" to be used by AMEC for DRS operations. *Id*. ¶ 28. Symetra claims that, although the existence of these quarterly fees was well known to the Church and Plan participants and was otherwise a topic of "ongoing conversations," AMEC never directed Dr. Harris to reduce or stop the fees. *Id*. The AMEC Defendants concede that one bishop was questioned about a provision from the Doctrine and Discipline, which stated as follows: "Two percent of reported contributions shall be allocated to the Department of Retirement Services for administration. Payments are to be remitted to the Department of Retirement Services within seven calendar days after they are received." AMEC Defs.' Resp. SOF ¶ 28. According to the AMEC Defendants, though, people within the Church understood the administrative fee represented 2% of contributions. *Id*.

Dr. Harris came up with an alternative interpretation of the Doctrine and Discipline, after consulting with Eaton and employees of Symetra and Newport, that the administrative fee represented 2% of the Plan balance, or the earnings of the portfolio. *Id*. In practice, Symetra agreed to remit Dr. Harris 2% of the Plan's balance at Symetra. *Id*. An individual quarterly statement issued to plan participants for 2004 disclosed the existence of a 2% deduction for "departmental support" and a vendor administrator fee of $6 per quarter.  Symetra SOF ¶ 29.

15

In May 2015, Harris directed Symetra to increase the quarterly DRS administrative fee to 0.55%. *Id.* ¶ 30. In September 2020, Harris reduced the quarterly DRS administrative fee back down to 0.25%. *Id.* In July 2021, Harris terminated the quarterly DRS administrative fee altogether. *Id.* When Miller replaced Harris as Executive Director of DRS, Miller reinstated the quarterly DRS administrative fee of 0.25%. *Id.* ¶ 31.

**VII.        The Plan's Purchase of the Key Marco, Florida Real Estate**

In 2002, Dr. Harris also began the process of buying real estate in Key Marco Island, Florida, for the Plan. *Id.* ¶ 32. To facilitate the Plan's purchase of the real estate, on May 29, 2003, Dr. Harris invested $1.7 million of the Plan's funds on a short-term basis in a Symetra money market sub-account of the 2001 Annuity. *Id.* ¶ 40. Dr. Harris made the transfer pursuant to a 2003 Recordkeeping Services Agreement ("the 2003 RSA"). *Id.* ¶ 33. According to Symetra, the 2003 RSA was intended to replace and supersede the 2001 RSA because Symetra's legal department had updated the terms of its standard recordkeeping agreement. *Id.* ¶ 35.[11]

The 2003 RSA contained the following provisions among others:

• § 4(a). Symetra "shall be entitled to rely fully on the accuracy and completeness of information submitted by or on behalf of the AMEC, Trustee, or Plan administrator and shall have no duty or responsibility to verify such information."

• § 4(c). "The AMEC, Trustee, and Plan administrator remain responsible for all actions necessary or desirable for the administration of the Plan that are not expressly undertaken by [Symetra] under this Agreement."

---

[11] The AMEC Defendants maintain that the 2003 RSA was never properly executed based on Harris' lack of authority and the fact that no one from Safeco or Symetra ever countersigned the contract. Be that as it may, the validity of the contract does not show that a genuine dispute exists over Symetra's reasons for proposing the 2003 RSA.

• § 4(d). "The AMEC, Trustee, and Plan Administrator shall collectively exercise all discretionary authority, control and responsibility in the administration of the Plan and the management of Plan assets."

• § 5(a). Symetra "is not and shall not become a Plan fiduciary or a party to the Plan or Trust by virtue of this Agreement. [Symetra] shall not exercise any discretionary authority or control with respect to the administration of the Plan or management of Plan assets. All matters relating to the administration of the Plan or the investment of Plan assets are to be determined solely by AMEC or another Plan fiduciary, which shall be a person other than [Symetra]"; and

• § 7. "Indemnification. In exchange for [Symetra] providing Services, the AMEC agrees to indemnify, defend, and hold harmless [Symetra], their parent, their affiliates, and their respective directors, employees and agents ("indemnitees") against any and all claims, losses, damages, liabilities, obligations, taxes, costs, or expenses (including reasonable attorneys fees) ("Claims") incurred by Indemnitees arising from this Agreement, except for any Claims resulting directly from [Symetra]'s willful misconduct in the performance of Services."

*Id*. ¶ 36.

Symetra takes the position that the 2003 RSA (and the 2001 RSA before it) was a "plan-level contract," meaning it covered and applied to all products Symetra sold to the Plan. *Id*. ¶ 37. Symetra maintains that it provided the applicable services listed on Schedule A of the 2003 RSA to the Plan for all products Symetra sold the Plan over time. *Id*. ¶ 38.

Although Symetra asserts that the 2003 RSA revised the parties' 2001 RSA, the AMEC Defendants contend the 2003 RSA was never a valid contract. Dr. Harris signed the 2003 RSA, AMEC Defs.' SOF ¶ 39, but did so purporting to be the Trustee of the Plan and on the line in the

17

document for the "Authorized Representative" of the Church. AMEC Defs.'s Resp. SOF ¶ 33.[12] The

AMEC Defendants dispute that Harris had such authority. Neither the AMEC General Board, the

AMEC Commission on Retirement Services, nor any other AMEC Commission or Department

signed or otherwise executed the 2003 RSA. *Id.*; AMEC Defs.' SOF ¶ 38. And there is no evidence

that AMEC authorized Dr. Harris to sign the 2003 RSA unilaterally. *Id.*[13]

What is more, the 2003 RSA document was a form document prepared by Symetra. AMEC

Defs.' Resp. SOF ¶ 33; AMEC Defs. Add'l Facts ¶ 39. However, no one signed the 2003 RSA on

behalf of Symetra (or Safeco). *Id.* An American Arbitration Association Commercial Tribunal has

ruled that the 2003 RSA did not grant Symetra a contractual right to arbitrate disputes with AMEC

because Symetra never executed those agreements such that they became "effective" pursuant to the

plain language of the agreement. *Id.*; AMEC Add'l Facts ¶ 46.[14]

Symetra argues that Dr. Harris properly signed the 2003 RSA and bound the Church.

Symetra counters that Dr. Harris was a General Officer of the Church and a member of the AMEC

General Board. Symetra Resp. SOF ¶ 38. As a result, Dr. Harris's signature constituted signing and

executing the 2003 RSA on behalf of AMEC. *Id.* As for the lack of a copy of the 2003 RSA bearing

an authorized signature from Symetra, Symetra concedes that a signed copy may no longer exist. *Id.*

---

[12] The parties dispute the significance of one person signing an RSA in multiple capacities. Although Symetra employees testified it was not unusual or suspicious for a person to sign an RSA in multiple capacities where they held multiple positions, Symetra's corporate representative testified that it is "not common" for one individual to sign as the Employer, the Plan Administrator, and the Trustee. Symetra SOF ¶ 34. No one alive at AMEC has personal knowledge of the negotiation or execution of the 2003 RSA. *Id.* ¶¶ 39, 81.

[13] The Court will address below Symetra's argument that the doctrine of collateral estoppel precludes AMEC from contesting an arbitrator's determination that Dr. Harris had authority to act on behalf of the Church and was the designated trustee of the Plan.

[14] The Court notes that the parties have briefed nearly identical factual statements about another RSA signed by Dr. Harris in 2008.  AMEC Defs.' SOF ¶¶ 40–44.

18

¶ 37. However, Symetra claims the document was executed in hardcopy more than twenty years ago, and Harris destroyed most of AMEC's documents related to the Plan. Symetra does not actually cite any record evidence to support these claims.

In any event, Dr. Harris proceeded with the plan to purchase the Florida real estate. In June 2003, Harris issued the 2003 DRS Annual Report to the DRS Commission and the AMEC General Board. *Id*. ¶ 41. The 2003 Annual Report contained the following statement:

> [A]s Trustee and Fiduciary for the [Plan], it is the inherent responsibility of the elected Executive Director to explore all investment avenues and vehicles in the pursuit of obtaining the maximum investment return for the participants of the Plan, but in a fiscally sound and prudent manner. Certain optional investments, particularly in the area of real estate, in carefully selected markets, provide excellent opportunities to accomplish a more satisfactory investment return, while utilizing collateralization to protect investment value and integrity. In the present investment environment, such opportunities are worthy of serious consideration and are recommended elsewhere in this Annual Report.

*Id*. Symetra characterizes the quoted language as Dr. Harris' disclosure that he was acting as Trustee of the Plan and was planning to invest Plan funds in real estate. *Id*. The AMEC Defendants respond that the statements only show that Dr. Harris called himself "Trustee" and asserted for himself the authority to invest Plan assets.

The 2003 DRS Annual Report included a "General Board Meeting Recommendation" that the Commission "shall direct the Executive Director of Employee Security as Trustee and Fiduciary of the Plan, to invest not more than 30% of the total assets of the Plan in alternate investment vehicles that will provide a greater rate of return, with the requirement that all such investments provide a fixed rate of return and shall be made only on a collateralized basis." Symetra SOF ¶ 42.

The Commission and General Board both formally approved and adopted Harris's 2003 DRS Annual Report and its recommendations. *Id.* ¶ 43. There is evidence that the Commission approved Dr. Harris's annual report every year between 2001 and 2021. *Id.* ¶ 44.[15]

Dr. Harris used the $1.7 million from the 2001 Annuity Contract money market account, along with an additional $800,000 in Plan funds, to purchase four lots in Marco Island ("Florida Real Estate") through Key Marco Holdings, a holding company owned by the Plan. *Id.* ¶ 46. The legal documents for this purchase that were notarized, filed with the State of Florida, and recorded in Collier County, Florida repeatedly identify Harris (and any successor Executive Director) as "Trustee of the African Methodist Episcopal Church Ministerial Retirement Annuity Plan." *Id.* ¶ 47. The AMEC Defendants add that the documents cited by Symetra to support its contention were not signed by Dr. Harris or any other individual associated with AMEC, and there is no indication who drafted any of the language in these documents. AMEC Defs.' Resp. SOF ¶ 47. The year-end 2003 Asset Reconciliation Report prepared by Newport stated that the Plan owned the Florida Real Estate as of September 30, 2003, and valued the property at the $2.5 million—the amount that the Plan had paid for it. Symetra SOF ¶ 48.

### VIII.    Eaton's Assignment of His Commissions and the Plan's Initial Investment in Motorskill

In June 2004, Dr. Harris ran unopposed and was reelected as Executive Director of DRS at the quadrennial AMEC General Conference. *Id.* ¶ 49. In September 2004, Eaton requested that Symetra assign his commissions from brokering the 2001 Annuity Contract to AMEC Financial Services, LLC, an entity owned by the Church and created by Dr. Harris in 2002 with authorization

---

[15] Symetra contends it never received any of the DRS Annual Reports Harris provided to the Commission and General Board over the years. Symetra SOF ¶ 45. The AMEC Defendants object that the evidence cited only shows that Symetra employee Jim Daniel testified he never "looked at" any DRS reports. AMEC Defs.' Resp. SOF ¶ 45. Daniel was employed at Symetra from 2001 to 2009. *Id.*

from the General Board. *Id*. ¶ 50. Symetra understood and believed that AMEC owned AMEC Financial Services, LLC. *Id*. Dr. Harris represented to Symetra that the assignment of Eaton's commissions was made to repay the Plan for a loan it had extended through AMEC Financial Services to a company with which Eaton was involved. *Id*. Symetra advised Dr. Harris that this assignment would have been potentially problematic if the Plan had been covered by ERISA. *Id*.

In a November 30, 2004 memorandum, Dr. Harris advised the President of the AMEC Council of Bishops that the "Executive Director of [DRS], by virtue of position, has the Fiduciary/Trustee responsibility for all retirement plan[s] of the Church." *Id*. ¶ 51. The AMEC Defendants provide additional context for the statement. By way of background, AMEC created a 403(b) retirement plan, effective January 1, 2004. Symetra SOF ¶ 9. The Church named it the "African Methodist Episcopal Church Retirement Plan for Pastors and Presiding Elders" ("the Pastor 403(b) Plan"). *Id*. At that time, the Pastor 403(b) Plan's assets were invested with Zurich Kemper Investments, not Symetra, though there is evidence the 403(b) Plan's assets were later transferred to Symetra. *Id*. ¶ 10. In other words, the Church had established and sponsored more than one retirement plan.

The AMEC Defendants explain that the memorandum contained a section entitled "Historical Summary–AMEC Retirement Board/Retirement Plan for Pastors and Presiding Elders," a reference, in AMEC's reading of the memo, to the Pastor 403(b) Plan, not the Rule 401(a) annuity-based Plan at issue here. AMEC Defs.' Resp. SOF ¶ 51. Dr. Harris wrote,

> The Executive Director of Employee Security, by virtue of position, has the Fiduciary/Trustee responsibility for all retirement plans of the Church. However, pertinent information and communication regarding the Plan was often difficult to obtain and no advisory was provided as to when and in what amount annual contributions/allocations were made. This has created a precarious management situation for the Executive Director as well as a position of jeopardy for the Church.

21

*Id*. The AMEC Defendants therefore argue the memo is ambiguous because it is unclear whether Dr. Harris was referring only to the Pastor 403(b) Plan or all retirement plans of the AME Church that existed at the time. The AMEC Defendants argue that other evidence, particularly the 1997 Plan Document and the Doctrine and Discipline, calls into doubt Dr. Harris's claim to authority over all of AMEC's retirement plans. *Id*. And Symetra has not presented any evidence confirming that the Council of Bishops or its President actually received the memo. *Id*.

In June 2005, Harris issued the 2005 DRS Annual Report to the Commission and General Board, in which he reminded the General Board that at its prior December 2004 meeting, DRS "was given the responsibility of the direct management of the [retirement] plan." Symetra SOF ¶ 52. The Commission and General Board both formally approved and adopted the 2005 DRS Annual Report. *Id*. The AMEC Defendants again dispute whether "the responsibility of the direct management of the [retirement] plan" meant the annuity-based Plan at issue. According to the AMEC Defendants, the evidence shows that Dr. Harris was referring only to "the Retirement Plan for Pastors and Presiding Elders (403b)," and not "the AMEC Annuity Plan (401a)." AMEC Defs.' Resp. SOF ¶ 52.

Symetra asserts that, once granted this authority, Dr. Harris began investing Plan funds in Motorskill, a venture capital fund that invested in a portfolio of start-up companies in a variety of industries, including technology, oil and gas, solar, and construction. Symetra SOF ¶ 53. Motorskill was run by the Erwin family: Randall Erwin, the Chairman of the Board; his son Jarrod Erwin, the President; and his son Ryan Erwin, a vice president. *Id*. ¶ 54. In October and December of 2005, Harris invested $500,000 of the Plan's money in Motorskill from the Plan's Regions Bank account (not from the Symetra annuity contract). *Id*. ¶ 55. The AMEC Defendants do not dispute that Dr. Harris began investing in Motorskill, only the inference that Dr. Harris had the authority to do so.

## IX.    The 2006 Plan Document

The parties dispute whether AMEC adopted a new Plan Document in 2006 ("the 2006 Plan Document").  Symetra claims that the Plan revised and restated its governing document, effective March 6, 2006. *Id*. ¶ 56. Newport drafted the 2006 Plan Document. *Id*. Dr. Harris testified in separate litigation that a purpose of the new 2006 Plan Document was to merge the 403(b) Pastor Plan into the AMEC 401(a) Plan. *Id*. ¶ 57. As the 1997 Plan Document did before it, the 2006 Plan Document defines the Plan as a non-electing Church plan and trust that qualifies for preferential tax treatment under the Internal Revenue Code, 26 U.S.C. § 401(a). *Id*. ¶ 59.

The 2006 Plan Document defines AMEC as the "Employer," DRS as the Plan "Administrator," and Harris as Plan "Trustee."  *Id*. ¶ 60. Under § 2.1 of the 2006 Plan Document, AMEC was "empowered to appoint and remove the Trustee and the Administrator" and was obligated to "periodically review the performance of any Fiduciary or other person to whom duties have been delegated." *Id*.  Section 7.2(a) of the 2006 Plan Document addresses the authority of the Trustee and states as follows:

> The Trustee shall invest and reinvest the Trust Fund to keep the Trust Fund invested without distinction between principal and income and in such securities or property, real or personal, wherever situated, as the Trustee shall deem advisable, including, but not limited to, stocks, common or preferred, open-end or closed-end mutual funds, bonds and other evidences of indebtedness or ownership, and real estate or any interest therein. The Trustee shall at all times in making investments of the Trust Fund consider, among other factors, the short and long-term financial needs of the Plan on the basis of information furnished by the Employer. In making such investments, the Trustee shall not be restricted to securities or other property of the character expressly authorized by the applicable law for trust investments; however, the Trustee shall give due regard to any limitations imposed by the Code or the Act so that at all times the Plan may qualify as a qualified 40l(k) Plan and Trust.

*Id*.

The 2006 Plan Document also addresses the liability of an "Insurer."  Section 9.8 of the 2006 Plan Document reads as follows:

INSURER'S PROTECTIVE CLAUSE: Except as otherwise agreed upon in writing between the Employer and the insurer, an insurer which issues any Contracts hereunder shall not have any responsibility for the validity of this Plan or for the tax or legal aspects of the Plan. The insurer shall be protected and held harmless in acting in accordance with any written direction of the Trustee, and shall have no duty to see to the application of any funds paid to the Trustee, nor be required to question any actions directed by the Trustee. Regardless of any provision of this Plan, the insurer shall not be required to take or permit any action or allow any benefit or privilege contrary to the terms of any Contract which it issues hereunder, or the rules of the insurer.

*Id*. ¶ 62.

Section 7.6(a) & (b) of the 2006 Plan Document also includes the following language:

(a) Within a reasonable period of time after the later of the Anniversary Date or receipt of the Employer contribution for each Plan Year, the Trustee, or its agent, shall furnish to the Employer and Administrator a written statement of account with respect to the Plan Year for which such contribution was made setting forth: (1) the net income, or loss, of the Trust Fund; (2) the gains, or losses, realized by the Trust Fund upon sales or other disposition of the assets; (3) the increase, or decrease, in the value of the Trust Fund; (4) all payments and distributions made from the Trust Fund; and (5) such further information as the Trustee and/or Administrator deems appropriate.

(b) The Employer, promptly upon its receipt of each such statement of account, shall acknowledge receipt thereof in writing and advise the Trustee and/or Administrator of its approval or disapproval thereof. Failure by the Employer to disapprove any such statement of account within thirty (30) days after its receipt thereof shall be deemed an approval thereof. The approval by the Employer of any statement of account shall be binding on the Employer and the Trustee as to all matters contained in the statement to the same extent as if the account of the Trustee had been settled by judgment or decree in an action for a judicial settlement of its account in a court of competent jurisdiction in which the Trustee, the Employer and all persons having or claiming an interest in the Plan were parties. However, nothing contained in this Section shall deprive the Trustee of its right to have its accounts judicially settled if the Trustee so desires.

*Id*. ¶ 63.

The AMEC Defendants argue the 2006 Plan Document never became effective as the Plan's governing document and deny that the 2006 Plan Document was ever anything more than a draft. AMEC Defs.' Resp. SOF ¶ 56. First, Dr. Harris improperly signed another document, the 2008

RSA, in 2008 as both the Employer and the Trustee without authority from AMEC or the General Board to represent himself in those positions. *Id*. Next, Symetra failed to acquire a signed or otherwise executed certificate of corporate resolution accompanying the 2006 Plan Document, confirming Harris had authority to enter such an agreement with Symetra. *Id*. No duly authorized representative of the AMEC General Board signed or executed the 2006 Plan Document. *Id*. Dr. Harris lacked authority under the Doctrine and Discipline or any other AMEC governing document to unilaterally execute a revised or remade governing Plan document. *Id*; AMEC Add'l Facts, ¶¶ 26–28, 32–35.

Symetra cites evidence tending to show that the Church adopted the 2006 Plan Document. In his 2006 DRS Annual Report to the Commission and General Board, Dr. Harris reported: "The governing Plan Document has been revised to consolidate [the Pastor 403(b) Plan] with the [the Plan] under the responsibility of the department and places day-to-day management and fiduciary responsibility specifically and exclusively with the Executive Director as Plan Administrator." *Id.* ¶ 65. Dr. Harris's report also stated that "[a]s the elected Trustee and Fiduciary of the retirement plans for [AMEC], it is the inherent responsibility of the Executive Director to examine and re-examine all investment programs and vehicles in the pursuit of obtaining the maximum return for the participants in the most fiscally sound and prudent manner." *Id*. Both the Commission and General Board formally approved and adopted Harris's 2006 DRS Annual Report. *Id.* ¶ 66.

Furthermore, in litigation commenced by a pastor's spouse against AMEC in April 2019, AMEC represented to the court that the 2006 Plan Document governed the Plan and that Harris was the Plan Trustee. *Id.* ¶ 67. AMEC also proffered Dr. Harris as the Church's Rule 30(b)(6) corporate representative in the litigation. *Id*. Dr. Harris testified under oath that he was the Plan Trustee and that the 2006 Plan Document governed the Plan. *Id*. Lastly, both Plaintiffs' retirement plan expert

25

and AMEC's corporate representative opined that the 2006 Plan Document governs the Plan. *Id.* ¶ 58.

In August 2019, when Newport was unable to find a fully executed copy of the 2006 Plan Document, it requested that Dr. Harris supply one. *Id.* ¶ 68. A question of fact remains over whether Newport received a signed copy of the 2006 Plan Document in 2006 and had subsequently misplaced it or whether the 2006 Plan Document was ever formally adopted in 2006. On September 17, 2019, Harris sent Newport fully executed signature pages for the 2006 Plan Document. *Id.* ¶ 69. Brian Cooper, AMEC's General Secretary, executed the Certificate of Corporate Resolution. *Id.* Richard Allen Lewis Jr.—AMEC's CFO, Treasurer, and authorized signatory—signed the 2006 Plan Document as the representative of the Church right above the line where Harris signed as Trustee. *Id.*

The AMEC Defendants add that no one filled out the blank on the Certificate of Corporate Resolution which read as follows:

> The undersigned Secretary of African Methodist Episcopal Church (the Corporation) hereby certifies that the following resolutions were duly adopted by the board of directors of the Corporation on _____, and that such resolutions have not been modified or rescinded as of the date hereof.

AMEC Defs.' Resp. SOF ¶ 69. Based on the fact that the line was left blank, the AMEC Defendants posit that "the board of directors of the Corporation" had not formally passed a corporate resolution approving and adopting the 2006 Plan Document in 2019 and that Jeffery Cooper simply signed the signature page at Dr. Harris's request. *Id.*

Overall, the parties dispute what authority Dr. Harris actually possessed at the time of the 2006 Plan Document. Symetra claims that regardless of his formal status as Trustee, Dr. Harris was responsible for managing the Plan and had authority to contract on behalf of the Plan. Symetra SOF ¶ 70. Between his election as Executive Director in 2000 and his retirement in 2021, Harris was the

26

only person who made investment decisions for the Plan. *Id.* ¶ 71. Harris was also the only person authorized by AMEC to give directions to or communicate with Symetra. *Id.*

The AMEC Defendants cite other evidence to call these statements into question. Under the Doctrine and Discipline, Dr. Harris, as Executive Director of the DRS, was authorized to administer the DRS by giving oversight to Church programs operated for the retirement security of the salaried personnel of the Church, including the AMEC Ministerial Retirement Annuity Plan. AMEC Defs.' Resp. SOF ¶ 70; AMEC Additional Facts, ¶ 9. The Doctrine and Discipline further states that the "Department of Retirement Services shall direct the Ministerial Annuity Plan of the African Methodist Episcopal Church, as directed by the General Board." AMEC Defs.' Resp. SOF ¶ 70. Accordingly, pursuant to a 2001 General Board Resolution, Dr. Harris, as Executive Director, was given specific authority to collect AMEC's contributions to the Plan and deposit them into a Symetra annuity contract, which the General Board had also authorized Dr. Harris to purchase. *Id.*; AMEC Add'l Facts, ¶¶ 9, 17–19.

By contrast, there are no resolutions or other documents generated by the General Board or any other AMEC authority that gave Dr. Harris authority to contract on behalf of the Plan beyond purchasing a fixed annuity contract with Symetra for depositing Plan funds. AMEC Defs.' Resp. SOF ¶ 70. Instead, Dr. Harris was only empowered to administer the Plan, meaning he could collect contributions and deposit them in the Symetra annuity account and, in conjunction with Newport, coordinate lawful distributions to plan participants from the Symetra annuity account upon eligibility. *Id.* Beyond depositing Plan funds into an annuity contract with Symetra, AMEC did not authorize Dr. Harris to make unilateral investment decisions with respect to the funds of the Annuity Plan. *Id.*; AMEC Add'l Facts, ¶¶ 9, 17–19. The Doctrine and Discipline also established the

Commission of Retirement Services to serve as the trust committee for annuity coverage of the Church. *Id.* ¶ 7.

### X.    Purchase of the Second Annuity and the Guaranteed Interest Contracts

In September 2006, Harris and Eaton investigated whether they could get a better deal for the Plan than Symetra was offering by issuing a new RFP for an annuity that would provide "the highest possible return to the plan with no risk to capital and a guaranteed rate of return[.]" Symetra SOF ¶ 72. On September 26, 2006, Symetra responded to the new RFP with a detailed proposal for a new annuity for the Plan. *Id.* ¶ 73.

According to Symetra, in January 2007, Harris received approval from the Chairman of the Commission on Retirement Services "to allow the use of multiple investment vehicles" for the Plan, to develop "a true diversified portfolio" seeking "to achieve higher average returns," and to sign new contracts with Symetra, including annuities with a staggered set of maturity dates. *Id.* ¶ 74. The AMEC Defendants deny that Dr. Harris was granted such authority. Symetra cites as evidentiary support for its claim a memorandum dated January 23, 2007. AMEC Defs.' Resp. SOF ¶ 74. The memorandum was purportedly drafted by Robert Eaton and addressed to Dr. Harris and Bishop Philip Robert Cousin, Sr., the Chairman of the Commission at the time. *Id.*

The subject of the memorandum was "Current Market Position and Recommendation" in which Eaton made the following statements:

> To reiterate the primary objective: To position the plan management structure to allow the use of multiple investment vehicles and/ or maturities to provide maximum investment return and security of principal . . . .

> What I recommend be implemented is the structuring of the current relationship with Symetra to develop a series of staggered maturity dates and balance those with comparable "A" rated or better options that allow you total flexibility to reposition the plan assets to maximize the return and increase the overall safety by developing a true diversified portfolio. This is the time to begin such a strategy as there are no "surrender charges" with Symetra, and the expected return is lower than can be

28

> received from a higher credit, which makes it the perfect time to increase return and lower overall risk.
>
> What I am prepared to do upon your direction is to put the needed structure together that will provide you and the department the ability to better serve your participants by maximizing their flexibility to achieve higher average returns with the primary focus on safety of principal . . . .
>
> I am prepared to begin putting the structure of this strategy together with your oversight and direction, and I would like to begin this process at our meeting with Symetra on the 6th of February. Immediately following that meeting, I am prepared to develop and present a 24 month strategy plan by the end of February for your final review and approval.
>
> If this is acceptable to you, your Commission and its Chairman; please provide the signatures as indicated below and I will begin the initial process of preparing a strategic plan for review prior to the meeting with Symetra.

*Id*. Both Dr. Harris and Bishop Cousin signed the memorandum just below the following statement: "The undersigned agree that a deversified [sic] format is in the best interest of the plan participants and hereby authorize Robert G [sic] Eaton as the Broker of Record to proceed with a strategic format as outlined above and as directed by the individuals whose signatures appear hereon." *Id*.

Thereafter, Dr. Harris applied for a second Symetra annuity. Symetra SOF ¶ 75. Dr. Harris also applied for a one-year Guaranteed Interest Contract ("GIC"), divided into two parts, one starting March 2007 funded with $20 million, and one starting June 2007 funded with $10 million (collectively "the 2007 GICs"). *Id*.; *see also* Symetra Resp. SOF ¶ 50 (describing the 2007 GIC as a single contact having "two tranches"). The 2007 GIC is a contract between Symetra and the Plan. Symetra Resp. SOF ¶ 50. The funding for the 2007 GIC came out of the 2001 Annuity Contract. *Id*. Dr. Harris submitted an application for the 2007 GIC on a form prepared by Symetra in which Dr. Harris signed the portion of the form designated "Trustee's Signature." AMEC Defs. SOF ¶ 51. AMEC did not draft, sign, or otherwise execute the 2007 GIC. *Id*. ¶ 52.

29

Symetra issued the Plan a GIC covering both the March 2007 GIC and the June 2007 GIC, which includes the following provisions:

• II.1 "This contract and the application of the contract holder, a copy of which is attached, shall constitute the entire contract between the parties. Symetra Life is not a party to nor bound by any trust or Plan. However, the terms of this contract are subject to the qualifying provisions of any Plan under which this contract is issued."

• IV.2(a) "Symetra Life may rely on the written directive and shall not be liable because of any failure to question of challenge such directive regarding the issuance of an annuity or payment of a cash distribution."

Symetra SOF ¶ 76; AMEC Defs. SOF ¶¶ 53–55.

The AMEC Defendants argue that the 2007 GIC did not limit Symetra's liability for following directives made by the Executive Director of the Department or for investing Plan funds in entities outside the scope of the 2007 Annuity Contract or 2007 GIC. *Id.* ¶¶ 56–57. Symetra disagrees. Symetra contends that the 2007 GIC is a contract between Symetra and the Plan and that Dr. Harris was the authorized representative of the Plan who applied for the 2007 GIC and executed the 2007 GIC applications on behalf of the Plan. Symetra Resp. SOF ¶ 56. It follows that Dr. Harris had authority under the 2007 GIC to give written directives to Symetra with respect to the 2007 GIC. *Id.* Symetra relies on the 2007 GIC's clause that Symetra would "not be obligated to issue an annuity or to make a cash distribution until it receives a written directive" and that Symetra could permissibly "rely on the written directive and shall not be liable because of any failure to question or challenge such directive regarding the issuance of an annuity or payment of a cash distribution." *Id.* ¶¶ 56–57. The Court considers the proper construction of the contract's terms in more depth below.

On or around March 6, 2007, Symetra drafted and issued a second Annuity Contract, under which Harris made an initial $10 million deposit (the "2007 Annuity Contract"). AMEC Defs. SOF ¶ 45; Symetra SOF ¶ 77. The 2007 Annuity Contract is a contract between Symetra and AMEC. Symetra Resp. SOF ¶ 50.  The 2007 Annuity Contract guaranteed a return of 4.15% interest for at least one year and guaranteed a minimum rate of interest of 1.5% for the length of the contract. Symetra SOF ¶ 77. The 2007 Annuity Contract contains the following provisions among others:

• "NON-PARTICIPATION IN SURPLUS: The Contract and associated Certificates will not share in the distribution of profits, losses, or surplus of Symetra."

• "PLAN PROVISIONS: Symetra is not a party to, nor bound by, any trust or Plan. However, the terms of the Contract and this Certificate are subject to the provisions of any Plan under which the Contract and this Certificate are issued."

• "THE FIXED ACCOUNT: All Purchase Payments and Transfers to the Fixed Account will become part of the General Account to be so used and invested and will not be segregated from Symetra's other assets."

• "INTEREST CREDITING: … Each Purchase Payment and Transfer will be credited with the annual effective interest rate established for the date that Symetra receives the Purchase Payment or Transfer. The rate is guaranteed for at least 6 months. After 6 months, Symetra can adjust the annual effective interest rate no more frequently than once every 6 months…."

• "TRANSFER REQUESTS: Symetra will accept Transfer requests submitted in writing on a form approved by Symetra or in an alternate format approved by Symetra provided that the request is made by:
• the Contractholder,
• you, if permitted under the terms of the Plan, or
• other authorized person designated to Symetra in writing by the Contractholder or you.

Symetra will not be liable for any failure to question or challenge such request for Transfer as long as there is a valid signed authorization on record at Symetra.

*Id.* ¶ 78. The Plan has kept all of its assets held at Symetra since 2007 in the fixed account portion of the 2007 Annuity Contract. *Id.* ¶ 79.[16]

For the 2007 Annuity Contract, Symetra provided services to the Plan that were listed in Schedule A of the 2003 RSA, though the AMEC Defendants maintain the 2003 RSA was never a valid, enforceable contract. *Id.* ¶ 80. Schedule A requires Symetra to value the annuity contract daily, prepare and provide quarterly reports on the annuity contract, and process retirement and hardship distributions from the annuity contract. *Id.* The AMEC Defendants point out that in the evidence cited by Symetra to support its claim, Rev. Brian Blackwell did not testify that Symetra provided these services pursuant to the 2003 RSA but rather that Symetra serviced the 2007 Annuity Contract pursuant to the 2001 RSA. AMEC Defs.' Resp. SOF ¶ 80.[17]

In June 2007, Dr. Harris issued his DRS Annual Report to the Commission and General Board, in which he reiterated that the 403(b) Pastor Plan had been merged into the Plan (pursuant to the 2006 Plan Document) and that "the responsibility for the day to day administration and management of this Plan now resides with [DRS]"). Symetra SOF ¶ 83. There is evidence both the Commission and General Board formally approved and adopted Harris's 2007 DRS Annual Report, though the AMEC Defendants continue to object that Symetra has not cited a formal resolution of the Commission or the General Board to that effect. *Id.*

---

[16] The AMEC Defendants make a number of assertions about the 2007 Annuity Contract. AMEC Defs. SOF ¶¶ 46–49. However, as Symetra correctly points out, the AMEC Defendants have cited the 2007 GIC to support their interpretation of the 2007 Annuity Contract, not the contract itself.

[17] Symetra goes on to assert as statements of fact that it did not have certain duties as part of the 2003 RSA. Symetra SOF ¶ 82. The AMEC Defendants rightly object that Symetra's claims are actually conclusions of law, not statements of fact. The Court therefore omits them here from the recitation of the evidence.

Attached to the 2007 DRS Annual Report was an Audit Report created by Rodney Brown & Company, Certified Public Accountants ("Rodney Brown"). *Id*. ¶ 84. The Audit Report states that "the balances of annuities held and invested by Symetra Financial Services and Insurance Company on behalf of participating servants of the African Methodist Episcopal Church totaled $62,000,000." *Id*. While technically a true statement, the Audit Report does not list the Plan's other investments in the Florida Real Estate and Motorskill. *Id*. Motorskill and the Florida Real Estate were not disclosed in the report. *Id*.

Rodney Brown issued a similar audit report every year up through 2021. *Id*. ¶ 85. The parties dispute whether both the Commission and the General Board understood Rodney Brown was auditing the Plan and whether both bodies relied on the accuracy and completeness of his audit reports over time with respect to how much money was in the Plan and where it was invested. Bishop Clement Fugh testified that he did not recall any member of the General Board ever proposing to require an audit of the DRS to be completed by a firm not selected by Dr. Harris. *Id*. ¶ 86.

Symetra never communicated directly with the Commission or the General Board. *Id*. ¶ 87. There is proof that members of the Commission and the General Board understood that Dr. Harris was the person authorized to communicate with Symetra on the Church's behalf. *Id*. Likewise, Symetra never communicated directly with the Plan participants. *Id*. ¶ 88. Plan participants would not have expected Symetra to do so, especially because many of them did not even know where the Plan's money was invested and never asked. *Id*.

XI.   **Motorskill and Financial Freedom Funds**

In June 2006, Harris and Eaton prepared a presentation for the AMEC General Board and Council of Bishops describing the Plan's investments, including the investments in the Symetra

33

annuity account ($59.1 million); Florida Real Estate ($2.5 million); and other stocks, bonds, membership units, mutual funds, money market accounts, and "loans and other investment vehicles" ($2.1 million). *Id*. ¶ 89. The presentation disclosed not only the Florida Real Estate but also the Motorskill investment. *Id*. The AMEC Defendants object to the claim that Dr. Harris and Eaton ever made such a presentation.   AMEC Defs.' Resp. SOF ¶ 89. While Symetra has cited a deck of presentation slides, there is no evidence the presentation was ever actually delivered to the General Board or the Council of Bishops. *Id*.

In 2006 and 2007, Harris invested another $2.5 million of the Plan's funds in Motorskill via the DRS's Regions Bank accounts (for a total of $2.5 million invested). Symetra SOF ¶ 90. Symetra denies that it had any involvement in or knowledge of these investments, though, according to the AMEC Defendants, Symetra cites no evidence to support its denial.

On January 11, 2008, Dr. Harris executed a Limited Liability Company Agreement creating Financial Freedom Funds, LLC ("FFF") as a 100% owned subsidiary of AMEC Financial Services, a company owned by the Church. *Id*. ¶ 91. On January 28, 2008, FFF opened a brokerage account at Bear Sterns. *Id*. ¶ 92. Dr. Harris executed the account agreement in his capacity as the Manager of FFF. *Id*.

With the March 2007 GIC maturing soon, on February 26, 2008, Eaton (as exclusive broker of record for the Plan) requested that Symetra wire $10 million to FFF's Bear Stearns brokerage account. *Id*. ¶ 93. Eaton attached to this request a Subscription Agreement, indicating the Plan was investing $10 million in FFF. *Id*. Two days later, on February 28, 2008, Dr. Harris instructed Bob Follette of Symetra to transfer $10 million dollars to FFF. AMEC Defs. SOF ¶ 58. This request to transfer $10 million away from Symetra on short notice raised liquidity and business retention concerns within Symetra, including from Symetra's actuaries and executives. *Id*. ¶ 94. Symetra's

James Daniel and Bob Follette also expressed concern that the investment could involve a conflict of interest (or prohibited transaction if the Plan were governed by ERISA) because they suspected Eaton could have had an ownership interest in FFF, given that its name was similar to Eaton's company, "Financial Freedom Group." *Id*. ¶ 95; AMEC Defs. SOF ¶ 60. The AMEC Defendants add that Follette testified that he had a call scheduled with Newport's Mark Yahoudy to discuss "potential prohibited transaction issues" that could arise from the FFF transfer request. AMEC Defs.' Resp. SOF ¶ 94; AMEC Add'l Facts, ¶ 62, Ex. W.

The AMEC Defendants also dispute that any concerns Symetra had related only to Eaton. Harris also signed the FFF Subscription agreement and followed up Eaton's request with his own request for the transfer. AMEC Defs.' Resp. SOF ¶ 94; AMEC Add'l Facts ¶ 60. In fact, Eaton had no ownership interest in FFF, which was owned 100% by AMEC via AMEC Financial Services, LLC. Symetra SOF ¶ 96. Eaton did serve as a consultant to FFF and as its Vice President of Business Development. AMEC Defs.' Resp. SOF ¶ 96.

On March 4, 2008, Follette emailed Dr. Harris informing him Symetra was "prepared to wire $10 million of the proceeds" of the 2007 GIC to the Bear Stears account. AMEC Defs. SOF ¶ 61. However, Follette recommended that Harris have an ERISA attorney review the transfer requests to ensure the transaction was not prohibited. *Id*.; Symetra SOF ¶ 97. Symetra claims Follette gave this advice to ensure the transfer did not constitute a conflicted or prohibited transaction. *Id*. The AMEC Defendants dispute that claim because Symetra executed the transfer less than 24 hours later and thus did not allow sufficient time for the transaction to be reviewed by an ERISA attorney. AMEC Defs.' Resp. SOF ¶ 97.

On March 5, 2008, Symetra wired $10 million from the maturing March 2007 GIC to FFF's Bear Sterns brokerage account.  Symetra SOF ¶ 98. The rest of the money from the maturing March

35

2007 GIC was transferred into the 2007 Annuity Contract. *Id.* Symetra asserts that it had no knowledge from this transaction or otherwise that Harris would subsequently decide to move the money invested in FFF out of FFF's Bear Sterns brokerage account and use it to invest in Motorskill; however, the AMEC Defendants counter that Symetra has cited no evidence to support its claim. *Id.* Shortly after this transaction, Symetra laid off both Daniel and Follette and replaced them with Erik Shaner as the Plan's primary point of contact at Symetra. *Id.* ¶ 99.

At some point in 2008, FFF's account at Bear Sterns was transferred to Deutsche Bank. *Id.* ¶ 100. At the end of July 2008, $6.6 million of the $10 million Symetra had transferred to Bear Sterns was invested conservatively in "USD Cash and Cash Equivalents" in FFF's brokerage account at Deutsche Bank. *Id.* ¶ 101. Between 2008 and 2011, FFF opened brokerage accounts at J.P. Morgan and Morgan Keegan (which became Raymond James in 2012) and invested almost $1 million in those accounts. *Id.* ¶ 102. Dr. Harris invested the Plan's money at J.P. Morgan, Deutsche Bank, and Raymond James in stocks and money market funds. *Id.* ¶ 103. FFF maintained these brokerage accounts for the Plan, invested in stocks and money market accounts, until May 2020. *Id.* ¶ 104.

In July 2008, AMEC held its quadrennial General Conference, in which all of the Church's bishops and General Officers convened along with dozens of representatives, pastors, and presiding elders from all of the Church's districts to elect the General Officers for the next four years. *Id.* ¶ 105. Dr. Harris ran unopposed and was re-elected at the Executive Director of the DRS. *Id.* At Dr. Harris's request, Symetra helped Harris prepare a brochure to use in his reelection campaign. *Id.* ¶ 106.

In 2008, Symetra drafted and issued another Guaranteed Interest Contract that named the Plan as the contract holder (the "2008 GIC"). AMEC Defs. SOF ¶ 62.18 AMEC did not draft, sign, or otherwise execute the 2007 GIC or the 2008 GIC Application. *Id*. ¶ 63. The 2008 GIC had a contract period lasting three years, after which, the contract "shall terminate and cease to be of any further force or effect at the close of the first day upon which Symetra Life has completed all of the duties and obligations which have arisen under this contract." *Id*. ¶ 64. Symetra argues that because AMEC and Plaintiffs take the position that Symetra has not satisfied all of its obligations under the 2008 GIC, the 2008 GIC has not terminated. Symetra Resp. SOF ¶ 64.

The 2008 GIC provides that Symetra "shall, upon written direction of the contract holder, issue an annuity or make a cash distribution to the contract holder, a Participant, or to any other person who is entitled to such benefits " Ex. V, art. IV.1. *Id.* ¶ 65. The 2008 GIC also provides that Symetra "shall not be liable because of any failure to question or challenge" a written directive by AMEC as the contract holder to make annuity or cash distributions to Plan participants. Ex. X, art. IV.2(a). *Id.* ¶ 66. However, just as they did with respect to the 2007 GIC, the parties dispute whether the 2008 GIC limited Symetra's liability for following directives made by the Executive Director of the Department. *Id.* ¶ 67. The 2008 GIC did not limit Symetra's liability for investing Plan funds in entities outside the scope of the 2007 Annuity Contract or 2008 GIC. See Ex. X, art. IV. *Id.* ¶ 68. Following the maturity and termination of the 2007 GIC and the 2008 GIC, the 2007 Annuity Contract is the only remaining document that has not terminated and/or expired under its own terms. *Id*. ¶ 69.

In November 2008, Harris helped Bishop Davis (who would become Chair of the Commission in 2012) purchase some real estate for AMEC's Ninth District. Symetra SOF ¶ 107. In

---

[18] The AMEC Defendants claim that the Church was a party to the 2008 GIC. The evidence shows that the parties to the 2008 GIC were Symetra and the Plan, not AMEC.

a series of emails sent to Bishop Davis, Dr. Harris noted, "As an elected General Officer of the church, I serve as the Executive Director of the department and the Trustee/Fiduciary of these plans. As such, I am singularly authorized [to] execute investment purchases of this type in the normal course of my responsibilities." *Id*. Dr. Harris proposed that the real estate be purchased by "Financial Freedom Funds, LLC, a Delaware limited liability company, which is wholly-owned by Jerome V. Harris, as Trustee of the African Methodist Episcopal Church Ministerial Annuity Plan, an affiliate of AMEC." *Id*.  The AMEC Defendants do not dispute the contents of the letter, only the inference that Dr. Harris himself had authored the proposal. The proof shows that an attorney, Matt Brinner of Glankler Brown, PLLC, included that language in a proposed amendment to the real estate contract, which he emailed to Dr. Harris. AMEC Defs.' Resp. SOF ¶ 107.

By the end of 2008, Dr. Harris had invested $6 million of FFF's assets into Motorskill, in addition to the $3 million the Plan had initially invested in Motorskill with funds from Regions Bank, for a total cash investment of $9 million. Symetra SOF ¶ 108. None of this money was transferred by Symetra or with its participation or knowledge. *Id*.  The AMEC Defendants add that $3 million of the $10 million transfer was invested in Motorskill within a week of Symetra allowing the transfer. AMEC Defs.' Resp. SOF ¶108.  According to the Church, the investment in Motorskill took the form of subscription agreements through FFF.  *Id*.  The AMEC Defendants argue that the Court should reject Symetra's claim about its lack of knowledge of the investments because Symetra has cited no evidence to support its claim.

**XII.      Harris and Eaton Negotiate Interest Rates with Symetra**

In January 2009, Symetra's executives became worried that Dr. Harris and Eaton were again "shopping" the Plan to other annuity providers. Symetra SOF ¶ 109. Symetra worried that Daniel—who now worked at OneAmerica—was soliciting the Plan's business. *Id*. Symetra's executives were

38

correct. *Id*. ¶ 110. Daniel did solicit the Plan's business, and Eaton and Harris went so far as to apply for an annuity from OneAmerica. *Id*.

Active negotiations between Symetra and Dr. Harris and Eaton about the annuity interest rates for the Plan continued into 2012, after Chelle Chase had replaced Erik Shaner as Symetra's point person for the Plan. *Id*. ¶ 111. Symetra did not want to go above 1.6%, but Eaton argued that the Plan could get up to 2% or even 2.35% with another company if it was willing to lock-up the money for four years (as opposed to having the money completely liquid with Symetra). *Id*. Ultimately, Symetra offered a rate of 1.75%, which Harris accepted. *Id*. This was higher than the rate Symetra was offering its other customers at the time. *Id*.

The same renewal negotiations occurred in 2013 and 2014, each resulting in Symetra offering a 1.75% rate to the Plan, which was 0.25% above the minimum guaranteed in the 2007 Annuity Contract. *Id*. ¶ 112. Symetra continued to give the Plan a rate of 1.75% until 2017, when the rate dropped to the contractual minimum of 1.5% where it has remained to the present. *Id*. ¶ 113. While the contractual minimum rate on the annuity contracts Symetra sold to the Plan was always 1.5%, Symetra paid significantly above this amount for most of the twenty years Harris was Executive Director. *Id*. During this time period, the interest Symetra paid AMEC on its annuity consistently outperformed other products with similar liquidity/risk profiles, such as treasury notes, certificates of deposit, and money market funds. *Id*.

## XIII.    Day and Night Solar

In March 2009, Dr. Harris, Eaton, and Keith Billhartz created Day and Night Solar LLC ("DNS"), each with a one-third ownership of the company. *Id*. ¶ 114. The ownership of DNS changed over time, with more investors joining between 2010 and 2013. *Id*. ¶ 115. In April 2009, AMEC Financial Services loaned $657,500 to DNS at a rate of 7% interest. *Id*. ¶ 116. On the same

day, FFF loaned the same amount to AMEC Financial Services at the same rate, with the net effect being that the Plan (through FFF) effectively loaned money to DNS. *Id*.

Symetra was aware of the existence of DNS and understood it was controlled by Eaton. *Id*. ¶ 117. Symetra received loan payments from DNS for the Plan, so it understood the Plan had loaned DNS money, but it did not participate in the loan or know about it until after the fact. *Id*. In August 2010, Dr. Harris purported to resign from and forfeit his interest in DNS due to a conflict of interest. *Id*. ¶ 118. However, after this apparent resignation, Dr. Harris's company, Trinity Financial Consultants, invested in DNS. *Id*. Motorskill subsequently invested in DNS in 2015. *Id*. ¶ 119. By the end of 2016, Motorskill owned 11% of DNS, and Trinity Financial Consultants owned 12%. *Id*.

### XIV. Dr. Harris's Investments in Motorskill, His Annual Reports, and Rodney Brown Audit Reports

In January 2009, Dr. Harris directed Symetra to wire $3 million from the 2007 Annuity Contract to FFF, which Symetra did. *Id*. ¶ 120. Dr. Harris then moved the $3 million from FFF to Motorskill along with an additional $1 million. *Id*. Just as they have objected to Symetra's claims about a lack of knowledge, the AMEC Defendants once more object that Symetra has cited no proof to support its claim that Dr. Harris made a transfer "unbeknownst to Symetra." Three months later in April 2009, Dr. Harris for the first time directed Symetra to transfer money directly to Motorskill in the amount of $1 million. *Id*. ¶ 121. While Symetra again disclaims any knowledge about Motorskill or which parties were involved with it, the AMEC Defendants restate their objection that Symetra's lack of knowledge is not actually a statement of fact and that Symetra has not cited any proof to support its disclaimer. By June 2009, Harris had invested $10 million of the Plan's funds in Motorskill through FFF and another $3 million from the Plan directly for a total investment of $13 million. *Id*. ¶ 122.

In June 2009, Dr. Harris issued his 2009 DRS Annual Report to the Commission and General Board, in which he explained that the Plan had suffered "no loss of principal or accrued interest" in 2008 despite the financial crisis and recession because:

> The primary aspect of [the] steps [taken] was asset diversification. Beginning in the latter months of 2007, the Department adopted a strategy of conservative diversification, whereby it began to reinvest a portion of assets into other guaranteed investments, thereby reducing the potential exposure that existed by having the entire portfolio invested in one fixed investment fund. Although the Symetra Financial Retirement Services Company retained the overall Plan management and accountability, lesser portions of the Plan assets were invested elsewhere in specific guaranteed investments. Thus far, this has proven to be a sound strategy.

*Id.* ¶ 123. Symetra denies Harris's statement that Symetra was involved in "Plan management." *Id.*

Attached to the 2009 DRS Annual Report was a Rodney Brown Audit Report which stated that "the balances of annuities held and invested by Symetra Financial Services and Insurance Company on behalf of participating servants of the African Methodist Episcopal Church totaled $77,500,000." *Id.* ¶ 124. According to a March 2009 Asset Reconciliation Report Newport provided to Rodney Brown, only $54.6 million of the Plan's money was invested in annuities. *Id.* The other approximately $22 million was invested in Motorskill, FFF, and the Florida Real Estate. *Id.* Brown's 2009 Audit Report failed to mention the existence of these non-Symetra investments and inaccurately stated where the Plan's money was invested and how much of it was invested with Symetra. *Id.* A genuine dispute of material fact exists over whether Rodney Brown received a copy of Newport's March 2009 Asset Reconciliation Report. Both the Commission and General Board relied on Rodney Brown's Audit Report. *Id.* ¶ 125. As the Court has already noted, the parties dispute whether the Commission and General Board formally approved and adopted Dr. Harris's DRS Annual Reports, including the 2009 Report.

In June 2011, Harris directed Symetra to transfer $2.7 million to Wells Fargo Bank for credit to Motorskill (only the second transfer from Symetra to Motorskill), along with $1 million to FFF's

41

Deutsche Bank brokerage account (which was later transferred to Raymond James). *Id*. ¶ 126. In addition to the $2.7 million transfer from the 2007 Annuity Contract, between June 2009 and June 2011, Harris invested another $4.3 million of the Plan's money in Motorskill via Regions Bank transfers and another $1 million via FFF. *Id*. ¶ 127. Symetra did not participate in or know about this $5.3 million in additional transfers, though the AMEC Defendants dispute the claim about Symetra's lack of knowledge. *Id*. This brought the total of Plan assets invested in Motorskill to $21 million. *Id*.

In June 2011, Harris issued his 2011 DRS Annual Report to the Commission and General Board. *Id*. ¶ 128. Attached to the 2011 DRS Annual Report was a Rodney Brown Audit Report which stated that "the balances of annuities held and invested on behalf of participating servants of [AMEC] totaled $89,000,000." *Id*. ¶ 129. But the March 2011 Newport Asset Reconciliation Report stated that only approximately $53 million of the Plan's money was invested in Symetra annuity products, while the other $36 million was invested in Motorskill, FFF, and the Florida Real Estate. *Id*. Brown's 2011 Audit Report failed to mention the existence of these non-Symetra investments and inaccurately stated where the Plan's money was invested and how much of it was invested with Symetra. *Id*. A genuine dispute of material fact exists over whether Rodney Brown received a copy of Newport's March 2011 Asset Reconciliation Report. The AMEC Defendants add that Brown testified he was auditing the Department, not the Plan, and that he only received confirmations of the value of the Plan from Newport's certified public accountant. AMEC Defs.' Resp. SOF ¶ 129.

Both the Commission and General Board relied on Rodney Brown's Audit Report. Symetra SOF ¶ 130. As the Court has already noted, the parties dispute whether the Commission and General Board formally approved and adopted Dr. Harris's DRS Annual Reports, including the 2009 Report.

In 2011, Reverend Brian Blackwell, a Plan participant (who later became Executive Director of DRS in 2024), concluded that the Plan statements he was receiving from DRS "looked off"

42

because "[g]iven the current economic condition of the country, [he] couldn't understand how the value of the investment was going up so much." *Id*. ¶ 131.  For context, Rev. Blackwell testified that he asked Dr. Harris a question about the Plan at a meeting of the Ninth Episcopal District in 2011 based on his opinion about the valuations "look[ing] off." AMEC Defs.' Resp. SOF ¶ 131.  When asked how much his account had gone up at that time, Rev. Blackwell testified, "I meant, it was–it was–honestly, I don't remember, but it was maybe 5 or 10 percent, which was not what anything else was doing, and at the time I didn't–we didn't have anything that was telling us what the annuity was supposed to do, but I just–it just seemed a little out of bounds." *Id*.

In front of an audience of approximately 500 congregants, Rev. Blackwell "asked [Harris] to explain the -- what the investment was, where the money was, and how we were -- how the plan was obtaining those returns." Symetra SOF ¶ 132.  Dr. Harris never answered the question because the presiding Bishop (Bishop James Davis) "did not feel it was an appropriate question to ask in front of the larger group." *Id*. Rev. Blackwell admitted he could have followed up and asked Dr. Harris the question in private but never did. *Id*.

Rev. Blackwell further explained that in one of his quarterly statements from the Department showed "the return was negative" and "then it kind of shot back up, and it just didn't seem to make any sense." *Id*. ¶ 133. Rev. Blackwell recognized that this "wasn't consistent with a fixed interest rate," but he never asked Dr. Harris any questions about it, or anyone on the Commission or General Board. *Id*. Prior to this part of his testimony, Rev. Blackwell testified that when participants signed up "we were thinking it was a fixed – and that may or may nor have been the case, but that's what as participants we were told it was fixed but it may or may not have been" and that in approximately 2009, Rev. Blackwell spoke with his presiding elder about what the Plan was invested in and his presiding elder "didn't say fixed. He said that the money went into Symetra, and that it was a safe

43

investment, and that when we retired, the money that we put in, we would get it back." AMEC

Defs.' Resp. SOF ¶ 133.

Rev. Blackwell discussed his concerns with colleagues in the Ninth District. Symetra SOF ¶

134. According to Rev. Blackwell's testimony, "[t]he prevailing opinion was that the statements

were false" and that "someone was manipulating them." *Id*.  Blackwell was not aware that anyone

asked questions of Harris or anyone on the Commission about these issues. *Id*.

The AMEC Defendants broadly object to any inferences to be drawn from Rev. Blackwell's

testimony inasmuch as Rev. Blackwell later became the Executive Director of the DRS and testified

as the Church's Rule 30(b)(6) representative. The AMEC Defendants argue that Rev. Blackwell's

statements about his opinions in 2011 are not material to any of the issues for decision between the

AMEC Defendants and Symetra.

Between July 2011 and the end of June 2012, Harris invested another $3 million of the Plan's

money in Motorskill through FFF and an additional $1 million of the Plan's money directly from

Regions Bank. Symetra SOF ¶ 135. Symetra did not participate in or know about this $4 million in

additional transfers, though the AMEC Defendants dispute the claim about Symetra's lack of

knowledge. *Id*. This brought the total investment of Plan assets in Motorskill to $25 million. *Id*.

In June 2012, Dr. Harris issued his 2012 DRS Annual Report to the AMEC Quadrennial

General Conference. *Id*. ¶ 136. The 2012 DRS Annual Report contained the following:

> The problems of the global economy have greatly impacted the economic recovery
> here at home. Though showing signs of improvement, the economy still remains
> weak. This has caused the US monetary policy to be one of maintaining dismally low
> interest rates in an effort to avoid inflation. As a result, the Retirement Annuity Plan
> has been challenged to produce the desired returns for its participants. However, as
> the following pages of this quadrennial report will show, the returns of the
> Retirement Annuity Plan have continued to be positive with no loss of interest or
> principal erosion. It may be said that this continuous positive trend has occurred as a
> result of aggressive diversification and prudent asset management. But in truth, in

has really only been achieved through the matchless grace of our merciful God and in spite of the significant distributions that were made during the period.

AMEC Defs.' Resp. SOF ¶ 136.  Attached to the 2012 DRS Annual Report was a Rodney Brown Audit Report which stated that "the balance of annuities held and invested on behalf of participating servants of the African Methodist Episcopal Church totaled $94,600,000." Symetra SOF ¶ 137.

The March 2012 Newport Asset Reconciliation Report stated that only approximately $50 million of the Plan's money was invested in Symetra annuity products, while the other $39 million was invested in Motorskill, FFF, and the Florida Real Estate. *Id*. Brown's 2012 Audit Report failed to mention the existence of these non-Symetra investments and inaccurately stated where the Plan's money was invested and how much of it was invested with Symetra. *Id*. A genuine dispute of material fact exists over whether Rodney Brown received a copy of Newport's March 2012 Asset Reconciliation Report. As the Court has already noted, Brown testified he was auditing the Department not the Plan and that he only received confirmations of the value of the Plan from Newport's certified public accountant. AMEC Defs.' Resp. SOF ¶ 137.

Every year between 2012 and 2021, Rodney Brown produced an Audit Report. Symetra SOF ¶ 138.  Every year Dr. Harris attached the Audit Report to his annual DRS Annual Report.  *Id.* Every year the Audit Report contained the exact same inaccurate information about all of the Plan's money being invested with Symetra. *Id*. The AMEC Defendants counter that the evidence shows the Audit Reports were attached to the DRS Annual Reports only for the years between 2013 and 2015. AMEC Defs.' Resp. SOF ¶ 138. According to Symetra, Rodney Brown must have known his statements about the Plan's investments were inaccurate because every year he received a statement from Symetra disclosing the actual amount of Plan money in the 2007 Annuity Contract and a statement from Newport disclosing the total amount of money in the Plan. Symetra SOF ¶ 139. These statements never matched, which meant that a significant amount of Plan money was invested

45

outside of the 2007 Annuity Contract. *Id.* It is undisputed that the Commission and the General Board relied on Brown's Audit Reports. *Id.*

The AMEC Defendants object to any statements about what Rodney Brown must have known. Furthermore, Brown testified in his deposition that his use of the phrase "the balance of annuities held and invested on behalf of the participating servants of the African Methodist Episcopal Church" may have been "somewhat not clear." AMEC Defs.' Resp. SOF ¶ 139. Brown testified that he meant the amounts available to meet the Plan's obligations to its participants, not literally that the total amount of the Plan's assets were invested in Symetra annuitants. *Id.*

At the 2012 Quadrennial General Conference, Dr. Harris ran unopposed and was reelected as Executive Director of DRS. Symetra SOF ¶ 140. Bishop Davis was appointed Chairman of the Commission. *Id.* Between July 2012 and August 2013, Dr. Harris ordered Symetra to transfer money to Motorskill on three more occasions. *Id.* ¶ 141. On November 14, 2012, he ordered Symetra to wire $1 million to Motorskill. *Id.* On April 10, 2013, he ordered Symetra to wire $2 million to Motorskill. *Id.* On August 15, 2013, he ordered Symetra to wire a final $1 million to Motorskill. *Id.*

Between July 2012 and June 2014, Harris invested another $2 million of the Plan's money in Motorskill via Regions Bank and another $3 million via FFF. *Id.* ¶ 142. Symetra did not participate in or know about this $5 million in additional transfers, though the AMEC Defendants dispute the claim about Symetra's lack of knowledge. *Id.* This brought the total investment of Plan assets in Motorskill to $34 million. *Id.* All in all, Symetra was aware of only five investments by the Plan in Motorskill totaling $7.7 million, though once more the AMEC Defendants dispute the claim about Symetra's knowledge or awareness or the lack thereof. *Id.* ¶ 143. Neither Dr. Harris nor Eaton directed Symetra to transfer any Plan funds to any other investments after August 2013. *Id.*

46

Between July 2014 and the end of June 2015, Dr. Harris invested another $3 million of the Plan's money in Motorskill through FFF and an additional $1 million of the Plan's money directly from Regions Bank. Symetra SOF ¶ 144. Symetra did not participate in or know about this $4 million in additional transfers, though the AMEC Defendants dispute the claim about Symetra's lack of knowledge. *Id*. This brought the total investment of Plan assets in Motorskill to $37 million. *Id*. These were the last investments Dr. Harris made of Plan money into Motorskill. *Id*. ¶ 145. The very last investment of Plan money into Motorskill was on January 15, 2015. *Id*.

Symetra was not involved in any investments in FFF or Motorskill after August 2013. *Id*. ¶ 146. The following table lists all transfers Dr. Harris directed Symetra to make to FFF and Motorskill:

### Symetra Transfers to Financial Freedom Funds, LLC and Motorskill

| Date | Payee | Amount |
|---|---|---|
| 03/05/2008 | Financial Freedom Funds | $ 10,000,000[19] |
| 01/28/2009 | Financial Freedom Funds | $ 3,000,000[20] |
| 06/06/2011 | Financial Freedom Funds | $ 1,000,000[21] |
| | **Total for FFF $14,000,000** | |
| 04/27/2009 | Motorskill | $ 1,000,000[22] |
| 06/06/2011 | Motorskill | $ 2,700,000[23] |
| 11/14/2012 | Motorskill | $ 1,000,000[24] |

---

[19] Money was transferred out of maturing Guaranteed Interest Contract.

[20] Money was transferred out of the 2001 Annuity Contract (listed in Terrell Report (Exhibit 53) as being transferred on 4/6/2010).

[21] Money was transferred out of maturing Guaranteed Interest Contract.

[22] Money was transferred out of 2001 Annuity Contract (listed in Terrell Report (Exhibit 53) as being transferred to FFF; listed in Motorskill Contribution Ledger (Exhibit 54) as being invested by FFF).

[23] Money was transferred out of maturing Guaranteed Interest Contract.

| 4/10/2013 | Motorskill | $ 2,000,000[25] |
| 8/15/2013 | Motorskill | $ 1,000,000[26] |
| | **Total for Motorskill $7,700,000** | |

*Id.*

Symetra asserts that there is no document, communication, or testimony from any former or current Symetra employee in this case stating that anyone at Symetra ever conspired with Dr. Harris or believed Harris was engaging in any misconduct. *Id.* ¶ 147. To the contrary, Symetra employees involved with the Plan's annuity contracts testified that they did not believe Harris was engaged in any misconduct and if they had believed Harris was engaging in misconduct or doing anything illegal, they would have reported it to their supervisors or Symetra's legal department. *Id.*

The AMEC Defendants respond that there are communications and testimony from former and current Symetra employees in this case indicating that they believed Dr. Harris engaged in misconduct and that Eaton was engaged in misconduct beyond concerns about the assignment of his commissions and his potential interest in FFF. AMEC Defs.'s Resp. SOF ¶ 147. The AMEC Defendants cite the following text messages between former Symetra employees Jim Daniel and Bob Follette and former Newport employee Mark Yahoudy.

- Jim Daniel stated in an April 2022 text upon learning of the lawsuit: "We may all get to c [sic] each other again at the depositions. Eaton will go to jail. Harris will kill himself or skip the country. The humiliation will be too much for him." AMEC Add'l Facts ¶ 74.

- Former Symetra employee Mark Simonetto texted in April 2022: "I imagine Bob Eaton and Jerome Harris are headed for the border." and "The head of the pension services was Jerome Harris. I always felt like I needed a shower when I was around

---

[24] Money was transferred out of 2007 Annuity Contract (listed in Terrell Report (Exhibit 53) and Motorskill Contribution Ledger (Exhibit 54) as being invested in Motorskill partially through FFF ($593,338) and partially directly by the Plan ($406,662)).

[25] Money was transferred out of 2007 Annuity Contract.

[26] Transfer not listed in Terrell Report (Exhibit 53).

Eaton. I often wondered if Eaton had Harris fooled but I think Harris was profiting as well." *Id.*

- Bob Follette texted in June 2022 upon reading a news article about allegations that Dr. Harris embezzled millions: "I can't believe he hasn't left the country. He is going to federal pound me in the ass prison." *Id.*

Symetra's witnesses also testified that it was not unusual for a retirement plan to have a single trustee and that they believed they were contractually obligated to follow Harris's lawful instructions regarding Plan funds invested in the annuity contracts. Symetra SOF ¶ 148. The AMEC Defendants add that Symetra's corporate representative conceded the company had no "documentation specifically authorizing Dr. Harris to act on behalf of the church." AMEC Defs.' Resp. SOF ¶ 148.

### XV.        Dr. Harris Re-Elected as Executive Director in 2016

In June 2016, Harris issued his 2016 DRS Annual Report to the AMEC Quadrennial General Conference, which includes not only Church leadership but also dozens (if not hundreds) of Plan participants. Symetra SOF ¶ 149. In the report, Harris stated that despite the "adverse winds blowing through a troubled global economy," the "approximate overall rate of return for the past four years has been in the 4-6 percent range which is well beyond the industry average of 1-2 percent." *Id.* The 2016 DRS Annual Report read as follows:

However, the AMEC Department of Retirement Services will continue to utilize conservative investment strategies and careful monitoring in an effort to maintain consistent profitability and growth for every participant. While some degree of month-to-month volatility in interest return is expected to continue in the foreseeable future, the final determination of profitability can only be determined on an annualized basis. As the following pages of this report will confirm, the consistent application of this strategy has proven to be both effective and successful. The approximate overall rate of return for the past four years has been in the 4-6 percent range which is well beyond the industry average of 1-2 percent.

49

AMEC Defs.' Resp. SOF ¶ 149. The parties dispute whether church leaders or plan participants questioned Dr. Harris at the 2016 Quadrennial about the Plan's returns or whether plan participants even saw a copy of the 2016 DRS Annual Report.

At the 2016 General Conference, Bishop Leath proposed an amendment to the Church's Doctrine and Discipline that would "establish a free standing board to give oversight to the operation of the Department [of Retirement Services]." Symetra SOF ¶ 150. A genuine dispute of material fact exists over whether the amendment was actually presented at the General Conference and whether plan participants attending the General Conference were allowed to participate in a vote on this amendment. *Id.* Instead, Harris ran unopposed and was again reelected as Executive Director of DRS. *Id.* ¶ 152. Bishop Green was appointed to replace Bishop Davis as Chairman of the Commission. *Id.* ¶ 153.

### XVI.      Dr. Harris Begins Trying to Unwind the Plan's Non-Symetra Investments

In November 2018, Harris began trying to sell the Plan's Florida Real Estate properties. *Id.* ¶ 154. At the end of 2019, Motorskill reported that the Plan's investment of $37 million in Motorskill had grown to $88 million as a result of appreciation and reinvested dividends since the first investment in 2006. *Id.* ¶ 155. In mid-2020, however, Motorskill stopped paying dividends or issuing quarterly statements. *Id.* ¶ 156. By January 2021, Harris and Eaton were actively trying to find a way to get the Plan out of its investment in Motorskill. *Id.* ¶ 157. Dr. Harris and Eaton also tried to get Motorskill to transfer its investment in DNS to the Church via AMEC Financial Services. *Id.* ¶ 158.

None of Dr. Harris' and Eaton's efforts to liquidate the Motorskill investment were successful. *Id.* ¶ 159. Instead, on June 11, 2021, Harris received a letter from an attorney for Motorskill explaining that Motorskill had lost all of its money except its 11% interest in DNS and that "there is nothing of any meaningful value remaining in the Fund." *Id.* Motorskill's management

maintains to this day that the company was a legitimate business venture that happened to go badly. *Id*. ¶ 160.

**XVII.     Dr. Harris's Final Annual Report and Retirement as Executive Director**

Dr. Harris did not disclose this loss of $37 million in contributions (and $88 million in Plan valuation) in his 2021 Annual Report to the AMEC Quadrennial General Conference. *Id*. ¶ 161. Instead, Harris falsely reported that the Plan had $128.3 million in assets. *Id*.; AMEC Defs.' SOF ¶ 14. Rodney Brown corroborated this false number in his 2021 Audit Report. Symetra SOF ¶ 161. Dr. Harris retired from his role as Executive Director of DRS at the 2021 General Conference. *Id*. ¶ 162.

Dr. James Miller was elected as the new Executive Director of DRS. *Id*. ¶ 163. Dr. Miller testified in his deposition that the Executive Director of DRS is a fiduciary of the Plan responsible for supervising the Plan's investments. *Id*. ¶ 164. Dr. Miller opined that Dr. Harris was Trustee of the Plan and its fiduciary. *Id*. The AMEC Defendants add that Dr. Miller testified that he did not believe that the Plan currently had a designated trustee but "that Dr. Harris was designated as a trustee with documentation." AMEC Defs.' Resp. SOF ¶ 164.

Symetra claims that during the twenty years that Dr. Harris served as Executive Director of DRS and issued Annual Reports about the Plan to the Commission, no one on the Commission ever asked to see any documentation of the Plan's investments or even asked Harris where he had invested the Plan's assets. Symetra SOF ¶¶ 165, 173. For example, Dr. Harris reported to the Commission over the years that he was "diversifying" the Plan's investments, but the Commission never once asked Harris what new investments he was diversifying into. *Id*. ¶¶ 166, 174. The AMEC Defendants respond that the proof only shows that former chairs of the Commission for years 2012 to 2021 testified that no member of the Commission asked Dr. Harris for additional information to

51

"support and corroborate" his Annual Reports. AMEC Defs.' Resp. SOF ¶ 165. The former chairs testified that they had no recollection of any member asking Dr. Harris to provide details on the Plan's investments. *Id.* ¶ 166.

The parties also dispute whether the Commission understood that Symetra and Newport were not supervising—and were not responsible for supervising—Harris. Symetra claims the Commission understood no such duty on the part of Symetra or Newport existed. Symetra SOF ¶ 167. The AMEC Defendants cite other testimony where Bishop Davis stated Dr. Harris, Symetra, and Newport, were "part of the professional team for managing the resources of the church" and "had a responsibility for reporting to each other." AMEC Defs.' Resp. ¶ 167.

A genuine dispute of material fact also exists over the Commission's supervision of Dr. Harris during his tenure as DRS Executive Director. Symetra cites testimony from Dr. Miller, who replaced Harris as Executive Director in 2021, and his opinion that the Commission believed it was supervising Dr. Harris by receiving his annual reports and the annual audit reports prepared by Rodney Brown. Symetra SOF ¶¶ 168, 172. Dr. Miller added that this did not constitute supervision in his opinion due to the fact that the reports contained inaccurate statements. *Id.* The AMEC Defendants counter that several past members of the Commission testified that they relied on Dr. Harris's reports to monitor the Department during Harris's tenure.

While AMEC and Plaintiffs have alleged that the Commission is the "trust committee for the annuity coverage under the Doctrine and Discipline," the members of the Commission have testified that they never recalled being referred to as a trustee of the Plan. Symetra SOF ¶ 169. According to Symetra, AMEC never communicated to Symetra that any "trust committee" existed for the Plan, nor did any member of the Commission ever contact Symetra claiming to be a trustee of the Plan. *Id.* ¶ 170. AMEC never authorized anyone other than Harris to give directions to or communicate with

52

Symetra. *Id*. And AMEC never communicated to Symetra that there were any limits on Dr. Harris's authority to act on behalf of the Plan. *Id*. The AMEC Defendants respond that the 1997 Plan Document, upon which Symetra now relies, plainly states that "Trustee" was defined as "Members of the Pension Commission, Pension Department of the A.M.E. Church." AMEC Defs.' Resp. ¶ 170.

As the "Employer" under the 1997 Plan Document and 2006 Plan Document, AMEC had a fiduciary duty to supervise Harris and monitor the Plan's investments. Symetra SOF ¶ 171. The AMEC Defendants do not dispute that section 2.1(b) of the 1997 Plan Document provides that the Employer shall "periodically review the performance of any person to whom duties have been delegated or allocated by it under the provisions for this Plan or pursuant to procedures established hereunder. This requirement may be satisfied by formal periodic review by the Employer or by a qualified person specifically designed by the Employer, through day-today conduct and evaluation, or through other appropriate ways." AMEC Defs.' Resp. SOF ¶ 171.

During the twenty years that Harris was Executive Director of DRS, no one from AMEC ever told Symetra that they believed Harris was not the trustee of the Plan. Symetra SOF ¶ 175. No one from AMEC ever objected to Harris holding himself out as the trustee and sole representative of the Plan. *Id*. No one from AMEC ever represented to Symetra that anyone other than Harris was the trustee or an authorized representative of the Plan. *Id*. Symetra had an internal system where Harris was identified as the trustee, so Symetra employees knew from whom to take instructions with respect to the Plan. *Id*. Dr. Harris was entered as the trustee in that system by Symetra's new business unit back in 2001 based on the initial paperwork Symetra received from American General and AMEC when it issued the 2001 Annuity Contract. *Id*.

By the same token, Symetra's corporate representative testified that that she was not aware of any corporate resolution or documentation from AMEC naming Dr. Harris as trustee of the Plan at

time the account was established or ever, outside of documents in which Dr. Harris named himself as the trustee or filled out pre-printed forms in the spaces labelled "Trustee." AMEC Defs.' Resp. SOF ¶ 175.

## XVIII.    The Church's Investigation Into the Plan's Shortfall

Shortly after becoming Executive Director of DRS in 2021, Dr. Miller called Symetra to ask about the amount of money the Plan had in the Symetra annuity contract. Symetra SOF ¶ 176. Dr. Miller testified that it only took him fifteen minutes of basic due diligence to determine that the real balance in the Symetra annuity contract was $37 million and not $127 million, as Dr. Harris had reported. *Id.*; AMEC Defs. SOF ¶ 15. In August 2021, Dr. Miller had meetings with Dr. Harris and Eaton and with Symetra and AMEC Treasurer Marcus Henderson. *Id.* ¶ 177. In Dr. Miller's meeting with Dr. Harris and Eaton, they discussed the $88 million the Plan currently had invested in Motorskill and the difficulty in recouping this investment. *Id.* In Dr. Miller's meeting with Symetra and Henderson, Symetra answered Dr. Miller's questions regarding the Plan's investment in Symetra annuity contracts, which Symetra summarized as: "While we are one small piece of the [Plan's] overall investments and the[y] are earning 1.5% they said they don't have any plans in moving the assets, which are currently at about $35M." *Id.*

In September 2021, Bishop Green asked Dr. Harris about the Plan's investments, and Harris responded that the Plan was invested in a Symetra annuity contract ($37 million) and Motorskill ($88 million). *Id.* ¶ 178. Once Dr. Miller realized that a significant portion of the Plan's money was invested in Motorskill, he froze the Plan and initiated an investigation to determine how much money the Plan had and where it was invested. *Id.* ¶ 179. After freezing the Plan, Dr. Miller provided the AMEC Council of Bishops with his preliminary findings, which included:

• The Plan had invested between $10 and $30 million in Motorskill;

54

    • Since 2005, the Motorskill investment had been over-valued based on dividends received in the form of more Motorskill shares;

    • It should have been a "red flag for our portfolio valuation" in 2012 when Motorskill lost its ability to operate in Texas where its main office was located;

    • A letter dated June 11, 2021 had been received from an attorney notifying that Motorskill was insolvent and had no funds to disperse;

    • It was unclear who actually owns the Florida Real Estate purchased with Plan funds and how much of it was included in the Plan valuation;

    • The Plan made an unsecured loan of $510,000 to DNS, which was extended four times and matured on March 31, 2021 with none of the loan having been repaid;

    • $36 million of the Plan's funds were invested in a Symetra annuity contract;

    • The Plan never had $125 million in liquid funds and currently realistically only had $36 million.

*Id*. ¶ 180.

On September 28, 2021, Dr. Miller retained Gregory Terrell, CPA, to conduct an investigation and forensic audit of the Plan. *Id*. ¶ 181. As part of his examination, Terrell interviewed the people and companies that provided services to the Plan, including Symetra. *Id*. ¶ 182. During one of these interviews, the Commercial Relationship Manager at Regions Bank admitted that checks from Symetra that Harris received as Trustee for the Plan "were not deposited into an account." *Id*. Instead, the "bank teller, being familiar with Dr. Harris and the account history of AMEC Department of Retirement Services, allowed Dr. Harris to in essence cash and draw cashier's checks and credit funds to accounts of the Department and others. That practice should not have been done [and] the entire Symetra check should have been deposited into the account of the Department." *Id*.

Terrell concluded that the amount of money Dr. Harris misappropriated by not fully depositing Plan checks in the DRS bank accounts was approximately $1,464,766.08. *Id*. ¶ 183.

55

Terrell estimated that the total amount of money misappropriated by Dr. Harris was $4,640,617. *Id.* ¶ 184. Terrell never concluded that Dr. Harris had misappropriated or personally benefitted from the Plan's investments in Motorskill. *Id.* ¶ 185. While requesting information about the Plan from Symetra, Terrell referred to Harris as the Trustee of the Plan. *Id.* ¶ 186.

After conducting his forensic examination, Terrell produced a report to AMEC detailing his findings, including descriptions of the various entities involved with the Plan over time, the transfers and investments that were made in FFF and Motorskill, and the commissions and fees paid by the Plan over time. *Id.* ¶ 187. Terrell concluded that the investment in Motorskill was valueless and that the overall value of the Plan as of September 30, 2021, was $37.2 million. *Id.* ¶ 188.

In late 2021, AMEC leadership undertook to calculate how much money would be required to make Plan participants "whole" and compensate them for their losses. *Id.* ¶ 189. Church leadership concluded that the appropriate way to calculate the amount required to make a Plan participant "whole" was the amount of that participant's contributions over time plus interest on those contributions calculated at the rates Symetra paid on its annuity contracts over time, minus any distributions. *Id.* The AMEC Defendants respond that the exhibit cited by Symetra as support for this claim was prepared before litigation began. On January 31, 2022, the Commission provided a report to the General Board. *Id.* ¶ 190. Using the damages calculation described above, the Commission concluded that it would cost the Church approximately $45 million to make all Plan participants whole. *Id.*

Symetra requested a formal Certificate of Incumbency for Dr. Miller, certifying that he was the Executive Director of DRS and an authorized representative of the Plan with authority to instruct Symetra as to the transfer and disbursement of Plan funds in the annuity contracts. *Id.* ¶ 191. AMEC's legal department drafted a Certificate of Incumbency for Miller, which was executed by

56

Bishop John Franklin White as the Chairman of the Commission on Retirement Services, Dr. Miller as the Executive Director of DRS, and Douglass P. Selby as General Counsel. *Id*. ¶ 192.

A genuine dispute of material fact exists over the independent authority of the Executive Director of the Department to invest Plan funds. The AMEC Defendants take the position that the Executive Director had the authority to deposit Plan funds into an annuity contract such as the Plan's annuity contract with Symetra. AMEC Defs. SOF ¶ 19. This meant Dr. Harris during his tenure as Executive Director was only empowered to collect contributions and deposit them to the Symetra annuity account and, in conjunction with Newport Group, Inc. ("Newport"), coordinate lawful distributions to plan participants from the Symetra annuity account upon eligibility. *Id*. ¶ 20. Beyond that, the Church's Doctrine and Discipline does not give the Executive Director authority to make investments or to direct a third-party vendor to make investments with Plan funds. *Id*. ¶ 10.

The AMEC Defendants deny that there are any documents, records, or representations generated by the AMEC General Board, the AMEC Commission on Retirement Services, or any other AMEC bodies or officers that granted Dr. Harris the sole individual authority to direct investments of Plan funds and assets. *Id*. ¶ 21. All documents, records, or representations identifying Dr. Harris as the Trustee of the Plan or otherwise indicating that Harris had authority to direct investments of Plan funds and assets were generated by a third party or Harris himself. *Id*. ¶ 22. For example, Newport drafted a Plan Document in 2006 ("the 2006 Plan Document") naming Dr. Harris as Trustee that Harris unilaterally signed. *Id*. ¶ 23. The AMEC Defendants therefore deny that the Executive Director has the authority to make unilateral investment decisions with respect to the funds of the Annuity Plan. *Id*. ¶ 19.

Symetra disputes the AMEC Defendants' claim about the limited nature of the Executive Director's authority. Symetra asserts that the Executive Director had the authority to make

investment decisions for the Plan and offers eleven different reasons to call the AMEC Defendants' contention into doubt.

First, Symetra cites language from the Doctrine and Discipline which describes the role and duties of the Executive Director, including the duty to purchase a group annuity and group hospitalization coverage. Symetra's Resp. to SOF ¶ 10. More specifically, the Doctrine and Discipline provides as follows:

> There shall be a Department of [Retirement Services] administered by the Executive Director of the Department, who is an elected General Officer responsible for giving oversight to the programs of the church operated for the retirement security of the salaried personnel of the church. These included Ministerial Annuities and the Ministerial Retirement Program. The Executive Director of the Department shall hire a specialist in financial management to see that the employees of the church receive the maximum benefits to which they are entitled from our investments . . . . the Executive Director shall purchase within six (6) months a group annuity and group hospitalization coverage. The premiums for the said policies shall be paid from the annuity fund.

Symetra Resp. to SOF ¶ 10.

Second, the 2006 Plan Document gave the Executive Director the authority (and the duty) to invest Plan funds and direct third-party vendors with respect to those funds. *Id*. The AMEC Defendant dispute the validity of the 2006 Plan Document and argue that the Church never formally adopted the Plan Document.

Third, Dr. Harris made investments on behalf of the Plan with Plan funds for twenty years without objection from anyone at AMEC, including the AMEC General Board and the Commission, both of which had a duty as the Plan Employer to monitor the Plan's investments and supervise Harris. *Id*.

Fourth, Harris was the only person who invested Plan funds between 2001 and his retirement in 2021, and he reported to AMEC that the investments he was making on behalf of the Plan were

58

diversified and consistently beating the market (which would not be true of a single investment in a single fixed annuity). *Id.*

Fifth, in his 2003 Annual Report to the AMEC General Board and Commission, Harris reported that he was the Plan Trustee and fiduciary and that he was pursuing investments on behalf of the Plan. *Id.* In his 2003 Annual Report, Harris also requested authority to invest up to 30% of the Plan's funds in investments outside of the Symetra Annuity Contracts. *Id.* According to Symetra, the AMEC General Board and Commission both formally approved and adopted Harris's 2003 Annual Report, including his request for authority to invest Plan money outside of the Symetra annuity contracts, though the AMEC Defendants dispute the contention. *Id.*

Sixth, Harris repeatedly referred to himself as the Plan trustee and administrator in memos and reports to Bishops and the Commission, and no one ever objected to those characterizations. *Id.*

Seventh, according to Symetra, AMEC formally ratified the 2006 Plan Document, which designated Harris as Plan trustee and gave him authority to invest Plan assets. *Id.* As the Court has already noted, the AMEC Defendant deny that the Church ever formally ratified the 2006 Plan Document.

Eighth, certain AMEC Bishops testified that Harris was responsible for managing the Plan and had authority to enter contracts on behalf of the Plan. *Id.*

Ninth, in January 2007, Harris sought and expressly received permission from the Chairman of the Commission to pursue multiple investment vehicles for the Plan and to develop a "true diversified portfolio" for the Plan in order to seek "higher average returns." *Id.*

Tenth, AMEC formally took the position in prior litigation that the 2006 Plan Document governed the Plan and that Harris was the Plan trustee. *Id.* The Court discusses the particulars of the prior litigation in more detail below.

59

Eleventh, in a decision that AMEC contends is legally binding in this litigation, an American Arbitration Association Commercial Tribunal ruled that Harris was "the trustee of AMEC's Retirement Plan" and "had actual and apparent authority to manage the AMEC Plan's retirement investments." *Id.*

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment if the party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Supreme Court has stated that "[t]hough determining whether there is a genuine issue of material fact at summary judgment is a question of law, it is a legal question that sits near the law-fact divide." *Ashcroft v. Iqbal*, 556 U.S. 662, 674 (2009). In reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A court does not engage in "jury functions" like "credibility determinations and weighing the evidence." *Youkhanna v. City of Sterling Heights*, 934 F.3d 508, 515 (6th Cir. 2019) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)). Rather, the question for the Court is whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Anderson*, 477 U.S. at 252. In other words, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

Nevertheless, "the standard that a movant must meet to obtain summary judgment depends on who will bear the burden of proof at trial." *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 491 (6th Cir. 2020). When the party moving for summary judgment bears the burden of proof at trial, the party's "initial summary judgment burden is higher in that [the moving party] must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Trs. of Iron Workers Defined Contribution Pension Fund v. Next Century Rebar, LLC*, 115 F.4th 480, 488–89 (6th Cir. 2024) (quoting *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001) (quotations omitted)). In other words, the moving party must show "that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *see also* 11 James William Moore, et al., *Moore's Federal Practice* § 56.40(1)(c) (3d ed. 2010) ("When the movant bears the burden of persuasion at trial, the movant must produce evidence that would conclusively support its right to a judgment after trial should the nonmovant fail to rebut the evidence.").

A federal court sitting in diversity applies the law of the forum state, including the forum's choice-of-law rules. *Atl. Marine Constr. Co. Inc. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 134 S. Ct. 568, 582 (2013); *Standard Fire Ins. Co. v. Ford Motor Co.*, 723 F.3d 690, 692 (6th Cir. 2013). Just as they have at each stage of the case, the parties have briefed the substantive law of the state of Tennessee in their motion papers. The Court will assume for purposes of deciding the questions of law presented in the Motions for Summary Judgment that Tennessee law governs the parties' dispute.

As part of its application of Tennessee law, the Court must follow "a ruling from the state supreme court." *Smith v. Gen. Motors LLC*, 988 F.3d 873, 878 (6th Cir. 2021) (citing *In re Darvocet, Darvon & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917, 937 (6th Cir. 2014)). Without

61

a clear ruling from the Tennessee Supreme Court, the *Erie* doctrine requires this Court to "predict[]

how the state supreme court would rule by looking to all available data, including decisions of the

states' appellate courts." *Smith*, 988 F.3d at 878 (internal citation omitted); *see also Fid. Union Trust

Co. v. Field*, 311 U.S. 169, 177–78, 61 S.Ct. 176, 85 L.Ed. 109 (1940) ("An intermediate state court

in declaring and applying the state law is acting as an organ of the [s]tate[,] and its determination, in

the absence of more convincing evidence of what the state law is, should be followed by a federal

court in deciding a state question."); *Lindenberg v. Jackson Nat'l Life Ins. Co.*, 912 F.3d 348, 358

(6th Cir. 2018) (citing Tenn. Sup. Ct. R. 4(G)(2) for the proposition that a published opinion of the

Tennessee Court of Appeals is "controlling authority for all purposes unless and until such opinion is

reversed or modified by a court of competent jurisdiction").

## ANALYSIS

The dispute at this stage of the case involves whether genuine issues of fact remain for trial

on either the AMEC Defendants' crossclaims against Symetra or Symetra's crossclaims against the

AMEC Defendants.  As a threshold matter, the AMEC Defendants seek summary judgment on any

crossclaim alleged by Symetra against the DRS, the AMEC General Board, and the AMEC Council

of Bishops. The AMEC Defendants argue that each is a department or subdivision of the Church, not

a separate legal entity amenable to suit. Symetra has not responded to this aspect of the AMEC

Defendants' Rule 56 Motion. Under the circumstances, Symetra has waived any crossclaim it might

have held against the DRS, the AMEC General Board, or the AMEC Council of Bishops.

When a party "fails to address [an argument] in response to a motion for summary

judgment," the argument is deemed waived. *Alexander v. Carter for Byrd*, 733 F. App'x 256, 261

(6th Cir. 2018) (citations omitted). And when a party waives its opposition to an argument, "district

courts in this Circuit grant summary judgment as a matter of course." *Id.* (collecting cases).

62

Therefore, the AMEC Defendants' Motion for Summary Judgment is **GRANTED** on Symetra's crossclaims against the DRS, the AMEC General Board, and the AMEC Council of Bishops.

Having addressed this preliminary issue, the Court now turns to the merits of the arguments presented in the parties' Rule 56 Motions.

## I.   Symetra's Motion for Partial Summary Judgment on Four Key Issues

As part of its Motion for Partial Summary Judgment, Symetra moves for judgment as a matter of law on four key issues or propositions: (1) Dr. Harris was a representative of AMEC and the Plan with authority (actual and apparent) to direct Symetra; (2) AMEC was a fiduciary of the Plan; (3) the 2006 Plan Document governed the Plan since March 2006 and is binding on AMEC; and (4) Symetra is not liable for transfers it made out of the Annuity and Guaranteed Interest Contracts at Dr. Harris's direction, including the $10 million transfer in 2008 under the terms of the GIC.

The Declaratory Judgment Act, 28 U.S.C. § 2201, provides that federal courts "upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). By its very nature, "a declaratory judgment action is a procedural device used to vindicate substantive rights" but is not itself a substantive claim for relief. *Int'l Ass'n of Machinists & Aerospace Workers v. T.V.A.*, 108 F.3d 658, 668 (6th Cir. 1997); *see also Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 199 (2014) (holding that "the operation of the Declaratory Judgment Act" is "procedural" only and leaves "substantive rights unchanged").

In other words, the Act "does not create an independent cause of action" that can be invoked absent some showing of an articulated legal wrong. *Davis v. United States*, 499 F.3d 590, 594 (6th Cir. 2007). A party's prayer for declaratory judgment "is barred to the same extent that the claim for

63

substantive relief on which it is based would be barred." *Int'l Ass'n of Machinists & Aerospace Workers*, 108 F.3d at 668. At the pleadings stage, the Court held that an exercise of its jurisdiction over Symetra's crossclaim for declaratory relief was appropriate.[27]

Rule 56 allows a party to move for partial summary judgment, "identifying each claim or defense—*or the part of each claim or defense*—on which summary judgment is sought." Fed. R. Civ. P. 56(a) (emphasis added). A "partial summary judgment" constitutes a disposition of just one part of a claim or defense, something "less than the whole action." Fed. R. Civ. P. 56, Advisory Committee's Note to subd. (a) (2010). Partial summary judgment is "merely a pretrial adjudication that certain issues shall be deemed established for the trial of the case." Fed. R. Civ. P. 56, Advisory Committee's Note to subdiv. (d) (1946).  A district court's "partial summary judgment" ruling "serves the purpose of speeding up litigation" by eliminating prior to trial questions on which there is no genuine dispute of material fact and leaving a determination about the rest of the parties' dispute for trial. *Id*.

## A.  Whether AMEC was a fiduciary of the Plan

AMEC objects in part to Symetra's request for partial summary judgment on the four issues listed in Symetra's Motion, particularly Symetra's argument that no genuine dispute of fact exists over the proposition that AMEC is a fiduciary of the Plan.[28]  While AMEC does not actually dispute

---

[27] AMEC argues in its Motion for Summary Judgment that the Court should grant the Church judgment as a matter of law on each proposition, not based on any procedural defect related to the Declaratory Judgment Act, just because Symetra has not carried its burden of proof.  AMEC does argue in its response in opposition to Symetra's Motion for Partial Summary Judgment that Symetra has not shown why partial summary judgment is the correct procedural device for reaching each of the propositions. The Court considers that argument in further detail below.

[28] Because AMEC addresses its procedural argument to the proposition concerning the Church's fiduciary status, the Court will take that question up first and then consider Symetra's arguments on the four key points in a different order than the order in which Symetra has raised them.

the factual contention, AMEC argues that Symetra has not shown why AMEC's fiduciary status is relevant to any of the claims or defenses at issue between the parties. In AMEC's view, without that showing, Rule 56(a) would not permit partial summary judgment on the proposition.

In its reply Symetra counters that partial summary judgment on the issue is appropriate for two reasons. First, AMEC denied the allegation as part of its Answer to Symetra's Cross-Complaint. Second, AMEC's fiduciary status is relevant to AMEC's duty "to monitor prudently the Plan's investments and diligently supervise Harris in his management of the Plan," and its fiduciary status "confirms its legal authority to employ and ratify Harris as a representative of the Plan authorized to direct Symetra." Symetra Reply 7 (ECF No. 1114).

The Court finds that Symetra has the better of this argument. As Symetra correctly points out, AMEC's Answer to Symetra's Amended Cross-Complaint denied the allegation that "any of the AMEC Defendants were a named fiduciary of the Plan during the time of the events of this lawsuit." AMEC Defs.' Answer to Symetra's Am. Cross-Complaint ¶ 1 (ECF No. 974). Deciding whether a genuine dispute remains on that point will therefore eliminate the need for any further proof on the matter and thereby "speed up" the remainder of the case, particularly inasmuch as AMEC's status as a fiduciary of the Plan has bearing on other aspects of the parties' dispute. Therefore, the Court finds good reason to consider whether partial summary judgment in Symetra's favor is warranted on that "key issue" and each of the other "key issues" on which Symetra seeks partial summary judgment.

The Court is not persuaded by the single case cited by AMEC to support its argument. In *Digital Group, LLC v. Hyper Networks, Inc.*, No. 3:19-cv-1008, 2022 WL 3142348 (M.D. Tenn. Aug. 5, 2022), the plaintiff had a subcontract consisting of three separate agreements with the defendant for the installation of fiber optic cable in Raleigh, North Carolina. After the plaintiff sued the defendant for breach of contract and other torts under North Carolina law, the defendant moved

65

for partial summary judgment on several of the plaintiff's claims, including "its contractual liability for particular kinds of damages." *Digital Group*, 2022 WL 3142348, at \*4.

Before granting the defendant's Rule 56 motion for partial relief, the court in *Digital Group* expressed some concern about whether Rule 56(a) authorized partial summary judgment on certain elements of damages for breach of contract, questioning whether discrete types of damages were "part of the claim," as Rule 56(a) uses the phrase. The court remarked that "[w]hen a court parses a single count too finely in pronouncing a purported partial summary judgment, it risks granting summary judgment as to something that is too fragmentary to properly be deemed even 'a part of a claim' (so as to be potentially subject to summary judgment in the first place)." *Id.* Despite its misgivings, the court nevertheless concluded that Rule 56(a) authorized it to grant partial summary judgment on the plaintiff's breach-of-contract damages for "labor downtime," lost profits, and "offset." *Id.* at \*\*5–7.

Respectfully, the Court finds that *Digital Group*'s discussion of the proper scope of partial summary judgment is non-binding obiter dicta. The discussion of the dangers of deciding "fragmentary" matters on a motion for partial summary judgment was not essential to the court's ultimate holding. The court in *Digital Group* raised the question but then decided that Rule 56(a) allowed it to grant partial summary judgment on the merits anyway. The four key facts on which Symetra moves for partial summary judgment are all propositions with relevance to one or more of the parties' claims and defenses, principally whether Dr. Harris had the actual or apparent authority to act on behalf of the Plan by directing Symetra to carry out transfers of Plan asserts and even by purporting to sign a new plan document on behalf of the Church. Any concerns with parsing a claim or defense into finer parts is just not present in this instance. And the Middle District of Tennessee not only decided the Rule 56 motion on the merits but ultimately granted the defendant partial

66

summary judgment on the separate elements of damages the plaintiff had sought for breach of contract. The Court finds then that *Digital Group* is not inconsistent with the outcome here.

Turning then to the merits of Symetra's argument about the proposition, in light of AMEC's concession on the point, the Court concludes that no genuine dispute of material fact exists on the issue of whether AMEC was a fiduciary of the Plan. Therefore, Symetra's Motion for Partial Summary Judgment is **GRANTED** on this point.

**B. Whether Dr. Harris was Authorized by AMEC and the Plan to direct Symetra as to the Annuity Contracts and GICs**

Symetra next seeks judgment as a matter of law on the issue of whether Dr. Harris was authorized by AMEC and the Plan to direct Symetra on the disposition of assets in the Plan's Symetra annuity account, including the Plan's Annuity Contracts and GICs. An agent can act on behalf of its principle with two types of authority, actual and apparent. *Savage v. City of Memphis*, 464 S.W.3d 326, 333 (Tenn. Ct. App. 2015) (citations omitted). An agent possesses actual authority to exercise "the powers which a principal directly confers upon an agent or causes or permits him to believe himself to possess." *Id.* (citing 2A C.J.S. *Agency* § 147 (1972) (other citation omitted)). Put another way, actual authority can be express or implied. *Id.* Symetra argues that Dr. Harris had actual authority as trustee by the express terms of the written Plan Documents and by implication from the circumstances.

**1. Actual Authority to Represent AMEC and Direct Symetra**

The Court holds that viewing the evidence in a light most favorable to AMEC, Symetra has not carried its heightened burden to prove as a matter of law that Dr. Harris had actual authority, either express or implied. Take Symetra's argument about Dr. Harris's express authority to act first. "A principal may expressly give actual authority to the agent in direct terms, either orally or in writing." *Hall v. Haynes*, 319 S.W.3d 564, 573 (Tenn. 2010) (citing *Rubio v. Precision*

*Aerodynamics, Inc.*, 232 S.W.3d 738, 742–43 (Tenn. Ct. App. 2006)). Symetra argues that the 1997 Plan Document expressly authorized Dr. Harris to act as Plan trustee and direct Symetra to take certain actions. The proper construction of the 1997 Plan Document presents a question of law for the Court to decide.

"The legal effect of a written contract or other written instruments is a question of law. This same standard applies to trust instruments." *In re Est. of Bone*, 677 S.W.3d 644, 650 (Tenn. Ct. App. 2023). Under Tennessee law, courts construing the terms of a contract ascertain the intent of the parties based on the ordinary and natural meaning of the words used in the instrument. *Perkins v. Metro. Gov't of Nashville*, 380 S.W.3d 73, 85 (Tenn. 2012); *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008). A court must consider the entire contract in construing any or all of its parts. *Cocke Cnty. Bd. of Highway Cm'rs. v. Newport Util. Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985). This means that "a contract must be viewed from beginning to end, and all its terms must pass in review, for one clause may modify, limit, or illuminate another." *Id.*

The Court holds that the 1997 Plan Document did not clearly and unambiguously grant the Executive Director of the DRS the authority to act as the trustee of the Plan and direct its investments.  The 1997 Plan Document undoubtedly gave the "trustee" the power "to invest, manage and control the Plan assets" in a manner "[c]onsistent with the instructions of the Employer." Putting aside how to interpret the phrase "consistent with the instructions of the Employer," the real question is who did the 1997 Plan Document name as the "trustee"?

The recitals to the 1997 Plan Document named the "Members of the Pension Commission, Pension Department of the A.M.E. Church" as trustees. 1997 Plan Doc. 1, Recitals (ECF No. 983-1, Page ID 29859); *see also id.* at § 1.40 (Page ID 29864) (defining the "trustee" as "the person or entity named as trustee herein or in any separate trust forming a part of this Plant [sic] and any

68

successors"). Symetra cites evidence the "Pension Department" was the previous name of the DRS. As Symetra sees it, Dr. Harris in his capacity as the Executive Director of the DRS was a member of "the Pension Commission" and therefore one of the Plan's "trustees."

But that remains an untested supposition. Symetra has not adduced any evidence to show that the Executive Director of the "Pension Department" (or its successor, the DRS) was a member of the Pension Commission or how the Church's subsequent reorganization of the "Pension Department" into the DRS affected the membership of the Pension Commission. For instance, there is no evidence to show that the Executive Director sat on the Pension Commission as a full member as opposed to merely reporting to the Commission. Without more, Symetra has not shown that Dr. Harris was a "trustee," much less that he had the express authority to act as trustee.

Even if Symetra could prove that Dr. Harris was at any time a member of the Pension Commission, the fact is the 1997 Plan Document granted the committee itself, not just a single member, the authority to act as trustee. Section 7.1 of the 1997 Plan Document granted the "trustee" certain "categories of responsibilities":

> (a) Consistent with the instructions of the Employer to invest, manage and control the Plan assets;
>
> (b) To direct the Insurer to pay benefits required under the Plan to Participants, or in the event of their death, to their Beneficiaries;
>
> (c) To maintain records of receipts and disbursements and furnish to the Employer for each Plan Year a written annual report per Section 7.6;
>
> (d) ***The committee acting as Trustee*** shall act by a majority of their number, but may authorize one or more members to execute papers on their behalf.

*Id.* at § 7.1 (emphasis added).

Reading each of these provisions together, the 1997 Plan Document granted the Pension Commission, not an individual, the actual authority "to invest, manage, and control the Plan assets"

and only in a manner consistent with the Church's "instructions." *Id.* § 7.1(a). Where the 1997 Plan

Document authorized an individual to act on behalf of the Pension Commission, the individual could

execute documents in the name of "the committee" but only with authorization from "the

committee." *Id.* at § 7.1(d) (granting "the committee" the authority to authorize "one or more

members" of the committee to execute papers on its behalf).[29] Symetra has not cited any evidence

the Pension Commission authorized Dr. Harris to sign documents in the name of the Commission

pursuant to any provision of the 1997 Plan Document. Therefore, Symetra has not carried its

heightened burden to show as a matter of law that the 1997 Plan Document vested Dr. Harris with

the express authority to act as trustee and direct Symetra with regard to the Plan's investments.[30]

Likewise, Symetra has not carried its burden to prove that Dr. Harris had the actual authority

to act as the trustee of the Plan based on the supposed adoption of the 2006 Plan Document. The

2006 Plan Document expressly named Dr. Harris as trustee.  However, genuine factual disputes

remain over whether AMEC ever formally adopted the 2006 Plan Document. The Court discusses

that issue in more detail below. Suffice it to say, the 2006 Plan Document does not establish Dr.

---

[29] AMEC has also cited the testimony of Bishop James Davis that if the Plan was going to make an investment other than annuities, Dr. Harris would have to come to the Commission and presented his recommendation. AMEC Add'l SOF ¶¶ 75–76. Then if the Commission agreed with Dr. Harris's recommendation, the Commission would bring the recommendation to the General Board for its approval. J. Davis Dep. 242:5–15. According to Bishop Davis, this was the customary practice in order for the Executive Director's recommendations to be approved. *Id*. at 243:1–16. Symetra responds that there is no such written procedure and that other evidence shows Dr. Harris made unilateral investment decisions with the Church's approval or acquiescence.

[30] Symetra cites the testimony of Rev. Brian Blackwell, the current Executive Director of the DRS. Rev. Blackwell testified that "to the best of his knowledge," Dr. Harris and only Dr. Harris was the person authorized to "communicate with Symetra." Symetra's Mem. in Support 3 (ECF No. 956-1). This proof, while relevant, does not show as a matter of law that Dr. Harris was vested with actual or apparent authority.

Harris's express authority to act as trustee and direct Symetra with regard to the Plan's investments.[31]

Symetra separately argues that Dr. Harris possessed by implication the actual authority to act as the trustee of the Plan and instruct Symetra on the disposition of the Plan's assets. A principal can grant its agent actual authority by implication to exercise "all powers which are necessary to carry into effect the granted power, in order to make effectual the purposes of the agency." *Hall*, 319 S.W.3d at 573 (quoting *Rubio*, 232 S.W.3d at 743). Implied authority can be inferred from the circumstances, for instance, by "conduct or a course of dealing between the principal and agent." *Id.* (quoting 2A C.J.S. Agency § 153 (1972)). Implied authority must be predicated "on some act or acquiescence of the principal," rather than the actions of the agent. *Id.* Generally speaking, the nature and extent of an agent's authority "implied from the facts and circumstances" of the principal-agency relationship are "usually questions of fact for the jury." *U.S. Bedding Co. v. Cohen*, 12 Tenn. App. 472, 478, 1930 WL 1722, at *5 (Tenn. Ct. App. 1930) (citing *S. Ry. Co. v. Pickle*, 197 S.W. 675 (Tenn. 1917)); *see also Johnson v. LeBonheur Children's Med. Ctr.*, 74 S.W.3d 338, 343 (Tenn. 2002) (holding that the existence and extent of an agency relationship "is a question of fact under the circumstances of the particular case," particularly an "examination of agreements among the parties or of the parties' actions").

Symetra asserts that Dr. Harris had the implied authority to act as trustee based on the undisputed evidence that Dr. Harris identified himself as the trustee of the Plan in his annual reports

---

[31] As part of its briefing on the record evidence for purposes of summary judgment, Symetra cites proof that in January 2007, Harris sought and expressly received permission from the Chairman of the Commission to pursue multiple investment vehicles for the Plan and to develop a "true diversified portfolio" for the Plan in order to seek "higher average returns." Such proof might arguably show that Dr. Harris had express authority over Plan assets and investment decisions, at least after January 2007. But Symetra has not discussed the proof as part of its argument for partial summary judgment on the proposition that Dr. Harris had the authority to act. As a result, the Court need not consider whether the evidence supports Symetra's theory of express actual authority.

71

to AMEC leadership. For example, as part of the 2003 Annual Report to the AMEC General Board and Commission, Dr. Harris stated that he was the Plan Trustee and fiduciary and that he was pursuing investments on behalf of the Plan. The 2003 Annual Report requested authority for Dr. Harris to invest up to 30% of the Plan's funds in investments outside of the Symetra Annuity Contracts. While there is a dispute now over whether the AMEC General Board or the Commission formally approved and adopted Harris's 2003 Annual Report, the document reasonably suggests that AMEC had acquiesced in Dr. Harris's claim to have this authority as a trustee with the power to control the Plan's investments.

In fact, Dr. Harris was the only person who invested Plan funds between 2001 and his retirement in 2021, and he reported to AMEC that the investments he was making on behalf of the Plan were diversified and consistently beating the market (which would not be true of a single investment in a single fixed annuity). Symetra argues then that AMEC caused or permitted Dr. Harris to believe that he possessed actual authority as the trustee of the Plan.

While it is true that a principal can confer authority on its agent in this manner, whether the principal did so is a fact-bound inquiry the Court cannot resolve on a motion for summary judgment. As the Court noted in its analysis of the proof, there is some dispute over whether the General Board formally adopted Dr. Harris's annual reports. Even if the General Board had done so, Symetra's argument requires a number of additional inferences to be drawn in order to reach the conclusion that Dr. Harris had the implied authority to act as trustee, chief among them (1) that Dr. Harris held a subjective belief that he was the trustee, and (2) that Dr. Harris's subjective belief somehow convinced him he had the actual authority to direct the disposition of the Plan's assets without seeking formal approval. Even accepting the premise that Dr. Harris believed he possessed the kind of authority reflected in his reports, did he reasonably arrive at those conclusions early in his tenure,

72

say in 2001? Or only after his first reelection as Executive Director in 2004? Or at some other time? The critical inquiry remains what did AMEC's alleged acquiescence imply to Dr. Harris about his actual authority over the Plan's assets and investments.

All of this underscores the conclusion that only a jury can weigh the evidence to arrive at any conclusion about Dr. Harris's implied authority. The Court does not find the evidence to be so one-sided that Symetra is entitled to judgment as a matter of law on those inferences or a final determination that Dr. Harris held actual authority to act as trustee by implication.

Symetra makes a related argument that Dr. Harris became the *de facto* trustee of the Plan, an argument the Court construes as a type of implied authority. The *de facto* trustee doctrine is commonly associated with bankruptcy law and excuses "technical non-compliance" with 11 U.S.C. § 322 so long as "the person acted as a trustee, held himself out to be a trustee, and has been treated as a trustee by the court, creditors, and other interested parties." *In re Wisdom*, 770 F. App'x 881, 882 (9th Cir. 2019); *see also In re Bankers Trust*, 403 F.2d 16, 20 (7th Cir. 1968) (holding that a *de facto* trustee is one who assumes the office "under color of right or title" and actually exercises the duties of the office). While courts have applied the doctrine to trustees outside of the bankruptcy context, Symetra has cited no legal authority recognizing a test for applying the *de facto* trustee doctrine under Tennessee law. *See Atkins v. Marks*, 288 S.W.3d 356, 369 (Tenn. Ct. App. 2008) (holding that a judgment-debtor was not a *de facto* trustee over property held in trust but without actually setting forth Tennessee's test for the doctrine). The Court is not convinced then that the *de facto* trustee doctrine applies in this circumstance.

In any event, the Court holds that triable issues remain over whether Dr. Harris was a *de facto* trustee for the Plan. Assuming without deciding that the Tennessee Supreme Court would recognize the doctrine of *de facto* trustees in the context of a revocable trust established as a church's

73

employee retirement plan, Symetra is not entitled to judgment as a matter of law on Dr. Harris's status as the Plan's *de facto* trustee. Symetra largely relies on the same proof the Court already considered as part of Symetra's theory that Dr. Harris became trustee by implication: Dr. Harris's annual reports identifying himself as trustee and his long-running control over Plan assets. Just as the proof did not show as a matter of law that Dr. Harris had the implied authority to act as trustee, the same evidence does not show as a matter of law that Dr. Harris was the Plan's *de facto* trustee. For all of these reasons, the Court concludes that genuine disputes of material fact remain for trial on the question of whether Dr. Harris had the actual authority, either express or implied, to act as trustee and direct Symetra as to the disposition of Plan assets.

### 2. Apparent Authority to Represent AMEC and Direct Symetra

Even where the principal has not given the agent actual authority to take a certain course of action, the agent may still bind the principal if he had apparent authority. *Hall*, 319 S.W.3d at 569. In order to prove apparent agency, Symetra must show (1) AMEC actually or negligently acquiesced in Dr. Harris's exercise of authority; (2) Symetra had knowledge of the facts and a good faith belief that Dr. Harris possessed such authority; and (3) Symetra relied on this apparent authority to its detriment. *Boren ex rel. Boren v. Weeks*, 251 S.W.3d 426, 432–33 (Tenn. 2008) (citing *Mechs. Laundry Serv. v. Auto Glass Co. of Memphis*, 98 S.W.3d 151, 157 (Tenn. Ct. App. 2002)). Unlike actual authority, "[a]pparent authority is established through the acts of the principal, rather than those of the agent, or through the perception of a third party." *Id.* (citing *Bells Banking Co. v. Jackson Ctr.*, 938 S.W.2d 421, 424 (Tenn. Ct. App. 1996)).

"Apparent authority is essentially agency by estoppel, in that its creation and existence depend[ ] on some conduct by the principal that will preclude him from denying liability for the acts of the agent." *Savage*, 464 S.W.3d at 333 (citing *Boren*, 251 S.W.3d at 432). A principal will be

74

responsible for its agent's acts within the agent's apparent authority "where the principal himself by his acts or conduct has clothed the agent with the appearance of authority, and not where the agent's own conduct has created the apparent authority." *Boren*, 251 S.W.3d at 433 (quoting *Pickle*, 197 S.W. at 677). As the party alleging an agency relationship and the scope and effect of Dr. Harris's apparent authority, Symetra has the burden of proof. *Cline v. 1298423 Ontario Ltd.*, 129 F. App'x 208, 209 (6th Cir. 2005) (citing *Durham v. Waddell & Reed, Inc.*, 723 S.W.2d 129, 131 (Tenn. Ct. App. 1986)).

The Court holds that genuine disputes of material fact remain for trial on the question of whether Dr. Harris acted with apparent authority, even though the evidence suggests that AMEC acquiesced in Dr. Harris's exercise of apparent authority. First, Symetra cites the fact that Dr. Harris issued all of the directives for the disposition of the Plan assets held in the Symetra annuity over a span of 20 years, including making the Church's application for a second annuity and two GICs in 2007 and a third GIC in 2008. Dr. Harris also prepared and signed annual reports to the AMEC General Board in which he identified himself as the trustee of the Plan and described investments and transactions he had carried out in the name of the Plan. But standing alone, Dr. Harris's unilateral actions are insufficient to create apparent authority. The key inquiry is whether AMEC itself "clothed [Dr. Harris] with the appearance of authority." *Boren*, 251 S.W.3d at 433. The fact then that Dr. Harris issued orders, signed documents, or otherwise communicated with Symetra about church business does not establish his apparent authority to act on behalf of the Plan.

The issue presented then is whether Symetra has carried its heightened burden to show that AMEC cloaked Dr. Harris with the apparent authority to act as trustee of the Plan and to direct Symetra regarding the disposition of Plan assets, even when viewing the evidence in a light most favorable to AMEC. The undisputed evidence shows Dr. Harris held his position in church

75

leadership for two decades. There is no real dispute that Dr. Harris was the Church's point of contact with Symetra at all times between 2001 and 2021. Going back to the initial interview of Safeco (Symetra's corporate predecessor) as one of the companies bidding on the Church's annuity business in 2001, AMEC positioned Dr. Harris as its representative. From that time forward, Dr. Harris and only Dr. Harris issued directions for the investment and disposition of the Plan's assets held in the Symetra annuity account. At no time did AMEC ever take any action to limit Dr. Harris's authority or signal to Symetra that Dr. Harris was required to receive additional approval for any of the actions he had taken. On the contrary, the AMEC General Board approved Dr. Harris's annual reports year after year and never took any action to curb his authority over the administration of the Plan. This evidence tends to show that AMEC acquiesced in Dr. Harris's exercise of apparent authority on these matters.

Viewing the evidence in a light most favorable to AMEC, however, a reasonable jury could conclude that the Church never had a complete picture of Dr. Harris' activities and therefore never acquiesced in his plan administration. For example, AMEC argues that there is no evidence any church body ever formally authorized Dr. Harris to take the actions he took with regard to Plan assets and any investment other than opening the Symetra annuity account. AMEC has also introduced evidence showing that Dr. Harris concealed the creation of AMEC Financial Services, a company established by Dr. Harris and used to funnel Plan assets to other allegedly inappropriate investments like Motorskill and companies formed by Dr. Harris to provide illusory services. AMEC's Rule 30(b)(6) representative Marcus Henderson testified that Dr. Harris engaged in active concealment of his activities. While the extent of the Plan's losses did not come to light until after Dr. Harris's retirement in 2021, a reasonable jury could find that AMEC did not have actual

76

knowledge of Dr. Harris' actions based on the fact that Dr. Harris gave wildly inaccurate information about the value of the Plan's assets as late as July 2021.[32]

In the final analysis, "the existence of apparent authority is a question of fact that should normally be left to the jury." *Permobil, Inc. v. Am. Exp. Travel Related Servs. Co.*, 571 F. Supp. 2d 825, 832 (M.D. Tenn. 2008) (citing *White v. Revco Discount Drug Ctrs., Inc.*, 33 S.W.3d 713, 723 (Tenn. 2000)). That general rule holds in this case. Therefore, Symetra's Motion for Partial Summary Judgment is **DENIED** on the issue of whether Dr. Harris was a representative of AMEC and the Plan with the authority (actual or apparent) to direct Symetra.

### 3.  Preclusive Effect of the Arbitrator's Determination About Dr. Harris's Authority

In addition to its arguments based on Tennessee principles of agency law, Symetra raises a separate collateral estoppel argument to establish Dr. Harris's authority (actual or apparent) over Plan administration (as well as the fact that Dr. Harris was the trustee of the Plan). At the conclusion of the arbitration phase of the dispute between AMEC and Symetra, the arbitrator issued a written decision, which contained a section setting out the arbitrator's factual findings.  As part of his assessment of the facts, the arbitrator found that Dr. Harris was "the trustee of AMEC's Retirement Plan" and "had actual and apparent authority to manage the AMEC Plan's retirement investments." Symetra's Add'l Fact ¶¶ 193, 196. Symetra argues that the arbitrator's factual determinations now bind AMEC under the doctrine of collateral estoppel.

An arbitrator's determination of the issues can have preclusive effect in subsequent litigation as long as the party invoking an arbitrator's findings can prove the elements of collateral estoppel.

---

[32] There is also evidence that Symetra's own employees questioned Dr. Harris before carrying out his instructions about the 2008 transfer of $10 million in Plan assets. That proof would go to another element of the apparent authority test, whether Symetra had a good faith belief that Dr. Harris possessed authority to act on behalf of AMEC. *Boren*, 251 S.W.3d at 432. AMEC does not cite the proof as part of its opposition on this point, and so the Court finds no reason to consider it further.

*Cent. Transp., Inc. v. Four Phase Sys., Inc.*, 936 F.2d 256, 260 (6th Cir. 1991). The doctrine of collateral estoppel "bars the same parties or their privies from relitigating in a later proceeding legal or factual issues that were actually raised and necessarily determined in an earlier proceeding." *Mullins v. State*, 294 S.W.3d 529, 534 (Tenn. 2009) (citing *Barnett v. Milan Seating Sys.,* 215 S.W.3d 828, 835 (Tenn. 2007)).

As the party asserting collateral estoppel, Symetra must prove the following elements: (1) that the issue to be precluded is identical to an issue decided in an earlier proceeding, (2) that the issue to be precluded was actually raised, litigated, and decided on the merits in the earlier proceeding, (3) that the judgment in the earlier proceeding has become final, (4) that the party against whom collateral estoppel is asserted was a party or is in privity with a party to the earlier proceeding, and (5) that the party against whom collateral estoppel is asserted had a full and fair opportunity in the earlier proceeding to contest the issue now sought to be precluded. *Id*. at 535 (citation omitted).

The Court holds that Symetra has not shown why AMEC is collaterally estopped from denying the fact that Dr. Harris was trustee or that he had actual or apparent authority to direct Symetra as to the disposition of Plan assets. The Tennessee Supreme Court has held that collateral estoppel applies only to issues "actually and necessarily determined in an earlier proceeding between the parties." *Id*. (citations omitted); *see also W.J. O'Neil Co. v. Shepley, Bulfinch, Richardson & Abbott, Inc.*, 765 F.3d 625, 631 (6th Cir. 2014) (holding that an arbitrator "lacks authority to decide a claim the parties have not mutually agreed to arbitrate," that is, "such a claim is not subject to arbitration"). Here, the Court granted the parties a mandatory stay under § 3 of the FAA, after holding that they had agreed to submit the gateway issue concerning the arbitrability of their dispute to binding arbitration.

78

Strictly speaking, the issue in arbitration was not whether Dr. Harris acted with authority or whether he was the trustee of the Plan. The issue was whether the parties had bound themselves to arbitration. True enough, the arbitrator found that Dr. Harris had signed the 2003 RSA on behalf of the Church and that he had the authority to do so. That determination, however, was not necessary to the arbitrator's decision. The critical factor was the arbitrator's finding that Symetra had not executed the agreement containing the arbitration clause. The Court concludes then that the arbitration decision does not have preclusive effect or collaterally estop AMEC from contesting Symetra's claim that Dr. Harris acted with authority or was in fact the trustee of the Plan.

C. **Whether the 2006 Plan Document Has Governed the Plan Since March 2006 and Is Binding on AMEC**

Symetra next argues that partial summary judgment is warranted on the fact that the 2006 Plan Document is the operative document for plan administration and has governed the Plan since March 2006, making the 2006 Plan Document binding on AMEC. The Court has already reviewed the relevant provisions of the 2006 Plan Document, chief among them the fact that it named Dr. Harris alone as trustee and granted the trustee wide discretion over the investment and control of Plan assets.

The issue presented now is whether the 2006 Plan Document ever took effect in the first place. On its face, the 2006 Plan Document purports to be a contract between AMEC and Dr. Harris. 2006 Plan Document, Recitals (ECF No. 74-1, Page ID 916) (stating that the 2006 Plan Document is an "agreement, hereby made and entered into . . . by and between [AMEC] (herein referred to as the 'Employer') and Dr. Jerome Harris (herein referred to as the 'Trustee')." Under Tennessee law, the question of "[w]hether a valid contract exists is a question of law" appropriate for decision on a motion for summary judgment. *Pharma Conf. Educ., Inc. v. State*, 703 S.W.3d 305, 311 (Tenn. 2024). "Interpretation of a contract and a determination of the parties' intentions related to the

79

contract" are likewise questions of law. *Id.* (citing *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)).

### 1. The 2006 Plan Document Did Not "Become Effective" in March 2006

The Court holds that the parties to the 2006 Plan Document, AMEC and Dr. Harris, never executed a valid contract and therefore did not effectively modify the 1997 Plan Document in March 2006. There is no real dispute the 1997 Plan Document governed the Plan at the time of Dr. Harris's election as Executive Director of the DRS in 2001 and continued to govern thereafter until such time as AMEC might amend the Plan. The 2006 Plan Document purported to be such an amendment. And yet the Church did not have the unilateral authority to simply alter the Plan.

The 1997 Plan Document sets out requirements for the modification of the Plan and its operative rules of administration. Section 8.1 of the 1997 Plan Document provides that "no such amendment which affects the rights, duties or responsibilities of the Trustee may be made, ***without the Trustee's written consent***." 1997 Plan Document § 8.1 (emphasis added); *see also id*. ("The Trustee shall not be required to execute any such amendment unless the Trust provisions contained herein are a part of this Agreement and the amendment affects the duties of the Trustee hereunder."). Perhaps more important, section 8.1 states that an amendment to the Plan "shall become effective as provided therein ***upon its execution***." *Id*. (emphasis added).

The Court finds that the language is clear and unambiguous. The 1997 Plan Document's provisions for amending the Plan required the amendment to be in writing and, in the event the modification concerned the duties of the trustee, "executed" by both the Church and the trustee in order for the changes to take effect. The Court construes section 8.1's use of the term "execution" to mean the act of making "a legal document valid by signing" or "to bring a legal document into its final, legally enforceable form." *Black's Law Dictionary* (12th ed. 2024) (internal parentheses

80

omitted). The Court holds that the 1997 Plan Document therefore required the parties to any future amendment of the Plan to execute or sign the amendment in order for the change to the Plan to "become effective."

The problem is the version of the 2006 Plan Document produced in discovery does not bear the signature of any church officer signing on behalf of the "Employer" (that is, AMEC). There is no testimony to show that an officer of the Church signed the 2006 Plan Document for AMEC in March 2006. There is no contemporaneous evidence of the Church, either through the AMEC General Board or the Commission on Retirement Services, authorizing any church officer to "execute" the 2006 Plan Document on behalf of the Church in March 2006. Nor have the parties identified a contemporaneously executed corporate resolution signed by the Church's General Secretary and showing that the AMEC General Board approved and adopted the 2006 Plan Document in March 2006. Because the 1997 Plan Document requires strict adherence to its written procedures for amendments to the Plan, the lack of execution means the 2006 Plan Document did not "become effective" in March 2006 without a signature from an authorized representative of the Church.

2.  **A Factual Dispute Exists Over Whether Dr. Harris Had Authority to Sign the 2006 Plan Document**

Furthermore, it is not clear Dr. Harris properly signed the 2006 Plan Document as the "Trustee" of the Plan. In recognition of the 1997 Plan Document's requirement for the trustee to consent to an amendment to the Plan, the 2006 Plan Document purported to amend the 1997 Plan Document with the consent of the "Trustee." 2006 Plan Document, Recitals ("WHEREAS, under the terms of the Plan, the Employer has the ability to amend the Plan, provided the Trustee joins in such amendment if the provisions of the Plan affecting the Trustee are amended."). Dr. Harris signed the extant version of the 2006 Plan Document with a wet ink signature on a pre-printed line for the signature of the "Trustee." *See* 2006 Plan Document (ECF No. 74-1).

81

However, as the Court has already concluded, the 1997 Plan Document named the "Members of the Pension Commission, Pension Department of the A.M.E. Church" as trustees, not Dr. Harris. 1997 Plan Doc. 1, Recitals (ECF No. 983-1, Page ID 29859); *see also id.* at § 1.40. While it is true the Pension Commission could authorize someone to sign documents on its behalf, *id.* at § 7.1(d), there is no evidence the Commission granted Dr. Harris such authority. Symetra has not shown then, much less proven as a matter of law, that Dr. Harris had the actual or apparent authority to sign the 2006 Plan Document as the authorized representative of the Pension Commission.

Just as a number of disputed fact questions remain over Dr. Harris's authority to act on behalf of AMEC, the Court cannot determine as a matter of law whether Dr. Harris was in fact the "Trustee" of the Plan in 2006 or the proper person to sign the 2006 Plan Document as "Trustee." Viewing the evidence in a light most favorable to AMEC, a reasonable juror could find that Dr. Harris was not the "Trustee" and lacked the authority to sign an amendment to the Plan as "Trustee." Because a genuine dispute of material fact exists over whether Dr. Harris was properly identified as the trustee of the Plan in 2006, Symetra has not carried its heightened burden to prove that Dr. Harris was the trustee of the Plan as of March 2006 when he signed the 2006 Plan Document in that capacity.[33]

Symetra argues that Dr. Harris had the authority to execute the 2006 Plan Document on behalf of the Church based on the actual and apparent authority the Church had vested in him. As the Court has already concluded, Dr. Harris's actual or apparent authority to act as trustee or some other agent of the Church raises a swath of disputed fact questions. Those same disputed questions mean

---

[33] This also includes Dr. Harris's proper authority (actual or apparent) to authorize the drafting of the amendment itself. The evidence shows that Dr. Harris instructed Newport to draft the new plan document in which Dr. Harris was identified as the trustee of the Plan. Just as Symetra was not entitled to partial summary judgment on the issue of Dr. Harris's authority to direct Symetra on the disposition of Plan assets, a fact question remains for trial over whether Dr. Harris had the authority to direct Newport to draft a new plan document.

the Court cannot determine as a matter of law whether Dr. Harris could bind the Church.  Besides, even if Symetra is correct, Dr. Harris signed the 2006 Plan Document in his capacity as "Trustee." Symetra has not produced an executed copy of the 2006 Plan Document signed by a proper representative of AMEC at the time of its alleged adoption in March 2006.  As the Court has already explained, the Plan's rules for any modification of the Plan required both the approval of an authorized representative of the Church and "the Trustee."

3. **The 2006 Plan Document Did Not Take Effect by Course of Performance or Implication**

The 1997 Plan Document's procedures for amending the Plan also preclude Symetra's argument that the parties had an agreement by performance. Symetra cites a number of facts surrounding the 2006 Plan Document, all to show that the parties recognized the 2006 Plan Document had actually amended the Plan. Specifically, Dr. Harris's 2006 Annual Report stated that "[t]he governing Plan Document has been revised to consolidate [the Pastor 403(b) Plan] with the [401(a) Annuity Plan] under the responsibility of the department and places day-to-day management and fiduciary responsibility specifically and exclusively with the Executive Director as Plan Administrator." The 2006 Annual Report also stated that "[a]s the elected Trustee and Fiduciary of the retirement plans for [AMEC], it is the inherent responsibility of the Executive Director to examine and re-examine all investment programs and vehicles in the pursuit of obtaining the maximum return for the participants in the most fiscally sound and prudent manner."  Symetra adds that AMEC also closed the account with Kemper Insurance, which had held the Church's 403(b) plan, and then transferred those assets to AMEC's Symetra annuity account.  In Symetra's view, all of this shows that AMEC had adopted the 2006 Plan Document to modify the Plan and achieve a merger of the two retirement funds into a single new plan.

A contract implied in fact "arises under circumstances which show mutual intent or assent to contract." *Thompson v. Hensley*, 136 S.W.3d 925, 930 (Tenn. Ct. App. 2003). Courts may infer the existence of a contract where "the conduct of the parties and the surrounding circumstances show mutual assent to the terms of the contract." *Id.* (citation omitted).[34] The proof concerning the statements in the 2006 Annual Report and AMEC's transfer of its 403(b) plan assets to Symetra is consistent with an attempt to merge the existing 403(b) plan with the 401(a) annuity plan.  Even so, the 1997 Plan Document is clear. AMEC's amendments to the Plan could only "become effective" once AMEC (and "the Trustee") had executed a written amendment to the Plan. While it is true that contracts can be implied in fact based on the parties' course of performance, without an executed amendment, the 2006 Plan Document did not "become effective" under the existing rules for plan administration.

**4.    AMEC Is Not Judicially Estopped From Denying the Validity of the 2006 Plan Document**

Symetra next argues that the doctrine of judicial estoppel should block AMEC from denying the validity of the 2006 Plan Document based on the contrary position taken by AMEC in previous litigation.  The equitable doctrine of judicial estoppel "prohibits a litigant from convincing a court to adopt one position at one time and then seeking the opposite position at a later time." *Mackey v. Rising*, 106 F.4th 552, 567 (6th Cir. 2024) (citing *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)). The doctrine can apply when "when a party takes conflicting positions across different

---

[34] Symetra cites the Tennessee Court of Appeals' decision in *R.J. Betterton Management Services, Inc. v. Whittemore*, 769 S.W.2d 214 (Tenn. Ct. App. 1988). The court in *Whittemore* applied the doctrine of equitable estoppel to find that a party to a contract for the management of a golf tournament was estopped from denying the validity of the contract for lack of execution. Whether the Court considers the argument under the doctrine of equitable estoppel or contract by implication, the argument fails under the terms of the 1997 Plan Document and its requirement that any Plan amendment be "executed" in order to "become effective."

cases," *id*., or during different phases of the same case. *Med. Marijuana, Inc. v. Horn*, 604 U.S. 593, 619 (2025).

Although the doctrine of judicial estoppel is flexible, the Supreme Court has noted that the following factors are commonly present: (1) a party's later position must be clearly inconsistent with its earlier position; (2) whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled; (3) and whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *New Hampshire v. Maine*, 532 U.S. at 750–51.

Symetra cites *Glover v. The Estate of James R. Glover, Jr., et. al*, No. 2019-CP3201361, a case heard in the Lexington County, South Carolina Court of Common Pleas, Eleventh Judicial Circuit ("*Glover*"). AMEC designated Dr. Harris as its Rule 30(b)(6) representative to testify in *Glover*. As part of Dr. Harris's testimony, Dr. Harris represented under oath that the 2006 Plan Document governed the administration of the Plan and that he himself was the trustee of the Plan. Symetra argues then that the Court should estop AMEC from denying that the 2006 Plan Document took effect and became the operable plan document governing the administration of the Plan. AMEC counters that it designated Dr. Harris to testify in the *Glover* case before the Church discovered Dr. Harris's alleged scheme to defraud the Plan. Symetra has not shown that AMEC "successfully and unequivocally" took a position on the 2006 Plan Document in the *Glover* litigation. Without such a showing, the Church argues, there is no basis to apply the doctrine of judicial estoppel.

The Court finds that the factors for the application of judicial estoppel are not present here, namely, Symetra has not shown that AMEC's positions were clearly inconsistent. There appears to

85

be no dispute that AMEC designated Dr. Harris as its corporate representative in the *Glover* case and that Dr. Harris testified the 2006 Plan Document was the current version of the Plan then in effect. Symetra has attached an excerpt of the transcript of Dr. Harris's deposition testimony and a copy of AMEC's Rule 56 motion in *Glover*, in which AMEC argued that the Church had distributed retirement funds to a plan participant in accordance with the distribution rules set forth in the 2006 Plan Document.

Even so, the Court has no indication the parties in *Glover* disputed the validity of the 2006 Plan Document or that the trial court had to decide whether the 2006 Plan Document had properly amended the 1997 Plan Document and had thereby "become effective." Those issues were not presented in *Glover*, at least as far as Dr. Harris's Rule 30(b)(6) deposition and AMEC's summary judgment brief reveal. Under the circumstances, AMEC "has arguably reconciled [] two allegedly inconsistent positions," Dr. Harris's past testimony about the 2006 Plan Document (where there was no dispute about the validity of the document) and AMEC's present challenge to the validity of the 2006 Plan Document. *Mackey*, 106 F.4th at 567. Symetra has not demonstrated then that AMEC's litigation positions were clearly inconsistent or that AMEC's litigation tactics have misled a court and resulted in an unfair advantage to the Church or prejudice to Symetra. In light of the fact that courts "apply judicial estoppel cautiously," *id.*, the Court declines to estop AMEC from contesting the validity of the 2006 Plan Document for purposes of the crossclaims between AMEC and Symetra.

### 5.   A Factual Dispute Exists Over Whether AMEC Later Ratified the 2006 Plan Document

Symetra makes one last argument in support of the proposition that the 2006 Plan Document governs the Plan and binds AMEC. According to Symetra, AMEC subsequently ratified the 2006 Plan Document and thereby made the amendments to the Plan effective. Ratification is

86

"confirmation after conduct." *Gay v.. City of Somerville*, 878 S.W.2d 124, 127 (Tenn. Ct. App. 1994). Under principles of Tennessee agency law, a principal can bind itself to a contract made by a person without the authority to do so if the principal subsequently ratifies the agreement. *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265, 270 (Tenn. 2001). If the principal ratifies the unauthorized agreement, the principal is "bound by its terms as if he or she had executed it originally." *Id*. (citing 12 *Williston on Contracts* § 35.22 (4th ed.1999)).

But in order for ratification to become valid and binding, the principal must have "full knowledge, at the time of the ratification, of all material facts and circumstances relative to the unauthorized act or transaction." *Id.* (citing *Gough v. Ins. Co. of N. Am.*, 11 S.W.2d 887, 888 (Tenn. 1928)). The Tennessee Supreme Court has explained that ratification focuses on the principal's intent and therefore raises a question of fact "to be determined from all of the surrounding circumstances." *Id*. (citations omitted). By the same token, "some actions so clearly evidence a principal's intent to ratify the transaction that ratification may be said to have occurred as a matter of law." *Id*. ("Where there is a full knowledge of the facts possessed by the principal, and he pursues thereafter a line of conduct which is consistent alone with the theory that the agent was acting for him, then the doctrine of ratification applies, and it is immaterial whether a ratification was contemplated or not.").

Viewing the evidence and the reasonable inferences to be drawn from it in a light most favorable to AMEC, genuine issues of material fact remain over whether AMEC ratified the 2006 Plan Document. The undisputed proof shows that Newport requested an executed copy of the 2006 Plan Document in 2019, 13 years after Dr. Harris originally signed it as the "Trustee." Dr. Harris obliged the request and returned a copy of the signature page and the separate corporate resolution, not with signatures dated March 2006 but with signatures from the church leaders holding their

87

respective offices in 2019. *See* Ex. 59 (ECF No. 984-9). The signature page contained the signature of Richard Allen Lewis, Jr., AMEC's Treasurer and CFO. The corporate resolution bore the signature of Brian Cooper, AMEC's General Secretary.

However, the signed copies do not show as a matter of law that AMEC ratified the 2006 Plan Document with full knowledge of "all material facts and circumstances relative to the unauthorized act or transaction." *Webber*, 49 S.W.3d at 270. As AMEC correctly points out, the corporate resolution page submitted by Dr. Harris in 2019 was incomplete. The page begins with the following statement: "the Secretary of the African Methodist Episcopal Church (the corporation) hereby certifies that the following resolutions were duly adopted by the board of directors of the corporation on _____ and that such resolutions have not been modified or rescinded as of the date hereof." *Id.* (Page ID 31961). No date appeared on the copy of the corporate resolutions page returned by Dr. Harris to Newport in 2019. AMEC argues that this omission calls into doubt whether the General Board actually adopted the resolutions and ratified the 2006 Plan Document, either in 2006 or in 2019. Symetra has cited no other evidence to show that AMEC passed the corporate resolutions in 2006 or at any time after that.

Based on the omission of a date to show when AMEC adopted the resolutions and the evidence that Dr. Harris had concealed other material facts about the Plan from AMEC, the Court concludes that a reasonable jury could find the Church did not have knowledge "of all material facts and circumstances relative to the unauthorized act or transaction." *Webber*, 49 S.W.3d at 270. The Court holds that Symetra has not carried its burden to show an entitlement to judgment as a matter of law on this point. Therefore, Symetra's Motion for Partial Summary Judgment is **DENIED** on the issue of whether the 2006 Plan Document took effect and bound AMEC.

### D.  Symetra's Liability For Transfers It Made Out Of The Annuity And Guaranteed Interest Contracts At Harris's Direction

88

The fourth and final key proposition on which Symetra seeks partial summary judgment is its claim that it is not liable for transfers it processed out of the Church's Annuity Contracts and Guaranteed Interest Contracts at Dr. Harris's direction. Symetra relies on the following exculpatory clauses in Symetra's contracts with AMEC:

2001 Annuity Contract: "[Symetra] may rely on the written direction of the Contractholder and shall not be liable because of any failure to question or challenge such direction and certification regarding the issuance of an Annuity or payment of a cash distribution." Symetra Exhibit 13 at E101 (PageID 30457).

2007 Annuity Contract: "[Symetra] will accept Transfer requests . . . made by . . . the Contractholder . . . or other authorized person designated to Symetra in writing by the Contractholder . . . . Symetra will not be liable for any failure to question or challenge such request for Transfer as long as there is a valid signed authorization on record at Symetra." Symetra Exhibit 70 (PageID 32276).

2007 and 2008 GICs: "Symetra Life shall not be obligated to issue an annuity or to make a cash distribution until it receives a written directive containing the terms and conditions, manner and amounts of such annuity or cash distribution . . . . Symetra may rely on the written directive and shall not be liable because of any failure to question or challenge such directive regarding the issuance of an annuity or payment of a cash distribution." Symetra Exhibit 69 at IV.2 (PageID 32258); Symetra Exhibit 202 at IV.2 (same).

Symetra moves for partial summary judgment on the conclusion that each exculpatory clause is enforceable and shields Symetra from liability for following transfer orders issued to Symetra by Dr. Harris. Specifically, Symetra seeks a ruling as a matter of law that it has no liability for "the $10 million transfer Symetra made at Harris's direction in March 2008 from a maturing

2007 GIC to a Bear Sterns Account for the benefit of Financial Freedom Funds, LLC ('FFF')," a

transfer Symetra describes as "perhaps the most important transaction in this case." Symetra's Mem.

in Support 15. Symetra also moves for a summary ruling that it has no liability for a series of

transfers made from the Annuity Contracts and GICs to FFF and Motorskill between 2008 and 2013.

Symetra's argument raises questions of law about the proper construction of each

contractual exculpatory clause as well as questions of fact about whether the particular transactions

fall within the ambit of the exculpatory clauses. The Court starts its analysis by construing the

relevant language of the Annuity Contracts and GICs.

1.    **2001 Annuity Contract**

The 2001 Annuity Contract was originally an agreement between AMEC and Safeco,

Symetra's corporate predecessor. The 2001 exculpatory clause is actually part of a larger section

entitled "PAYMENT OF BENEFITS," which appears as paragraph E101 of the agreement and reads

in full:

> Subject to the provisions of this Contract and pursuant to applicable provisions of the Plan, SAFECO will, upon the written direction of the Contractholder, issue an Annuity or make a cash distribution to a Participant or to any other person who is entitled to such benefits under the Plan.
>
> The Contractholder and each person entitled to receive benefits under this Contract shall furnish information on such forms and at such times as SAFECO may reasonably require with respect to an Annuity to be issued or payment to be made.
>
> SAFECO shall not be obligated to issue an Annuity or to make a cash distribution until it receives written direction from the Contractholder containing the terms and conditions, manner and amounts of such Annuity or cash distribution, together with a written certification that such Annuity or cash distribution is in accordance with the provisions of the Plan.
>
> SAFECO may rely on the written direction of the Contractholder and shall not be liable because of any failure to question or challenge such direction and certification regarding the issuance of an Annuity or payment of a cash distribution.

2001 Annuity Contract, § E101.

90

In context, paragraph E101 of the 2001 Annuity Contract clearly and unambiguously outlines the procedures for the payment of benefits "to a Participant or to any other person who is entitled to such benefits under the Plan." Under E101, there are two types of payable of benefits, the issuance of an annuity and "cash distributions." The "Contractholder," which the agreement identifies as AMEC, was required to submit two items in writing to trigger Symetra's duty to issue an annuity or make a cash distribution: (1) a "written direction" from AMEC "containing the terms and conditions, manner and amounts of such Annuity or cash distribution"; and (2) a "written certification that such Annuity or cash distribution is in accordance with the provisions of the Plan."

The 2001 Annuity Contract's so-called exculpatory clause did not simply remove Symetra's liability for any and all transactions, only the act of "issuing an annuity" or making a "cash distribution" to a Plan participant (or their beneficiaries). The clause only permitted Symetra to rely on AMEC's "written direction" and "certification regarding the issuance of an Annuity or payment of a cash distribution" and shielded Symetra from liability for its "failure to question or challenge such direction and certification *regarding the issuance of an Annuity or payment of a cash distribution*." (emphasis added). Reading each part of paragraph E101 and giving the language of the paragraph its natural and ordinary meaning, the 2001 Annuity Contract shielded Symetra from liability for following AMEC's instructions "regarding the issuance of an Annuity or payment of a cash distribution" to a Plan participant or their beneficiaries.

2. **2007 Annuity Contract**

The 2007 Annuity Contract contains nearly identical language limiting Symetra's liability "for any failure to question or challenge [a] direction and certification regarding the issuance of an annuity or payment of a cash distribution." 2007 Annuity Contract 11 (ECF No. 984-20, Page ID

91

32280). The Court construes that language in the same manner it has construed the identical language found in the 2001 Annuity Contract.

Symetra does not specifically rely on this provision in the 2007 agreement and instead points to the contract's section entitled "TRANSFER REQUESTS." The "TRANSFER REQUESTS" section reads in full:

> Symetra will accept Transfer requests submitted in writing on a form approved by Symetra or in an alternate format approved by Symetra provided that the request is made by:
>
>  • the Contractholder,
>  • you, if permitted under the terms of the Plan, or
>  • other authorized person designated to Symetra in writing by the Contractholder or you.
>
> *Symetra will not be liable for any failure to question or challenge such request for Transfer as long as there is a valid signed authorization on record at Symetra.*

2007 Annuity Contract (emphasis added).

The "TRANSFERS REQUESTS" section of the 2007 Annuity Contract includes a series of terms defined elsewhere in the agreement. For example, the "Contractholder" means AMEC, and "you" means the "Participant" or "a person for whom an account is established under the Plan."

The relevant exculpatory language of the 2007 Annuity Contract's "TRANSFER REQUESTS" section also contains a number of specially defined terms. When the agreement uses the word "Transfer," it does not refer to just any movement of Plan assets. A "Transfer" specifically means "[a]ny Withdrawal from a Portfolio(s) or Fixed Account for investment in another Portfolio or Fixed Account" where

 • "Withdrawal" means "[a]ny payment, including charges and deductions, made under the Contract";

92

• "Portfolio" means "[a]n Eligible Investment of the Separate Account under the Contract, as shown on the Schedule" and "Fixed Account" means "[a]n Eligible Investment of the Contract";

• "Eligible Investment" means "investments available under the Contract, as shown on the Certificate and Contract Schedule pages";

"Separate Account" means "the Symetra Group Variable Annuity Separate Account, a non-registered separate investment account of Symetra. The Separate Account is divided into Portfolios."; and

• "Schedule" means "[t]he Schedule page that forms a part of this Certificate or the Contractholder's Contract."

Reading each of the defined terms together, the 2007 Annuity Contract defines a "Transfer" as a "withdrawal" (or "payment under the Contract") from one "Portfolio" or "Fixed Account" to another "Portfolio" or "Fixed Account," where those terms refer to certain "Eligible Investments" listed in a "Schedule" attached to the Contract. The 2007 contract's "Certificate Schedule" listed 41 such "Eligible Investments," all of which appear to be mutual funds, each presumably with its own investment objectives and mix of investment holdings. In other words, where the 2007 Annuity Contract uses the term "Transfer," the contract is referring to requests for withdrawals from one of the "Eligible Investments" listed in the contract to another "Eligible Investment," not the movement of Plan assets generally from the Symetra account and into an investment or account not listed among the Plan's "Eligible Investments."

3.    **2007 and 2008 Guaranteeed Interest Contracts ("GICs")**

Symetra also seeks partial summary judgment on the exculpatory provisions found in the 2007 and 2008 GICs, both of which contain largely identical language mirroring the other limits of liability in the 2001 and 2007 Annuity Contracts. Both the 2007 and 2008 GICs include a section

93

entitled "Retirement and Supplemental Benefits." Like the 2001 and 2007 Annuity Contracts, both GICs describe the procedures for AMEC and Plan participants to direct Symetra to "issue an annuity or a make a cash distribution" to a "a Participant, or to any other person who is entitled to such benefits hereunder on the Maturity Date of the contract" and "pursuant to applicable provisions of the Plan." 2007 GIC, IV.1 (Page ID 32258). And like the 2001 and 2007 Annuity Contracts, the 2007 and 2008 GICs limit Symetra's liability "because of any failure to question or challenge [a] directive regarding the issuance of an annuity or payment of a cash distribution." *Id*.

The 2007 and 2008 GICs differ from the 2001 and 2007 Annuity Contracts in two important respects. First, unlike the 2001 and 2007 Annuity Contracts, the 2007 and 2008 GICs required a written directive to authorize the issuance of an annuity or a cash distribution but not a separate written certification that the annuity or cash distribution complied with the terms of the Plan. *See* 2008 GIC, IV.2 ("Symetra Life shall not be obligated to issue an annuity or to make a cash distribution until it receives a written directive containing the terms and conditions, manner and amounts of such annuity or cash distribution.").

Second, unlike the 2001 and 2007 Annuity Contracts, the 2007 and 2008 GICs permitted Symetra to issue an annuity or make a cash distribution not just to participants and beneficiaries but also to "the contract holder." The 2007 GIC contains a preamble (Page ID 32255) and states that Symetra issued the GIC "to the contract holder named below." The space below, beside the phrase "Contract Holder," however, is blank. Elsewhere, the GIC identifies AMEC as the "Owner" of the contract. Despite this omission from the 2007 GIC, the 2008 GIC named the Plan itself as "the Contract Holder." AMEC denies that it was even a party to the GICs. AMEC Defs.' Mem. in Support 16 (ECF No. 1070-1) ("Symetra cannot hold AMEC liable for breaching the 2007 GIC and

94

the 2008 GIC–AMEC is not a party to either agreement."). The Court can presume without deciding then that the Plan is the "contract holder" mentioned throughout both GICs.

Assuming the Plan is the "contract holder," the Court holds that the rest of the language of the GICs is clear and unambiguous. Construing each GIC's specific language found in their identical sections on "Retirement and Supplemental Benefits," the Court holds the 2007 and 2008 GICs limited Symetra's liability for its failure to question or challenge a written directive but only a directive "[p]ursuant to applicable provisions of the Plan" and related to issuing an annuity or paying out a cash distribution. Furthermore, the annuity or cash distribution had to go to the Plan, a Plan participant, or a beneficiary of the participant.

Having arrived at the proper construction of the relevant language in each contract, the issue then is whether Symetra is entitled to a ruling that it is not liable as a matter of law for transfers it processed out of the Church's Annuity and Guaranteed Interest Contracts at Dr. Harris's direction. The Court holds that Symetra is not. All of the parties' contracts, the 2001 and 2007 Annuity Contracts and the 2007 and 2008 GICs, only limited Symetra's liability for transfers related to issuing annuities or making cash distributions. Each of the disputed transfers arguably qualify as "cash distributions."

The problem for Symetra is the 2001 and 2007 Annuity Contracts only shield Symetra from making cash distributions to a participant or the participant's beneficiary. Symetra has cited no evidence that the transfers at issue were made to a Plan participant or an eligible beneficiary. The key transfer, the $10 million transfer of Plan assets in 2008, was made to a Bear Stearns account held by FFF. The Court holds then that the 2001 and 2007 Annuity Contracts do not shield Symetra from liability for following Dr. Harris's directions to make the "cash distributions" in question.

The 2007 and 2008 GICs dictate the same result, though for slightly different reasons. The GICs work differently in that each limits Symetra's liability for making "cash distributions," not just to participants and beneficiaries, but also to "the contract holder." Assuming the Plan is the "contract holder" referred to in both GICs, the transfers in question were not "cash distributions" to the Plan but rather transfers to other entities like FFF. This suggests that the limits of liability adopted in the 2007 and 2008 GICs would not apply to "cash distributions" of Plan assets to any entity other than the Plan. On the other hand, the parties have cited proof, which shows FFF was a wholly owned subsidiary of AMEC Financial Services, itself a subsidiary of the Church. A fact question exists then on whether the $10 million transfer of Plan assets to FFF qualified as a "cash distribution" to the "contract holder."[35]

Symetra argues that its contractual limit of liability also applies to one category of transfers that went directly to Dr. Harris, the periodic payment of certain administrative fees. AMEC alleges that Dr. Harris collected millions of dollars in excessive administrative fees, all paid out of Plan assets in the Symetra account. The payment of the administrative fees arguably meets the GICs' definition of a "cash distribution." But the distributions went to Dr. Harris, not the Plan. That evidence suggests that the exculpatory language in the 2007 and 2008 GICs would not apply. There is also a genuine dispute over whether Dr. Harris had the authority to collect the fees at all, meaning Symetra has not shown as a matter of law that the payment of the fees was "[p]ursuant to applicable provisions of the Plan." 2001 Annuity Contract, § E101; 2007 GIC, IV.1. The Court cannot say then

---

[35] The GICs also specify that the transfer orders must come from the "contract holder." The proof shows, though, that the initial instructions for the $10 million transfer to FFF's Bear Stearns account came from Robert Eaton, the "broker of record" for the DRS. A fact question also exists then over whether the GICs protected a transfer initiated by Eaton and whether Dr. Harris's later confirmation of Eaton's order matters.

that Symetra is entitled to judgment as a matter of law on its liability for paying out administrative fees to Dr. Harris.

Additionally, it is factually undisputed that Dr. Harris, not AMEC, ordered Symetra to make each of the transfers. The Court has already concluded that questions of fact remain over (1) Dr. Harris' authority (actual or apparent) to act on behalf of AMEC and direct Symetra; (2) whether the 2006 Plan Document and the wider authority it granted the "Trustee" was formally adopted and took effect; and relatedly (3) whether Dr. Harris was in fact the trustee, as the 2006 Plan Document suggests. Those same disputes mean the Court cannot decide as a matter of law whether Dr. Harris properly ordered Symetra to make the specific transfers in question.

More fundamentally, a genuine dispute of material fact exists over the independent authority of the Executive Director of the Department to invest Plan funds at all. AMEC takes the position that the Executive Director had the authority to deposit Plan funds into an annuity contract such as the Plan's annuity contract with Symetra. This meant Dr. Harris during his tenure as Executive Director was only authorized to collect contributions and deposit them to the Symetra annuity account and, in conjunction with Newport, coordinate lawful distributions to plan participants from the Symetra annuity account upon a showing of eligibility. Beyond that, the Church's Doctrine and Discipline does not give the Executive Director authority to make investments or to direct a third-party vendor to make investments with Plan funds. Any other writing granting Dr. Harris such authority originated with Dr. Harris.

Symetra disputes AMEC's claim about the limited nature of the Executive Director's authority. Symetra asserts that the Executive Director had the authority to make investment decisions for the Plan for many of the reasons the Court has already discussed like the language of the 2006 Plan Document. Symetra also cites language from the Doctrine and Discipline which describes the

97

role and duties of the Executive Director, including the duty to purchase a group annuity and group hospitalization coverage:

> There shall be a Department of [Retirement Services] administered by the Executive Director of the Department, who is an elected General Officer responsible for giving oversight to the programs of the church operated for the retirement security of the salaried personnel of the church. These included Ministerial Annuities and the Ministerial Retirement Program. The Executive Director of the Department shall hire a specialist in financial management to see that the employees of the church receive the maximum benefits to which they are entitled from our investments . . . . the Executive Director shall purchase within six (6) months a group annuity and group hospitalization coverage. The premiums for the said policies shall be paid from the annuity fund.

The fact is Dr. Harris made investments on behalf of the Plan with Plan funds for twenty years without objection from anyone at AMEC, including the AMEC General Board and the Commission. In his 2003 Annual Report, Harris requested authority to invest up to 30% of the Plan's funds in investments outside of the Symetra Annuity Contracts. Not only that, Dr. Harris later reported to AMEC that the investments he was making on behalf of the Plan were diversified and consistently beating the market, a claim which is incompatible with the notion of the Plan holding a single investment in a single fixed annuity.

While the 2007 and 2008 GICs shield Symetra from following AMEC's instructions for a cash distribution, a genuine dispute of material fact exists over whether Dr. Harris had the power to make the directives. At the end of the day, the GICs require Symetra to make cash distributions "pursuant to applicable provisions of the Plan." Because serious factual disputes remain over Dr. Harris' authority and even which Plan Document controlled the administration of the Plan, Symetra has not carried its burden to show that its 2007 and 2008 GICs limit Symetra's liability for the transfers at issue.

In sum, the Court holds that the exculpatory language found in the 2001 and 2007 Annuity Contracts does not limit Symetra's liability for following Dr. Harris' orders for any of the transfers at

issue. A genuine dispute of material fact remains over whether the exculpatory language of the 2007 and 2008 GICs limit Symetra's liability for following Dr. Harris's orders. Therefore, Symetra's Motion for Partial Summary Judgment is **DENIED** on this issue.

Having ruled on Symetra's Motion for Partial Summary Judgment regarding each of the four key facts discussed above, the Court now turns to the merits of each side's requests for summary judgment on their crossclaims for relief.

## II. Symetra's Crossclaim for Breach of Contract

Each party moves for summary judgment on Symetra's crossclaim for breach of contract. Symetra's breach of contract crossclaim is based on § 9.8 of the 2006 Plan Document and the agreements Symetra had with AMEC: (1) the 2001 Annuity Contract, (2) the 2007 Annuity Contract, (3) the 2007 and 2008 GICs. According to Symetra, the 2006 Plan Document and the contracts stipulated that Symetra could not be liable for its failure to question or challenge an annuity transfer request from the Trustee of the Annuity Plan or be held liable as fiduciary of the Plan. Symetra alleges that AMEC's crossclaims against Symetra constitute a breach of these exculpatory clauses not to hold Symetra liable for relying on Dr. Harris's orders about the disposition of Plan assets.

Both parties believe they are now entitled to summary judgment on Symetra's breach-of-contract theory. Symetra argues that the 2006 Plan Document was the effective governing document for purposes of plan administration and that Symetra is a third-party beneficiary of the 2006 Plan Document's "Insurer's Protective Clause." Symetra further argues the validity of each contractual agreement is not in dispute. The contracts, the 2001 and 2007 Annuity Contracts and the 2007 and 2008 GICs, all contain exculpatory language, the same language the Court has already construed as part of its analysis of whether Symetra was entitled to partial summary judgment on its lack of

liability for following Dr. Harris's transfer orders. Symetra concludes that it can prove all of the elements of its claim for breach-of-contract crossclaim.

For its part, AMEC moves for summary judgment in its favor on Symetra's crossclaim. AMEC begins by arguing that the Court should find the exculpatory clauses in the parties' contracts are not enforceable due to Symetra's greater bargaining power, the broad sweep of the exculpatory clauses, and public policy considerations. Even assuming the exculpatory clauses are enforceable, Tennessee law does not recognize a breach of contract based on an exculpatory clause. With specific reference to the 2007 and 2008 GICs, the Plan, not AMEC, was the party to each contract, and the Plan has nonsuited any claims it had against Symetra. The 2007 and 2008 GICs have also expired. Finally, AMEC argues that the exculpatory clauses do not reach the alleged conduct by Symetra in carrying out instructions to transfer Plan assets to other entities. So AMEC contends that it is entitled to summary judgment in its favor on Symetra's crossclaims for breach of contract.

In Tennessee, the essential elements of a claim for breach of contract are as follows: "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *Life Care Ctrs. of Am., Inc. v. Charles Town Assocs., Ltd.*, 79 F.3d 496, 514 (6th Cir. 1996); *C & W Asset Acquisition, LLC v. Oggs,* 230 S.W.3d 671, 676–77 (Tenn. Ct. App. 2007) (quoting *ARC LifeMed, Inc. v. AMC–Tenn., Inc.,* 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)). Rather than consider all of the arguments framed by the parties, the Court can quickly address Symetra's breach of contract claims based on the 2006 Plan Document and the 2001 and 2007 Annuity Contracts and the exculpatory language each contains.

Section 9.8 of the 2006 Plan Document contains an "INSURER'S PROTECTIVE CLAUSE" which provides in relevant part that "[t]he insurer shall be protected and held harmless in acting in accordance with any written direction of the Trustee, and shall have no duty to see to the

100

application of any funds paid to the Trustee, nor be required to question any actions directed by the Trustee." Symetra alleges that it is a third-party beneficiary of this provision and alleges that AMEC has breached its duty to Symetra by filing crossclaims against Symetra over the fact that Symetra followed written directions from Dr. Harris without questioning his actions. As the Court has already held, genuine disputes of material fact exist over whether the 2006 Plan Document ever took effect. Therefore, both AMEC's Motion for Summary Judgment on Symetra's breach-of-contract crossclaim premised on the 2006 Plan Document and Symetra's Motion for Partial Summary Judgment on the claim are **DENIED**.

As for the 2001 and 2007 Annuity Contracts, for reasons the Court has already discussed, the limit on Symetra's liability under each contract for following Dr. Harris's orders to make specific transfers simply does not apply under the facts of the case. The 2001 and 2007 Annuity Contracts only shielded Symetra for following directives about issuing an annuity or making a cash distribution to participants and beneficiaries. AMEC has not alleged that Symetra is liable for any such transaction, only cash transfers made to FFF and other third parties. It follows that AMEC has not breached any contractual duty it may owe Symetra based on the exculpatory clauses of the 2001 and 2007 Annuit Contracts. Therefore, AMEC's Motion for Summary Judgment is **GRANTED** on Symetra's breach-of-contract crossclaim based on the 2001 and 2007 Annuity Contracts, and Symetra's Motion for Partial Summary Judgment is **DENIED**.

Turning to the 2007 and 2008 GICs,[36] the parties first dispute whether the exculpatory language in each agreement is enforceable at all. "As a general rule, Tennessee courts recognize that

---

[36] Strictly speaking, the parties to the 2007 and 2008 GICs are Symetra and the Plan, not AMEC. The Plan has voluntarily nonsuited its crossclaims against Symetra, crossclaims which formed the basis of Symetra's breach-of-contract crossclaim against the Plan. AMEC seems to argue that the dismissal of the Plan's crossclaims perhaps had some effect on the ongoing viability of Symetra's crossclaims. AMEC Defs.' Mem. in Support 16 ("As an initial matter, the Plan has

exculpatory clauses are valid in Tennessee and are not against the public policy of the state."

*Roopchan v. ADT Sec. Sys., Inc.*, 781 F.Supp.2d 636, 647 (E.D. Tenn. 2011) (quoting *Burks v. Belz–*

*Wilson Props.,* 958 S.W.2d 773, 776 (Tenn. Ct. App. 1997)). However, not all exculpatory

agreements are enforceable in Tennessee. The Tennessee Supreme Court has held that the

enforceability of an exculpatory agreement "should be determined by considering the totality of the

circumstances and weighing these non-exclusive factors: (1) relative bargaining power of the parties;

(2) clarity of the exculpatory language, which should be clear, unambiguous, and unmistakable about

what the party who signs the agreement is giving up; and (3) public policy and public interest

implications." *Copeland v. Healthsouth/Methodist Rehab. Hosp., LP*, 565 S.W.3d 260, 274 (Tenn.

2018).

The Court holds that the exculpatory language in the 2007 and 2008 GICs is enforceable.

First, the parties had relatively equal bargaining power. There is evidence in the record that at the

time of the 2007 GIC, the Plan had an opportunity to open an annuity account with another firm,

possibly earning a higher interest rate. As part of the negotiations to retain the Church's business,

Symetra agreed to pay more interest in return for the Plan keeping its Symetra account.  Nothing

about the proof suggests that the Plan was somehow at a disadvantage in negotiating the terms of the

GICs. If anything, the Plan had leverage.

Second, the language of the GICs is clear and unambiguous. The Plan agreed that Symetra

would not be liable for issuing an annuity or making a cash distribution to the Plan, a participant, or

a beneficiary. As Symetra points out, each GIC had a maturity date at which time the parties

anticipated the Plan would need a means of transferring the funds covered by the GIC, i.e. a cash

---

voluntarily non-suited its crossclaims against Symetra (ECF No. 839), so there can be no breach of
any contract to which the Plan is a party because the Plan is no longer asserting any crossclaims
against Symetra."). AMEC has cited no legal authority to show that the Plan's voluntary dismissal of
its crossclaims somehow extinguishes Symetra's crossclaim against the Plan.

distribution. By the same token, the exculpatory language did not permit Symetra to make just any transfer. Nothing about the exculpatory language is vague or unclear.

Third, the GICs' exculpatory clauses do not raise any public policy or public interest concerns. AMEC rightly argues that the Plan is a retirement plan for a religious organization, thereby serving a number of important public interests. Public policy, though, should also encourage financial institutions to provide financial services to group retirement plans, particularly where the employer's resources might be constrained such as a charitable religious organization. Allowing the financial institution to bargain for some assurance about a limit to its liability to the plan, its participants, and their beneficiaries is consistent with that policy. The GICs potentially curb Symetra's liability for specific transfers without completely insulating Symetra from any and all liability to the Plan. All in all, the Court concludes that the exculpatory language of the 2007 and 2008 is enforceable.

AMEC makes a separate argument to challenge the enforceability of the GICs. AMEC contends that the exculpatory language found in the GICs amounts to a waiver or release of a legal right, not a contractual duty. The Tennessee Supreme Court, albeit in an unpublished decision, has described "the existence of [an] exculpatory clause" as an affirmative defense. *Stewart v. Chalet Village Props., Inc.*, No. E2007–01499–SC–R11–CV, 2009 WL 3616611, at *2 (Tenn. Nov. 3, 2009). Insofar as the Court construes the GICs' exculpatory language as the Plan's covenant not to sue Symetra, "Tennessee law allows a party to sue for the breach of a covenant not to sue." *Trinity Faire, LLC v. Am.'s Collectibles Network, Inc.*, No. 3:22-cv-417, 2023 WL 6064297, at *4 (E.D. Tenn. Feb. 15, 2023) (citing *Kreutzmann v. Bauman*, 609 S.W.2d 736, 739 (Tenn. Ct. App. 1980) and *Oliver v. Williams*, 83 S.W.2d 271, 273 (Tenn. Ct. App. 1935)). Based on this authority, the

103

Court is satisfied that Symetra can pursue a claim for breach of contract based on the exculpatory language of the GICs as a breach of the parties' covenant not to sue.

AMEC raises another gateway challenge to Symetra's crossclaim premised on breach of the GICs. Each GIC expired some years ago. AMEC argues then that the contracts are no longer enforceable. This is an argument the Court previously addressed at the pleadings stage. In denying AMEC's motion to dismiss the crossclaim, the Court found that AMEC had not demonstrated "why the maturity of the 2007 GIC or the 2008 GIC means Symetra cannot enforce the exculpatory clauses found in those contracts." Order GIP, DIP AMEC Defs.' Mot. to Dismiss 29, Sept. 10, 2026 (ECF No. 929). The Court noted the lack of legal authority supporting AMEC's position and reasoned that "if AMEC can hold Symetra liable for actions undertaken pursuant to the 2007 GIC or the 2008 GIC, then Symetra should be able to invoke the exculpatory clauses found in those agreements, even though the contracts matured over a decade ago." *Id*. The Court sees no reason to deviate from that reasoning now.

AMEC cites a single case to support its position, *Stevens-Bratton v. TruGreen, Inc.*, 675 F'. App'x 563 (6th Cir. 2017). The plaintiff in *Stevens-Bratton* had a contract with the defendant for lawn care services. As part of her services contract, the plaintiff agreed that the defendant could contact her on her cell phone "to discuss [her] account and lawn care services, including current and possible future services, customer service and billing." *Stevens-Bratton v. TruGreen, Inc.*, 675 F. App'x 563, 570 (6th Cir. 2017). After the services contract expired, the plaintiff continued to receive a volume of phone calls from the defendant about lawn care services and sued for violations of the Telephone Consumer Protection Act. The district court dismissed the claims, and the plaintiff appealed.

104

The issue presented in *Stevens-Bratton* was whether the defendant's contractual right to telephone the plaintiff "regarding future services, survive[d] expiration [of the services contract] under normal principles of contract interpretation." *Id*. The Sixth Circuit found that the contract language was ambiguous because it was capable of being understood in two senses. One reading of the contract allowed the defendant to call the plaintiff only during the period of the contract, the other reading allowed the defendant to call the plaintiff indefinitely after the conclusion of the contract. Construing the ambiguous provision against the defendant as the drafter of the form contract, the Court of Appeals concluded that the services contract only allowed the defendant to contact the plaintiff during the contract period and therefore the subsequent calls did not "arise under the contract." *Id*. at 570–71.

The Court respectfully finds that *Stevens-Bratton* does not squarely address the question presented here. *Stevens-Bratton* concerned the proper interpretation of the services contract which allowed one party to the agreement to phone the other party about "future services." The interpretation had bearing on whether the dispute between the parties was subject to a separate arbitration clause found in the same contract. The case has nothing to say about the viability of a breach-of-contract claim after the expiration date of the contract.

By contrast, the dispute between AMEC and Symetra is purely contractual: the Plan accuses Symetra of breaching its duties under the 2007 and 2008 GICs, Symetra denies that it has any liability to the Plan based on the exculpatory language in each agreement. Both parties invoke their rights and obligations under the contract far beyond the maturity date of their agreement. *Stevens-Bratton* does not show why the Court should prevent Symetra from using the exculpatory language of the GICs as the basis for a breach of contract.

On the merits, both sides seek judgment as a matter of law on the merits of Symetra's claim for breach of the 2007 and 2008 GICs.  Viewing the evidence in a light most favorable to the non-moving party, the Court holds that genuine issues of material fact remain for trial. On Symetra's request for partial summary judgment, Symetra argues that no genuine dispute exists on any element of its claim. But the Court has already held that disputed issues prevent the Court from ruling as a matter of law that the exculpatory language of the 2007 and 2008 GICs limit Symetra's liability for following Dr. Harris's orders. Those same disputed questions preclude Symetra's request for judgment as a matter of law on its breach of contract claim.

Likewise, when viewed in a light most favorable to Symetra, a reasonable jury could find that Dr. Harris had the authority to direct Symetra as to the disposition of the Plan's investments (because AMEC had vested him with the authority to do so and/or he was the "Trustee" under the 2006 Plan Document). The disputed questions on those and other issues mean the Court cannot grant AMEC judgment as a matter of law on Symetra's crossclaim for breach of contract. Both parties' Rule 56 Motions are **DENIED** on Symetra's crossclaim for breach of contract based on the 2007 and 2008 GICs.

### III.  Symetra's Crossclaim for Contractual Indemnification

Next, both parties move for judgment as a matter of law on Symetra's crossclaim for contractual indemnification. Symetra alleges in its Amended Cross-Complaint that a 2003 recordkeeping services agreement ("RSA") and the 2008 RSA contain contribution provisions. Symetra's Am. Cross-Compl. ¶ 188 ("Under the 2003 RSA and 2008 RSA, AMEC agreed and promised 'to indemnify, defend, and hold harmless [Symetra] . . . .'"). Now, in its Motion for Partial Summary Judgment, Symetra adds that both the 1997 Plan Document and the 2006 Plan Document contain exculpatory language to hold Symetra harmless for following Dr. Harris's directions.

106

"In Tennessee, indemnification requires the complete shifting of liability for loss from one party to another and rests on two principles: persons should be responsible for their own wrongdoing and wrongdoers should be liable to persons required to pay damages that the wrongdoers should have paid." *AutoZone, Inc. v. Glidden Co.*, 737 F.Supp.2d 936, 943 (W.D. Tenn. 2010) (quoting *Winter v. Smith,* 914 S.W.2d 527, 541 (Tenn. Ct. App. 1995) (cleaned up)). Parties may agree to indemnify each other by contract, as long as the contract contains "a clear and unequivocal expression of an intention to indemnify." *Id.* at 944 (citing *First Am. Bank of Nashville, N.A. v. Woods*, 734 S.W.2d 622, 632 (Tenn. Ct. App. 1987)). The proper construction of the Plan Documents and RSAs is a question of law for the Court.

Before reaching the merits, the Court takes up AMEC's argument that Symetra failed to plead the 1997 Plan Document or the 2006 Plan Document as a contractual basis for its indemnification claim. As a result, the Court should not permit Symetra to expand the grounds for its claim at summary judgment. "A plaintiff may not shift its theory of liability at the summary judgment stage in a way that materially alters the pleaded factual basis of its claim and prejudices the opposing party." *Grand Traverse Band of Ottawa & Chippewa Indians v. Blue Cross Blue Shield of Mich.*, 146 F.4th 496, 511–12 (6th Cir. 2025) (citing *S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327–28 (6th Cir. 2013)). A plaintiff is "not rigidly bound" to the specific legal theories articulated in the pleadings. *Id.* at 512 (citing *Johnson v. City of Shelby*, 574 U.S. 10, 11, 135 S.Ct. 346, 190 L.Ed.2d 309 (2014)). And yet a defendant is entitled to "fair notice of the nature and basis or grounds for a claim," meaning a plaintiff cannot "pivot to a new factual basis for liability" if the pivot prejudices the defendant. *Id.* (citing *Sierra Brokerage*, 712 F.3d at 327–28 (quoting *Colonial Refrigerated Trans., Inc., v. Worsham*, 705 F.2d 821, 825 (6th Cir. 1983)).

107

The Court finds that Symetra is not unfairly expanding the factual basis for its indemnification theory. The centerpiece of Symetra's case throughout the MDL has been its theory that Dr. Harris was vested with sweeping powers as trustee and that Symetra's contracts with AMEC permitted it to follow Dr. Harris's instructions for the Plan's investments. AMEC has had "fair notice of the nature and basis or grounds" for Symetra's theory of the case. Symetra's argument at summary judgment that the Plan Document(s) also provide(s) a contractual basis for indemnification does not unfairly prejudice AMEC. Both parties have fully briefed the issue, and AMEC has had a complete opportunity to present its position on the indemnification question. The Court will not limit Symetra's claim to the particulars of the Amended Cross-Complaint.

AMEC makes a separate argument to narrow the scope of the indemnification question. As part of the earlier arbitration phase of the dispute between AMEC and Symetra, the arbitrator concluded that the RSAs (containing the arbitration clauses) were never formally executed and therefore did not take effect. AMEC contends that under the doctrine of collateral estoppel, the arbitrator's conclusions are binding on Symetra. The Court has already addressed the relevant legal standard for this argument. As a general rule, "an arbitrator's decision has preclusive effect in federal court." *Schreiber v. Philips Display Components Co.*, 580 F.3d 355, 367 (6th Cir. 2009) (citation omitted). The party relying on an arbitrator's earlier determination of an issue must usually prove the elements of collateral estoppel. *Id.*; *Cent. Transp., Inc. v. Four Phase Sys., Inc.*, 936 F.2d 256, 260 (6th Cir. 1991).

Symetra does not actually engage AMEC's argument about the preclusive effect of the arbitrator's decision concerning the validity of the RSAs.[37] Rather, Symetra pivots to invoke the

---

[37] AMEC makes two alternative arguments about the RSAs: (1) that the RSAs are not enforceable, essentially for the same reasons the arbitrator concluded the RSAs never took effect; and (2) AMEC's crossclaims against Symetra are beyond the scope of the services described in the

"Insurer Protective Clauses" in the Plan Documents as the basis for its indemnification claim.

Because Symetra does not counter AMEC's collateral estoppel argument, the Court finds that

Symetra has waived the issue. Therefore, AMEC's Motion for Summary Judgment on Symetra's

contractual claim for indemnification based on the 2003 and 2008 RSAs is **GRANTED**.

Having framed the inquiry for purposes of Symetra's contractual indemnification claim, the

Court now turns to the correct construction of the clauses containing the exculpatory language found

in the Plan Documents. Both Plan Documents include identical sections entitled "Insurer's Protective

Clause," which read as follows:

> Any Insurer who shall issue Contracts hereunder shall not have any responsibility for
> the validity of this Plan or for the tax or legal aspects of this Plan. ***The Insurer shall
> be protected and held harmless in acting in accordance with any written direction
> of the Trustee, and shall have no duty to see to the application of any funds paid to
> the Trustee, nor be required to question any actions directed by the Trustee.***
> Regardless of any provision to the contrary the Insurer shall not be required to take
> or permit any action or allow any benefit or privilege contrary to the terms of any
> Contract which it issues hereunder, or the rules of the Insurer.

1997 Plan Document, § 9.7 (ECF No. 983-1, Page ID 29898) (emphasis added).

As is clear by now, the 1997 Plan Document identified the "Trustee" as the "Pension

Commission." The Court construes the "Insurer Protective Clause" to protect an "Insurer" like

Symetra when the "Insurer" acted in accordance with any written direction of the "Pension

Commission." The clause further protected the "Insurer" by not requiring it to question any actions

taken by the Commission. The 2006 Plan Document contains an identically worded "Insurer

Protective Clause." (ECF No. 74-1, Page ID 974). The difference is the 2006 version of the Plan

Document specifically names Dr. Harris as "Trustee." So instead of protecting an "Insurer" when the

Pension Committee gave written directions and not requiring the "Insurer" to question the

---

RSAs. Symetra has also failed to address these points as part of its briefing on the contractual
indemnification claim. The Court finds that Symetra has waived any opposition to these arguments,
as well.

Commission's actions, the 2006 Plan Document protected the "Insurer" when Dr. Harris gave written directions and did not require the "Insurer" to question Dr. Harris's decisions.

How does this impact Symetra's contractual indemnification claim? The Court has thoroughly discussed the factual disputes surrounding the 2006 Plan Document, including whether the Plan Document ever took effect and whether Dr. Harris was in fact the trustee of the Plan. To the extent that Symetra moves for summary judgment on the basis of the 2006 Plan Document, the factfinder must decide whether the 2006 Plan Document ever became effective. That means the Court cannot grant Symetra judgment as a matter of law on its indemnification claim based on the 2006 Plan Document. Turning the tables and taking the most favorable view of the evidence from Symetra's position, a reasonable jury could decide the 2006 Plan Document became effective (for example, when church leaders ratified it in 2019), meaning the exculpatory language of the 2006 iteration could provide a basis for indemnification. Therefore, both parties' Motions for Summary Judgment are **DENIED** on Symetra's contractual indemnification claim based on the 2006 Plan Document.

As for the indemnification language in the 1997 Plan Document, Symetra would only be entitled to seek indemnification from AMEC under two scenarios: (1) if Symetra has evidence that it was simply following directions from the trustee named in the 1997 Plan Document, the Pension Commission, or (2) if Symetra can establish that Dr. Harris had the authority (actual or apparent) to act in the name of the Pension Commission and direct Symetra to make transfers of Plan assets. Symetra has adduced no proof to the make the first showing. On the contrary, Symetra denies that the Pension Commission was the trustee at all. Symetra maintains instead that Dr. Harris had the sole authority to direct the transfer and investment of Plan assets. Regardless, the 1997 Plan Document only protects an "Insurer" who acts in accordance with the instructions of the Pension Commission.

110

Without some evidence to show how Symetra's conduct fits within the scope of the indemnifying language of the "Insurer Protective Clause," Symetra has not carried its minimal burden to survive AMEC's Rule 56 on the issue, much less Symetra's heightened burden to obtain summary judgment in its favor on the claim.

As for the second showing, Symetra has introduced proof from which a reasonable jury might find that Dr. Harris had the actual authority (by implication) or the apparent authority to direct Symetra to carry out certain transactions. The Court has already announced its holding on those issues. If the jury found that Dr. Harris was imbued with authority, then the exculpatory language of the 1997 Plan Document might apply and limit Symetra's liability for following Dr. Harris' instructions insofar as he was acting as the "trustee." In light of the foregoing, Symetra's Motion for Partial Summary Judgment must be **DENIED** on Symetra's contractual indemnification claim premised on the 1997 Plan Document, and AMEC's Motion for Summary Judgment is also **DENIED**.

## IV.  Symetra's Crossclaim for Negligent Misrepresentation

Both parties also move for summary judgment on Symetra's crossclaim for negligent misrepresentation. Symetra contends five different contracts stated that AMEC would not consider Symetra a plan fiduciary and would not require Symetra to vet or challenge directives from Dr. Harris. Contrary to the representations in the parties' contracts, AMEC has since sued Symetra precisely for following without question Dr. Harris's directives about the disposition of Plan assets. Symetra alleges then that AMEC negligently misrepresented the facts when it communicated to Symetra that it would not hold Symetra responsible for complying with Dr. Harris's orders.[38]

---

[38] Symetra's Amended Cross-Complaint alleges that according to a 2003 recordkeeping services agreement ("2003 RSA") AMEC had with Symetra's corporate predecessor Safeco, AMEC agreed that Safeco was not a plan fiduciary. Symetra alleges that when AMEC agreed as part of the

Tennessee law recognizes "the common-law tort of negligent misrepresentation and [has] adopted the Restatement (Second) of Torts § 552 (1977) as the guiding principle with regard to these claims." *Hodge v. Craig*, 382 S.W.3d 325, 344–45 (Tenn. 2012) (citing *Bethlehem Steel Corp. v. Ernst & Whinney*, 822 S.W.2d 592, 595 (Tenn. 1991)). In order to prove negligent misrepresentation, a plaintiff must show the following: (1) the defendant was acting, in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary interest; (2) the defendant supplied faulty information meant to guide others in their business transaction; (3) the defendant failed to exercise reasonable care in obtaining or communicating the information; (4) the plaintiff justifiably relied on the information. *See Restatement (Second) of Torts* § 552; *see also John Martin Co. v. Morese/Diesel, Inc.* 819 S.W.2d 428, 431 (Tenn. 1991).

As a preliminary point, this crossclaim bears some factual resemblance to Symetra's crossclaim for breach of contract. Symetra grounds both crossclaims in the exculpatory language found in five different contracts: the 2001 and 2007 Annuity Contracts, the 2007 and 2008 GICs, and the 2006 Plan Document. The Court has already carefully parsed the relevant exculpatory language

---

2003 RSA that it did not consider Symetra's corporate predecessor a fiduciary, AMEC made a false statement because AMEC now alleges as part of the MDL that Symetra was always a fiduciary. AMEC argues that if anything, Symetra has alleged that AMEC merely disavowed the provision from the 2003 RSA, which cannot form the basis for negligent misrepresentation. Symetra concedes in its briefing at summary judgment that an arbitrator has held the 2003 RSA unenforceable.

Just as with Symetra's crossclaim for breach of contract, the Court finds that Symetra's pivot to other contractual language as the basis for its negligent misrepresentation claim has not caught AMEC by unfair surprise or resulted in any prejudice to the Church. Symetra has made the representations in the parties' different agreements a centerpiece of its defense at each stage of the MDL.

Even so, AMEC raised the argument in its opening brief that Symetra could not prove the elements of its negligent misrepresentation claim based on the statements found in the 2003 RSA. Symetra has essentially conceded the point. Therefore, the Court finds that AMEC is entitled to judgment as a matter of law on Symetra's crossclaim for negligent misrepresentation premised on the 2003 RSA. AMEC's Motion for Summary Judgment is **GRANTED** on this point.

in each agreement. Where the breach-of-contract theory assumes that each contract's exculpatory language shields Symetra from liability, the negligent misrepresentation theory proceeds from an alternative assumption that Symetra might be liable for the transfers, meaning AMEC's representations about the limits of Symetra's liability were false when AMEC made them.

The Court can quickly address Symetra's negligent misrepresentation claim premised on the exculpatory language of the 2001 and 2007 Annuity Contracts. The Court has already concluded that Symetra has not introduced any evidence to show that the specific transfers of Plan assets fell within the scope of the exculpatory language in the 2001 and 2007 Annuity Contracts: the exculpatory language only limited Symetra's liability for issuing annuities or making cash distributions to plan participants and their beneficiaries. Without proof to show that the 2001 and 2007 Annuity Contracts supplied faulty information about the limits of Symetra's liability, Symetra has not carried its burden on an essential element of its negligent misrepresentation claim premised on the language of the 2001 and 2007 Annuity Contracts. Therefore, Symetra's Motion for Partial Summary Judgment is **DENIED** as to its negligent misrepresentation claim arising out of the exculpatory language of the 2001 and 2007 Annuity Contracts. AMEC's Motion for Summary Judgment is **GRANTED** on the claim.

This just leaves three of the parties' contracts: the 2006 Plan Document (with Symetra as a third-party beneficiary) and the 2007 and 2008 GICs. As for the exculpatory language of the 2006 Plan Document, the Court has by now thoroughly explained its conclusion that a myriad of factual disputes remain for trial: whether Dr. Harris had the authority (actual or apparent) to speak for AMEC and whether the 2006 Plan Document (granting Dr. Harris' powers as the "Trustee") ever took effect (in March 2006, or in 2019, or at some other time). If the jury finds that the 2006 Plan Document took effect and thus gave Dr. Harris the authority to order the transfers, then Symetra

113

would be entitled to the protection of the 2006 Plan Document's exculpatory language. The jury would then need to decide whether AMEC had negligently misrepresented anything to Symetra and whether Symetra reasonably relied on any supposed misrepresentation. "[R]easonable reliance is a question of fact." *Naylor Medical Sales & Rentals, Inc. v. Invacare Continuing Care, Inc.*, 517 F. App'x 443, 452 (6th Cir. 2013) (citing *Davis v. McGuigan,* 325 S.W.3d 149, 158 (Tenn. 2010)).[39] So is the question of whether a statement constitutes a misrepresentation. *Howell v. Colonial Penn Ins. Co.*, 842 F.2d 821, 822 (6th Cir. 1987) (citing *Womack v. Blue Cross & Blue Shield,* 593 S.W.2d 294 (Tenn. 1980)). As such, both parties' Rule 56 Motions are **DENIED** on Symetra's negligent misrepresentation claim based on exculpatory language in the 2006 Plan Document.

The same holds true for Symetra's allegation that the 2007 and 2008 GICs contained misrepresentations about the limits of Symetra's liability. A genuine issue of material fact exists over the question of whether Dr. Harris had the unilateral authority to direct Symetra about transfers of Plan assets and whether Dr. Harris's instructions for the transfers fell within the scope of the exculpatory language of the 2007 and 2008 GICs. Again, depending on a jury's view of the evidence, the finder of fact may decide that Dr. Harris had the authority to direct Symetra to make the transfers, meaning Symetra could receive the benefit of the exculpatory language of the GICs. Conversely, a reasonable jury could find that Dr. Harris lacked the authority to direct Symetra, leaving Symetra without the protection of the GICs' exculpatory language. The jury would then need to decide whether statements found in GICs drafted by Symetra contained misrepresentations

---

[39] The Tennessee Supreme Court in *Davis* enumerated a series of factors for juries to consider in deciding whether a party reasonably relied on a misrepresentation: (1) the plaintiff's sophistication and expertise in the subject matter of the representation, (2) the type of relationship— fiduciary or otherwise—between the parties, (3) the availability of relevant information about the representation, (4) any concealment of the misrepresentation, (5) any opportunity to discover the misrepresentation, (6) which party initiated the transaction, and (7) the specificity of the misrepresentation. *Davis*, 325 S.W.3d at 158.

attributable to AMEC and whether Symetra reasonably relied on the exculpatory language of the GICs. Both parties' Motions for Summary Judgment are **DENIED** as to this claim.

## V.    Symetra's Crossclaim for Common Law Indemnification

AMEC also seeks summary judgment on Symetra's crossclaim for common law indemnification. In addition to an express contractual provision for indemnification, Symetra alleges that AMEC has a common law duty to indemnify Symetra. Tennessee recognizes "an obligation to indemnify" by implication "from the parties' relationship." *AutoZone*, 737 F. Supp. 2d at 944 (citing *Houseboating Corp. of Am. v. Marshall*, 553 S.W.2d 588, 589 (Tenn. 1977)). "Courts will impose an implied obligation to indemnify when the obligation is a necessary element of the parties' relationship, or when justice and fairness demand that the burden of paying for the loss be shifted to the party whose fault or responsibility is qualitatively different from the other parties." *Winter v. Smith*, 914 S.W.2d 527, 542 (Tenn. Ct. App. 1995) (citing *Lusk v. Jim Walter Homes, Inc.*, 648 S.W.2d 935, 939 (Tenn. 1983) and *Velsicol Chem. Corp. v. Rowe*, 543 S.W.2d 337, 339 (Tenn. 1976)). "In the absence of an express contract, an obligation to indemnify will be implied only if the party from who [sic] indemnification is sought breached a contract or engaged in some other related tortious conduct." *Winter*, 914 S.W.2d at 542 (collecting cases).

The Court holds that requiring AMEC to indemnify Symetra is not warranted under the circumstances of the case. First, the relevant Plan Documents still give Symetra viable paths to receive contractual indemnification from AMEC. For example, if the jury decides that 2006 Plan Document took effect and Symetra was entitled to follow directions issued by the "Trustee" named in the Plan Document (Dr. Harris), the "Insurer Protective Clause" of the 2006 Plan Document will arguably entitle Symetra to seek indemnification from AMEC. And even if Symetra does not prevail on that theory, the jury could still decide Dr. Harris had the authority (actual or apparent) to act as

the trustee of the Plan and direct Symetra. The Court has already held that under this scenario, Symetra could arguably receive indemnification from AMEC based on the 1997 Plan Document's "Insurer Protective Clause." Allowing Symetra to pursue an additional claim for indemnification by implication would serve no purpose under these scenarios.

Granting Symetra an implied right to indemnification would be inequitable under the other possible outcomes of the case. In the event the jury decides the 2006 Plan Document never took effect and that Dr. Harris did not have the authority (either actual or apparent) to direct Symetra's actions, the equities would weigh against any right to common law indemnification. Those jury findings would suggest that Symetra itself bore responsibility for any liability incurred to any other party in the MDL with claims against Symetra, including AMEC. At bottom Symetra had an arms-length contractual agreement to provide financial services to AMEC and the Plan. The fact is a right to indemnity is not implied in every contractual relationship. *Time & Sec. Mgmt., Inc. v. Pittway Corp.*, 422 F.Supp.2d 907, 914 (W.D. Tenn. 2006); *Stiver Marketing, Inc. v. Performance Business Forms, Inc.*, No. 01-A-019108CH00276, 1991 WL 254564, at *4 (Tenn. Ct. App. Dec. 4, 1991).

And Symetra has not identified any other "unique special factors indicating the parties' intent that the party from whom indemnity is sought be ultimately liable" or shown why the "conduct of the parties or . . . nature of their relationship" warrants indemnity. *Employers Ins. Co. of Wausau v. Dan Walker Assocs., Inc.*, No. 22-cv-2530, 2024 WL 646375, at *4 (W.D. Tenn. Feb. 15, 2024) (citing *Striver Mktg.*, 1991 WL 25464 at *4). Aside from the parties' contracts, Symetra has argued that AMEC might be liable for the tort of negligent misrepresentation. But even that claim goes back to representations allegedly made by AMEC in the parties' contracts and the Plan Documents. In other words, AMEC's allegedly tortious conduct involved representations contained in written agreements, and not any other independent tortious act.

116

Lastly, Symetra has not shown why "justice and fairness demand that the burden of paying the loss be shifted to the party whose fault or responsibility is qualitatively different from the other parties." *Winter*, 914 S.W. 2d at 542. [40] In Symetra's view, "AMEC's failure to monitor the Plan's investments and its failure to supervise and oversee its own employee's investment decisions was tortious, and at least grossly negligent, if not reckless" and "caused 100% of the Plan's losses." Symetra's Resp. in Opp'n 33 (ECF No. 1092). AMEC obviously sees things differently. According to AMEC, the Church "depended on Symetra, as a financial specialist, to help ensure that its employees received maximum benefits from the Annuity Plan" only for Symetra to "enable[] Harris in his scheme that resulted in reports of Plan value that were false and grossly inflated." AMEC Mem. in Support 29 (ECF No. 1070-1).

Symetra's argument calls on the Court to make a determination of relative fault and before the parties have had an opportunity to present their cases to a jury. Generally speaking, the correct apportionment of fault in a negligence case is a fact question a trial court cannot decide as a matter of law on a Rule 56 motion for summary judgment. *Morgan v. Memphis Light Gas & Water*, No. W2016–01249–COA–R3–CV, 2018 WL 733217, at *8 (Tenn. Ct. App. Feb. 6, 2018). AMEC and Symetra will presumably have an opportunity to argue the comparative fault of a number of parties named in the MDL as part of the trial on their crossclaims.

---

[40] Another member of this Court has suggested that this species of implied indemnification may no longer be available under Tennessee law following the Tennessee Supreme Court's adoption of comparative fault in *McIntyre v. Balentine*, 833 S.W. 2d 52 (Tenn. 1992). *Siegel-Robert, Inc. v. United Inventory Servs., Inc.*, No. 07-1206, 2008 WL 11320194, at *3 (W.D. Tenn. Oct. 14, 2008). Judge Breen reasoned that implied indemnification based on "justice and fairness" "contemplated comparison of fault among joint tortfeasors and held that a tortfeasor guilty of only 'passive' negligence could recover from a tortfeasor guilty of 'active' negligence. Id. (quoting *Owens v. Truckstops of Am.*, 915 S.W. 2d 420, 433 (Tenn. 1996)). After the adoption of comparative fault, the Tennessee Supreme Court has held that "there can be no claim for indemnification based on active-passive negligence because that distinction is subsumed into the doctrine of comparative fault." *Id.* at 434. Neither party has addressed this precise issue, and so the Court finds it unnecessary to weigh in on the question.

117

At the end of the day, Symetra's argument on fault takes the Court back to square one. If Symetra is correct about Dr. Harris's authority to act as trustee, then Symetra will be entitled to contractual indemnification from AMEC. If Symetra is wrong (and Dr. Harris acted outside the scope of his authority), then Symetra will not be entitled to contractual indemnification, and any number of other parties, including the Estate of Dr. Harris, will potentially share in the fault. The dispute between AMEC and Symetra involves more than just an arms-length business relationship between a financial institution and an employer who sponsored a retirement plan. Weighing the equities under all of the circumstances, justice and fairness do not demand that AMEC indemnify Symetra. Therefore, AMEC's Motion for Summary Judgment is **GRANTED** on Symetra's claim for common law indemnification.

## VI. Symetra's Crossclaim for Contribution

AMEC finally seeks summary judgment on Symetra's crossclaim for contribution. As the Court explained at an earlier stage of the case, the remedy of contribution for tort claims in Tennessee was severely limited by the adoption of comparative fault in *McIntyre v. Balentine*, 833 S.W.2d 52 (Tenn. 1992). After *McIntyre*, the Tennessee Supreme Court held in *General Electric Co. v. Process Control Co.*, 969 S.W.2d 914 (Tenn. 1998) that a claim for contribution may proceed in the following circumstances:

> 1. Causes of action that arose prior to *McIntyre*, a suit was filed, and the parties made irrevocable litigation decisions based on pre-*McIntyre* law;
>
> 2. Cases in which joint and several liability continues to apply under doctrines such as the family purpose doctrine, cases in which tortfeasors act in concert or collectively with one another, cases in which the doctrine of respondeat superior permits vicarious liability due to an agency-type relationship, or in the "appropriate" products liability case; or
>
> 3. Cases in which fairness demands contribution.

*Process Control*, 969 S.W.2d at 916 (citations omitted).

118

The General Assembly codified these exceptions in the Uniform Contribution Among Tort-feasors Act, Tenn. Code Ann. § 29–11–101 *et seq.* Pursuant to Tenn. Code Ann. § 29–11–107(b)(1) and as a statutorily created exception to principles of comparative fault, Tennessee continues to recognize joint and several liability "[t]o apportion financial responsibility in a civil conspiracy among two (2) or more at-fault defendants who, each having the intent and knowledge of the other's intent, accomplish by concert an unlawful purpose, or accomplish by concert a lawful purpose by unlawful means, which results in damage to the plaintiff." Tenn. Code Ann. § 29–11–107(b)(1). The statute further provides that "[n]othing in this section limits the ability of the trier of fact to allocate fault to a nonparty to the suit, including . . . a settling party." § 29–11–107(d).

The Court holds that Symetra's claim for contribution fails as a matter of law. Under the Tennessee statute, joint and several liability is preserved only "[t]o apportion financial responsibility *in a civil conspiracy* among two (2) or more at-fault defendants." § 29–11–107(b)(1) (emphasis added). No party to the MDL has alleged that AMEC and Symetra conspired with each other to "accomplish by concert an unlawful purpose, or accomplish by concert a lawful purpose by unlawful means." *Id.* At summary judgment, Symetra has the burden, at a minimum, to show that some basis for joint and several liability exists in order to prove its claim for contribution. Without proof to show that any party has sought to hold AMEC and Symetra liable for conspiring to engage in tortious contract, there is no basis to hold AMEC and Symetra jointly and severally liable as a matter of Tennessee law. *Ferguson v. R.W. Fowler and Assocs.*, 18 F. App'x 372, 375 (6th Cir. 2001) ("The defendants correctly argue that contribution is not available [under Tennessee law] because they would not be jointly liable to Ferguson with Chemetals."). As a result, Symetra has no claim for contribution against AMEC.

119

Symetra's counterargument that the MDL Plaintiffs' damages model somehow preserves Symetra's right to seek contribution fails to convince. Symetra contends that the MDL Plaintiffs' proposed damages model fails to isolate and distinguish measures of damages caused by the alleged civil conspiracy and other measures of damages caused by other torts and non-torts committed by non-conspirators like AMEC. From Symetra's perspective, the damages model amounts to a kind of joint-and-several liability approach to proving the MDL Plaintiffs' losses.

The Court has discussed the MDL Plaintiffs' damages model and how it impacts the certification of the MDL Plaintiffs' class action claims in previously issued orders. *See* Order GIP, DIP Pls.' Renewed Mot. for Class Cert., Jan. 2, 2026 (ECF No. 1099). While it is true the Court has expressed concerns about the model's capacity to isolate damages for very specific acts, the Court has never found that the model somehow lumps all of the MDL Plaintiffs' damages flowing from all of their allegations, including their claims against AMEC, into one undifferentiated whole. The Court initially denied full class certification on all of the MDL Plaintiffs' causes of action and held the model did not properly account for how each cause of action worked. In fact, the Court never addressed whether the model accounted for damages only attributable to AMEC, largely because the MDL Plaintiffs reached a settlement with AMEC over a year ago. So the MDL Plaintiffs did not seek class certification of any class-action claim against AMEC. The Court therefore had no occasion to decide whether the MDL Plaintiffs' damages model provided a good fit with their theories of liability against AMEC. Symetra has not shown then why the MDL Plaintiffs' damages model supports its claim for contribution.

Symetra also seeks to avoid summary judgment by arguing that the MDL Plaintiffs have alleged that Symetra and Dr. Harris are liable for a civil conspiracy. The MDL Plaintiffs have therefore alleged a basis for their joint-and-several liability as co-conspirators. Symetra argues that

under basic principles of agency law, AMEC would be vicariously liable for Dr. Harris's conspiratorial acts carried out within the scope of his authority as an employee of the Church.[41] But Symetra has not shown how this makes out a claim for contribution against AMEC.

The question here is not whether Symetra has the right to seek contribution from an alleged conspirator, the Estate of Dr. Harris, or even whether AMEC can be held vicariously liable for conspiracy damages for which Dr. Harris might be jointly and severally liable. The question is can Symetra seek contribution for conspiracy damages under Tennessee law when there is no allegation the potential contributor was part of the conspiracy? Symetra's argument does not furnish an answer.

While the Court acknowledges the contingent nature of contribution claims generally, Symetra has not carried its burden to show why any genuine dispute of material fact should preclude summary judgment. Therefore, AMEC's Motion for Summary Judgment is **GRANTED** on Symetra's crossclaim for contribution against AMEC.

This concludes the Court's analysis of the issues presented in AMEC's Motion for Summary Judgment. Consistent with each ruling already announced, AMEC's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**.

The Court now turns to the remaining issues raised in Symetra's Motion for Partial Summary Judgment on the Church's crossclaims against it.

### VII. Statute of Limitations on AMEC's Crossclaims

---

[41] Symetra's argument on this point suffers from the same problem the Court identified in Symetra's implied indemnification argument. If Symetra is right and Dr. Harris acted within the scope of his authority and employment with AMEC, Symetra will have the benefit of the "Insurer Protective Clauses" found in both versions (1997 and 2006) of the Plan Document. In that case Symetra will be entitled to seek indemnification by contract. "Where the right of full indemnity exists between persons liable in tort, no right of contribution exists." *Craven v. Lawson*, 534 S.W.2d 653, 656 (Tenn. 1976). Symetra has not shown why it would be entitled to indemnification from AMEC as well as contribution from AMEC for its agent Dr. Harris's joint and several liability.

The next argument presented in Symetra's Rule 56 Motion concerns the timeliness of AMEC's crossclaims. Assuming a three-year statute of limitations applies to each of AMEC's causes of action, Symetra contends that the statute of limitations had run on each crossclaim by March 4, 2022, the date the first member case in the consolidated MDL was filed.

The Tennessee Supreme Court has explained that statutes of limitations are "shields, not swords" and reflect "a societal choice that actions must be brought within a certain time period." *Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 456 (Tenn. 2012) (citations omitted). Statutes of limitations under Tennessee law "(1) promote stability in personal and business relationships, (2) give notice to defendants of potential lawsuits, (3) prevent undue delay in filing lawsuits, (4) avoid the uncertainties and burdens inherent in pursuing and defending stale claims, and (5) ensure that evidence is preserved and facts are not obscured by the lapse of time or the defective memory or death of a witness." *Id.* (internal quotations marks and citations omitted). By enacting statutes of limitations, the Tennessee legislature presumes that "persons with the legal capacity to litigate will not delay bringing suit on a meritorious claim beyond a reasonable time." *Id.* (citations omitted).

The statute of limitations is an affirmative defense. Fed. R. Civ. P. 8(c); *Surles v. Andison*, 678 F.3d 452, 458 (6th Cir. 2012). When a party seeks judgment as a matter of law on a statute of limitations, the Court must decide two questions: "(1) whether the statute of limitations has run and (2) whether there exists a genuine issue of material fact as to when the plaintiff's cause of action accrued." *Henry v. Norfolk S. Ry. Co.*, 605 F. App'x 508, 510 (6th Cir. 2015) (quoting *Campbell v. Grand Trunk W. R.R. Co.,* 238 F.3d 772, 775 (6th Cir. 2001)).

As the party invoking the statute of limitations as an affirmative defense, Symetra has the

122

burden to prove that the statute of limitations has run on AMEC's crossclaims and that no genuine issue of material fact exists as to when the crossclaims accrued. *Id.* If Symetra can discharge its burden to show that the claims are now time barred, the burden shifts to AMEC to prove an exception to the statute of limitations. *Redwing,* 363 S.W.3d at 463–64, 467; *Lutz v. Chesapeake Appalachia, L.L.C.,* 717 F.3d 459, 464 (6th Cir. 2013).

The first disputed issue regarding the statute of limitations concerns the accrual date of AMEC's crossclaims. The parties agree that the MDL Plaintiffs filed the first member case on March 4, 2022, and that a three-year statute of limitations applies to each of AMEC's crossclaims. Only causes of action accruing after March 4, 2019 are therefore timely. The Court will assume without deciding that the parties' agreed facts on these points are true. If the crossclaims accrued before March 4, 2019, then AMEC has brought its Cross-Complaint out of time.

"A cause of action accrues when the plaintiff discovers it, that is, when the plaintiff knows or in the exercise of reasonable care and diligence should know that an injury has been sustained as a result of wrongful or tortious conduct by the defendant." *Hilliard*, 578 F. App'x at 563 (quoting *PNC Multifamily Cap. Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 544 (Tenn. Ct. App. 2012) (other citations omitted). In the context of a breach of duty, a plaintiff has no judicial remedy until the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, "(1) the occasion, the manner and means by which a breach of duty occurred that produced his injury; and (2) the identity of the defendant who breached the duty." *Foster v. Harris,* 633 S.W.2d 304, 305 (Tenn. 1982); *Hill v. A.O. Smith Corp.*, 801 F.2d 217, 225 (6th Cir. 1986) (holding that under Tenn. law, civil conspiracy claim accrued on the date the plaintiff "discover[ed] the source of the problem that formed the crux of their civil conspiracy claim").

And yet the statute of limitations "can begin to run before a plaintiff has actual knowledge of her legal claim, if she has learned of facts sufficient to put a reasonable person on notice that she has suffered an injury as a result of wrongful conduct." *Hilliard*, 578 F. App'x at 564 (quoting *Redwing*, 363 S.W.3d at 459) (cleaned up). The Tennessee Supreme Court has referred to this as "constructive notice" or "inquiry notice." *Redwing*, 363 S.W.3d at 459. "[I]nquiry notice charges a plaintiff with knowledge of those facts that a reasonable investigation would have disclosed," meaning "once a plaintiff gains information sufficient to alert a reasonable person of the need to investigate the injury, the limitation period begins to run." *Id.* (citations omitted). "In the mine run of such cases, what a plaintiff knew and when she came to know it is a fact question inappropriate for summary judgment," meaning the accrual date of a plaintiff's cause of action presents a jury question. *Hilliard*, 578 F. App'x at 564 (citing *City State Bank v. Dean Witter Reynolds, Inc.*, 948 S.W.2d 729, 735 (Tenn. Ct. App. 1996)); *Hill*, 801 F.2d at 225 (same).

The Court holds that a genuine dispute of material fact exists over when AMEC's crossclaims accrued. Symetra rightly argues that AMEC's crossclaims are based on discrete actions that occurred years, some even more than a decade, before 2019. For instance, Symetra followed Dr. Harris's instructions and began remitting administrative fees to Dr. Harris in 2002. All of the discrete acts were known to Dr. Harris, the Executive Director of the DRS and a general officer of the Church. Symetra transferred $10 million in Plan assets to FFF's Bear Stearns account in 2008 at the behest of Dr. Harris (and Eaton). Symetra argues then AMEC knew or should have known about each act forming the basis of AMEC's crossclaims and allegedly causing AMEC's injuries long before 2019.

Symetra's view of the evidence fails to examine the facts in a light most favorable to AMEC, as the Court must at summary judgment, particularly if a jury finds that Dr. Harris fraudulently

124

concealed his activities from other members of church leadership. Fraudulent concealment is a tolling exception that operates to toll the running of a statute of limitations "when the defendant has taken steps to prevent the plaintiff from discovering he [or she] was injured." *Redwing*, 363 S.W.3d at 462 (quoting *Fahrner v. SW Mfg., Inc.*, 48 S.W.3d 141, 146 (Tenn. 2001)) (internal quotation marks omitted). As an exception to the statute of frauds, AMEC has the burden to make out the elements of the defense.

To establish that the fraudulent concealment exception applies, a plaintiff must prove that: (1) the defendant affirmatively concealed the plaintiff's injury or failed to disclose material facts regarding the injury despite a duty to do so; (2) the plaintiff could not have discovered the injury despite reasonable care and diligence; (3) the defendant knew the plaintiff had been injured; and (4) the defendant concealed material information from the plaintiff by withholding information or making use of some device to mislead the plaintiff in order to exclude suspicion or prevent inquiry. *Id.* at 462–63 (quotation marks and citations omitted). Where it applies, the fraudulent concealment exception tolls the running of the statute of limitations "until the plaintiff discovers or, in the exercise of reasonable diligence, should have discovered the defendant's fraudulent concealment or sufficient facts to put the plaintiff on actual or inquiry notice of his or her claim." *Id.* at 463 (citation omitted).

Here, a factual dispute exists over whether Dr. Harris fraudulently concealed his activities from AMEC and therefore when AMEC could have or should have discovered its injuries and Symetra's alleged role in causing them. AMEC cites evidence Dr. Harris had reported to church leaders just before his retirement that the value of the Plan's assets was over $120 million when the Plan was really only worth $38 million. AMEC did not discover the losses to the Plan until September 2021, months after Dr. Harris had retired as Executive Director of the DRS. Symetra has

125

not cited any evidence to show that church leaders could have discovered a nearly $90 million shortfall in Plan value prior to that time.

Symetra's point about Dr. Harris acting as an agent and general officer of the denomination does not necessarily mean his knowledge is imputed to AMEC. As a general rule, a corporation is charged with "constructive knowledge regardless of its actual knowledge, of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of his employment within the scope of authority, even though the officer or agent does not in fact communicate his knowledge to the corporation." *Griffith Motors, Inc. v. Parker*, 633 S.W.2d 319, 322 (Tenn. Ct. App. 1982) (quoting 3 W. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 790)).

The Court continues to find that a genuine dispute of material fact exists over whether Dr. Harris had authority (actual or apparent) to represent AMEC and direct Symetra in the disposition of Plan assets and whether he was acting within the scope of that authority with respect to each of the transactions challenged by AMEC. The same fact questions concerning the scope of Dr. Harris's authority, if any, to select the investments and order the transfers can only be decided by a jury. And AMEC has persuasively argued as part of its defense that the adverse-interest exception to the general rule should apply.

An agent's knowledge is not imputed to the principal under the adverse-interest exception "where the agent is dealing with the principal in his own interests or where his interests are adverse to that of the principal so that it is to his own advantage not to impart his knowledge to the principal." *Parker*, 633 S.W.2d at 322; *see also Doe by Doe v. Piraino*, 688 F. Supp. 3d 635, 652 (M.D. Tenn. 2023) (citing *In re Fair Fin. Co.*, 834 F.3d 651, 677 (6th Cir. 2016)). AMEC cites evidence that Dr. Harris was acting in his own interests and his interests were adverse to AMEC's in

126

his dealings with Symetra. A reasonable jury could find from the proof that the adverse-interest exception applied and Dr. Harris's knowledge of the transactions should not be imputed to AMEC.

One more point bears discussion. Symetra argues that an exception to the adverse-interest exception applies in this case. The "sole actor" or the "sole representative" doctrine "holds that the adverse interest exception does not apply when the transaction on behalf of the principal to which notice is sought to be imputed is entrusted solely to the officer or agent having the knowledge." *Parker*, 633 S.W.2d at 322. "The rationale for the rule is that, when a corporation has only one representative, that sole representative has no one to whom to impart his or her knowledge and no one from whom he or she may conceal it." *Piraino*, 688 F. Supp. 3d at 652 (citing *Fletcher Cyclopedia of Corporations* § 819)). Just as a jury must decide the scope of Dr. Harris's authority to act on behalf of AMEC and the Plan, a genuine dispute over whether AMEC authorized Dr. Harris to act as its sole representative in transacting the Plan's business with Symetra remains for trial. A reasonable jury could find from the evidence that AMEC did not discover its injuries until September 2021 and Dr. Harris's knowledge of the true state of affairs is not properly imputed to AMEC. Therefore, Symetra's Motion for Partial Summary Judgment on the timeliness of AMEC's crossclaims must be **DENIED**.

## VIII.    AMEC's Proof of Causation and Damages

Symetra next moves for partial judgment as a matter of law on the issues of causation and damages as to all of AMEC's crossclaims. Symetra argues AMEC has no evidence to establish that any allegedly tortious conduct committed by Symetra was the cause of the Church's supposed damages. Symetra takes the position that "AMEC has produced no data or documents or admissible evidence of any kind supporting its claims for lost tithing, lost membership, lost clergy, lost reputation, or lost institutional value." Symetra Mem. in Support 28 (ECF No. 1072-1, PageID

41639). Just as Symetra argued AMEC's Cross-Complaint failed to allege damages to support it crossclaims at the pleadings stage, Symetra returns to the argument here.

Symetra's point that each of AMEC's crossclaims requires proof to show how Symetra's acts caused AMEC's damages is an accurate statement of Tennessee law. Generally speaking, a jury's "award of damages, which is intended to make a plaintiff whole, compensates the plaintiff for damage or injury *caused by* a defendant's wrongful conduct." *Dedmon v. Steelman*, 535 S.W.3d 431, 437 (Tenn. 2017) (emphasis added) (quoting *Meals ex rel. Meals v. Ford Motor Co.*, 417 S.W.3d 414, 419 (Tenn. 2013)). "A plaintiff may be compensated for any economic or pecuniary losses that *naturally result* from the defendant's wrongful conduct." *Meals*, 417 S.W.3d at 419 (emphasis added) (citing *Inland Container Corp. v. Mar.*, 529 S.W.2d 43, 44 (Tenn. 1975)). "The party seeking damages has the burden of proving them." *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 703 (Tenn. Ct. App. 1999). In order to recover from Symetra then, AMEC has the burden to show that some wrongful conduct committed by Symetra caused or resulted in AMEC's damages or injury.

Furthermore, each of AMEC's crossclaims against Symetra requires proof of causation to trace or connect AMEC's damages to some tortious act committed by Symetra. AMEC alleges the following crossclaims against Symetra: breach of fiduciary duty, negligence, fraudulent concealment, civil conspiracy, and aiding and abetting. Each cause of action requires AMEC to show how Symetra's conduct caused or resulted in damage to AMEC. *White v. Miller*, No. M2018-00381-COA-R3-CV, 2018 WL 4847109, at *3 (Tenn. Ct. App. Oct. 5, 2018) (breach of fiduciary duty requires proof of "injury to the plaintiff or benefit to the defendant as a result of that breach"); *Tumminello v. Father Ryan High Sch., Inc.*, 678 F. App'x 281, 286–87 (6th Cir. 2017) (citing *West v. E. Tenn. Pioneer Oil Co.*, 172 S.W.3d 545, 550 (Tenn. 2005) and defining an injury or loss, cause in fact, and proximate or legal cause as elements of negligence); *Saltire Indus., Inc. v. Waller,*

128

*Lansden, Dortch & Davis, PLLC*, 491 F.3d 522, 527 (6th Cir. 2007) (citing *Justice v. Anderson Cnty.*, 955 S.W.2d 613, 616 (Tenn. Ct. App. 1997) and defining fraudulent concealment to include proof of damage to the plaintiff "as a result of the concealment or suppression of the fact"); *Morrow v. Kroger Ltd. P'ship I*, No. 2:24-cv-02564-SHL-cgc, 2025 WL 367404, at *5 (W.D. Tenn. Jan. 29, 2025) (citing *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006) and defining "injury as a result" of a civil conspiracy as an element of the claim); *PNC Multifamily Cap. Inst. Fund XXVI*, 387 S.W.3d at 552 (quoting *Restatement of Torts* § 876 (1934 & 2004 Supp.) and defining aiding and abetting to include "harm resulting to a third person from the tortious conduct of another").

All of this to say, to prevail on each of its crossclaims against Symetra, AMEC must show that Symetra's tortious act(s) caused AMEC's damages. Questions of causation are "usually treated as questions of fact." *Leatherwood v. Wadley*, 121 S.W.3d 682, 694 (Tenn. Ct. App. 2003). For example, in the context of ordinary negligence, cause in fact and proximate cause are "ordinarily jury questions, unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome." *Hale v. Ostrow*, 166 S.W.3d 713, 718 (Tenn. 2005); *see also Wilson v. Americare Sys., Inc.*, 397 S.W.3d 552, 559 (Tenn. 2013) ("Where the evidence supports more than one reasonable conclusion, causation in fact and proximate causation are issues of fact which should be decided by the jury and not the [] court."). Because causation is an essential element of each of AMEC's crossclaims against Symetra and typically a fact question, the Court holds that Symetra has not shown why it is entitled to judgment as a matter of law on the issue.

The issue presented then is whether Symetra has shown as a matter of law that no genuine issue of material fact remains for trial on damages. In the normal course, a defendant is not entitled

129

to summary judgment on the question of damages. In Tennessee, "the ascertainment of damages is a question of fact for the jury." *McClay v. Airport Mgmt. Servs., LLC*, 596 S.W.3d 686, 690 (Tenn. 2020) (collecting cases). This includes "the type and amount of any damages" to be awarded to the prevailing party. *Borne v. Celadon Trucking Servs., Inc.*, 532 S.W.3d 274, 308 (Tenn. 2017) (citing *Meals*, 417 S.W.3d at 419–20). The same is true for non-economic damages. *Id.* (assuming without deciding that the question of non-economic damages is a question of fact for a jury and that a plaintiff has the right to a jury determination of non-economic damages).

### A. AMEC's "Financial Harm" Damages

With that legal standard in mind, the Court holds that Symetra has not shown why it is entitled to summary judgment on the issue of damages. AMEC's Second Amended Cross-Complaint makes general allegations about two types of damages: "financial harm" and "significant reputational and structural harm." Second Am. Cross-Compl. ¶¶ 195, 197. The "financial harm" consists of the loss of money used by the Church to establish the Plan and fund contributions to the Plan for the benefit of church employees. *Id.* ¶ 198.[42] At the pleadings stage, the Court held that AMEC's allegation of "financial harm" is something other than merely the loss of the Plan's assets and represents a separate injury to AMEC's finances.

At summary judgment, AMEC has carried its burden to prove its allegation about "financial harm," albeit narrowly. AMEC cites the deposition testimony of Bishop James Davis. Bishop Davis testified in relevant part that the denomination had plans to reduce its operating budget by 25 percent, though the purpose of this budget proposal was not entirely clear. Davis Dep. 173:7–175:3,

---

[42] AMEC's Amended Cross-Complaint (ECF No. 256) alleged that the Church had been forced to "replenish the Plan funds that were lost due to the negligence of Newport . . . ." Am. Cross-Compl. ¶ 60. No such allegation concerning damages caused by Symetra appeared in the pleading, and nothing of that sort appears in the Church's Second Amended Cross-Complaint against Symetra.

Jan. 8, 2025 (ECF No. 1095-30). Bishop Davis explained that the Church intends to make plan participants whole by replacing every dollar of contributions that participants had lost plus interest. *Id.* at 177:15–25. Elsewhere, Bishop Davis also testified that the Church had raised $10 million of the $20 million total AMEC had agreed to pay the MDL Plaintiffs in settlement of their dispute by borrowing against other unspecified property. *Id.* at. 192:12–25. It is not clear whether the budget cut of 25 percent was necessary to fund AMEC's settlement with the MDL Plaintiffs or whether the budget cut was being used to make the legacy plan "whole." And Bishop Davis did not describe how the budget cut impacted church operations or how long the cut would remain in effect to fund the settlement and/or meet the Church's commitment to make plan participants whole.

Testimony from other church leaders fills the gap, at least in part. AMEC also cites the deposition testimony of Bishop Marvin C. Zanders II, for the proposition that the Church intends to "recoup plan participants' losses that it has paid from those it believes to be culpable." AMEC Statement of Add'l Fact ¶ 79. Bishop Zanders testified that one proposal under consideration called for the denomination to use 25 percent of "connectional budget" funds contributed by "each Episcopal district" for a period of 13 to 15 years. Zanders Dep. 141:17–22, Jan. 9, 2025 (ECF No. 1095-31). The Church would transfer the funds raised in this manner directly to the legacy plan. *Id.* Bishop Zanders testified, though, that the General Board had not voted to adopt the plan, at least to his knowledge and as of the time of his deposition. *Id.* at 142:9–14.

The testimony of Bishop Davis and Bishop Zanders is somewhat ambiguous. The losses they describe could simply refer to the Church's $20 million settlement with Plaintiffs. In point of fact, AMEC's settlement with the MDL Plaintiffs was a settlement of claims Plaintiffs and other plan participants had alleged against the denomination for losses caused by AMEC, not other parties. The proof about the amount of AMEC's settlement with the MDL Plaintiffs might be relevant to a claim

131

for indemnification or contribution. Those are not claims, however, the Church has actually alleged.

AMEC's burden at summary judgment is to show that Symetra's acts caused or resulted in "financial

harm" to the Church.[43]

Viewing the evidence in a light most favorable to AMEC, though, the testimony of the

bishops could be understood to describe the "financial harms" alleged in the Second Amended

Cross-Complaint. Bishop Davis affirmed that AMEC reached the settlement with Plaintiffs not as an

admission of fault but to make its clergy whole, even if the Church had to make other sacrifices,

while the Church pressed its claims for relief against other parties to hold them accountable. There

also exists a jury question over whether Symetra caused financial harm to AMEC and whether

AMEC's $20 million settlement with Plaintiffs and/or the Church's proposal to divert 25 percent of

its connectional budget in an effort to make the legacy plan whole produces an accurate measure of

that harm. The Court concludes that the testimony of Bishop Davis and Bishop Zanders is enough to

show that the Church suffered some form of financial harm and that the Church would hold Symetra

responsible for that harm. Therefore, Symetra's Motion for Summary Judgment must be **DENIED**

on this issue.

### B. AMEC's Damages for "Reputational and Structural Harm"

AMEC's Second Amended Cross-Complaint alleged another type of damage, "reputational

and structural harm" in the form of "reduced tithing, shrinking membership, and the resignation of

clergy" and, even more broadly, "incalculable harm to the unity of the Church." Second Am. Cross-

Compl. ¶ 196. As a threshold matter, AMEC has cited no evidence to support its claim about a

---

[43] As the Court emphasized at the pleadings stage and at many other times throughout the MDL, the Church must show that it suffered losses of its own, not just losses that are properly considered the losses of the Plan itself. For reasons the Court has explained elsewhere, the MDL Plaintiffs have pursued derivative claims on behalf of the Plan and therefore the recovery they seek in a real way is a recovery of the Plan's losses. The point is AMEC can pursue damages of its own but not the damages suffered by the Plan.

132

reduction in tithing. Reduced donations to a religious organization or any other charitable institution relying on the goodwill of its supporters seems like a natural consequence when the organization loses that goodwill.  In other words, reduced giving might be an appropriate measure of damages for reputational harm. The notion is analogous to a loss of profit suffered by a corporation. Like other measures of damages, the existence and amount of damages for lost profits is a question of fact. *Eggert v. Meritain Health, Inc.*, 428 F. App'x 558, 563 (6th Cir. 2011) ("The determination of the existence and amount of the lost profits is a question of fact" under Ohio law); *Riverside Coal Co. v. United Mine Workers of Am.*, 410 F.2d 267, 274 (6th Cir. 1969) (applying the Labor Management Relations Act of 1947 and Kentucky law).

Regardless of the correct legal standard for analyzing the claim, the fact is AMEC has cited no proof to show that the Church has experienced a reduction in tithing or giving, much less that the reduction was caused by Symetra. The Church's Rule 30(b)(6) representative, Rev. Brian Blackwell, testified that the denomination does not track the amount of overall tithing. Blackwell Dep. 265:17–20, Aug. 28, 2025 (ECF No. 1095-32). While Rev. Blackwell speculated that some other office within the denomination might have the information, AMEC has not cited any evidence of the sort. Without that or some similar proof, there is no evidence from which a reasonable jury could find that Symetra's conduct caused a reduction in tithing. Therefore, Symetra's Motion for Summary Judgment is **GRANTED** on this issue.

By contrast, AMEC has carried its burden to prove the Church has lost membership and had clergy resign due in part to the scandal related to the Plan. AMEC has introduced proof that the Church has experienced membership decline since September 2021 when the Plan's lost funds first came to light. The declines have been more noticeable in some of its districts, like the Ninth District specifically. *Id.* at 267:5–19. AMEC does not explain what the Ninth District is or why its decline in

133

membership might stand out. There is also proof that at least one member of the clergy resigned over the revelations about the Plan's losses. *Id*. at 267:20–268:6. While the evidence cited is by no means conclusive, AMEC has met its burden to adduce slightly more than a scintilla of evidence to support its theory of reputational harm.

The Court pauses to note that AMEC has also disclosed opinion evidence from J. Lester Alexander, an expert witness who has opined on "whether AMEC suffered reputational harm affecting the 'enterprise value'" of the denomination and, assuming the Church has, "to quantify the resulting diminution in value." AMEC Resp. in Opp'n 48 (ECF No. 1094). Under Tennessee law, the existence and amount of damages based on diminished value is a question of fact. *Keller v. Estate of McRedmond*, No. M2019-00094-COA-R3-CV, 2020 WL 5648758, at *3 (Tenn. Ct. App. Sept. 22, 2020). Symetra argues that if the Court excludes Mr. Alexander's opinion evidence, AMEC has no proof to establish its damages.

On July 2, 2026, after the parties had fully briefed their Rule 56 Motions, the United States Magistrate Judge granted Symetra's motion to exclude Mr. Alexander's opinions on diminished value. Order GIP, DIP Mots. to Exclude (ECF No. 1195). The Magistrate Judge held that Mr. Alexander could properly assume the fact that Symetra's acts and omissions had caused the damages claimed by AMEC. *Id*. at 29–33. But the Magistrate Judge concluded that Mr. Alexander's opinion evidence on the impaired value of the Church as a denomination did not have a reliable basis, specifically, his opinion that AMEC's diminished value could be calculated based on a risk premium of 9% as opposed to some other percentage. *Id*. at 33–39.

While the parties disagree over the reliability of the opinion evidence given by Mr. Alexander, the exclusion of Mr. Alexander's opinions about AMEC's diminished value does not mean Symetra is entitled to judgment as a matter of law on the issue of AMEC's damages. The

134

Church has not relied exclusively on Mr. Alexander's opinions regarding damages. AMEC has also cited testimony from church leadership about a decline in membership and the broader effects of the scandal on church finances. The Court holds that AMEC can rely on the testimony of church officers and others in positions of authority to opine on causation and damages in this manner. *See* Fed. R. Evid. 701, advisory committee notes to the 2000 amendments ("[M]ost courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert."); *Lativafter Liquidating Tr. v. Clear Channel Comm'ns, Inc.*, 345 F. App'x 46, 51 (6th Cir. 2009) (holding that a corporation's board member and investor with research into the company's financial condition had "personal, particularized knowledge of [the company]'s value" and could therefore testify about its "projected value"); *Gary R. Prince Revocable Tr. v. Blackwell*, 735 F.Supp.2d 804, 820 (M.D. Tenn. 2010) (holding that "persons engaged in business can, by virtue of their experience, testify as to expected losses even if the subject matter is specialized or technical because the testimony is based upon personal knowledge"). Even if Mr. Alexander's testimony is excluded at trial, the testimony of church leadership is enough to send the question of damages related to reputational harm to a jury.

Symetra further argues that without documentary proof to show the dollars and cents of AMEC's damages, AMEC has failed to prove both causation and damages. Demanding documentary proof to reflect the proper measure or valuation of AMEC's injury sets the bar too high. "Once an injured party proves that it has been damaged, the amount of the damages need not be proved with certainty or mathematical precision." *Waggoner Motors, Inc. v. Waverly Church of Christ*, 159 S.W.3d 42, 58 (Tenn. Ct. App. 2004) (citing *McClain v. Kimbrough Constr. Co.,* 806 S.W.2d 194, 200 (Tenn. Ct. App. 1990)). This is particularly true for non-economic damages like reputational and structural harm. *Meals*, 417 S.W.3d at 420 (holding that "a plaintiff is generally not

135

required to prove the monetary value of non-economic damages"). Although "[d]amages may never be based on speculation or conjecture," *Overstreet*, 4 S.W.3d at 703, "damages become too speculative only when the existence of damages is uncertain, not when the precise amount is uncertain." *Waggoner Motors*, 159 S.W.3d at 57.

Overall, AMEC's proof related to causation and damages presents a close call. But the Court's task in deciding the parties' Rule 56 Motions is not to weigh the evidence marshaled by the Church. The issue for the Court to decide is whether a reasonable jury could find for AMEC on the questions of causation and damages. The Court holds that triable issues exist over the nature and extent of the Church's damages and, more fundamentally, whether any action taken by Symetra was the cause of or resulted in AMEC's damages in the first place. The evidence when viewed in a light most favorable to AMEC suffices to raise a jury question over whether Symetra's actions caused an injury to AMEC and the amount or extent of AMEC's damages. The one exception is AMEC's claim over lost or reduced tithing. Therefore, Symetra's Motion for Summary Judgment is **GRANTED in part and DENIED in part** on this issue.

## IX. AMEC's Crossclaim for Breach of Fiduciary Duty

Symetra next moves for judgment as a matter of law on AMEC's crossclaim for breach of fiduciary duty. In order to recover for breach of fiduciary duty, a plaintiff must establish: (1) a fiduciary relationship, (2) breach of the resulting fiduciary duty, and (3) injury to the plaintiff or benefit to the defendant as a result of that breach. *Faber v. Ciox Health, LLC*, 331 F. Supp. 3d 767, 780 (W.D. Tenn. 2018) (citing *In re Estate of Potter*, 2017 WL 4546788, at *2 (Tenn. Ct. App. Oct. 11, 2017) and *Ann Taylor Realtors, Inc. v. Sporup*, No. W2010–00188COA–R3–CV, 2010 WL 4939967 (Tenn. Ct. App. Dec. 3, 2010)); *see also* 37 C.J.S. *Fraud* § 15 (2008).

136

Symetra first argues AMEC has no proof to support its allegation that Symetra was a fiduciary of the Church. "A fiduciary is a person holding the character of a trustee who bears the duty to act primarily for the benefit of another." *Sanford v. Waugh & Co., Inc.*, 328 S.W.3d 836, 843 (Tenn. 2010) (citing *McRedmond v. Estate of Marianelli*, 46 S.W.3d 730, 738 (Tenn. Ct. App. 2000)). A fiduciary duty is the highest standard of duty under the law. *Overstreet v. TRW Com. Steering Div.*, 256 S.W.3d 626, 642 (Tenn. 2008) (citation omitted). In Tennessee, a party can be either a fiduciary *per se* or a fiduciary due to a confidential relationship. *Faber*, 331 F.Supp.3d at 780 (citing *Grant v. Tucker*, 57 F.Supp.3d 852, 859 (M.D. Tenn. 2014)).

The Court addressed the same issue at the pleadings stage, when it denied Symetra's motion to dismiss AMEC's breach-of-fiduciary-duty claim. Order GIP, DIP Symetra's Mot. to Dismiss, Sept. 23, 2025 (ECF No. 958). That ruling is worth revisiting before the Court takes up Symetra's Rule 56 arguments. The Court's discussion focused on what AMEC's Second Amended Cross-Complaint had not alleged. There was no factual predicate to show the existence of a confidential relationship between the Church and Symetra. And none of the facts alleged supported the conclusion that Symetra acted as a fiduciary *per se*. AMEC alleged three critical facts, all to show that Symetra had become a fiduciary: (1) Symetra was "the carrier of tens of millions of dollars of Plan funds"; (2) Symetra "had authority and control respecting management or control of Plan assets"; and (3) Symetra had a "custom and practice of providing investment advice and compliance advice." Second Am. Cross-Compl. ¶ 419. The Court held that none of these facts, however, made Symetra a fiduciary *per se*. ("In sum, AMEC's allegations do not show why Symetra became AMEC's fiduciary *per se* or how the parties had a confidential relationship."). Order GIP, DIP Mot. to Dismiss 27.

AMEC's claim for breach of fiduciary duty only survived Symetra's motion to dismiss based on the Church's allegations that Symetra in essence "facilitated a dramatic shift away from AMEC's stated objective of investing in conservative annuities toward higher risk investments in other asset classes outside of the Plan's Symetra account." *Id*. at 29. And "Symetra knew or should have known Harris's self-serving representations about his authority to act or his unilateral role in plan administration were utterly false when he made them." *Id*. So if AMEC was going to hold Symetra liable as a fiduciary, it could only be on this specific and limited basis. Otherwise, the facts alleged in AMEC's Second Amended Cross-Complaint failed to show why Symetra owed the Church any fiduciary duty.

The Court stopped short of a definitive holding about Symetra's status as a fiduciary. Recognizing that the question required "a fact-intensive inquiry," *In re Regions Morgan Keegan ERISA Litig.*, 692 F. Supp. 2d 944 (W.D. Tenn. 2010), the Court reserved "a final determination of the existence of or the precise scope of Symetra's fiduciary duty to the Church" for summary judgment. Order GIP, DIP Mot. to Dismiss 30. Having framed the inquiry and given the parties a full opportunity for discovery, Symetra now returns to the issue as part of its request for judgment as a matter of law.

At summary judgment, Symetra makes three points to show that it was not a fiduciary. First, Symetra argues that rather than showing Symetra was a "carrier of Plan funds," the proof shows Symetra simply sold the Plan an annuity, a fact which did not make Symetra a fiduciary, both as a matter of ERISA law and Tennessee insurance law. Second, AMEC has no proof Symetra "had authority and control respecting management or control of Plan assets," particularly in light of the provisions of the 2006 Plan Document. Third and finally, AMEC has no evidence Symetra ever

138

rendered investment advice to the Church for a fee. The proof shows Symetra merely sold its own annuity products to the Plan.

AMEC counters that the proof shows Dr. Harris relied on Symetra to assist him in carrying out his own fiduciary duties and advised him on other investments for the Plan like real estate and the amount of administrative fees to which he was entitled. AMEC also takes the position that Symetra had discretion over whether to follow Dr. Harris's directives about the movement of Plan assets out of the Symetra annuity account.

The issue presented is whether Symetra owed AMEC a fiduciary duty by virtue of the facts and circumstances surrounding the parties' relationship. Ultimately, whether Symetra owed AMEC a fiduciary duty is a question of law for the Court to decide. *EPAC Techs., Inc. v. HarperCollins Christian Publishing, Inc.*, 398 F. Supp. 3d 258, 270 (M.D. Tenn. 2019) (citing *Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993)); *see also Hamilton v. Carell*, 243 F.3d 992, 997 (6th Cir. 2001) ("Where the facts are not in question, a party's status as an ERISA fiduciary is purely a question of law."); *Petroleum Enhancer, LLC v. Woodward*, 690 F.3d 757, 766 (6th Cir. 2012) (same and applying Michigan law). The Court holds that even under the most favorable view of the evidence, AMEC has not carried its burden to show why Symetra became a fiduciary and therefore owed the denomination a fiduciary duty to act in AMEC's best interests.

First, Symetra did not become a fiduciary simply because it sold an annuity. The Court covered most of the relevant law on this point in its decision on Symetra's motion to dismiss. As a general rule, parties dealing at arm's length "lack the sort of relationship of trust and confidence that gives rise to a fiduciary relationship." *Dick Broadcasting Co., Inc. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 674 (Tenn. 2013) (Koch, J., concurring). Perhaps not surprisingly then, courts have held that under ERISA "the mere payment of claims or sale of annuity contracts does not render an

139

insurer a 'fiduciary' within the meaning of ERISA." *James v. Provident Nat. Assur. Co.*, 865 S.W.2d 23, 25 (Tenn. Ct. App. 1993) (holding that an insurance company's performance of "ministerial functions at [the plan sponsor's] direction" did not meet ERISA's statutory definition of a "fiduciary").

These well-established principles of Tennessee law cut against any finding that Symetra acted as a fiduciary. There is no real dispute that the relationship between Symetra and AMEC was contractual, although the undisputed proof shows that AMEC was party to only one annuity contract with Symetra, the 2007 Annuity Contract. The parties to the 2001 Annuity Contract, the original annuity agreement purchased the Plan assets, were the Plan itself and Symetra's corporate predecessor Safeco. In any event, the law presumes that arms-length business dealings of this sort, particularly limited as they were to the sale of an annuity, do not give rise to a fiduciary relationship.

Second, there is no evidence Symetra had responsibility for management or control of any Plan assets. Drawing again on the ERISA analogy, an annuity company does not exercise "discretionary control over the management of plan assets or the administration of the plan" simply by selling an annuity. *Flacche v. Sun Life Assur. Co. of Canada (U.S.)*, 958 F.2d 730, 734–35 (6th Cir. 1992). The undisputed evidence at this stage of the case shows that Symetra sold annuity products and assumed certain contractual obligations which included following the Plan's directives for issuing annuities or making cash distributions to plan participants and beneficiaries. The fact that Symetra carried out these functions as part of its contractual obligations did not somehow elevate it to fiduciary status.

Different writings exchanged by the parties spell this out. The 2001 RSA, a document signed by AMEC and the Plan but not by Symetra, "limited" Symetra's "participation in the Plan" "to providing such investment products as may be purchased by the Plan Trustee(s) and the services

described above." The 2003 RSA went further and stipulated that Symetra was "not and shall not become a Plan fiduciary" and "shall not exercise any discretionary authority or control with respect to the administration of the Plan or management of Plan assets." The 2003 RSA vested responsibility for "[a]ll matters relating to the administration of the Plan or the investment of Plan assets" with AMEC "or another Plan fiduciary," but not Symetra.

While it is true questions of fact remain over whether the RSAs became legally binding on the parties, there is no genuine dispute that the parties conducted their affairs as though the agreements governed. Regardless, the fact remains that Symetra's responsibilities to AMEC were defined in the parties' contracts, not driven by a hypothetical duty to act in AMEC's best interests. Nothing about Symetra's role in carrying out functions of Plan administration suggest that AMEC relied on Symetra to act in the best interests of the denomination.

This just leaves AMEC's theory that Symetra became a fiduciary by rendering investment advice to the Church for a fee. The Tennessee Court of Appeals has held that those who broker or render investment advice to clients can take on fiduciary status, depending "on the degree of discretion the client has entrusted to the broker or advisor." *Orlowski v. Bates*, 146 F.Supp.3d 908, 927 (W.D. Tenn. 2015) (quoting *Johnson v. John Hancock Funds*, 217 S.W.3d 414, 428 (Tenn. Ct. App. 2006)).  The execution of a "non–discretionary and at arm's length" transaction, for example, "a simple order to buy or sell a particular stock," does not take on a fiduciary character.  *Id*. However, a broker or advisor who is asked for and gives professional investment advice or who has discretion to select investments for the client has "broad fiduciary obligations that extend beyond the individual transactions." *Id*.

The Court holds that there is no proof Symetra ever rendered investment advice to AMEC. Not only is the claim at odds with the parties' writings limiting Symetra's discretion over Plan

141

investments, AMEC has cited no evidence Symetra advised the Church about the Plan's investments. AMEC focuses on Dr. Harris's dealings with Symetra: his reliance on Symetra to assist him in carrying out his own fiduciary duties, his discussions with Symetra employees about investing the Plan's assets in real estate, and his consultation with Symetra about the amount of administrative fees to which he was entitled under church policy. But each piece of evidence concerns the relationship between Symetra and Dr. Harris, not AMEC.

Even assuming *arguendo* Dr. Harris reposed a certain confidence in his contacts at Symetra, it is not at all clear why Dr. Harris's supposed reliance on Symetra created a confidential relationship between AMEC and Symetra. AMEC's focus on Dr. Harris's activities appears to be inconsistent with its overall theory of the case that Dr. Harris acted without authority from the Church. There is no genuine dispute AMEC designed its Plan to invest in annuities and in 2001 authorized Dr. Harris to move the Plan's annuity business to Symetra with a transfer of nearly $50 million in Plan assets, an amount which at the time represented the entire corpus of the trust.

A genuine dispute remains, as ever, over the critical issue of whether Dr. Harris acted with authority (actual or apparent) over the investment and transfer of Plan assets, and relatedly, whether the 2006 Plan Document vesting Dr. Harris with broader powers as trustee ever took effect. The Court has already concluded a reasonable jury could find for AMEC on these issues and decide that Dr. Harris exceeded the scope of his authority by ordering Symetra to transfer Plan assets out of the Symetra annuity account to much more speculative investments. But these findings arguably cut against any inference that AMEC had a confidential relationship of sorts with Symetra. If anything, the most favorable view of the evidence would suggest Symetra was Dr. Harris's fiduciary, but not AMEC's.

142

All of this means AMEC has not shown why Symetra became a fiduciary, either a fiduciary *per se* or arising out of some confidential relationship between the parties. AMEC defends its fiduciary duty claim at summary judgment by suggesting that Symetra became its fiduciary through a kind of confidential relationship. Putting aside the fact that the Plan, and not AMEC, was the original party to the 2001 Annuity Contract with Symetra, AMEC argues that the Church's relationship with Symetra took on a fiduciary character based on the unique circumstances of the parties' business dealings: the Church's intent to invest the Plan's assets in conservative annuities, AMEC's decision to use all the Plan's assets to purchase an annuity contract with Symetra, and the fact that Symetra never properly confirmed Dr. Harris's authority to direct the Plan's investments. For reasons the Court has now discussed at several points in this decision, AMEC has shown that each of these propositions has evidentiary support in the record and that a genuine dispute of fact exists over the extent of Dr. Harris's authority to act unilaterally.

Even so, AMEC has not identified any legal authority to show why these contentions, accepting each as true and viewing them in a light most favorable to AMEC, add up to a fiduciary relationship. Tennessee insurance law illustrates the problem with AMEC's theory about Symetra's fiduciary duty. In Tennessee, "insurance policies are contracts of the utmost good faith and must be administered and performed as such by the insurer." *Thompson v. Am. Gen. Life and Acc. Ins. Co.*, 404 F. Supp. 2d 1023, 1029 (M.D. Tenn. 2005) (citing *MFA Mut. Ins. Co. v. Flint,* 574 S.W.2d 718, 720 (Tenn. 1978)). The Tennessee Supreme Court has held that this implied covenant of good faith and fair dealing, inherent in every insurance contact, "goes deeper than the mere surface of" a contract of insurance. *Flint*, 574 S.W.2d at 720. But even then, "no fiduciary relationship exists between an insurer and its insured," for example, "when the company is settling a claim directly with its insured." *Id.*

143

The problem for AMEC is that "an annuity contract is not a contract of insurance." *Mercy v. Olsen*, 672 S.W.2d 196, 198 (Tenn. 1984). To the extent the two types of agreements bear any resemblance, AMEC has cited, and the Court has located, no Tennessee legal authority for idea that an annuity contract includes an implied covenant of good faith, much less that a company selling an annuity can become a fiduciary to the owner of the contract. *See Whitman v. Tucker*, 779 F. App'x 336, 341 (6th Cir. 2019) ("The considerations that underlie imposing extracontractual duties on an insured simply do not extend to annuities.") (applying Ohio law). This forecloses any notion that by purchasing an annuity, AMEC had a fiduciary relationship with Symetra.

All of this leads to the inevitable conclusion that Symetra did not owe AMEC a fiduciary duty born out of the facts and circumstances of their annuity contract. The Court concludes that AMEC has not carried its burden of proof to establish the existence of a fiduciary relationship between AMEC and Symetra. Therefore, Symetra's Motion for Partial Summary Judgment is **GRANTED** as to AMEC's claim for breach of fiduciary duty.

## X. AMEC's Crossclaim for Negligence

Symetra also moves for judgment as a matter of law on AMEC's crossclaim for ordinary negligence. One of the elements of AMEC's crossclaim for common law negligence is "a duty of care owed by the defendant to the plaintiff." *Tumminello*, 678 F. App'x at 286–87 (citing *West v. E. Tenn. Pioneer Oil Co.*, 172 S.W.3d 545, 550 (Tenn. 2005)). "In general, all persons have a duty 'to use reasonable care to refrain from conduct that will foreseeably cause injury to others.'" *Biscan v. Brown*, 160 S.W.3d 462, 478 (Tenn. 2005) (quoting *Turner v. Jordan*, 957 S.W.3d 815, 818 (Tenn. 1997)). "To determine whether a particular defendant owes a duty of care to a particular plaintiff," Tennessee courts "balance the foreseeability and gravity of the potential harm against the feasibility and availability of alternatives that would have prevented the harm." *Hale*, 166 S.W.3d at 716–17.

144

The question of duty is "entirely a question of law for the court." *Power & Tel. Supply Co., Inc. v. SunTrust Banks, Inc.*, 447 F.3d 923, 932 (6th Cir. 2006) (citing *Bradshaw*, 854 S.W.2d at 869).

The Court holds that Symetra owed AMEC an ordinary duty of care under the circumstances. At the pleadings stage, the Court reached the same result.

> AMEC alleges "[i]t was foreseeable that an individual purporting to be the sole Trustee could mishandle and mismanage funds invested in a group retirement plan." Second Am. Cross-Compl. ¶ 462; *see also Biscan*, 160 S.W.3d at 480 ("Although all the balancing considerations are important, the foreseeability prong is paramount because foreseeability is the test of negligence.") (cleaned up). According to AMEC, Symetra "failed to establish and maintain controls to protect the Plan from unauthorized transfers and activity." Second Am. Cross-Compl. ¶ 462. Balanced against "the feasibility and availability of alternatives that would have prevented the harm," the risk and gravity of the potential harm creates an unreasonable risk. *Hale*, 166 S.W.3d at 716–17.

Symetra has not shown why the proof at summary judgment requires a different result.

Symetra contends that AMEC has no evidence to show why Symetra owed the Church any duty of care. In Tennessee, legal duties can arise in a number of ways: "from statutes or by operation of the common law," *West v. Shelby Cnty. Healthcare Corp.*, 459 S.W.3d 33, 47 (Tenn. 2014); "by implication of law" or "the relation or situation of the parties" or "the circumstances surrounding or attending an occurrence or transaction." *Int'l Harvester Co. v. Sartain*, 222 S.W.2d 854, 867 (Tenn. Ct. App. 1949). Under Tennessee law, every contract includes a common-law duty to perform "with care, skill, reasonable expediency and faithfulness the thing they agreed to be done." *Federal Ins. Co. v. Winters*, No. E2009–02065–COA–R3–CV, 2010 WL 4065609, at *4 (Tenn. Ct. App. Oct. 18, 2010). One party to the agreement's "negligent failure to observe any of these conditions is a tort, as well as a breach of contract." *Id*.

Applying these principles of Tennessee law, the Court concludes that Symetra owed AMEC a duty of care based on its performance of the parties' contracts. Some courts have observed that an annuity contract "does not fit neatly into the category of either goods or services." *Am. Gen. Life Ins.*

145

*Co. v. Valentine*, 2017 WL 5635014, at *12 (C.D. Cal. 2017) (citing *Estate of Migliaccio v. Midland Nat'l. Life Ins. Co.*, 436 F. Supp. 2d 1095, 1109 (C.D. Cal. 2006)). "The annuity itself is a product, but its administration involves the performance of certain services, including appropriate investment strategies and appropriate administration of the payment of benefits." *Id*. AMEC's negligence claim concerns Symetra's performance of the services required by the annuity contract, not the annuity itself. As the Court has discussed elsewhere, the contracts governing the Plan's annuity account with Symetra included specific provisions for the administration of the Plan's annuities. For example, Symetra agreed on procedures for cash distributions from the account, both in the 2001 and 2007 Annuity Contracts and the 2007 and 2008 GICs. Symetra's contractual obligations included a legal duty to carry out its obligations with reasonable care and skill.

To the extent that the Plan itself, and not AMEC, was a party to each of the agreements, Symetra still owed the denomination a duty of care. A contract can create a legally enforceable duty when "negligent performance of a contract" causes injury to another, even one who is not a party to the contract. *Howell v. Betts*, 362 S.W.2d 924, 926 (Tenn. 1962) (citation omitted). All in all, the Court can easily conclude that Symetra owed AMEC a duty of care based on the contracts that controlled the administration of the Symetra annuity account.

Symetra also moves for summary judgment on the fact that Symetra did not breach any duty to AMEC. AMEC alleges that Symetra breached its duties to the Church by failing to implement proper controls to prevent unauthorized transfers of Plan assets out of the Symetra annuity account. Second Am. Cross-Compl. ¶ 462 (alleging Symetra's "fail[ure] to establish and maintain controls to protect the Plan from unauthorized transfers and activity"). Symetra argues that AMEC has not introduced any proof to establish the "prevailing standard of care for an annuity provider." Symetra's Mem. in Support 38.

146

The Court disagrees. The question of breach of duty is for a jury to decide. *Giggers v. Memphis Housing Auth.*, 277 S.W.3d 359, 366 (Tenn. 2009). In light of the fact that the contracts themselves spelled out the processes for transfers out of the Symetra annuity account, proof that Symetra did not comply with the processes would establish a breach of its duty of care in performing its contractual functions. As the Court has already held, Symetra has not carried its burden to show as a matter of law that all transfers of Plan assets, including the $10 million transfer to FFF's Bear Stearns account in 2008 and the payment of administrative fees to Dr. Harris, were made "[p]ursuant to applicable provisions of the Plan." The Court has also noted the glut of factual issues over the extent of Dr. Harris's authority to issue orders for the transfer of Plan assets and even which Plan Document was in effect to define his authority. Once again, those disputes preclude a ruling as a matter of law on whether Symetra breached its duty to AMEC. AMEC has introduced evidence to create a triable issue over the extent of Dr. Harris's authority to direct Symetra as to the disposition of the Plan's assets in the Symetra annuity account.

The Church actually goes further and alleges that to the extent Symetra did have internal controls, the company chose to ignore them "to ensure that Harris kept the remainder of the Plan's annuities with Symetra Life." Second Am. Cross-Compl. ¶ 463. The record at summary judgment suggests that Symetra had concerns about retaining AMEC's business, particularly around the time of the $10 million transfer in 2008. A former Symetra employee had gone to work for a competitor and had solicited Dr. Harris and Eaton about moving the Plan's annuity business to that company. Dr. Harris and Eaton went so far as to issue a request for proposals, only to decide to keep the annuity with Symetra in exchange for a higher interest rate. Accepting the truth of the evidence most favorable to AMEC, Symetra is not entitled to summary judgment on AMEC's negligence claim.

147

Symetra has also cited evidence of its standard onboarding process for a new retirement plan customer. According to Symetra, it would have confirmed the identity of the trustee(s) by obtaining a board resolution or other documentation. For purposes of summary judgment, a dispute exists over whether Symetra followed its process. Symetra posits it would not have opened an account for the Plan if Symetra had not received some confirmation from the Church. But Symetra's corporate representative admitted in a deposition that she had no information about any corporate resolution or documentation naming Dr. Harris as a trustee of the Plan at the time the account was established in 2001. This proof goes back to the core dispute over Dr. Harris's authority, actual or apparent, to direct the Plan's investments, including the transfers of Plan assets out of the Symetra annuity account and into holdings other than annuities. So Symetra's point about its onboarding processes does not alter the result. Therefore, Symetra's Motion for Partial Summary Judgment is **DENIED** on AMEC's negligence claim.

### XI. AMEC's Crossclaim for Fraudulent Concealment

Symetra also moves for judgment as a matter of law on AMEC's crossclaim for fraudulent concealment. AMEC alleges that Symetra fraudulently concealed Dr. Harris's unauthorized transfers of Plan assets. Under Tennessee law, the tort of fraudulent concealment, also known as "constructive fraud," occurs when "a party who has a duty to disclose a known fact or condition fails to do so, and another party reasonably relies upon the resulting misrepresentation, thereby suffering injury." *Roopchan v. ADT Sec. Sys., Inc.*, 781 F. Supp. 2d 636, 650 (E.D. Tenn. 2011) (quoting *Odom v. Oliver*, 310 S.W.3d 344, 349–50 (Tenn. Ct. App. 2009)); *see also Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 571 (6th Cir. 2003) (quoting *Chrisman v. Hill Home Dev., Inc.*, 978 S.W.2d 535, 538–39 (Tenn. 1998)).

To establish its crossclaim for fraudulent concealment, AMEC must show that "(1) [Symetra] concealed or suppressed a material fact, (2) that [Symetra] had a duty to disclose that fact to [AMEC], (3) that [Symetra] intentionally concealed or suppressed that fact with the intent to deceive [AMEC], (4) that [AMEC was] unaware of the fact and would have acted differently if [the Church] had known about the concealed fact, and (5) that [AMEC was] damaged as a result of the concealment or suppression of the fact." *Saltire Indus.*, 491 F.3d at 527 (citing *Justice v. Anderson Cnty.*, 955 S.W.2d 613, 616 (Tenn. Ct. App. 1997)).

The issue presented at this stage of the case is whether Symetra owed a duty to disclose to AMEC Dr. Harris's transfers of Plan assets out of the Symetra annuity account. As AMEC correctly notes, there exists a duty to disclose in just three scenarios: (1) where there is a previous definite fiduciary relation between the parties; (2) where it appears one or each of the parties to the contract expressly reposes a trust and confidence in the other; and (3) where the contract or transaction is intrinsically fiduciary and calls for perfect good faith. *Id*. at 528. At the pleadings stage, the Court held that AMEC's Second Amended Cross-Complaint has plausibly alleged the claim based on AMEC's parallel allegations about Symetra's fiduciary duty to AMEC. In other words, AMEC's fraudulent concealment claim would rise or fall with the merits of its claim for breach of fiduciary duty.

The Court having now decided that AMEC cannot show Symetra owed it a fiduciary duty, AMEC likewise has no proof Symetra had a duty to disclose information about Dr. Harris's activities to the denomination, at least without a fiduciary duty to do so. Symetra is entitled to summary judgment on the fraudulent concealment claim for this reason alone. The Church falls back then on a separate argument that its contract or transaction with Symetra was intrinsically fiduciary and called for perfect good faith. This type of duty typically arises in the context of insurance. *Id*.

149

But AMEC cites no legal support extending the same reasoning to the purchase of an annuity, even a large annuity to fund the future obligations of a retirement plan. *See Fuller v. Allianz Life Ins. Co. of N. Am.*, No. E2018-02267-COA-R3-CV, 2020 WL 830067, at *12 (Tenn. Ct. App. Feb. 19, 2020) (holding that purchases of annuities were "commercial transactions, conducted at arm's length" and did not suggest a duty to disclose). Therefore, Symetra's Motion for Summary Judgment is **GRANTED** on AMEC's crossclaim for fraudulent concealment.

## XII.     AMEC's Crossclaim for Civil Conspiracy

Symetra's Motion for Partial Summary Judgment also takes aim at AMEC's crossclaim for civil conspiracy. To prove up its civil conspiracy claim, AMEC has the burden to show that (1) two or more persons had a common design; (2) the common design sought to accomplish an unlawful purpose; (3) those individuals engaged in an overt act in furtherance of the conspiracy; and (4) Plaintiffs suffered injury as a result. *See Morrow v. Kroger Ltd. P'ship I*, No. 2:24-cv-02564-SHL-cgc, 2025 WL 367404, at *5 (W.D. Tenn. Jan. 29, 2025) (citing *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006)). Conspiracy is not an independent tort under Tennessee law. *Campbell v. BNSF Ry. Co.*, 600 F.3d 667, 677 (6th Cir. 2010) (citing *Greene v. Brown & Williamson Tobacco Corp.*, 72 F. Supp. 2d 882, 887 (W.D. Tenn. 1999)). Rather, civil conspiracy is "a means of extending, to a tortfeasor's co-conspirators, liability for the tortfeasor's underlying tort." *Wachter, Inc. v. Cabling Innovations, LLC*, 387 F. Supp. 3d 830, 849 (M.D. Tenn. 2019).

Just as it did at the pleadings stage, Symetra moves for judgment on AMEC's civil conspiracy claim for lack of proof of an agreement between Dr. Harris and Symetra. The Tennessee Supreme Court has defined the tort of conspiracy as "an agreement between two or more persons to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means." *First Cmty. Bank, N.A. v. First Tenn. Bank, N.A.*, 489 S.W.3d 369, 395 (Tenn.

150

2015) (citations omitted). There is no requirement that the conspiracy rest on a formal agreement. *Chenault v. Walker*, 36 S.W.3d 45, 52 (Tenn. 2001) (quoting *Dale v. Thomas H. Temple Co.*, 208 S.W. 2d 344, 353 (Tenn. 1948)). A conspiracy may proceed from only a tacit understanding, meaning "it is not essential that each conspirator have knowledge of the details of the conspiracy." *Id.* "Each conspirator must have the intent to accomplish this common purpose, and each must know of the other's intent." *First Cmty. Bank*, 489 S.W.3d at 396 (citation omitted). It is not necessary, however, "that each conspirator have knowledge of the details of the conspiracy." *Id.* (citation omitted).

The Court holds that viewing the proof in a light most favorable to AMEC, the Church has carried its burden to make a circumstantial showing of a tacit agreement. Under Tennessee law, the proof necessary to show a civil conspiracy is "rarely" direct. *Id.* Instead, a conspiracy is more often proved through circumstantial evidence "and inferences drawn from the evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances." *Id.* (citation omitted). AMEC has marshalled the proof to substantiate the allegations of its Second Amended Cross-Complaint. Dr. Harris (with Eaton) moved $49 million in Plan assets to Symetra and embarked on a years-long program of transferring Plan assets out of the Symetra annuity account and into what were arguably self-serving or prohibited investments. Symetra received the benefit of a large annuity contract and in return paid Eaton commissions based on the Plan's purchase of Symetra annuities and Dr. Harris millions of dollars in administrative fees. This proof establishes "the nature of the acts [of the conspirators], the relationship of the parties, the interests of the conspirators, and other circumstances." *First Cmty. Bank*, 489 S.W.3d at 396. A reasonable jury could find from this proof a tacit conspiracy to convert the Plan's assets, something "more than a suspicion or conjecture that a conspiracy exists." *Id.*

Symetra returns to an argument, or at least a variation on the argument, from the pleadings stage that AMEC must allege something more than parallel conduct.  In moving to dismiss the civil conspiracy crossclaim under Rule 12(b)(6), Symetra relied on *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) for the proposition that "an allegation of parallel conduct and a bare assertion of conspiracy" did not state the claim. *Twombly*, 550 U.S. at 556–57. The Court found the analogy to an antitrust conspiracy unpersuasive. Order GIP, DIP Mot. to Dismiss 39 (ECF No.  ("Symetra has cited no authority for its argument that pleading a civil conspiracy under Tennessee common law requires fact allegations to exclude the possibility of independent action."). The Court also held that AMEC had alleged "an ongoing course of dealing and concerted action among the Cross-Defendants by which each member of the alleged conspiracy received mutual benefit at AMEC's expense." *Id*.

Symetra circles back to the argument now, this time citing for support two cases, a decision of the Illinois Supreme Court and a case from the Southern District of Ohio applying Ohio common law. *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242 (Ill. 1999); *Ryan v. Romo*, No. 2:14-cv-38, 2015 WL 1221281, at *6 (S.D. Ohio Mar. 17, 2015), *aff'd in part, rev'd in part*, (6th Cir. Mar. 9, 2016).    *McClure* addressed the evidentiary standard for proving civil conspiracy under Illinois law where a plaintiff alleged that the manufacturers of asbestos had conspired to conceal the dangers of their product. As an issue of first impression, the Illinois Supreme Court held that "parallel conduct may serve as circumstantial evidence of a civil conspiracy among manufacturers of the same or similar products but is insufficient proof, by itself, of the agreement element of this tort." *McClure*, 720 N.E.2d at 259. *Ryan* addressed the pleading standard for alleging civil conspiracy under Ohio law where *pro se* plaintiffs alleged that Wells Fargo and other defendants had conspired to foreclose on the plaintiffs' real property. The *Ryan* court dismissed the alleged civil conspiracy for

152

lack of allegations to show an agreement. *Ryan*, 2015 WL 1221281, at *6 ("Plaintiffs have alleged no facts to suggest that any Defendants reached an agreement of any kind.").

While the Court finds both cases illustrative, the decisions are in the final analysis not binding and, respectfully, not entirely convincing. Symetra has not shown why cases applying the law of states other than Tennessee would require the dismissal of AMEC's civil conspiracy claim under Tennessee common law. What is more, even if, as these cases suggest, something more than parallel conduct is required to prove a civil conspiracy in Illinois or Ohio, AMEC can prove something more than parallel conduct. The evidence, when seen in a light most favorable to AMEC, suggests that Dr. Harris, Eaton, and Symetra engaged in concerted action by which each party stood to gain from the other party's acts. That is by no means the only inference capable of being drawn from the proof. But a reasonable jury could find in AMEC's favor on the issue. *Anderson*, 477 U.S. at 252.

And Symetra has not cited any binding authority to support its claim that AMEC "must offer evidence that tends to rule out the possibility of unilateral but parallel conduct, such as conduct Symetra would not otherwise engage in but for the alleged agreement." Symetra's Mem. in Support 42. Symetra cites a number of facts, all of which Symetra argues would undermine any inference of a tacit agreement or conspiracy to act against the Plan's interests. For example, Symetra points to the lack of testimony or documentary proof to establish or even suggest the existence of an agreement among the alleged co-conspirators.

But the Court's task at the summary judgment stage is not to weigh the evidence or consider how unfavorable proof might undermine a party's claim or defense, the exclusive province of a jury.

*Youkhanna*, 934 F.3d at 515. Symetra has not shown why the Court should focus on evidence that might to tend support the moving party's (Symetra) version of events and cut against the non-moving party's (AMEC).

This just leaves Symetra's point about Dr. Harris and his role in the alleged conspiracy. Symetra argues that Dr. Harris was a general officer and authorized agent of the Church. AMEC essentially alleges a conspiracy that involved its own agent. Symetra argues that it is entitled to summary judgment on the claim because the evidence shows Dr. Harris "acted with the actual and apparent authority of the Church and within the scope of that authority." Symetra's Mem. in Support 46. That argument turns, however, on disputed factual questions that only a jury can resolve about Dr. Harris and his authority to take the actions he took. AMEC has introduced evidence from which a jury could find that Dr. Harris acted outside of the scope of his authority and in a manner designed to further his interests at the expense of the denomination's. The parties dispute the evidence and disagree over the reasonable inferences to be drawn from it, a dispute the Court cannot resolve as a matter of law. For all of these reasons, Symetra's Motion for Partial Summary Judgment is **DENIED** as to AMEC's civil conspiracy claim.

## XIII.    AMEC's Crossclaim for Aiding and Abetting Breach of Fiduciary Duty

The final issue raised in Symetra's Rule 56 Motion is its argument for the dismissal of AMEC's claim against it for aiding and abetting the breach of fiduciary duty. Under Tennessee law, a plaintiff may hold a defendant liable for a third-party's breach of duty if "the defendant knew that his companions' conduct constituted a breach of duty, and that he gave substantial assistance or encouragement to them in their acts." *PNC Multifamily Cap. Inst. Fund XXVI Ltd. P'ship*, 387 S.W.3d at 552 (quoting *Carr v. United Parcel Serv.*, 955 S.W.2d 832, 836 (Tenn. 1997)). The

154

Tennessee Court of Appeals has cited the *Restatement of Torts* § 876 (1934 & 2004 Supp.) with

approval. *Id. Restatement of Torts* § 876 provides as follows:

> For harm resulting to a third person from the tortious conduct of another, a person is liable if he:
>
> (a) orders or induces such conduct, knowing of the conditions under which the act is done or intending the consequences which ensue, or
>
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
>
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

*Restatement of Torts* § 876 (1934 & 2004 Supp.).

The Court holds that AMEC's aiding and abetting claim turns in large part on issues related

to Dr. Harris: his authority (actual or apparent) to direct Symetra to make certain transfers of Plan

assets, and his role as the trustee of the Plan (and relatedly whether the 2006 Plan Document naming

Dr. Harris as trustee ever took effect). A reasonable jury could find from the evidence that Dr. Harris

lacked authority to order the transfers and unilaterally set the investment policy for the Plan. The

same proof arguably shows that Symetra knew or should have known about Dr. Harris's lack of

authority to move Plan assets out of annuities and into high-risk investments or possibly prohibited

investments. In following Dr. Harris's directions for the transfer of Plan assets (including the

payment of unauthorized administrative fees to Dr. Harris), Symetra also failed to comply with the

terms of the Plan and the procedures delineated in the parties' contracts for the proper distribution of

assets from the annuity account. A reasonable jury could find in AMEC's favor on each issue and

decide that Symetra gave substantial assistance to Dr. Harris's breach of fiduciary duty. That is

enough to survive Symetra's request for judgment as a matter of law. Therefore, Symetra's Motion

for Partial Summary Judgment is **DENIED** on AMEC's claim for aiding and abetting breach of fiduciary duty.

**CONCLUSION**

The dispute between AMEC and Symetra largely turns on questions about Dr. Harris, his role in the administration of the Plan, and his authority (either actual or apparent) to direct Symetra to transfer Plan assets out of the Plan's Symetra annuity account. Genuine disputes of material fact on each of those questions and others remain for trial. Those genuine disputes mean neither side has shown why they are entitled to judgment as a matter of law on some of the crossclaims between them. By the same token, the parties have shown an entitlement to summary disposition on other points. The end result is the AMEC Defendants' Motion for Summary Judgment and Symetra's Motion for Partial Summary Judgment are **GRANTED in part, DENIED in part**.

**IT IS SO ORDERED**.

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: July 9, 2026

156