**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **IN RE: AME CHURCH EMPLOYEE RETIREMENT FUND LITIGATION,** | ) ) ) ) | **Lead Case No. 1:22–md–03035–STA–jay** <br> **ALL CASES** |

---

# ORDER DENYING MOTION FOR SUMMARY JUDGMENT OF DEFENDANT SANDRA HARRIS (ECF NO. 971)

---

Defendant Sandra Harris has moved for summary judgment on Counts IV, VIII, and IX of Plaintiffs' Second Amended Complaint, which brings claims against Mrs. Harris for conversion, civil conspiracy, and aiding and abetting breach of fiduciary duty.[1] (ECF No. 971.) Plaintiffs have filed a response in opposition to the motion. (ECF No. 1028.) For the reasons set forth below, Mrs. Harris's motion is **DENIED**.

## Background

The Court has set out the procedural history of the case in its previous orders and need not review the full history here. Suffice it to say that this multidistrict litigation concerns losses to a non-ERISA retirement Plan established by the African Methodist Episcopal Church ("the Church") for its clergy and employees. Plaintiffs are current or retired clergy/staff of the Church and have alleged a number of claims under state law against the denomination, church officials, third-party service providers to the Plan, and other alleged tortfeasors, including Mrs. Harris and her now deceased husband, Dr. Jerome Harris.

---

[1] Plaintiffs have filed their own motion for partial summary judgment on Plaintiffs' conversion claim. (ECF No. 978.) That motion is the subject of a separate order.

**Standard of Review**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When deciding a motion for summary judgment, the Court must review all the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in favor of the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court "may not make credibility determinations or weigh the evidence." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).

When the motion is supported by documentary proof such as depositions and affidavits, the non-moving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 360 (6th Cir. 2014). These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the non-moving party is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

**Statement of Undisputed Material Facts**

Pursuant to the Local Rules of this Court, the parties have prepared statements of material

facts "to assist the Court in ascertaining whether there are any material facts in dispute." Local Rule 56.1(a). A fact is material if it "might affect the outcome of the lawsuit under the governing substantive law." *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citing *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994), and *Anderson,* 477 U.S. at 247–48). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248. For purposes of summary judgment, a party asserting that a material fact is not genuinely in dispute must cite to particular parts of the materials in the record and show that the materials fail to establish a genuine dispute or that the adverse party has failed to produce admissible evidence to support a fact. Fed. R. Civ. P. 56(c)(1). The non-moving party must respond to the movant's statement of fact "by either (1) agreeing that the fact is undisputed; (2) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (3) demonstrating that the fact is disputed." Local Rule 56.1(b). Additionally, the non-movant may "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

If the non-movant asserts that a genuine dispute of material fact exists, it must support its contention with a "specific citation to the record." Local Rule 56.1(b). If a party fails to demonstrate that a fact is disputed or fails to address the opposing party's statement of facts properly, the Court will "consider the fact undisputed for purposes" of ruling on the motion. Fed. R. Civ. P. 56(e)(2); *see also* Local Rule 56.1(d) ("Failure to respond to a moving party's statement of material facts, or a non-moving party's statement of additional facts, within the time periods provided by these rules shall indicate that the asserted facts are not disputed for purposes of summary judgment."). Under Rule 56 of the Federal Rules of Civil Procedure, the Court "need

consider only the cited materials" but has discretion to "consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

Mrs. Harris submitted a statement of facts (ECF No. 971-1) to which Plaintiffs responded. (ECF No. 1028-1.) Plaintiffs then submitted an additional statement of facts. (ECF No. 1028-1.) Mrs. Harris did not respond to Plaintiff's additional facts, and, therefore, the additional facts are deemed undisputed.

The Court has disregarded any inadmissible evidence in making its decision. The parties may renew any pertinent objections at trial. The Court finds that there is no genuine dispute as to the following facts unless otherwise noted.[2]

Dr. Jerome V. Harris was a citizen and resident of Memphis, Tennessee. He served as the Executive Director of the African Methodist Episcopal Church's Department of Retirement Services ("the Department") from January 2001 until June 2021.[3] Beginning with his initial election as Executive Director in 2000, Dr. Harris was elected to sequential four-year terms, with his final term ending in 2021.

Dr. Harris died on May 8, 2024. At the time of his death, Dr. Harris had been named as a defendant in multiple complaints consolidated in the present MDL, including Plaintiffs' First Amended Consolidated Complaint.

Mrs. Harris is a resident of Memphis, Tennessee, and the widow of Dr. Harris.

Mrs. Harris worked for the Department intermittently. She worked for approximately two

[2] The parties state that some facts are disputed only for the purpose of the Court's deciding the motion for summary judgment. At other times, a party has noted that a particular statement does not contain material facts that must be decided in order to resolve any substantive claim or defense but concedes that the statement is undisputed for purposes of ruling on the motion for summary judgment. All facts are stated for the purpose of deciding this motion only.
[3] Plaintiffs object to any reliance by Mrs. Harris on citations to Plaintiffs' Second Amended Complaint as to certain facts. However, they do not dispute the facts themselves.

years in the early 2000s and for a short period sometime between 2010 and 2012. On September 11, 2014, Mrs. Harris again began working for the Department. Mrs. Harris testified she worked "for more than 3 years. I would think it would be – it would be probably maybe 5 or so years, give or take."

Dr. James Miller testified that Mrs. Harris "worked and helped [Dr. Harris]" and "did work in the office at one time," adding that he did not know her specific duties or the length of her employment.[4]

Mrs. Harris's responsibilities included, *inter alia*, verifying reports supplied to the Department, recording reports into the Department's system, assigning unregistered reports to other employees, and assisting Dr. Harris with calculating the respective quarter balances. Mrs. Harris testified that she had knowledge of specific sums within the Department, where Plan money was transferred, deposited, wired, or cashed. She logged reports, assigned work, verified data integrity, reconciled quarterly balances, and communicated with Symetra and Newport in relation to account verification and database corrections. Other witnesses confirmed that she helped Dr. Harris," that she "balanced reports" to verify sums received from districts, and that she worked "off and on" in the office. No one testified that she performed exclusively clerical tasks or lacked knowledge of financial transactions.

In 2012, Mrs. Harris served as Dr. Harris's executive assistant. Her duties included occasional event coordination or staff gatherings and assisting Dr. Harris with anything he needed. Her responsibilities were not necessarily confined to social or clerical functions.

On April 28, 2023, the AMEC Defendants responded to Plaintiffs' First Set of Interrogatories. Interrogatory No. 2 asked for the names of all individuals who worked at the

[4] Dr. James Miller was elected as the new Executive Director of the Department in 2021.

Department, their job titles, who they reported to, the scope of their responsibilities and their compensation structure. The AMEC Defendants' response did not list Mrs. Harris.

Mrs. Harris attended conference meetings with Bishop Samuel L. Green,[5] the commission members, and Dr. Harris. Mrs. Harris testified that she was present when meetings for the Retirement Commission occurred, including meetings where Bishop Green was in attendance. AMEC Retirement Department Reports were discussed at those meetings.

Mrs. Harris testified that she was aware that the AMEC Retirement Plan had purchased land in Key Marco, Florida, learning of it "in passing of conversation," and she understood that the purchase was for "an investment."[6]

Although Mrs. Harris claims to have has no knowledge relating to (former) Defendant Newport Group, Inc. nor its role with AMEC, she testified: (i) as to her awareness of the names of Newport Group's corporate predecessors, (ii) that she worked with Dennis Kass, a Newport employee, to resolve a technical issue, and (iii) that Kass was involved in handling quarterly reconciliations and Mrs. Harris was involved in getting "the master file to Dennis."[7]

Trinity Financial Consultants, LLC was an entity formed by Dr. Harris in 2008, purportedly to manage the AMEC Retirement Plan.

Although Mrs. Harris claims not to have been involved in the creation of Trinity and contends that she was never made aware that (1) she was both an officer of the company and a signatory on the Trinity bank account or that (2) Trinity received money from the Plan's assets,

---

[5] Bishop Green served as Chair of the Commission over the Department from 2016 until 2021.

[6] By way of background, in 2002, Dr. Harris began the process of buying real estate in Key Marco Island, Florida, for the Plan. Dr. Harris used funds from the Annuity Contract money market account with Symetra, along with additional Plan funds, to purchase four lots in Marco Island through Key Marco Holdings. (Ord. ECF No. 1196.)

[7] In her deposition, Mrs. Harris incorrectly described Kass as working for Symetra.

she signed a form with SunTrust Bank wherein she was listed as an "Officer" of Trinity and she was made an authorized signatory to the account as early as 2009. Her signature appears on the July 30, 2009 SunTrust corporate form. She also testified that she was aware Dr. Harris conducted business under the name "Trinity Financial Consultants," and she signed several joint tax returns, under penalty of perjury, indicating that Dr. Harris was employed by and earned money from Trinity.

Although Mrs. Harris claims to have no knowledge relating to any joint or separate bank accounts held at Truist Financial Corporation, in particular joint bank accounts with Dr. Harris, or that Dr. Harris had at Truist (formerly Sun Bank), Mrs. Harris and Dr. Harris's 2018 joint tax return lists a SunTrust Bank account under "Taxable Dividends and Interest." Additionally, Mrs. Harris signed a document making her an authorized signatory to a bank account held by Trinity at SunTrust Bank.

Mrs. Harris claims that, while Dr. Harris served as executive director of the Department, she was unaware that Dr. Harris owned or possessed any interest in a business entity. She contends that she only became aware that Dr. Harris owned two percent (2%) of Defendant Day and Night Solar, LLC after his death. However, she signed several years' worth of joint tax returns with Dr. Harris wherein he included a Schedule C for "Profit or Loss from Business" that listed Trinity Financial Consultants. She signed these returns under penalty of perjury and affirmed that she had "examined this return and accompanying schedules and statements." With respect to Day and Night Solar, Mrs. Harris's 2010 joint tax return, which she signed, included a loss of $24,133 from Day and Night Solar, which reduced Mrs. Harris's tax owed. Her 2011 tax papers also listed Day and Night Solar LLC as S-Corporation income, as did her 2012 tax papers. And Mrs. Harris's 2013 joint tax return, which she signed, included S Corporation income from Day and Night Solar, LLC.

Mrs. Harris has an account held by Strategic Financial Services, Inc. The source of the money in that account is disputed.

Mrs. Harris and Dr. Harris were joint owners of the personal investment account Regions Bank Account No. 8025142237. At various times, she has used funds from that account to pay bills, taxes, and attorney's fees.

On September 10, 2020, Mrs. Harris signed a spousal consent form authorizing the withdrawal of $500,000 from Dr. Harris's AME retirement account. Mrs. Harris testified that Dr. Harris sought to move $500,000 of his retirement account into another investment in 2020 because "he could get more return" elsewhere.

Mrs. Harris withdrew $70,000 from her Plan retirement account in the fourth quarter of 2019, which was shortly before Dr. Harris was set to retire from the Department.

Mrs. Harris was aware that Dr. Harris conducted business under the name "Trinity Financial Consultants." Mrs. Harris claims that she had no knowledge that $690,000 of disputed Plan Funds were deposited into Trinity between 2014 and 2021, nor that Trinity purportedly loaned money to Financial Freedom Funds. However, she signed a form with SunTrust Bank wherein she was listed as an "Officer" of Trinity and wherein she was made an authorized signatory to the account. She also signed several joint tax returns, under penalty of perjury, indicating that Dr. Harris was employed by and earned money from Trinity, while also being the Executive Director of the Department of Retirement Services.

Mrs. Harris's son Christopher Harris, a Department and Trinity employee, testified that he was paid by both entities and when asked why he was paid by Trinity, he stated "because – well, the way I was explained – well, because I did help – any work that I did, the AME Church only

had a certain amount of funds that they could pay us and to supplement that what I was making previous to that, that's how we did it."

Mrs. Harris attended a meeting in Houston, Texas, to, *inter alia*, discuss database issues with Motorskill personnel.[8] During the meeting, Mrs. Harris spoke with Motorskill's administrative assistants about various database issues. She also participated in a multi-party business meeting that included Dr. Harris, Robert Eaton, and Motorskill principals (Randall Irwin and his sons), each of whom were central figures in entities that received or held Plan assets. Mrs. Harris traveled to the Houston meeting "in the capacity of working with Dr. Harris" and was present in the company's conference room while discussions occurred among those key participants. Gloria Peterson, Dr. Harris's administrative assistant within the Department, was also present at the meeting(s).

On February 28, 2023, Dr. Harris produced his and Mrs. Harris's 2018-2021 joint tax returns. Those joint tax returns show Dr. Harris or Trinity earning income from Motorskill. In 2006, Mrs. Harris and Dr. Harris's joint tax return stated that Dr. Harris earned "$5,000" in "other income" from "Motroskill [sic] Ventures." Mrs. Harris received a W-2 from the Department for $27,213.42 in wages.

In 2009, Mrs. Harris and Dr. Harris's joint tax return included a Schedule C (Form 104) for a Sole Proprietorship for Trinity Financial Consultants. It listed a net profit of $107,202. The return also listed "Day and Night Solar, LLC" under "Income or Loss from Partnerships and S

---

[8] Motorskill was a venture capital fund that invested in a portfolio of start-up companies in a variety of industries, including technology, oil and gas, solar, and construction. Motorskill was run by the Erwin family: "Doc" Randall Erwin, Chairman of the Board; his son Jarrod Erwin, President; and his son Ryan Erwin, vice president. (Ord. ECF No. 1196.)

Corporations." Dr. Harris claimed a net loss of $24,133 from Day and Night Solar and listed it as a K-1 entity.

In 2010, Mrs. Harris and Dr. Harris's joint tax return included a Schedule C (Form 104) for a Sole Proprietorship for Trinity Financial Consultants. It listed a net profit of $76,823. The return also listed "Day and Night Solar, LLC" under "Income or Loss from Partnerships and S Corporations." Dr. Harris claimed a net loss of $24,133 from Day and Night Solar and listed it as a K-1 entity.

In 2011, Mrs. Harris and Dr. Harris's "2011 Tax Organizer" from CBIZ listed Trinity Financial Consultants as part of "Business Income and Cost of Goods Sold." In the information provided to CBIZ, Dr. Harris listed a salary of $57,415 from Trinity. The document also listed Day and Night Solar LLC under "S Corporation Income."

In 2012, Mrs. Harris and Dr. Harris's "2012 Tax Organizer" from CBIZ listed Trinity Financial Consultants as part of "Business Income and Cost of Goods Sold." The document also listed Day and Night Solar LLC under "S Corporation Income." Mrs. Harris signed the Tax Organizer and stated that "this information is true, correct and complete to the best of my (our) knowledge."

In 2013, Mrs. Harris and Dr. Harris's "2013 Tax Organizer" from CBIZ listed taxable wages of $60,000 from "Trinity Financial Consult[ants]." This document also listed $72,000 for "Financial Freedom Funds – Mgmt Fees" for Trinity Financial Consultants, which was also on a 1099 form. It additionally listed $110,000 for Trinity Financial Consultants in "Commissions and fees." Day and Night Solar LLC under "S Corporation Income."

In 2014, Mrs. Harris and Dr. Harris's 2014 Tax Organizer from CBIZ listed taxable wages of $64,442.33 from "Trinity Financial Consult[ants]." On the "Business Income and Cost of Goods

Sold" page for Trinity, it listed Miscellaneous Income of $20,000 from Motorskill Ventures I LP and $72,000 from Financial Freedom Group. This $72,000 from Financial Freedom Group, Inc. to "Jerome V. Harris Trinity Financial Consultants" was also on a 1099-Miscellaneous Income form. Similarly, a 1099-Miscellaneous Income form showed the $20,000 payment from Motorskill to Trinity.

In 2015, Mrs. Harris and Dr. Harris's "2015 Tax Organizer" from CBIZ listed, on the "Business Income and Cost of Goods Sold" page for Trinity, Miscellaneous Income of $72,000 from Financial Freedom Group. The $72,000 from Financial Freedom Group, Inc. to "Jerome V. Harris Trinity Financial Consultants" was also on a 1099-Miscellaneous Income form. The Schedule K-1 information also listed Day and Night Solar, LLC. And the W-2 form for Dr. Harris from Trinity included wages of $68,091.21.

In 2016, Mrs. Harris and Dr. Harris's joint tax return included a Schedule C (Form 1040) for a Sole Proprietorship for Trinity Financial Consultants. It listed a net profit of $73,699. The 2016 Business Checking Account for Trinity include monthly credits to Trinity from "Robert G. Eaton – Financial Freedom Group" and a "Quarterly Consulting Fee" of $27,500 listed as a "Debit" on Trinity's ledger.

In 2017, Mrs. Harris and Dr. Harris's joint tax return showed a $38,364 payment from Trinity to Financial Freedom Group. The Schedule C (Form 1040) for a Sole Proprietorship for Trinity Financial Consultants listed a net profit of $59,264. Miscellaneous Income document also showed a payment of $30,000 from Financial Freedom Group to Jerome V. Harris Trinity Financial Consultants.

In 2018, Mrs. Harris and Dr. Harris's joint tax return listed "Trinity Financial Consultants, LLC" as Dr. Harris's employer and reporting $65,500 in income from that entity. Mrs. Harris and

Dr. Harris's 2019 to 2021 joint tax returns likewise listed Trinity Financial Consultants as a Sole Proprietorship of Dr. Harris and included income that he received from the entity.

Mrs. Harris signed her tax returns under penalty of perjury and affirmed she had "examined this return and accompanying schedules and statements."

**Analysis**

A federal court sitting in diversity applies the law of the forum state, including the forum's choice-of-law rules. *Atl. Marine Constr. Co. Inc. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 134 S. Ct. 568, 582 (2013); *Standard Fire Ins. Co. v. Ford Motor Co.*, 723 F.3d 690, 692 (6th Cir. 2013). Just as they have at each stage of the case, the parties have briefed the substantive law of the state of Tennessee in their motion papers. The Court will assume for purposes of deciding the questions of law presented in Mrs. Harris's motion for summary judgment that Tennessee law governs the disputes presented in her motion.

**Statute of Limitations**

The first argument raised by Mrs. Harris concerns the timeliness of Plaintiffs' civil conspiracy claim against her. Mrs. Harris asserts that a claim for civil conspiracy must be filed within one year after the cause of action begins to accrue under Tenn. Code Ann. § 28-3-104(a)(1)(A). This section provides that "the following actions shall be commenced within one (1) year after the cause of action accrued: (A) Actions for libel, injuries to the person, false imprisonment, malicious prosecution, or breach of marriage promise." According to Mrs. Harris, Plaintiffs were aware of her alleged conduct as early as January 2022, based on the fact that many, if not all, of the same allegations levied against Dr. Harris in the initial complaint were alleged

against her in Plaintiff's Second Amended Complaint, filed on August 29, 2024.[9] (ECF No. 493.) Mrs. Harris reasons that the statute of limitations expired at the latest in March 2023, which would render the August 29, 2024 Second Amended complaint untimely.[10] Mrs. Harris's argument fails for several reasons.

The Tennessee Supreme Court has explained that statutes of limitations are "shields, not swords" and reflect "a societal choice that actions must be brought within a certain time period." *Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 456 (Tenn. 2012) (citations omitted). Statutes of limitations under Tennessee law "(1) promote stability in personal and business relationships, (2) give notice to defendants of potential lawsuits, (3) prevent undue delay in filing lawsuits, (4) avoid the uncertainties and burdens inherent in pursuing and defending stale claims, and (5) ensure that evidence is preserved and facts are not obscured by the lapse of time or the defective memory or death of a witness." *Id*. (internal quotations marks and citations omitted). By enacting statutes of limitations, the Tennessee legislature presumes that "persons with the legal capacity to litigate will not delay bringing suit on a meritorious claim beyond a reasonable time." *Id*. (citations omitted).

When a party seeks judgment as a matter of law on a statute of limitations, the Court must decide two questions: "(1) whether the statute of limitations has run and (2) whether there exists a genuine issue of material fact as to when the plaintiff's cause of action accrued." *Henry v. Norfolk S. Ry. Co.*, 605 F. App'x 508, 510 (6th Cir. 2015) (quoting *Campbell v. Grand Trunk W. R.R. Co.,* 238 F.3d 772, 775 (6th Cir. 2001)).

---

[9] The first amended complaint was filed on August 19, 2022, and named Dr. Harris (but not Mrs. Harris) as a defendant. (ECF No. 74.)

[10] *See*, *e.g.*, *Ewing v. Newport Group, Inc.*, 2:22-cv-02136-STA-jay, filed on March 4, 2022, naming Dr. Harris (but not Mrs. Harris) as a defendant.

As the party invoking the statute of limitations as an affirmative defense, Mrs. Harris has the burden to prove that the statute of limitations has run on Plaintiffs' claims and that no genuine issue of material fact exists as to when the claims accrued. If Mrs. Harris can discharge her burden to show that the claims are now time-barred, the burden shifts to Plaintiffs to prove an exception to the statute of limitations. *Redwing,* 363 S.W.3d at 463–64, 467; *Lutz v. Chesapeake Appalachia, L.L.C.,* 717 F.3d 459, 464 (6th Cir. 2013).

Clearly, the causes of action brought against Mrs. Harris do not come within the parameters of § 28-3-104(a)(1)(A). Instead, as noted by Plaintiffs, their civil conspiracy claim has a three-year statute of limitations rather than one year, as argued by Mrs. Harris.

> In determining the statute of limitations, a court is to look at the gravamen of each claim. *McFarland v. Pemberton*, 530 S.W.3d 76, 109 (Tenn. 2017). "To determine the gravamen of a claim ... 'a court must first consider the legal basis of the claim and then consider the type of injuries for which damages are sought.'" *Id.* (quoting *Benz-Elliot v. Barrett Enters., L.P.*, 456 S.W.3d 140, 151 (Tenn. 2015)).
> …
> A civil conspiracy "is neither a punishable offense standing alone nor a wrong capable of supporting a cause of action by its own weight." *Swafford v. Memphis Individual Practice Ass'n*, No. 02A01-9612-CV-00311, 1998 WL 281935 at * 11 (Tenn. Ct. App. June 2, 1998) (citing *Wyatt v. Union Mortgage Co.*, 24 Cal.3d 773, 157 Cal. Rptr. 392, 598 P.2d 45, 53 (Cal. 1979)). Therefore, the statute of limitations for conspiracy claims depends on the gravamen of the claim. *Id.*; *McFarland*, 530 S.W.3d at 109 (Tenn. 2017).

*Findley v. Hubbard*, 2018 WL 3217717, at *8 (Tenn. Ct. App. July 2, 2018). That is, the limitations period for civil conspiracy is that of the underlying tort. *See Swafford v. Memphis Individual Practice Ass'n*, 1998 WL 281935 at * 11 (Tenn. Ct. App. June 2, 1998).

Here, Plaintiffs have alleged claims of conversion, breach of fiduciary duty, and fraudulent concealment, all of which have a three-year statute of limitations. *See Pomeroy v. McGinnis*, 2021 WL 3017199, at *2 (Tenn. Ct. App. July 16, 2021) (discussing the dismissal of fraud and conversion claims pursuant to the three-year statute of limitations provided in Tenn. Code Ann. §

28-3-105); *PNC Multifamily Cap. Inst. Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 556 (Tenn. Ct. App. 2012) ("Conversion is subject to the three-year statute of limitations set out at Tennessee Code Annotated Section 28-3-105...."); *Smith v. Hilliard*, 578 F. App'x 556, 563 (6th Cir. 2014) ("The parties agree that the plaintiff's claims (negligence, recklessness, and breach of fiduciary duty) sound in tort, for which the statute of limitations is three years. See Tenn. Code Ann. § 28–3–105."). Similarly, the limitations period for an aiding and abetting claim is the same as the period for the underlying tort being aided or abetted. *College v. Nat'l Ass'n of Christian Athletes*, 2023 WL 128275, at *5 (Tenn. Ct. App. Jan. 9, 2023).[11]

Mrs. Harris was not named as a defendant until the Second Amended Complaint was filed on August 29, 2024. Thus, only causes of action accruing after August 29, 2021, are timely.

"A cause of action accrues when the plaintiff discovers it, that is, when the plaintiff knows or in the exercise of reasonable care and diligence should know that an injury has been sustained as a result of wrongful or tortious conduct by the defendant." *Hilliard*, 578 F. App'x at 563 (quoting *PNC Multifamily*, 387 S.W.3d at 544 (other citations omitted)). In the context of a breach of duty, a plaintiff has no judicial remedy until the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, "(1) the occasion, the manner and means by which a breach of duty occurred that produced his injury; and (2) the identity of the defendant who breached the duty." *Foster v. Harris,* 633 S.W.2d 304, 305 (Tenn. 1982); *Hill v. A.O. Smith Corp.*, 801 F.2d 217, 225 (6th Cir. 1986) (holding that under Tenn. law, civil conspiracy claim accrued

[11] Mrs. Harris herself acknowledged this in her response to Plaintiffs' motion for partial summary judgment. "Tennessee imposes a three-year statute of limitations for conversion and related tort claims. Tenn. Code Ann. § 28-3-105(2). Similarly, civil conspiracy and aiding and abetting claims are governed by the same limitations period as the underlying tort." (Resp. p. 4, ECF No. 1010.)

on the date the plaintiff "discover[ed] the source of the problem that formed the crux of their civil conspiracy claim").

And yet the statute of limitations "can begin to run before a plaintiff has actual knowledge of her legal claim, if she has learned of facts sufficient to put a reasonable person on notice that she has suffered an injury as a result of wrongful conduct." *Hilliard*, 578 F. App'x at 564 (quoting *Redwing*, 363 S.W.3d at 459) (cleaned up). The Tennessee Supreme Court has referred to this as "constructive notice" or "inquiry notice." *Redwing*, 363 S.W.3d at 459. "[I]nquiry notice charges a plaintiff with knowledge of those facts that a reasonable investigation would have disclosed," meaning "once a plaintiff gains information sufficient to alert a reasonable person of the need to investigate the injury, the limitation period begins to run." *Id.* (citations omitted). "In the mine run of such cases, what a plaintiff knew and when she came to know it is a fact question inappropriate for summary judgment," meaning the accrual date of a plaintiff's cause of action presents a jury question. *Hilliard*, 578 F. App'x at 564 (citing *City State Bank v. Dean Witter Reynolds, Inc.*, 948 S.W.2d 729, 735 (Tenn. Ct. App. 1996)); *Hill*, 801 F.2d at 225 (same).

Plaintiffs have pointed to evidence in the record that their claims against Mrs. Harris are timely because the statute of limitations was tolled under the discovery rule until at least February 28, 2023, when Dr. Harris produced his joint tax returns with Mrs. Harris showing that he was employed by Trinity Financial Consultants. Thus, there is a question of fact as to whether Plaintiffs could have discovered that Mrs. Harris knew about the alleged schemes to divert assets from the Plan until at least the time that Dr. Harris's tax returns were produced.

Additionally, there is evidence that Dr. Harris reported to church leaders just before his retirement that the value of the Plan's assets was over $120 million when the Plan was really only worth $38 million. The losses to the Plan were not discovered until September 2021, and Mrs.

Harris has not cited any evidence to show that the nearly $90 million shortfall in Plan value could have been discovered prior to that time.

Moreover, a jury could find that Mrs. Harris's involvement was not fully known because the Church's interrogatory responses submitted on April 28, 2023, did not include Mrs. Harris as a Department employee. A jury could also find that it was not until after Christopher Harris's deposition on January 29, 2024, that Plaintiffs began to understand Mrs. Harris's role in the Department, which led to additional investigation and eventually the Second Amended Complaint naming her as a defendant, thus finding that Plaintiffs' claims against Mrs. Harris did not accrue until that date.

Plaintiffs also argue that their claims against Mrs. Harris are subject to fraudulent concealment which is a tolling exception that operates to toll the running of a statute of limitations "when the defendant has taken steps to prevent the plaintiff from discovering he [or she] was injured." *Redwing*, 363 S.W.3d at 462 (quoting *Fahrner v. SW Mfg., Inc.*, 48 S.W.3d 141, 146 (Tenn. 2001)) (internal quotation marks omitted).

To establish that the fraudulent concealment exception applies, a plaintiff must prove that: (1) the defendant affirmatively concealed the plaintiff's injury or failed to disclose material facts regarding the injury despite a duty to do so; (2) the plaintiff could not have discovered the injury despite reasonable care and diligence; (3) the defendant knew the plaintiff had been injured; and (4) the defendant concealed material information from the plaintiff by withholding information or making use of some device to mislead the plaintiff in order to exclude suspicion or prevent inquiry. *Id.* at 462–63 (quotation marks and citations omitted). When it applies, the fraudulent concealment exception tolls the running of the statute of limitations "until the plaintiff discovers or, in the exercise of reasonable diligence, should have discovered the

defendant's fraudulent concealment or sufficient facts to put the plaintiff on actual or inquiry notice of his or her claim." *Id.* at 463 (citation omitted).

Here, a factual dispute exists over whether Mrs. Harris fraudulently concealed Dr. Harris's and her own activities. Plaintiffs point to evidence from which a jury could find that Mrs. Harris failed to disclose the transfers from their joint bank account to Day and Night Solar, her role in Trinity, and her husband's transfers out of the Plan despite being an employee of the Department during at least some of the relevant time period and having a duty to speak as a fiduciary. Accordingly, the Court finds that Mrs. Harris is not entitled to summary judgment on the issue of whether Plaintiffs' claims are barred by the statute of limitations.

**Conversion**

Conversion is "the appropriation of tangible property to a party's own use in exclusion or defiance of the owner's rights." *PNC Multifamily*, 387 S.W.3d at 553. To establish a prima facie case of conversion, Plaintiffs must prove (1) the appropriation of another's property to one's own use and benefit; (2) by the intentional exercise of dominion over it; (3) in defiance of the true owner's rights. *See Williams v. E. I. du Pont de Nemours & Co.*, 2015 WL 6458285, at *2 (W.D. Tenn. Oct. 26, 2015).

Plaintiffs allege that Mrs. Harris, *inter alia*, converted monies from the Plan.

> "[T]he general rule is that money is an intangible and therefore not subject to a claim of conversion." *PNC Multifamily Cap. Inst. Fund XXVI Ltd. P'ship*, 387 S.W.3d 525 at 553 (quoting 90 *C.J.S. Trover and Conversion* § 16 (2012)); *see also Knox Trailers, Inc. v. Maples*, 581 F. Supp. 3d 1000, 1017 (E.D. Tenn. 2022) (noting that Tennessee law does not permit conversion actions for intangible property and that money is generally considered to be intangible). But a plaintiff may establish a claim of conversion where money is specific and capable of identification, or where there is a determinate sum that the defendant was entrusted to apply to a certain purpose. *PNC Multifamily Cap. Inst. Fund XXVI Ltd. P'ship*, 387 S.W.3d 525 at 553. A plaintiff may establish a claim of conversion by showing "ownership or the right to possess specific, identifiable money," such as "tax receipts or insurance premiums, where there is an obligation to keep the money

> intact or deliver it." *Brown v. J. Rockett Audio Designs, LLC*, No. 1:17-CV-00093, 2018 WL 3656481, at *2 (M.D. Tenn. Aug. 2, 2018) (quoting *PNC Multifamily Cap. Inst. Fund XXVI Ltd. P'ship*, 387 S.W.3d at 553); *see also Knox Trailers, Inc.*, 581 F. Supp. at 1018 (denying motion to dismiss claim of conversion where plaintiffs alleged that defendants obtained unauthorized health insurance benefits for their own use). This exception is limited, however: there is no conversion unless the defendant wrongfully received or was obliged to deliver the money. *Id.* at *2.

*McCoy v. E. Tennessee Luxury Coach*, LLC, 2024 WL 4916367, at *10 (E.D. Tenn. Nov. 6, 2024).[12] Although conversion is an intentional tort, a "wrongful intent on the part of the defendant is not an element of conversion and, therefore, need not be proved." *White v. Empire Express, Inc.*, 395 S.W.3d 696, 720 (Tenn. Ct. App. 2012) (internal citations omitted).

Mrs. Harris contends that Plaintiffs' conversion claim should be dismissed because the record contains no facts revealing that she (1) appropriated Plaintiffs' property to her own use and benefit, (2) intentionally exercised dominion over Plaintiffs' property, and (3) acted in defiance of Plaintiffs' rights to the Plan and the retirement funds associated with the Plan. In essence, she argues that the alleged converted funds did not belong to Plaintiffs and that she lacked any knowledge of the source of the funds or the alleged unlawful transference of the funds or that she held a joint bank account at Truist or that there were any issues with the Department's investments.

Contrary to Mrs. Harris's arguments, summary judgment is not appropriate because Plaintiffs have pointed to evidence from which a jury could find that Mrs. Harris knowingly participated in the diversion of Plan funds through Trinity Financial Consultants and accounts she co-owned with Dr. Harris. The record is replete with evidence that the alleged converted funds belonged to the Plan and that Mrs. Harris had knowledge of this. For example, she served as a signatory on Trinity Financial Consultants accounts through which Plan funds were funneled; she

[12] Mrs. Harris concedes that a conversion of money can occur "where the money was wrongfully received by the defendant." (Mot. at 8, ECF No. 971-2 (quoting *PNC Multifamily*, 387 S.W.3d at 553.

jointly received and controlled deposits of Plan money into her Regions Bank accounts with Dr. Harris; and she certified under penalty of perjury annual tax returns disclosing income from Trinity Financial Consultants and Financial Freedom Group.

Mrs. Harris herself testified that "I knew my husband was supposed to have been, you know, had Trinity Financial." Trinity Financial was one of the vehicles by which Dr. Harris and Mrs. Harris, as an authorized signatory on a Trinity Financial bank account, allegedly funneled assets out of the Plan for their own benefit. There is evidence that Trinity entered into a Management and Services Agreement with Financial Freedom Funds, LLC, an entity that held Plan assets, whereby Trinity received $300,000 a year.

The money that Dr. Harris allegedly diverted from Plan assets to Trinity was held in a joint bank account with Mrs. Harris that she now controls. A jury could find that assets were taken from Plan participants and diverted to Trinity, where Mrs. Harris was as an officer. Similarly, there are disputed issues of fact as to whether Mrs. Harris acquired Plan assets when she inherited all of the funds in the Regions Bank, Account No. 8025142237, that she jointly held with Dr. Harris. Moreover, she withdrew her Plan account balance and signed off on Dr. Harris's withdrawal of his Plan account just before Dr. Harris's retirement as the Executive Director of the Department. If these facts are established at trial, the jury could find that Mrs. Harris knowingly exercised dominion over alleged converted funds that belonged to the Plan and benefited from those funds through personal withdrawals and early Plan distributions. *See*, *e.g.*, *White*, 395 S.W.3d at 720 (Tenn. Ct. App. 2012) ("A conversion claim focuses on the interference with a property owner's right." (citation omitted)).

There is also evidence that Mrs. Harris knew that she was exercising "dominion or control over the property in such a way that would be inconsistent with the owner's rights and which

results in injury to him." *See Permobil, Inc. v. Am. Exp. Travel Related Servs. Co., Inc.*, 571 F. Supp. 2d 825, 840 (M.D. Tenn. 2008). In her deposition, Mrs. Harris admitted that she authorized or permitted transfers of her retirement funds from the Plan while aware of "departmental issues." Mrs. Harris also signed a "Business Account Signature Card" as an "Officer" of Trinity, with an "Authorized Signature" along with Dr. Harris (also listed as an officer) and Gloria Peterson. There is also evidence, if proved at trial, that Mrs. Harris shared joint control over accounts receiving alleged converted Plan funds, such as through Regions Bank Account No. 8025142237, which she held jointly with Dr. Harris, and that she received deposits which are allegedly traceable to Plan assets. Mrs. Harris admitted awareness of these deposits and expenditures, including a $73,284.08 check to "Roadshow BMW" and a $500,000 transfer to Brighthouse Investments, which she retains in an account worth approximately $1 million.

Although Mrs. Harris testified she was unaware that she was an officer of Trinity Financial or an authorized signatory on its bank account, despite the fact that she signed documents indicating otherwise, her testimony is not sufficient to support summary judgment in her favor. *See*, *e.g.*, *Ganz v. Pappas Restaurants, Inc.*, 2020 WL 3050766, at *3 (S.D. Ohio June 8, 2020) ("[I]t is well-settled that unsubstantiated, self-serving statements that are not supported by any documentation or other testimony cannot defeat summary judgment.")

The Court finds that Mrs. Harris has not shown that she is entitled to summary judgment on Plaintiffs' conversion claim because there are disputed issues of material fact.

**<u>Civil Conspiracy</u>**

To prove their civil conspiracy claim, Plaintiffs have the burden to show that (1) two or more persons had a common design; (2) the common design sought to accomplish an unlawful purpose; (3) those individuals engaged in an overt act in furtherance of the conspiracy; and (4)

Plaintiffs suffered injury as a result. *See Morrow v. Kroger Ltd. P'ship I*, 2025 WL 367404, at *5 (W.D. Tenn. Jan. 29, 2025) (citing *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006)). Conspiracy is not an independent tort under Tennessee law. *Campbell v. BNSF Ry. Co.*, 600 F.3d 667, 677 (6th Cir. 2010) (citing *Greene v. Brown & Williamson Tobacco Corp.*, 72 F. Supp. 2d 882, 887 (W.D. Tenn. 1999)). Rather, civil conspiracy is "a means of extending, to a tortfeasor's co-conspirators, liability for the tortfeasor's underlying tort." *Wachter, Inc. v. Cabling Innovations, LLC*, 387 F. Supp. 3d 830, 849 (M.D. Tenn. 2019).

The Tennessee Supreme Court has defined the tort of conspiracy as "an agreement between two or more persons to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means." *First Cmty. Bank, N.A. v. First Tenn. Bank, N.A.*, 489 S.W.3d 369, 395 (Tenn. 2015) (citations omitted). There is no requirement that the conspiracy rest on a formal agreement. *Chenault v. Walker*, 36 S.W.3d 45, 52 (Tenn. 2001) (quoting *Dale v. Thomas H. Temple Co.*, 208 S.W. 2d 344, 353 (Tenn. 1948)). A conspiracy may proceed from only a tacit understanding, meaning "it is not essential that each conspirator have knowledge of the details of the conspiracy." *Id.* "Each conspirator must have the intent to accomplish this common purpose, and each must know of the other's intent." *First Cmty. Bank*, 489 S.W.3d at 396 (citation omitted). However, each conspirator does not necessarily have to have knowledge of the details of the conspiracy. *Id* (citation omitted).

"A claim for civil conspiracy requires an underlying predicate tort allegedly committed pursuant to the conspiracy." *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 180 (Tenn. Ct. App. 2007). Here, Plaintiffs' conspiracy claim involves the predicate torts of conversion, breach of fiduciary duty, violations of the Tennessee Uniform Trust Code, and negligence.

According to Mrs. Harris, Plaintiffs have alleged no facts showing that she had the requisite intent to accomplish, by concerted action, either an unlawful purpose or a lawful purpose by unlawful means. (Mot. p. 2, ECF No. 971-2.) She points to the following allegations in the complaint in support of her argument:

> 1. That Mrs. Sandra Harris and other named defendants conspired together in a scheme that was intended to accomplish an unlawful purpose by concerted action.
>
> 2. That Sandra Harris and other co-conspirators shared a common plan or design to enrich themselves at the expense of the Plan.
>
> 3. Sandra Harris and other co-conspirators were aware of a common plan or design and the [sic] agreed to participate in a common plan or design.
>
> 4. Sandra Harris and other co-conspirators committed overt acts in furtherance of the conspiracy.
>
> 5. That Sandra Harris and other co-conspirators provided substantial assistance to the conspiracy.

(*Id.*)

As in *Jones v. Mortgage Menders, LLC*, 2014 WL 7069665, at *6 (Tenn. Ct. App. Dec. 12, 2014), "[o]ther than denying Plaintiff's assertions and highlighting the lack of evidence, Defendant has not negated an element of Plaintiff's claim or demonstrated that Plaintiff could not establish the elements of his claim." A jury could find that the alleged co-conspirators, including Mrs. Harris, had a common design to enrich themselves at the expense of the Plan and that Mrs. Harris did, in fact, enrich herself. For example, she had a joint bank account with Dr. Harris where alleged converted Plan funds were deposited; she signed joint tax returns listing income from Trinity, transactions with Financial Freedom Group, miscellaneous income from Motorskill, and losses from Day and Night Solar; she withdrew funds from her retirement account before the Plan's true value was revealed; and she signed off on her husband's doing the same.

Plaintiffs also point to evidence in the record from which a jury could find that Mrs. Harris and her alleged co-conspirators acted in concert to accomplish the unlawful purpose of enriching themselves at the expense of the Plan. Specifically, there is evidence that Mrs. Harris and her alleged co-conspirators established and managed entities such as Trinity which facilitated the flow of funds from out of the Plan and into the co-conspirators' pockets. *See*, *e.g.*, *Kingsport Pavilion, LLC v. Crown Enterprises, Inc.*, 2010 WL 11435699, at *11 (E.D. Tenn. Aug. 16, 2010) (finding a disputed issue of fact as to whether coconspirators consulted among themselves to misrepresent whether sand filter had been removed from commercial property purchased by the plaintiff).

As evidence of overt acts in furtherance of the alleged conspiracy, Plaintiffs point out that Mrs. Harris executed bank documents and received distributions derived from alleged converted Plan assets. She jointly filed tax returns with Dr. Harris wherein he obtained income from several co-conspirators. Mrs. Harris, jointly with Dr. Harris, was an "Authorized Signatory" of a Trinity bank account and was listed as an "Officer" on a document that she signed. And, as previously stated, she transferred her own funds out of the Plan and signed off on Dr. Harris's withdrawal shortly before Dr. Harris's retirement as the Executive Director of the Department.

Mrs. Harris relies on her own testimony that she had "little to no knowledge of any financial transactions directed or engaged in" by Dr. Harris or other co-conspirators. However, a jury could find otherwise. Joint tax returns that Mrs. Harris signed under penalty of perjury list Dr. Harris's income from other co-conspirators.[13]

---

[13] Mrs. Harris posits that she did not know what she signed. However, it is well-established that "I did not know what I signed" cannot be testimony that satisfies that there is no genuine dispute of material fact for a defendant. *See Upton v. Tribilcock*, 91 U.S. 45, 50 (1875) ("It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written.")

She also attended a meeting at the offices of Motorskill with her husband and alleged co-conspirator Robert Eaton. A jury could find that Mrs. Harris acted as a supervisor and had knowledge of Plan money that was transferred, deposited, wired, or cashed. Additionally, her job description indicates that she logged reports, assigned work, verified data integrity, reconciled quarterly balances, and communicated with Symetra and Newport in relation to account verification and database corrections.

Mrs. Harris argues that there is no evidence that she agreed to a conspiracy. The Court holds that viewing the proof in a light most favorable to Plaintiffs, they have carried their burden to make a circumstantial showing of a tacit agreement. Under Tennessee law, the proof necessary to show a civil conspiracy is "rarely" direct. *First Cmty. Bank*, 489 S.W.3d at 396. Instead, a conspiracy is more often proved through circumstantial evidence "and inferences drawn from the evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances." *Id.* (citation omitted). Direct proof of agreement is unnecessary; it "may be inferred from circumstantial evidence and the conduct of the parties." *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 703 (Tenn. 2002).

The Court finds that Plaintiffs have presented sufficient evidence, which if proved at trial, substantiate the allegations of their complaint as to the involvement of Mrs. Harris in the alleged conspiracy. The "inferences drawn from the evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances," *First Cmty. Bank*, 489 S.W.3d at 395-96, demonstrate that Mrs. Harris: (1) had joint control of a bank account used by Dr. Harris in the conspiracy, (2) was an authorized signatory to a bank account belonging to another defendant and co-conspirator; (3) met with other coconspirators at Motorskill and Eaton in her capacity as a Department employee, and (4) withdrew her own retirement funds and approved of Dr. Harris's

withdrawal of his retirement funds before the losses became public. These facts would support a jury finding of the existence of an agreement involving Mrs. Harris. A reasonable jury could find from this proof a tacit conspiracy to convert the Plan's assets, something "more than a suspicion or conjecture that a conspiracy exists." *Id.*

Summary judgment is inappropriate on the civil conspiracy claim because Mrs. Harris "has not negated an element of Plaintiff's claim or demonstrated that Plaintiff could not establish the elements of his claim" and the court is "required to assume that the nonmoving party may still, by the time of trial, somehow come up with evidence to support her claim." *Jones*, 2014 WL 7069665, at *6 (cleaned up).

**Aiding and Abetting Breach of Fiduciary Duty**

Under Tennessee law, a plaintiff may hold a defendant liable for a third-party's breach of duty if "the defendant knew that his companions' conduct constituted a breach of duty, and that he gave substantial assistance or encouragement to them in their acts." *PNC Multifamily*, 387 S.W.3d at 552 (quoting *Carr v. United Parcel Serv.*, 955 S.W.2d 832, 836 (Tenn. 1997)). The *Restatement of Torts* provides as follows:

> For harm resulting to a third person from the tortious conduct of another, a person is liable if he:
>
> (a) orders or induces such conduct, knowing of the conditions under which the act is done or intending the consequences which ensue, or
>
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
>
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

*Restatement of Torts* § 876 (1934 & 2004 Supp.) (cited by *PNC Multifamily*).

Plaintiffs allege that Mrs. Harris "substantially assisted or encouraged Dr. Harris and Eaton's breaches of fiduciary duty by serving as a signatory on the bank accounts of Trinity Financial Consultants and otherwise working to operate that entity as it skimmed money from the Plan through a series of contracts for fictitious 'management services.'" Mrs. Harris attempts to make the argument that she is entitled to summary judgment on Plaintiffs' claim against her for aiding and abetting the breach of fiduciary duty. She continues to rely on her own testimony that she "had no knowledge of any of the alleged misdeeds of any other named defendant, including her husband Dr. Harris or defendant Robert Eaton. Her lack of knowledge as to the misdeeds that Plaintiffs have claim were perpetrated by other defendants is fatal to their claim of aiding and abetting any breach of fiduciary duty." (Mot. p. 11, ECF No. 971-2.) She states that she was never made aware that she was an officer of Trinity and a signatory on Trinity's bank account or that Trinity received money from the Plan. (*Id.* at p. 12.) She further states that she committed no act that would constitute giving "substantial assistance or encouragement to the alleged scheme." (*Id.*)

Plaintiffs counter by pointing to evidence in the record from which a jury could find that Mrs. Harris was aware that Dr. Harris was breaching his fiduciary duty to the Plan; she knew that he controlled Trinity; she knew that he was obtaining income from Motorskill and Financial Freedom Group; she knew that Plan funds were being redirected through her husband's entities; she gave spousal consent to the early withdrawal of Dr. Harris's $500,000 Plan distribution before the Plan's true value was discovered; and she withdrew her own retirement funds in the same period as well.

Plaintiffs cite as additional evidence of Mrs. Harris's substantial assistance her maintaining co-ownership of Trinity's accounts, serving as signatory, and receiving personal benefit from Plan proceeds which Plaintiffs claim materially aided her husband's fiduciary breach. Further, Mrs.

Harris jointly filed and signed tax returns and maintained bank and investment accounts, which received alleged converted Plan assets. A jury could find that Mrs. Harris's position as signatory alone, coupled with participation in a household account receiving diverted funds, constitutes sufficient "substantial assistance" under Tennessee law. *See PNC Multifamily*, 387 S.W.3d at 552-53 (finding that joint control of misused funds supports aiding liability). Thus, Mrs. Harris has not shown that she is entitled to summary judgment on Plaintiffs' aiding and abetting claim.

## Conclusion

Mrs. Harris's motion for summary judgment must be **DENIED** on all claims brought against her because she has failed to show that she is entitled to judgment as a matter of law in light of the disputed facts contained in the record.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: September 29, 2026.