**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **IN RE: AME CHURCH EMPLOYEE RETIREMENT FUND LITIGATION,** | ) ) ) ) | **Lead Case No. 1:22–md–03035–STA–jay** <br><br> **ALL CASES** |

---

# ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON CONVERSION CLAIM AGAINST DEFENDANT SANDRA HARRIS AND GRANTING MOTION ON CONVERSION CLAIM AGAINST JEROME HARRIS AND GRANTING MOTION AS TO FIDUCIARY STATUS OF JEROME HARRIS (ECF NO. 978)

---

Plaintiffs have moved for partial summary judgment as to liability on their conversion claims (Count IV) against Defendants Sandra Harris and the Estate of Dr. Jerome Harris. (ECF No. 978.) Additionally, Plaintiffs seek partial summary judgment finding that Dr. Harris was a fiduciary to the Plan and Plan participants. Defendant Sandra Harris responded to the motion. (ECF No. 1010.) Thereupon, Plaintiffs filed a reply to her response. (ECF No. 1040.)

Subsequently, it was determined that Daniel Parish, *Administrator Ad Litem* of the Estate of Dr. Harris, had not been made a party to the lawsuit. On April 30, 2026, the Court granted Plaintiffs' motion for substitution of Parish in his capacity as *Administrator Ad Litem* of the Estate of Jerome V. Harris in place of Dr. Jerome V. Harris for all purposes in this litigation pursuant to Rule 25 of the Federal Rules of Civil Procedure. (ECF No. 1176.) *Administrator Ad Litem* Parish then filed a response to Plaintiffs' motion for partial summary judgment on behalf of Dr. Harris's Estate. (EF No. 1187.)

For the reasons set forth below, the partial motion for summary judgment is **DENIED** as to the conversion claim against Mrs. Harris and **GRANTED** as to the conversion claim and determination of fiduciary status against Dr. Harris.

## Background

The Court reiterates its previous summary of the procedural history of this case. This multidistrict litigation concerns losses to a non-ERISA retirement Plan established by the African Methodist Episcopal Church for its clergy and employees. Plaintiffs are current or retired clergy/staff of the Church and have alleged a number of claims under state law against the denomination, church officials, third-party service providers to the Plan, and other alleged tortfeasors, including Mrs. Harris and her now deceased husband, Dr. Jerome Harris.

## Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When deciding a motion for summary judgment, the Court must review all the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in favor of the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court "may not make credibility determinations or weigh the evidence." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).

When the motion is supported by documentary proof such as depositions and affidavits, the non-moving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 360 (6th Cir. 2014). These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the non-moving party is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The Court should ask "whether the

evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

**<u>Statement of Undisputed Material Facts</u>**

Pursuant to the Local Rules of this Court, the parties have prepared statements of material facts "to assist the Court in ascertaining whether there are any material facts in dispute." Local Rule 56.1(a). A fact is material if it "might affect the outcome of the lawsuit under the governing substantive law." *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citing *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994), and *Anderson,* 477 U.S. at 247–48). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248. For purposes of summary judgment, a party asserting that a material fact is not genuinely in dispute must cite to particular parts of the materials in the record and show that the materials fail to establish a genuine dispute or that the adverse party has failed to produce admissible evidence to support a fact. Fed. R. Civ. P. 56(c)(1). The non-moving party must respond to the movant's statement of fact "by either (1) agreeing that the fact is undisputed; (2) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (3) demonstrating that the fact is disputed." Local Rule 56.1(b). Additionally, the non-movant may "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

If the non-movant asserts that a genuine dispute of material fact exists, it must support its contention with a "specific citation to the record." Local Rule 56.1(b). If a party fails to

demonstrate that a fact is disputed or fails to address the opposing party's statement of facts properly, the Court will "consider the fact undisputed for purposes" of ruling on the motion. Fed. R. Civ. P. 56(e)(2); *see also* Local Rule 56.1(d) ("Failure to respond to a moving party's statement of material facts, or a non-moving party's statement of additional facts, within the time periods provided by these rules shall indicate that the asserted facts are not disputed for purposes of summary judgment."). Under Rule 56 of the Federal Rules of Civil Procedure, the Court "need consider only the cited materials" but has discretion to "consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

Plaintiffs have submitted a statement of facts (ECF No. 978-2) to which Mrs. Harris responded. (ECF No. 1012.) Mrs. Harris did not submit an additional statement of facts. The Estate of Dr. Harris responded to Plaintiffs' statement of facts (ECF No. 1187) but also did not submit an additional statement of facts.

The Court has disregarded any inadmissible evidence in making its decision. The parties may renew any pertinent objections at trial. The Court finds that there is no genuine dispute as to the following facts unless otherwise noted.[1]

Dr. Jerome V. Harris was a citizen and resident of Memphis, Tennessee. He served as the Executive Director of the African Methodist Episcopal Church's Department of Retirement Services ("the Department") from January 2001 until June 2021. Beginning with his initial election as Executive Director in 2000, Dr. Harris was elected to sequential four-year terms, with his final term ending in 2021.

---

[1] The parties state that some facts are disputed only for the purpose of the Court's deciding the motion for summary judgment. At other times, a party has noted that a particular statement does not contain material facts that must be decided in order to resolve any substantive claim or defense but concedes that the statement is undisputed for purposes of ruling on the motion for summary judgment. All facts are stated for the purpose of deciding this motion only.

Dr. Harris died on May 8, 2024. At the time of his death, Dr. Harris had been named as a defendant in multiple complaints consolidated in the present MDL, including Plaintiffs' First Amended Consolidated Complaint. Sandra Harris is the widow of Dr. Harris.

The governing laws and rules for the Department of Retirement Services of the African Methodist Episcopal Church, a corporation, are set forth in the Church's Doctrine and Discipline. The Doctrine and Discipline also sets forth the duties of the Executive Director of the Department. Between 2000 and 2016 the Department was renamed from the Department of Employee Security to the Department of Annuity Investment and Insurance and now, currently, the Department of Retirement Services.

The Doctrine and Discipline provides that the Executive Director of the Department has responsibilities to oversee, direct, and manage the Ministerial Annuities Funds of the Church ("the Plan") and the annuities it was to invest in. That is, as Executive Director, Dr. Harris was the administrator of the Plan and was responsible for the operation of the retirement fund for the salaried servants of the Church.

The Executive Director must, *inter alia*, report to each Quadrennial Session of the General Conference, prepare proposed budgets for approval by the General Conference, report receipts and disbursements to the General Board, maintain records of all monies and funds paid out of the Department, communicate with insurers and investment entities regarding financial activities and returns on investments, and communicate with participants in the Plan.

The Doctrine and Discipline states that the Executive Director is to hire a specialist in financial management to see that the employees of the Church receive the maximum benefits to which they are entitled from the investments. Dr. Harris reported to the General Board as required by the Doctrine and Discipline.

Mrs. Harris worked as an administrative assistant at the Department for two separate periods of time - initially, approximately two years in the early 2000s. On September 11, 2014, Mrs. Harris was again employed and added to the Department's staff payroll. Mrs. Harris testified that she worked for approximately 3 – 5 years as an administrative assistant at the Department with a salary of $21,500.

In the fourth quarter of 2019, Mrs. Harris withdrew $70,000 from her retirement account with the AME Church.[2] She signed off on Dr. Harris's withdrawal of $500,000 from his AME retirement account in 2020.

Dr. Harris created AMEC Financial Services, LLC in 2002. Its Operating Agreement describes the nature and purpose of the entity. AMEC Financial Services, LLC was converted to a C corporation in 2010 and, thereafter, was a subsidiary for-profit entity of AMEC. On paper, the Plan owned 100% of AMEC Financial Services, LLC's voting stock. Subsequently, Defendant Financial Freedom Funds, LLC ("Freedom Funds") was formed by Dr. Harris in 2006. The documents establishing Freedom Funds listed "Dr. Jerome V. Harris, AMEC Financial Services" as the Manager of Freedom Funds.

Dr. Harris opened and maintained an investment brokerage account for Freedom Funds at Deutsche Bank. In March of 2008, Dr. Harris initiated a $10 million dollar withdrawal from the Plan's fixed annuity account at Symetra and transferred those funds to Freedom Funds which Dr. Harris invested in the Motorskill entities in subsequent years. The withdrawal was completed on March 5, 2008.

Financial Freedom Group, Inc., was formed by Dr. Harris and Robert Eaton in 2007. Dr. Harris and Eaton each owned a 50% share in Financial Freedom Group. Dr. Harris and Eaton were

[2] It is disputed as to whether a portion of these funds came from a previous retirement account.

listed as signatories for agreements involving Financial Freedom Group.

Trinity Financial Consultants, LLC ("Trinity") was formed by Dr. Harris in 2008. Dr. Harris was listed as the managing member of Trinity. Mrs. Harris testified that she was aware that Dr. Harris "had Trinity Financial Consultants."

Dr. Harris, along with his son, Christopher Harris, and the Department's executive administrative assistant, Gloria Peterson, were on the payroll for Trinity from 2009 until October of 2021. Christopher Harris did not know what Trinity did to generate income.

In addition to his salary paid by the Church, Dr. Harris wrote himself checks from the Department's Operating Account. Many times, he would issue several checks in the amount of $1,000 each payable to himself with different iterations of his name. He would then deposit those into his personal account. Dr. Harris's Estate clarifies that Dr. Harris was authorized as Executive Director to receive compensation, reimbursements, and disbursements from Department accounts in the ordinary course of his duties.

Trinity's business transactions included, *inter alia*, a Management and Services Agreement between Trinity and Freedom Funds and a substantially similar Administrative Services Agreement between Financial Freedom Group and Trinity.

In the agreement between Trinity and Freedom Funds, dated July 1, 2009, Trinity stated that it "is experienced and skilled in the performance and general management, business advisory, program performance, administrative, fiscal, legal and accounting services" and that "in order to further its investment strategies [Financial Freedom Funds, LLC] is in need of such services and desires to engage Trinity Financial Consultants to perform such services." Freedom Funds agreed to pay Trinity $300,000 annually for these services.

In a separate agreement between Financial Freedom Group and Trinity, also dated July 1,

2009, Financial Freedom Group stated it "is experienced and skilled in the performance and general management support, business advisory, market reviews, program performance reviews, maintain regular contact and collect updated holding analysis and reviews, provide as needed administrative support." and that "in order to further its investment strategies, [Trinity] is in need of such services and desires to engage Financial Freedom Group, Inc., to perform such services." Trinity agreed to pay Financial Freedom Group $110,000 annually in addition to annual expenses not to exceed $125,000.

Trinity was also used to purchase units in Day and Night Solar, LLC after Dr. Harris relinquished his interest in the company and stated that he did not intend to gain any financial interest in it.

Dr. Harris directed Gloria Peterson to "pay the consultant fee" to Financial Freedom Group, Inc.

Meanwhile, Freedom Funds also entered into a Management and Administrative Services Agreement with AMEC Financial Services LLC. This Agreement, dated January 11, 2008, stated that "AMEC Financial Services, LLC is experienced and skilled in the performance of general management, business advisory, program performance, administrative, fiscal, legal and accounting services" and that "in order to further its investment strategies, [Financial Freedom Funds, LLC] is in need of such services and desires to engage AMEC Financial Services, LLC to perform such services." Freedom Funds agreed to pay AMEC Financial Services 65 basis points for its Management and Administrative Services plus direct and indirect expenses.

At times, Dr. Harris obtained cashier's checks from Plan assets to be paid to various entities. Defendants dispute that the entities that received the checks were "fraudulent and/or illusory entities." Regions Bank account statements from December 2016 through 2022 reflect

repeated receipt of Symetra fee payments from the Plan assets into Financial Freedom Group, Inc.'s account.

On April 17, 2009, AMEC Financial Services, LLC borrowed $657,500 from Freedom Funds. On the same day, AMEC Financial Services loaned $657,000 to Day and Night Solar, LLC.

On February 15, 2016, AMEC Financial Services loaned Robert Eaton d/b/a Day and Night Solar $225,000. The loan was renewed for $325,000 on May 15, 2016.

On July 26, 2016, AMEC Financial Services loaned Robert Eaton d/b/a Financial Freedom Group $100,000. On October 17, 2016, the loan was renewed for $150,000. On January 23, 2017, the loan was again renewed and added $150,000 for a total loan of $300,000. Other than a $200,000 payment made in October 2021, there is no evidence that the loans have been repaid by Financial Freedom Group or Day and Night Solar.

Dr. Harris told Gloria Peterson he was closing Trinity Financial Consultants in 2021, because "it was not making any money" and because of COVID.

Mrs. Harris jointly filed tax returns annually with Dr. Harris. She signed the joint tax returns annually.

In 2018, Mrs. Harris's jointly filed a tax return identifying Dr. Harris's having Trinity Financial Consultants, LLC as an "Employer." Income was listed at $65,500 on Form 1040 and was attributed to Trinity Financial Consultants LLC. In 2018, Mrs. Harris under penalty of perjury declared that she "examined this return and accompanying schedules and statements...."

Mrs. Harris and the late Dr. Harris jointly held a personal investment account at Regions Bank, Account No. 8025142237. Following Dr. Harris's death, Mrs. Harris acquired all funds in Regions Bank, Account No. 8025142237. As of January 17, 2025, the balance in the Regions Bank, Account No. 8025142237, was $289,000. Mrs. Harris testified that she "used the money

[from Regions Bank, Account No. 8025142237] to pay bills, including, lawyer fees, taxes and property taxes."

On July 12, 2017, the opening balance in the jointly held personal investment Regions Bank, Account No. 8025142237, was $706,331.25. On August 2, 2017, Check No. 1059 was written for $250,000 from Account No. 8025142237 to Sun Trust Bank. On April 18, 2018, a check was written from Account No. 8025142237 for $50,000 payable to Robert G. Eaton for a "short term loan" to Day and Night Solar.

On July 14, 2020, the opening balance in the jointly held personal investment Regions Bank, Account No. 8025142237, was $481,477.85. On July 16, 2020, and again on August 6, 2020, there were two deposits into Account No. 8025142237 - $380,000 and $241,432.72, totaling $641,432.72.

On July 23, 2020, a check was written from joint Account No. 8025142237 for $500,000 payable to "Brighthouse Investments" as a "personal investment." Mrs. Harris testified that she still has Brighthouse Investments held at Strategic Financial Services with an approximate balance of one million dollars. On July 19, 2021, Dr. Harris wrote a $73,284.08 check to "Roadshow BMW" to purchase a car.

A second Regions Bank Account, No. 0203761096, was titled to both Jerome V. Harris and Sandra E. Harris. On February 3, 2020, there was a wire transfer into Account No. 0203761096 from Keidan Path IV; then on February 5, 2020, Dr. Harris wrote a check, bearing his signature, for cash in the amount of $380,000. Mrs. Harris testified that she was aware that Dr. Harris invested "300 some odd thousand dollar[s]" and that part of the money was sent to Strategic Financial Planners. Mrs. Harris also testified that the $300,000 invested with Strategic Financial Partners came from Acorn.

In 2000, the Doctrine and Discipline allowed for 1% of contributions to be retained by the Department of Retirement Services to be used for administration of the Plan. In 2004, the Doctrine and Discipline was amended to increase the Department's administrative fee to 2% of contributions.

Instead of assessing a 2% fee on contributions, Symetra paid Dr. Harris a quarterly fee of 0.25% on the entire Symetra account balance for AMEC. Symetra paid this 1% fee as part of an agreement between Dr. Harris, Symetra, and Newport in 2005. On May 18, 2015, Dr. Harris requested that Symetra increase the quarterly administrative fee from 0.25% to 0.55% "until further notice." This effectively was a request for Dr. Harris to receive a 2.2% annual fee on all AMEC assets at Symetra.

Symetra's next payment of administrative fees to Dr. Harris occurred on June 24, 2015. That quarterly payment was for $233,332.50 - an amount more than twice as much as Symetra's last quarterly payment.

These "administrative fees" were not wired by Symetra to the Department's bank account. Instead, Symetra would send Dr. Harris a check made out to "Dr. Jerome V. Harris, Trustee." Typically, Dr. Harris would cash the check and deposit a round, even amount of the check into a Department bank account to cover the Department's expenses. In an audit report, Gregory Terrell opined that Dr. Harris "apparently" pocketed the difference between the even amount he deposited and the remaining balance of the check.

In September 2018, Dr. Harris received a check for administrative fees from Symetra, signed by its CEO Margaret Meister. The check was made out to "Harris, Dr. Jerome V, Trustee AMEC Department of Retirement Services" and was in the amount of $221,056.78. Dr. Harris cashed that check on or about October 4 and deposited the funds as follows:

a. $75,000.00 into the Department's general bank account;
b. $75,000.00 into a bank account for Trinity Financial;
c. $10,000.00 was used to pay a credit card bill for AMEC Financial Services;
d. $50,000.78 was deposited into the Department's operating account that was used for its payroll;
e. $7,056.00 was used to pay Dr. Harris's personal credit card; and
f. Dr. Harris kept $4,000 in cash.

According to this same audit report, Dr. Harris transferred $690,000 to Trinity Financial Consultants, $75,000 to Gloria Peterson, $332,148.90 to AMEC Financial credit card, $290,909.23 to Dr. Harris's personal credit card, and $50,000 to Freedom Funds. In total, Dr. Harris transferred $1,464,766.08 to himself and his entities from Symetra payments.

Mrs. Harris admits that Dr. Harris understood and accepted that he had fiduciary duties to the Plan while the Estate of Dr. Harris admits only that Dr. Harris acknowledged "fiduciary responsibilities" in an email.

**Analysis**

A federal court sitting in diversity applies the law of the forum state, including the forum's choice-of-law rules. *Atl. Marine Constr. Co. Inc. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 64 (2013); *Standard Fire Ins. Co. v. Ford Motor Co.*, 723 F.3d 690, 692 (6th Cir. 2013). The parties have briefed the substantive law of the state of Tennessee in their motion papers. The Court will assume for purposes of deciding the questions of law presented in Plaintiffs' motion for summary judgment that Tennessee law governs the disputes presented in her motion.

**Statute of Limitations**

In her response to Plaintiffs' motion (ECF No. 1010), Mrs. Harris raises the issue of the timeliness of Plaintiffs' claims against her.[3] The Estate of Dr. Harris has not raised this affirmative

[3] Although Plaintiffs seek summary judgment only on their conversion claim against Dr. Harris and Mrs. Harris, Mrs. Harris's response addresses all three claims brought against her: conversion,

defense. As previously determined by this Court (Ord. Denying Mot. Summ. J. S. Harris, ECF No. 1219), when a party seeks judgment as a matter of law on a statute of limitations, the Court must decide two questions: "(1) whether the statute of limitations has run and (2) whether there exists a genuine issue of material fact as to when the plaintiff's cause of action accrued." *Henry v. Norfolk S. Ry. Co.*, 605 F. App'x 508, 510 (6th Cir. 2015) (quoting *Campbell v. Grand Trunk W. R.R. Co.,* 238 F.3d 772, 775 (6th Cir. 2001)).

As the party invoking the statute of limitations as an affirmative defense, Mrs. Harris has the burden to prove that the statute of limitations has run on Plaintiffs' claims and that no genuine issue of material fact exists as to when the claims accrued. If Mrs. Harris can discharge her burden to show that the claims are now time-barred, the burden shifts to Plaintiffs to prove an exception to the statute of limitations. *Redwing,* 363 S.W.3d at 463–64, 467; *Lutz v. Chesapeake Appalachia, L.L.C.,* 717 F.3d 459, 464 (6th Cir. 2013).

Mrs. Harris asserts that a claim for civil conspiracy must be filed within one year after the cause of action begins to accrue under Tenn. Code Ann. § 28-3-104(a)(1)(A). This section provides that "the following actions shall be commenced within one (1) year after the cause of action accrued: (A) Actions for libel, injuries to the person, false imprisonment, malicious prosecution, or breach of marriage promise." According to Mrs. Harris, Plaintiffs were aware of her alleged conduct as early as January 2022, based on the fact that many, if not all, of the same allegations levied against Dr. Harris in the initial complaint were alleged against her in Plaintiff's Second Amended Complaint, filed on August 29, 2024.[4] (ECF No. 493.) Mrs. Harris reasons that the

civil conspiracy, and aiding and abetting fiduciary duty. Out of an abundance of caution, the Court has also addressed all three claims as to the statute of limitations.

[4] The first amended complaint was filed on August 19, 2022, and named Dr. Harris (but not Mrs. Harris) as a defendant. (ECF No. 74.)

statute of limitations expired at the latest in March 2023, which would render the August 29, 2024 Second Amended complaint untimely.[5] Mrs. Harris's argument fails for several reasons.

The Court reiterates that the causes of action brought against Mrs. Harris do not come within the parameters of § 28-3-104(a)(1)(A). Instead, as noted by Plaintiffs, their civil conspiracy claim has a three-year statute of limitations rather than one year, as argued by Mrs. Harris.

> In determining the statute of limitations, a court is to look at the gravamen of each claim. *McFarland v. Pemberton*, 530 S.W.3d 76, 109 (Tenn. 2017). "To determine the gravamen of a claim ... 'a court must first consider the legal basis of the claim and then consider the type of injuries for which damages are sought.'" *Id.* (quoting *Benz-Elliot v. Barrett Enters., L.P.*, 456 S.W.3d 140, 151 (Tenn. 2015)).
> …
> A civil conspiracy "is neither a punishable offense standing alone nor a wrong capable of supporting a cause of action by its own weight." *Swafford v. Memphis Individual Practice Ass'n*, No. 02A01-9612-CV-00311, 1998 WL 281935 at * 11 (Tenn. Ct. App. June 2, 1998) (citing *Wyatt v. Union Mortgage Co.*, 24 Cal.3d 773, 157 Cal. Rptr. 392, 598 P.2d 45, 53 (Cal. 1979)). Therefore, the statute of limitations for conspiracy claims depends on the gravamen of the claim. *Id.*; *McFarland*, 530 S.W.3d at 109 (Tenn. 2017).

*Findley v. Hubbard*, 2018 WL 3217717, at *8 (Tenn. Ct. App. July 2, 2018). That is, the limitations period for civil conspiracy is that of the underlying tort. *See Swafford v. Memphis Individual Practice Ass'n*, 1998 WL 281935, at * 11 (Tenn. Ct. App. June 2, 1998).

Here, Plaintiffs have alleged claims of conversion, breach of fiduciary duty, and fraudulent concealment, all of which have a three-year statute of limitations. *See Pomeroy v. McGinnis*, 2021 WL 3017199, at *2 (Tenn. Ct. App. July 16, 2021) (discussing the dismissal of fraud and conversion claims pursuant to the three-year statute of limitations provided in Tenn. Code Ann. § 28-3-105); *PNC Multifamily Cap. Inst. Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 556 (Tenn. Ct. App. 2012) ("Conversion is subject to the three-year statute of

[5] *See, e.g.*, *Ewing v. Newport Group, Inc.*, 2:22-cv-02136-STA-jay, filed on March 4, 2022, naming Dr. Harris (but not Mrs. Harris) as a defendant.

limitations set out at Tennessee Code Annotated Section 28-3-105....”); *Smith v. Hilliard*, 578 F. App’x 556, 563 (6th Cir. 2014) (“The parties agree that the plaintiff’s claims (negligence, recklessness, and breach of fiduciary duty) sound in tort, for which the statute of limitations is three years. See Tenn. Code Ann. § 28–3–105.”). Similarly, the limitations period for an aiding and abetting claim is the same as the period for the underlying tort being aided or abetted. *College v. Nat’l Ass’n of Christian Athletes*, 2023 WL 128275, at *5 (Tenn. Ct. App. Jan. 9, 2023).

Mrs. Harris was not named as a defendant until the Second Amended Complaint was filed on August 29, 2024. Thus, only causes of action accruing after August 29, 2021, are timely.

“A cause of action accrues when the plaintiff discovers it, that is, when the plaintiff knows or in the exercise of reasonable care and diligence should know that an injury has been sustained as a result of wrongful or tortious conduct by the defendant.” *Hilliard*, 578 F. App’x at 563 (quoting *PNC Multifamily*, 387 S.W.3d at 544 (other citations omitted)). In the context of a breach of duty, a plaintiff has no judicial remedy until the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, “(1) the occasion, the manner and means by which a breach of duty occurred that produced his injury; and (2) the identity of the defendant who breached the duty.” *Foster v. Harris,* 633 S.W.2d 304, 305 (Tenn. 1982); *Hill v. A.O. Smith Corp.*, 801 F.2d 217, 225 (6th Cir. 1986) (holding that under Tenn. law, civil conspiracy claim accrued on the date the plaintiff “discover[ed] the source of the problem that formed the crux of their civil conspiracy claim”).

And yet the statute of limitations “can begin to run before a plaintiff has actual knowledge of her legal claim, if she has learned of facts sufficient to put a reasonable person on notice that she has suffered an injury as a result of wrongful conduct.” *Hilliard*, 578 F. App’x at 564 (quoting *Redwing*, 363 S.W.3d at 459) (cleaned up). The Tennessee Supreme Court has referred to this as

"constructive notice" or "inquiry notice." *Redwing*, 363 S.W.3d at 459. "[I]nquiry notice charges a plaintiff with knowledge of those facts that a reasonable investigation would have disclosed," meaning "once a plaintiff gains information sufficient to alert a reasonable person of the need to investigate the injury, the limitation period begins to run." *Id.* (citations omitted). "In the mine run of such cases, what a plaintiff knew and when she came to know it is a fact question 'inappropriate for summary judgment,'" meaning the accrual date of a plaintiff's cause of action presents a jury question. *Hilliard*, 578 F. App'x at 564 (citing *City State Bank v. Dean Witter Reynolds, Inc.*, 948 S.W.2d 729, 735 (Tenn. Ct. App. 1996)); *Hill*, 801 F.2d at 225 (same).

Plaintiffs have pointed to evidence in the record that their claims against Mrs. Harris are timely because the statute of limitations was tolled under the discovery rule until at least February 28, 2023, when Dr. Harris produced his joint tax returns with Mrs. Harris showing that he was employed by Trinity Financial Consultants. Thus, there is a question of fact as to whether Plaintiffs could have discovered that Mrs. Harris knew about the alleged schemes to divert assets from the Plan until at least the time that Dr. Harris's tax returns were produced.

Additionally, there is evidence that Dr. Harris reported to church leaders just before his retirement that the value of the Plan's assets was over $120 million when the Plan was really only worth $38 million. The losses to the Plan were not discovered until September 2021, and Mrs. Harris has not cited any evidence to show that the nearly $90 million shortfall in Plan value could have been discovered prior to that time.

Moreover, a jury could find that Mrs. Harris's involvement was not fully known because the Church's interrogatory responses submitted on April 28, 2023, did not include Mrs. Harris as a Department employee. A jury could also find that it was not until after Christopher Harris's deposition on January 29, 2024, that Plaintiffs began to understand Mrs. Harris's role in the

Department, which led to additional investigation and eventually the Second Amended Complaint naming her as a defendant, thus finding that Plaintiffs' claims against Mrs. Harris did not accrue until that date.

Plaintiffs also argue that their claims against Mrs. Harris are subject to fraudulent concealment which is a tolling exception that operates to toll the running of a statute of limitations "when the defendant has taken steps to prevent the plaintiff from discovering he [or she] was injured." *Redwing*, 363 S.W.3d at 462 (quoting *Fahrner v. SW Mfg., Inc.*, 48 S.W.3d 141, 146 (Tenn. 2001)) (internal quotation marks omitted).

To establish that the fraudulent concealment exception applies, a plaintiff must prove that: (1) the defendant affirmatively concealed the plaintiff's injury or failed to disclose material facts regarding the injury despite a duty to do so; (2) the plaintiff could not have discovered the injury despite reasonable care and diligence; (3) the defendant knew the plaintiff had been injured; and (4) the defendant concealed material information from the plaintiff by withholding information or making use of some device to mislead the plaintiff in order to exclude suspicion or prevent inquiry. *Id.* at 462–63 (quotation marks and citations omitted). When it applies, the fraudulent concealment exception tolls the running of the statute of limitations "until the plaintiff discovers or, in the exercise of reasonable diligence, should have discovered the defendant's fraudulent concealment or sufficient facts to put the plaintiff on actual or inquiry notice of his or her claim." *Id.* at 463 (citation omitted).

The Court finds that a factual dispute exists over whether Mrs. Harris fraudulently concealed Dr. Harris's and her own activities. Plaintiffs point to evidence from which a jury could find that Mrs. Harris failed to disclose the transfers from their joint bank account to Day and Night Solar, her role in Trinity, and her husband's transfers out of the Plan despite being an employee of

the Department during at least some of the relevant time period and having a duty to speak as a fiduciary. Accordingly, the Court finds that there is a factual dispute as to whether the claims against Mrs. Harris are barred by the statute of limitations.

**Conversion Claim Against Mrs. Harris**

The Court also previously discussed Plaintiffs' conversion claim against Mrs. Harris in ruling on her own motion for summary judgment. In that order, the Court explained that conversion is "the appropriation of tangible property to a party's own use in exclusion or defiance of the owner's rights." *PNC Multifamily*, 387 S.W.3d at 553. To establish a prima facie case of conversion, Plaintiffs must prove (1) the appropriation of another's property to one's own use and benefit; (2) by the intentional exercise of dominion over it; (3) in defiance of the true owner's rights. *See Williams v. E. I. du Pont de Nemours & Co.*, 2015 WL 6458285, at *2 (W.D. Tenn. Oct. 26, 2015).

> Plaintiffs allege that Mrs. Harris, *inter alia*, converted monies from the Plan.
>
> "[T]he general rule is that money is an intangible and therefore not subject to a claim of conversion." *PNC Multifamily Cap. Inst. Fund XXVI Ltd. P'ship*, 387 S.W.3d 525 at 553 (quoting 90 *C.J.S. Trover and Conversion* § 16 (2012)); *see also Knox Trailers, Inc. v. Maples*, 581 F. Supp. 3d 1000, 1017 (E.D. Tenn. 2022) (noting that Tennessee law does not permit conversion actions for intangible property and that money is generally considered to be intangible). But a plaintiff may establish a claim of conversion where money is specific and capable of identification, or where there is a determinate sum that the defendant was entrusted to apply to a certain purpose. *PNC Multifamily Cap. Inst. Fund XXVI Ltd. P'ship*, 387 S.W.3d 525 at 553. A plaintiff may establish a claim of conversion by showing "ownership or the right to possess specific, identifiable money," such as "tax receipts or insurance premiums, where there is an obligation to keep the money intact or deliver it." *Brown v. J. Rockett Audio Designs, LLC*, No. 1:17-CV-00093, 2018 WL 3656481, at *2 (M.D. Tenn. Aug. 2, 2018) (quoting *PNC Multifamily Cap. Inst. Fund XXVI Ltd. P'ship*, 387 S.W.3d at 553); *see also Knox Trailers, Inc.*, 581 F. Supp. at 1018 (denying motion to dismiss claim of conversion where plaintiffs alleged that defendants obtained unauthorized health insurance benefits for their own use). This exception is limited, however: there is no conversion unless the defendant wrongfully received or was obliged to deliver the money. *Id.* at *2.

*McCoy v. E. Tennessee Luxury Coach*, LLC, 2024 WL 4916367, at *10 (E.D. Tenn. Nov. 6, 2024). Although conversion is an intentional tort, a "wrongful intent on the part of the defendant is not an element of conversion and, therefore, need not be proved." *White v. Empire Express, Inc.*, 395 S.W.3d 696, 720 (Tenn. Ct. App. 2012) (internal citations omitted).

The Court previously found, and now reaffirms that finding, that summary judgment is not appropriate because there is evidence from which a jury could find that Mrs. Harris knowingly participated in the diversion of Plan funds through Trinity Financial Consultants and accounts she co-owned with Dr. Harris – although there is also contrary evidence. The record contains evidence that the alleged converted funds belonged to the Plan and that Mrs. Harris had knowledge of this. For example, she served as a signatory on Trinity Financial Consultants accounts through which Plan funds were funneled; she jointly received and controlled deposits of Plan money into her Regions Bank accounts with Dr. Harris; and she certified under penalty of perjury annual tax returns disclosing income from Trinity Financial Consultants and Financial Freedom Group.

Mrs. Harris herself testified that "I knew my husband was supposed to have been, you know, had Trinity Financial." Trinity was one of the vehicles by which Dr. Harris and Mrs. Harris, as authorized signatories on the Trinity bank account, allegedly funneled assets out of the Plan for their own benefit. There is evidence that Trinity entered into a Management and Services Agreement with Financial Freedom Funds, LLC, an entity that held Plan assets, whereby Trinity received $300,000 a year.

The money that Dr. Harris allegedly diverted from Plan assets to Trinity was held in a joint bank account with Mrs. Harris that she now controls. A jury could find that assets were taken from Plan participants and diverted to Trinity, where Mrs. Harris was as an officer. Similarly, there are disputed issues of fact as to whether Mrs. Harris acquired Plan assets when she inherited all of

the funds in the Regions Bank, Account No. 8025142237, that she jointly held with Dr. Harris. Moreover, she withdrew her Plan account balance and signed off on Dr. Harris's withdrawal of his Plan account just before Dr. Harris's retirement as the Executive Director of the Department. If these facts are established at trial, the jury could find that Mrs. Harris knowingly exercised dominion over alleged converted funds that belonged to the Plan and benefited from those funds through personal withdrawals and early Plan distributions. *See*, *e.g.*, *White*, 395 S.W.3d at 720 (Tenn. Ct. App. 2012) ("A conversion claim focuses on the interference with a property owner's right." (citation omitted)).

There is also evidence that Mrs. Harris knew that she was exercising "dominion or control over the property in such a way that would be inconsistent with the owner's rights and which results in injury to him." *See Permobil, Inc. v. Am. Exp. Travel Related Servs. Co., Inc.*, 571 F. Supp. 2d 825, 840 (M.D. Tenn. 2008). In her deposition, Mrs. Harris admitted that she authorized or permitted transfers of her retirement funds from the Plan while aware of "departmental issues." Mrs. Harris also signed a "Business Account Signature Card" as an "Officer" of Trinity, with an "Authorized Signature" along with Dr. Harris (also listed as an officer) and Gloria Peterson. There is also evidence, if proved at trial, that Mrs. Harris shared joint control over accounts receiving alleged converted Plan funds, such as through Regions Bank Account No. 8025142237, which she held jointly with Dr. Harris, and that she received deposits which are allegedly traceable to Plan assets. Mrs. Harris admitted awareness of these deposits and expenditures, including a $73,284.08 check to "Roadshow BMW" and a $500,000 transfer to Brighthouse Investments, which she retains in an account worth approximately $1 million.

Contrarily, a jury could find that the funds now possessed by Mrs. Harris were not the product of and directly tied to the alleged malfeasance of Dr. Harris. Dr. Harris was also a

participant in the AMEC retirement plan, and a jury could find that Mrs. Harris understood that he had personal investment streams separate from his employment and/or capacity as director of the Plan. Because there are disputed issues of fact as to whether there is a direct relationship between the funds allegedly misappropriated by Dr. Harris and those funds now possessed by Mrs. Harris, summary judgment on Plaintiffs' conversion claim against Mrs. Harris is not appropriate.

**Conversion Claim Against Dr. Harris**

As discussed above, to establish a prima facie case of conversion, Plaintiffs must prove (1) the appropriation of another's property to one's own use and benefit; (2) by the intentional exercise of dominion over it; (3) in defiance of the true owner's rights. A defendant need only have an intent to exercise dominion and control over the property that is inconsistent with a plaintiff's right and do so - good faith is generally immaterial. *See Mammoth Cave Prod. Credit Ass'n v. Oldham*, 569 S.W.2d 833, 836 (Tenn. Ct. App. 1977).

In this case, the Court finds that the undisputed facts show that Dr. Harris appropriated the property of Plaintiffs by intentionally exercising dominion over it in defiance of Plaintiffs' rights. That is, the evidence shows that, while he was the Executive Director of the AMEC Department of Retirement Services, Dr. Harris engaged in a series of transactions that "funneled millions into his and his associates' pockets and depleted the Plan to the detriment of Plan participants." (Pls' Memo. p. 11, ECF No. 978-1.)

Examples of these transactions are as follows.[6] In addition to his salary paid by the Church, Dr. Harris wrote himself checks from the Department's Operating Account. More than once, he issued checks in the amount of $1,000 payable to himself with different iterations of his name. He would then deposit those into his personal account.

[6] These examples are non-exhaustive.

Additionally, Dr. Harris formed Trinity Financial Consultants in 2008, naming himself as managing member. Dr. Harris, along with his son, Christopher Harris, and the Department's executive administrative assistant, Gloria Peterson, were on the payroll for Trinity from 2009 until October of 2021. They were each paid salaries from Trinity in addition to their salaries from the Department. Christopher Harris understood that Trinity was set up by Dr. Harris to "pay additional salary – because [Dr. Harris] knew the amount we were getting paid at the AME Church was not enough . . . so that Trinity Financial stipend . . . he had money that could pay that off." Trinity entered into a Management and Services Agreement with Financial Freedom Funds, an entity that held Plan assets, whereby Trinity received $300,000 a year while Trinity paid Freedom Group $110,000 annually plus expenses. This undisputed evidence shows that Dr. Harris intentionally exercised dominion over Plan assets through Trinity in defiance of the true Plan beneficiaries' rights.

Dr. Harris created Freedom Funds in 2006 and listed himself as Manager, under the name "Dr. Jerome V. Harris, AMEC Financial Services." In March 2011, Dr. Harris directed a $75,000 distribution from Freedom Funds's Deutsche Bank Account into Trinity. While receiving Plan investments, Freedom Funds was simultaneously paying Trinity and AMEC Financial Services for identical services, while Trinity in turn paid Financial Freedom Group.

Financial Freedom Group was formed by Dr. Harris and Robert Eaton in 2007. Dr. Harris and Eaton each owned a 50% share and were listed as signatories for agreements involving Financial Freedom Group. Regions Bank account statements from December 2016 through 2022 reflect receipt of Symetra administrative fee payments from the Plan being transferred into Financial Freedom Group's account.

On April 17, 2009, AMEC Financial Services, LLC borrowed $657,500 from Freedom Funds. On the same day, AMEC Financial Services loaned $657,000 to Day and Night Solar, LLC. On February 15, 2016, AMEC Financial Services loaned Robert Eaton d/b/a Day and Night Solar $225,000. The loan was renewed for $325,000 on May 15, 2016. On July 26, 2016, AMEC Financial Services loaned Robert Eaton d/b/a Financial Freedom Group $100,000. On October 17, 2016, the loan was renewed for $150,000. On January 23, 2017, the loan was again renewed and added $150,000 for a total loan of $300,000. Other than a $200,000 payment made in October 2021, there is no evidence in the record that the loans have been repaid by Freedom Group or Day and Night Solar.

The undisputed evidence also shows that Dr. Harris converted Plan funds when Symetra issued physical checks for "administrative fees" directly to "Dr. Jerome V. Harris, Trustee," rather than directly into the Department's bank account. Regions Bank account statements confirm that converted Plan assets were repeatedly deposited into Financial Freedom Group's accounts from Symetra fee payments. These transactions enriched Dr. Harris while depleting the Plan.

The evidence also shows that Symetra paid Dr. Harris administrative fees that were excessive and that Dr. Harris converted them from Plan assets into funds used for his own purposes. While the Doctrine and Discipline allowed for a 1% and later a 2% fee on contributions for Department operations, beginning in 2005, Symetra paid Dr. Harris directly a quarterly fee of 0.25% on the entire Plan balance, which was increased to 0.55% in 2015. On May 18, 2015, Dr. Harris requested that Symetra increase the quarterly administrative fee from 0.25% to 0.55% "until further notice." This resulted in Dr. Harris's receiving a 2.2% annual fee on all AMEC assets at Symetra.

These administrative fees were not wired by Symetra to the Department's bank account. Instead, Symetra would send Dr. Harris a check, made out to "Dr. Jerome V. Harris, Trustee." Typically, according to an auditor, Dr. Harris would cash the check and deposit a round, even amount of the check into a Department bank account to cover the Department's expenses and then pocket the difference between the even amount he deposited and the remaining balance of the check.

In September 2018, Dr. Harris received $221,056.78 in Symetra fees, deposited $75,000 into the Department's account, $75,000 into Trinity's account, $10,000 to AMEC Financial Services' credit card, $7,056 to his personal credit card, and pocketed $4,000 in cash. Additionally, Dr. Harris transferred $690,000 into Trinity, $75,000 to Gloria Peterson, $332,148.90 to AMEC Financial credit card, $290,909.23 to Dr. Harris's personal credit card, and $50,000 to Freedom Funds. In total, Dr. Harris was able to transfer $1,464,766.08 from the Symetra quarterly fees into his own accounts and into the accounts of entities he controlled and for payment of his personal expenses.

The undisputed facts in the record show that Plaintiffs are entitled to summary judgment on their claim for conversion against Dr. Harris.

**Fiduciary Status of Dr. Harris**

Plaintiffs seek summary judgment on the issue of Dr. Harris's fiduciary status. They contend that the Court should find as a matter of law that, in his capacity as Executive Director of AMEC's Department of Retirement Services, Dr. Harris was a fiduciary to the Plan. In support of their argument, Plaintiffs rely, in part, on the Tennessee Uniformed Fiduciaries Act, Tenn Code. Ann § 35-2-102(2), which provides that a fiduciary includes "a trustee…executor, administrator, personal representative, guardian, conservator, curator, receiver…agent, officer of a

corporation…or any other person acting in a fiduciary capacity for another person, trust or estate." Additionally, Tennessee Uniform Trust Code § 35-15-103 provides that a "fiduciary" is "a[n]…agent under any agency agreement or other instrument….or any other party, including a trust advisor or a trust protector, who is acting in a fiduciary capacity for any…trust." Plaintiffs also cite Tennessee case law in support of their argument.

> Under Tennessee common law, there are two principal types of fiduciary status. The first category of common law fiduciary status consists of relationships that are fiduciary *per se*, sometimes referred to as legal fiduciary, such as between a guardian and ward, an attorney and client, or conservator and incompetent. *See Kelly v. Allen*, 558 S.W.2d 845, 848 (Tenn. 1977); *Mitchell v. Smith*, 779 S.W.2d 384, 389 (Tenn. Ct. App.1989); *Parham v. Walker*, 568 S.W.2d 622, 625 (Tenn. Ct. App.1978). The second category consists of relationships that are not *per se* fiduciary in nature, but arise in situations where one party exercised "dominion and control over another." *Kelley v. Johns*, 96 S.W.3d 189, 197 (Tenn. Ct. App. 2002); *Matlock v. Simpson*, 902 S.W.2d 384, 385-86 (Tenn. 1995); *Kelly v. Allen*, 558 S.W.2d at 848. This relationship, often called a "confidential relationship," "is not merely a relationship of mutual trust and confidence, but rather it is one 'where confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with ability, because of that confidence, to influence and exercise dominion and control over the weaker or dominated party.'" *Kelley v. Johns*, 96 S.W.3d at 197 (citing *Iacometti v. Frassinelli*, 494 S.W.2d 496, 499 (Tenn. Ct. App.1973)). The person upon whom the trust and confidence is imposed is under a duty to act for and to give advice for the benefit of the other person on matters within the scope of the relationship. *McRedmond v. Estate of Marianelli*, 46 S.W.3d 730, 738 (Tenn. Ct. App.2000); *Restatement (Second) of Torts* § 874 cmt. a (1979).
>
> Relationships that are not fiduciary *per se* "require proof of the elements of dominion and control in order to establish the existence of a confidential relationship." *Kelley v. Johns*, 96 S.W.3d at 197 (citing *Matlock v. Simpson*, 902 S.W.2d at 385-86; *Kelly v. Allen*, 558 S.W.2d at 848. Moreover, a confidential relationship cannot be unilateral, rather both parties must understand that a special trust or confidence has been reposed.

*Foster Bus. Park, LLC v. Winfree*, 2009 WL 113242, at *12 (Tenn. Ct. App. Jan. 15, 2009) (some citations and footnote omitted).

In this case, Dr. Harris served as AMEC's Executive Director for the Department of Retirement Services. In his role as Executive Director, it is undisputed that Dr. Harris was

responsible for oversight of the Plan and its operations and was delegated the specific duty of administering the annuities. Thus, as Executive Director with the duty to administer the Plan and annuities, he became a fiduciary under the Tennessee Uniform Fiduciaries Act. Further, in performing his administration duties he was acting in a fiduciary capacity with respect to the Plan and a fiduciary as contemplated by the Tennessee Uniform Trust Code. In addition, as a General Officer of the Church Dr. Harris was also a corporate fiduciary. It is also undisputed that both Dr. Harris and the Plan participants understood that "a special trust or confidence [had] been reposed." The Estate of Dr. Harris has admitted that Dr. Harris acknowledged "fiduciary responsibilities" in an email.

Specifically, at all pertinent times, AMEC's Doctrine and Discipline provided that the Executive Director of the Department had responsibilities to oversee, direct, and manage the Plan and the annuities it was to invest in. The Executive Director was also responsible for the operation of the retirement fund for the salaried servants of the AME Church. The Executive Director was required to report to each Quadrennial Session of the General Conference, prepare proposed budgets for approval by the General Conference, report receipts and disbursements to the General Board, maintain records of all monies and funds paid out of the Department, communicate with insurers and investment entities regarding financial activities and returns on investments, and communicate with participants in the Plan. As Executive Director, Dr. Harris was tasked with these requirements.

Accordingly, the record shows that at all pertinent times Dr. Harris was acting in a fiduciary capacity consistent with the fiduciary intent of the Tennessee Uniform Trust Code and Uniform Fiduciary Code including managing and operating the Department of Retirement Services including reporting of the activities of the Plan to the General Board. As such, the Court finds that

Dr. Harris was a fiduciary to the Plan with respect to all transactions that the Plan entered into between 2000-2021. Summary judgment is granted to Plaintiffs on this issue.

**Summary/Conclusion**

Plaintiff's partial motion for summary judgment is **DENIED** at to the conversion claim against Mrs. Harris and **GRANTED** as to the conversion claim and determination of fiduciary status against Dr. Harris.

IT IS SO ORDERED.

**s/ S. Thomas Anderson**
S.THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: November 13, 2026.